No. 23-1825

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 3:23-cv-00209-SPM |
| KWAME RAOUL, Attorney General of the State of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, | ) ) ) ) ) ) | The Honorable STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) | Judge Presiding. |

**STATE DEFENDANTS' EMERGENCY MOTION TO STAY THE DISTRICT COURT'S PRELIMINARY INJUNCTION ORDER PENDING APPEAL**

The district court entered a preliminary injunction enjoining defendants in four consolidated cases from statewide enforcement of the Protect Illinois Communities Act, a law that restricts the sale, manufacture, and possession of assault weapons and large capacity magazines ("LCMs"). This unprecedented order conflicts with two district court decisions denying preliminary injunctive relief based on similar Second Amendment challenges to the Act, *Bevis v. Naperville*, No. 22- cv-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (appeal docketed at No. 23-1353); *Herrera v. Raoul*, No. 23-cv-532, 2023 WL 3074799 (N.D. Ill. April 26, 2023)

(appeal docketed at No. 23-1793); is the only federal decision in the country state defendants are aware of that enjoins restrictions on assault weapons or LCMs under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), *see Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Delaware*, No. 22-951-RGA, 2023 WL 2655150 (Mar. 27, 2023); *Ocean State Tactical LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022); *Or. Firearms Federation, Inc. v. Kotek*, 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022); and was entered subsequent to, but does not acknowledge, this court's order denying an injunction pending appeal in *Bevis*.

The district court's decision, moreover, is legally erroneous in several respects, beginning with the court's departure from the two-step, text-and-tradition *Bruen* framework in favor of a different inquiry:  whether defendants established the regulated items are commonly owned.  Doc. 101 at 25.[1]  In doing so, the court failed to decide whether assault weapons are "bearable arms" commonly used for self-defense (thus bringing them within the Second Amendment's plain text), erroneously decided that LCMs are such "arms," and failed to meaningfully consider the historical record.  *Id.* at 18-21.  The court also erroneously held that plaintiffs established irreparable harm and an inadequate legal remedy through allegations about a purported Second Amendment violation—effectively collapsing these

---

[1] All citations to the district court's docket refer to the lead case, *Barnett v. Raoul*, No. 23-cv-209.

elements into the merits—and economic loss—which is inherently monetary and compensable in damages. *Id.* at 9-10. Furthermore, the court did not acknowledge this court's decisions upholding materially similar restrictions on assault weapons and LCMs in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019).

Because defendants are likely to prevail on the merits and because this outlier decision could cause serious and irreparable harm to the safety of Illinois residents during the pendency of this appeal, State Defendants-Appellants Kwame Raoul, Attorney General of the State of Illinois, and Brendan F. Kelly, Director of the Illinois State Police, request that this court stay the preliminary injunction order under Federal Rule of Appellate Procedure 8(a)(2). State defendants filed notices of interlocutory appeal and a motion for stay pending appeal on April 28, 2023, the same day the court entered the preliminary injunction. Docs. 102-03. On May 2, the court set a deadline of May 8 for responses to the stay motion. Doc. 107. Because the district court has not indicated when it intends to rule on the motion, and has constructively denied that motion in the interim, state defendants are renewing the motion in this court. *See* Fed. R. App. P. 8(a)(2) (providing for relief from this court where district court "failed to afford the relief requested"). In addition, because the preliminary injunction upends the status quo set by this court when it denied an injunction pending appeal in *Bevis* and threatens significant, irreparable harm to the public, state defendants request emergency relief from this court.

## BACKGROUND

On July 4, 2022, a shooter armed with an assault weapon loaded with 30-round magazines opened fire on a parade in Highland Park, Illinois.  Doc. 37-2 ¶¶ 18, 20.  The weapon allowed the shooter to fire 83 rounds in less than a minute, killing seven and wounding 48.  *Id.* ¶ 19.  A Highland Park ordinance prohibited the sale of assault weapons, but the shooter had legally purchased the weapon elsewhere in Illinois.  *Id.* ¶ 22.

In response, on January 10, 2023, the State passed the Act, which generally restricts the sale, purchase, manufacture, delivery, or importation of assault weapons (defined as semiautomatic weapons with certain unique characteristics, as well as specific types of weapons) and LCMs (defined as magazines or similar devices that can accept more than 10 rounds of ammunition for long guns or 15 rounds for handguns) subject to exceptions for law enforcement, members of the military, and other professionals with similar firearms training and experience.  720 ILCS 5/24-1.9, 1.10.  Individuals who lawfully possessed assault weapons and LCMs prior to the Act can continue to do so.  *Id.* 5/1.9(c)-(d), 1.10(c)-(d).[2]

Relevant here, four sets of plaintiffs brought suit challenging the Act.  *Harrel v. Raoul*, No. 23-cv-141; *Langley v. Kelly*, No. 23-cv-192; *Barnett v. Raoul*, No. 23-cv-209; *Fed. Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-215.  Each case included a claim against state defendants alleging that the Act violated the Second

---

[2]  To continue lawfully possessing an assault weapon, an individual must submit to the State Police an endorsement affidavit by January 1, 2024.  720 ILCS 5/24-1.9(d).  This requirement does not extend to LCMs.  *Id.* 5/24-1.10(d).

Amendment and sought preliminary injunctive relief. *E.g.*, Doc. 101 at 11. The district court consolidated the cases, Doc. 32, and state defendants responded to the preliminary injunction motions, Doc. 37.

State defendants explained that plaintiffs were not likely to succeed on the merits under *Bruen* because plaintiffs failed to carry their burden at the first step to show that the regulated items are covered by the plain text of the Second Amendment and because, at the second step, the evidence confirms that the Act is consistent with the historical tradition of regulating dangerous and unusual weapons. *Id.* at 11. Moreover, preliminary injunctive relief was inappropriate because plaintiffs set forth no evidence of irreparable harm and the balance of equities and public interest weighs heavily in the State's favor. *Id.* at 63-69.

State defendants also submitted 10 expert declarations, which demonstrated that assault weapons are uniquely lethal, Docs. 37-6, 37-7, 37-10, 37-14, were developed and marketed as military-style offensive weapons rather than for self-defense, Doc. 37-7, and are inferior to handguns and shotguns, and not commonly used, for lawful self-defense, Docs. 37-4, 37-6. Indeed, they are increasingly used in crimes of violence, including mass shootings. Docs. 37-4, 37-6, 37-11.

And state defendants presented historical evidence demonstrating that from the colonial era onward, legislatures have regulated weapons thought to be especially dangerous and unusual—from knives, clubs, pistols, and revolvers in the 18th and 19th centuries to automatic and semiautomatic firearms in the early 20th century. Docs. 37-4, 37-12. In particular, there is a longstanding course of practice

in this country whereby a weapon is introduced, proliferates to the point where its use has become a significant threat to public safety, and is then regulated to curb violence and protect the public.  Doc. 37-12.

The district court granted plaintiffs' motions for preliminary injunction and enjoined defendants from enforcing the Act's restrictions on the sale, manufacture, and possession of assault weapons and LCMs "statewide during the pendency of this litigation."  Doc. 101 at 28-29.  At step one of the *Bruen* test, the court assessed whether LCMs and other accessories fall within the plain text of the Second Amendment (and concluded that they did); it did not decide whether assault weapons satisfy that standard.  *Id.* at 17-18; *id.* at 21 ("at this stage, this Court need not address each example in an attempt to piece together the portions of [the Act] that may be constitutional").  At step two, the court concluded that *defendants* had failed to show that the items regulated by the Act were not in common use, *id.* at 22-23, which was "dispositive," *id.* at 25.  The court did not examine the historical record other than to say that the Act is not relevantly similar to "concealed carry regulations."  *Id.* at 25-26.  About the remaining factors, the court determined that plaintiffs demonstrated irreparable harm and an inadequate remedy of law through allegations about the existence of a constitutional violation and economic loss.  *Id.* at 9-10.  Finally, the court held, the balance of equities favors plaintiffs because, on the one hand, some cannot purchase or use their firearm of choice and others cannot sell their inventory, *id.* at 26, and on the other, "there is no evidence as to how [the Act] will help Illinois Communities," *id.* at 28.

