# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

|  |  |  |
|---|---|---|
| CALEB BARNETT, et al., | ) ) ) ) ) | |
| *Plaintiffs-Appellees*, | ) ) | Nos. 23-1825; 23-1826 |
| v. | ) ) | |
| KWAME RAOUL, Attorney General of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, | ) ) ) ) ) | |
| *Defendants-Appellants*. | ) ) | |

**PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION TO STAY THE DISTRICT COURT'S PRELIMINARY INJUNCTION ORDER PENDING APPEAL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... ii

INTRODUCTION ............................................................................... 1

BACKGROUND .................................................................................. 3

ARGUMENT ....................................................................................... 5

I.    The State Identifies No Viable Basis To Disturb The District Court's
Conclusion That Plaintiffs Are Likely To Succeed On The Merits................ 6

      A.    *Bruen* Abrogates This Court's Decisions in *Friedman* and
*Wilson* ............................................................................. 6

      B.    The Firearms and Magazines HB 5471 Bans Are "Arms" ................. 9

      C.    The Firearms and Magazines HB 5471 Bans Are In Common
Use ...................................................................................11

      D.    There Is No Historical Tradition in This Country of Banning
These Ubiquitous Arms................................................... 16

II.    The Remaining Factors All Favor Leaving the District Court's
Status-Quo-Preserving Injunction In Place ................................. 20

III.    This Court Should Expedite The Appeal.................................... 21

CONCLUSION ................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*,
    841 F.2d 163 (7th Cir. 1988) .................................................................5

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................... *passim*

*Duncan v. Becerra*,
    970 F.3d 1133 (9th Cir. 2020) ............................................. 14, 18, 19

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .................................................................20

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ................................................. 1, 6, 7, 8

*Hinrichs v. Bosma*,
    440 F.3d 393 (7th Cir. 2006) .................................................................6

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...............................................................14

*Miller v. Bonta*,
    542 F.Supp.3d 1009 (S.D. Cal. 2021) ........................................ 13, 18

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111, 2128 (2022) ...................................................... *passim*

*Staples v. United States*,
    511 U.S. 600 (1994) ....................................................................2, 13

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ........................................................1, 6

## Statutes and Regulation

720 ILCS 5/24-1.9(a)(1)(A) .......................................................3, 12

720 ILCS 5/24-1.9(a)(1)(B) ..................................................... 10, 12

720 ILCS 5/24-1.9(a)(1)(C) .............................................................4

720 ILCS 5/24-1.9(a)(1)(D) ..................................................................4

720 ILCS 5/24-1.9(a)(1)(F) ..................................................................4

720 ILCS 5/24-1.9(a)(1)(H) ..................................................................4

720 ILCS 5/24-1.9(a)(1)(I) ...................................................................4

720 ILCS 5/24-1.9(a)(1)(J) ..................................................... 3, 4, 12

720 ILCS 5/24-1.9(a)(1)(K) ..................................................................4

720 ILCS 5/24-1.9(b) ..........................................................................3

720 ILCS 5/24-1.9(c) ..........................................................................3

720 ILCS 5/24-1.9(d) .......................................................................4, 5

720 ILCS 5/24-1.10(a) .....................................................................5, 10

720 ILCS 5/24-1.10(d) ........................................................................ 5

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ............................................18

86 Fed. Reg. 30,826 (2021) .................................................................. 13

**Other Authorities**

Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field &
    Stream (Mar. 20, 2023) https://bit.ly/42nqTBX ..................................14

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups
    on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB ..................12

Ben Johnson, *ATF announces pistol brace ban affecting millions of
    gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN ................. 13

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment*
    (2d ed. 2018) ................................................................ 19

Christopher S. Koper et al., *An Updated Assessment of the Federal
    Assault Weapons Ban: Impacts on Gun Markets & Gun Violence,
    1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice
    (2004), available at https://bit.ly/3wUdGRE ...................................19

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1 (last visited May 9, 2023) ...................................................................15

NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3zKDFh4 ...........................12

NSSF, *Firearm Production in the United States* (2020), https://bit.ly/3NUM7ma........................................................................14

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS ....................................................14

Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners* (Mar. 26, 2023), https://wapo.st/3KrUouy ............................13

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3HaqmKv ................................................... 12, 14, 15, 16

## INTRODUCTION

While the framework for addressing bans on arms may not have been pellucid when this Court decided *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), there is no longer room for debate. The Supreme Court made clear last year "that the Second Amendment protects the possession and use of weapons that are 'in common use,'" and that the relevant metric for that determination is *not* whether arms were common at the Founding or "considered 'dangerous and unusual' during the colonial period," but whether they are "in common use *today*." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128, 2143 (2022) (emphasis added). One would think that would have led Illinois to take stock of its existing prohibitions and ensure that they are consistent with the test *Bruen* laid down. Instead, Illinois took the opposite approach, rushing to usher in a sweeping new law that bans hundreds of models of rifles, shotguns, and pistols that have been lawful in Illinois (and most other states) for the better part of a century, and in some cases even longer. For good measure, Illinois banned a wide swath of standard-issue ammunition feeding devices too.

That effort is patently unconstitutional under *Bruen*. The firearms Illinois has banned are not newfangled innovations that demand novel government intervention. Semiautomatic rifles, shotguns, and pistols with the features Illinois has singled out have been around for generations, as have ammunition feeding devices that hold

1

more than 10 or 15 rounds.  As recently as a few decades ago, it was common ground that these ubiquitous arms are "lawful," *Staples v. United States*, 511 U.S. 600, 612 (1994), and millions of law-abiding Americans continue to lawfully possess them for lawful purposes today.  Under *Bruen*, that is the end of the matter.

The district court correctly recognized as much and granted Plaintiffs' consolidated motions for a preliminary injunction.  This Court has since temporarily stayed that order, but it should not make that action permanent, as the state has not come close to meeting its burden of showing that its law is consistent with historical tradition.  Instead, the state just resists the proposition that it bears any burden at all.  But *Bruen* speaks for itself, and it means what it says.  Plaintiffs are therefore likely to succeed on the merits, as the district court concluded after considering extensive briefing and argument, and they should be allowed to exercise their constitutional rights during the state's appeal.  And far from seeking to prolong this appeal, Plaintiffs are eager—indeed, apparently far more eager than the state—to expeditiously brief and argue it so that a final determination of HB 5471's constitutionality may be reached forthwith.  The Court should accordingly deny the state's motion and reinstate the preliminary injunction, but in all events should promptly issue a substantially expedited briefing schedule to ensure that Plaintiffs have a full and fair opportunity to defend the relief they secured.

## BACKGROUND

*Bruen* plainly made it more difficult for the states to restrict the keeping and bearing of firearms.  Yet rather than view *Bruen* as a prompt to ensure that its existing restrictions conformed with the Constitution, Illinois inexplicably deemed it an occasion to enact new bans on the possession of common firearms that were long lawful in Illinois (and elsewhere).  Under HB 5471, it is now "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon."  720 ILCS 5/24-1.9(b).  And come next year, it will be unlawful even to "possess an assault weapon."  720 ILCS 5/24-1.9(c).

HB 5471 defines "assault weapons" exceedingly broadly.  First, HB 5471 bans any "semiautomatic rifle" with "the capacity to accept a detachable magazine" that has "one or more of the following": "a pistol grip," "any feature capable of functioning as a protruding grip that can be held by the non-trigger hand," a folding or telescoping stock, a "flash suppressor," or a "shroud" (*i.e.*, a forend).  720 ILCS 5/24-1.9(a)(1)(A).  Second, HB 5471 bans "all AR type[]" rifles ("including" 43 named variants, such as the AR-15) explicitly, as well as all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon."  720 ILCS 5/24-1.9(a)(1)(J)(ii).  Third, HB 5471 bans all semiautomatic shotguns with "one or more of" a list of features similar to the list for semiautomatic rifles, including

semiautomatic shotguns with "a pistol grip." 720 ILCS 5/24-1.9(a)(1)(F). Fourth, HB 5471 lists nearly 100 more rifles and deems them all—and any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"— "assault weapons." 720 ILCS 5/24-1.9(a)(1)(J). All in all, HB 5471 bans nearly a thousand rifles and shotguns, including all of the most popular models.

HB 5471 also defines "assault weapon" to include any semiautomatic *pistol* "that has the capacity to accept a detachable magazine" and one of a list of features similar to the features listed for rifles. 720 ILCS 5/24-1.9(a)(1)(C). It also bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9(a)(1)(D). And HB 5471 goes on to ban these common pistols twice more: banning "all AR type[]" pistols ("including" 13 named variants) and approximately 40 more semiautomatic pistol models by name; and banning all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." 720 ILCS 5/24-1.9(a)(1)(K). In a final catchall, "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," plus any part that can convert any firearm into one, is an "assault weapon[]." 720 ILCS 5/24-1.9(a)(1)(H)-(I).[1]

In addition to banning many of the most common firearms in America, Illinois

---

[1] The already-long list of banned arms is not static: The State Police can add to it annually. 720 ILCS 5/24-1.9(d)(3).

now bans any magazine with "a capacity of … more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," which HB 5471 dubs a "large capacity ammunition feeding device." 720 ILCS 5/24-1.10(a)(1). Current owners may continue to possess now-prohibited arms and magazines, but only subject to onerous restrictions. 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d).

Plaintiffs-Appellees challenged HB 5471 as a clear violation of the Second Amendment as recently clarified in *Bruen* and sought a preliminary injunction. After considering extensive briefing and argument, the district court granted that relief. The state moved the district court for a stay mere hours later—albeit not on an emergency basis—and then sought the same relief from this Court before Plaintiffs-Appellants had even responded. Before Plaintiffs-Appellants had the opportunity to respond to that motion either, this Court temporarily stayed the injunction via a single-judge order.

## ARGUMENT

A stay pending appeal is an extraordinary remedy that should issue only in exceptional circumstances. *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*, 841 F.2d 163, 165 (7th Cir. 1988). That is especially true when the order sought to be stayed is a preliminary injunction, as the court is essentially being asked to second-guess on truncated briefing the same factors the district court considered after full briefing and argument. The party seeking a stay must show "it has a

significant probability of success on the merits[ and] that it will face irreparable harm absent a stay; and that a stay will not injure the opposing party and will be in the public interest." *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006). The state has not made and cannot make that showing here.

I.     **The State Identifies No Viable Basis To Disturb The District Court's Conclusion That Plaintiffs Are Likely To Succeed On The Merits.**

A.     ***Bruen* Abrogates This Court's Decisions in *Friedman* and *Wilson*.**

When this Court first confronted a ban on "assault weapons" and a magazine capacity restriction without the benefit of *Bruen*, it analyzed their constitutionality by asking, first, whether they "ban[ned] weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,'" and, second, whether they left law-abiding citizens with "adequate means of self-defense." *Friedman*, 784 F.3d at 410-12. The next time the Court confronted such restrictions, it "first ask[ed] whether the restricted activity is protected by the Second Amendment," and then "inquire[d] whether the strength of the government's reasons justifies the restriction of rights at issue." *Wilson*, 937 F.3d at 1036. Neither analysis survives *Bruen*.

At the outset, *Bruen* expressly repudiated any "two-step" mode of analysis that balances "the strength of the government's reasons" for restricting activity protected by the Second Amendment. *See Bruen*, 142 S.Ct. at 2127. Under *Bruen*, it is not twenty-first-century policy concerns, but "the traditions of the American

6

people [] that demand[] our unqualified deference." *Id.* at 2131. Accordingly, so long as "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the state must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126-27. There is no longer any room for the kind of interest-balancing in which *Friedman* and *Wilson* engaged.

*Bruen* also made clear how courts should analyze prohibitions on arms. First, *Bruen* identified what "Arms" are covered by the text of the Second Amendment: "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* Under *Bruen*'s threshold inquiry, then, it does not matter whether arms "were common at the time of ratification or … have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Friedman*, 784 F.3d at 410. *Any* instrument that facilitates armed self-defense is "presumptively protect[ed]" by the Second Amendment. *Bruen*, 142 S.Ct. at 2126.

To be sure, that presumption is not unrebuttable. But a state may rebut it only by "affirmatively prov[ing]" that its prohibition is consistent with "historical

tradition." *Id.* at 2127. And when it comes to efforts to ban arms, *Bruen* identified what that historical tradition is: "[T]he Second Amendment protects … weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 2143. Lest there be any lingering confusion, the Court also identified what "time" matters: The Second Amendment protects arms that are "in common use *today*," regardless of whether they would have been "considered 'dangerous and unusual weapons' in the 1690s" or when the Second or Fourteenth Amendments were ratified. *Id.* (emphasis added). Once again, then, *Bruen* squarely rejects any test based on whether arms "were common at the time of ratification or … have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Friedman*, 784 F.3d at 410.

The first question this Court must ask in analyzing HB 5471 thus is whether the firearms and magazines it bans "facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132. If they do, then they are "presumptively protect[ed]," and the state must prove that they are not "in common use today," *id.* at 2126, 2143—i.e., that they are *not* "typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). If it cannot, then HB 5471 is unconstitutional. Because neither *Friedman* nor *Wilson* employed that analysis, the results they reached can survive if—and only if—a faithful application of *Bruen*

compels the same conclusion.  For the reasons discussed below, it compels precisely the opposite.

### B.     The Firearms and Magazines HB 5471 Bans Are "Arms."

The state offers no reason to disturb the district court's conclusion that the rifles, pistols, and shotguns HB 5471 bans are "Arms" covered by the text of the Second Amendment.  Indeed, it no longer appears to dispute that those firearms are "Arms."  *See* CA7.Stay.Br.8-10 (making no such argument and forfeiting the issue).

Illinois instead argues only that the ammunition feeding devices (i.e., magazines) that HB 5471 bans do not qualify as "Arms."  But *Bruen* could not be clearer that "the Second Amendment's definition of 'arms'" covers all "modern instruments that facilitate armed self-defense."  142 S.Ct. at 2132.  Remarkably, the state never even so much as mentions that definition.  Magazines obviously satisfy it.  As one of the state's own witnesses explained, virtually all modern "pistol[s]" and rifles "utilize[] a 'box' magazine" that "is inserted into the firearm" "to contain and feed multiple rounds of ammunition" and then is detached and reloaded when spent.  D.Ct.Dkt.37-9 ¶10.  These magazines are an integral part of the design mechanism that makes semiautomatic firearms work.  When the trigger is pulled, the round in the chamber fires, and the semiautomatic action combines with the

magazine to feed a new round into the chamber. That is why they are called "ammunition *feeding* devices."

That readily distinguishes magazines from the kinds of non-functional "accessories" to which the state tries to analogize, "like cartridge cases and boxes." Stay.Br.8-9. A cartridge box is just that—a box that holds cartridges. The box itself is not inserted into the firearm to facilitate its use for self-defense. To be sure, magazines may not have "offensive or defensive uses" when they are *not* inserted into a firearm. Stay.Br.9. But the same could be said of just about every component of a firearm. Triggers, barrels, and firing pins are of little use by themselves. Yet they are no less important to the design and functioning of a firearm than an engine or transmission is to a car. If all of these integral components were "accessories" entitled no protection at all, Stay.Br.8-9, then a state could ban the whole by the sum of its parts, rendering the Second Amendment meaningless.

The state's argument makes particularly little sense given that HB 5471 bans not just detachable magazines, but "fixed magazines" as well. *See* 720 ILCS 5/24-1.9(a)(1)(B); 720 ILCS 5/24-1.10(a). Illinois did not even argue below that firearms with fixed magazines somehow cease to be "arms." Nevertheless, it now asserts that they too deserve no protection because "fixed magazines … are not necessary to operate any firearm as designed." Stay.Br.9. That is both wrong and beside the point. Firearms with unremovable feeding devices cannot be fired if the fixed

magazine is removed. Indeed, one of the state's own witnesses confirmed that fixed magazines cannot be removed from a firearm without rendering it inoperable as a firearm—i.e., as an instrument of self-defense. D.Ct.Dkt.37-7 ¶22.

In all events, the state has the law wrong again. "[T]he Second Amendment's definition of 'arms'" covers all "modern instruments that *facilitate* armed self-defense," not just components that are "necessary" to (state-favored) firearms. 142 S.Ct. at 2132 (emphasis added). And rightly so, for if the Second Amendment protected only those arms or components that are essential to self-defense, there would be virtually no limit to what the government could ban. A firearm equipped with a 15- or 30-round magazine is equally capable (indeed, more so) of facilitating armed self-defense as one equipped with a 10-round magazine, regardless of whether that magazine is detachable or fixed, and regardless of how frequently people expend more than 10 or 15 of those rounds for self-defense. The state thus identifies no reason to disturb the district court's conclusion that the magazines HB 5471 bans are "arms."

### C.     The Firearms and Magazines HB 5471 Bans Are In Common Use.

Because the firearms and feeding devices HB 5471 bans easily fit "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that they may be banned "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126, 2132. The district court correctly concluded that the state

is exceedingly unlikely to meet that burden.  D.Ct.Dkt.101 at 22-24.  The Supreme Court has already determined which "arms" may be banned consistent with "historical tradition":  those that are not "in common use today," but rather are "highly unusual in society at large." *Id.* at 2143.  If—and only if—arms are "highly unusual" *today* can they fall within the historical tradition of prohibitions on "dangerous *and unusual*" arms. *Id.* (emphasis added).  The only question after *Bruen* is whether the state has proven that the arms it has banned are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

That makes this an easy case, for the arms HB 5471 bans are the furthest thing from "highly unusual."  HB 5471 bans all AR-platform rifles, by both feature and name.  720 ILCS 5/24-1.9(a)(1)(A), (B), (J).  Recent estimates indicate that millions of Americans collectively own more than *24 million* of these rifles.  Op.23; William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2 (May 13, 2022), https://bit.ly/3HaqmKv; NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3zKDFh4.  That exceeds by a considerable measure the number of Ford F-150s, America's most popular automobile, in the country.  *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB.

That should come as little surprise. The Supreme Court recognized nearly three decades ago that "AR-15 rifle[s]" are "widely accepted as lawful possessions." *Staples*, 511 U.S. at 603, 612. And "the numbers have been steadily increasing" since then. *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020, 1022 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In 2018 alone[,] … 1,954,000 modern rifles were manufactured or imported into the United States." *Id.* at 1022. A product lawfully owned by millions of Americans—and 20% of all gun owners, *see* Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners* (Mar. 26, 2023), https://wapo.st/3KrUouy—is plainly not "highly unusual in society at large."

Moreover, HB 5471 does not stop with AR-platform rifles, or even rifles. *See supra* pp.3-5. And while the other types of firearms it bans may not be quite as ubiquitous as AR-platform rifles, the state has not even tried to meet its burden of proving that they are uncommon. *See, e.g.*, Ben Johnson, *ATF announces pistol brace ban affecting millions of gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN (explaining that private ownership of "pistol braces," which are most commonly used for the types of pistols HB 5471 bans, is estimated to be around 10 to 40 million); 86 Fed. Reg. 30,826, 30,845-46 (2021) (ATF estimate that 3 to 7 million stabilizing braces, designed for and commonly used with AR-style pistols, were sold between 2013 and 2020); Phil Bourjaily, *The Best Duck Hunting Shotguns*

*of 2023*, Field & Stream (Mar. 20, 2023) https://bit.ly/42nqTBX (listing multiple shotguns banned by HB 5471).  In short, far from committing any clear error, the district court was eminently correct to conclude that the ubiquitous arms HB 5471 bans are common.

The same goes for the ammunition feeding devices HB 5471 bans. Conservative estimates are that Americans own more than 100 million magazines that hold more than 10 rounds.  *See* English, *supra*, at 24 (estimating 269 million such handgun magazines and another 273 million such rifle magazines); NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3NUM7ma; *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc).  And recent industry data indicates that 75% of modern rifle magazines in the United States have a standard capacity of more than 10 rounds. NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS.  Likewise, many of the most popular handguns come standard with 15+ round magazines.  D.Ct.Dkt.10 at 16-17.  The magazines HB 5471 bans are thus even more ubiquitous than the firearms it bans.

The district court also correctly concluded that the state is highly unlikely to prove that the common arms HB 5471 bans are not commonly owned "for lawful purposes," *Heller*, 554 U.S. at 625.  D.Ct.Dkt.101 at 22.  Of course, these arms can be used to perpetrate horrific crimes, *see* Stay.Br.15-16, just as any modern firearm

can. But that has nothing to do with the relevant legal question—i.e., whether they are "*typically* possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). On that question, the record is undisputed and indisputable: Purchasers consistently report that self-defense, hunting, and sport shooting are the most important reasons why they buy rifles on the AR-15 platform. NSSF, *2021 Firearms Retailer Survey Report* at 7, https://bit.ly/3CXJwC1 (last visited May 9, 2023); English, *supra*, at 23. That is unsurprising; the features Illinois singles out are self-evidently beneficial for personal self-defense—the *raison d'être* of the Amendment. Indeed, the state contends that it may ban the arms HB 5471 prohibits *precisely because* they increase "sustained accuracy during rapid fire." Stay.Br.10. As the district court explained, "the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target." D.Ct.Dkt.101 at 29.

Unable to demonstrate that the arms it has banned are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, the state tries to change the subject. It insists that these arms are "not commonly *used* for personal self-defense," Stay.Br.10 (emphasis added), by which it apparently means firing a particular firearm or emptying an entire magazine when confronted by an assailant. In the state's view, "the people" have no right to keep a firearm for self-defense unless they often shoot attackers with it, and they have no right to keep a magazine

above a certain capacity unless they frequently fire that many rounds in self-defense. Stay.Br.10-11.  By that logic, the state could seemingly ban arms entirely, as most people fortunately never have to fire their firearms for self-defense at all.  Indeed, even people who confront a self-defense situation often manage to ward off the attack merely by brandishing a firearm.  *See* English, *supra*, at 14 ("[I]n the vast majority of defensive gun uses (81.9%), the gun was not fired.").

Unsurprisingly, that is not the law.  As *Bruen* reiterated, the people are entitled to keep and bear arms "'for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict with another person.'"  142 S.Ct. at 2134 (ellipses in original; emphasis added) (quoting *Heller*, 554 U.S. at 584).  That fundamental right does not turn on how frequently people actually confront such situations or how many rounds they typically fire when they do.  Indeed, *Bruen* squarely rejected the idea that a state may restrict Second Amendment rights based on whether it thinks people really "need" to exercise them.  *See id.* at 2156.  Simply put, "the very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

### D.    There Is No Historical Tradition in This Country of Banning These Ubiquitous Arms.

The Court can and should end its analysis there.  "[T]he traditions of the American people … demand[] our unqualified deference," *id.* at 2131, and that

tradition is that law-abiding citizens may possess arms that are commonly possessed for self-defense. That *is* the historical test—i.e., the key inquiry under *Bruen*—and it forecloses the state's effort to ban these common arms. After all, a state may not prohibit what the Constitution protects, even if what the Constitution protects is dangerous or capable of abuse.

Rather than engage with what *Bruen* said about bans on arms, the state renews its argument that the district court should have deployed the "more nuanced" historical approach reserved for laws that respond to "dramatic technological changes" or "unprecedented societal concerns." Stay.Br.13-17. But *Bruen* already squarely rejected that argument when it comes to restrictions on particular types of arms. As the Court explained, even if a state could identify historical "laws[ that] prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons'" at the time, that would "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use *today*." *Bruen*, 142 S.Ct. at 2143 (emphasis added). That makes sense: The test *Bruen* prescribes for protected arms already accounts for technological and social change by ensuring that the Second Amendment's protection extends to all firearms that are common in society at the time the analysis is conducted.

In all events, the state has identified neither a "dramatical technological change" nor an "unprecedented societal concern." The arms Illinois has banned are

17

no novelties. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan*, 970 F.3d at 1147. Even narrowing the lens to semiautomatics equipped with detachable magazines and features like a pistol grip, these too have been around for over a century. Indeed, one of the firearms Illinois has identified as prohibited by HB 5471 is the Broomhandle, which dates back to 1896. *See* D.Ct.Dkt.37-3 Ex.A at 8; *Duncan*, 970 F.3d at 1148. Yet before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024.

The earliest laws treating such features as sufficient to convert an otherwise-lawful firearm into a so-called "assault weapon" date back to only 1989, and the earliest restriction on magazine capacity dates back only to 1990, which is far too late to serve as an indicator of "historical tradition." *Bruen*, 142 S.Ct at 2126. And even today, such laws remain rare; the arms Illinois has banned are legal in (at least) 40 states, and the magazines are legal in (at least) 35. As for the federal government, it did not restrict semiautomatic arms, firing capacity, or magazine capacity until 1994. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994). And Congress allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts*

*on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE.

The state is thus forced to resort to laws restricting *fully automatic* firearms. Stay.Br.5-6, 14. But the historically divergent treatment of automatic versus semiautomatic firearms only undercuts the state's case. While many states and the federal government began restricting *fully automatic* firearms during the Prohibition Era, only a handful of states and D.C. imposed any restrictions on *semi*automatic arms—and most were repealed outright or replaced with laws regulating only machine guns. *Duncan*, 970 F.3d at 1150 & n.10. That is particularly notable because semiautomatic arms had been on the civilian market for decades before anyone tried to market automatic firearms to civilians. In fact, unlike automatics, semiautomatic arms were civilian arms from the start. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment*, 463, 519 (2d ed. 2018). Yet while more than a dozen states banned automatic arms within only a couple years of their entry onto the civilian market in the 1920s, very few ever restricted semiautomatic arms, and none tried to ban the most popular ones.

Simply put, there is no enduring American tradition of banning any kinds of semiautomatic firearms or feeding devices. To the contrary, the enduring American tradition is one of protecting the right of law-abiding citizens to possess firearms that, like semiautomatic rifles and pistols equipped with common features such as

19

detachable magazines, pistol grips, and thumbhole stocks, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2127, the district court correctly concluded that HB 5471 likely violates the Second Amendment.

## II. The Remaining Factors All Favor Leaving the District Court's Status-Quo-Preserving Injunction In Place.

As one would expect in a contest between law-abiding citizens' ability to exercise constitutional rights and the state's interest in enforcing a novel restriction on those recently reaffirmed rights, the remaining factors strongly favor leaving the district court's status-quo-preserving injunction in place. The district court was plainly correct to conclude that HB 5471 is causing Plaintiffs irreparable harm, as it is the square law of this Circuit that "[i]nfringements of" "the right to possess firearms for protection" inflict irreparable injury. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). The state argues that those constitutional injuries do not matter because Plaintiffs could use other weapons for self-defense. Stay.Br.18. But *Heller* expressly rejected the argument "that it is permissible to ban the possession of [one type of protected firearm] so long as the possession of other firearms … is allowed." 554 U.S. at 629. And while the state complains that the district court "did not meaningfully explain why a damages award could not make the businesses

whole" from lost sales due to HB 5471, Stay.Br.19, the explanation is obvious: Economic injuries are irreparable when, as here, the defendants have Eleventh Amendment immunity. The state tellingly nowhere suggests that it would waive that immunity and pay Plaintiffs who suffer such injuries on account of a stay should HB 5471 ultimately be held unconstitutional. Finally, HB 5471 tramples on fundamental constitutional rights, and it is always in the public interest to prevent the violation of constitutional rights. The state has no answer for that black-letter law.

## III.   This Court Should Expedite The Appeal.

While the state has identified no reason to stay the district court's injunction for the duration of its appeal, if this Court is nevertheless inclined to grant that relief, it should at the very least substantially expedite this appeal. Indeed, Plaintiffs urge the Court to expedite this appeal either way, on a schedule that will allow argument to occur alongside argument in *Bevis v. City of Naperville*, No. 23-1353, which also challenges HB 5471's constitutionality. The state has demonstrated that it is perfectly capable of briefing this case on an expedited basis, as it filed its emergency stay motion a mere two business days after the district court's injunction issued, and it has already fully briefed the issues in *Bevis*. Yet while Plaintiffs immediately approached the state about expedition, and offered to brief this case as expeditiously as necessary to ensure that this Court can consider it alongside *Bevis*, the state has yet to commit to any expedition at all. Plaintiffs thus urge the Court to enter an expedited briefing

schedule no matter how it resolves the state's stay motion, but the better course would

be to leave the district court's status-quo-preserving injunction in place pending that

expedited appellate consideration.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Respectfully submitted,

s/Erin E. Murphy

GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025
(618) 655-3131
gpinter@smbtrials.com

ANDREW A. LOTHSON*
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN*
MARIEL A. BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Plaintiffs-Appellees Caleb Barnett, et al.*

DAVID G. SIGALE
LAW FIRM OF DAVID G. SIGALE, P.C.
430 W. Roosevelt Road
Wheaton, IL 60187

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036

*Counsel for Plaintiffs-Appellees Dane Harrell, et al.*

May 9, 2023

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,200 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

May 9, 2023

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy