Nos. 23-1793, 23-1825, 23-1826, 23-1827, 23-1828 (consol.)

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

JAVIER HERRERA, et al.,

Plaintiffs-Appellants,

    v.

KWAME RAOUL, et al.,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division &
the Southern District of Illinois
Nos. 23-cv-00532, 23-cv-00209-SPM, 23-cv-00141-SPM,
23-cv-00192-SPM, 23-cv-00215-SPM
The Honorable Lindsay C. Jenkins & Stephen P. McGlynn, Judges Presiding
————

**BRIEF AND SHORT APPENDIX
OF THE CITY OF CHICAGO AND SUPERINTENDENT OF POLICE**
————

Corporation Counsel
 of the City of Chicago
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 744-3173

MYRIAM ZRECZNY KASPER
 Deputy Corporation Counsel
SUZANNE LOOSE
 Chief Assistant Corporation Counsel
ELIZABETH MARY TISHER
 Assistant Corporation Counsel
 Of Counsel

# TABLE OF CONTENTS

———

Page

**JURISDICTIONAL STATEMENT** ................................................................ 1

**ISSUE PRESENTED** ....................................................................................... 2

**STATEMENT OF THE CASE** ........................................................................ 2

**SUMMARY OF ARGUMENT** ........................................................................ 5

**ARGUMENT** ................................................................................................... 7

I.      **HERRERA IS NOT LIKELY TO SUCCEED ON THE MERITS.** ............. 8

      A.    **Assault Weapons And High-Capacity Magazines Are Not In Common Use For Self-Defense.** ................................................. 10

      B.    **Assault Weapons And High-Capacity Magazines Are Dangerous And Unusual.** ................................................................. 19

            1.    **AR-15s are "like" M-16s and thus "may be banned" under** <u>**Heller**</u>**.** ................................................. 21

            2.    **Assault weapons and high-capacity magazines are dangerous and unusual because of their extraordinary lethality.** ........................... 25

            3.    **Assault weapons and high-capacity magazines pose extraordinary risks to law enforcement.** ................................................. 27

      C.    **The City's Ordinance Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.** .............................. 31

            1.    **The nation has a longstanding tradition of regulating weapons that threaten the public peace.** ............................................................................... 32

            2.    **The City's ordinance addresses dramatic technological changes and unprecedented societal concerns.** ................................................. 36

i

3.      The City's ordinance imposes a comparable
        burden on the right of armed self-defense,
        and is comparably justified. ....................................................38

II.    HERRERA WILL NOT SUFFER IRREPARABLE HARM ABSENT A
       PRELIMINARY INJUNCTION. ..................................................................45

III.   THE BALANCE OF EQUITIES FAVORS DEFENDANTS AND THE
       PUBLIC INTEREST. ..........................................................................................49

CONCLUSION ................................................................................................................51

# TABLE OF AUTHORITIES

———

**CASES**                                                                           **Page(s)**

Alden v. Maine,
      527 U.S. 706 (1999) ........................................................................... 20

Aymette v. State,
      21 Tenn. (2 Hum.) 154 (1840) .................................................... 34, 41

Caetano v. Massachusetts,
      577 U.S. 411 (2016) ........................................................................... 19

District of Columbia v. Heller,
      554 U.S. 570 (2008) ......................................................................*passim*

Ezell v. City of Chicago,
      651 F.3d 684 (7th Cir. 2011) ......................................................... 48-49

Friedman v. City of Highland Park,
      784 F.3d 406 (7th Cir. 2015) .............................................................. 48

Halczenko v. Ascension Health, Inc.,
      37 F.4th 1321 (7th Cir. 2022) ............................................................. 47

Illinois Republican Party v. Pritzker,
      973 F.3d 760 (7th Cir. 2020) ............................................................. 8, 9

Kolbe v. Hogan,
      849 F.3d 114 (4th Cir. 2017), abrogated on other grounds by
      New York State Rifle & Pistol Association v. Bruen,
      142 S. Ct. 2111 (2022) .................................................................. 20-21

McDonald v. City of Chicago,
      561 U.S. 742 (2010) ........................................................................... 11

Michigan v. U.S. Army Corps of Engineers,
      667 F.3d 765 (7th Cir. 2011) .............................................................. 47

New York State Rifle & Pistol Association v. Bruen,
      142 S. Ct. 2111 (2022) ..................................................................*passim*

Nken v. Holder,
      556 U.S. 418 (2009) ............................................................................. 8

Parker v. District of Columbia,
    478 F.3d 370 (D.C. Cir. 2007), aff'd sub nom.
    District of Columbia v. Heller, 554 U.S. 570 (2008) ........................................ 13

Seminole Tribe of Florida v. Florida,
    517 U.S. 44 (1996) ........................................................................................ 24-25

State v. Huntley,
    25 N.C. (3 Ired.) 418 (1843) ............................................................................. 41

Stuller, Inc. v. Steak N Shake Enterprises,
    695 F.3d 676 (7th Cir. 2012) ............................................................................... 8

Tully v. Okeson,
    977 F.3d 608 (7th Cir. 2020) ........................................................................... 8-9

Ty, Inc. v. Jones Group, Inc.,
    237 F.3d 891 (7th Cir. 2001) ............................................................................. 48

United States v. Miller,
    307 U.S. 174 (1939) .................................................................................... 10, 11

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982) ........................................................................................... 8

Winter v. Natural Resources Defense Council, Inc.,
    555 U.S. 7 (2008) ................................................................................... 8, 45-46

Worman v. Healey,
    922 F.3d 26 (1st Cir. 2019), abrogated on other grounds by
    New York State Rifle & Pistol Association v. Bruen,
    142 S. Ct. 2111 (2022) .................................................................. 14, 15, 44-45

## OTHER AUTHORITIES

28 U.S.C. § 1292(a)(1) ................................................................................... 1, 2

28 U.S.C. § 1331 ............................................................................................ 1, 2

28 U.S.C. § 2107(a) ............................................................................................ 2

42 U.S.C. § 1983 ................................................................................................. 1

Chicago City Council Journal of Proceedings, July 7, 1992 ...................... 2-3

Chicago City Council Journal of Proceedings, July 2, 2010.........................................3

Fed. R. App. P. 4(a)(1)(A)........................................................................................ 2

Gary Kleck & Marc Gertz, <u>Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun</u>, 86 J. Crim. L. & Criminology 150 (1995).......................... 13

Joseph Blocher & Reva B. Siegel, <u>When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under <i>Heller</i></u>, 116 Nw. U. L. Rev. 139 (2021)................................................................................................................ 41, 42

Mark A. Frassetto, <u>To the Terror of the People: Public Disorder Crimes & the Original Public Understanding of the Second Amendment</u>, 43 S. Ill. U. L.J. 61 (2018).................................................................................................................. 33, 40

Municipal Code of Chicago, Ill. § 8-20-010 .................................................. 3-4, 12, 24

Municipal Code of Chicago, Ill. § 8-20-075 ...................................................... 3

Municipal Code of Chicago, Ill. § 8-20-085 (2010)........................................... 3

Municipal Code of Chicago, Ill. § 8-20-085(a)........................................... 4, 24

Municipal Code of Chicago, Ill. § 8-24-025 (1992)........................................... 3

Saul Cornell, <u>The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928</u>, 55 U. C. Davis L. Rev. 2545 (2022) ................................. 40-41

Violence Policy Center, <u>Mass Shootings in the United States Involving Large Capacity Ammunition Magazines</u>, Apr. 17, 2023, https://vpc.org/fact_sht/VPC shootinglist.pdf ............................................................................................ 42

William Blackstone, <u>Commentaries on the Laws of England</u> (1765) ........................ 10

William Blackstone, <u>Commentaries on the Laws of England</u> (1769) .................. 20, 33

William Blackstone, <u>Commentaries on the Laws of England</u> (St. George Tucker ed. 1803)............................................................................................................... 10

Zara Abrams, <u>Stress of Mass Shootings Causing Cascade of Collective Traumas</u>, Sept. 1, 2022, https://www.apa.org/monitor/2022/09/news-mass-shootings-collective-traumas ....................................................................................................... 38, 42

# JURISDICTIONAL STATEMENT

_____

## Herrera v. Raoul, No. 23-1793

On January 27, 2023, Javier Herrera brought this 42 U.S.C. § 1983 action against the State of Illinois Attorney General, the Director of Illinois State Police, Cook County and its Board President and Sheriff, the Illinois State's Attorney, and the City of Chicago and its Superintendent of Police. R. 1.[1] Herrera claims the State, County, and City bans on assault weapons and high-capacity magazines violate the Second and Fourteenth Amendments to the United States Constitution. R. 1. The district court has jurisdiction pursuant to 28 U.S.C. § 1331.

On April 25, 2023, the district court denied Herrera's motion for a temporary restraining order and preliminary injunction. A1-A31. On April 26, 2023, Herrera filed a notice of appeal. This court has jurisdiction over this appeal from the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## Barnett v. Raoul, Nos. 23-1825, 23-1826, 23-1827, 23-1828

Other plaintiffs filed complaints in four separate lawsuits challenging the State ban on assault weapons and large-capacity magazines. Barnett v. Raoul, No. 23-1825; Harrel v. Raoul, No. 23-1826; Langley v. Kelly, No. 23-1827; and Federal Firearms Licensees of Illinois v. Pritzker, No. 23-1828 (collectively "Barnett"). Among other claims, plaintiffs allege the State's ban violates the Second and

_____

[1] We cite the record in Herrera as R. __. We cite the records in the consolidated cases according to the lead plaintiff's name and record number, _i.e._, Barnett R. __. We cite the appendix as A__.

Fourteenth Amendments.  <u>Barnett</u> R. 1; <u>Harrel</u> R.1; <u>Langley</u> R. 1; <u>Federal Firearms</u>
<u>Licensees of Illinois</u> ("<u>FFLI</u>") R. 1.  The district court has jurisdiction pursuant to 28
U.S.C. § 1331.

On April 28, 2023, the district court entered an order granting the plaintiffs'
motions for preliminary injunction.  <u>Barnett</u> R. 101.  Also on April 28, 2023, the
State filed a notice of appeal in each of the four cases.  <u>Barnett</u> R. 104; <u>Harrel</u> R. 46;
<u>Langley</u> R. 37; <u>FFLI</u> R. 45.  The State timely appealed under 28 U.S.C. § 2107(a)
and Fed. R. App. P. 4(a)(1)(A).  This court has jurisdiction over these appeals
pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED

————

Whether the district court properly denied Herrera's motion for a temporary
restraining order and preliminary injunction, where he is not likely to succeed on
the merits of his Second and Fourteenth Amendment claims, has not shown he will
suffer irreparable harm absent an injunction, and the balance of equities favors
defendants and the public interest.

## STATEMENT OF THE CASE

————

**City's Ordinance.**  In 1992, Chicago City Council enacted an ordinance
banning assault weapons.  Chicago City Council Journal of Proceedings, July 7,
1992, 19196.  City Council found that "[t]here has been a recent nationwide increase
in armed violence," "[m]any violent crimes have been committed with assault
weapons," assault weapons "are not primarily designed for any lawful nonmilitary

use," and "[t]here is therefore a need to impose more effective regulation of assault weapons and other firearms." Id. at 19197. The ordinance provided that "[n]o person shall sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or assault ammunition." Id. at 19206; Municipal Code of Chicago, Ill. § 8-24-025 (1992). Among the rifles included in the definition of "assault weapon" was the AR-15. Id. at 19203. City Council amended the ordinance periodically and, in 2010, made it "unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine." Chicago City Council Journal of Proceedings, July 2, 2010, 96247; Municipal Code of Chicago, Ill. § 8-20-085 (2010).

City Council amended and recodified its firearms ordinance in 2013, and, in relevant respects, that version is still in force today. The current ordinance makes it "unlawful for a person to import, sell, manufacture, transfer, or possess an assault weapon." Municipal Code of Chicago, Ill. § 8-20-075. The ordinance provides a list of specific assault weapons that are banned, including AR-15 rifles and all other "AR types." Id. § 8-20-010(a)(10)(B). The ordinance also defines "assault weapon" to include semiautomatic rifles that have certain features, such as "the ability to accept a detachable magazine" and "one or more of the following: (A) a folding, telescoping or detachable stock; (B) a handgun grip; (C) a forward grip; (D) a threaded barrel; (E) a grenade, flare or rocket launcher; or (F) a barrel shroud," id. § 8-20-010(a)(1); or "a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and

3

capable of operating only with, .22 caliber rimfire ammunition," id. § 8-20-010(a)(2).

The current ordinance also makes it "unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine or tubular magazine extension for a shotgun," Municipal Code of Chicago, Ill. § 8-20-085(a), and defines "high capacity magazine" as any "magazine, belt, drum, feed strip, or similar device, including any such device joined or coupled with another in any manner, that has an overall capacity of more than 15 rounds of ammunition," except for "an attached tubular device [designed] to accept, and capable of operating only with, .22 caliber rimfire ammunition," id. § 8-20-010.

**Herrera's Complaint.** On January 27, 2023, Herrera filed a complaint against the City and its Superintendent of Police, alleging the City's ban on assault weapons and high-capacity magazines violates the Second and Fourteenth Amendments. R. 1 ¶¶ 155-73.[2] Herrera is a Chicago resident who owns two Glock handguns and two AR-15 rifles. R. 1 ¶¶ 20, 23, 24. He alleges that the City's ordinance prevents him from keeping in his home his AR-15 rifles and the 30-round magazines he uses with them, and further alleges that he must store them outside the City. R. 1 ¶¶ 24, 32. He also alleges that the City's ordinance prevents him from using the 17-round magazine that comes standard with his Glock 45. R. 1 ¶¶ 20, 22. He further alleges that the City's ordinance prevents him from using his preferred weapon for self-defense, R. 1 ¶ 23, and hinders his ability to participate as

---

[2] Herrera also challenges State and Cook County restrictions on assault weapons and large-capacity magazines under the Second and Fourteenth Amendments. R. 1 ¶¶ 105-154.

a volunteer medic in Special Weapons and Tactics ("SWAT") trainings with his AR-15, R. 1 ¶ 31.

**Proceedings Below.**  On January 27, 2023, Herrera moved for a temporary restraining order and preliminary injunction, seeking to prevent the City from enforcing its ordinance, and the State and Cook County from enforcing their laws. R. 4.  On April 25, 2023, the district court denied Herrera's motion, A1-A31, concluding that he is not likely to succeed on the merits, A24, he is not likely to suffer irreparable harm absent an injunction, A25, and the balance of equities favors defendants and the public interest, A30.  Herrera appealed.  R. 77.

In January and February 2023, the <u>Barnett</u> plaintiffs also moved for preliminary injunctions.  <u>Barnett</u> R. 10; <u>Harrel</u> R. 16; <u>Langley</u> R. 6; <u>FFLI</u> R. 28.  On April 28, 2023, the district court granted their motions, <u>Barnett</u> R. 101, and the State filed notices of appeal, <u>Barnett</u> R. 104; <u>Harrel</u> R. 46; <u>Langley</u> R. 37; <u>FFLI</u> R. 45.  On May 1, 2023, the State moved to consolidate the appeals, which this court granted on May 3, 2023.  And on May 2, 2023, the State filed an emergency motion to stay the district court's preliminary injunction order, which this court granted on May 4, 2023.  On May 12, 2023, this court consolidated Herrera's appeal with the <u>Barnett</u> appeals.

## SUMMARY OF ARGUMENT
———

Herrera is not entitled to a preliminary injunction.  He is not likely to succeed on the merits because the assault weapons and high-capacity magazines banned under the City's ordinance are not protected by the Second Amendment.  At

the outset, the magazines do not even constitute "arms," but are instead accessories. In addition, assault weapons and high-capacity magazines are not in common use for self-defense. They are owned by a small percentage of Americans, are not suitable for self-defense, and are far too lethal.

Assault weapons and high-capacity magazines are also dangerous and unusual. The AR-15 rifles Herrera wishes to keep in his home are no different from M-16 rifles, which may be banned. AR-15s were originally developed for military use, and the civilian versions in circulation today are, if anything, even deadlier than those used on the battlefield. Assault weapons and high-capacity magazines are extraordinarily lethal, disproportionately used in mass shootings, and cause an outsize number of fatalities and serious injuries. They also pose exceptional risks to law enforcement officers who are not adequately protected from the extreme fire power of assault rifles and who face challenges planning and securing large events.

The City's ordinance is part of a longstanding historical tradition of regulating such dangerous and unusual weapons. From the founding era to the present day, lawmakers have responded to new weapons and the risks they pose to public safety by enacting increasingly restrictive regulations. The City's ordinance, like historical weapons restrictions, seeks to quell public terror and protect public safety and citizens' freedom to participate in public life. And because of the dramatic technological changes and unprecedented societal concerns about mass shootings using assault weapons and high-capacity magazines, the City can address these public safety concerns only through banning these dangerous instruments

completely, in both public *and* private spaces.

Herrera also cannot show he will suffer irreparable harm absent an injunction.  Although he cannot keep his AR-15 rifles and extended magazines in his home, he still has myriad options for self-defense, including his two Glock handguns.  Nor does he suffer irreparable harm because he must drive an hour outside the City to retrieve his AR-15 rifles for SWAT training.  He does not need to train with an AR-15 to serve in his role as a medic, and in any event, he has managed to attend trainings with his AR-15 since 2018, notwithstanding Chicago's assault weapon ban.

Finally, the balance of equities favors defendants and the public interest.  Assault weapons and high-capacity magazines pose a grave threat to public safety, and the record demonstrates that bans on these dangerous weapons reduce injuries and deaths from mass shootings.  Herrera's claimed harms do not outweigh the substantial public benefit of maintaining the status quo.

## ARGUMENT
———

Assault weapons and high-capacity magazines are instruments of war.  In the hands of civilians, they enable perpetrators of mass shootings to unleash horrific carnage, pose a grave threat to law enforcement officers, instill terror in citizens, disrupt public life, undermine democracy, and impose significant economic and social costs on communities and municipal governments.  For these reasons, the City enacted an ordinance banning these military-grade weapons.  Herrera now challenges that ordinance – decades after the bans first went into effect – and seeks

7

a preliminary injunction.  He is not entitled to any relief.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008).  A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  Where, as here, the government is a defendant, the balance of equities and public interest factors merge.  Nken v. Holder, 556 U.S. 418, 435 (2009).  The plaintiff's burden under all factors is "significant," Illinois Republican Party v. Pritzker, 973 F.3d 760, 763 (7th Cir. 2020), and courts, in exercising their sound discretion, "'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" Winter, 555 U.S. at 24 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).  When reviewing the district court's denial of a preliminary injunction, this court reviews the legal conclusions de novo, the findings of fact for clear error, and the balance of equities for abuse of discretion.  Stuller, Inc. v. Steak N Shake Enterprises, 695 F.3d 676, 678 (7th Cir. 2012).  Under these standards, the district court's judgment denying Herrera's request for a preliminary injunction should be affirmed.

## I.     HERRERA IS NOT LIKELY TO SUCCEED ON THE MERITS.

A plaintiff seeking injunctive relief bears the burden of showing he is likely to succeed on the merits of his claims, Winter, 555 U.S. at 20, 22, and this showing

8

"must be 'strong,'" <u>Tully v. Okeson</u>, 977 F.3d 608, 613 (7th Cir. 2020) (quoting

<u>Pritzker</u>, 973 F.3d at 762-63). Where the plaintiff cannot show likelihood of success,

the preliminary junction must be denied. <u>Id.</u> at 612-13. Denial was proper here.

The evidence overwhelmingly demonstrates that the weapons Herrera seeks to use

– AR-15 rifles and high-capacity magazines – are not the sort of weapons protected

by the Second Amendment because they are not in common use for self-defense.[3]

Moreover, those firearms and magazines are dangerous and unusual weapons of the

sort that the Court held may be banned. And, regardless, the City's ordinance is

wholly consistent with a longstanding historical tradition of regulating dangerous

and unusual weapons to quell terror and protect public safety and citizens' freedom

to participate in public life.

     Herrera has, therefore, failed to carry his burden of showing, on his motion

for preliminary injunction, that he is likely to succeed on the merits. Herrera

ironically has asserted that defendants "resist <u>Heller</u>'s simplicity," R. 63 at 34, and

"overcomplicate," <u>Bruen</u>, R. 63 at 15, while it is he who resists the tests the Court

has already endorsed for determining whether a weapon is protected and a law

restricting it constitutional. Herrera has not shown that he is likely to succeed on

his Second Amendment claim; in particular, he has not shown that these weapons

are in common use for self-defense, that they are not dangerous and unusual

weapons that justify severe restrictions, or that banning such weapons is

---

[3] High-capacity magazines are not protected for the added reason that they do not
constitute arms at all. We adopt the argument of the State on this point. <u>See</u>
Opening Brief of the State Parties ("State Br.") 17-20.

inconsistent with historical tradition.

A.      **Assault Weapons And High-Capacity Magazines Are Not In Common Use For Self-Defense.**

In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the United States Supreme Court recognized an "important limitation on the right to keep and carry arms." <u>Id.</u> at 627.  The Court explained that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" <u>Id.</u> (quoting <u>United States v. Miller</u>, 307 U.S. 174, 179 (1939)).  The Court again recognized this founding-era limitation on the right to bear arms in <u>New York State Rifle & Pistol Association v. Bruen</u>, 142 S. Ct. 2111 (2022), where it reaffirmed that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" <u>Id.</u> at 2143 (quoting <u>Heller</u>, 554 U.S. at 627).

<u>Heller</u> and <u>Bruen</u> also made clear that the Second Amendment protects only those modern arms that are commonly used for purposes of self-defense.  As <u>Heller</u> explained, the right that the founders adopted from the English Bill of Rights was the "'right of self-preservation,'" 554 U.S. at 595 (quoting 1 William Blackstone, <u>Commentaries on the Laws of England</u>, 145-46 n.42 (St. George Tucker ed. 1803)), or, in other words, "'the right of having and using arms for self-preservation and defence [sic],'" <u>id.</u> at 594 (quoting 1 Blackstone, <u>supra</u>, at 140 (1765)).  The Court cited a host of sources – ranging from newspaper articles to commentator interpretations from the colonial and early national periods – confirming that the founders "understood" that the right to bear arms was "to enable individuals to

defend themselves." Id. According to the Court, at least seven state constitutions adopted between 1789 and 1820 enshrined "an individual right to use arms for self-defense." Id. at 602-03. These provisions, the Court explained, provide "strong evidence" of "how the founding generation conceived of the right." Id. at 603. As such, "the inherent right of self-defense" is "central to the Second Amendment," id. at 628, and is its "core" purpose, id. at 630; see also id. at 599 (self-defense is "the *central component* of the right itself").

The Court reaffirmed in McDonald v. City of Chicago, 561 U.S. 742 (2010), that self-defense is "'the *central component*' of the Second Amendment right," id. at 767 (quoting Heller, 554 U.S. at 599), and thus "the Second Amendment protects the right to keep and bear arms for the purpose of self-defense," id. at 749. Bruen, too, reaffirmed that the Second Amendment codifies "an individual right to keep and bear arms for self-defense," 142 S. Ct. at 2125, and explained that the sort of "modern instruments" that the Second Amendment protects, id. at 2132, are those that are "'in common use,'" id. at 2128 (quoting Heller, 554 U.S. at 627), and "that facilitate armed self-defense," id. at 2132.

Resisting how Heller defines the core right protected by the Second Amendment, Herrera characterized Heller as asking "whether the banned arms are 'typically *possessed* by law-abiding citizens *for lawful purposes*.'" R. 63 at 36 (quoting Heller, 554 U.S. at 625). But he draws that conclusion from a passage in Heller that reads the Court's earlier decision in Miller "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding

citizens for lawful purposes." <u>Heller</u>, 554 U.S. at 625.  This passing remark does not

purport to define the scope of what the Second Amendment *does* protect.  That work

is done elsewhere in <u>Heller</u> and in <u>Bruen</u>, as we explain above, and is encapsulated

in the Court's holdings that the Second Amendment protects the right of self-

defense and covers modern arms that facilitate self-defense.

Assault weapons and high-capacity magazines are neither commonly used for

nor effectively facilitate self-defense.  Only a small percentage of Americans even

own an assault weapon.  Of all firearms in circulation in American society, only

5.3% are assault rifles, R. 52-4 ¶ 27, while 50% are handguns, R. 52-4 ¶ 28.  And

ownership of assault rifles is "highly concentrated among a small percentage of gun

owners," R. 60-4 ¶ 131 – less than 8% of all firearm owners and less than 2% of all

Americans own an assault rifle, R. 52-4 ¶ 27.  An even smaller number of

Americans purport to own an assault rifle for self-defense.  According to Herrera,

approximately 34% of gun buyers purchase *any* type of "semiautomatic rifle" for

"personal protection."  R. 1 ¶ 70.  But not all semiautomatic rifles are even

considered assault rifles, <u>see</u> Municipal Code of Chicago, Ill. § 8-20-010(a), so the

number of Americans who claim to own an actual *assault rifle* for self-defense is

miniscule – well below 1%.  That is not "common use" by any sense of the word.

High-capacity magazines are also not commonly used, as the firearms most

commonly owned by Americans – many types of handguns and rifles – "do not

accommodate" extended magazines.  R. 60-4 ¶ 133.

Moreover, assault weapons and high-capacity magazines, unlike handguns,

are not well-suited for self-defense.  As <u>Heller</u> observed, a handgun is well-suited for self-defense because:  "It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper body strength to lift and aim a long gun; [and] it can be pointed at a burglar with one hand while the other hand dials the police."  554 U.S. at 629.  For these reasons, handguns are not only "the most popular weapon chosen by Americans for self-defense," <u>id.</u>, but they are the weapon that Americans actually *use* in the overwhelming majority of defensive firearm confrontations.  According to the study that the court of appeals in <u>Heller</u> relied on to conclude that handguns are the quintessential self-defense weapon, <u>see</u> <u>Parker v. District of Columbia</u>, 478 F.3d 370, 400 (D.C. Cir. 2007) (citing Gary Kleck & Marc Gertz, <u>Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun</u>, 86 J. Crim. L. & Criminology 150 (1995)), <u>aff'd sub nom.</u> <u>Heller</u>, 554 U.S. 570, approximately 70-80% of all "defensive gun uses" involve handguns, Kleck & Gertz, <u>supra</u>, at 164, 175, 177, 184.  The Court relied on that study as well by quoting the court of appeal's conclusion that handguns are "'the most preferred firearm in the nation to keep and use for protection of one's home and family.'"  <u>Heller</u>, 554 U.S. at 628-29 (quoting <u>Parker</u>, 478 F.3d at 400).

Herrera tried to marginalize these numbers as "statistical handwringing" that <u>Heller</u> did not undertake.  R. 63 at 35.  But <u>Heller</u> relied on the Kleck study, and that study's recognition that handguns are the quintessential self-defense weapon *was* the product of a great deal of statistical handwringing.  Herrera can

show no such comparable statistics supporting the common use of assault weapons or high-capacity magazines for self-defense.  Other plaintiffs elsewhere have similarly failed to do so.  In upholding Massachusetts' ban on assault weapons and high-capacity magazines, the First Circuit remarked that, "when asked directly, not one of the plaintiffs or their six experts could identify even a single example of the use of an assault weapon for home self-defense."  Worman v. Healey, 922 F.3d 26, 37 (1st Cir. 2019), abrogated on other grounds by Bruen, 142 S. Ct. 2111.

The reason for this is simple:  unlike traditional handguns, assault weapons and high-capacity magazines are not well-suited for self-defense.  For starters, assault rifles, in particular, are too large to be stored in a nightstand or other readily accessible location, are "less maneuverable in confined areas," R. 60-4 ¶ 158 (quotation omitted), and "require two hands to effectively aim and shoot," making it difficult "to use one hand to call 911" or to "pick up or guide a small child, elderly or handicapped individual," R. 52-9 ¶ 104.  Assault weapons are also more complex, less intuitive, and less reliable, R. 61-1 at 44 ¶ 59, particularly for individuals "not adequately trained or practiced with their firearm," R. 52-9 ¶ 102.  "During a stressful situation, such as a home invasion or break in, there may be multiple steps required by the operator to bring the weapon from a safe condition to a firing condition."  R. 52-9 ¶ 102.  Some of those tasks, like inserting a magazine or manipulating the charging handle or safety switch, "may be difficult to accomplish under stress."  R. 52-9 ¶ 102.  Indeed, even law enforcement officers prefer to carry handguns for self-defense, for the same reason civilians do – "because of their

reliability and ease of use." R. 61-1 at 44 ¶ 59.

In addition, assault weapons and high-capacity magazines offer far greater fire power than is necessary for self-defense. "Home defense and/or self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." R. 52-9 ¶ 98. Most defensive shootings occur "in close quarters, in places such as rooms, hallways, parking lots, and common areas in buildings," R. 61-1 at 64 ¶ 78, so there is no need for a weapon with a range of 400-500 yards, like that of an AR-15, R. 52-9 ¶ 98; R. 52-10 ¶ 26. And the average number of shots fired in self-defense is 2.2, R. 54-5 at 8, 22, so there is no need for a firearm or magazine that can rapidly shoot a large number of rounds. Moreover, as Herrera concedes, the offender in a personal attack or home invasion is more likely to be armed with a handgun, R. 1 ¶¶ 90-92, which has a muzzle velocity of up to 1,200 feet per second, R. 52-9 ¶ 6, and an energy release of between 54 and 266 joules, depending on the caliber, R. 52-14 ¶ 26. The muzzle velocity of an AR-15, on the other hand, is 3,200 feet per second – nearly three times the upper limit for handguns, R. 52-9 ¶ 98, and the energy release is 1,055 joules – four to nineteen times that of a handgun, R. 52-14 ¶ 26. There is no need to meet the modest fire power of a handgun with the enormous fire power of an AR-15. In short, "wielding [an assault weapon] for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut." Worman, 922 F.3d at 37.

Critically, the enormous fire power of assault weapons also creates serious safety concerns, particularly when compared to a handgun. A handgun bullet "goes

in like a nail" and produces a wound akin to "a stabbing with a bullet."  R. 60-4 ¶ 109 (quotation omitted).  For this reason, a handgun wound is "generally survivable unless the bullet penetrates a critical organ or major blood vessel." R. 52-10 ¶ 38.  Assault weapon injuries, on the other hand, are physically devastating and often lethal, R. 52-10 ¶¶ 31-36 – "the payload of kinetic energy" from an AR-15 bullet "rips open a cavity inside the flesh," R. 52-6 ¶ 34, "as if you shot somebody with a Coke can," R. 60-4 ¶ 109 (quotations omitted).  This poses a significant risk to friends and family who may be nearby or mistaken for intruders. And the safety risk extends well beyond those in the immediate vicinity.  High-velocity bullets can easily penetrate walls, R. 54-8 ¶ 9; R. 61-1 at 64 ¶ 78, posing "substantial risks to individuals in adjoining rooms, neighboring apartments or other attached dwelling units," R. 52-9 ¶ 101, particularly in dense urban areas, R. 61-1 at 64 ¶ 78; see R. 52-9 ¶ 98 (assault weapons "pose a serious risk of over-penetration in most home construction materials"); R. 60-4 ¶ 154 ("Bullets fired by assault weapons or a modern weapon with [a high-capacity magazine] will easily penetrate walls, threatening family members or occupants in attached dwellings."). While Herrera's firearms expert explained that wall penetration is a concern for any weapons used for self-defense in the home, R. 63-5 ¶ 54, he did not dispute that, relatively speaking, AR 15s pack extraordinary power and that the potential for devastating consequences is particularly high.  During tests on AR-15s for home defense, for example, the rounds fired not only "easily penetrated the wall section," but they also struck water jugs placed three feet behind the wall, causing them to

explode.  R. 52-9 ¶ 99.  For these reasons, assault weapons, unlike traditional handguns, are not well-suited for self-defense.

Moreover, assault weapons do not merely incapacitate their targets, they cause "unbelievable devastation," R. 52-14 ¶ 33, that trauma surgeons have likened to a "war zone," R. 52-10 ¶¶ 29-30 (quotations omitted).  Their capabilities are excessive in a self-defense situation, and massively increase the potential for carnage when they are misused for other purposes.  As a physician who treated Highland Park victims observed, the injuries were of the kind that "happen when bullets can blow bodies up."  R. 52-10 ¶ 30 (quotation omitted).  Due to the high velocity and kinetic energy, "assault weapon blasts to the head, neck, or trunk are usually lethal," R. 52-10 ¶ 34, and survivors routinely suffer injuries to multiple organs and major blood vessels, experience "tremendous blood loss," "require a series of operations" and "prolonged hospitalizations," undergo amputations, and live with permanent disabilities, R. 52-10 ¶¶ 36-37.  A single round can destroy organs, shatter bones, and shred soft tissue "in a way that looks like an explosion happened."  R. 52-10 ¶ 35; see R. 52-14 ¶ 32 (assault weapons more likely to cause "severely lacerated" organs, "catastrophic bleeding," and "significant damage to bones and skeletal structure"); R. 54-10 at 5 ("[b]ones are more likely shattered and soft tissue more likely destroyed").  And assault weapons are even more lethal to children, who have smaller torsos, more compressed vital organs, and smaller blood reserves.  R. 52-14 ¶ 35.  Indeed, "[n]ot a single child wounded by an assault weapon at Sandy Hook survived."  R. 52-14 ¶ 35.

At bottom, Herrera's effort to meet the common use threshold consists of little more than counting how many assault rifles and high-capacity magazines were sold in the United States between 1990 and 2018. R. 63 at 33-34. Even accepting Herrera's numbers as trustworthy, but see State Br. 21-22 (identifying flaws in plaintiffs' statistics), they show nothing about whether these instruments are commonly owned for the purposes of, and actually used for, self-defense. Nor do Herrera's statistics about how common *other* types of things are, such as lawyers, teachers, and Ford F-150s. R. 63 at 35. Unless one can use a lawyer, a teacher, or a truck for armed self-defense, those statistics are entirely irrelevant and serve only to distract from the reality that assault weapons and high-capacity magazines are owned by a miniscule number of Americans and are not, in practice, well-suited for self-defense.

Herrera also cited some cases that purportedly show it is "beyond dispute" that AR-15s are "in common use." R. 63 at 32. But those decisions show only that a handful of courts have recognized that many AR-15s have been manufactured or sold. That point is no more telling than Herrera's statistics about how many lawyers there are in the United States, and is not enough under Bruen, which, as we explain, requires that firearms actually be used and well-suited for self-defense. Indeed, it would defy logic to rely solely on the bare number of assault rifles that have been sold in the last thirty years. If that were the test, gun manufacturers could secure Second Amendment protection for their wares merely by flooding the market with them.

Herrera's reliance, R. 63 at 35, on Justice Alito's concurrence in <u>Caetano v.</u>
<u>Massachusetts</u>, 577 U.S. 411 (2016), does not help him establish common use for
self-defense here, either.  That concurrence reflects the view of two Justices in a
summary reversal of a decision by Massachusetts' high court upholding a ban on
stun guns.  Justice Alito observed that "stun guns are widely owned and accepted as
a legitimate means of self-defense across the country," and that approximately
200,000 civilians owned them in 2009.  <u>Id.</u> at 420 (Alito, J., concurring).  Herrera
has asserted that if 200,000 stun guns cannot be banned, then millions of assault
weapons and high-capacity magazines cannot, either.  R. 63 at 35-36.  That
simplistic comparison should be rejected.  The number of stun guns owned for self-
defense cannot provide any useful metric for gauging common use of assault
weapons.  Stun guns are designed for self-defense and, as Justice Alito observed,
provide less force than a firearm.  <u>Caetano</u>, 577 U.S. at 421 (Alito, J., concurring).
AR-15s, as we explain, were designed for maximum killing potential in wartime
scenarios and provide *too much* force in a self-defense scenario.  This apples-to-
oranges comparison is frivolous.

### B.   Assault Weapons And High-Capacity Magazines Are Dangerous And Unusual.

The Court recognized in <u>Heller</u>, and reaffirmed in <u>Bruen</u>, another limitation
on the right to bear arms – the longstanding "historical tradition of prohibiting the
carrying of dangerous and unusual weapons."  <u>Heller</u>, 554 U.S. at 627 (quotation
omitted); <u>accord</u> <u>Bruen</u>, 142 S. Ct. at 2128.  Indeed, William Blackstone – whom the
Court deemed "'the preeminent authority on English law for the founding

19

generation,'" Heller, 554 U.S. at 593-94 (quoting Alden v. Maine, 527 U.S. 706, 715 (1999)) – described "[t]he offense of riding or going armed, with dangerous or unusual weapons," as "a crime against the public peace, by terrifying the good people of the land," 4 Blackstone, supra, at 85 (1769). Consistent with this tradition, the Court in Heller pronounced that those "weapons that are most useful in military service – M-16 rifles and the like – may be banned." 554 U.S. at 627. M-16s and other "weapons useful in warfare," id. at 624, are "sophisticated" and "highly unusual in society at large," the Court wrote, id. at 627, and it would be "startling" to conclude that bans on those weapons "might be unconstitutional," id. at 624.

Herrera ignored this part of Heller. In fact, he asserted that "dangerousness" is not even relevant "[b]ecause all firearms have the potential to be lethal," R. 63 at 30, including handguns, which are nevertheless entitled to Second Amendment protection, R. 63 at 30-31. That not only misses the point, but fails to give effect to clear language from Heller. And, as we discuss below, the laws prohibiting dangerous and unusual weapons show that "dangerous" was a term used to describe certain weapons whose characteristics made them desirable to perpetrators of violent crime and which struck terror in the citizenry. That precisely describes assault weapons and high-capacity magazines.

These passages in Heller provide "a dispositive and relatively easy inquiry" – are assault weapons and high-capacity magazines "'like'" M-16 rifles and "thus outside the ambit of the Second Amendment?" Kolbe v. Hogan, 849 F.3d 114, 136

20

(4th Cir. 2017) (quoting <u>Heller</u>, 554 U.S. at 627), <u>abrogated on other grounds by</u>
<u>Bruen</u>, 142 S. Ct. 2111.  And, as the Fourth Circuit concluded, the answer is
"plainly in the affirmative," as AR-15s are "like" M-16s "under any standard
definition of that term."  <u>Id</u>.  The assault weapons and high-capacity magazines at
issue here are – like M-16 rifles – military-grade instruments.  Moreover, even on
the view that AR-15s and M-16s are not similar, the assault weapons and high-
capacity magazines banned under the City's ordinance are nevertheless particularly
dangerous in the hands of civilians because of their extraordinary lethality, as well
as the extraordinary challenges they present to law enforcement officers attempting
to prevent and respond to mass shootings involving such weapons.

> ### 1.     AR-15s are "like" M-16s and thus "may be banned" under <u>Heller</u>.

The AR-15, the very weapon that Herrera wishes to keep in his Chicago
residence, R. 1 ¶ 24, is a direct descendant of the M-16, sharing in its military
origins, R. 52-2 ¶ 16; R. 52-6 ¶ 32; R. 52-7 ¶¶ 11, 32; R. 52-11 ¶ 49.  The AR-15
traces its roots to the ArmaLite AR-15, which was developed by the U.S. Army in
the late 1950s and used in the Vietnam War, R. 52-2 ¶ 16; R. 52-6 ¶¶ 25-26; R. 52-7
¶ 32, and "was specifically designed to satisfy clearly stated military requirements
for an assault rifle," R. 52-7 ¶ 32.  The weapon was lauded for its light weight,
maneuverability, low recoil, accuracy, high capacity, and ability to shoot bullets at
an extremely high velocity.  R. 52-6 ¶¶ 30-34; R. 52-7 ¶ 32.  The weapon's "lethality"
and its "reliability record were particularly impressive," and the wounds it created
"were prodigious."  R. 60-4 ¶ 104 (quotation omitted).  Designed for "maximum

wound effect," the bullets "travel nearly three times the speed of sound," R. 52-6 ¶ 34 (quotation omitted), creating "catastrophic injuries" to the human body, R. 52-6 ¶ 27. "[A]s the bullet strikes the body, the payload of kinetic energy rips open a cavity inside the flesh," thereby "destroying inelastic tissues, including nerves, blood vessels and vital organs." R. 52-6 ¶ 34 (quotation omitted). Details of the weapon's carnage in Vietnam are "harrowing" – a single round could cause an abdominal or thoracic cavity to explode or completely take off a limb or head. R. 52-6 ¶ 27; see R. 60-4 ¶ 104 ("One round in the head – took it completely off. Another in the right arm, took it completely off, too.") (quotation omitted). In short, the ArmaLite AR-15 had "phenomenal lethality," R. 52-6 ¶ 32, and was the "perfect killing machine," R. 52-6 ¶ 34 (quotations omitted).

The ArmaLite AR-15 was eventually rebranded as the M-16 with minimal modifications, R. 52-2 ¶ 16; R. 52-6 ¶¶ 32, 35, and today there is little difference between the M-16s Heller described as useful for military purposes and the AR-15s now used by civilians, like Herrera. The features of M-16s "intended to enhance their capability as military firearms remained," R. 52-9 ¶ 64, meaning an AR-15 used by a civilian today retains all of the "aspects that made it such a valuable lethal weapon for deadly combat," R. 60-4 ¶ 107.

In fact, the only difference is that the AR-15 lacks the fully automatic mode. R. 52-2 ¶ 17; R. 52-7, ¶¶ 11, 34; R. 60-4 ¶ 107. But that is not a distinction that makes AR-15s any less dangerous; on the contrary, semiautomatic fire can actually be *more* lethal. To be sure, an M-16 is capable of firing 750 to 900 rounds per

minute when set to fully automatic mode, compared to 45 rounds per minute in semiautomatic mode, R. 52-11 ¶ 49; but according to the U.S. Army, the preferred combat mode for an M-16 is semiautomatic, R. 52-7 ¶ 34; R. 52-11 ¶ 49, because that mode "allows targeting of specific human targets with repeated accurate shots rather than inaccurate, indiscriminate 'spray,'" R. 52-7 ¶ 34 (quotation omitted), and thus "more accurately, effectively, and sustainably" inflicts "mass casualties," R. 52-11 ¶ 49.  In fact, the Army's Field Manual explicitly states that semiautomatic fire is "devastatingly accurate" and "the most important firing technique during fast-moving, modern combat."  R. 60-4 ¶ 107 (quotation omitted).  Automatic weapons, on the other hand, are useful for "suppressing enemy movements," but less effective at "actually killing the enemy."  R. 52-7 ¶ 34 (quotation omitted).

Because an AR-15 has essentially the same muzzle velocity as an M-16 (3,200 for an AR-15, compared to 3,300 for an M-16), as well as the same rate of fire as an M-16 on semiautomatic mode, R. 52-11 ¶ 49, civilians are wielding essentially the same weapons that the Army uses to inflict mass casualties in combat.  And with the rise in marketing of AR-15s to civilians, manufacturers have developed improvements that make AR-15s more lethal than the version used in the Vietnam War and, in many cases, more lethal than those rifles used in the military today. R. 52-7 ¶¶ 41-42.  That includes a host of accessories – highly-effective electronic optics, more sensitive triggers, bump stocks and modified trigger systems to convert to automatic fire, forward and pistol grip options, tactical lights, laser-pointing devices, and high-capacity magazines, among others – all of which are "designed

and marketed to increase the effectiveness of the rifle in live-fire situations."  R. 52-7 ¶ 42.  Many of these are the very devices that are either banned outright under the City's ordinance, <u>see</u> Municipal Code of Chicago, Ill. § 8-20-010(a)(4) (bump stocks and other devices that "accelerate the rate of fire of a semiautomatic rifle"); <u>id.</u> § 8-20-060 (laser sight accessories); <u>id.</u> § 8-20-085 (high-capacity magazines), or that, when used with a semiautomatic rifle or handgun, qualify such a firearm as a prohibited "assault weapon," <u>see id.</u> § 8-20-010.  And rightfully so.  They help place weapons of war in the hands of civilians, allowing them to inflict the same level of carnage that soldiers do on the battlefield, just like the M-16s the Supreme Court recognized could be banned in <u>Heller</u>.

Herrera has done almost nothing to distinguish AR-15s from M-16s.  He tries to minimize <u>Heller</u>'s discussion of M-16s as dicta, R. 63 at 17, and claims that AR-15s are unlike M-16s because of their inability to shoot automatic fire, R. 63 at 17-18.  Neither point has merit.  While the Court in <u>Heller</u> was not considering a ban on M-16 rifles, its statements about M-16s were a necessary part of its rationale, made to illuminate the contours of the Second Amendment right it was describing.  As the Court explained, handguns have a number of advantages for personal and home self-defense and are overwhelmingly the weapon of choice for average citizens, 554 U.S. at 629, while M-16s, by contrast, are "sophisticated" weapons that would be "useful" and "effective" in "military service," <u>id.</u> at 627.  This sort of explication by the Supreme Court must be "adhere[d]" to in the same manner as the Court's holdings, and cannot be swept aside as mere dicta.  <u>Seminole Tribe of Florida v.</u>

24

<u>Florida</u>, 517 U.S. 44, 66-67 (1996).  Moreover, the fact that AR-15s have no

mechanism to produce automatic fire is not a meaningful distinction.  As we explain

above, semiautomatic fire is at least as lethal, if not more so, than automatic fire,

and semiautomatic rifles can easily be upgraded to be fully automatic.

> **2.     Assault weapons and high-capacity magazines are dangerous and unusual because of their extraordinary lethality.**

<u>Heller</u> regarded M-16s as dangerous and unusual because they are military-

grade weapons of extreme lethality – not the sort of weapons typically possessed by

law-abiding citizens in times of peace.  Even if AR-15s were not so directly

comparable to M-16s, they nevertheless retain the sort of staggering lethality that

makes them more suitable to military use and particularly attractive to criminals,

and thus fall squarely within the category of dangerous and unusual weapons that

may be banned.

Herrera boldly claimed the opposite – that it is the military characteristics of

AR-15s that *confirm* they are covered by the Second Amendment, R. 63 at 18-19,

and that founding-era militia laws even required "weapon[s] of war" to be "kept in

homes," R. 63 at 46.  But <u>Heller</u> flatly rejected the notion that a weapon's military

character qualifies it for Second Amendment protection.  554 U.S. at 627.  Indeed,

the Court stated that "weapons that are most useful in military service," like M-16s,

"may be banned," even though those weapons may be necessary for an effective

modern-day militia.  <u>Id.</u>  As the Court acknowledged, although the prefatory clause

stresses the importance of a militia, <u>id.</u> at 598, "modern developments" – namely the

sophisticated military weapons, against which the small arms commonly owned by Americans for self-defense would be no match – "have limited the degree of fit between the prefatory clause and the protected right," id. at 627.  The lack of a close fit, however, did not "change [the Court's] interpretation of that right."  Id.

Indeed, it is the military character of assault weapons and high-capacity magazines that makes them increasingly attractive to perpetrators of mass shootings.  The light weight and high maneuverability of assault weapons, along with their low recoil, allow perpetrators to move around easily and continue firing without having to re-aim.  R. 52-10 ¶ 27.  They also have an effective range of 400-500 yards, compared to 50 for a typical handgun, allowing mass shooters to attack unseen from windows or rooftops.  R. 52-10 ¶ 26.  That is how the Las Vegas shooter struck several hundred people from the 32nd floor of a hotel.  R. 52-10 ¶ 29.  High-capacity magazines further "increase this destructive potential" of firearms "by increasing the number of rounds that can be fired during a given time period."  R. 52-14 ¶ 30.  For example, in Highland Park, the perpetrator fired 83 rounds in under 60 seconds, striking 55 parade attendees – seven fatally.  R. 52-2 ¶ 19.  And in Las Vegas, the perpetrator fired hundreds of rounds per minute, for ten minutes, killing 58 concertgoers and wounding several hundred more.  R. 52-10 ¶ 29.

And these instruments play a disproportionate role in mass shootings.  While assault weapons make up only 5.3% of firearms in circulation in the United States, R. 52-4 ¶ 13, more than half of all mass shootings in the past four years have involved assault weapons, and all have involved magazines with a capacity greater

than ten bullets.  R. 52-4 ¶ 12.  And of the deadliest mass shootings in the past decade – *e.g.*, Las Vegas (58), Pulse Nightclub (49), Sandy Hook Elementary School (27), Sutherland Springs Church (23), Robb Elementary School (21) – nearly all involved AR-15s equipped with high-capacity magazines.  R. 52-4 ¶ 14 (Table 2).

In the last three decades, mass shootings involving assault weapons resulted in 67% more fatalities than those not involving such weapons.  R. 52-4 ¶ 15; R. 54-13 at 16.  Since 1991, 100% of mass shootings with more than 40 fatalities, 75% of mass shootings with more than 20 fatalities, and 61% of mass shootings with more than ten fatalities have involved assault weapons, and all but a few involved high-capacity magazines with a capacity greater than ten bullets.  R. 52-4 ¶ 14 (Figures 9 & 10).  In fact, in mass shootings since 1966, the number of fatalities and injuries increased nearly threefold when semiautomatic rifles were equipped with extended magazines.  R. 52-11 ¶ 55 (Figure 2).  In short, assault weapons equipped with high-capacity magazines "are deadly accurate weapons with enormous destructive capacity" that "can be fired at a rate of hundreds of rounds per minute" and "are designed for the purpose of maximum killing in wartime settings."  R. 52-10 ¶ 41.

Simply put, assault weapons and high-capacity magazines bring terror to the masses because they are attractive to, and useful for, mass shootings and other crimes.  They are plainly dangerous and unusual.

> **3.    Assault weapons and high-capacity magazines pose extraordinary risks to law enforcement.**

As deadly as assault weapons and high-capacity magazines are to average

citizens, they "pose a disproportionate risk to law enforcement." R. 52-6 ¶ 52. One

in five officers slain in the line of duty is killed with an assault weapon. R. 52-6

¶ 52; R. 60-4 ¶ 44. In Chicago, most police officers do not use or train with assault

weapons, meaning "the officers first responding to an active shooter incident

involving an assault weapon will usually have weaker firepower than the

assailant." R. 54-8 ¶ 16. On top of that, "the high velocity of bullets fired by assault

weapons" enables them "to defeat standard protective equipment." R. 54-8 ¶ 17. In

fact, in nearly 25% of the incidents in which officers were slain by assault rifles in

the line of duty, the "bullet penetrated the officer's body armor." R. 52-6 ¶ 52. Even

the highest level of protective equipment, which includes ballistic helmets and

bullet-proof vests outfitted with trauma plates, R. 54-8 ¶ 18, "would not ensure that

officers are protected from" an assault weapon, R. 54-8 ¶ 21. The "equipment still

leaves some parts of the body vulnerable," and even where a bullet "is stopped by

the vest or plate," the body can still suffer "major trauma." R. 54-8 ¶ 21. Moreover,

this heavy-duty protective gear is expensive, bulky, limits mobility, and requires

specialized training, making it impractical for officers to wear on their daily beats.

R. 54-8 ¶ 19. See also R. 52-6 ¶ 49 (standard-issue ballistic vests "do not protect the

body against bullets fired by assault rifles"; high-level protective gear "takes time to

put on and then limits the movement of the responding officers"; and "many assault

weapons are able to fire rounds that pierce even ceramic and metal-plated vests and

body armor").

      What is more, "[t]raditional law enforcement tactics" are "inadequate to

mitigate the threat posed by assault weapons." R. 52-6 ¶ 54. Law enforcement officers must have "significant skills, training, practice, and coordinated movement and action to defend against and eliminate" an active shooter, R. 52-6 ¶ 55, but most local governments do not have the resources for that training, or for equipment that could help with such responses, like armored vehicles, explosives, robots, and drones, R. 52-6 ¶ 54. In any event, no matter how well-trained, an officer "rarely has the opportunity to respond under the surprise circumstances" of a mass shooting. R. 52-6 ¶ 55. As demonstrated in Las Vegas – where the perpetrator shot hundreds of rounds in mere minutes – "a well-placed attacker with an assault weapon is devastatingly effective and decreases the opportunity for effective law enforcement response." R. 52-6 ¶ 56. Thus, such attacks are deadly, even where law enforcement officers, armed security, and lawfully armed citizens are present. R. 52-6 ¶ 53.

Advanced planning for large public events presents even greater challenges. Law enforcement agencies rarely have the means to implement the "rigorous safety plans" necessary to lessen the impact of an attack. R. 61-1 at 62 ¶ 70. Such plans require barricading roadways, clearing and securing large areas and rooftops, constant monitoring by drones and video cameras, establishing a command center, gathering intelligence, and maintaining a significant law enforcement presence – ideally tactically trained SWAT teams with special weapons, protective gear, and armored vehicles. R. 52-6 ¶ 47; R. 61-1 at 62 ¶ 72. This takes substantial resources that most law enforcement agencies do not have. R. 61-1 at 62 ¶ 71.

29

The Chicago Police Department ("CPD"), for its part, has "adjusted its large-event and domestic terrorism preparations to address assault weapons and mass shootings," and has dedicated "increasingly large amounts of resources and time to securing public events," R. 54-8 ¶ 24, but doing so "deplet[es] the resources available for other activities, including routine policing in neighborhoods," R. 54-8 ¶ 25. And even those safety plans and countermeasures are no match for an attack with an assault weapon at a public event. At Chicago's 2022 Lollapalooza, for example, an event that attracts close to 400,000 attendees, CPD received a report of a threat, forcing it "to evaluate whether to evacuate everyone" – an extremely difficult "operational decision[ ]" that could have led to a loss of life either way. R. 54-8 ¶ 26. It is virtually impossible in such a situation – where the park is lined with high-rise buildings – to know where a shooter is located. In fact, a shooter armed with an assault rifle could take advantage of an evacuation by lying in wait outside a secured perimeter. R. 54-8 ¶ 26.

The deadly combination of everyday gang violence and assault rifles that is increasingly prevalent in Chicago, R. 54-8 ¶¶ 10-14, along with the threat of mass shootings at large public events, places enormous stress on officers and affects them in other indirect, but profound, ways. An officer cannot know in advance if an individual will have an assault weapon, nor guarantee that an attack with an assault weapon can be stopped. R. 54-8 ¶ 27. For these reasons, encountering an individual armed with an assault weapon "is one of the most stressful situations" for an officer. R. 54-8 ¶ 27. This undermines officer health, recruitment, retention,

performance, and overall well-being, to the detriment of the officers and the communities they serve and protect.  R. 52-6 ¶ 57.

### C.    The City's Ordinance Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.

Where "the Second Amendment's plain text covers an individual's conduct," the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  Bruen, 142 S. Ct. at 2129-30.  This requires "analogical reasoning," id. at 2132, meaning the government need only identify a "historical *analogue*, not a historical *twin*," id. at 2133.  "[A] historical regulation is a proper analogue for a distinctly modern firearm regulation" if the two "are relevantly similar."  Id. at 2132 (quotation omitted).  Key considerations are whether the two address the same "general societal problem," id. at 2131, and "how and why the regulations burden a law-abiding citizen's right to armed self-defense," or, in other words, whether the "regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified," id. at 2133.  And where the challenged law implicates "unprecedented societal concerns or dramatic technological changes," the analysis requires "a more nuanced approach."  Id. at 2132.  In that case, analogical reasoning cannot be "a regulatory straightjacket," id. at 2133; it must allow courts to consider "circumstances beyond those the Founders specifically anticipated," id. at 2132.

As we explain above, assault weapons and high-capacity magazines are not protected by the Second Amendment, but, regardless, the City's ordinance is also consistent with the nation's historical tradition of regulating dangerous and

unusual weapons.  Herrera criticized defendants' reliance on this historical record in general, and on declarations from history and linguistic experts in particular. R. 63 at 14-15.  But these experts provide crucial information about the "how" and the "why," Bruen, 142 S. Ct. at 2133, and the "general societal problem," id. at 2131, to which early lawmakers were responding.  The nuanced analysis needed to place the historical regulations in context and properly analogize to them requires more than a review of the four corners of the laws themselves or the caselaw applying them.  The historical record and analysis of the experts provide an understanding of why these laws were enacted and how they protected earlier generations.

And it is this very historical tradition that underlies Heller's recognition that dangerous and unusual weapons, like M-16s, can be banned.  From the founding era to the present day, lawmakers have sought to protect public safety and preserve citizens' freedom to participate in public life, by enacting restrictions on dangerous and unusual weapons responsible for causing terror and instigating violent crime. The City's ordinance seeks to address the same concerns.  And the City's response – banning assault weapons and high-capacity magazines – is comparably justified. These instruments are so extraordinarily lethal – and increasingly being used in deadly ways – that the only way to protect public safety and quell the terror they instill is to ban these instruments in both public *and* private places.

> **1. The nation has a longstanding tradition of regulating weapons that threaten the public peace.**

As Bruen instructs, analogies to historical regulations of firearms should

focus not just on "how" firearms were regulated, but also on the "why" underlying the regulation. 142 S. Ct. at 2133. In other words, the reasons that justified regulations in the founding era and throughout history inform what regulations are permissible today. And a significant reason for some of the most restrictive early regulations of weapons was to protect the public peace by guarding against fear caused by dangerous and unusual weapons.

The right to bear arms enshrined in the Second Amendment was understood to protect the right of self-preservation found within the English Bill of Rights, and, as Blackstone described, that right was properly limited by the prohibition on "riding or going armed, with dangerous or unusual weapons." 4 Blackstone, supra, at 85 (1769). That limitation originated in the Statute of Northampton of 1328, which sought to prevent "the terror of the King's People." Mark A. Frassetto, To the Terror of the People: Public Disorder Crimes & the Original Public Understanding of the Second Amendment, 43 S. Ill. U. L.J. 61, 62, 68 (2018). That statute "formed the basis for Anglo-American public carry regulation during the seventeenth and eighteenth centuries" and "was codified in many colonial and early-American legal codes" and "enforced as part of the common law in many other states." Id. at 62-63. The early-American laws that followed reflect the fact that, "[a]t different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans." R. 54-14 at 28.

As the State describes in its brief, laws from the colonial period, through the

founding, and into the early national period restricted the carrying of pocket pistols, skeines, stilettoes, daggers, dirks, trap guns, clubs, and knives, among others, State Br. 34-35, all in an effort to "secure the peace and public safety," R. 54-14 at 10. "Among the most widely and ubiquitously regulated" of these early weapons were clubs and other blunt instruments. R. 52-12 ¶ 73. The earliest law prohibiting the carrying of clubs was enacted in 1664, while six more such laws were enacted between 1750 and 1799, and seven more in the 1800s. R. 52-12 ¶ 76. These blunt instruments were considered "objectionable," "wicked," and "cowardly," and those who carried them "vicious," and, consequently, they were greatly "feared" by colonists and early Americans. R. 52-12 ¶ 73 (quotations omitted); see State Br. 35. The laws that regulated these instruments carried forward "the ancient common law tradition of singling out weapons capable of producing terror." R. 54-14 at 28.

Many new dangerous and unusual weapons emerged during the nineteenth century that struck terror in the people as they proliferated and became the weapons of choice for violent crime. See State Br. 35-36. When the Bowie knife gained notoriety in the 1830s as a fighting knife, R. 52-12 ¶¶ 62-63, legislatures responded. In the 1830s, at least six states prohibited carrying Bowie knives, and by the start of the twentieth century, all but one state, as well as the District of Columbia, barred or restricted these knives. R. 52-12 ¶ 70. These laws were designed "'to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce.'" R. 52-12 ¶ 65 (quoting Aymette v. State, 21 Tenn. (2 Hum.) 154, 159 (1840)).

34

Lawmakers reacted similarly to advancements in firearms technology, such as the development of percussion cap pistols and multi-shot handguns, that made these weapons more dangerous and more effective for criminal activity. See State Br. 36. From the seventeenth and eighteenth centuries, laws prohibited the "wearing of weapons" that "induced 'great Fear and Quarrels.'" R. 52-12 ¶ 82. And through the nineteenth century, laws barred both open and concealed carry of firearms that were more lethal than their predecessors and were being "used in novel ways" – such as "shootouts in bars, streets, and even churchyards." R. 52-11 ¶ 34. In short, there is an unbroken tradition of placing increasingly stringent restrictions on dangerous and unusual weapons as they have increasingly contributed to public terror and violent crime. R. 52-11 ¶¶ 25-40. Indeed, by the twentieth century, "every state in the Union restricted the right to carry certain concealable weapons." R. 52-11 ¶ 34.

Consistent with this historical pattern, firearm restrictions grew more robust during the early twentieth century with the advent of semiautomatic and automatic weapons. See State Br. 36-38. During the 1920s, when firearms like the Thompson submachine gun became the "preferred weapon for gangsters," R. 54-14 at 23, "[f]ears about gangster weapons echoed earlier fears about weapons of 'bravado and affray' associated with earlier periods of intensive firearms regulation," R. 54-14 at 22. By 1934, at least 32 states and the District of Columbia enacted anti-machine gun laws, R. 52-12 ¶¶ 23-24, and Congress enacted the National Firearms Act, imposing "a series of strict requirements on the civilian acquisition and general

circulation of fully automatic weapons," R. 52-12 ¶ 25.  During this same period, at least seven states and the District of Columbia also enacted laws restricting semiautomatic weapons.  R. 52-12 ¶ 28.  And in 1994, Congress enacted a federal ban on assault weapons, R. 52-7 ¶ 38, which by then had become even more sophisticated and more lethal than the early semiautomatic and automatic weapons from which they originated.

> **2.  The City's ordinance addresses dramatic technological changes and unprecedented societal concerns.**

The City's ordinance, like the historical laws that preceded it, seeks to quell terror and protect public safety and the freedom to gather in shared public places. In that sense, the modern and historical laws are addressing the same general societal problem in the same way – restricting the weapons that create fear and are used in violent crime.  But also, in the same way the historical laws evolved as new weapons and social conditions emerged, the City's ordinance is tailored to specifically address dramatic technological changes and unprecedented societal concerns that were unknown to earlier generations – namely the use of assault weapons and high-capacity magazines in deadly mass shootings.

Weapons with the killing power of assault rifles and high-capacity magazines simply did not exist in the eighteenth and nineteenth centuries.  As the State describes, early firearms, such as the musket or fowling piece, had limited utility and were infrequently used in violent crime.  State Br. 40.  The few multi-shot firearms that did exist were "flawed curiosities," or slow to catch on until after the

Civil War.  State Br. 40-41; R. 52-12 ¶¶ 36-50.  Even the semiautomatic and automatic rifles notorious in the gangster era were not nearly as lethal as the AR-15s marketed to civilians today, which, as we explain above, were perfected for offensive use on the battlefield in Vietnam and greatly improved upon in subsequent decades to enhance their effectiveness.  For this very reason, assault weapons and high-capacity magazines have become today's weapon of choice for perpetrators of the extraordinarily violent crimes that threaten public safety.

Indeed, mass shootings are a modern phenomenon precisely because earlier weapons were far less effective for committing any sort of homicide, R. 52-11 ¶ 16, let alone mass murder, R. 52-11 ¶ 41.  The first known shooting resulting in ten or more deaths occurred in 1949.  R. 52-4 ¶ 18.  Over the next few decades, mass shootings occurred relatively infrequently – between 1949 and 2004, there were a total of ten that resulted in fatalities in the double digits, or one every 5.6 years. R. 52-4 ¶ 21.  After the federal assault weapons ban expired in 2004, "mass shooting violence increased substantially."  R. 52-4 ¶ 21.  Since 2004, there have been 20 mass shootings with fatalities in the double-digits, or one every 0.9 years.  R. 52-4 ¶ 21; see R. 52-14 ¶ 19 (Table 7).  Compared to the fusty muskets and fowling pieces of the founding era – or even the more nefarious knives, daggers, and clubs – the firearms and magazines banned under the City's ordinance wreak an unprecedented level of destruction on society.

Assault weapons and high-capacity magazines also strike an unprecedented level of terror in the public.  Not only are these military-grade instruments far more

deadly – and used in far deadlier ways – but they have invaded the collective consciousness in ways unknown to the founders.  Today, Americans are constantly exposed through social and mass media to harrowing events across the nation. "Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety," R. 60-4 ¶ 58, and they "occupy an outsize space in the public consciousness," Zara Abrams, Stress of Mass Shootings Causing Cascade of Collective Traumas, Sept. 1, 2022, https://www. apa.org/monitor/2022/09/news-mass-shootings-collective-traumas (last visited June 5, 2023).  They "cause profound social damage," R. 60-4 ¶ 58, and "[b]ecause they are seemingly random and unpredictable, these events cause helplessness, making them more traumatic than nearly all other causes of injury and death in healthy populations that are exposed," R. 54-13 at 18 (quotation omitted).

### 3. The City's ordinance imposes a comparable burden on the right of armed self-defense, and is comparably justified.

Like the historical laws that preceded it, the City's ordinance does not burden the right of armed self-defense, but instead regulates only certain dangerous and unusual weapons that, as we explain above, are neither commonly owned for, nor well-suited for, armed self-defense.  It leaves on the table many firearms like revolvers, pistols, and shotguns that are effective, reliable, and easy to use, and that are recommended for self-defense by experts.  R. 52-6 ¶ 61; R. 52-7 ¶¶ 25-28; R. 52-9 ¶¶ 107-08.  It also leaves on the table many handguns, which Heller recognized as the "quintessential" self-defense weapon.  554 U.S. at 629.  In fact, Herrera himself

owns two Glock handguns, R. 1 ¶¶ 20, 23, which he can lawfully carry or keep in his home.  Although his Glock 45 comes equipped with a detachable, 17-round magazine, R. 1 ¶ 20, he can easily replace that with lower-capacity magazine, R. 61-1 at 47 ¶ 66.  In other words, the City's ordinance does not burden Herrera's, or anyone else's, right of self-defense.  It merely removes offensive, military-grade weapons designed for maximum killing potential in wartime settings from the list of firearms that may be used for self-defense.

Moreover, the City's ordinance is comparably justified.  Like the historical laws, the City's ordinance seeks to quell public terror and restore the safety and security of public life.  To be sure, the City's ordinance is not a "twin" to any founding-era laws, but it need not be.  Bruen, 142 S. Ct. at 2133.  And the fact that it is not a twin does not diminish the relevance of the analog; it merely reflects that the unprecedented physical and psychological trauma rendered by assault weapons and high-capacity magazines has necessitated a more robust response.  Again, Bruen endorsed this "nuanced approach" where the challenged laws implicate concerns unknown to the founders.  Id. at 2132.  Taking that approach here, the historical laws are relevantly similar in at least two important respects.  First, as the State discusses, from the founding era into the twenty-first century, lawmakers have responded to new weapons technologies with increasingly stringent regulation, from public carry restrictions to outright bans.  See State Br. 45-46.  The City's ordinance merely continues that long pedigree of legislative response to public safety threats.  Second, as we discuss in detail below, restrictions on carrying

dangerous and unusual weapons were enacted to address the fear and disturbance to the public peace caused by the mere possession of these weapons in shared public spaces. The City's ordinance seeks to achieve the same result by banning the extraordinarily lethal instruments largely responsible for the epidemic of mass shootings.

Herrera attempted to characterize our comparison of modern circumstances to historical ones as the sort of "interest-balancing" <u>Bruen</u> expressly rejects. R. 63 at 13-14. That is nonsense. We are not, of course, advocating for any traditional "means-end test such as strict or intermediate scrutiny," or an "interest-balancing inquiry" of the type disapproved of in <u>Bruen</u>. 142 S. Ct. at 2129. Rather, we engage in precisely the kind of analogizing that <u>Bruen</u> holds is necessary. To determine whether the historical laws address a comparable societal problem in a comparable way, it is important to understand why both the founders and today's lawmakers adopted a particular restriction. If the founders were worried about how dangerous a particular weapon was and how often it was used to commit violent crime, the court must consider whether the challenged laws reflect the same concerns.

As we explain above, founding-era laws prohibiting the carrying of dangerous and unusual weapons in public places were based on the Statute of Northampton, which sought to prevent "the terror of the King's People." Frassetto, <u>supra</u>, at 62, 68. Under these early laws, "a passive" threat to the public was all that was required to show a breach of the peace. <u>Id.</u> at 68. "The act of traveling with an offensive weapon by its very nature provoked a 'fear of the people' – there was no

need to establish a specific intent to terrify or prove that an action was an actual breach of the peace to meet this terror requirement."  Saul Cornell, <u>The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928</u>, 55 U. C. Davis L. Rev. 2545, 2556 (2022).  In other words, "[t]he 'peace' that the law protected encompassed more than physical safety" – merely riding armed to "fairs and markets was an offense to the crown itself."  Joseph Blocher & Reva B. Siegel, <u>When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under <i>Heller</i></u>, 116 Nw. U. L. Rev. 139, 165 (2021).  This much is undisputed among scholars:  "<i>terror</i>, not just physical violence, could justify regulating the carrying of weapons."  <u>Id.</u> at 166

For example, in <u>State v. Huntley</u>, 25 N.C. (3 Ired.) 418 (1843), the court explained that the defendant's actions – "riding upon the public highway" with a double-barreled shotgun – "attack directly that public order and sense of security." <u>Id.</u> at 419, 421.  Because, "when any deadly weapon" is "worn or wielded" in such a way, it serves only "to terrify and alarm" the people.  <u>Id.</u> at 422-23.  And in <u>Aymette</u>, the court confirmed that public carry restrictions were aimed at preserving citizens' freedom to gather peacefully in public places, and that the legislature has the authority to prohibit individuals armed "with drawn swords, guns, and fixed bayonets" from entering a theater or church and "break[ing] up" these "public assemblages."  21 Tenn. (2 Hum.) at 159.  The "key determinant of legality" under these early laws "was the probability that a particular weapon would provoke terror and undermine the peace."  R. 54-14 at 14.  In other words, the fear of violence by

weapons was itself the "general societal problem," <u>Bruen</u>, 142 S. Ct. at 2131, that the statute was designed to address.

The City's ordinance addresses the same concerns about fear of violence by weapons in public places. Today, mass shootings perpetrated with assault weapons and high-capacity magazines have infiltrated nearly every type of public space we consider important to community life – parks, schools, houses of worship, theaters, nightclubs, concert venues, shopping centers, and outdoor gathering places for parades, festivals, rallies, and other events. Violence Policy Center, <u>Mass Shootings in the United States Involving Large Capacity Ammunition Magazines</u>, Apr. 17, 2023, https://vpc.org/fact_sht/VPCshootinglist.pdf (last visited June 5, 2023). They have also been used to intimidate voters, legislators, and peaceful protestors, posing a direct threat to democracy. Blocher & Siegel, <u>supra</u>, at 147-48; <u>see generally</u> R. 54-15. But, while early lawmakers believed that prohibiting the carrying of certain dangerous and unusual weapons in public places would quell fear, responding to that historically rooted concern today requires more than just banning the weapons in public spaces – due to the extreme lethality of the instruments involved, as well as advances in our understanding of trauma, and the fact that this lethality and trauma can be inflicted on the public even with assault weapons and high-capacity magazines kept in private places.

As we explain above, mass shootings cause collective trauma and profound social damage. Abrams, <u>supra</u>; R. 60-4 ¶ 58; R. 54-13 at 18. Approximately 80% of adults "report feeling stressed about mass shootings," while 75% of youth "report

mass shootings [as] being a primary source of stress." R. 54-13 at 19. And "nearly half of all adults in the United States fear becoming a victim of a mass shooting." R. 54-13 at 19. "This results in people avoiding locations like shopping malls and movie theaters, and large community events and gatherings," and children and teenagers "feeling too unsafe to attend school." R. 54-13 at 19. In short, "mass shootings are associated with several problematic mental health outcomes including increased fear and a reduction in perceived safety, among communities both directly and indirectly exposed." R. 54-13 at 19. As long as assault weapons and high-capacity magazines are in circulation, the possibility of a mass shooting will continue to hang over our heads like a sword of Damocles.

Merely prohibiting individuals from carrying assault weapons and high-capacity magazines in public places cannot eliminate this perceived safety threat. Indeed, many mass shootings have been perpetrated with assault rifles that were lawfully kept in the home – "an enormous source of guns used by teens in school shootings come from the home," a point underscored by the perpetrator of the Sandy Hook shooting, who "used his mother's assault rifle to kill 26 [teachers and children]." R. 60-4 ¶ 128. It goes without saying that "[t]he more assault weapons lying around in the home of law-abiding citizens," the more will be available for perpetrators of mass shootings. R. 60-4 ¶ 128.

More important, assault weapons and high-capacity magazines are so extraordinarily lethal, they can cause devastating injuries even from the privacy of one's own home, and must be banned there, in addition to public spaces. The very

reason mass shootings are so terrifying is that perpetrators are able to conceal themselves on rooftops and in interior rooms – as did the perpetrator of the Las Vegas shooting, who killed dozens and injured hundreds more, all from the 32nd floor of a nearby hotel.  Indeed, many of the public spaces where Americans gather are particularly vulnerable to mass shootings from windows and rooftops.  In dense urban areas, like Chicago, tall buildings tower over lakefront parks and beaches that host concerts, festivals, rallies, and other special events and are crowded daily with locals and tourists.  At major events like Lollapalooza, as many as 400,000 attendees pack into Grant Park in the shadow of Michigan Avenue's high rises. While an individual walking into the festival brandishing an assault rifle would certainly cause a panic, an equally significant threat comes from the possibility that a perpetrator could be perched undetectably in a hotel room or condominium on an upper floor of a high rise.  And this threat is not unique to major cities.  Suburbs and small towns host parades, festivals, and concerts along their main streets, where a perpetrator could just as easily be hiding in an upper story window or on the rooftop of a commercial block, as was the case at the Highland Park shooting.

Even when used for self-defense, assault weapons and high-capacity magazines pose a substantial risk to public safety.  As we discuss above, the bullets from an assault rifle, like an AR-15, can easily penetrate walls, risking the lives of neighbors in adjacent apartments and passersby on the street.  And because these weapons are exceedingly lethal, an errant bullet is more likely to be fatal.  Put simply, "the use of semiautomatic assault weapons, even in the home, does not

implicate the safety of only those who live or visit there. Rather, the use of semiautomatic assault weapons implicates the safety of the public at large." Worman, 922 F.3d at 37 (quotation omitted). Thus, restrictions on assault weapons and high-capacity magazines must reach both public *and* private spaces to effectively address the unique and extreme physical devastation and psychological terror created by those weapons.

Herrera has asserted that "[t]here is no historical tradition of banning entire classes of arms in the home," R. 63 at 9, but that grossly exaggerates the scope of the City's ordinance, which merely bans certain particularly dangerous assault weapons and high-capacity magazines. There are still myriad handguns and rifles – including semiautomatic ones – that Herrera and others can use for self-defense. Beyond that, Herrera has taken an overly cramped view of the historical laws and ignores that the weapons banned today represent dramatic technological changes over those available in prior centuries and that their use in mass shootings has wrought unprecedented societal concerns. The historical record demonstrates an unbroken lineage of increasingly restrictive regulation of dangerous and unusual weapons from the founding era to the present day, and banning the modern weapons in both public and private spaces is the only way to address the general societal problem that has been the constant thread throughout – the need to quell terror and protect public safety and citizens' freedom to gather in public spaces.

## II.   HERRERA WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

A plaintiff must show "that irreparable injury is *likely* in the absence of an

injunction." <u>Winter</u>, 555 U.S. at 22. Herrera cannot do so. He alleges that the City's ordinance prevents him from keeping his two AR-15 rifles, along with the 30-round magazines he uses with them, in his home, and that he must instead store them in a secure location outside the City. R. 1 ¶¶ 24, 32. He also alleges that, since 2018, he has served as a volunteer medic on a Chicago-area SWAT team, R. 1 ¶ 25, and that "[h]e does not carry a firearm on missions, but he trains with them to ensure he could quickly secure, unload, and make safe an injured officer's AR-15 in the field," R. 1 ¶ 28. He further alleges that, to attend training with his AR-15, he would have to drive an hour to retrieve his rifle and another hour to return it, R. 1 ¶ 33, making his "participation in these monthly training drills with his AR-15 a practical impossibility," R. 1 ¶ 31. He also alleges that he would like to use his AR-15 for self-defense, hunting, and sport shooting, but the City's ordinance prevents him from doing so. R. 1 ¶ 37. Finally, he alleges that the 17-round magazine he uses with his Glock 45 handgun is barred by the City's ordinance, R. 1 ¶ 20, which means his Glock 45 is inoperable, R. 1 ¶ 22.

None of this suffices to show irreparable harm. Herrera is free to use any number of other handguns and rifles that are permitted under the ordinance, including his Glock 43x, which he says he carries for self-defense, R. 1 ¶ 23, or his Glock 45, R. 1 ¶ 20, which he could equip with a lower-capacity magazine and still achieve the same level of reliability, R. 61-1 at 47 ¶ 66. Herrera also cannot show irreparable harm by his purported inability to bring his AR-15 to SWAT trainings. By his own admission, he does not carry or use an AR-15 in SWAT missions, R. 1

¶ 28, and would, at most, need to handle an AR-15 only if a SWAT member were injured or needed to free up their hands, in which case Herrera would merely take the AR-15 and unload it.  R. 1 ¶ 30; R. 5-1 ¶ 8.  But according to the Special Operations Commander for the Illinois State Police, even that is beyond the medic's role during missions:  a SWAT medic should never be in the "hot zone," R. 52-16 ¶ 8, should never handle an AR-15, R. 52-16 ¶¶ 9-10, and should not need to train with one, R. 52-16 ¶ 11.

Herrera countered that this testimony conflicts with other "guidelines for tactical medicine," as well as his own experience.  R. 63 at 53-54.  But, even on Herrera's view of his role in SWAT missions, whether he will ever be required to handle an AR-15 is speculative at best, and the court will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury." Michigan v. U.S. Army Corps of Engineers, 667 F.3d 765, 788 (7th Cir. 2011) (quotation omitted); accord Halczenko v. Ascension Health, Inc., 37 F.4th 1321, 1325 (7th Cir. 2022) (where "alleged harm" is purely "speculative," it does not "warrant the extraordinary remedy of preliminary injunctive relief").  Regardless, the guidelines Herrera cited in his declaration do not support his assertion – the "training required for tactical medicine personnel is a joint decision" with the "leadership of each law enforcement agency," and the amount of training medics receive is "mutually agree[d] upon" with the "designated law enforcement agency." R. 63-3 at 13.  The designated law enforcement agency in this case contends that AR-15 training is not necessary and that a medic "should not have any reason to

handle an injured operator's AR-15 while rendering medical aid." R. 52-16 ¶ 10.

Moreover, Herrera has been attending monthly trainings since 2018 and admits that he has participated with his AR-15, despite the alleged inconvenience of driving to retrieve it. R. 1 ¶ 30; R. 5-1 ¶ 10. He has not explained why, after five years, he is only now at risk of suffering irreparable harm. Delay in seeking a preliminary injunction "may raise questions regarding the plaintiff's claim that he or she will face irreparable harm." Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 903 (7th Cir. 2001). Herrera offered that his delay is justifiable because, by the time he joined the SWAT team, this court already decided, in Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015), that the Second Amendment does not protect assault weapons. R. 63 at 51. But he cites no authority suggesting this is a reasonable ground for delay.

Finally, Herrera has asserted that under Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011), irreparable harm is presumed for Second Amendment violations. R. 63 at 52. Ezell explained that "for some kinds of constitutional violations, irreparable harm is presumed," and it cited a First Amendment violation as an example of one that "is frequently presumed to cause harm." Id. at 699. The court then stated that "[t]he Second Amendment protects similarly intangible and unquantifiable interests," id., but it based its conclusion that the plaintiffs suffered irreparable harm, in part, on "the form of the claim," id. at 700. The claim there involved an ordinance that mandated one hour of range training as a prerequisite of lawful gun ownership, while also prohibiting all firing ranges in the city. Id. at 689.

According to the court, the ordinance's "very existence" stood "as a fixed harm to every Chicagoan's Second Amendment right to maintain proficiency in firearm use by training at a range." Id. at 699. The ordinance at issue here renders no such "fixed harm" to every Chicagoan's Second Amendment right. The ordinance bans only certain particularly dangerous weapons and high-capacity magazines, and allows myriad handguns, rifles, and other types of firearms for use in self-defense. In other words, Chicagoans – including Herrera, who has two handguns that are not assault weapons – can still exercise the core right of self-defense. Ezell stands for nothing other than that, in some circumstances, depending on the nature of the claim, irreparable harm may be presumed. This is not one of those circumstances.

## III. THE BALANCE OF EQUITIES FAVORS DEFENDANTS AND THE PUBLIC INTEREST.

The district court found that "neither the public interest nor the equities favor Herrera's claim." A30. That was not an abuse of discretion. The City's ordinance protects the public interest by removing thousands of assault weapons and high-capacity magazines from the streets. Indeed, between 2018 and 2022, CPD recovered more than 3,500 firearms that constitute assault weapons under the City's ordinance. R. 54-8 ¶¶ 11, 13. And that number is trending upward; in 2022 alone, CPD recovered 1,713 assault weapons, a five-fold increase from 2018. R. 54-8 ¶ 13. According to CPD, "[d]emand for assault weapons" has "risen in recent years," R. 54-8 ¶ 13, in large part because gang members are procuring more assault weapons, which they use to intimidate other gangs or to respond in kind to shootings involving assault weapons, R. 54-8 ¶ 14.

49

In addition, these weapons are disproportionately used in mass shootings, particularly high-fatality ones, R. 52-4 ¶¶ 11-17, and these mass shootings have touched nearly every type of public space, including parks, schools, houses of worship, theaters, nightclubs, concert venues, shopping centers, and outdoor gathering places for parades, festivals, rallies, and other events – and have claimed hundreds of lives and injured thousands more, <u>see</u> Violence Policy Center, <u>supra</u>. And research confirms that bans on assault weapons and high-capacity magazines, like the City's, effectively reduce injuries and deaths from mass shootings by hindering potential offenders' access to these dangerous weapons and by deterring them from committing mass shootings altogether.  R. 52-4 ¶¶ 30-39.  At a minimum, bans on these weapons force offenders to commit their crimes with less lethal weapons, resulting in less devastation.  R. 52-4 ¶ 34.  Notably, after the expiration of the federal assault weapon ban in 2004, "mass shooting violence in the United States increased substantially."  R. 52-4 ¶ 41.  Epidemiological calculations "lead to the same conclusion:  when bans on assault weapons and [high-capacity] magazines are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings."  R. 52-4 ¶ 47.

In sum, the inability to possess an assault weapon, like Herrera's AR-15, does not strip anyone of the ability to possess other firearms for self-defense.  A plaintiff's preference for military-grade firearms does not outweigh the significant benefits to defendants and the public interest of maintaining the status quo.

## CONCLUSION

———

For the foregoing reasons, this court should affirm the district court's

judgment denying Herrera's request for a preliminary injunction.

Respectfully submitted,

Corporation Counsel
 for City of Chicago

s/ Elizabeth M. Tisher
BY:   ELIZABETH M. TISHER
      Assistant Corporation Counsel
      2 N. LaSalle Street, Suite 580
      Chicago, Illinois 60602
      (312) 744-3173
      elizabeth.tisher@cityofchicago.org
      appeals@cityofchicago.org

**7TH CIRCUIT RULE 30(A) APPENDIX**

# TABLE OF CONTENTS OF APPENDIX

———

**Page**

Memorandum Opinion and Order...................................................................A1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAVIER HERRERA,

    *Plaintiff,*

v.

KWAME RAOUL, *in his official capacity as Attorney General for the State of Illinois*, BRENDAN F. KELLY, *in his official capacity as Director of the Illinois State Police*, COOK COUNTY, *a body politic and corporate*, TONI PRECKWINKLE, *in her official capacity County Board of Commissioners President*, KIMBERLY M. FOXX, *in her official capacity as Cook County State's Attorney*, THOMAS J. DART, *in his official capacity as Sheriff of Cook County*, CITY OF CHICAGO, *a body politic and corporate*, DAVID O'NEAL BROWN, *in his official capacity as Superintendent of Police for the Chicago Police Department*,

    *Defendants.*

No. 23 CV 532

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Laws enacted by the City of Chicago, Cook County, and, most recently, the State of Illinois restrict Illinois residents' ability to possess or purchase certain firearms and large-capacity magazines (defined as more than ten rounds for a semiautomatic rifle and more than fifteen rounds for a handgun). Javier Herrera, a Chicago resident, local emergency room doctor, and owner of several restricted firearms and large-capacity magazines, sued the City of Chicago, Cook County, and

1

**A1**

the State of Illinois, alleging that these laws violate the Second and Fourteenth Amendments. [Dkt. No. 1]. He simultaneously moved for a temporary restraining order and preliminary injunction to enjoin the enforcement of these laws. [Dkt. No. 4]. The Court held a hearing on April 17, 2023. [Dkt. No. 72]. For the reasons detailed below, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

## I.     Background

### A.     Factual Background

In response to widespread mass shootings nationally, including the mass shooting in Highland Park, Illinois on July 4, 2022, the State of Illinois passed the "Protect Illinois Communities Act," HB 5471 ("the Illinois Act"). Ill. Pub. Act 102-1116, § 1; [Dkt. No. 1 at ¶ 40]. The Illinois Act made three changes to state law at issue in this case.

Under the Act, Illinois residents can no longer carry, possess, or purchase certain "assault weapon[s]." 720 ILCS 5/24-1(a)(15)–(16). The Act defines an "assault weapon" to include various models of firearms with various features, including a "semiautomatic rifle" with a "pistol grip." 720 ILCS 5/24-1.9(a)(1)(A)(i). This definition encompasses an AR-15 rifle. *See* 720 ILCS 5/24-1.9(a)(1)(J)(ii)(II). Additionally, Illinois residents can no longer purchase or possess any "large capacity ammunition feeding device" ("large-capacity magazine"). 720 ILCS 5/24-1.10(a). For rifles, the Illinois Act defines a "large capacity ammunition feeding device" as a "magazine . . . that can [be] readily restored or converted to accept, more than [ten]

**A2**

rounds of ammunition." *See* 720 ILCS 5/24-1.10(a)(1). For handguns, it is defined as a magazine of more than fifteen rounds. *Id.* The restrictions on firearms and large-capacity magazines took effect on January 10, 2023. *See* 720 Ill. Comp. Stat. ("ILCS") 5/24-1.

The Illinois Act allows any owner of a restricted firearm who acquired the firearm prior to the Illinois Act's effective date to continue to lawfully possess that firearm if they provide an "endorsement affidavit" by October 1, 2023 ("registration requirement"). 720 ILCS 5/24-1.9(d). The affidavit must include the affiant's Illinois firearm owner's identification ("FOID") number, an affirmation that the affiant lawfully owned the restricted firearm before October 1, 2023, and the make, model, caliber, and serial number of the restricted firearm. *Id.* Owners of restricted large-capacity magazines may similarly retain all magazines acquired before the effective date. *See* 720 ILCS 5/24-1.10(d). The Illinois Act does not allow for the purchase of new restricted weapons or large-capacity magazines after its effective date. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d).

The Illinois Act mirrors county and city enactments already in place.[1] *See* Cook County, Ill., Code §§ 54-210–215 (2006); Chi., Ill., Mun. Code §§ 8-20-010, 8-20-075, 8-20-85 (2013); *see also Wilson v. Cook County*, 937 F.3d 1028, 1029 (7th Cir. 2019). Since 2006, the Cook County Code ("County Code") has prohibited county residents from purchasing, carrying, or possessing certain semiautomatic rifles, including an

---

[1]     Because the challenged laws all contain substantively the same restrictions, the Court often treats them together in its analysis below. The Court notes differences between the three enactments when necessary.

**A3**

AR-15 rifle, and large-capacity magazines, defined as any magazine that can accept more than ten rounds. Cook County, Ill., Code §§ 54-211(7)(A)(iii), 54-212(a). Owners of restricted firearms or large-capacity magazines who possessed either prior to the County Code's enactment are required to remove them from the county, render them "permanently inoperable," or surrender them to the Cook County Sheriff. *Id.* at § 54-212(c).

Since 2013, the City Code of Chicago ("City Code") similarly prohibited city residents from purchasing, carrying, or possessing certain semiautomatic rifles, which included the AR-15 rifle, and large-capacity magazines, defined as magazines of fifteen or more rounds for semiautomatic handguns and ten or more rounds for semiautomatic rifles. Chi., Ill., Mun. Code §§ 8-20-010(a)(10)(B)(ii), 8-20-075, 8-20-085. Much like the County Code, the City Code requires that all restricted firearms or large-capacity magazines possessed before the enactment date be disposed of or removed from city limits. *Id.* at §§ 8-20-075(c)(1), 8-20-085(b).

Plaintiff Javier Herrera is an emergency room doctor, Chicago resident, and owner of multiple firearms. [Dkt. No. 1 at ¶ 5]. Herrera owns a Glock 45, Glock 43x, and two AR-15 rifles. [*Id.* at ¶¶ 20, 23–24]. Herrera keeps his Glock 45 and Glock 43x at his Chicago home and his AR-15 rifle "beyond county lines." [*Id.* at ¶ 22–24]. Herrera alleges that he owns these firearms for self-defense, hunting, and sport shooting. [*Id.* at ¶¶ 19, 37]. Herrera has both a FOID card and a concealed carry license. [*Id.* at ¶¶ 5, 19, 23].

4

**A4**

In addition to his day job, as of 2018, Herrera has served as a volunteer medic on a local Special Weapons and Tactics ("SWAT") team, which carries out high-risk law-enforcement missions. [*Id.* at ¶ 25]. As a volunteer medic, Herrera renders medical aid to SWAT team officers, bystanders, or anyone else who may be injured on these missions. [*Id.* at ¶ 28]. Herrera is not a law enforcement officer on the SWAT team and does not carry a firearm on these missions. [*Id.*] During his volunteer shifts, Herrera is stationed inside the command vehicle until called upon to render medical aid. [*Id.*] Herrera also attends monthly SWAT trainings, which include shooting drills. [Dkt. No. 5-1 at ¶ 10]. He has participated in these trainings in the past with his personal AR-15 to maintain confidence and proficiency with the weapon. [*Id.* at ¶¶ 10, 12].

## B.    Procedural Background

On January 27, 2023, Herrera sued Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly (the "State Defendants"), County Board of Commissioners President Toni Preckwinkle, Cook County State's Attorney Kim Foxx, Sheriff of Cook County Thomas J. Dart, Cook County (the "County Defendants"), Chicago Police Department Superintendent David O'Neal Brown, and the City of Chicago (the "City Defendants"). [Dkt. No. 1]. Herrera moved for a temporary restraining order and preliminary injunction the same day.[2] [Dkt. No. 4]. In his complaint, Herrera alleges that the City Code, County Code, and Illinois Act

---

[2]     Herrera's complaint additionally seeks declaratory judgment that these statutes are unconstitutional and a permanent injunction. [Dkt. No. 1 at 30–31].

violate the Second and Fourteenth Amendments. [Dkt. No. 1 at ¶¶ 105–173]. Herrera charges that these laws infringe on his right to armed self-defense in several ways. [*Id.* at ¶¶ 97–103].

In particular, Herrera alleges that his right to self-defense is threatened by his inability to keep his AR-15 rifle, his Glock 45, or their accompanying standard magazine in his home due to the City and County Code. [*Id.* at ¶¶ 97–98]. As part and parcel of this harm, because Herrera cannot keep his AR-15 rifle in his home, he must commute over four hours round trip to complete shooting drills with his SWAT team. [Dkt. No. 1 at ¶¶ 31–34, 99; Dkt. No. 5-1 at ¶ 12]. Herrera contends that he must be prepared to handle or secure the AR-15 rifle of an injured officer in the event an officer hands that weapon to Herrera while the officer uses another tool. [Dkt. No. 5-1 at ¶ 8]. Herrera has not alleged that he has ever needed to handle the AR-15 of an injured officer or shoot such a weapon. [Dkt. No. 1, 5-1, 63-3]. But Herrera alleges that on one mission in 2021, a SWAT officer handed him an AR-15 rifle for him to secure. [Dkt. No. 63-3 at ¶ 13]. As a result, Herrera contends that he is effectively precluded from SWAT training shooting drills, given the long commute and his hours as an emergency doctor.[3] [Dkt. No. 1 at ¶ 99; Dkt. No. 5-1 at ¶ 12].

Herrera further alleges injury from the inability to purchase additional AR-15 rifles, rifle components, or large-capacity magazines for any of his weapons in

---

[3]    Herrera additionally alleges that "County and City ordinances deny Dr. Herrera easy access to his rifles for hunting and sport shooting in his off time. As a result, Dr. Herrera engages in these hobbies less than he otherwise would." [Dkt. No. 1 at ¶ 100]. Because this argument does not appear in the parties' briefs regarding a preliminary injunction, the Court need not address it further. *See generally* [Dkt. No. 5, 52, 54, 61, 63].

**A6**

furtherance of his right to self-defense. [Dkt. No. 1 at ¶¶ 101–102]. Herrera argues that because certain large-capacity magazines come standard with his AR-15 rifle and Glock 45, his inability to purchase those items render the weapons inoperable and causes the weapons to wear out with disuse. [*Id.* at ¶¶ 98, 101].

Finally, Herrera contends that the Illinois Act "will soon prohibit [him] from possessing his AR-15 rifles anywhere in Illinois, even far away from [his] home, unless he complies with its intrusive and ahistorical registration requirement." [*Id.* at ¶ 103]. Herrera fears that the Illinois Act's requirement is but a "prelude to gun confiscation" and risks exposing his personal information in the event of a data breach. [*Id.* at ¶ 103].

## II.    Legal Standard

Because the standard for granting a temporary restraining order and a preliminary injunction is the same, the Court proceeds under the familiar *Winter v. National Resources Defense Council, Incorporated* framework. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). As such, one is "never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To be awarded such relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

**A7**

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20).

## III.   Analysis

### A.    Likelihood of Success on the Merits

To meet the likelihood of success on the merits prong, Herrera must show that his challenge has "some likelihood of success on the merits, not merely a better than negligible chance." *Doe*, 43 F.4th at 791 (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (cleaned up) (noting that showing a "better than negligible chance" or "a mere possibility of success" are both insufficient to demonstrate a likelihood of success on the merits sufficient for a preliminary injunction). This prong serves as "an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

Having considered the preliminary record at this stage, the Court concludes that Herrera is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The challenged restrictions on semiautomatic weapons and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with "the Nation's historical tradition of firearm regulation," namely the history and tradition of regulating particularly "dangerous" weapons. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

**A8**

The Court does not consider this case in isolation. There are two other matters within this district that challenge the Illinois Act as well as similar city restrictions on the possession, carry, and sale of semiautomatic weapons and large-capacity magazines. *See Goldman v. City of Highland Park, Ill.*, No. 22-cv-4774 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Highland Park ordinance that restricts possession and purchase of certain semiautomatic rifles and large-capacity magazines); *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Naperville City ordinance that restricts sale of certain semiautomatic rifles and large-capacity magazines). Most recently, the *Bevis* Court denied a motion for preliminary injunction of the Illinois Act and a Naperville City ordinance, both restricting the sale of certain semiautomatic rifles and large-capacity magazines.[4] *See Bevis*, 2023 WL 2077392, at *3. This Court agrees with the *Bevis* Court's analysis and incorporates it into this order as applicable.

### 1.    Second Amendment History and Jurisprudence

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme

---

[4]        After the *Bevis* Court denied the request for a temporary restraining order and preliminary injunction, plaintiffs appealed. *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 64. On appeal, the *Bevis* plaintiffs requested a stay of the Illinois Act during the pendency of their appeal. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF. No. 8. On April 18, 2023, the Seventh Circuit denied the request for a stay. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF No. 51. As such, this Court can rule on the pending motion for a temporary restraining order and preliminary injunction in the present case. [Dkt. No. 4].

Court first recognized the Second Amendment right to keep and bear arms for the purpose of self-defense. 554 U.S. 570, 628–29 (2008). In *Heller*, the Court confronted a challenge to a District of Columbia law that restricted handgun possession without a license and imposed a trigger-lock requirement, which rendered such firearms inoperable. *Id.* at 574–75. The Court ultimately struck down the law, finding that it violated the Second Amendment "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court emphasized that "self-defense" was a "central component" of the right. *Id.* at 599.

Notwithstanding the Court's central holding, the Court in *Heller* underscored that the Second Amendment right is not "unlimited." *Id.* at 626. Indeed, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court gave a few examples of limits on the Second Amendment right.  First, as set out in *United States v. Miller*, 307 U.S. 174, 178 (1939), the right does not extend to "weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Furthermore, laws related to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms" are all presumptively lawful, *id.* at 626–27.

Two years later, in *McDonald v. City of Chicago*, the Court incorporated this right against the states through the Fourteenth Amendment. 561 U.S. 742, 767

**A10**

(2010). In that vein, the Court noted that "[f]rom the early days of the Republic, through the Reconstruction era, to the present day, States and municipalities . . . banned altogether the possession of especially dangerous weapons." *Id.* at 899–900. The Court remarked that "[t]his history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers." *Id.* at 900–01.

Thereafter, federal courts were left to formulate a test to determine whether a gun regulation was constitutional. *Bruen*, 142 S. Ct. at 2125. The Courts of Appeals generally adhered to a two-step test doing just that. *Id.*; *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). In 2022, however, the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen* rejected those efforts and set out a new framework for lower courts to evaluate gun laws. 142 S. Ct. at 2126–34; *see also United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023) (acknowledging that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rending our prior precedent obsolete" (cleaned up and internal citation omitted)). With that history in mind, as the *Bevis* Court succinctly explained, "*Bruen* is now the starting point" for this Court's analysis of a challenged gun regulation. *Bevis*, 2023 WL 2077392, at *9.

The *Bruen* Court outlined a two-step analysis to determine whether a challenged gun regulation is constitutional. *Bruen*, 142 S. Ct. at 2126–34. The Court must first determine whether "the Second Amendment's plain text covers an

individual's conduct." *Id.* at 2129–30. If the plain text does not cover the challenged regulation, then the regulation is outside of the Second Amendment's scope and is unprotected. *Id.* However, if the text does include such conduct, "the Constitution presumptively protects that conduct." *Id.* at 2130. As such, for the regulation to be upheld as constitutional, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To demonstrate that a regulation is "consistent with the Nation's historical tradition of firearm regulation," the government must engage in "analogical reasoning" by pointing to "a well-established and representative historical analogue." *Id.* at 2133 (emphasis removed). The government can utilize analogues from a range of historical periods, including English statutes from late 1600s, colonial-, Revolutionary- and Founding-era sources, and post-ratification practices, specifically from the late 18th and early 19th centuries. *Id.* at 2135–56; *Heller*, 554 U.S. at 605– 626; *Rahimi*, 61 F.4th at 455–59. *Bruen* took special note that the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. The government's proposed analogue need not be "a historical twin" and the "modern-day regulation" need not be "a dead ringer for historical precursors" to "pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

Importantly, "*Bruen* does not displace the limiting examples provided in *Heller*." 2023 WL 2077392, at *9. As set out in *Heller*, states may still enact (1) "prohibitions on the possession of firearms by felons and the mentally ill"; (2) "laws

12

**A12**

forbidding the carrying of firearms in sensitive places"; (3) "laws imposing conditions and qualifications on the commercial sale of arms"; and (4) bans on "dangerous" weapons that are not "in common use." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted). The list itself "does not purport to be exhaustive." *Id.* (quoting *Heller*, 554 U.S. at 626 n.26).

### 2. Restrictions on Semiautomatic Rifles and Large-Capacity Magazines under the Challenged Laws

The Court holds that the restrictions on possession of certain semiautomatic rifles and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with the Nation's "history and tradition" of treating particularly "dangerous" weapons as unprotected. *Bruen*, 142 S. Ct. at 2130.

Because the Court ultimately agrees with *Bevis* and its conclusion, only a brief discussion of that opinion is necessary.[5] In *Bevis*, a Naperville gun shop owner and the National Association for Gun Rights ("NAGR") challenged a Naperville City ordinance and the Illinois Act's restrictions on sale of certain semiautomatic weapons and large-capacity magazines as unconstitutional under the Second Amendment. *Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court denied the plaintiffs' request for

---

[5]    While *Bevis* dealt principally with sale of restricted firearms, its analysis extends to gun possession, as is challenged in the present case. *See Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court principally concluded that "Naperville and Illinois lawfully exercised their authority to control the[] *possession*, transfer, sale, and manufacture [of certain semiautomatic weapons] by enacting a ban on commercial sales." *Id.* at *16 (emphasis added). The *Bevis* Court explicitly noted that while the parties only challenged laws as they applied to sales, nonetheless, "the state[] [has] general authority to regulate assault weapons because logically if a state can prohibit the weapons altogether, it can also control their sales." *Id.* at *9 n.8. Otherwise, "a right to own a weapon that can never be purchased would be meaningless." *Id.* (citing *Drummond v. Robinson Township*, 9 F.4th 217, 229 (3d Cir. 2021)). This Court agrees and applies *Bevis*'s analysis to the question of possession presented here.

**A13**

a preliminary injunction, concluding that "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected" and thus, the plaintiffs were unlikely to succeed on the merits sufficient for a preliminary injunction. *Id.* at *9.

To reach this conclusion, the *Bevis* Court detailed the regulatory history of "Bowie kni[ves]," clubs, trap guns, and gun silencers. *Id.* at *10–14. The Court utilized over fifty examples, ranging from the Colonial Era to the early 20th century, showing a clear trend that when weapons became "prevalent," so too would "the laws governing the most dangerous of them." *Id.* at *10. The Court noted that as firearms proved more reliable, states similarly regulated them, including "gun silencers" and "semiautomatic weapons." *Id.* at *12. As to the latter, the Court noted that "semiautomatic weapons themselves, which assault weapons fall under, were directly controlled in the early 20th century." *Id.* From this body of evidence, the Court concluded that "[t]he history of firearm regulation . . . establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)."[6] *Id.* at *14–16.

In response to the Defendants' citation to similar statutes in this case, Herrera argues that his suit does not concern public carry, but rather defense of the home. [Dkt. No. 63 at 1]. This argument is unavailing. The Supreme Court was clear in its instruction that "analogical reasoning" is not a "regulatory straightjacket" and "even

---

[6]     The State Defendants in this case similarly point to the history of regulations regarding "concealable [firearms], Bowie knives, clubs, and, later, machine guns and semi-automatic weapons" and conclude that "[b]ecause the Act regulates 'dangerous and unusual weapons' for a purpose and in a manner relevantly similar to comparable historical regulations, it does not violate the Second Amendment." [Dkt. No. 52 at 42–43]. The County and City Defendants do the same. [Dkt. 54 at 36, 45–50; Dkt. No. 61-1 at 15–17].

**A14**

if a modern-day regulation is not a dead ringer for historical precursors," the government's chosen analogue "may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133. While the government's analogue may not be identical, it need not be. *Id. Bruen* also expressly observed that "dramatic technological changes" or "unprecedented societal concerns" may require a "more nuanced approach." *Id*. at 2132.

Such an approach is applicable here. As the State Defendants put forth at oral argument, laws regulating weapons, including various firearms, developed over time in response to the type of harm that those weapons presented, as in the present case. Transcript of Oral Argument at 82–84, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73; *see also* [Dkt. No. 52 at 58 ("Throughout American history, when lawmakers have confronted new or escalating forms of societal violence, they have frequently responded by regulating the instruments of that violence in an effort to reduce it.")]. Here, the City Code, County Code, and Illinois Act similarly responded to "dramatic technological changes" and "unprecedented societal concerns" of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them. *Bruen*, 142 S. Ct. at 2132. This is well in line with earlier laws regulating carry and progressing to restrictions on sale and possession, in and out the home. [See Dkt. No. 52 at 60–63].

Having concluded that Defendants demonstrated a tradition of regulating "particularly dangerous weapons," *id*. at *9, the *Bevis* Court next considered "whether assault weapons and large-capacity magazines fall under this category" of "highly

**A15**

dangerous arms (and related dangerous accessories)," and answered with a resounding yes. *Id.* at *14. The Court considered ample record evidence of the vastly destructive injuries that semiautomatic weapons cause and their "disproportionate[]" use in "mass shootings, police killings, and gang activity. *Id.* at *14–15. The Court observed that large-capacity magazines "share similar dangers," with studies showing that the use of such magazines lead to an increased number of fatalities in mass-shooting scenarios. *Id.* at *15 ("[R]esearchers examining almost thirty years of mass-shooting data [have] determined that high-capacity magazines resulted in a 62 percent higher death toll."). The Court rejected any argument that regulations on semiautomatic weapons and large-capacity magazines are not "unusual," given the ten-year federal ban on assault weapons and eight bans on semiautomatic weapons and large-capacity magazines in jurisdictions such as Illinois. *Id.* at *16. As such, the Court concluded that "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." *Id.*

This Court concurs with the *Bevis* analysis, including its analysis and conclusions regarding large-capacity magazines, and adopts it here. *See Bevis*, 2023 WL 2077392, at *14–16. Herrera is unlikely to be successful in his challenge to the semiautomatic weapons and large-capacity magazine restrictions in the City Code, County Code, and Illinois Act. *Doe*, 43 F.4th at 791.

### 3.    Registration Requirement Under the Illinois Act

The Court next turns to Herrera's challenge to the Illinois Act's registration requirement to determine his likelihood of success on the merits.

#### a)    Ripeness

Before doing so, the Court first concludes that the question is ripe for adjudication and Herrera has alleged sufficient imminent injury in a pre-enforcement challenge context. To establish Article III standing, the plaintiff must allege injury-in-fact traceable to the defendant and capable of being redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury alleged must be "concrete and particularized," as well as "actual or imminent," rather than "conjectural or hypothetical." *Id*. at 560.

"Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up). In evaluating ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id*. at 560. In the context of a pre-enforcement challenge, like the present case, ripeness and standing often plumb the same concept: "timing." *Id*.

When a plaintiff faces a realistic threat that a law will be enforced against him, "a party may advance a preenforcement challenge before suffering an injury—so long as the threatened enforcement is sufficiently imminent." *Sweeney*, 990 F.3d at 559 (internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573

**A17**

U.S. 149, 159 (2014)). The plaintiff need not suffer "an actual arrest, prosecution, or other enforcement action," nor does the plaintiff need "to confess that he will in fact violate the law." *Driehaus*, 573 U.S. at 158, 163. Rather, a plaintiff may bring a pre-enforcement challenge where (1) he intends to perform conduct that is arguably constitutionally protected, (2) the conduct is prohibited by the rule or statute challenged, and (3) there is a credible threat of enforcement. *Id*. at 159.

These criteria are met in the present case. Herrera avers an intent to disobey any law that he perceives to be unconstitutional, like the Illinois Act's registration requirement. [Dkt. No. 63-3 at ¶ 18]. While the parties dispute whether the regulations are constitutional, failure to register in compliance with the Illinois Act at the very least implicates the Second Amendment and is "arguably constitutionally protected." See *Heller*, 554 U.S. at 635 (directing that the district court permit the plaintiff "to register his handgun" in compliance with District law). Finally, there seems to be a credible threat of enforcement, given that Herrera's "intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will not enforce the statute." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998); *see also* 720 ILCS 5/24-1(b) (stating that an individual who possesses a restricted firearm in violation of 720 ILCS 5/24-1(a)(15) commits a Class A misdemeanor, with second or subsequent violation classified as a Class 3 felony). As such, Herrera can advance his suit before suffering his alleged injury. To delay adjudication of these issues until the Illinois

**A18**

Act's registration requirement is in effect would cause undue "hardship" to Herrera and as such, the issue is similarly ripe. *Sweeney*, 990 F.3d at 560.

>    **b)**    **Analysis**

While Herrera can challenge the Illinois Act's registration requirement before its effective date, he is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The Court holds that the Illinois Act's registration requirement is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As discussed below, Defendants have put forth a "representative historical analogue" to demonstrate a tradition vindicating the Illinois Act's registration requirement. *Id.* at 1233; [Dkt. No. 52 at 40 n.24; Dkt. No. 52-14].

Pre-colonial evidence suggests that colonies required gun registration in a variety of ways. For instance, in 1631, Virginia implemented a "muster" requirement, necessitating inhabitants to annually account for their "arms and ammunition" to the "commanders" under which they served. [Dkt. No. 52-15 at 69]. As other district courts have similarly noted, American colonies in the 17th century had firearm owners register their guns through mandatory "muster" laws, taxes requiring identification of firearms, and as part of broader legislative programs regarding the sale, transfer, and taxation of firearms. See *United States v. Holton*, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (noting that multiple colonial governments required registration of arms through mandatory "muster" laws and taxes imposed from "as early as 1607 and well into the 1800s"); see also *United States v. Tita*, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (noting that "many of the colonies enacted

laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms," citing laws from 17th century New York, Virginia, and Connecticut). Indeed, the *Holton* Court relied on many of the same registration and taxation statutes as cited in this case to hold that 18 U.S.C. § 922(k), the statute prohibiting receipt of a firearm with the manufacturer's serial number obliterated or removed, "pass[ed] constitutional muster under *Bruen*." *Compare Holton*, 2022 WL 16701935, at \*4–5 (cleaned up) *with* [Dkt. No. 52 at 40 n.24; Dkt. No. 52-15 at 69–71].

During the era of the Fourteenth Amendment's ratification, many state legislatures taxed firearms, which in essence required that firearms be identified and disclosed to the government. Mississippi required a "tax of two dollars on each dueling or pocket pistol" in 1848. [Dkt. No. 52-15 at 69]. In 1856, North Carolina similarly required that "every pistol, except such as are used exclusively for mustering" that was "used, worn or carried" be taxed. [*Id.*] This law was reenacted in a similar form the next congressional session. [*Id.*] Georgia, in 1866, enacted a similar tax, requiring "one dollar apiece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties," with the firearm owner required to render an "oath" of any such "gun, pistol, musket, or rifle." [*Id.* at 69–70]. Alabama did much the same a year later. [*Id.* at 70]. The state imposed a "tax of two dollars each" for "[a]ll pistols or revolvers in the possession of private persons," for which the taxpayer would receive "a special receipt" in order to prove payment. [*Id.*] The Court

20

**A20**

finds that these historical regulations sufficiently analogous to the Illinois Act's registration requirement to satisfy *Bruen*. 142 S. Ct. at 2134.

Herrera complains that the statutes Defendants identify "mostly targeted certain kinds of pistols and arms like the Bowie knife," and "did not generally target rifles," such that they are not sufficiently analogous. [Dkt. No. 63 at 41]. Again, *Bruen* does not require a "historical twin." 142 S. Ct. at 2133. Rather, the inquiry is whether the modern statute and the historical regulations are sufficiently analogous. *Id.* ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

Late-19th and 20th century laws, while not themselves dispositive of a history or tradition of gun registration laws, can serve as "confirmation" of the same, as they do here. *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019); *see Heller*, 554 U.S. at 614, 621–25 (utilizing 19th and 20th century sources in its analysis); *see also Bruen*, 142 S. Ct. at 2154 n. 28 (noting that "late-19th-century evidence" and "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*" (emphasis added)). This sort of evidence confirms what the Court has already concluded: the registration requirement in the Illinois Act is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

A review of the legislation during this period shows a continuing tradition of state and national registration requirements. For example, starting in 1885, Illinois kept a "register of all such [deadly] weapons sold or given away" with various

**A21**

identifying information, including the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the weapon, and the purpose for which it is purchased or obtained." [Dkt. No. 52-15 at 70–71]. Failure to comply with the register resulted in a fine. [*Id.*] In 1918, Montana required that any individual who possessed a "fire arm" to register it with the local sheriff. [*Id.* at 71]. Indeed, as the Supreme Court in *United States v. Miller* noted, the National Firearms Act of 1934 imposed registration requirements on owners of certain firearms, imposing a fine for failure to do so. *See Miller*, 307 U.S. at 175, 175 n.1 (noting that the National Firearms Act of 1934 required owners of grandfathered weapons to register their weapons within 60 days by providing "the number or other mark identifying such firearm, together with [the owner's] name, address, place where such firearm is usually kept, and place of business or employment").

*Bruen* itself suggests that the Illinois Act's registration requirement is permissible. In concluding that there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense," *Bruen*, 142 S. Ct. at 2138, the *Bruen* Court took special note that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of existing "shall-issue" licensing laws, *id.* at 2138 n.9. In so doing, the Court distinguished New York's problematic statute from other shall-issue licensing regimes because the latter did not require an "appraisal of facts, the exercise of judgment," or "the formation of an opinion" on the part of the licensing official. *Id.*; *see also id.* at 2162 (Kavanaugh, J., concurring) (noting that "shall-issue regimes" are "constitutionally permissible," even

22

**A22**

if they require an individual to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements").

Of course, licensing regimes and registration requirements are not the same thing, as each serves a different purpose. But the Illinois Act's registration requirement remains far less invasive than the presumptively constitutional regulations described in *Bruen*. The shall-issue licensing schemes discussed in *Bruen* involved a "background check" or the passage of a "firearms safety course," *Bruen*, 142 S. Ct. at 2138 n.9, which are *more* onerous than the relatively mechanical registration process required by the Illinois Act, *see* 720 ILCS 5/24-1.9(d). Nor does the Act permit state officials to have "open-ended discretion" to deny or allow a firearm to be registered. *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Rather, owners of semiautomatic rifles before the Act's effective date must provide the affiant's FOID number, report the make, model, caliber, and serial number of the weapon, and thereafter affirm that he or she lawfully owned the weapon before January 10, 2023.[7] *See* 720 ILCS 5/24-1.9(d).

Citing *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011), Herrera argues that the "fundamental problem with [the] gun registration law

---

[7]    FOID cards and concealed carry licenses are arguably even more intrusive than the Illinois Act's registration requirement. *See* 430 ILCS 65/4(a) (requiring an applicant's name, birth date, home address, driver's license information, and a color photograph for the issuance of a FOID card); *see also* 430 ILCS 66/10(a), 430 ILCS 66/25, 430 ILCS 66/35 (requiring an applicant's FOID license, background check, and completion of a firearms training program). Herrera has already applied and received both a FOID card and a concealed carry license. [Dkt. No. 1 at ¶¶ 5, 19, 23].

23

**A23**

is that registration of lawfully possessed guns is not 'longstanding.'" [Dkt. No. 5 at 3, 27–28]. This argument is unpersuasive for at least two reasons. Herrera cites to then-Judge, now-Justice Kavanaugh's dissent in *Heller II* on remand. The opinion is not controlling, as both out-of-circuit caselaw and a dissenting opinion. *Heller II*, 670 F.3d at 1269–96 (Kavanaugh, J., dissenting). Second, the challenged registration requirement in *Heller II* is factually distinguishable from the present case. In *Heller II*, the District of Columbia required that an applicant provide his "name, address, and occupation," submit "for a ballistics identification procedure," appear in person to register (with a limit of one pistol allowed to be registered every thirty days), and renew each registration every three years with a renewed certificate of his compliance with the law. *Id.* at 1248. These are far afield from the requirements at issue here.

For these reasons, Defendants have put forth "representative historical analogue" to demonstrate a tradition of registration regulation in line with the registration requirement of the Illinois Act. *Bruen*, 142 S. Ct. at 2133. The registration requirement is "consistent with this Nation's historical tradition of firearm regulation" and therefore, likely constitutional. *Id.* at 2130. Accordingly, Herrera is unlikely to succeed on the merits of his claim and is not due the "extraordinary equitable remedy [of a preliminary injunction] that is available only when the movant shows clear need." *Turnell*, 796 F.3d at 661.

### B.    Irreparable Harm

While the Court need not address the remaining preliminary injunction factors, the Court additionally concludes that Herrera has not shown that he will suffer irreparable harm absent a preliminary injunction, *see Doe*, 43 F.4th at 791.

Harm is "irreparable" when "legal remedies are inadequate to cure it." *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate" does not denote that such remedies would be "wholly ineffectual," only that such a remedy would be "seriously deficient as compared to the harm suffered." *Id.* (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). In determining whether Herrera will suffer irreparable harm absent a preliminary injunction, the Court must weigh "how urgent the need for equitable relief really is." *U.S. Army Corps of Engineers*, 667 F.3d at 788.

Harm stemming from a constitutional violation can constitute irreparable harm. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). However, a presumption of irreparable harm is not applicable to all alleged constitutional violations. *Compare Int'l Ass'n of Fire Fighters, Loc. 365*, 56 F.4th at 450–51 ("Under Seventh Circuit law, irreparable harm is presumed in *First Amendment* cases.") (emphasis added); *and Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (describing that "[t]he loss of a *First Amendment right* is frequently presumed to cause irreparable harm") (emphasis added); *with Campbell v. Miller*, 373

25

**A25**

F.3d 834, 835 (7th Cir. 2004) (rejecting plaintiff's argument that "money never is an adequate remedy for a constitutional wrong").

Herrera, much like the *Bevis* plaintiffs, cites *Ezell* for the proposition that there is a presumption of irreparable harm in all Second Amendment challenges. [Dkt No. 5 at 28; Dkt. No. 63 at 44]. The Court rejects this argument. *See Bevis*, 2023 WL 2077392, at *16. While the Seventh Circuit in *Ezell* likened the plaintiff's alleged Second Amendment harm to a First Amendment challenge, where harm can be presumed, the Seventh Circuit declined to create such a wide-ranging presumption for Second Amendment cases. *Ezell*, 651 F.3d at 699; *see also Bevis*, 2023 WL 2077392, at *16 (cleaned up) (observing that "the Seventh Circuit [in *Ezell*] stopped short of holding that injury in the Second Amendment context unquestionably constitutes irreparable harm," as stated in *Elrod*).

Apart from a presumption, Herrera alleges two sources of harm: (1) his inability to possess his AR-15 rifle, its corresponding standard large-capacity magazine, and additional large-capacity magazines for his Glock 45 impinges on his capacity to protect himself in his home, and (2) the commute time to retrieve his personal AR-15 rifle renders his monthly SWAT training a "practical impossibility." [Dkt. No. 1 at ¶¶ 31, 97–103; Dkt. No. 5-1 at ¶ 12]. The Court takes each argument in turn.[8]

---

[8]      The Court has its doubts about the time-sensitive nature of Herrera's emergency request for preliminary injunction, given his delayed challenge to the City and County Codes. Since 2006, Herrera has been prohibited from keeping his AR-15 rifle, its assorted components, and any large-capacity magazine for his Glock 45 or AR-15 rifle in his Chicago home. *See* Cook County, Ill., Code §§ 54-211, 54-212(a), (c)(2); Chi., Ill., Mun. Code

**A26**

Herrera's alleged inability to protect himself in his home is unsupported by the record. Herrera does not dispute that he currently has two firearms in his home—a Glock 43x and Glock 45—that he can use for self-defense. [Dkt. No. 1 at ¶¶ 20, 23–24.] While Herrera prefers to use his standard seventeen-round magazine for his Glock 45 due to fear of it malfunctioning or jamming [Dkt. No. 5 at ¶ 5], he does not dispute that his firearm can accept a magazine of less than fifteen rounds to operate, [Dkt. No. 63-3 at ¶ 17]. Indeed, Herrera utilizes a ten-round magazine for his Glock 43x, which is compliant with city, county, and state law. [Dkt. No. 1 at ¶ 23]. Additionally, none of the challenged laws seek to take from Herrera his two AR-15 rifles or existing large-capacity magazines. He need only register such accoutrements and he may continue to keep them in his out-of-county storage location. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d). Herrera's contention that without "standard" magazines for his firearms, his weapons will "wear out" is unsupported by the record. [Dkt. No. 52-7 at ¶ 25 ("Despite the recent proliferation of large capacity magazines, it is important to note that there is no known firearm that requires a large-capacity magazine to function as designed.")].

---

§§ 8-20-010, 8-20-075, 8-20-085. He has been subject to a lengthy round-trip commute to retrieve his personal AR-15 rifle since he became a volunteer medic in 2018. [Dkt. No. 5-1 at ¶¶ 8, 10, 12]. Yet, Herrera did not request a preliminary injunction seeking to enjoin either law until 2023. [Dkt. No. 4]. Herrera says that he held off on challenging these laws before now because he understood that he would likely be denied such relief given Seventh Circuit law. [Dkt. No. 63-3 at ¶ 19]. He cites to no caselaw showing that his reasoning constitutes sufficient grounds to delay filing a challenge or that he was reasonably diligent in doing so. As a result, Herrera's apparent delay weighs against his request. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (noting that "a party requesting a preliminary injunction must generally show reasonable diligence" and the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request" for preliminary injunction).

Herrera's allegations regarding his training with the SWAT team are similarly undercut by record evidence. At the outset, Herrera expresses seemingly contradictory facts about his past and current efforts to bring his personal AR-15 rifle to SWAT team training. Herrera acknowledges that he has brought his personal AR-15 rifle to monthly trainings in the past but has now stopped. [*Compare* Dkt. No. 5-1 at ¶ 10 ("Similar to SWAT school, I have participated in those [SWAT] shooting drills in the past with my own AR-15.") *with* Dkt. No. 63-3 at ¶ 5 ("I can't feasibly bring my AR-15 to the training and participate in the weapons handling training or shooting drills with my other team members because I cannot keep that firearm and its standard magazines in my home.")].

Herrera's explanation for this change, in short, is that the drive is too long. But he alleges nothing in support of why the commute is *now* too long, as compared to his commute before. As the State Defendants noted at oral argument, for the past five years of training while only the City and County Codes were being enforced, Herrera faced no obstacle to bringing his personal AR-15 rifle with him, apart from the long commute. Transcript of Oral Argument at 53–54, 84–85, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73. Even under the current state law, assuming that Herrera is completing SWAT training at a licensed firing range, he is expressly allowed to do so. *See* 720 ILCS 5/24-1.9(d) (allowing for "use of the assault weapon . . . at a properly licensed firing range"); 720 ILCS 5/24-1.10(d) (allowing for the "use of the large capacity ammunition feeding device at a properly licensed firing range").

28

**A28**

That aside, Herrera's allegations are speculative. While the requirement of access to "[r]ange training" lies "close to the core of the individual right of armed defense," *Ezell*, 846 F.3d at 893, Herrera's allegations regarding SWAT training seem to place him outside of the scope of that right. Herrera does not carry a firearm during SWAT missions. [Dkt. No. 1 at ¶ 28]. As a volunteer medic, Herrera is tasked with "provid[ing] medical care to the operators on my team, any injured perpetrators, or injured bystanders," not shooting a weapon offensively or defensively. [Dkt. No. 5-1 at ¶ 8]. Herrera's harm is predicated on the contingency that he might need to "act if a SWAT officer is not immediately present to assist with an injured officer or armed suspect." [Dkt. No. 63-3 at ¶ 7]. In essence, Herrera's allegations amount to speculation about what he might need to do, not about harm he is "*likely* to suffer . . . in the absence of preliminary relief." *See Winter*, 555 U.S. at 20 (emphasis added).

Herrera argues that his inability to "adequately train for SWAT duties . . . flies in the face of textbook standards of tactical medicine." [Dkt. No. 63 at 46]. Yet, the authority Herrera cites in support requires that any training volunteer medics receive should be "mutually agree[d] upon" with "the involved agencies" and "local law enforcement." [Dkt. No. 63-3 at 13]. The local agencies in the present case, however, contend that as a medic, Herrera "should not have any reason to handle an injured operator's AR-15 while rendering medical aid." [Dkt. No. 52-15 at ¶ 10]. Volunteer SWAT medics, like Herrera, are affirmatively not trained in deadly force protocols, given weapons, or put in a position that requires the use of deadly force. [*Id*. at 2-3]. Indeed, "the training that is most valuable for a civilian medic is not . . .

**A29**

shooting drills, but rather being trained and knowledgeable about tactical medicine, including how to quickly remove a SWAT team member's uniform and equipment to render medical aid." [*Id.* at ¶ 11 (internal quotation marks omitted)].

Given this record and the early stage of this case, the Court cannot conclude that the alleged harm is "anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022). For these reasons, Herrera has additionally failed to demonstrate a "clear need" for the "extraordinary equitable remedy [of preliminary injunction]." *Turnell*, 796 F.3d at 661.

## C.    Public Interest and Balance of the Equities

Finally, while not required given the Court's above conclusions, *see Turnell*, 796 F.3d at 662, the Court concludes that neither the public interest nor the equities favor Herrera's claim, *see Doe*, 43 F.4th at 791. *See also Nken v. Holder*, 556 U.S. 418, 435 (holding that the public interest and balance of the equities are considered together when the government is the party opposing injunctive relief). To balance the equities, the Court weighs "the degree of harm the nonmoving party would suffer if the injunction is granted against the degree of harm to the moving party if the injunction is denied." *Troogstad v. City of Chicago*, 576 F. Supp. 3d 578, 590 (citing *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021)). The analysis also gauges the public interest, or "the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971

**A30**

F.2d 6, 11 (7th Cir. 1992)); *see id* (defining the public interest as the "interests of people and institutions that are not parties to the case").

This Court, like the *Bevis* Court, finds that the challenged laws "protect public safety by removing particularly dangerous weapons from circulation" which would be "injured by the grant of injunctive relief." *Bevis*, 2023 WL 2077392, at *17 (quoting *Metalcraft of Mayville, Inc. v. The Toro Comp.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017)). By contrast, Herrera seeks to prevent harm flowing from the enforcement of what he maintains is an unconstitutional law—an interest that is comparably weak given the conclusions above. [Dkt. No. 5 at 28–29]. None of the harms he identifies outweigh the overwhelming interest in public safety. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) (observing that it is the "primary concern of every government" to protect "the safety and indeed the lives of its citizens"). In sum, he has failed to show a "clear need" for the extraordinary remedy he seeks. *Turnell*, 796 F.3d at 661.

## XIV.  Conclusion

For these reasons, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

Enter: 23-cv-532

Date:  April 25, 2023

_____

Lindsay C. Jenkins
United States District Judge

31

**A31**

## CERTIFICATE OF COMPLIANCE

——

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(i) and Cir. R. 32(c). This brief contains 13,826 words, beginning with the words "Jurisdictional Statement" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word processing system used to prepare the brief.

s/ Elizabeth M. Tisher
ELIZABETH M. TISHER, Attorney

## CERTIFICATE OF COMPLIANCE WITH 7TH CIRCUIT RULE 30

——

In accordance with 7th Cir. R. 30(d), I certify that the materials required by 7th Cir. R. 30(a) are included in the appendix to this brief. I further certify that there are no materials within the scope of 7th Cir. R. 30(b).

s/ Elizabeth M. Tisher
ELIZABETH M. TISHER, Attorney

## CERTIFICATE OF SERVICE

——

I certify that on June 5, 2023, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Elizabeth M. Tisher
ELIZABETH M. TISHER, Attorney