## LEGAL STANDARD

"The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). The court considers "the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *Id.* A stay pending appeal is intended "to minimize the costs of error" and can be "necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits." *Id.*

## ARGUMENT

### I. State Defendants Are Likely To Succeed On The Merits.

*Bruen* clarified that the legal framework for Second Amendment claims is a two-step test that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. At the first step, plaintiffs bear the burden to show that the "Second Amendment's plain text covers [the regulated] conduct*." Id.* at 2126; *id.* at 2141 n.11. If plaintiffs satisfy that burden, then the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. But plaintiffs have not shown that they are likely to succeed under either step. The district court's contrary conclusion—which failed to apply the governing two-step standard and ignored substantial evidence marshaled by state defendants—was incorrect.

7

**A.    Plaintiffs have not carried their burden to show that the Act regulates conduct protected by the Second Amendment.**

Plaintiffs failed to carry their step-one burden to demonstrate that the regulated items are "arms" presumptively protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2132. The Amendment confers the right to "ordinary, law-abiding, adult citizens" to possess and carry firearms "for self-defense." *Id.* at 2125, 2134. This right "is not unlimited," *id.* at 2128 (cleaned up), and "extends only to certain types of weapons," *Heller*, 554 U.S. at 623; *id.* at 626 (no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). Namely, the Amendment protects firearms that are "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (cleaned up). Accordingly, firearms that do not fit within that category, such as "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Heller*, 554 U.S. at 627. Plaintiffs did not carry their step-one burden for at least two reasons.

First, LCMs are accessories, not "arms," and thus are not within the Second Amendment's scope. As a historical matter, "arms" referred to weapons and excluded related accessories like ammunition magazines. *Heller*, 554 U.S. at 581 (citing 1773 dictionary defining "arms" as "[w]eapons of offence, or armour of defence"); *Ocean State Tactical LLC*, 2022 WL 17721175, *14 (magazines not arms because "[t]he word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of the weapons such as the trigger, or a cartridge box"); Doc. 37-8 at 5-6 (common phrase "arms and accoutrements" distinguished

8

weapons from items like cartridge cases and boxes, which are "ammunition containers . . . analogous to today's 'magazines'"). Although LCMs may be used alongside weapons, they are not themselves weapons with offensive or defensive uses. *Ocean State Tactical*, 2022 WL 17721175, *12 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*, 554 U.S. at 581); Doc. 37-7 at 10 ("Magazines are containers which hold ammunition").

The district court concluded, however, that LCMs are "arms" because the Second Amendment extends to "corollaries to the meaningful exercise" of that right, which includes "the ability to effectively load ammunition into the firearm." Doc. 101 at 18 (cleaned up). The court relied on a decision recognizing that the Second Amendment right extends to "corollaries" like the ammunition and training necessary to make firearms operable for self-defense. *Id.* (citing *Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019)). But that principle is inapposite here because an LCM is not necessary to operate a firearm, including for self-defense. In fact, all firearms that can accept a detachable LCM can also accept a magazine that holds fewer rounds and work just as well. Doc. 37-7 at 10-13. The same is true of firearms with fixed magazines, which are not necessary to operate any firearm as designed. *Id.* at 10; *see also Or. Firearms Fed'n, Inc.*, 2022 WL 17454829, *9 (rejecting argument that LCMs are necessary for self-defense because no evidence that firearms "can *only* operate with magazines that accept more than ten rounds") (emphasis in original). The court also cited *Association of New Jersey Rifle & Pistol*

*Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106 (3d Cir. 2018), which determined that "a magazine is an arm under the Second Amendment." *Id.* at 116. But this means-ends decision, which has been abrogated by *Bruen*, is wrong on this point for the reasons just discussed.

Second, even if LCMs were "arms," plaintiffs are unlikely to prevail because they failed to show that LCMs and assault weapons are commonly used for self-defense—a burden that the district court improperly shifted to defendants at the second step of its analysis. Doc. 101 at 21 ("to bear its burden, Defendants must . . . demonstrate that the 'arms' [the Act] bans are not in 'common use'"). Rather than being commonly used for self-defense, the evidence shows that the regulated items are offensive weapons that derive from rifles and magazines designed for the military with features that "increase the effectiveness of killing enemy combatants in offensive battlefield situations." Doc. 37-7 at 15; Doc. 37-9 at 26. But while these features render the regulated instruments suitable for war, they also make them unsuitable and not commonly used for personal self-defense.

For instance, the rate of fire and sustained accuracy during rapid fire make assault weapons incredibly potent on the battlefield, especially when used with LCMs. Doc. 37-14 at 3-4 & n.5. But these features are unnecessary in the civilian self-defense context, where "most confrontations involving gunfire are at close range." Doc. 37-6 at 21; Doc. 37-9 at 28. Additionally, the massive amount of energy imparted by AR-15 rounds is far more than needed, and counterproductive, for self-defense. Doc. 37-10 at 5, 9. In fact, assault weapons are inherently

10

dangerous in "a home defense scenario" because they pose "substantial risks to individuals in adjoining rooms, neighboring apartments or other attached dwelling units." Doc. 37-9 at 28-29. And as compared with handguns, assault weapons produce much larger cavities in the body, making injuries especially catastrophic for children, given the relative proximity of vital organs in their smaller bodies. Doc. 37-14 at 9-11. There is also no need in self-defense scenarios for the round capacity that LCMs provide. Doc. 37-9 at 31; *Hanson*, 2023 WL 3019777, *10 (studies showing that "average number of shots fired in self-defense was 2.2 and 2.1, respectively"). Smaller magazines are preferable for self-defense, which is why the most "respected" and "effective" self-defense firearms are handguns built to function with magazines that hold fifteen or fewer rounds. Doc. 37-7 at 9, 11; Doc. 37-6 at 21-22; Doc. 37-9 at 31.

Nevertheless, the district court concluded—as part of its second- rather than its first-step analysis, which, again, was incorrect—that the regulated items are in common use. Doc. 101 at 22. But in doing so, it wrongly focused on the numerosity of particular assault weapons (specifically, AR-15-style rifles) and LCMs in circulation, rather than considering whether these instruments are in "'common use' today for self-defense," as is required under *Bruen*. 142 S. Ct. at 2134 (quoting *Heller*, 554 at 580). Furthermore, this metric—which, in effect, "rel[ies] on how common a weapon is at the time of litigation"—is "circular." *Friedman*, 784 F.3d at 409. Under it, States would be powerless to regulate new weapons—no matter how destructive or deadly—if a sufficient number made it into circulation first.

As an alternative ground, the district court noted that AR-15-style rifles could meet a self-defense requirement "considering that 34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self defense at home." Doc. 101 at 22 (citing Doc. 39-11 at 34). But these numbers—which come from an unpublished, non-peer-reviewed paper recounting an online survey that does not disclose its sources of funding or measurement tools, Doc. 39-11; Doc. 37-4 at 25 n.28—go to the subjective motivation for ownership, and not actual use. Doc. 39-11 at 33-34. And in fact, that same survey confirms that handguns and shotguns—not assault weapons—accounted for the large majority of defensive firearms use. *Id.* at 10-11. According to the paper, only 13% of incidents of self-defense with guns involve rifles of any kind. *Id.* And because the paper does not distinguish among types of rifles, it is unclear whether *any* of this 13% includes weapons restricted by the Act. *Id.*

### B. The Act is consistent with the historical tradition of prohibiting dangerous and unusual weapons.

Not only did the district court misperceive *Bruen*'s second step as asking whether assault weapons and LCMs are commonly used for self-defense, it also failed to engage with the significant historical record state defendants had amassed and otherwise misapplied *Bruen*'s step-two standard.

*Bruen* explained that the Second Amendment allows firearms regulations when the government can show the regulation is "consistent with this Nation's historical tradition" by demonstrating that it is "relevantly similar" to historical regulations. 142 S. Ct. at 2131-32. "[W]hether modern and historical regulations

12

impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations" when determining whether regulations are "relevantly similar." *Id.* at 2133. To undertake this analysis, courts should begin with the public understanding of the Second Amendment during the Founding and Reconstruction eras. *Id.* at 2132-33. But "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 2136 (cleaned up). Furthermore, when a modern regulation implicates "unprecedented societal concerns or dramatic technological changes," courts should apply a "more nuanced approach" to reasoning by analogy. *Id.* at 2132.

When *Bruen* is properly applied, the States' evidence demonstrates that the Act is "relevantly similar" to historical regulations of dangerous and unusual weapons. The record below reveals a robust historical tradition pre-dating the Founding whereby a weapon was introduced into civilian society, proliferated to the point where it caused a novel threat to public safety, and then was regulated to curb the public harm stemming from its use. In particular, in the 18th and 19th centuries, States responded to violence plaguing their communities through categorical restrictions on the sale, use, and ability to carry certain concealed weapons in public. *E.g.*, Doc. 37-12 at 41-56. The scope of these regulations—which *Bruen* recognized as permissible restrictions on "dangerous and unusual" weapons, 142 S. Ct. at 2128—was directly responsive to the problem at hand: misuse of weapons like clubs, knives, pistols, and revolvers that could be concealed and

13

brandished in a violent attack or other criminal undertaking, Doc. 37-12 at 41-56; Doc. 37-11 at 10-17.

Then in the early 20th century, States and the federal government followed this tradition by enacting regulations responding to the new threat presented by semiautomatic and automatic weapons. Doc. 37-11 at 8-9, 14-15, 22-23. Because the danger posed by these weapons went well beyond their concealable nature, legislatures enacted bans on civilian possession. *Id. Heller* recognized that, as with the concealed carry restrictions of the 18th and 19th centuries, the 20th century bans on automatic weapons are constitutionally permissible. 554 U.S. at 627. Thus, to the extent there were any ambiguity about whether laws precluding civilians from possessing dangerous and unusual weapons are consistent with the public understanding of the Second Amendment, that question has been "liquidated & settled" by this regular course of practice and subsequent judicial approval. *Bruen*, 142 S. Ct. at 2136.

The record evidence also demonstrates that "a more nuanced approach" to the historical inquiry is required because the Act was enacted in response to unprecedented societal concerns about increasingly frequent and deadly mass shootings that are enabled by dramatic technological changes. The Act regulates items that did not exist at the Founding (or during Reconstruction) and that were made possible only by dramatic technological changes in weapons technology. And though Second Amendment protections are not limited to the arms available at the Founding, *Bruen*, 142 S. Ct. at 2132, the absence of assault weapons and LCMs

14

when the Second and Fourteenth Amendments were adopted confirms the existence of a dramatic technological change.

At the Founding, Americans typically owned muskets and fowling pieces, which, given their technological limitations, were infrequently used as murder weapons. Doc. 37-11 at 9-10. These and other single-shot, muzzle-loading firearms remained the standard weapon up through the Civil War. Doc. 37-12 at 30-31. While a few "experimental, multi-shot guns" existed in and before the Founding, they were unusual curiosities that were dangerous to the shooter. *Id.* at 24-27. Although the first practical multi-shot firearm (the Colt revolver) was invented in the 1830s, it proliferated only after the Civil War. *Id.* at 30-32. These late 19th century weapons, moreover, had no semiautomatic capabilities and required manually reloading one round at a time. *Id.* at 31-32. Since then, technological advancements have dramatically altered the rate of fire, ease of reloading, power, range, sustained accuracy, and ultimately, lethality of multi-shot firearms. *Id.* at 22.

This increased lethality has wrought unprecedented societal concerns— specifically, about lone shooters equipped with assault weapons and LCMs murdering dozens of people in minutes, if not seconds. The increasing frequency and severity of mass shootings confirms this is a new phenomenon. *E.g.*, Doc. 37-4 at 18-21 (from 1949 to 2004, there was "a total of 10 mass shootings resulting in double-digit fatalities" but since 2004, there have been 20 such shootings, and their average rate "has increased over six-fold"). Assault weapons and LCMs are the

chosen instruments for most of these attacks. Doc. 37-6 at 9, 13. And beyond the increased injury and death, mass shootings committed with assault weapons and LCMs have "traumatic impacts on victims, first responders, and the greater community," as well as "tremendous negative economic effects on communities." *Id.* at 14.

The Act's regulation of assault weapons and LCMs is consistent with the historical tradition of restricting dangerous and unusual weapons in all relevant respects. Like its regulatory predecessors, the Act was passed to protect the public following an increase in violence that corresponded with the proliferation of a novel and deadly weapon. And like historical regulations, the Act imposes, at most, a minimal burden on an individual's right to armed self-defense. The instruments regulated by the Act are best suited for combat, and their defining characteristics are unnecessary (and often counterproductive) for self-defense. *Supra* pp. 10-11. Indeed, while these instruments have been used by mass shooters to inflict untold harm on innocent victims, there is no evidence that they are commonly used for self-defense, where handguns and shotguns are preferred. *Supra* pp. 11-12. Because the Act preserves access to a vast array of handguns, rifles, and shotguns, it is consistent with its historical predecessors in that it imposes tailored restrictions on the dangerous and unusual instruments causing harm to the public while retaining the ability for Americans to own and carry weapons for self-defense.

The Act is also materially indistinguishable from the early 20th century restrictions on the possession and sale of automatic and semiautomatic weapons.

The AR-15 and M-16 are virtually identical weapons, except for the M-16's ability to toggle between semiautomatic and automatic fire.  Doc. 37-9 at 34; *Friedman*, 784 F.3d at 409.  But this distinction does not render an assault weapon any less an instrument of war than an M-16.  Doc. 37-6 at 8-9; Doc. 37-7 at 17-18.  Because there is no basis to distinguish between the Act and these early 20th century regulations, the decision below calls into question the validity of federal restrictions on machine guns.  *But see Heller*, 554 U.S. at 624 (deeming this suggestion "startling").

The district court, however, engaged with virtually none of this evidence or precedent, asserting only that state defendants' evidence was insufficient because their experts relied on concealed carry laws.  Doc. 101 at 26.  But as explained, that is not a fair characterization.  Furthermore, the court's remark that concealed carry laws are "categorically different" than the Act's restrictions is incorrect.  *Id.*  As explained, the historical concealed carry restrictions and the Act share the same justifications (protecting the public from new forms of violence) and impose the same minimal burden on self-defense (by restricting only those weapons that were causing this violence while leaving other means of self-defense available).  And subsequent laws precluding civilians from possessing automatic and semiautomatic firearms demonstrate a regular course of practice that confirms that such restrictions are consistent with the Second Amendment.  Moreover, to the extent there is any difference in scope between Founding- or Reconstruction-era

regulations and the Act, that is because of the dramatic technological and societal shifts that have occurred in the interim.

## II.     The Remaining Factors Support A Stay.

Because the district court erred in concluding that plaintiffs are likely to succeed on the merits, a stay is warranted on this basis alone. But even if the merits were a close question (which it at the very least is, given that district courts have unanimously rejected similar challenges and this court denied an injunction pending appeal in *Bevis*), a stay should be granted because the remaining factors favor one.

For starters, the district court erred in concluding that plaintiffs had established irreparable harm and an inadequate remedy at law. Allowing the Act to remain in effect during the pendency of the appeal would merely prohibit individuals from acquiring more assault weapons and LCMs than they already possess; it would not preclude anyone from obtaining any number of handguns, shotguns, or other weapons for self-defense. This case thus is not one where an alleged violation of Second Amendment rights presumptively establishes irreparable harm. *Cf. Ezell v. City of Chicago*, 651 F.3d 684, 689-90 (7th Cir. 2011) (where city ordinance made it "impossible" to qualify for *any* gun ownership, thus burdening "the right to possess firearms for protection," court presumed that "[i]nfringements of this right [could not] be compensated by damages"). As for the harm to the businesses that sell assault weapons and LCMs, although the district court recognized that lost sales and other economic injury "is generally not a basis

for granting injunctive relief," Doc. 101 at 11, the court did not meaningfully explain why a damages award could not make the businesses whole. *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017) ("Harm cannot be considered irreparable if it can be fully rectified in a final judgment."); *McHenry County v. Raoul*, No. 21-334, 2022 WL 636643 (7th Cir. Jan. 12, 2022) (denying injunction pending appeal where, inter alia, plaintiffs suing State "have not shown that they will lose substantial revenue absent an injunction or that this loss of revenue is permanent").

By contrast, the threat of irreparable harm to the State if a stay is not allowed is significant. Assault weapons and LCMs are disproportionately used in mass shootings to inflict substantial injury and death. Continued access to assault weapons and LCMs in the civilian market increases the likelihood that additional mass shootings will occur in Illinois. Indeed, in just the past few weeks, lone gunmen used AR-15s and LCMs to kill six people at an elementary school in Nashville, several former co-workers in Louisville, and five members of a neighbor's family in Texas.[3] A stay pending appeal will reduce the risk that yet another Illinois community adds its name to this list.

---

[3] Justine McDaniel, *Manhunt Underway for Gunman Who Killed Five Neighbors, Sheriff Says*, Wash. Post (Apr. 29, 2023), https://bit.ly/40OrGuh; Joe Hernandez, *3 Children and 3 Adults Are Dead in a Shooting at a Christian School in Nashville*, NPR (Mar. 27, 2023), https://bit.ly/3LMDHMx; Kevin Williams, *Gunman Kills 5 Co-Workers at Louisville Bank on Livestream, Police Say*, N.Y. Times (Apr. 10, 2023), https://nyti.ms/3njG5Rn.

Further compounding the harm to the public of the preliminary injunction order is its sheer breadth.  Rather than finding particular provisions of the Act are likely to be unconstitutional and then enjoining those, the district court enjoined the entirety of the Act's restrictions on assault weapons and LCMs because it believes some portions of the Act ultimately may be unconstitutional.  Doc. 101 at 21.  Indeed, the order enjoins restrictions on weapons and features—like the Act's restriction on grenade launcher attachments—that several plaintiffs conceded were not protected by the Second Amendment.  *Compare* Doc. 101 at 7 n.4 *with* Doc. 1 ¶ 52 n.6.  Not only that, but the court enjoined enforcement of the Act statewide, despite having made no findings to support such a broad injunction.  *See City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) (injunctions extending beyond plaintiff's rights "present real dangers, and will be appropriate only in rare circumstances"); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (generally, injunctions should not exceed "the extent of the plaintiff's protectible rights") (cleaned up).

For similar reasons, the balance of equities and public interest favor a stay.  Again, plaintiffs have not made a strong showing that they will prevail or that their inability to purchase or sell assault weapons and LCMs will irreparably harm them.  By contrast, the Act's restrictions on assault weapons and LCMs promote a compelling interest in protecting the public and saving lives.  According to a recent epidemiological study, States that have enacted similar restrictions have "experienced a 56% decrease in high-fatality mass shooting incidence rates" and a

"72% decrease in the rate of deaths resulting from high-fatality mass shootings" over the past three decades. Doc. 37-4 at 34-35. The district court's conclusion to the contrary—that there was "no evidence" in the record that the Act "will actually help Illinois Communities," Doc. 101 at 28—is thus incorrect. When all evidence is taken into account, the balance of equities weighs heavily in favor of state defendants.

## CONCLUSION

State defendants ask this court to stay the district court's April 28, 2023 order granting a preliminary injunction pending appeal.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

By:   /s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

Attorneys for State Defendants

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this motion has been prepared in proportionally spaced typeface using Microsoft Word 2013, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 27(d)(2)(A) in that the motion contains 5,199 words.

<u>/s/ Sarah A. Hunger</u>
SARAH A. HUNGER
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CALEB BARNETT**, *et al.,*<br>    **Plaintiffs,**<br><br>        v.<br><br>**KWAME RAOUL**, *et al.,*<br>    **Defendants.** | **No. 3:23-cv-00209-SPM (Lead Case)** |
| **DANE HARREL**, *et al.*,<br>    **Plaintiffs,**<br><br>        v.<br><br>**KWAME RAOUL**, *et al.*,<br>    **Defendants.** | **No. 3:23-cv-00141-SPM** |
| **JEREMY W. LANGLEY**, *et al.,*<br>    **Plaintiffs,**<br><br>        v.<br><br>**BRENDAN KELLY**, *et al.,*<br>    **Defendants.** | **No. 3:23-cv-00192-SPM** |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS**, *et al.,*<br>    **Plaintiffs,**<br><br>        v.<br><br>**JAY ROBERT "J.B." PRITZKER**, *et al.,*<br>    **Defendants.** | **No. 3:23-cv-00215-SPM** |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Before the Court are consolidated cases with requests for the imposition of a preliminary injunction under Federal Rule of Civil Procedure 65(a) to prevent the enforcement of Illinois' Protect Illinois Communities Act ("PICA"), until there can be a final determination of the merits as to the law's constitutionality. Lead Plaintiffs Caleb Barnett, Brian Norman, Hoods Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc., along with Plaintiffs from companion cases (hereinafter collectively referred to as "Plaintiffs"), filed motions for preliminary injunction. (Doc. 10).[1] The Illinois Attorney General's Office, representing Attorney General Kwame Raoul, Governor Jay Robert Pritzker, and the Director of Illinois State Police, Brendan F. Kelly, (hereinafter collectively referred to as "Defendants") filed an extensive response to the respective motions that included 14 exhibits. (Doc. 37).

On June 23, 2022, the United States Supreme Court issued its opinion in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Amongst other things, the *Bruen* Court reaffirmed that "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" 142 S. Ct. at 2134 (quoting *D.C. v. Heller*, 554 U.S. 570, 584 (2008)).

---

[1] This Court consolidated the following cases: 23-cv-141, 23-cv-192, 23-cv-209, and 23-cv-215 for purposes of discovery and injunctive relief, with the Barnett case designated as the lead case. Because the respective cases all have similar Motions for Preliminary Injunction pending, this Order carries over to those cases as well. (Doc. 16 in 22-cv-00141, Doc. 6 in 22-cv-00192, and Doc. 28 in 22-cv-00215, respectively).

Less than two weeks later, family and friends gathered in Highland Park, Illinois to enjoy one of the mainstay festivities of this nation's Independence Day celebration, a parade. They gathered to salute our Country, our liberty, and our freedoms. During the parade, a senseless tragedy occurred involving firearms and multiple paradegoers were killed and wounded.

Some months after that, the State of Illinois enacted PICA into law.[2] The proponents of PICA cited the Highland Park tragedy as an impetus for passing the law. That law placed sweeping restrictions and outright bans on the sale, purchase, manufacture, delivery, importation, and possession of many firearms, magazines, attachments, stocks, and grips. PICA was immediately challenged as unconstitutional.

As Americans, we have every reason to celebrate our rights and freedoms, especially on Independence Day. Can the senseless crimes of a relative few be so despicable to justify the infringement of the constitutional rights of law-abiding individuals in hopes that such crimes will then abate or, at least, not be as horrific? More specifically, can PICA be harmonized with the Second Amendment of the United States Constitution and with *Bruen*? That is the issue before this Court. The simple answer at this stage in the proceedings is "likely no." The Supreme Court in *Bruen* and *Heller* held that citizens have a constitutional right to own and possess firearms and may use them for self-defense. PICA seems to be written in spite of the clear directives in *Bruen* and *Heller*, not in conformity with them. Whether well-

---

[2] For purposes of this Order, the Court focuses on PICA's changes to 720 ILCS 5/24-1 and additions of 1.9 and 1.10.

intentioned, brilliant, or arrogant, no state may enact a law that denies its citizens

rights that the Constitution guarantees them. Even legislation that may enjoy the

support of a majority of its citizens must fail if it violates the constitutional rights of

fellow citizens. For the reasons fully set out below, the overly broad reach of PICA

commands that the injunctive relief requested by Plaintiffs be granted.

## JURISDICTION AND VENUE

Plaintiffs raised a federal question when filing these cases; specifically asking

whether PICA violates the Second Amendment to the Constitution. As a result, this

Court has subject matter jurisdiction. *See* 28 U.S.C. § 1331. Furthermore, venue in

non-diversity cases is proper in any judicial district where any defendant resides if

all defendants reside in the same state. 28 U.S.C. § 1391(b).

## STANDING

In order to have standing to bring a claim in federal court under the

jurisdiction conferred by Art. III, § 2 of the U.S. Constitution, a plaintiff must

establish that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to

the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). While

Defendants did not challenge the standing of any Plaintiff, courts must still consider

this jurisdictional issue because standing is an "essential and unchanging part of the

case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504

U.S. 555, 560 (1983).

Even a cursory review of the named Plaintiffs satisfies the three requisite

elements. Furthermore, a plaintiff who wishes to engage in conduct that is arguably

protected by the Constitution, but criminalized by a statute, successfully demonstrates an immediate risk of injury. *Bell v. Keating,* 697 F.3d 445, 451 (7th Cir. 2012). In this case, Plaintiffs face criminal sanctions were they to sell or purchase any of the items banned by PICA, unless preliminary injunction issues.

## FACIAL CHALLENGES AND SEVERABILITY

"Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law." *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (citing *Leavitt v. Jane L.*, 116 S.Ct. 2068, 2069 (1996); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985)). However, "[i]n a facial challenge, *lex ipsa loquitur*: the law speaks for itself." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (quoting Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010)). Meaning that "[o]nce standing is established" the Court must weigh "the applicable constitutional doctrine without reference to the facts or circumstances of particular applications." *Id.* at 697-98 (quoting David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006)). A "facial challenge directs the judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety." *Id.* at 698 (quoting Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 387 (1998)). Therefore, because this Court finds a likelihood of facial unconstitutionality on the merits, the entirety of PICA as codified will be enjoined. *See Id.* It is important to note

that the Court has *not* found that PICA, or any provision, is *in fact* unconstitutional, only that there is a likelihood that it will be.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary and drastic remedy for which there must be a clear showing that plaintiff is entitled to relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The purpose of a preliminary injunction is to preserve a party's position until a trial on the merits can be held. *GEFT Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 371 (7th Cir. 2019). The issuance of a preliminary injunction should also minimize the hardship a party pending final judgment. *See Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

In the Seventh Circuit, "a district court engages in an analysis that proceeds in two distinct phases to decide whether such relief is warranted: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.,* 883 F.3d 959, 965 (7th Cir. 2018). In order to survive the first phase, a party seeking a preliminary injunction must satisfy three requirements: (1) the movant will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) the movant has a reasonable likelihood of success on the merits. *See HH Indianapolis, LLC v. Consol. City of Indianapolis & Cnty of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018). If a moving party fails to demonstrate any one of those three initial requirements, a court must deny the request for preliminary injunction. *See GEFT Outdoors, LLC,* 922 F.3d at 364. If, on the other hand, a moving party meets the initial threshold, the court then moves on to the balancing stage. *See Id. (*quoting

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health,* 896 F.3d 809, 816 (7th Cir. 2018)).

In the second phase, a court must weigh the irreparable harm to the moving party if the injunction were denied against any irreparable harm the nonmoving party would suffer if the party were to grant the requested relief. *See Id.* When balancing the harm to each party, a court should also consider the effect of an injunction on the public interest. *See Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).

### ANALYSIS OF REQUEST FOR INJUNCTIVE RELIEF

On April 12, 2023, an evidentiary hearing was held before the Court on the pending motions. At that time, Erin Murphy argued on behalf of Plaintiffs, while Christopher Wells argued on behalf of the state Defendants. Troy Owens argued on behalf of McHenry County Defendants, Patrick Kenneally, and Sheriff Robb Tadelman, as their position was contradictory to the state Defendants.[3] Additionally, Thomas Maag argued certain issues not raised by Ms. Murphy.[4]

---

[3] Of significance, Patrick Kenneally, in his official capacity as State's Attorney of McHenry County, is a plaintiff in the Northern District of Illinois where he is seeking similar injunctive relief against defendants Kwame Raoul and JB Pritzker regarding the constitutionality of PICA. (*See Kenneally v. Raoul et al.*, NDIL Case No. 3:23-CV-50039.

[4] Mr. Maag distinguished a flare launcher from a grenade launcher and advised the Court that the exemplar identified by Defendants as a grenade launcher (Doc. 37-3) appears to be a Tac-D, which is a rescue, assistance, and/or self-defense device that does not involve the use of fragmentation devices. The device is often referred to as a flare launcher, flare gun, or Very gun and is commonly used for safety by hunters, and for rescue operations. In fact, such a launcher is required by the U.S. Coast Guard on larger vessels on navigable waterways for launching flares. (Doc. 88, pp. 40-44).

In light of the evidence presented at the evidentiary hearing and the record, the Court makes the following findings of fact and conclusions of law.

## I.   PHASE ONE

### A. *Irreparable Harm*

A moving party must demonstrate that he or she will likely suffer irreparable harm absent obtaining preliminary injunctive relief. *See Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "Harm is irreparable if legal remedies are inadequate to cure it. Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (internal citation omitted)).

The requirement of irreparable harm eliminates those cases where, although the ultimate relief sought is equitable, a plaintiff can wait until the end of trial to get that relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Interim injunctive relief is only available if a plaintiff will suffer irreparable harm before final judgment is entered, which requires "more than a mere possibility of harm." *Whitaker*, 858 F.3d at 1045. It does not, however, require that the harm actually occur before injunctive relief is warranted nor does it require that the harm be certain to occur before a court may grant relief on the merits. *Id.* Instead, the Seventh Circuit has found irreparable harm when it "cannot be prevented or fully rectified by the final judgment after trial." *Id.* (quoting *Girl Scouts of Monitou*

*Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).

Plaintiffs claimed that the "assault weapon" ban enacted by PICA is unconstitutional as it contravenes the Second Amendment "right to keep and bear Arms." (Doc. 10). For some constitutional violations, particularly involving First Amendment claims, irreparable harm is presumed. *Christian Legal Society v. Walker,* 453 F.3d 853, 867 (7th Cir. 2006). Although the Supreme Court has not recognized a presumption of irreparable harm in regard to Second Amendment violations, it has emphasized that the Second Amendment and the constitutional right to bear arms for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen,* 142 S. Ct. at 2156 (*citing McDonald v. City of Chi., Ill.,* 561 U.S. 742, 780 (2010) (plurality opinion)). When a law is facially challenged under the Second Amendment, "the form of the claim and the substance of the Second Amendment right" create a "harm [that] is properly regarded as irreparable and having no adequate remedy at law." *Ezell*, 651 F.3d at 699-700.

Assuming arguendo that there is no presumption of harm for an alleged violation of the Second Amendment, Plaintiffs still satisfy this element. For example, Barnett and Norman are no longer able to purchase any firearm, attachment, device, magazine, or other item banned by PICA, while Hoods and Pro Gun are now prohibited from selling said any item banned by PICA. These harms are irreparable and in direct violation of the Second Amendment right to bear arms in self-defense. There is no question that the right to armed self-defense is limited by PICA, and in

some cases, may be prohibited altogether.  It is true that not all items are banned under PICA; however, if a lawful citizen only possesses items that are banned under PICA, he or she would have to purchase a non-banned firearm in order to legally defend oneself under the Second Amendment.

### B. *No Adequate Remedy at Law*

Plaintiffs must next make a threshold showing that any remedy at law would be inadequate. An inadequate remedy of law is not necessarily wholly ineffectual; instead, it is deficient when compared to the harm suffered. *See Foodcomm*, 328 F.3d at 304. Accordingly, the Court must ask if the Plaintiffs can and will be made whole if they prevail upon the merits and are awarded damages. *See Roland*, 749 F.2d at 386. That answer is "No."

But for PICA, Barnett and Norman would purchase additional banned firearms and magazines.[5] Should either one attempt to do so, he could face criminal penalties. There is no monetary award that can compensate for such an injury and make them whole.

There is also no question that both Hoods and Pro Gun have lost income and will continue to do so while PICA remains in effect. The declarations of both James Hood and Paul Smith, owners of Hoods and Pro Gun respectively, expressed that a large percentage of their income was derived from sales of items banned under PICA

---

[5] As set forth in the declarations, Barnett indicated he "would like to purchase at least one more AR platform rifle and at least one more magazine with capacity of greater than 10 rounds" and Norman stated that he "would like to purchase more firearms on the AR platforms and more magazines with capacity greater than 10 rounds." (Docs. 10-1, ¶5 and 10-2, ¶7).

and that they currently had in their possession tens of thousands of dollars worth of inventory that they have been prohibited from selling since PICA's effective date. (Docs. 10-3, 10-4).[6] As each month drags on, the injury, along with the inventory, remains. They are stuck with this inventory. While this injury is economic, which is generally not a basis for granting injunctive relief, because Plaintiffs can never recover their financial losses irreparable harm exists. *See e.g., Cmty. Pharmacies of Indiana, Inc. v. Indiana Fam. & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011). Again, there is clearly no adequate remedy at law that would make Plaintiffs whole.

### C. *Likelihood of Success on the Merits*

This Court must now consider the third issue, likelihood of success on the merits. Plaintiffs rely on recent Supreme Court decisions that made it clear that the Second Amendment protects the possession and use of weapons that are in common use. (Doc. 10, p. 1); *see Bruen,* 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 627). Plaintiffs contend there can be no question regarding the likelihood of success because the items banned under PICA are in common use today. (Doc. 10, p. 9).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. A plain reading of this text would seem to lend

---

[6] James Hood indicated that "approximately $209,000, or 48%" of his purchases in 2021 and 2022 were attributable to firearms banned under PICA while approximately 25% of his gross revenue was attributable to said items. (Doc. 10-3, ¶¶ 5, 6). Paul Smith stated he had been selling and transferring the firearms, magazines, and products now deemed "assault weapons" under PICA for the past 7 years and estimated that more than half of Pro Gun's revenue from sales was attributable to those items. (Doc. 10-4, ¶¶ 5-7).

itself to the notion that PICA is in fact violative of the Second Amendment. However, before weighing the parties' arguments and the validity of PICA, it is first necessary to review the pertinent aspects of the *Bruen* decision as well as the *Heller* and *McDonald* decisions.

In *Heller*, the Supreme Court began its analysis by setting forth that the Constitution should be interpreted according to the principle that it was written to be understood by the "normal and ordinary" meaning of the words. *See Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). This principle leads to an interpretation of the Second Amendment that contains two distinct clauses, the prefatory clause and the operative clause. *Id.* at 577.

The prefatory clause of the Second Amendment states, "[a] well-regulated Militia, being necessary to the security of a free State . . . ." The prefatory clause "announces a purpose" for the operative clause but "does not limit [it]." *Id.* Meaning that there "must be a link between the state purpose and command" but that the scope of the operative clause remains unchanged by the prefatory language. *See Id.* As the Supreme Court noted, the operative clause of the Second Amendment creates an individual right. *See Id.* at 598. Thus, logic demands that there be a link between an individual right to keep and bear arms and the prefatory clause. The link is clear, "to prevent elimination of the militia." *Id.* at 599. During the founding era, "[i]t was understood across the political spectrum that the right . . . might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* Therefore, although "most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting" the additional purpose of securing the ability

of the citizenry to oppose an oppressive military, should the need arise, cannot be overlooked. *See Id.*

In *Heller*, the Court broke the operative clause down further into two sections, "Right of the People" and "Keep and Bear Arms." *Id.* at 579-95. The "Right of the People" was then analyzed to determine the significance of "the people." *Id.* at 579. The Court noted that "right of the people" is only used three times in the amendments, in the First Amendment, in the Fourth Amendment, and most relevant to this case, in the Second Amendment. *See Id.* The usage of the term "right of the people" in each instance "unambiguously refer[s] to individual rights." *Id.* The *Heller* Court then categorized "the people" to whom the Constitution refers as "all members of the political community" or "persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of the community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). There is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The second section of the operative clause, "Keep and Bear Arms," defines the substance of the right held by "the people." *Id.* The *Heller* Court first turned to what constitutes "arms" and found that "arms" were understood, near the time of the ratification of the Second Amendment, to mean any weapon or thing that could be used for either offense or defense. *See Id.* The Court specifically noted that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Finally, the Court turned to the meaning of "keep" and "bear." *Id.* at 582-92. These

words are understood, in light of founding era history, to mean to "have" and to "carry" respectively. *See Id.* at 582-84. In sum, the operative clause of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Next, the Court looks to *McDonald*. The Supreme Court noted, "[t]he Bill of Rights, including the Second Amendment, originally applied only to the Federal Government." *McDonald*, 561 U.S. at 754. However, the Due Process Clause extended protection of rights that are "fundamental to our scheme of ordered liberty" and allows them "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.* at 765-67 (first citing *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) then quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)). Whether the Second Amendment protections can be applied against a state turns on the incorporation of the right in the concept of due process. *See Id.* at 767. The right guaranteed by the Second Amendment is a "basic right, recognized by many legal systems from ancient times to the present day." *Id.* Further, the right is "deeply rooted in this Nation's history and tradition." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Consequently, the Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment." *Id.* at 791.

Finally, this Court turns to *Bruen*. In analyzing the constitutional question presented, the *Bruen* Court first turned to its prior holdings in *Heller* and *McDonald*; in those cases, the Court "held that the Second . . . Amendment[] protect[s] an individual right to keep and bear arms." *Bruen*, 142 S. Ct. at 2125. The Court then

explained that in the years following *Heller* and *McDonald*, the Courts of Appeals analyzed the Second Amendment under a two-step test. *See Id.* at 2126. The first step included an analysis to determine if "the original scope of the right based on its historical meaning." *Id.* The second step was a balancing test of either intermediate scrutiny or strict scrutiny depending on "[i]f a 'core' Second Amendment right is burdened." *See Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc)).

The *Bruen* Court firmly rejected this two-step framework, concluding that "[d]espite the popularity of this two-step approach, it is one step too many." *Id.* at 2127. The Court instead adopted a single step test "rooted in the Second Amendment's text, as informed by history" under which the "government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Under this framework, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). The full standard for Second Amendment analysis is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen*, 142 S. Ct at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).

The Court then turned to outlining the framework under which this Nation's historical tradition of firearm regulation must be analyzed. First, it noted that *Heller*, in its historical analysis, compares the right to keep and bear arms to the rights guaranteed by the First Amendment. *See Bruen*, 142 S. Ct. at 2130. Thus, a similar approach can be taken to historical analysis of the Second Amendment as is taken when analyzing restrictions imposed on the freedom of speech and when a violation of the Establishment Clause is alleged. *Id.*

Examples are then given of situations where the historical analysis may be "fairly straightforward." *Id.* at 2131.

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that could also be evidence that a modern regulation is unconstitutional.

*Id.* Thus, showing that a historical analogue need not be a "historical twin," but rather a "relatively similar" and "well-established and representative historical analogue" will pass constitutional muster. *Id.* at 2132-33. Two metrics to apply in undertaking the historical analogue analysis are "how and why" the regulations burden the right to keep and bear arms. *Id.* at 2133.

The *Bruen* Court then noted that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*" and "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136 (emphasis original). A short-lived law long preceding the framing or a post-enactment law must not be given undue weight. *See Id.* Thus, no matter the "post-ratification

adoption or acceptance" of a law that is inconsistent with the original public meaning of the Constitution, it cannot overcome or change the text. *See Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). As the Court explained, "the scope of the protection applicable" to rights enumerated in the Bill of Rights, including the right to keep and bear arms, "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*; *see e.g. Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011).

### 1.  **Plain Text Analysis**

This Court must determine if the Second Amendment's plain text, as it was originally understood, covers Plaintiffs' conduct. If so, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. Defendants argued that PICA does burden "arms" as they are understood in the context of the Second Amendment. (Doc. 37, p. 15).  Defendants argued that accessories and "weapons that are most useful in military service" are not "arms" under the plain text of the Second Amendment. *Id.* at 15-16. Defendants did not challenge that Plaintiffs are all "law-abiding" citizens such that they hold the individual right guaranteed by the Second Amendment. Further, Defendants did not challenge that possessing the restricted items falls within the ambit of "keep[ing]" for purposes of the Second Amendment.

This Court will first address Defendants' contention that "non-essential accessories" are not within the scope of the Second Amendment's plain text. PICA outlaws possession of a "semiautomatic pistol" with a detachable magazine if it is equipped with any of the following: "a threaded barrel," "a shroud attached to the

barrel or that partially or completely encircles the barrel," "a flash suppressor," or "arm brace."[7] 720 ILCS 5/24-1.9. PICA further outlaws possession of a magazine for a handgun capable of holding more than 15 rounds of ammunition and of "[a] semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9-10. Defendants contend that such items are not necessary to the functioning of a firearm and are thus not "arms" and therefore not protected by the Second Amendment. (Doc. 37, p. 17).

Defendants' argument is not persuasive. The Seventh Circuit has recognized the Second Amendment as extending to "corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense." *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (quoting *Ezell*, 651 F.3d at 708). It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm. The Third Circuit recognized the importance of this corollary and held that "a magazine is an arm under the Second Amendment." *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018). Further, Defendants' own expert defined "high-capacity firearms" as "hand-held arms with a capacity greater than ten rounds, recognizing that Illinois's statute allows up to 15 rounds for handguns." (Doc. 37-13, p. 2). Defendants' expert is clearly referencing magazines and incorporating such into his definition of a "firearm[]." *Id*. This Court agrees that magazines are "arms" as used in the plain text of the Second Amendment. Plaintiffs are correct that

---

[7] The list provided is not exhaustive but rather meant to illustrate some features referred to as "accessories" by Defendants.

"[t]his is not even a close call." (Doc. 10, p. 16). If Defendants' own expert incorporates magazine capacity into his definition of a firearm, given his level of expertise, it would be unreasonable to expect the original public meaning of the plain text to not reflect a similar understanding.

The Seventh Circuit held in *Ezell* that Chicago could not prohibit law-abiding citizens from target practice at a firing range because doing so interfered with the meaningful exercise of their Second Amendment right. *See* 651 F.3d at 708. PICA also interferes with the meaningful exercise of Second Amendment rights for one group of individuals — those with disabilities. To provide one example, consider arm braces for semiautomatic pistols. As noted above, PICA prohibits the use of an arm brace on any semiautomatic pistol with a detachable magazine without any caveat or exceptions. The Department of Justice has also attempted to regulate possession and registration of arm braces.[8] *See generally* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 FR 6478. However, one notable distinction exists. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has recognized that such braces are necessary for those with disabilities to use a firearm by directing that "[t]his rule does not affect 'stabilizing braces' that are objectively designed and intended as a 'stabilizing brace' for use by individuals with disabilities." Factoring Criteria for Firearms With Attached "Stabilizing Braces", https://www.atf.gov/rules-and-regulations/factoring-criteria-firearms-attached-stabilizing-braces.  As  reason and the ATF final rule evidences, braces are needed by certain individuals with

---

[8] "Any weapons with 'stabilizing braces' or similar attachments that constitute rifles under the NFA must be registered no later than May 31, 2021." 88 FR 6478-01.

disabilities to operate a firearm. Thus, arm braces are an integral part of the meaningful exercise of Second Amendment rights for such individuals and can also be considered an "arm."

Further, in *Ezell*, the Seventh Circuit noted that "the right to maintain proficiency in firearm use" is "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." 651 F.3d at 708. "[T]he core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. Undoubtedly, training, practice, and proficiency for effective exercise of Second Amendment rights refers to the ability of citizens to accurately shoot and hit their intended target in case of confrontation. Plaintiffs stated that "[a] pistol grip improves accuracy and reduces the risk of stray shots," that "[t]humbhole stocks likewise . . . provide[] for greater accuracy and decreases the risk of dropping the firearm or firing stray shots," and that "flash suppressors not only prevent users from being blinded in low lighting conditions . . . but also reduce recoil and muzzle movement, making the firearm less painful to use." (Doc. 10, p. 10-11). Defendants' have also recognized that such items "facilitate . . . sustained accuracy." (Doc. 88, p. 80). This Court agrees that in the case of each of these items "[t]he defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting) (quoting David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994)). Therefore, because the "meaningful exercise" of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended

target, items that aid in accuracy may be considered "arms" and are presumptively protected by the Second Amendment.

The aforementioned examples of "arms" regulated by PICA is by no means exhaustive. PICA is replete with other examples of "arms" being banned. However, at this stage, this Court need not address each example in an attempt to piece together the portions of PICA that may be constitutional.

### 2. This Nation's Historical Tradition of Firearm Regulation

This Court must next determine if PICA is consistent with this Nation's historical tradition of firearm regulation. Pursuant to *Bruen*, as outlined above, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The Supreme Court held the historical tradition supports "prohibiting the carrying of 'dangerous and unusual weapons'" but that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[9] Therefore, to bear its burden, Defendants must: (1) demonstrate that the "arms" PICA bans are not in "common use;" and (2) "identify a well-established and representative historical analogue" to PICA. *See Id* at 2128, 2133.

Defendants first argued that PICA is consistent with historical tradition because "[n]either large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified." (Doc. 37, p. 22). This

---

[9] During oral argument, Plaintiffs conceded that firearms are dangerous.

argument is "bordering on the frivolous" because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Defendants also argued that "[t]he Act restricts weapons and accessories not commonly used for self-defense today." (Doc. 37, p. 26). Similarly, this argument is misplaced. *Bruen* clearly holds that the Second Amendment protects "possession and use" of weapons "in common use" not just weapons in common use for self-defense as Defendants' argued. 142 S. Ct. at 2128. Even if there was a requirement that the "common use" of an "arm" be self-defense, AR-15 style rifles would meet such a test considering that 34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home. (Doc. 39-11, p. 34).

The only argument Defendants made to bear their burden of showing that the arms regulated by PICA are not in common use, rather than attempting to change the constitutional analysis, is that the "[s]ales and ownership numbers do not show commonality or use." (Doc. 37, p. 34). However, Defendants made no argument and present no evidence regarding the commonality of the two "arms" examples from the plain text analysis above.[10] Such "arms" are part of semiautomatic pistols. As the Supreme Court found "handguns are the most popular weapon chosen by Americans for self-defense" and are thus clearly in common use and protected by the Second Amendment. *See Heller*, 554 U.S. at 629.

---

[10] Although this Court has not engaged in an exhaustive analysis of each item banned by PICA, it is worth noting that many of the items banned are used by a multitude of individuals for entirely lawful purposes including self-defense.

Rather, Defendants' focused almost entirely on AR-15 rifles and their commonality or lack thereof. (Doc. 37, p. 34-39). As then-Judge Kavanaugh noted, "[t]here is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Heller*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

However, supposing that Defendants need only show that AR-15 rifles are not in common use, they still fail. Plaintiffs asserted that "[p]ractically all modern rifles, pistols, and shotguns are semiautomatics." (Doc. 10, p. 8) (quoting James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 CARDOZO L. REV. 681, 685-87 (2015)). Plaintiffs added that "recent data showed that more than 24 million AR-15 style rifles are currently owned nationwide." *Id.* at 9 (citing National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/). As the Fourth Circuit noted "in 2012, the number of AR- and Ak-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc). Twenty-four (24) million firearms dwarfs the 200,000 stun guns which the Supreme Court found sufficient to meet the "common use" test. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (per curiam) (Alito, J., concurring). Under the *Caetano* test, even 1% of the 24 million AR-15 style rifles held by citizens is sufficient to result in a finding that such arms are in common use. However, the Court need not rely solely on the current ownership numbers to

determine commonality of use of these arms. The AR-15 style rifles are among the most popular arms produced "account[ing] for nearly half of the rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020." (*See* Doc. 67, p. 7 (citing NSSF, *Firearm Production in the United States* 18 (2020), https://bit.ly/3LwJvKh)). AR-15 style rifles possess no "quasi-suspect character" and "traditionally have been widely accepted as lawful possessions." *Staples v. U.S.*, 511 U.S. 600, 612 (1973). Further, considering the commonality of magazines banned by PICA, which as this Court explained are "arms" for purposes of the Second Amendment, the analysis becomes even more clear. There are "about 39 million individuals" who "have owned magazines that hold over 10 rounds (up to 542 million such magazines in total)." (Doc. 39-11, p. 1-2). Thirty-nine million individuals is over three times the population of Illinois, the sixth most populous state in this Nation. *See US States – Ranked by Population 2023*, https://worldpopulationreview.com/states. Although "[t]here may well be some capacity above which magazines are not in common use. . . that capacity is surely not ten" and probably not fifteen either. *Heller*, 670 F.3d at 1261. Therefore, both AR-15 style rifles and magazines with a capacity of greater than ten are "in common use" and protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128.

Although Defendants challenged the veracity of Plaintiffs' evidence, they were unable to produce evidence showing that modern sporting rifles are both dangerous and unusual.[11] Consequently, Defendants failed to meet their burden to demonstrate

---

[11] In fact, the Illinois State Police has noted that firearm data relevant to the stated purpose of PICA (and required by 5 ILCS 830/10-5 to be collected) is "unattainable." *2022 Gun Trafficking                    Legislative                         Report*,

that the "arms" banned by PICA are "*dangerous and unusual*" and thus not protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128 (emphasis added).

Finally, although the commonality of "arms" banned under PICA is dispositive, Defendants shifted to the historical tradition of firearm regulation in an attempt to show the constitutionality of PICA. In determining if PICA is consistent with the historical tradition of firearm regulation, the question is whether there were "relevantly similar" regulations dating back to the Founding. *See Bruen*, 142 S. Ct. at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). Meaning that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. The government must only "identify a well-established and representative historical analogue, not a historical twin." *Id.* When assessing a historical analogue to determine if it passes "constitutional muster" a court is guided by two metrics: "how and why" the right to bear arms was burdened. *Id.*

Defendants relied on a litany of experts to support the proposition that a ban on "assault rifles" has sufficient historical analogues to pass constitutional muster. (*See* Docs. 37-10, 37-11, 37-12, 37-13, 37-14). However, the relevant analysis of each historic firearm regulation must be centered around "how and why" the regulation burdened Second Amendment rights. *See Bruen*, 142 S. Ct. at 2133. As the Defendants' counsel noted, the regulations cited by Defendants' experts were "[c]onceal carry regulations . . . that's what they were. They were largely conceal carry

---

https://isp.illinois.gov/StaticFiles/docs/Gun%20Trafficking/2022%20Gun%20Trafficking%20
Legislative%20Report.pdf.

regulations." (Doc. 91, p. 11). The "how and why" of a concealed carry regulation is categorically different than the "how and why" of a ban on possession and cannot pass "constitutional muster" as a historical analogue to demonstrate this Nation's historical tradition regarding an "arms" ban.

## II.      PHASE TWO: BALANCING OF HARMS AND THE PUBLIC INTEREST

At phase two, a court proceeds to the balancing analysis; weighing the harm the denial of a preliminary injunction would cause a plaintiff against the harm to a defendant if a court were to grant it. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). This balancing process involves a "sliding scale" approach: the more likely a plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). That is, this Court must consider the irreparable harm to Plaintiffs if the preliminary injunction is wrongfully denied versus the irreparable harm to Defendants if the preliminary injunction is wrongfully granted. *See Turnell v. CentiMark Corp*, 796 F.3d 656, 662 (7th Cir. 2015). The Court must also consider the effects, if any, the grant or denial of the preliminary injunction would have on non-parties, *i.e.*, the public interest. *Id.*

There is no question that Plaintiffs are harmed by PICA and will continue to be harmed if this Court denies the motion for preliminary injunction. A constitutional right is at stake. Some Plaintiffs cannot purchase their firearm of choice, nor can they exercise their right to self-defense in the manner they choose. They are bound by the State's limitations. Moreover, other Plaintiffs cannot sell their inventory, even to residents of other states that do not ban the "arms" identified in PICA.

To the contrary, there can be "no harm to a [government agency] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *see also Does v. City of Indianapolis*, Case No. 1:06-CV-865-RLY-WTL, 2006 WL 2927598, at *11 (S.D. Ind. Oct. 5, 2006) ("Defendants will not be harmed by having to conform to constitutional standards, and without an injunction, plaintiffs will continue to be denied their constitutional rights").

However, this does not end the inquiry. The Court must also balance the severity of PICA against the core Second Amendment right of armed self-defense with the public-interest justification of protecting Illinois communities. With respect to the public-interest justification, the answer is less clear-cut and there are two sides that need to be considered. It is uncontroverted that law-abiding members of society, including the elderly, infirmed, and disabled, have the constitutional right to arm themselves for self-defense. As discussed during briefing:

> The need for self-defense is not insignificant. According to a report by the Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive firearm uses in the United States have determined that there are up to 2.5 million instances each year in which civilians used firearms for home defense.

(Doc. 39, p. 11) (citing Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 164 (1995)). Handguns, many of which are limited under PICA, are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 629). It is also uncontroverted that many of the banned modifiers, including but not limited to pistol

grips, protruding grips, flash suppressors, and shrouds, have legitimate purposes that assist law-abiding citizens in their ability to defend themselves. The other side is less clear – there is no evidence as to how PICA will actually help Illinois Communities. It is also not lost on this Court that the Illinois Sheriff's Association and some Illinois States Attorneys believe PICA unconstitutional and cannot, in good conscience, enforce the law as written and honor their sworn oath to uphold the Constitution.

In no way does this Court minimize the damage caused when a firearm is used for an unlawful purpose; however, this Court must be mindful of the rights guaranteed by the Constitution. While PICA was purportedly enacted in response to the Highland Park shooting, it does not appear that the legislature considered an individual's right under the Second Amendment nor Supreme Court precedent. Moreover, PICA did not just regulate the rights of the people to defend themselves; it restricted that right, and in some cases, completely obliterated that right by criminalizing the purchase and the sale of more than 190 "arms." Furthermore, on January 1, 2024, the right to mere possession of these items will be further limited and restricted. *See* 735 ILCS 5/24-1.9(c). Accordingly, the balance of harms favors the Plaintiffs.

## Conclusion

Plaintiffs have satisfied their burden for a preliminary injunction. They have shown irreparable harm with no adequate remedy at law, a reasonable likelihood of success on the merits, that the public interest is in favor of the relief, and the balance of harm weighs in their favor. Therefore, the Plaintiffs' motions for preliminary

injunction are **GRANTED**. Defendants are **ENJOINED** from enforcing Illinois statutes 720 ILCS 5/24-1.9(b) and (c), and 720 ILCS 5/24-1.10, along with the PICA amended provisions set forth in 720 ILCS 5/24-1(a), including subparagraphs (11), (14), (15), and (16), statewide during the pendency of this litigation until the Court can address the merits.

The Court recognizes that the issues with which it is confronted are highly contentious and provoke strong emotions. Again, the Court's ruling today is not a final resolution of the merits of the cases. Nothing in this order prevents the State from confronting firearm-related violence. There is a wide array of civil and criminal laws that permit the commitment and prosecution of those who use or may use firearms to commit crimes. Law enforcement and prosecutors should take their obligations to enforce these laws seriously. Families and the public at large should report concerning behavior. Judges should exercise their prudent judgment in committing individuals that pose a threat to the public and imposing sentences that punish, not just lightly inconvenience, those guilty of firearm-related crimes.

**IT IS SO ORDERED.**

**DATED:  April 28, 2023**

**s/ _Stephen P. McGlynn_**
**STEPHEN P. McGLYNN**
**U.S. District Judge**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 2, 2023, I electronically filed the foregoing State Defendants' Emergency Motion to Stay the District Court's Preliminary Injunction Order Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this appeal are CM/ECF users, and thus will be served via the CM/ECF system.

I further certify that participants in the related appeals *Harrel v. Raoul*, No. 23-1826; *Langley v. Kelly*, No. 23-1827; and *Federal Firearms Licensees of Illinois v. Pritzker*, No. 23-1828, named below, will be served by transmitting a copy to all e-mail addresses of record designated by those participants on May 2, 2023.

Thomas G. Maag
tmaag@maaglaw.com

David G. Sigale
dsigale@sigalelaw.com

Mark L. Shaw
mlshaw@shawlawltd.com

Carl D. Michel
cmichel@michellawyers.com

Thomas R. Ysursa
try@bhylaw.com

James E. Godfrey, Jr.
jgodfrey@evans-dixon.com

Sean P. Dolan
sdolan@evans-dixon.com

Andrew G. Hamilton
aghamilton@mchenrycountyil.gov

Troy Owens
tcowens@mchenrycountyil.gov

Keith B. Hill
khill@heylroyster.com

Dominic W. Sinclair
nsinclair@heylroyster.com

Michael D. Schag
mschag@heylroyster.com

Kerry Banahan Dagestad
kbanahan@evans-dixon.com

Beth Pani
bpani@evans-dixon.com

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov