Nos. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, et al., | ) | Appeal from the United States |
| | ) | District Court for the Southern |
| Plaintiffs-Appellees, | ) | District of Illinois |
| | ) | |
| v. | ) | No. 3:23-cv-00209-SPM |
| | ) | |
| KWAME RAOUL, et al., | ) | The Honorable |
| | ) | STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) | Judge Presiding. |

(Full Caption on Next Page)

**OPENING BRIEF OF THE STATE PARTIES AND SHORT APPENDIX**

**SARAH A. HUNGER**
Deputy Solicitor General
**IVAN PARFENOFF**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

Attorneys for the State Parties

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Nos. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 3:23-cv-00209-SPM |
| KWAME RAOUL, Attorney General of the State of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, | ) ) ) ) ) | The Honorable STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) | Judge Presiding. |
| DANE HARREL; C4 GUN STORE, LLC; MARENGO GUNS, INC.; ILLINOIS STATE RIFLE ASSOCIATION; FIREARMS POLICY COALITION, INC.; and SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, | ) ) ) ) ) ) | |
| Defendants-Appellants, | ) ) | No. 3:23-cv-00141-SPM |
| and | ) ) | |

JAMES GOMRIC, in his official )
capacity as State's Attorney of St. Clair )
County, Illinois; JEREMY WALKER, in )
his official capacity as State's Attorney )
of Randolph County, Illinois; PATRICK )
D. KENNEALLY, in his official )
capacity as State's Attorney of )
McHenry County, Illinois; RICHARD )
WATSON, in his official capacity as )
Sheriff of St. Clair County, Illinois; )
JARROD PETERS, in his official )
capacity as Sheriff of Randolph County, )
Illinois; ROBB TADELMAN, in his )
official capacity as Sheriff of McHenry )
County, Illinois,                         ) The Honorable
                                          ) STEPHEN P. McGLYNN,
         Defendants.                      ) Judge Presiding.

JEREMY W. LANGLEY, TIMOTHY B. ) Appeal from the United States
JONES, and MATTHEW WILSON,    ) District Court for the Southern
                              ) District of Illinois
         Plaintiffs-Appellees, )
                              )
         v.                   )
                              )
BRENDAN KELLY, in his official )
capacity as Director of the Illinois State )
Police,                        ) No. 3:23-cv-00192-SPM
                              )
         Defendant-Appellant,  )
                              )
         and                  )
                              )
COLE PRICE SHANER, in his official )
capacity as State's Attorney of )
Crawford County, Illinois,     ) The Honorable
                              ) STEPHEN P. McGLYNN,
         Defendant.           ) Judge Presiding.

| | | |
|---|---|---|
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, an Illinois not-for-profit corporation; GUNS SAVE LIFE, an Illinois not-for-profit corporation; GUN OWNERS OF AMERICA, a California non-stock corporation and a not-for-profit membership organization; GUN OWNERS FOUNDATION, a Virginia non-stock corporation and a not-for-profit legal defense and educational foundation; PIASA ARMORY, a Missouri corporation; DEBRA CLARK; JASMINE YOUNG; and CHRIS MOORE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| | ) | No. 3:23-cv-00215-SPM |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| JAY ROBERT "J.B." PRITZKER, in his official capacity as Governor of the State of Illinois; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, | ) ) ) ) ) ) ) ) | The Honorable STEPHEN P. McGLYNN, Judge Presiding. |
| Defendants-Appellants. | ) | |
| JAVIER HERRERA, | ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |

KWAME RAOUL, in his official
capacity as Attorney General for the
State of Illinois; BRENDAN F. KELLY,
in his official capacity as Director of the
Illinois State Police; COOK COUNTY,
ILLINOIS, a body politic and corporate;
TONI PRECKWINKLE, in her official
capacity as County Board of
Commissioners President; CITY OF
CHICAGO, a body politic and
corporate; KIMBERLY M. FOXX, in her
official capacity as Cook County State's
Attorney; THOMAS J. DART, in his
official capacity as Sheriff of Cook
County; and DAVID O'NEAL BROWN,
in his official capacity as
Superintendent of Police for the
Chicago Police Department,

                Defendants-Appellees.

No. 1:23-cv-00532

The Honorable
LINDSAY C. JENKINS,
Judge Presiding.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

JURISDICTIONAL STATEMENT .................................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................................. 4

STATEMENT OF THE CASE ........................................................................... 5

A.    The Protect Illinois Communities Act .................................................. 5

B.    *Barnett* ......................................................................................................... 7

C.    *Herrera* ....................................................................................................... 10

SUMMARY OF ARGUMENT ........................................................................ 13

ARGUMENT ..................................................................................................... 15

I.    Plaintiffs must show that they are entitled to a preliminary injunction, which is granted only in exceptional circumstances ........................................ 15

II.    Plaintiffs have not shown a likelihood of success on the merits of their claim challenging the assault weapon and LCM restrictions. .............. 15

    A.    Plaintiffs have not carried their burden of showing that the Act regulates conduct protected by the Second Amendment ................ 16

        1.    LCMs are not "arms." ................................................................. 17

        2.    Plaintiffs did not show that assault weapons and LCMs are commonly used for self-defense. ............................................ 20

        3.    Assault weapons and LCMs are offensive, militaristic weapons that are not commonly used for self-defense. ............. 28

    B.    The Act is consistent with the Nation's history of regulating firearms. ................................................................................................ 32

        1.    There is a historical tradition of regulating dangerous and unusual weapons. ................................................................. 34

i

2.     The Act's restrictions on assault weapons and LCMs are relevantly similar to the historical tradition of regulating dangerous and unusual weapons ................................................ 38

a.     The Act responds to unprecedented societal concerns prompted by dramatic technological changes. ................. 39

b.     When compared to historic regulations, the Act imposes a comparable burden on the right of armed self-defense and that burden is comparably justified...... 44

III.     Herrera has not shown a likelihood of success on the merits of his claim challenging the endorsement affidavit requirement. ..................... 50

IV.     Plaintiffs failed to satisfy the remaining preliminary injunction factors. ........................................................................................... 53

CONCLUSION......................................................................................... 56

CERTIFICATES OF COMPLIANCE

SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey,*
    910 F.3d 106 (3d Cir. 2018) ............................................................................. 19

*Authenticom, Inc. v. CDK Global, LLC,*
    874 F.3d 1019 (7th Cir. 2017) ......................................................................... 54

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ......................................................................................... 23

*Del. State Sportsmen's Ass'n, Inc. v. Delaware,*
    No. 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ................... 24, 46

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................................. *passim*

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ..................................................................... 19, 54

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ................................................................... *passim*

*GEFT Outdoors, LLC v. City of Westfield,*
    922 F.3d 357 (7th Cir. 2019) ........................................................................... 15

*Hanson v. District of Columbia,*
    No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ...................... 30

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ........................................................................... 19

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ........................................................................... 30

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ......................................................................................... 15

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ......................................................................................... 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ................................................................. *passim*

*Ocean State Tactical LLC v. Rhode Island,*
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............................... 17

*Or. Firearms Fed'n, Inc. v. Brown,*
    No. 2:22-cv-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) .................... 19

*Staples v. United States,*
    511 U.S. 600 (1994) ........................................................................ 22

*United States v. Holton,*
    No. 21-CR-0482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ....................... 52

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................................... *passim*

*United States v. Tita,*
    No. 21-CR-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) ........................ 52

*Wilson v. Cook County,*
    937 F.3d 1028 (7th Cir. 2019) ................................................... 18-19, 49

## Statutes and Rules

28 U.S.C. § 1292(a)(1) ..................................................................... 3

28 U.S.C. § 1331 ......................................................................... 2, 3

28 U.S.C. § 1441(a) ....................................................................... 1

28 U.S.C. § 2107(a) ....................................................................... 3

42 U.S.C. § 1983 ......................................................................... 2, 3

720 ILCS 5/24-1.9 ................................................................... *passim*

720 ILCS 5/24-1.10 .................................................................. *passim*

1750 Mass. Acts 544, ch. 17, § 1 ....................................................... 35

1686 N.J. 289, 289-90, ch. 9 ........................................................... 34

1642 N.Y. Laws 33 ............................................................... 35

Fed. R. App. P. 4(a)(1)(A) .................................................... 3

**Other Authorities**

4 William Blackstone, *Commentaries on the Laws of England* (1769) ..................... 34

*A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60, ch. 3 (1792) ........................................................ 35

William English, *2021 National Firearms Survey:  Updated Analysis Including Types of Firearms Owned* (May 13, 2022) ....................................... 21

*Minutes from a Convention of the Federalist Society*, 4 NYU J.L. & Liberty 293 (2009) ............................................................ 52

Meg Penrose, *A Return to the States' Rights Model*, 46 Conn. L. Rev. 1463 (2014) .. 52

## JURISDICTIONAL STATEMENT

Defendants-Appellants Attorney General Kwame Raoul, State Police Director Brendan Kelly, and Governor JB Pritzker in *Barnett v. Raoul* (Nos. 23-1825, 23-1826, 23-1827 & 23-1828) (consol.) and Defendants-Appellees Raoul and Kelly in *Herrera v. Raoul* (No. 23-1793) (collectively, "State Defendants") provide this jurisdictional statement under Circuit Rule 28(a).

Plaintiffs-Appellees Jeremy W. Langley, Timothy B. Jones, and Matthew Wilson filed a complaint in state court against Kelly and Crawford County State's Attorney Cole Price Shaner, which was removed to federal court pursuant to 28 U.S.C. § 1441(a) and captioned *Langley v. Kelly*, No. 3:23-cv-00192. *Langley* Docs. 1, 1-1.[1]

Plaintiffs-Appellees Dane Harrel; C4 Gun Store, LLC; Marengo Guns, Inc.; Illinois State Rifle Association; Firearms Policy Coalition, Inc.; and Second Amendment Foundation filed a complaint in the district court against Raoul, Kelly, St. Clair County State's Attorney James Gomric, St. Clair County Sheriff Richard Watson, Randolph County State's Attorney Jeremy Walker, Randolph County Sheriff Jarrod Peters, McHenry County State's Attorney Patrick D. Kenneally, and McHenry County Sheriff Robb Tadelman, captioned as *Harrel v. Raoul*, No. 3:23-cv-00141-SPM. *Harrel* Doc. 1.

---

[1] Citations to the *Barnett* docket appear as "Doc. __" or "7th Cir. Doc. __." The other dockets are cited by their case name. The Short Appendix to this brief is cited as "SA__."

Plaintiffs-Appellees Caleb Barnett, Brian Norman, Hood's Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc., filed a complaint in the district court against Raoul and Kelly, captioned as *Barnett v. Raoul*, No. 3:23-cv-00209. Doc. 1.

Plaintiffs-Appellees Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Debra Clark, Jasmine Young, and Chris Moore filed a complaint in the district court against State Defendants, captioned as *Federal Firearms Licensees of Illinois v. Pritzker*, No. 3:23-cv-00215. *Fed. Firearms* Doc. 1.

Each action was brought under 42 U.S.C. § 1983 and alleged that the Protect Illinois Communities Act ("Act"), violated plaintiffs' rights under the Second and Fourteenth Amendments to the United States Constitution. Doc. 1 at 19-26; *Fed. Firearms* Doc. 1 at 32-43; *Harrel* Doc. 1 at 25-28; *Langley* Doc. 1-1 at 3-8, 11-15. The *Langley* plaintiffs also claimed that the Act violated their rights under the Fifth and Fourteenth Amendments. *Langley* Doc. 1-1 at 8-11, 15. Because the complaints raised federal questions, the district court had subject matter jurisdiction under 28 U.S.C. § 1331.

In each action, plaintiffs sought a preliminary injunction. Doc. 10; *Harrel* Doc. 16; *Langley* Doc. 6; *Fed. Firearms* Doc. 28. The district court entered an order consolidating the actions "for the purposes of discovery and injunctive relief" and designating *Barnett* "as the lead case." Doc. 32 at 3-4. On April 28, 2023, the court granted a preliminary injunction in an order entered in *Barnett* that "carrie[d] over"

2

to the other cases.  SA2.  No motion to alter or amend the order was filed.  That same day, State Defendants filed notices of appeal in each case.  Doc. 102; *Harrel* Doc. 46; *Langley* Doc. 37; *Fed. Firearms* Doc. 45.  These appeals were timely because they were filed within 30 days of the order granting a preliminary injunction.  28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).  This court consolidated the appeals.  7th Cir. Doc. 7.

Meanwhile, Plaintiff-Appellant Javier Herrera filed a complaint against Raoul, Kelly, Cook County, County Board of Commissioners President Toni Preckwinkle, Cook County State's Attorney Kimberly M. Foxx, Cook County Sheriff Thomas J. Dart, the City of Chicago, and Chicago Police Superintendent David O'Neal Brown.  *Herrera* Doc. 1.  This action was brought under section 1983 and claimed that the Act, as well as City and County ordinances, violated the Second Amendment.  *Herrera* Docs. 1, 48.  The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1331.  On April 25, 2023, the court denied a preliminary injunction.  SA30-31.  No motion to alter or amend the order was filed. The next day, Herrera filed a timely notice of appeal within 30 days of that order. *Herrera* Doc. 77; 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

This court, which consolidated the *Herrera* appeal with the *Barnett* appeals, 7th Cir. Doc. 30, has jurisdiction over these appeals granting or denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

1.     Whether plaintiffs failed to show that they are likely to succeed on the merits of their claims that the Act's restrictions on assault weapons and large capacity ammunition feeding devices violates the Second Amendment, where they did not show that the regulated items are covered by the Second Amendment's text and where the Act's restrictions are consistent with the historical tradition of regulating firearms.

2.     Whether Herrera failed to show that he is likely to succeed on the merits of his claim that the Act's endorsement affidavit requirement violates the Second Amendment, where he failed to show that this requirement is covered by the Second Amendment's text and where the requirement is consistent with the historical tradition of firearm registration requirements.

3.     Alternatively, whether plaintiffs have not shown they lack an adequate remedy at law or will suffer irreparable harm absent an injunction, and where the balance of equities favor defendants and the public interest.

## STATEMENT OF THE CASE

**A.     The Protect Illinois Communities Act.**

On July 4, 2022, a shooter armed with a semiautomatic AR-15-style rifle and 30-round magazines opened fire on a parade in Highland Park, Illinois.  Doc. 37-2 ¶¶18, 20.  The weapon allowed the shooter to fire 83 rounds in less than a minute, killing seven and wounding 48.  *Id.* ¶19.  Among the victims were an eight-year-old boy left paralyzed from the waist down and both parents of a two-year-old child. Doc. 37-1 at 22-25, 38-39.  A Highland Park ordinance prohibited the sale of assault weapons, but the shooter had legally purchased his firearm elsewhere in Illinois. Doc. 37-2 ¶22.

On January 10, 2023, Illinois enacted the Act, which imposes restrictions on the sale, purchase, manufacture, delivery, importation, and possession of the instruments often chosen by mass shooters:  assault weapons and large capacity ammunition feeding devices ("LCMs").  720 ILCS 5/24-1.9, 1.10.  Consistent with this purpose, the Act defines assault weapons in terms of the features that, individually or in combination, render them ill-suited for civilian self-defense but uniquely dangerous as offensive weapons.  *E.g.*, Doc. 37-7 ¶¶12-28.

The Act thus defines "assault weapon" to include semiautomatic rifles with the capacity to accept "detachable magazine[s]" and at least one of the following features:  a pistol grip or thumbhole stock, a protruding grip held by the non-trigger hand, a flash suppressor, a grenade launcher, a barrel shroud, or a folding, telescoping, or detachable stock.  720 ILCS 5/24-1.9(a)(1)(A).  As one of State

5

Defendants' experts explained, each of these features, which render assault weapons useful on the battlefield, is unnecessary for effective self-defense.  Doc. 37-7 ¶¶12-28.  For instance, although a pistol grip or thumbhole stock "may be useful during military operations because it helps the shooter stabilize the weapon and reduce muzzle rise during rapid fire, [it] is not necessary to operate a firearm safely in lawful self-defense situations."  *Id.* ¶¶13-14; *see also, e.g.*, *id.* ¶15 (protruding grips were "developed as a feature for troops charged with fast and efficient killing of enemy combatants in offensive warfare," but are unnecessary for self-defense). As another example, flash suppressors enable soldiers to "stay[ ] on target in extended rapid-fire situations" by reducing "the prevalence of 'night blindness' that can develop during low-light firefights," but are unnecessary for civilian self-defense.  *Id.* ¶17.  And barrel shrouds are "useful in military operations"—but unnecessary for self-defense—because they "allow the shooter to attach various accessories" like lights, optical sights, and laser aiming devices.  *Id.* ¶19; *id.* (barrel shrouds not found on firearms commonly used for hunting or target shooting).

The Act's definition of "assault weapon" also includes semiautomatic pistols and shotguns that meet a features-based definition similar to the one for semiautomatic rifles, as well as semiautomatic rifles with fixed magazines holding more than 10 rounds of ammunition, semiautomatic pistols with fixed magazines holding more than 15 rounds, shotguns with revolving cylinders, and semiautomatic firearms accepting belt-fed ammunition.  720 ILCS 5/24-1.9(a)(1)(B)-(G).  These round-capacity limitations mirror those in the definition of LCMs, which are defined

6

as a magazine or similar device that accepts more than 10 rounds for long guns or 15 rounds for handguns. *Id.* 5/24-1.10(a). As the State Defendants' expert details, there is no self-defense need for these firearms either, or for more round capacity than what is permitted by the Act. *E.g.*, Doc. 37-7 ¶¶12-28. Finally, the Act lists specific firearms models that fall within its definition of "assault weapon." 720 ILCS 5/24-1.9(a)(1)(L). This list, which is almost entirely duplicative of the features-based definition, allows buyers and sellers to easily discern whether a particular firearm is within the Act's purview.

The Act includes a number of exceptions. It excludes from the definition of "assault weapon" all antique firearms, air rifles, handguns (unless they have the features prohibited by the Act), and firearms operated by bolt, pump, lever, or slide action. *Id.* 5/24-1.9(a)(2). The Act's restrictions do not apply to law enforcement, members of the military, and other professionals with similar firearms training and experience. *Id.* 5/24-1.9, 1.10. And individuals who lawfully possessed assault weapons and LCMs prior to the Act may continue to do so. *Id.* 5/1.9(c)-(d) & 5/1.10(c)-(d). To continue lawfully possessing an assault weapon, an individual must submit to the State Police an endorsement affidavit by January 1, 2024. *Id.* 5/24-1.9(d). This requirement does not extend to LCMs. *Id.* 5/24-1.10(d).

**B.     *Barnett***

*Barnett* arose from four lawsuits alleging that the Act's restrictions on assault weapons and LCMs violate the Second Amendment. Doc. 1; *Fed. Firearms* Doc. 1; *Harrel* Doc. 1; *Langley* Doc. 1. Plaintiffs in these actions are individuals who

7

seek to purchase and possess assault weapons and LCMs, businesses that wish to continue selling assault weapons and LCMs, and advocacy organizations. Doc. 37 at 8-9. In each action, plaintiffs filed a motion for preliminary injunction. Doc. 10; *Fed. Firearms* Doc. 28; *Harrel* Doc. 16; *Langley* Doc. 6. The district court then consolidated the four cases.

In a combined response to the preliminary injunction motions, State Defendants argued that plaintiffs were unlikely to succeed on the merits under the two-step standard articulated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Doc. 37 at 11. At the first step, State Defendants explained, plaintiffs failed to carry their burden to show that the regulated items are covered by the Second Amendment's text. *Id.* At the second step, State Defendants argued that their evidence established that the Act is consistent with the historical tradition of regulating firearms. *Id.* Moreover, preliminary injunctive relief was inappropriate because plaintiffs set forth no evidence of irreparable harm and because the balance of equities and public interest favored the State. *Id.* at 63-69.

In support, State Defendants submitted 10 expert declarations demonstrating that assault weapons and LCMs are uniquely lethal instruments that were developed as military-style offensive weapons rather than for civilian self-defense. Docs. 37-6, 37-7, 37-10, 37-14. These instruments, moreover, are not commonly used for lawful self-defense; rather, they are increasingly used in violent crimes, including mass shootings. Docs. 37-4, 37-6, 37-11. State Defendants also presented historical evidence demonstrating that from the Colonial era onward,

8

legislatures have regulated weapons thought to be especially dangerous and unusual—from knives, clubs, pistols, and revolvers in the 18th and 19th centuries to automatic and semiautomatic firearms in the early 20th century. Docs. 37-4, 37-12. In particular, the historical evidence showed, there is a longstanding practice whereby a specific weapon is introduced, proliferates to the point where its use becomes a significant threat to public safety, and is then regulated to curb violence and protect the public while leaving ample other means of armed self-defense available. Doc. 37-12.

The district court granted a preliminary injunction and enjoined enforcement of the Act's restrictions on assault weapons and LCMs. SA28-29. The court rejected State Defendants' argument that LCMs are not covered by the Second Amendment's text. SA17-18, 21. The court did not examine the historical record other than to say that the Act is not relevantly similar to "conceal[ed] carry regulations." SA25-26. Rather, the court held, State Defendants had failed to show that assault weapons and LCMs were not in "common use," SA22-23, which was "dispositive," SA25. The court also determined that plaintiffs demonstrated irreparable harm and an inadequate remedy of law through allegations about the existence of a constitutional violation and economic loss, SA9-10, and that the balance of equities favored plaintiffs because some cannot purchase or use their firearm of choice and others cannot sell their inventory, SA26.

**C.**   *Herrera*

Herrera is a doctor who resides in Chicago, owns two AR-15 rifles, and serves as a volunteer medic for a Special Weapons and Tactics ("SWAT") team. *Herrera* Doc. 1 ¶¶16, 24-26. Herrera alleged that the Act violates his Second Amendment rights by prohibiting him from purchasing additional assault weapons and LCMs and by requiring him to file an endorsement affidavit to continue possessing the AR-15s that he already owns. *Id.* ¶¶105-35. Herrera further alleged that the County and City ordinances—which prohibit possessing assault weapons and LCMs within their respective jurisdictions—violate his Second Amendment rights by restricting his ability to keep his AR-15s in his home. *Id.* ¶¶136-73.

As in *Barnett*, State Defendants responded to Herrera's preliminary injunction motion by arguing that he had not shown he was likely to succeed on the merits of his challenge to the Act's restrictions on assault weapons and LCMs under either step of the *Bruen* analysis and had not satisfied the remaining preliminary injunction factors. *Herrera* Doc. 52. The evidence State Defendants presented in support included nearly identical versions of the expert declarations they submitted in *Barnett*. *Herrera* Docs. 52-4–14. Additionally, State Defendants argued, Herrera was unlikely to succeed on the merits of his challenge to the Act's endorsement affidavit requirement because it does not implicate conduct within the Second Amendment's text, Doc. 52 at 37-41, and because registration requirements have a longstanding historical pedigree, *id.* at 40 & n.24.

10

The district court denied a preliminary injunction, determining that the Act's restrictions on assault weapons and LCMs are consistent with this country's tradition of firearms regulation. SA42-43. The court rejected Herrera's contention that 18th- and 19th-century laws—many of which restricted concealed carry—were insufficiently analogous. SA43-44. As the court explained, "*Bruen* also expressly observed that 'dramatic technological changes' or 'unprecedented societal concerns' may require a 'more nuanced approach'" to reasoning by analogy. SA44. That approach was appropriate because the Act "responded to 'dramatic technological changes' and 'unprecedented societal concerns' of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them." *Id.* And under that approach, the Act is "well in line" with the many historical analogues that regulated weapons "in response to the type of harm that those weapons presented." *Id.*

The court also held that Herrera was not likely to succeed on his challenge to the endorsement affidavit requirement because it is "consistent with this Nation's historical tradition" of requiring gun registration. SA48. Furthermore, "*Bruen* itself suggests that the [endorsement affidavit] requirement is permissible" because it is "far less invasive than the presumptively constitutional [shall-issue licensing] regulations described in *Bruen*." SA51-52.

Finally, the court concluded, Herrera had not satisfied the remaining preliminary injunction factors. SA54-60. As to irreparable harm, the court found that "Herrera's alleged inability to protect himself in his home is unsupported by

11

the record." SA56.  It also determined that the balance of equities favored

defendants and the public interest, given the "overwhelming interest in public

safety." SA60.

## SUMMARY OF ARGUMENT

Plaintiffs are not entitled to preliminary injunctive relief.  To begin, plaintiffs failed to show that they are likely to succeed on the merits of their Second Amendment claim under *Bruen*'s two-step test, which directs courts to first assess whether the regulated conduct is within the Second Amendment's text and then, if necessary, whether the challenged regulation is consistent with the country's historical tradition of regulating firearms.

At the first step, plaintiffs bore the burden of showing that assault weapons and LCMs are "arms" in "common use today for self-defense."  *Bruen*, 142 S. Ct. at 2132, 2134 (internal quotations omitted).  But plaintiffs did not satisfy that burden for three reasons.  First, LCMs are not "arms":  rather, they are accessories or "accoutrements," and they are unnecessary to operate firearms.  Second, plaintiffs presented no evidence demonstrating that assault weapons or LCMs are in common use for self-defense.  Third, setting plaintiffs' lack of evidence aside, the record shows that assault weapons and LCMs are offensive, militaristic instruments that are not commonly used for individual self-defense.

Plaintiffs likewise cannot succeed at the second step because the historical evidence shows that the Act's restrictions on assault weapons and LCMs are consistent with the country's historical tradition of regulating firearms.  Relevant here, there is a well-established tradition pre-dating the Founding era whereby a weapon is introduced into civilian society, proliferates to where it causes a substantial threat to public safety, and is then regulated to curb the public harm

13

stemming from its use.  Additionally, the record shows that a "more nuanced approach" to the historical inquiry is appropriate here, where the Act was passed in response to "unprecedented societal concerns" that emerged as a result of "dramatic technological changes" in weapons technology, *id.* at 2132:  the increasing frequency of deadly mass shootings that are committed by individuals armed with assault weapons and LCMs.  And under this approach, the Act's restrictions are consistent with the historical tradition of regulating "dangerous and unusual" weapons, including the minimal burden that those restrictions impose on the right to self-defense and the justifications for imposing that burden.  *Id.* at 2128, 2132-33.

Nor is Herrera likely to succeed on his challenge to the Act's endorsement affidavit requirement.  He cannot succeed at *Bruen*'s first step because he has offered no explanation, let alone evidence, as to how the requirement implicates conduct protected by the Second Amendment's text by burdening his right to self-defense.  Besides, Herrera is unlikely to succeed at *Bruen*'s second step because there is a longstanding tradition of registration requirements.

Finally, preliminary injunctive relief is unwarranted because plaintiffs have not shown that they lack an adequate remedy at law or would suffer irreparable harm absent an injunction.  Similarly, plaintiffs cannot prevail on the balance of equities, which weighs heavily in favor of the State and the public interest.

## ARGUMENT

**I.    Plaintiffs must show that they are entitled to a preliminary injunction, which is granted only in exceptional circumstances.**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (cleaned up).  The plaintiff "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up).  If the plaintiff satisfies those requirements, then the court weighs the harm that the plaintiff will incur without an injunction against the harm to the defendant if one is entered, and "consider[s] whether an injunction is in the public interest." *Id.* (cleaned up).  This analysis is done on a "sliding scale"—if the plaintiff is less likely to win on the merits, the balance of harms must weigh more heavily in its favor, and vice versa.  *Id.* (cleaned up).

When reviewing a district court's order granting or denying a preliminary injunction, this court reviews legal conclusions *de novo*, findings of historical or evidentiary fact for clear error, and the balancing of the injunction factors for an abuse of discretion.  *Id.*

**II.    Plaintiffs have not shown a likelihood of success on the merits of their claim challenging the assault weapon and LCM restrictions.**

The Second Amendment confers the right to "ordinary, law-abiding, adult citizens" to possess and carry firearms "for self-defense." *Bruen*, 142 S. Ct. at 2134.

But this right "'is not unlimited.'" *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Relevant here, it "extends only to certain types of weapons." *Heller*, 554 U.S. at 623; *see also id.* at 626 (no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").

In *Bruen*, the Supreme Court clarified that the framework for Second Amendment claims is a two-step test that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." 142 S. Ct. at 2131. At the first step, as many plaintiffs acknowledged below, *e.g.*, Doc. 10 at 12, 18, the challengers bear the burden to show that the "Second Amendment's plain text covers [the regulated] conduct" and thus "presumptively protects that conduct," *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2141 n.11. If the challengers satisfy that burden, then at the second step, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. No plaintiff has shown that they are likely to succeed under either step.

### A.     Plaintiffs have not carried their burden of showing that the Act regulates conduct protected by the Second Amendment.

First, plaintiffs are not likely to succeed on the merits of their Second Amendment claim because they failed to demonstrate that assault weapons and LCMs fall within the Second Amendment's text. To satisfy this burden, plaintiffs must prove that the regulated items fit within the category of "bearable arms" presumptively protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2132, 2134. Namely, the Amendment protects firearms "in common use today for self-

16

defense." *Id.* at 2132, 2134 (internal quotations omitted); *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) ("[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense."); *Heller*, 554 U.S. at 628 ("the inherent right of self-defense" is "central to the Second Amendment"). Accordingly, firearms that do not fit within that category, such as "weapons that are most useful in military[.] service—M-16 rifles and the like—may be banned[.]" *Heller*, 554 U.S. at 627.

Plaintiffs are not likely to succeed at step one for three reasons. First, they have not shown that LCMs—which are accessories (or "accoutrements") unnecessary to operate firearms—are "arms." Second, they failed to demonstrate that LCMs and assault weapons are commonly used for self-defense. Third, State Defendants showed that the regulated items are offensive, militaristic instruments that are not commonly used for self-defense.

### 1.    LCMs are not "arms."

At the threshold, LCMs are accessories or "accoutrements," and are unnecessary to operate firearms; thus, they are not within the Second Amendment's text.

As a historical matter, "arms" referred to weapons and excluded related accessories like ammunition containers, which were referred to as "accoutrements." *Heller*, 554 U.S. at 581 (citing 1773 edition of dictionary defining "arms" as "weapons of offence, or armour of defence") (cleaned up); *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, *13 (D.R.I. Dec. 14, 2022) (from

Founding through Reconstruction, "[t]he word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include," among other things, "ammunition containers . . . or a cartridge box"); Doc. 37-8 ¶12 (common phrase "arms and accoutrements" distinguished weapons from items that stored ammunition); *id.* ¶40 (compiling examples and explaining that "in literally hundreds of cases, 'arms' and 'accoutrements' are treated as separate categories of military gear").[2]  Indeed, there is ample historical evidence demonstrating that during the Founding and Reconstruction eras, cartridge cases and boxes were not viewed as "arms." *Id.* ¶30; *see also id.* ¶¶31-35 (collecting historical examples of cartridge boxes being considered "accoutrements").  LCMs similarly "are containers which hold ammunition."  Doc. 37-7 ¶22; *see also id.* ¶29 (because an LCM "is not a required component for a firearm to operate, it is characterized as an accessory by the industry").  Thus, LCMs are not "arms" within the meaning of the Second Amendment.

The *Barnett* court concluded, however, that LCMs are "arms" because the Second Amendment extends to "corollaries to the meaningful exercise" of that right, including "the ability to effectively load ammunition into the firearm."  SA18 (cleaned up).  As support, the court relied on decisions recognizing that the Amendment extends beyond "arms" to the ammunition and training necessary to make firearms operable for self-defense. *Id.* (citing *Wilson v. Cook County*, 937 F.3d

---

[2] As explained, *supra* p. 10, State Defendants set forth virtually identical expert declarations in *Barnett* and *Herrera*.  For purposes of economy, this brief cites to the *Barnett* declarations wherever possible.

1028, 1032 (7th Cir. 2019), and *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)). But that principle is inapposite because LCMs are not necessary to operate firearms or, as the *Barnett* court suggested, effectively load ammunition into them. As the record reflects, all firearms that can accept a detachable LCM can also accept magazines that hold fewer rounds (which are not restricted by the Act) and work just as well. Doc. 37-7 ¶¶25; *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, *9 (D. Or. Dec. 6, 2022) (rejecting argument that LCMs are necessary for self-defense because no evidence that firearms "can *only* operate with magazines that accept more than ten rounds") (emphasis in original). And though plaintiffs quarreled with this below, they presented no contrary evidence on whether LCMs (as opposed to ammunition or magazines generally) are necessary to operate firearms. *E.g.*, Doc. 66 at 14; Doc. 67 at 4-5; *Herrera* Doc. 63 at 13.

The *Barnett* court also cited *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106 (3d Cir. 2018)—a means-ends decision that was abrogated by *Bruen*, 142 S. Ct. at 2127 n.4—as support for the proposition that "a magazine is an arm," SA18 (cleaned up). But there was no need for the *Barnett* court to address whether magazines in general are "arms," because the Act does not restrict all magazines. *E.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (distinguishing between restrictions that eliminate access to all ammunition and those that regulate certain types of ammunition). In other words, the Act regulates one dimension of a magazine—its round capacity—and does not prohibit magazines in their entirety. *Cf. United States*

*v. Miller*, 307 U.S. 174, 178 (1939) (upholding regulation based on barrel length of restricted shotguns).  Indeed, individuals in Illinois retain the right to purchase magazines, so long as they comply with the Act's round-capacity limitations.  720 ILCS 5/24-1.10.

### 2.  Plaintiffs did not show that assault weapons and LCMs are commonly used for self-defense.

Next, plaintiffs are unlikely to prevail because they failed to show that LCMs and assault weapons are commonly used for self-defense.  Plaintiffs relied primarily on manufacturing and ownership estimates for AR-15-style rifles and magazines that hold more than 10 rounds.  *E.g.*, Doc. 10 at 9-10; *Herrera* Doc. 5 at 16-17.  But this evidence is not probative of the relevant question:  whether the instruments regulated by the Act are "in common use today for self-defense."  *Bruen*, 142 S. Ct. at 2134 (internal quotations omitted).

In addition to conflicting with *Bruen*, relying on statistics showing "how common a weapon is at the time of litigation" is "circular."  *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).  Under such a standard, a law banning certain types of weapons—and thus rendering them uncommon—would be "the source of its own constitutional validity."  *Id.*  This principle is illustrated by data tracking the annual production of "modern sporting rifles"—an industry term that includes AR- and AK-style firearms—for the American market between 1990 and 2020.  It shows that these rifles became more prevalent after the expiration of the Federal Assault Weapons Ban in 2004:  only 12% of those rifles entered circulation between 1990 and 2004, as compared with 88% between 2004 and 2020.

Doc. 37-7 ¶¶39-40; *id.* ¶39 (domestic production of modern sporting rifles for American market increased from 43,000 in 1990 to 653,000 in 2011 and 1,882,000 in 2013). Applying plaintiffs' view of commonality, the text analysis could turn out differently depending on whether a law regulating these rifles was enacted before or after 2004. In addition to producing this "absurd" result, *Friedman*, 784 F.3d at 409, the standard is unworkable. Under it, the government would need to carefully monitor the introduction of new weapons so that it could regulate them before they became commonly sold and possessed, even if there was not yet evidence that they posed a public-safety threat. Otherwise, the government would risk being left powerless to regulate these weapons once they began to circulate more broadly, no matter how destructive or deadly they turned out to be.

Moreover, plaintiffs' evidence is flawed. They rely heavily on the claim that Americans own more than 24 million AR-15-style rifles and have owned approximately 542 million magazines that hold more than 10 rounds. Doc. 10 at 9, 16. But these ownership estimates come from an unpublished, non-peer-reviewed paper recounting an online survey that does not disclose its funding or measurement tools. *Id.* (citing William English, *2021 National Firearms Survey* (May 13, 2022)); Doc. 37-4 ¶29 n.28. In fact, one of Herrera's experts (Gary Kleck) testified that this survey is unreliable because the author is "vague about exactly how he developed his sample," which means that "you can't know that it applies in any way, shape, or form, to the US population as a whole." *Or. Firearms Fed'n*, No. 2:22-cv-01815-IM, Doc. 175-7 at 12-13. Beyond these flaws, the estimate with

21

respect to AR-15-style rifles is misleading:  Industry and government data shows that 6.4 million gun owners (less than 8% of the 81 million gun owners in the United States and 2% of all Americans) possess the assault rifles in circulation (24.4 million out of 461.9 million firearms).  Doc. 37-4 ¶27.  And the LCM estimate, which derives from the same discredited online survey, purports to show a 13-fold increase in LCM ownership over "just 8 years," a number that defies logic.  *Id.* ¶29 n.28. Finally, plaintiffs' remaining sources—for example, estimates of how many Americans partake in target shooting or crime statistics detailing the number of murders committed with rifles, *e.g.*, *Harrel* Doc. 16 at 12-13—offer no insight into whether assault weapons and LCMs are commonly used for self-defense.

Furthermore, none of the cases plaintiffs cited below demonstrates that the regulated items are within the Second Amendment's text.  *Staples v. United States*, 511 U.S. 600 (1994)—which reversed a conviction where the government failed to prove that the defendant "knew of the features of his AR-15 that brought it within the scope of the [National Firearms] Act," *id.* at 619—was not a Second Amendment case and did not assess what kinds of weapons are "arms" covered by that Amendment.  Moreover, the Court's assertion that firearms other than the "machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation" were "widely accepted as lawful possessions" was a descriptive statement referring to the state of federal law at the time.  *Id.* at 611-12. Circumstances have changed since then:  assault weapons, including AR-15s, were banned as a matter of federal law between 1994 and 2004, and, as outlined below,

*infra* Section II.B.2.a, are increasingly being used for criminal violence, including mass shootings.

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam), which addressed whether the Second Amendment reaches stun guns, also does not support plaintiffs' argument. *Caetano* concluded only that the lower court erred in determining that stun guns were unprotected because they did not exist at the Founding. *Id.* at 411-12. The Court has never (in *Caetano* or elsewhere) set a numerical threshold for commonality, much less applied such a threshold to assault weapons or LCMs. In fact, the 200,000 figure plaintiffs cited as a purported threshold, *e.g.*, Doc. 10 at 10; *Herrera* Doc. 63 at 28, comes from a parenthetical in a concurrence signed by just two justices, *see Caetano*, 577 U.S. at 420 (Alito, J., concurring). In any event, such a low threshold would be at odds with the historical understanding of common ownership; indeed, data shows that the firearms considered commonly owned during the Founding era (muskets and hunting rifles) were present in 50% to 60% of households. Doc. 37-11 ¶15.

Plaintiffs also are incorrect that *Heller* already settled the common use question as to semiautomatic handguns. *E.g.*, *Herrera* Doc. 5 at 21; *see also* SA22-23. *Heller* did not say anything about semiautomatic handguns in particular; instead, it concluded that a regulation banning *all* handgun possession was impermissible because it left residents without adequate means of self-defense in the home. 554 U.S. at 628-29. And that holding is not implicated here because the Act leaves individuals with ample means of self-defense. Furthermore, many

23

semiautomatic handguns are unaffected by the Act's restrictions, Doc. 37-9 ¶74, and even semiautomatic handguns with detachable magazines of greater than 15 rounds can be sold under the Act by simply replacing the non-compliant magazine with a 15-round magazine, 720 ILCS 5/24-1.10(a); Doc. 37-7 ¶22.

For its part, the *Barnett* court failed to hold plaintiffs to their burden. First, the court declined to decide whether assault weapons fell within the Second Amendment's text. SA21. And when addressing the commonality of assault weapons (albeit incorrectly at the second step), the court did not "engage[ ] in an exhaustive analysis of each item banned by [the Act]," noting only that "many of the items banned are used by a multitude of individuals for entirely lawful purposes." SA22 n.10. But plaintiffs must show that each regulated item meets the common use standard. *E.g.*, *Del. State Sportsmen's Ass'n, Inc. v. Delaware*, No. 22-951-RGA, 2023 WL 2655150, \*5-6 (D. Del. Mar. 27, 2023) (plaintiffs failed to carry burden where they provided no evidence that "assault pistols" as defined by Delaware statute are commonly used).

The court also wrongly determined that plaintiffs need only show that the weapons are "in common use," irrespective of the underlying purpose. SA22. The touchstone of the Second Amendment is individual self-defense. *Supra* pp. 16-17; *Heller*, 554 U.S. at 635 (Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *id.* at 630 (describing "core lawful purpose of self-defense"). Accordingly, weapons fall within the Amendment's text when they are in common use for self-

defense. But as explained, even if the *Barnett* court correctly stated the standard, plaintiffs have not shown that the regulated items are commonly owned, let alone commonly used for lawful purposes.

The court also stated that even if self-defense were part of the standard, "AR-15 style rifles would meet such a test considering that 34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home." SA22 (citing Doc. 39-11 at 34). But these statistics—which are from the same discredited English survey discussed above—purport to show ownership and not use. Doc. 39-11 at 33-34. In fact, the survey found that handguns—not assault weapons—accounted for the large majority of defensive firearms use. *Id.* at 10-11. According to it, only 13% of incidents of self-defense with guns involve rifles of any kind. *Id.* But because the survey does not distinguish among types of rifles, it is unclear whether any of this 13% includes assault weapons. *Id.*

Beyond these statistics, the court appeared to invoke self-defense in another way, suggesting that the text of the Second Amendment covers assault weapons because some of the regulated features (pistol grips, thumbhole stocks, and flash suppressors) allow individuals to be more proficient in self-defense. SA20. As such, the court stated, they are "corollaries" to the Second Amendment right. SA18 (cleaned up). But as explained, *see supra* pp. 5-7; *infra* Section II.A.2, these features were developed for offensive, military uses and are unnecessary for civilian self-defense. Nor is it correct that under *Bruen*, an instrument is covered by the Second Amendment's text so long as it is a corollary to, or otherwise facilitates, self-

defense.  The passage from *Bruen* plaintiffs cited for this argument, *e.g.*, Doc. 67 at 4, does not establish the first-step standard.  Instead, this passage is part of the Court's discussion of the historical methodology required under the second step.  And that passage describes instances in which the "Second Amendment's historically fixed meaning applies to new circumstances."  *Bruen*, 142 S. Ct. at 2132.  As one example of such circumstances, the "reference to 'arms' does not apply only to those arms in existence in the 18th century," but instead "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Id.* (cleaned up).  The Court then recognized that "modern instruments that facilitate armed self-defense" can fall within the definition of "arms."  *Id.*  In other words, the purpose of that passage was to make clear that analogical reasoning should account for changed circumstances; it did not purport to expand the definition of "arms" for purposes of the text analysis.

Relatedly, by using the phrase "bearable arms," the Court did not hold that the Second Amendment protects all weapons that a single person can carry, as some plaintiffs suggested below.  *E.g.*, *Herrera* Doc. 63 at 9, 11-12.  In addition to contradicting the Court's statement that "arms" constitute instruments "in common use today for self-defense," *Bruen*, 142 S. Ct. at 2134 (internal quotations omitted), such a rule would include weapons that the Court has deemed permissible to ban, such as machineguns and short-barreled shotguns, and those like grenade

26

launchers that even some plaintiffs concede fall outside of the Second Amendment. *E.g.*, *Heller*, 554 U.S. at 624; *Miller*, 307 U.S. at 178; Doc. 1 ¶52 n.6.

Finally, there is no merit to the suggestion that plaintiffs could prevail simply by showing that the Act is a categorical ban on commonly possessed firearms. *E.g.*, SA25; Doc. 10 at 7-8; *Herrera* Doc. 5 at 12. Perhaps most obviously, that formulation contradicts *Bruen*'s two-step, text-and-history test by reducing it to a one-step, popularity test. Furthermore, it derives from cherry-picked language that, when read in context, offers no support for plaintiffs' proposed standard. Specifically, plaintiffs cited *Heller* for the proposition that "when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is 'typically possessed by law-abiding citizens for lawful purposes.'" Doc. 10 at 8 (quoting *Heller*, 554 U.S. at 625). But the cited sentence does not describe the standard by which courts determine whether a weapon is protected; rather, as the *Herrera* court recognized, SA39, it reiterates that weapons not typically possessed for lawful purposes are unprotected by the Second Amendment: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," *Heller*, 554 U.S. at 625. This language thus provides no basis for departing from the two-step *Bruen* standard.

In any event, plaintiffs cannot meet even their articulation of the standard, for the Act does not impose a categorical ban on commonly possessed firearms. As noted, the Act regulates firearms that are owned by less than 8% of gun owners and

2% of all Americans.  Doc. 37-4 ¶27.  The Act is thus dissimilar from the law at issue in *Heller*, which imposed a "complete prohibition" on "the most popular weapon chosen by Americans for self-defense in the home."  554 U.S. at 629. Furthermore, the Act is not a categorical ban:  rather than prohibiting a class of firearms, it prohibits certain features (and models containing those features) that are particularly dangerous to the public while leaving individuals free to possess any number of other types of handguns, rifles, and shotguns.  *Supra* pp. 5-7. Plaintiffs thus failed to carry their burden—whether under *Bruen* or their proposed standard—of showing that assault weapons and LCMs are covered by the Second Amendment's text.

> **3.      Assault weapons and LCMs are offensive, militaristic weapons that are not commonly used for self-defense.**

Because plaintiffs' evidence fell short of satisfying their step-one burden, denial of preliminary injunctive relief is warranted on this basis alone.  In any event, even if it were their burden, State Defendants presented evidence showing that assault weapons and LCMs are not commonly used for self-defense, and are instead offensive, militaristic weapons designed for the battlefield.  As such, they are not covered by the Second Amendment's text.  *Bruen*, 142 S. Ct. at 2143 (handguns protected because they are "in common use for self-defense today") (cleaned up); *Heller* 554 U.S. at 627 ("weapons that are most useful in military service—M-16 rifles and the like—may be banned").

The evidence showed that the items regulated by the Act derive from rifles and magazines designed for the military with features that "increase the

effectiveness of killing enemy combatants in offensive battlefield situations." Doc. 37-7 ¶31; Doc. 37-9 ¶94 ("The lineage of high capacity detachable magazines can be traced directly to a military heritage."). Indeed, the AR-15 models in circulation today trace their origin to rifles designed in the 1950s for use by the American military. Doc. 37-6 ¶25; Doc. 37-9 ¶¶55-59. Following field tests in the Vietnam War in the early 1960s, which demonstrated the potency of these rifles on the battlefield, the Army adopted the AR-15 as a combat rifle, rechristening it the M-16. Doc. 37-6 ¶¶26-32.

Not only do assault weapons and LCMs derive from military-grade weaponry, their features render them uniquely effective as weapons of war but not commonly used or suitable for civilian self-defense. For instance, assault weapons enable high-velocity rounds to be fired at "a high rate of delivery" and "a high degree of accuracy at long range." Doc. 37-14 ¶14 & n.5. Accordingly, assault weapons cause "more victims and injuries per event." Doc. 37-10 ¶25. And LCMs "only increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period." Doc. 37-14 ¶30; Doc. 37-6 ¶41 (discussing ability "to fire rapidly with high-capacity magazines and remain accurate at ranges well beyond 100 yards").

While these features are incredibly potent on the battlefield, they are unnecessary for civilian self-defense, where "most confrontations involving gunfire are at close range" and do not require the long-distance accuracy of assault

29

weapons.  Doc. 37-6 ¶59 ("most armed defense takes place within 3-7 yards"); Doc.

37-9 ¶98 ("Home defense and/or self-defense situations are rarely, if ever, lengthy

shootouts at long ranges with extensive exchanges of gunfire.").  There is also no

need in self-defense scenarios for the round capacity of LCMs.  Doc. 37-9 ¶105 ("an

abundance of ammunition" is no substitute for "weapons familiarization and shot

placement").  As studies examining "armed citizen" incidents have confirmed, "the

average number of shots fired in self-defense was 2.2 and 2.1, respectively."  *Kolbe

v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated on other grounds by

Bruen*, 142 S. Ct. 2111; *Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL

3019777, *10 (D.D.C. Apr. 20, 2023).

Not only are assault weapons and LCMs unnecessary for civilian self-defense,

they may be counterproductive.  Assault weapons are inherently dangerous in "a

home defense scenario" because they "pose a serious risk of over-penetration in most

home construction materials."  Doc. 37-9 ¶¶98-100.  Firing an assault weapon in

close quarters poses "substantial risks to individuals in adjoining rooms,

neighboring apartments or other attached dwelling units."  *Id.* ¶101.  And as

compared with handguns, assault weapons produce much larger cavities in the

body, making them especially catastrophic for children.  Doc. 37-6 ¶34; Doc. 37-14

¶¶32-35; Doc. 37-10 ¶24.  Some weapons regulated by the Act, such as assault

pistols, are a poor choice for self-defense for the additional reason that they often

require two hands to aim and shoot effectively, meaning that an individual would be

precluded from simultaneously taking other actions, such as calling the police,

picking up a child, or assisting an elderly relative. Doc. 37-9 ¶104. LCMs likewise are poorly suited for self-defense when compared with smaller magazines because "the physical size/profile of the shorter magazine is easier to carry, shoot and conceal." Doc. 37-7 ¶25.

For these reasons, the most "respected" and "effective" self-defense firearms, like the "Model 1911" and "Sig P938," are handguns built to function with magazines that hold 15 or fewer rounds. *Id.* Indeed, it is "widely accepted" that handguns and shotguns unrestricted by the Act are "popular," as well as preferable, for self-defense. Doc. 37-7 ¶17; *id.* ¶¶25-26 (describing the Beretta Model 92, which is unregulated by the Act); Doc. 37-6 ¶61 ("shotguns and 9mm pistols" generally recognized as most suitable and effective choices for armed defense); Doc. 37-4 ¶25 (between 2000 and 2021, "only 1 incident out of 406" active shootings "involved an armed civilian intervening with an assault weapon").

Finally, not only do their features make assault weapons and LCMs poorly suited for civilian self-defense, they make them as effective on the battlefield (if not more so) as automatic weapons like the M-16, which the Court deemed permissible to ban. *Heller*, 554 U.S. at 627; Doc. 37-6 ¶33 (Army's 2008 Field Manual stressed that use of semiautomatic fire is "the most important firing technique during fast-moving modern, combat," in part because it is "devastatingly accurate") (cleaned up); Doc. 37-7 ¶34 (semiautomatic is "the mode that is most often deployed in battle to efficiently target and kill" enemy troops and is viewed by Special Forces trainers as "the preferred and most lethal setting in most wartime scenarios"). In fact, the

31

most commercially successful weapons regulated by the Act—AR-15 rifles—are M-16s in every way except one:  the ability to toggle between semiautomatic and automatic fire.  Doc. 37-9 ¶116 (AR-style weapons "retain the identical performance capabilities and characteristics (save full automatic capability) as initially intended for use in combat").

All told, given plaintiffs' lack of relevant evidence, on the one hand, and the substantial evidence showing that assault weapons and LCMs are offensive, militaristic weapons not commonly used or suitable for self-defense, on the other, plaintiffs are unlikely to succeed at step one.

B.     **The Act is consistent with the Nation's history of regulating firearms.**

Even if plaintiffs had shown that the Second Amendment's text protects assault weapons or LCMs, they did not show that the State will be unable to satisfy its burden at *Bruen*'s second step.  As explained, the Second Amendment allows firearms regulations when the government can show the regulation is "consistent with this Nation's historical tradition" by demonstrating that it is analogous to historical regulations.  *Bruen*, 142 S. Ct. at 2126.  To determine whether a historical regulation is an appropriate analogue, courts must assess "whether the two regulations are relevantly similar."  *Id.* at 2132 (cleaned up).

*Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment" but noted that "*Heller* and *McDonald* point toward" two "central considerations":  "whether modern and historical regulations impose a comparable burden on the right of armed self-

32

defense and whether that burden is comparably justified." *Id.* at 2132-33 (cleaned up). The Court also indicated that, when reasoning by analogy, courts should begin with the public understanding of the right during the Founding and Reconstruction eras. *Id.* But "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 2136 (cleaned up). To that end, subsequent history can shed light on the public understanding of the Second Amendment, so long as that history does not "contradict[ ] earlier evidence." *Id.* 2154 n.28. And when the regulation at issue implicates "unprecedented societal concerns or dramatic technological changes," courts should apply a "more nuanced approach" to reasoning by analogy. *Id.* at 2132.

Applying *Bruen*'s guidance here, plaintiffs are not likely to succeed at the second step because the Act is "relevantly similar" to historical regulations with respect to "dangerous and unusual" weapons. *Id.* The evidence in the record reveals a robust historical tradition pre-dating the Founding era whereby a weapon is introduced into civilian society, proliferates to where it causes a substantial and novel threat to public safety, and is then regulated to curb the public harm stemming from its use. The evidence further demonstrates that the Act—which follows in this historical tradition—was enacted in response to unprecedented societal concerns about frequent and deadly mass shootings that are enabled by dramatic technological changes in weapons technology. As such, a "more nuanced approach" to the historical inquiry is required. And under that approach, the

evidence confirms that the Act's regulation of assault weapons and LCMs is consistent with historical tradition in all relevant respects, including the minimal burden that it imposes on self-defense and the justifications for imposing that burden.

### 1.    There is a historical tradition of regulating dangerous and unusual weapons.

As the Court recognized in *Heller* and *Bruen*, our country has a longstanding tradition of regulating "dangerous and unusual" weapons. *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627. Relevant here, these regulations have limited the sale, possession, and use of such weapons since the Colonial era—from pistols and "fighting knives" in the 18th and 19th centuries, revolvers in the second half of the 19th century, and machineguns and semiautomatic weapons in the early 20th century. In each era, legislatures imposed restrictions on categories of weapons— culminating in Prohibition-era laws prohibiting automatic and semiautomatic firearms—when their proliferation caused escalating or novel forms of violence resulting in harm to the public. Doc. 37-12 ¶¶9-11.

The origins of this tradition pre-date the Founding era. *E.g.*, 4 William Blackstone, *Commentaries on the Laws of England*, 148-49 (1769) ("riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land"). For instance, a 1686 East New Jersey law restricted concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." 1686 N.J. 289, 289-90, ch. 9; *see* Doc. 37-12 ¶82. Other colonies, too, regulated dangerous and unusual weapons like trap

guns, clubs, and knives that posed a danger to the public. *E.g.*, Doc. 37-12 ¶¶82-83, Ex. F; 1750 Mass. Acts 544, ch. 17, § 1 (Doc. 37-12, Ex. E); 1642 N.Y. Laws 33 (outlawing the drawing of knives).

During the Early Republic and Founding eras, legislatures continued to impose restrictions on specific weapons. For example, States began to regulate new "objectional" and "vicious" weapons like clubs, which had increasingly been used by criminals and as fighting instruments. Doc. 37-12 ¶¶73, 80 (cleaned up); *id.* ¶76 (compiling six laws enacted between 1750 and 1799 restricting the carrying of weapons like clubs); *see also, e.g.*, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60, ch. 3 (1792). By the end of the 19th century, "every state in the nation had laws restricting one or more types of clubs." Doc. 37-12 ¶73; *id.* Ex. C (compiling laws).

As new dangerous and unusual weapons emerged during the 19th century, States continued to exercise their traditional regulatory authority to impose categorical restrictions on their use, possession, and sale. One such weapon was the Bowie knife, which was invented in the 1820s and gained notoriety in the 1830s as a particularly effective fighting knife, "especially at a time when single-shot pistols were often unreliable and inaccurate." *Id.* ¶63. As "[h]omicide rates increased," in part as a result of knife-dueling, so did laws restricting the use, sale, and possession of Bowie knives. *Id.* ¶¶64, 70; Doc. 37-11 ¶24. By the beginning of the 20th century, the vast majority of States restricted Bowie knives in some manner,

whether by outlawing concealed and/or open carry, enhancing criminal penalties, taxing ownership, or barring their sale. *E.g.*, Doc. 37-15, table 2.

The categorical regulation of Bowie knives parallels the response to other emergent weapons during the same era, such as percussion cap pistols and multi-shot handguns. While 17th- and 18th-century pistols were not often used for committing crimes because they misfired and reloaded slowly, advancements in firearms technology during the 19th century rendered pistols more effective for criminal purposes. *E.g.*, Doc. 37-12 ¶82; Doc. 37-11 ¶¶16-17. In particular, these firearms could be kept loaded and carried around for longer periods without risk of corrosion. Doc. 37-11 ¶25. To address the increased criminal violence being committed with these concealable weapons, States began enacting prohibitions on carrying certain concealable weapons, including pistols and revolvers. *Id.* ¶26 (identifying examples, including Louisiana, Indiana, Arkansas, and Virginia regulations); Doc. 37-15, table 3 (compiling regulations on revolvers). By the turn of the century, there was near unanimity among the States in prohibiting or severely restricting concealable firearms and other weapons, Doc. 37-11 ¶28, a practice that has since been deemed constitutional, *e.g.*, *Bruen*, 142 S. Ct. at 2128.

The historical tradition of regulating firearms in response to criminal misuse and violence continued into the 20th century. During World War I, advancements in weapons technology led to the invention of hand-held semiautomatic and automatic firearms. Doc. 37-12 ¶¶14-16. Like the 18th- and 19th-century advancements, these new weapons proliferated, and "their uniquely destructive

capabilities" began to impact civilian life through criminal violence. *Id.* ¶16. The Thompson submachine gun and the Browning Automatic Rifle, in particular, were used in high-profile crimes, like the 1929 St. Valentine's Day Massacre. *Id.* ¶¶15-16, 21-23. These weapons were used "relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention." *Id.* ¶16.

As in prior eras, States responded, with the majority enacting anti-machine gun laws between 1925 and 1934. *Id.* Exs. B, D. States also regulated magazines and magazine capacity: between 1917 and 1934, nearly half of all States imposed "restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity." *Id.* ¶32. Many of these laws regulated conduct beyond the carriage restrictions imposed in the 19th century by prohibiting possession subject to limited exceptions, and at least seven of the anti-machinegun laws extended these bans to both automatic and semiautomatic weapons. *Id.* ¶28 & Ex. B. In 1932, Congress took similar action by banning machineguns, which it defined as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading," from the District of Columbia. *Id.* ¶24. Two years later, Congress enacted the National Firearms Act, which regulated the sale, transfer, and transport of machineguns and other firearms associated with criminal violence, like short-barreled shotguns and rifles. *Id.* The Act was upheld over challenges to the ban on short-barreled shotguns in *Miller*, 307 U.S. at 178, and its

restrictions on automatic firearms were recognized as permissible in *Heller*, 554 U.S. at 624, 627.

In all, there is a well-established pattern preceding the Founding era and continuing into the 19th and 20th centuries of regulating "dangerous and unusual" weapons—more specifically, when new weapons technology emerged, proliferated among citizens, and contributed to increased violence, governmental entities responded by imposing categorical regulations designed to reduce homicide, violence, and other disruptions to public order.

> **2.    The Act's restrictions on assault weapons and LCMs are relevantly similar to the historical tradition of regulating dangerous and unusual weapons.**

The Act is consistent with this longstanding historical tradition of regulating dangerous and unusual weapons under all relevant metrics. As explained, *Bruen* instructs courts to apply a "more nuanced approach" to the historical inquiry in circumstances where the challenged regulation responds to unprecedented societal concerns or dramatic technological changes. 142 S. Ct. at 2132. Such an approach is warranted here because, as the record demonstrates, Illinois enacted restrictions on assault weapons and LCMs in response to increasingly frequent and deadly mass shootings enabled by these instruments, which represent a dramatic technological change from the Founding and Reconstruction eras. And under that approach, the Act is analogous to the historical tradition of regulating dangerous and unusual weapons in that it imposes, at most, a minimal burden on individual self-defense to

protect the public from the unprecedented danger and substantial harm caused by the proliferation of a specific type of weapon.

> **a.  The Act responds to unprecedented societal concerns prompted by dramatic technological changes.**

To start, the "more nuanced approach" applies to the historical analysis because, as the *Herrera* court correctly determined, the evidence shows that that the Act was passed in response to the unprecedented problem of mass shootings committed with assault weapons and LCMs.  SA44.  Indeed, *Bruen* acknowledged while some historical analogies are "straightforward," others are not "simple to draw."  142 S. Ct. at 2131-32.  This is because "[t]he regulatory challenges posed by firearms today" are not the same as those that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id.* at 2132.  Yet the Second Amendment must "apply to circumstances beyond those . . . anticipated" during the Founding and Reconstruction era.  *Id.*  To resolve the difficulties posed by applying historical evidence to circumstances unanticipated by previous generations, the Court directed courts to apply a "more nuanced approach" to analogical reasoning in cases involving "unprecedented societal concerns or dramatic technological changes."  *Id.*  Because the Act regulates instruments that would not exist without enormous advancements in firearms technology and that have generated unprecedented public-safety concerns, application of that approach is appropriate here.

As to the first consideration, the Act regulates items that were not in existence during the Founding or Reconstruction eras and that were made possible

only by "dramatic technological changes" in weapons technology.  *E.g.*, *Friedman*,
784 F.3d at 410.  And though Second Amendment protections are not limited to
arms available at the Founding, *Bruen*, 142 S. Ct. at 2132, the absence of assault
weapons and LCMs when the Second and Fourteenth Amendments were adopted
confirms the existence of a dramatic technological change.  During the Founding
era, Americans typically owned muskets, which were used for militia service, and
fowling pieces, which were used to hunt birds and control vermin.  Doc. 37-11 ¶15.
Given their technological limitations, they were infrequently used as murder
weapons.  *Id.* ¶¶16-17.  These muzzle-loading firearms were "liable to misfire" and
could generally fire one shot before reloading, which typically took at least 30
seconds.  *Id.* ¶16.  And because they "were difficult to keep loaded for any length of
time" given the risk of corrosion, they "could not be used impulsively unless they
were already loaded for some other purpose."  *Id.*

Single-shot, muzzle-loading firearms remained the standard weapon up to
and including the Civil War.  Doc. 37-12 ¶¶44-45.  While a few "experimental multi-
shot guns" existed in and before the Founding, *id.* ¶36, they were flawed curiosities
that were dangerous to the shooter, highly unusual, and, in most instances, "never
advanced beyond the prototype stage," *id.* ¶¶36-39.  The first practical firearm that
could shoot more than one bullet without reloading was a revolver designed by
Samuel Colt in the 1830s.  *Id.* ¶45.  But adoption of this technology was slow, with
widespread proliferation beginning only after the Civil War.  *Id.*  Likewise, reliable
rifles capable of firing more than one round, such as the 1866 Winchester rifle, did

40

not appear in significant numbers until after the Civil War, and even then had significant limitations. *Id.* ¶46. In particular, these late 19th-century weapons, which were not semiautomatic, required manually reloading one round at a time. *Id.*

Since that time, technological advancements have dramatically altered the rate of fire, ease of reloading, power, range, sustained accuracy, and ultimately, lethality of multi-shot weapons. *Supra* Section II.A.3. As one example, the near-instantaneous firing of an assault weapon is materially different than manually re-filling each chamber of a Colt revolver, individually inserting rounds into a Winchester repeating rifle, or loading a single musket ball in half a minute. Likewise, the damage caused by a standard caliber AR-15 round is more significant than that caused by Thompson machine guns, handguns, muskets, or hunting rifles. Doc. 37-14 ¶29; *id.* ¶26 (AR-15 releases three times the energy of a Thompson, four to nineteen times the energy of handguns of various calibers, and ten times the energy of a musket); Doc. 37-11 ¶54 (danger posed by semiautomatic rifles "is intrinsically different from past weaponry").

Unsurprisingly, the lethality associated with these technologically advanced weapons has wrought unprecedented societal concerns—specifically, about lone shooters armed with assault weapons and LCMs murdering dozens of people in minutes, if not seconds, and bringing entire communities to a halt. The increasing frequency and severity of mass shootings confirms this is a new phenomenon. The first known mass shooting by a single individual resulting in 10 or more deaths

41

occurred in 1949; it took 17 years (until 1966) for another comparably lethal shooting to occur, another nine (to 1975) before the third such shooting, and an additional seven before the fourth (in 1982). Doc. 37-4 ¶¶18-19. But in recent years—and especially since the expiration of the federal assault weapons ban in 2004—the frequency and cumulative lethality of mass shootings has increased dramatically. From 1949 to 2004, there were "a total of 10 mass shootings resulting in double-digit fatalities," only one of which occurred during the decade when the federal assault weapons ban was in effect. *Id.* ¶21 & table 7. From 2004 to 2022, however, there were 20 such mass shootings, and their average rate "increased over six-fold." *Id.* And when the definition of mass shootings includes six or more casualties (as opposed to 10), there were a total of 93 between 1991 and 2022. *Id.*, Ex. B. In fact, since September 11, 2001, the deadliest individual acts of intentional criminal violence in the United States have been mass shootings, and the frequency of these incidents is only increasing. *Id.* ¶11 & figs. 1-2.

Assault weapons and LCMs are the chosen instruments for the vast majority of these attacks because of their "unique killing potential." Doc. 37-6 ¶34; *see supra* Section II.A.3 (describing unique lethality of assault weapons). These instruments allow solo shooters to "inflict mass death and injury" by enabling them to "shoot uninterrupted for longer periods, and get more shots off with fewer reloads." Doc. 37-6 ¶¶41, 50. And when used in combination with LCMs, "semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms." Doc. 37-11 ¶56; Doc. 37-4 ¶15 (average death toll for incidents involving any type of

firearm loaded with an LCM is 11.5 fatalities per shooting, as compared with 7.3 fatalities without LCMs); *id.* ¶12 (62% of "high-fatality mass shooting[ ]" deaths from 2019 to 2022 "involv[ed] assault weapons [and] 82% . . . involv[ed] LCMs").

Assault weapons also pose a "disproportionate risk to law enforcement":  in 2016 and 2017, 25% of officers slain in the line of duty were killed with assault weapons.  Doc. 37-6 ¶52; Doc. 37-11 ¶54 (threat to law enforcement is "modern phenomenon").  And beyond inflicting increased injury and death, including to law enforcement officers, mass shootings using assault weapons and LCMs are "devastating to communities and first responders" because "assault weapons are particularly physically and emotionally traumatic," and have "tremendous negative economic effects on communities."  Doc. 37-6 ¶¶43, 45.  Indeed, one reason that the use of these weapons is "particularly terrifying" is "the limited ability that organizations, communities, and law enforcement have to counter them."  *Id.* ¶23.  Because assault weapons allow for long-range rapid fire, police are required to secure a multi-block radius and are often called to "run into active situations without adequate protection."  *Id.* ¶¶41, 49; *id.* ¶49 ("Most standard-issue ballistic vests are not rifle-rated and therefore do not protect the body against bullets fired by assault rifles.").  Accordingly, where crimes involving assault weapons and LCMs are concerned, the public remains at "greater risk [ ] due to the limits of reasonable and practical law enforcement and crisis planning efforts."  *Id.* ¶46.

In short, the Act regulates instruments that, as a result of dramatic changes in weapons technology, have caused unprecedented societal concerns; thus, this court should apply a more nuanced approach in its historical inquiry.

> **b.  When compared to historic regulations, the Act imposes a comparable burden on the right of armed self-defense and that burden is comparably justified.**

Under this approach, plaintiffs are unlikely to succeed on the merits because the Act is "relevantly similar" to historical regulations of dangerous and unusual weapons both in its "burden on the right of armed self-defense" and the justifications for that burden. *Bruen*, 142 S. Ct. at 2132-33.  In conducting this inquiry, courts must consider the entirety of the relevant historical tradition, which begins with an examination of the public understanding of the right when the Second and Fourteenth Amendments were ratified.  *Id.*  But *Bruen* also contemplates consideration of subsequent historical evidence in at least two ways, both of which are relevant here.  First, as a practical matter, it would be impossible to account for the "dramatic technological changes" or "unprecedented societal concerns" that necessitate a "more nuanced approach" without looking at the time period in which those changes and concerns arose.  *Id.* at 2132.  Second, later history is relevant when there is a "regular course of practice" that "liquidate[s] & settle[s]" the meaning of the Constitution.  *Id.* at 2136 (cleaned up); *id.* at 2154 n.28 (subsequent history relevant when it does not "contradict[ ]" the earlier historical evidence).  Here, evidence of our country's tradition of regulating "dangerous and unusual" weapons—beginning prior to the Founding era, continuing through the

18th and 19th centuries, and confirmed by early 20th-century regulations—
demonstrates that the Act is "relevantly similar" to firearms regulations of the past.

As detailed above, there is a longstanding tradition in this country whereby a
weapon is introduced into society, proliferates to the point where its use has become
a significant threat to public safety, and is then regulated by the government to
curb violence and protect the public. *Supra* Section II.B.1. In the 18th and 19th
centuries, States responded to violence in a number of ways, but most often through
categorical restrictions on the ability to carry certain weapons in public. The scope
of these regulations—which the Court recognized as permissible restrictions on
"dangerous and unusual" weapons, *Bruen*, 142 S. Ct. at 2128—was directly
responsive to the problem at hand: misuse of weapons like clubs, knives, pistols,
and revolvers that could be concealed and brandished in a violent attack or other
criminal undertaking, *supra* pp. 35-36.

Then in the early 20th century, States and the federal government followed
this tradition when responding to the new threat presented by automatic and
semiautomatic weapons. *Supra* pp. 36-37. Because the danger posed by these
weapons went well beyond their concealable nature, legislatures enacted bans on
civilian possession and purchase. *Id.* In *Heller*, the Court recognized that the 20th-
century bans on automatic weapons are constitutionally permissible. 554 U.S. at
624, 627. Thus, to the extent that there was ever any ambiguity about whether
laws precluding civilians from possessing categories of firearms are consistent with
the public understanding of the Second Amendment, that question has been

"liquidate[d] & settle[d]" by this regular course of practice and subsequent judicial approval. *Bruen*, 142 S. Ct. at 2136 (cleaned up).

The Act is consistent with this historical tradition, as the *Herrera* court recognized. SA44-45. Like its regulatory predecessors, the Act was passed in response to an increase in violence that corresponded with the proliferation of novel and deadly weapons. As explained, *supra* Section II.B.2.a, the emergence of assault weapons and LCMs as mass shooting instruments is a recent phenomenon that has inflicted unprecedented death and injury on communities across the country. In fact, the specific regulations at issue here were enacted in response to a mass shooting at a local parade, where a lone gunman used an AR-15-style rifle and LCMs to fire 83 rounds in less than a minute, killing seven and wounding 48 more. *Supra* p. 5. In short, the public safety justifications underlying the Act are nearly identical to those that prompted 18th-, 19th-, and 20th-century legislatures to regulate weapons associated with an increase in homicides and other criminal misuse attributable to specific weapons.

The Act is also relevantly similar to historical regulations in that it imposes, at most, a minimal burden on an individual's right to armed self-defense. *E.g.*, *Del. State Sportsmen's Ass'n*, 2023 WL 2655150, *12 (assault weapon and LCM restrictions impose "slight" burden on self-defense). The defining characteristics of the instruments regulated by the Act allow the firing of dozens of rounds rapidly and accurately across long distances, while inflicting injuries that destroy organs and other tissue. *Supra* Section II.A.3. These features are unnecessary for self-

46

defense, but have been used by mass shooters to inflict untold harm on innocent victims. *Supra* Sections II.A.3, II.B.2.a. At the same time, there is no evidence that assault weapons and LCMs are commonly used for self-defense. *Supra* Section II.A.2-3. Instead, handguns and shotguns are preferred for self-defense scenarios, which typically occur in close quarters and in circumstances where individuals benefit from their concealable nature and facile handling. *Id.* And because the Act preserves access to a vast array of handguns, rifles, and shotguns, it is consistent with its historical predecessors in that it imposes tailored restrictions on the specific instruments causing harm to the public while retaining the ability for Americans to possess and carry weapons for self-defense.

Beyond these similarities, which are themselves sufficient to satisfy *Bruen*'s second step, the Act is materially indistinguishable from the 20th-century restrictions on the possession and sale of automatic and semiautomatic weapons. Like these analogues, the Act restricts ownership of offensive, militaristic weapons designed for the battlefield that, when introduced into society, were used in mass-casualty acts of criminal violence. *Supra* Section II.B.2.a. In fact, the AR-15 and M-16 are virtually identical, except for the M-16's ability to toggle between semiautomatic and automatic fire, *Friedman*, 784 F.3d at 409 (AK-47 and AR-15 rifles are submachine guns in military use, "though civilian versions are restricted to semi-automatic fire"). But this does not render an assault weapon any less an instrument of war than an M-16, which often is used in semiautomatic mode on the battlefield. *Supra* pp. 31-32. Because there is no principled distinction between the

47

Act and these early 20th-century restrictions, plaintiffs' argument calls into question the federal law prohibiting machineguns. *Heller*, 554 U.S. at 624 (deeming this suggestion "startling"); *Friedman*, 784 F.3d at 408 ("*Heller* deemed a ban on private possession of machine guns to be obviously valid.").

For its part, the *Barnett* court failed to discuss almost all of this evidence or precedent, asserting only that State Defendants' evidence was insufficient because their experts relied on concealed carry laws. SA26. But that is not a fair characterization of the robust historical analysis conducted by the experts in this case or the compilation of historical statutes provided to the court. *Supra* Section II.B.1; Doc. 37-15. Furthermore, the court's remark that concealed carry laws are "categorically different" than the Act's restrictions is incorrect. SA26. As explained, historical concealed carry restrictions and the Act share the same justifications (protecting the public from new forms of violence) and impose the same minimal burden on self-defense (by restricting only those weapons causing the violence while leaving other means of armed self-defense available). Moreover, to the extent there were any difference in scope between Founding- or Reconstruction-era regulations and the Act, that is because of the dramatic technological and societal shifts that have occurred in the interim. *Supra* Section II.B.2.a.

The court also failed entirely to consider this court's decisions in *Friedman* and *Wilson*, which plaintiffs did not dispute are on point. *E.g.*, Doc. 10 at 14-15; *Herrera* Doc. 63 at 4. Nor could they: the Act regulates assault weapons and LCMs in substantially the same way as the laws *Friedman* and *Wilson* upheld. *Compare*

48

720 ILCS 5/24-1.9(a)(1), 1.10(a) *with Friedman*, 784 F.3d at 407, *and Wilson*, 937 F.3d at 1029-30.  Instead, plaintiffs believe *Bruen* abrogated them.  Doc. 10 at 15; *Herrera* Doc. 63 at 4.  This is incorrect.  *Bruen* emphasized that its holding—that New York's "may issue" licensing scheme for publicly carrying handguns violated the Second Amendment, 142 S. Ct. at 2123-24—was limited to the statute before it, *id.* at 2134; *id.* at 2157 (Alito, J., concurring) (Court did not "decide anything about the kinds of weapons that people may possess").  Nor does *Bruen* require a different result than this court reached in *Friedman* and *Wilson*.  Indeed, *Friedman* and *Wilson* eschewed the levels-of-scrutiny approach that *Bruen* overruled in favor of a historical analysis.  *Friedman*, 784 F.3d at 410 (asking whether regulated items "were common at the time of ratification" and "whether law-abiding citizens retain adequate means of self-defense"); *Wilson*, 937 F.3d at 1033 (same).  Accordingly, *Bruen* does not require the court to reach a different result than in *Friedman* and *Wilson*, and the *Barnett* court's decision to grant preliminary injunctive relief without considering the effect of those decisions was error.

All told, there is a longstanding tradition in this country of restricting specific weapons once they proliferate and cause substantial harm to the public while leaving available ample means of armed self-defense.  Because the Act is consistent with this historical tradition, plaintiffs are unlikely to succeed at the second step of the *Bruen* test.

**III.   Herrera has not shown a likelihood of success on the merits of his claim challenging the endorsement affidavit requirement.**

Herrera asserts that the endorsement affidavit requirement—which allows individuals to continue lawfully possessing assault weapons obtained prior to the Act so long as they submit an endorsement affidavit to the State Police by January 1, 2024—violates the Second Amendment. *Herrera* Doc. 1 at 25-26.   Herrera, however, has not shown that he is likely to succeed on the merits of this claim; in fact, he has not even attempted to show how this requirement implicates conduct protected by the Second Amendment's text.   And, in any event, as the *Herrera* court explained, the requirement is consistent with *Bruen* and the longstanding historical tradition of States imposing registration requirements on firearms possession. SA48-51.

To start, Herrera offered no explanation, let alone made any showing, as to how the endorsement affidavit requirement interferes with conduct covered by the Second Amendment's text.   Instead, he stated only that he "do[es] not wish to register" because he fears "that information could be later used to confiscate [his] rifle." *Herrera* Doc. 5-1 ¶14.   But this fear is speculative and contrary to the purpose of the endorsement affidavit requirement.   The requirement, which tracks a similar requirement in the 1934 National Firearms Act, *Miller*, 307 U.S. at 175-76 & n.1, enables law enforcement to distinguish between lawful and unlawful assault weapons, but it does not prevent Herrera from continuing to keep and use his previously owned rifles, or from possessing all manner of firearms not restricted by the Act, for individual self-defense.   Moreover, the endorsement affidavit process is

straightforward and nonintrusive:  Herrera need only provide the number on his state firearms license; the make, model, and serial number of his assault weapons; and an attestation that he lawfully owned the weapons on January 10, 2023.  720 ILCS 5/24-1.9(d).  He then will be automatically entitled to keep the weapons.  *Id.*

Besides, as the *Herrera* court recognized, "*Bruen* itself suggests that the [endorsement affidavit] requirement is permissible" by endorsing licensing schemes that do not burden the right to self-defense.  SA51.  *Bruen* stated that notwithstanding its holding that New York's discretionary licensing regime violated the Second Amendment, nothing in its decision should cast doubt on the constitutionality of "shall-issue" licensing regimes.  142 S. Ct. at 2138 n.9.  Like those regimes, the endorsement affidavit requirement is governed by "narrow, objective, and definite standards" designed to ensure that affiants are "in fact, law-abiding citizens."  *Id.* (cleaned up).  The requirement does not require "the appraisal of facts, the exercise of judgment, [or] the formation of an opinion" on the part of licensing officials, nor is the requirement being "put toward abusive ends" in order to "deny ordinary citizens" their rights.  *Id.* (cleaned up).  In other words, because the endorsement affidavit requirement does not interfere with the individual right to self-defense, it is not protected by the Second Amendment's plain text.

And even if the endorsement affidavit requirement were covered by the Second Amendment's text, Herrera is still unlikely to succeed because the requirement is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  Indeed, as the *Herrera* court recognized,

these kinds of requirements trace to our country's earliest days. *E.g.*, SA48 (citing *United States v. Tita*, No. 21-CR-0334, 2022 WL 17850250, *7 (D. Md. Dec. 22, 2022); *United States v. Holton*, No. 21-CR-0482, 2022 WL 16701935, *4 (N.D. Tex. Nov. 3, 2022)). By 1631, Virginia had a "muster" law requiring an annual accounting of "arms and munition" held by its inhabitants. *Herrera* Doc. 52-15, table 5. Other early governments implemented similar muster laws throughout the 17th and 18th centuries. *E.g.*, *Holton*, 2022 WL 16701935, *5 (citing Meg Penrose, *A Return to the States' Rights Model*, 46 Conn. L. Rev. 1463, 1483 (2014); *Minutes from a Convention of the Federalist Society*, 4 NYU J.L. & Liberty 293, 309 (2009)).

This tradition continued into the 19th century, when legislatures imposed taxes on firearms, the collection of which necessarily required the firearms to be identified and disclosed to the government. As the *Herrera* court noted, in 1848, "Mississippi required a 'tax of two dollars on each dueling or pocket pistol.'" SA49 (citing *Herrera* Doc. 52-15 at 69-70). Among other examples, in 1856, North Carolina imposed a tax on most pistols. *Herrera* Doc. 52-15, table 5. Likewise, in 1866, Georgia imposed a tax on every gun over a total of three owned by any individual, and in 1867, Alabama imposed a tax "[o]n [a]ll pistols or revolvers in the possession of private persons not regular dealers holding them for sale." *Id.*

Similar statutes continued into the late 19th and 20th centuries, "serv[ing] as confirmation" of the deeply rooted historical tradition of firearm registration laws. SA50 (internal quotations omitted). As early as 1885, Illinois required registration

of weapons "sold or given away," which included identifying information such as the name and age of the weapon's recipient. *Herrera* Doc. 52-15, table 5. In the early 20th century, Montana required "every person" "who owns or has in his possession any fire arms or weapons" to "make a full, true, and complete verified report" to the local sheriff of all such weapons. *Id.* And at the federal level, the 1934 National Firearms Act imposed registration requirements for certain categories of firearms. *Miller*, 307 U.S. at 175 n.1.

As the *Herrera* court held, this historical record "shows a continuing tradition of state and national registration requirements" that are analogous to the Act's endorsement affidavit requirement. SA50-51, 53. In fact, many of the historical analogues were more burdensome than the Act, since they often also required payment of a tax and applied to more types of weapons. Thus, Herrera cannot show he is likely to succeed on the merits of this claim.

## IV.  Plaintiffs failed to satisfy the remaining preliminary injunction factors.

In addition to failing to show that they are likely to succeed on the merits, plaintiffs have not satisfied the remaining preliminary injunction factors. As an initial matter, plaintiffs have not shown they will likely suffer irreparable harm absent injunctive relief or that they lack an inadequate remedy at law, and the *Barnett* court's conclusion otherwise was erroneous. Plaintiffs (and the *Barnett* court) relied primarily on the theory that under this court's decision in *Ezell*, a facial challenge on Second Amendment grounds "create[s] a harm that is properly regarded as irreparable and having no adequate remedy at law." SA9 (cleaned up);

*e.g.*, Doc. 10 at 19; *Herrera* Doc. 5 at 28. But, as the *Herrera* court recognized, *Ezell* did not "create such a wide-ranging presumption for Second Amendment cases." SA55. Instead, the *Ezell* presumption applies only where a law burdens the "the right to possess firearms for protection." 651 F.3d at 699. And here, the Act does not burden the right to armed self-defense because it allows individuals to purchase and wield many types of handguns (which are "the quintessential self-defense weapon[s]," *Heller*, 554 U.S. at 629), shotguns, and rifles.

Several plaintiffs also pointed to lost revenue as another basis for irreparable harm. *E.g.*, Doc. 10 at 20. Although the *Barnett* court recognized that lost sales and other economic injury "is generally not a basis for granting injunctive relief," it nevertheless concluded that the lost revenue was irreparable here. SA11. But the court did not meaningfully explain why a damages award could not make the businesses whole. And this court has recognized that where, as here, harm can be "fully rectified in a final judgment," it "cannot be considered irreparable." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017).

For his part, Herrera also claimed irreparable harm based on his inability to keep assault weapons and LCMs in his Chicago home, precluding him from using them for self-defense at home and requiring him to travel to obtain them for his SWAT training. *Herrera* Doc. 5 at 5, 28. But these harms are not attributable to the Act, which allow individuals to possess assault weapons that they owned prior to the Act so long as they obtain an endorsement affidavit. 720 ILCS 5/24-1.9(d). In any event, as the *Herrera* court recognized, Herrera's "alleged inability to protect

54

himself in his home is unsupported by the record" because, among other reasons, he "currently has two firearms in his home—a Glock 43x and Glock 45—that he can use for self-defense." SA56. And with respect to retrieving his weapons, Herrera set forth "contradictory facts" about his efforts to bring those weapons to SWAT training and made only "speculative" claims about why this training is necessary for a volunteer medic, who is not tasked with "shooting a weapon," like him. SA57-58.

For similar reasons, the balance of equities tips firmly in the favor of the State. Again, plaintiffs have not made a strong showing that they will prevail or that their inability to purchase or sell assault weapons and LCMs will irreparably harm them. By contrast, the Act's restrictions on assault weapons and LCMs promote a compelling interest in protecting the public and saving lives. According to an epidemiological study, States that have enacted similar restrictions have "experienced a 56% decrease in high-fatality mass shooting incidence rates" and a "72% decrease in the rate of deaths resulting from high-fatality mass shootings" over the past three decades. Doc. 37-4 ¶¶45-46. The *Barnett* court's conclusion to the contrary—that there was "no evidence" in the record that the Act "will actually help Illinois Communities," SA28—is thus incorrect. *See also Friedman*, 784 F.3d at 411 (data shows that restrictions on assault weapons "reduce the share of gun crimes involving assault weapons") (cleaned up).

When all evidence is taken into account, plaintiffs cannot satisfy the remaining preliminary injunction factors because they have not shown they are

suffering irreparable harm or lack an adequate remedy at law and because the balance of equities weighs in favor of State Defendants.

## CONCLUSION

State Defendants request that this court affirm the district court's denial of preliminary injunctive relief in *Herrera* and reverse the district court's decision granting a preliminary injunction in *Barnett*.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for the State Parties

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
**IVAN PARFENOFF**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

June 5, 2023

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(A) in that the brief is 13,926 words.

<u>/s/ Sarah A. Hunger</u>
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

**CERTIFICATE OF COMPLIANCE WITH 7TH CIR. R. 30**

In accordance with 7th Cir. R. 30(d), I certify that all materials required by 7th Cir. R. 30(a) and (b) are included in the short appendix to the Opening Brief of the State Parties.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

# SHORT APPENDIX

## TABLE OF CONTENTS TO THE SHORT APPENDIX

**Page(s)**

Memorandum and Order on Plaintiffs' Motions for a Preliminary Injunction,
  April 28, 2023 (*Barnett v. Raoul*, Doc No. 101) ....................................... SA1-29

Memorandum and Order on Plaintiff's Motion for a Preliminary Injunction,
  April 25, 2023 (*Herrera v. Raoul*, Doc. No. 75)...................................... SA30-60

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CALEB BARNETT**, *et al.,*<br>        **Plaintiffs,**<br><br>        v.<br><br>**KWAME RAOUL**, *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00209-SPM (Lead Case)** |
| **DANE HARREL**, *et al.,*<br>        **Plaintiffs,**<br><br>        v.<br><br>**KWAME RAOUL**, *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00141-SPM** |
| **JEREMY W. LANGLEY**, *et al.,*<br>        **Plaintiffs,**<br><br>        v.<br><br>**BRENDAN KELLY**, *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00192-SPM** |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS**, *et al.,*<br>        **Plaintiffs,**<br><br>        v.<br><br>**JAY ROBERT "J.B." PRITZKER**, *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00215-SPM** |

## <u>MEMORANDUM AND ORDER</u>

**SA1**

**McGLYNN, District Judge:**

Before the Court are consolidated cases with requests for the imposition of a preliminary injunction under Federal Rule of Civil Procedure 65(a) to prevent the enforcement of Illinois' Protect Illinois Communities Act ("PICA"), until there can be a final determination of the merits as to the law's constitutionality. Lead Plaintiffs Caleb Barnett, Brian Norman, Hoods Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc., along with Plaintiffs from companion cases (hereinafter collectively referred to as "Plaintiffs"), filed motions for preliminary injunction. (Doc. 10).[1] The Illinois Attorney General's Office, representing Attorney General Kwame Raoul, Governor Jay Robert Pritzker, and the Director of Illinois State Police, Brendan F. Kelly, (hereinafter collectively referred to as "Defendants") filed an extensive response to the respective motions that included 14 exhibits. (Doc. 37).

On June 23, 2022, the United States Supreme Court issued its opinion in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Amongst other things, the *Bruen* Court reaffirmed that "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" 142 S. Ct. at 2134 (quoting *D.C. v. Heller*, 554 U.S. 570, 584 (2008)).

---

[1] This Court consolidated the following cases: 23-cv-141, 23-cv-192, 23-cv-209, and 23-cv-215 for purposes of discovery and injunctive relief, with the Barnett case designated as the lead case. Because the respective cases all have similar Motions for Preliminary Injunction pending, this Order carries over to those cases as well. (Doc. 16 in 22-cv-00141, Doc. 6 in 22-cv-00192, and Doc. 28 in 22-cv-00215, respectively).

**SA2**

Less than two weeks later, family and friends gathered in Highland Park, Illinois to enjoy one of the mainstay festivities of this nation's Independence Day celebration, a parade. They gathered to salute our Country, our liberty, and our freedoms. During the parade, a senseless tragedy occurred involving firearms and multiple paradegoers were killed and wounded.

Some months after that, the State of Illinois enacted PICA into law.[2] The proponents of PICA cited the Highland Park tragedy as an impetus for passing the law. That law placed sweeping restrictions and outright bans on the sale, purchase, manufacture, delivery, importation, and possession of many firearms, magazines, attachments, stocks, and grips. PICA was immediately challenged as unconstitutional.

As Americans, we have every reason to celebrate our rights and freedoms, especially on Independence Day. Can the senseless crimes of a relative few be so despicable to justify the infringement of the constitutional rights of law-abiding individuals in hopes that such crimes will then abate or, at least, not be as horrific? More specifically, can PICA be harmonized with the Second Amendment of the United States Constitution and with *Bruen*? That is the issue before this Court. The simple answer at this stage in the proceedings is "likely no." The Supreme Court in *Bruen* and *Heller* held that citizens have a constitutional right to own and possess firearms and may use them for self-defense. PICA seems to be written in spite of the clear directives in *Bruen* and *Heller*, not in conformity with them. Whether well-

---

[2] For purposes of this Order, the Court focuses on PICA's changes to 720 ILCS 5/24-1 and additions of 1.9 and 1.10.

**SA3**

intentioned, brilliant, or arrogant, no state may enact a law that denies its citizens rights that the Constitution guarantees them. Even legislation that may enjoy the support of a majority of its citizens must fail if it violates the constitutional rights of fellow citizens. For the reasons fully set out below, the overly broad reach of PICA commands that the injunctive relief requested by Plaintiffs be granted.

### JURISDICTION AND VENUE

Plaintiffs raised a federal question when filing these cases; specifically asking whether PICA violates the Second Amendment to the Constitution. As a result, this Court has subject matter jurisdiction. *See* 28 U.S.C. § 1331. Furthermore, venue in non-diversity cases is proper in any judicial district where any defendant resides if all defendants reside in the same state. 28 U.S.C. § 1391(b).

### STANDING

In order to have standing to bring a claim in federal court under the jurisdiction conferred by Art. III, § 2 of the U.S. Constitution, a plaintiff must establish that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). While Defendants did not challenge the standing of any Plaintiff, courts must still consider this jurisdictional issue because standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1983).

Even a cursory review of the named Plaintiffs satisfies the three requisite elements. Furthermore, a plaintiff who wishes to engage in conduct that is arguably

**SA4**

protected by the Constitution, but criminalized by a statute, successfully demonstrates an immediate risk of injury. *Bell v. Keating,* 697 F.3d 445, 451 (7th Cir. 2012). In this case, Plaintiffs face criminal sanctions were they to sell or purchase any of the items banned by PICA, unless preliminary injunction issues.

## FACIAL CHALLENGES AND SEVERABILITY

"Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law." *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (citing *Leavitt v. Jane L.*, 116 S.Ct. 2068, 2069 (1996); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985)). However, "[i]n a facial challenge, *lex ipsa loquitur*: the law speaks for itself." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (quoting Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010)). Meaning that "[o]nce standing is established" the Court must weigh "the applicable constitutional doctrine without reference to the facts or circumstances of particular applications." *Id.* at 697-98 (quoting David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006)). A "facial challenge directs the judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety." *Id.* at 698 (quoting Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 387 (1998)). Therefore, because this Court finds a likelihood of facial unconstitutionality on the merits, the entirety of PICA as codified will be enjoined. *See Id.* It is important to note

**SA5**

that the Court has *not* found that PICA, or any provision, is *in fact* unconstitutional, only that there is a likelihood that it will be.

LEGAL STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary and drastic remedy for which there must be a clear showing that plaintiff is entitled to relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The purpose of a preliminary injunction is to preserve a party's position until a trial on the merits can be held. *GEFT Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 371 (7th Cir. 2019). The issuance of a preliminary injunction should also minimize the hardship a party pending final judgment. *See Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

In the Seventh Circuit, "a district court engages in an analysis that proceeds in two distinct phases to decide whether such relief is warranted: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.,* 883 F.3d 959, 965 (7th Cir. 2018). In order to survive the first phase, a party seeking a preliminary injunction must satisfy three requirements: (1) the movant will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) the movant has a reasonable likelihood of success on the merits. *See HH Indianapolis, LLC v. Consol. City of Indianapolis & Cnty of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018). If a moving party fails to demonstrate any one of those three initial requirements, a court must deny the request for preliminary injunction. *See GEFT Outdoors, LLC,* 922 F.3d at 364. If, on the other hand, a moving party meets the initial threshold, the court then moves on to the balancing stage. *See Id. (*quoting

**SA6**

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health,* 896

F.3d 809, 816 (7th Cir. 2018)).

In the second phase, a court must weigh the irreparable harm to the moving

party if the injunction were denied against any irreparable harm the nonmoving

party would suffer if the party were to grant the requested relief. *See Id.* When

balancing the harm to each party, a court should also consider the effect of an

injunction on the public interest. *See Winter v. Natural Resources Defense Council,*

*Inc.,* 555 U.S. 7, 20 (2008).

### ANALYSIS OF REQUEST FOR INJUNCTIVE RELIEF

On April 12, 2023, an evidentiary hearing was held before the Court on the

pending motions. At that time, Erin Murphy argued on behalf of Plaintiffs, while

Christopher Wells argued on behalf of the state Defendants. Troy Owens argued on

behalf of McHenry County Defendants, Patrick Kenneally, and Sheriff Robb

Tadelman, as their position was contradictory to the state Defendants.[3] Additionally,

Thomas Maag argued certain issues not raised by Ms. Murphy.[4]

---

[3] Of significance, Patrick Kenneally, in his official capacity as State's Attorney of McHenry County, is a plaintiff in the Northern District of Illinois where he is seeking similar injunctive relief against defendants Kwame Raoul and JB Pritzker regarding the constitutionality of PICA. (*See Kenneally v. Raoul et al.,* NDIL Case No. 3:23-CV-50039.

[4] Mr. Maag distinguished a flare launcher from a grenade launcher and advised the Court that the exemplar identified by Defendants as a grenade launcher (Doc. 37-3) appears to be a Tac-D, which is a rescue, assistance, and/or self-defense device that does not involve the use of fragmentation devices. The device is often referred to as a flare launcher, flare gun, or Very gun and is commonly used for safety by hunters, and for rescue operations. In fact, such a launcher is required by the U.S. Coast Guard on larger vessels on navigable waterways for launching flares. (Doc. 88, pp. 40-44).

**SA7**

In light of the evidence presented at the evidentiary hearing and the record, the Court makes the following findings of fact and conclusions of law.

## I.   PHASE ONE

### A. *Irreparable Harm*

A moving party must demonstrate that he or she will likely suffer irreparable harm absent obtaining preliminary injunctive relief. *See Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "Harm is irreparable if legal remedies are inadequate to cure it. Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (internal citation omitted)).

The requirement of irreparable harm eliminates those cases where, although the ultimate relief sought is equitable, a plaintiff can wait until the end of trial to get that relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Interim injunctive relief is only available if a plaintiff will suffer irreparable harm before final judgment is entered, which requires "more than a mere possibility of harm." *Whitaker*, 858 F.3d at 1045. It does not, however, require that the harm actually occur before injunctive relief is warranted nor does it require that the harm be certain to occur before a court may grant relief on the merits. *Id.* Instead, the Seventh Circuit has found irreparable harm when it "cannot be prevented or fully rectified by the final judgment after trial." *Id.* (quoting *Girl Scouts of Monitou*

**SA8**

*Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).

Plaintiffs claimed that the "assault weapon" ban enacted by PICA is unconstitutional as it contravenes the Second Amendment "right to keep and bear Arms." (Doc. 10). For some constitutional violations, particularly involving First Amendment claims, irreparable harm is presumed. *Christian Legal Society v. Walker,* 453 F.3d 853, 867 (7th Cir. 2006). Although the Supreme Court has not recognized a presumption of irreparable harm in regard to Second Amendment violations, it has emphasized that the Second Amendment and the constitutional right to bear arms for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen,* 142 S. Ct. at 2156 (*citing McDonald v. City of Chi., Ill.,* 561 U.S. 742, 780 (2010) (plurality opinion)). When a law is facially challenged under the Second Amendment, "the form of the claim and the substance of the Second Amendment right" create a "harm [that] is properly regarded as irreparable and having no adequate remedy at law." *Ezell*, 651 F.3d at 699-700.

Assuming arguendo that there is no presumption of harm for an alleged violation of the Second Amendment, Plaintiffs still satisfy this element. For example, Barnett and Norman are no longer able to purchase any firearm, attachment, device, magazine, or other item banned by PICA, while Hoods and Pro Gun are now prohibited from selling said any item banned by PICA. These harms are irreparable and in direct violation of the Second Amendment right to bear arms in self-defense. There is no question that the right to armed self-defense is limited by PICA, and in

**SA9**

some cases, may be prohibited altogether.  It is true that not all items are banned under PICA; however, if a lawful citizen only possesses items that are banned under PICA, he or she would have to purchase a non-banned firearm in order to legally defend oneself under the Second Amendment.

### B. *No Adequate Remedy at Law*

Plaintiffs must next make a threshold showing that any remedy at law would be inadequate. An inadequate remedy of law is not necessarily wholly ineffectual; instead, it is deficient when compared to the harm suffered. *See Foodcomm*, 328 F.3d at 304. Accordingly, the Court must ask if the Plaintiffs can and will be made whole if they prevail upon the merits and are awarded damages. *See Roland*, 749 F.2d at 386. That answer is "No."

But for PICA, Barnett and Norman would purchase additional banned firearms and magazines.[5] Should either one attempt to do so, he could face criminal penalties. There is no monetary award that can compensate for such an injury and make them whole.

There is also no question that both Hoods and Pro Gun have lost income and will continue to do so while PICA remains in effect. The declarations of both James Hood and Paul Smith, owners of Hoods and Pro Gun respectively, expressed that a large percentage of their income was derived from sales of items banned under PICA

---

[5] As set forth in the declarations, Barnett indicated he "would like to purchase at least one more AR platform rifle and at least one more magazine with capacity of greater than 10 rounds" and Norman stated that he "would like to purchase more firearms on the AR platforms and more magazines with capacity greater than 10 rounds." (Docs. 10-1, ¶5 and 10-2, ¶7).

**SA10**

and that they currently had in their possession tens of thousands of dollars worth of inventory that they have been prohibited from selling since PICA's effective date. (Docs. 10-3, 10-4).[6] As each month drags on, the injury, along with the inventory, remains. They are stuck with this inventory. While this injury is economic, which is generally not a basis for granting injunctive relief, because Plaintiffs can never recover their financial losses irreparable harm exists. *See e.g., Cmty. Pharmacies of Indiana, Inc. v. Indiana Fam. & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011). Again, there is clearly no adequate remedy at law that would make Plaintiffs whole.

### C. *Likelihood of Success on the Merits*

This Court must now consider the third issue, likelihood of success on the merits. Plaintiffs rely on recent Supreme Court decisions that made it clear that the Second Amendment protects the possession and use of weapons that are in common use. (Doc. 10, p. 1); *see Bruen,* 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 627). Plaintiffs contend there can be no question regarding the likelihood of success because the items banned under PICA are in common use today. (Doc. 10, p. 9).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. A plain reading of this text would seem to lend

---

[6] James Hood indicated that "approximately $209,000, or 48%" of his purchases in 2021 and 2022 were attributable to firearms banned under PICA while approximately 25% of his gross revenue was attributable to said items. (Doc. 10-3, ¶¶ 5, 6). Paul Smith stated he had been selling and transferring the firearms, magazines, and products now deemed "assault weapons" under PICA for the past 7 years and estimated that more than half of Pro Gun's revenue from sales was attributable to those items. (Doc. 10-4, ¶¶ 5-7).

**SA11**

itself to the notion that PICA is in fact violative of the Second Amendment. However, before weighing the parties' arguments and the validity of PICA, it is first necessary to review the pertinent aspects of the *Bruen* decision as well as the *Heller* and *McDonald* decisions.

In *Heller*, the Supreme Court began its analysis by setting forth that the Constitution should be interpreted according to the principle that it was written to be understood by the "normal and ordinary" meaning of the words. *See Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). This principle leads to an interpretation of the Second Amendment that contains two distinct clauses, the prefatory clause and the operative clause. *Id.* at 577.

The prefatory clause of the Second Amendment states, "[a] well-regulated Militia, being necessary to the security of a free State . . . ." The prefatory clause "announces a purpose" for the operative clause but "does not limit [it]." *Id.* Meaning that there "must be a link between the state purpose and command" but that the scope of the operative clause remains unchanged by the prefatory language. *See Id.* As the Supreme Court noted, the operative clause of the Second Amendment creates an individual right. *See Id.* at 598. Thus, logic demands that there be a link between an individual right to keep and bear arms and the prefatory clause. The link is clear, "to prevent elimination of the militia." *Id.* at 599. During the founding era, "[i]t was understood across the political spectrum that the right . . . might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* Therefore, although "most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting" the additional purpose of securing the ability

**SA12**

of the citizenry to oppose an oppressive military, should the need arise, cannot be overlooked. *See Id.*

In *Heller*, the Court broke the operative clause down further into two sections, "Right of the People" and "Keep and Bear Arms." *Id.* at 579-95. The "Right of the People" was then analyzed to determine the significance of "the people." *Id.* at 579. The Court noted that "right of the people" is only used three times in the amendments, in the First Amendment, in the Fourth Amendment, and most relevant to this case, in the Second Amendment. *See Id.* The usage of the term "right of the people" in each instance "unambiguously refer[s] to individual rights." *Id.* The *Heller* Court then categorized "the people" to whom the Constitution refers as "all members of the political community" or "persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of the community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). There is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The second section of the operative clause, "Keep and Bear Arms," defines the substance of the right held by "the people." *Id.* The *Heller* Court first turned to what constitutes "arms" and found that "arms" were understood, near the time of the ratification of the Second Amendment, to mean any weapon or thing that could be used for either offense or defense. *See Id.* The Court specifically noted that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Finally, the Court turned to the meaning of "keep" and "bear." *Id.* at 582-92. These

**SA13**

words are understood, in light of founding era history, to mean to "have" and to "carry" respectively. *See Id.* at 582-84. In sum, the operative clause of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Next, the Court looks to *McDonald*. The Supreme Court noted, "[t]he Bill of Rights, including the Second Amendment, originally applied only to the Federal Government." *McDonald*, 561 U.S. at 754. However, the Due Process Clause extended protection of rights that are "fundamental to our scheme of ordered liberty" and allows them "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.* at 765-67 (first citing *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) then quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)). Whether the Second Amendment protections can be applied against a state turns on the incorporation of the right in the concept of due process. *See Id.* at 767. The right guaranteed by the Second Amendment is a "basic right, recognized by many legal systems from ancient times to the present day." *Id.* Further, the right is "deeply rooted in this Nation's history and tradition." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Consequently, the Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment." *Id.* at 791.

Finally, this Court turns to *Bruen*. In analyzing the constitutional question presented, the *Bruen* Court first turned to its prior holdings in *Heller* and *McDonald*; in those cases, the Court "held that the Second . . . Amendment[] protect[s] an individual right to keep and bear arms." *Bruen*, 142 S. Ct. at 2125. The Court then

**SA14**

explained that in the years following *Heller* and *McDonald*, the Courts of Appeals analyzed the Second Amendment under a two-step test. *See Id.* at 2126. The first step included an analysis to determine if "the original scope of the right based on its historical meaning." *Id.* The second step was a balancing test of either intermediate scrutiny or strict scrutiny depending on "[i]f a 'core' Second Amendment right is burdened." *See Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc)).

The *Bruen* Court firmly rejected this two-step framework, concluding that "[d]espite the popularity of this two-step approach, it is one step too many." *Id.* at 2127. The Court instead adopted a single step test "rooted in the Second Amendment's text, as informed by history" under which the "government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Under this framework, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). The full standard for Second Amendment analysis is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen*, 142 S. Ct at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).

The Court then turned to outlining the framework under which this Nation's historical tradition of firearm regulation must be analyzed. First, it noted that *Heller*, in its historical analysis, compares the right to keep and bear arms to the rights guaranteed by the First Amendment. *See Bruen*, 142 S. Ct. at 2130. Thus, a similar approach can be taken to historical analysis of the Second Amendment as is taken when analyzing restrictions imposed on the freedom of speech and when a violation of the Establishment Clause is alleged. *Id.*

Examples are then given of situations where the historical analysis may be "fairly straightforward." *Id.* at 2131.

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that could also be evidence that a modern regulation is unconstitutional.

*Id.* Thus, showing that a historical analogue need not be a "historical twin," but rather a "relatively similar" and "well-established and representative historical analogue" will pass constitutional muster. *Id.* at 2132-33. Two metrics to apply in undertaking the historical analogue analysis are "how and why" the regulations burden the right to keep and bear arms. *Id.* at 2133.

The *Bruen* Court then noted that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*" and "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136 (emphasis original). A short-lived law long preceding the framing or a post-enactment law must not be given undue weight. *See Id.* Thus, no matter the "post-ratification

**SA16**

adoption or acceptance" of a law that is inconsistent with the original public meaning of the Constitution, it cannot overcome or change the text. *See Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). As the Court explained, "the scope of the protection applicable" to rights enumerated in the Bill of Rights, including the right to keep and bear arms, "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*; *see e.g. Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011).

### 1. Plain Text Analysis

This Court must determine if the Second Amendment's plain text, as it was originally understood, covers Plaintiffs' conduct. If so, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. Defendants argued that PICA does burden "arms" as they are understood in the context of the Second Amendment. (Doc. 37, p. 15).   Defendants argued that accessories and "weapons that are most useful in military service" are not "arms" under the plain text of the Second Amendment. *Id.* at 15-16. Defendants did not challenge that Plaintiffs are all "law-abiding" citizens such that they hold the individual right guaranteed by the Second Amendment. Further, Defendants did not challenge that possessing the restricted items falls within the ambit of "keep[ing]" for purposes of the Second Amendment.

This Court will first address Defendants' contention that "non-essential accessories" are not within the scope of the Second Amendment's plain text. PICA outlaws possession of a "semiautomatic pistol" with a detachable magazine if it is equipped with any of the following: "a threaded barrel," "a shroud attached to the

**SA17**

barrel or that partially or completely encircles the barrel," "a flash suppressor," or "arm brace."[7] 720 ILCS 5/24-1.9. PICA further outlaws possession of a magazine for a handgun capable of holding more than 15 rounds of ammunition and of "[a] semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9-10. Defendants contend that such items are not necessary to the functioning of a firearm and are thus not "arms" and therefore not protected by the Second Amendment. (Doc. 37, p. 17).

Defendants' argument is not persuasive. The Seventh Circuit has recognized the Second Amendment as extending to "corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense." *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (quoting *Ezell*, 651 F.3d at 708). It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm. The Third Circuit recognized the importance of this corollary and held that "a magazine is an arm under the Second Amendment." *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018). Further, Defendants' own expert defined "high-capacity firearms" as "hand-held arms with a capacity greater than ten rounds, recognizing that Illinois's statute allows up to 15 rounds for handguns." (Doc. 37-13, p. 2). Defendants' expert is clearly referencing magazines and incorporating such into his definition of a "firearm[]." *Id*. This Court agrees that magazines are "arms" as used in the plain text of the Second Amendment. Plaintiffs are correct that

---

[7] The list provided is not exhaustive but rather meant to illustrate some features referred to as "accessories" by Defendants.

"[t]his is not even a close call." (Doc. 10, p. 16). If Defendants' own expert incorporates magazine capacity into his definition of a firearm, given his level of expertise, it would be unreasonable to expect the original public meaning of the plain text to not reflect a similar understanding.

The Seventh Circuit held in *Ezell* that Chicago could not prohibit law-abiding citizens from target practice at a firing range because doing so interfered with the meaningful exercise of their Second Amendment right. *See* 651 F.3d at 708. PICA also interferes with the meaningful exercise of Second Amendment rights for one group of individuals — those with disabilities. To provide one example, consider arm braces for semiautomatic pistols. As noted above, PICA prohibits the use of an arm brace on any semiautomatic pistol with a detachable magazine without any caveat or exceptions. The Department of Justice has also attempted to regulate possession and registration of arm braces.[8] *See generally* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 FR 6478. However, one notable distinction exists. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has recognized that such braces are necessary for those with disabilities to use a firearm by directing that "[t]his rule does not affect 'stabilizing braces' that are objectively designed and intended as a 'stabilizing brace' for use by individuals with disabilities." Factoring Criteria for Firearms With Attached "Stabilizing Braces", https://www.atf.gov/rules-and-regulations/factoring-criteria-firearms-attached-stabilizing-braces.   As   reason and the ATF final rule evidences, braces are needed by certain individuals with

---

[8] "Any weapons with 'stabilizing braces' or similar attachments that constitute rifles under the NFA must be registered no later than May 31, 2021." 88 FR 6478-01.

**SA19**

disabilities to operate a firearm. Thus, arm braces are an integral part of the meaningful exercise of Second Amendment rights for such individuals and can also be considered an "arm."

Further, in *Ezell*, the Seventh Circuit noted that "the right to maintain proficiency in firearm use" is "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." 651 F.3d at 708. "[T]he core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. Undoubtedly, training, practice, and proficiency for effective exercise of Second Amendment rights refers to the ability of citizens to accurately shoot and hit their intended target in case of confrontation. Plaintiffs stated that "[a] pistol grip improves accuracy and reduces the risk of stray shots," that "[t]humbhole stocks likewise . . . provide[] for greater accuracy and decreases the risk of dropping the firearm or firing stray shots," and that "flash suppressors not only prevent users from being blinded in low lighting conditions . . . but also reduce recoil and muzzle movement, making the firearm less painful to use." (Doc. 10, p. 10-11). Defendants' have also recognized that such items "facilitate . . . sustained accuracy." (Doc. 88, p. 80). This Court agrees that in the case of each of these items "[t]he defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting) (quoting David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994)). Therefore, because the "meaningful exercise" of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended

target, items that aid in accuracy may be considered "arms" and are presumptively protected by the Second Amendment.

The aforementioned examples of "arms" regulated by PICA is by no means exhaustive. PICA is replete with other examples of "arms" being banned. However, at this stage, this Court need not address each example in an attempt to piece together the portions of PICA that may be constitutional.

## 2. This Nation's Historical Tradition of Firearm Regulation

This Court must next determine if PICA is consistent with this Nation's historical tradition of firearm regulation. Pursuant to *Bruen*, as outlined above, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The Supreme Court held the historical tradition supports "prohibiting the carrying of 'dangerous and unusual weapons'" but that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[9] Therefore, to bear its burden, Defendants must: (1) demonstrate that the "arms" PICA bans are not in "common use;" and (2) "identify a well-established and representative historical analogue" to PICA. *See Id* at 2128, 2133.

Defendants first argued that PICA is consistent with historical tradition because "[n]either large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified." (Doc. 37, p. 22). This

---

[9] During oral argument, Plaintiffs conceded that firearms are dangerous.

**SA21**

argument is "bordering on the frivolous" because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Defendants also argued that "[t]he Act restricts weapons and accessories not commonly used for self-defense today." (Doc. 37, p. 26). Similarly, this argument is misplaced. *Bruen* clearly holds that the Second Amendment protects "possession and use" of weapons "in common use" not just weapons in common use for self-defense as Defendants' argued. 142 S. Ct. at 2128. Even if there was a requirement that the "common use" of an "arm" be self-defense, AR-15 style rifles would meet such a test considering that 34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home. (Doc. 39-11, p. 34).

The only argument Defendants made to bear their burden of showing that the arms regulated by PICA are not in common use, rather than attempting to change the constitutional analysis, is that the "[s]ales and ownership numbers do not show commonality or use." (Doc. 37, p. 34). However, Defendants made no argument and present no evidence regarding the commonality of the two "arms" examples from the plain text analysis above.[10] Such "arms" are part of semiautomatic pistols. As the Supreme Court found "handguns are the most popular weapon chosen by Americans for self-defense" and are thus clearly in common use and protected by the Second Amendment. *See Heller*, 554 U.S. at 629.

---

[10] Although this Court has not engaged in an exhaustive analysis of each item banned by PICA, it is worth noting that many of the items banned are used by a multitude of individuals for entirely lawful purposes including self-defense.

**SA22**

Rather, Defendants' focused almost entirely on AR-15 rifles and their commonality or lack thereof. (Doc. 37, p. 34-39). As then-Judge Kavanaugh noted, "[t]here is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Heller*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

However, supposing that Defendants need only show that AR-15 rifles are not in common use, they still fail. Plaintiffs asserted that "[p]ractically all modern rifles, pistols, and shotguns are semiautomatics." (Doc. 10, p. 8) (quoting James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 CARDOZO L. REV. 681, 685-87 (2015)). Plaintiffs added that "recent data showed that more than 24 million AR-15 style rifles are currently owned nationwide." *Id.* at 9 (citing National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/). As the Fourth Circuit noted "in 2012, the number of AR- and Ak-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc). Twenty-four (24) million firearms dwarfs the 200,000 stun guns which the Supreme Court found sufficient to meet the "common use" test. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (per curiam) (Alito, J., concurring). Under the *Caetano* test, even 1% of the 24 million AR-15 style rifles held by citizens is sufficient to result in a finding that such arms are in common use. However, the Court need not rely solely on the current ownership numbers to

**SA23**

determine commonality of use of these arms. The AR-15 style rifles are among the most popular arms produced "account[ing] for nearly half of the rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020." (*See* Doc. 67, p. 7 (citing NSSF, *Firearm Production in the United States* 18 (2020), https://bit.ly/3LwJvKh)). AR-15 style rifles possess no "quasi-suspect character" and "traditionally have been widely accepted as lawful possessions." *Staples v. U.S.*, 511 U.S. 600, 612 (1973). Further, considering the commonality of magazines banned by PICA, which as this Court explained are "arms" for purposes of the Second Amendment, the analysis becomes even more clear. There are "about 39 million individuals" who "have owned magazines that hold over 10 rounds (up to 542 million such magazines in total)." (Doc. 39-11, p. 1-2). Thirty-nine million individuals is over three times the population of Illinois, the sixth most populous state in this Nation. *See US States – Ranked by Population 2023*, https://worldpopulationreview.com/states. Although "[t]here may well be some capacity above which magazines are not in common use. . . that capacity is surely not ten" and probably not fifteen either. *Heller*, 670 F.3d at 1261. Therefore, both AR-15 style rifles and magazines with a capacity of greater than ten are "in common use" and protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128.

Although Defendants challenged the veracity of Plaintiffs' evidence, they were unable to produce evidence showing that modern sporting rifles are both dangerous and unusual.[11] Consequently, Defendants failed to meet their burden to demonstrate

---

[11] In fact, the Illinois State Police has noted that firearm data relevant to the stated purpose of PICA (and required by 5 ILCS 830/10-5 to be collected) is "unattainable." *2022 Gun Trafficking                        Legislative                        Report*,

**SA24**

that the "arms" banned by PICA are "*dangerous and unusual*" and thus not protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128 (emphasis added).

Finally, although the commonality of "arms" banned under PICA is dispositive, Defendants shifted to the historical tradition of firearm regulation in an attempt to show the constitutionality of PICA. In determining if PICA is consistent with the historical tradition of firearm regulation, the question is whether there were "relevantly similar" regulations dating back to the Founding. *See Bruen*, 142 S. Ct. at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). Meaning that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. The government must only "identify a well-established and representative historical analogue, not a historical twin." *Id.* When assessing a historical analogue to determine if it passes "constitutional muster" a court is guided by two metrics: "how and why" the right to bear arms was burdened. *Id.*

Defendants relied on a litany of experts to support the proposition that a ban on "assault rifles" has sufficient historical analogues to pass constitutional muster. (*See* Docs. 37-10, 37-11, 37-12, 37-13, 37-14). However, the relevant analysis of each historic firearm regulation must be centered around "how and why" the regulation burdened Second Amendment rights. *See Bruen*, 142 S. Ct. at 2133. As the Defendants' counsel noted, the regulations cited by Defendants' experts were "[c]onceal carry regulations . . . that's what they were. They were largely conceal carry

---

https://isp.illinois.gov/StaticFiles/docs/Gun%20Trafficking/2022%20Gun%20Trafficking%20
Legislative%20Report.pdf.

**SA25**

regulations." (Doc. 91, p. 11). The "how and why" of a concealed carry regulation is categorically different than the "how and why" of a ban on possession and cannot pass "constitutional muster" as a historical analogue to demonstrate this Nation's historical tradition regarding an "arms" ban.

## II.    PHASE TWO: BALANCING OF HARMS AND THE PUBLIC INTEREST

At phase two, a court proceeds to the balancing analysis; weighing the harm the denial of a preliminary injunction would cause a plaintiff against the harm to a defendant if a court were to grant it. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). This balancing process involves a "sliding scale" approach: the more likely a plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). That is, this Court must consider the irreparable harm to Plaintiffs if the preliminary injunction is wrongfully denied versus the irreparable harm to Defendants if the preliminary injunction is wrongfully granted. *See Turnell v. CentiMark Corp*, 796 F.3d 656, 662 (7th Cir. 2015). The Court must also consider the effects, if any, the grant or denial of the preliminary injunction would have on non-parties, *i.e.*, the public interest. *Id.*

There is no question that Plaintiffs are harmed by PICA and will continue to be harmed if this Court denies the motion for preliminary injunction. A constitutional right is at stake. Some Plaintiffs cannot purchase their firearm of choice, nor can they exercise their right to self-defense in the manner they choose. They are bound by the State's limitations. Moreover, other Plaintiffs cannot sell their inventory, even to residents of other states that do not ban the "arms" identified in PICA.

**SA26**

To the contrary, there can be "no harm to a [government agency] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *see also Does v. City of Indianapolis*, Case No. 1:06-CV-865-RLY-WTL, 2006 WL 2927598, at *11 (S.D. Ind. Oct. 5, 2006) ("Defendants will not be harmed by having to conform to constitutional standards, and without an injunction, plaintiffs will continue to be denied their constitutional rights").

However, this does not end the inquiry. The Court must also balance the severity of PICA against the core Second Amendment right of armed self-defense with the public-interest justification of protecting Illinois communities. With respect to the public-interest justification, the answer is less clear-cut and there are two sides that need to be considered. It is uncontroverted that law-abiding members of society, including the elderly, infirmed, and disabled, have the constitutional right to arm themselves for self-defense. As discussed during briefing:

> The need for self-defense is not insignificant. According to a report by the Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive firearm uses in the United States have determined that there are up to 2.5 million instances each year in which civilians used firearms for home defense.

(Doc. 39, p. 11) (citing Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 164 (1995)). Handguns, many of which are limited under PICA, are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 629). It is also uncontroverted that many of the banned modifiers, including but not limited to pistol

**SA27**

grips, protruding grips, flash suppressors, and shrouds, have legitimate purposes that assist law-abiding citizens in their ability to defend themselves. The other side is less clear – there is no evidence as to how PICA will actually help Illinois Communities. It is also not lost on this Court that the Illinois Sheriff's Association and some Illinois States Attorneys believe PICA unconstitutional and cannot, in good conscience, enforce the law as written and honor their sworn oath to uphold the Constitution.

In no way does this Court minimize the damage caused when a firearm is used for an unlawful purpose; however, this Court must be mindful of the rights guaranteed by the Constitution. While PICA was purportedly enacted in response to the Highland Park shooting, it does not appear that the legislature considered an individual's right under the Second Amendment nor Supreme Court precedent. Moreover, PICA did not just regulate the rights of the people to defend themselves; it restricted that right, and in some cases, completely obliterated that right by criminalizing the purchase and the sale of more than 190 "arms." Furthermore, on January 1, 2024, the right to mere possession of these items will be further limited and restricted. *See* 735 ILCS 5/24-1.9(c). Accordingly, the balance of harms favors the Plaintiffs.

## CONCLUSION

Plaintiffs have satisfied their burden for a preliminary injunction. They have shown irreparable harm with no adequate remedy at law, a reasonable likelihood of success on the merits, that the public interest is in favor of the relief, and the balance of harm weighs in their favor. Therefore, the Plaintiffs' motions for preliminary

injunction are **GRANTED**. Defendants are **ENJOINED** from enforcing Illinois statutes 720 ILCS 5/24-1.9(b) and (c), and 720 ILCS 5/24-1.10, along with the PICA amended provisions set forth in 720 ILCS 5/24-1(a), including subparagraphs (11), (14), (15), and (16), statewide during the pendency of this litigation until the Court can address the merits.

The Court recognizes that the issues with which it is confronted are highly contentious and provoke strong emotions. Again, the Court's ruling today is not a final resolution of the merits of the cases. Nothing in this order prevents the State from confronting firearm-related violence. There is a wide array of civil and criminal laws that permit the commitment and prosecution of those who use or may use firearms to commit crimes. Law enforcement and prosecutors should take their obligations to enforce these laws seriously. Families and the public at large should report concerning behavior. Judges should exercise their prudent judgment in committing individuals that pose a threat to the public and imposing sentences that punish, not just lightly inconvenience, those guilty of firearm-related crimes.

**IT IS SO ORDERED.**

**DATED:  April 28, 2023**

s/ *Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**

**SA29**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JAVIER HERRERA,

    *Plaintiff,*

v.

KWAME RAOUL, *in his official capacity as Attorney General for the State of Illinois*, BRENDAN F. KELLY, *in his official capacity as Director of the Illinois State Police*, COOK COUNTY, *a body politic and corporate*, TONI PRECKWINKLE, *in her official capacity County Board of Commissioners President*, KIMBERLY M. FOXX, *in her official capacity as Cook County State's Attorney*, THOMAS J. DART, *in his official capacity as Sheriff of Cook County*, CITY OF CHICAGO, *a body politic and corporate*, DAVID O'NEAL BROWN, *in his official capacity as Superintendent of Police for the Chicago Police Department*,

    *Defendants.*

|  |  |
|---|---|
|  | No. 23 CV 532 |
|  | Judge Lindsay C. Jenkins |

### MEMORANDUM OPINION AND ORDER

Laws enacted by the City of Chicago, Cook County, and, most recently, the State of Illinois restrict Illinois residents' ability to possess or purchase certain firearms and large-capacity magazines (defined as more than ten rounds for a semiautomatic rifle and more than fifteen rounds for a handgun). Javier Herrera, a Chicago resident, local emergency room doctor, and owner of several restricted firearms and large-capacity magazines, sued the City of Chicago, Cook County, and

**SA30**

the State of Illinois, alleging that these laws violate the Second and Fourteenth Amendments. [Dkt. No. 1]. He simultaneously moved for a temporary restraining order and preliminary injunction to enjoin the enforcement of these laws. [Dkt. No. 4]. The Court held a hearing on April 17, 2023. [Dkt. No. 72]. For the reasons detailed below, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

## I.    Background

### A.    Factual Background

In response to widespread mass shootings nationally, including the mass shooting in Highland Park, Illinois on July 4, 2022, the State of Illinois passed the "Protect Illinois Communities Act," HB 5471 ("the Illinois Act"). Ill. Pub. Act 102-1116, § 1; [Dkt. No. 1 at ¶ 40]. The Illinois Act made three changes to state law at issue in this case.

Under the Act, Illinois residents can no longer carry, possess, or purchase certain "assault weapon[s]." 720 ILCS 5/24-1(a)(15)–(16). The Act defines an "assault weapon" to include various models of firearms with various features, including a "semiautomatic rifle" with a "pistol grip." 720 ILCS 5/24-1.9(a)(1)(A)(i). This definition encompasses an AR-15 rifle. *See* 720 ILCS 5/24-1.9(a)(1)(J)(ii)(II). Additionally, Illinois residents can no longer purchase or possess any "large capacity ammunition feeding device" ("large-capacity magazine"). 720 ILCS 5/24-1.10(a). For rifles, the Illinois Act defines a "large capacity ammunition feeding device" as a "magazine . . . that can [be] readily restored or converted to accept, more than [ten]

**SA31**

rounds of ammunition." *See* 720 ILCS 5/24-1.10(a)(1). For handguns, it is defined as a magazine of more than fifteen rounds. *Id*. The restrictions on firearms and large-capacity magazines took effect on January 10, 2023. *See* 720 Ill. Comp. Stat. ("ILCS") 5/24-1.

The Illinois Act allows any owner of a restricted firearm who acquired the firearm prior to the Illinois Act's effective date to continue to lawfully possess that firearm if they provide an "endorsement affidavit" by October 1, 2023 ("registration requirement"). 720 ILCS 5/24-1.9(d). The affidavit must include the affiant's Illinois firearm owner's identification ("FOID") number, an affirmation that the affiant lawfully owned the restricted firearm before October 1, 2023, and the make, model, caliber, and serial number of the restricted firearm. *Id*. Owners of restricted large-capacity magazines may similarly retain all magazines acquired before the effective date. *See* 720 ILCS 5/24-1.10(d). The Illinois Act does not allow for the purchase of new restricted weapons or large-capacity magazines after its effective date. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d).

The Illinois Act mirrors county and city enactments already in place.[1] *See* Cook County, Ill., Code §§ 54-210–215 (2006); Chi., Ill., Mun. Code §§ 8-20-010, 8-20-075, 8-20-85 (2013); *see also Wilson v. Cook County*, 937 F.3d 1028, 1029 (7th Cir. 2019). Since 2006, the Cook County Code ("County Code") has prohibited county residents from purchasing, carrying, or possessing certain semiautomatic rifles, including an

---

[1]      Because the challenged laws all contain substantively the same restrictions, the Court often treats them together in its analysis below. The Court notes differences between the three enactments when necessary.

AR-15 rifle, and large-capacity magazines, defined as any magazine that can accept more than ten rounds. Cook County, Ill., Code §§ 54-211(7)(A)(iii), 54-212(a). Owners of restricted firearms or large-capacity magazines who possessed either prior to the County Code's enactment are required to remove them from the county, render them "permanently inoperable," or surrender them to the Cook County Sheriff. *Id.* at § 54-212(c).

Since 2013, the City Code of Chicago ("City Code") similarly prohibited city residents from purchasing, carrying, or possessing certain semiautomatic rifles, which included the AR-15 rifle, and large-capacity magazines, defined as magazines of fifteen or more rounds for semiautomatic handguns and ten or more rounds for semiautomatic rifles. Chi., Ill., Mun. Code §§ 8-20-010(a)(10)(B)(ii), 8-20-075, 8-20-085. Much like the County Code, the City Code requires that all restricted firearms or large-capacity magazines possessed before the enactment date be disposed of or removed from city limits. *Id.* at §§ 8-20-075(c)(1), 8-20-085(b).

Plaintiff Javier Herrera is an emergency room doctor, Chicago resident, and owner of multiple firearms. [Dkt. No. 1 at ¶ 5]. Herrera owns a Glock 45, Glock 43x, and two AR-15 rifles. [*Id.* at ¶¶ 20, 23–24]. Herrera keeps his Glock 45 and Glock 43x at his Chicago home and his AR-15 rifle "beyond county lines." [*Id.* at ¶ 22–24]. Herrera alleges that he owns these firearms for self-defense, hunting, and sport shooting. [*Id.* at ¶¶ 19, 37]. Herrera has both a FOID card and a concealed carry license. [*Id.* at ¶¶ 5, 19, 23].

4

**SA33**

In addition to his day job, as of 2018, Herrera has served as a volunteer medic on a local Special Weapons and Tactics ("SWAT") team, which carries out high-risk law-enforcement missions. [*Id.* at ¶ 25]. As a volunteer medic, Herrera renders medical aid to SWAT team officers, bystanders, or anyone else who may be injured on these missions. [*Id.* at ¶ 28]. Herrera is not a law enforcement officer on the SWAT team and does not carry a firearm on these missions. [*Id.*] During his volunteer shifts, Herrera is stationed inside the command vehicle until called upon to render medical aid. [*Id.*] Herrera also attends monthly SWAT trainings, which include shooting drills. [Dkt. No. 5-1 at ¶ 10]. He has participated in these trainings in the past with his personal AR-15 to maintain confidence and proficiency with the weapon. [*Id.* at ¶¶ 10, 12].

### B.    Procedural Background

On January 27, 2023, Herrera sued Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly (the "State Defendants"), County Board of Commissioners President Toni Preckwinkle, Cook County State's Attorney Kim Foxx, Sheriff of Cook County Thomas J. Dart, Cook County (the "County Defendants"), Chicago Police Department Superintendent David O'Neal Brown, and the City of Chicago (the "City Defendants"). [Dkt. No. 1]. Herrera moved for a temporary restraining order and preliminary injunction the same day.[2] [Dkt. No. 4]. In his complaint, Herrera alleges that the City Code, County Code, and Illinois Act

---

[2]    Herrera's complaint additionally seeks declaratory judgment that these statutes are unconstitutional and a permanent injunction. [Dkt. No. 1 at 30–31].

violate the Second and Fourteenth Amendments. [Dkt. No. 1 at ¶¶ 105–173]. Herrera charges that these laws infringe on his right to armed self-defense in several ways. [*Id.* at ¶¶ 97–103].

In particular, Herrera alleges that his right to self-defense is threatened by his inability to keep his AR-15 rifle, his Glock 45, or their accompanying standard magazine in his home due to the City and County Code. [*Id.* at ¶¶ 97–98]. As part and parcel of this harm, because Herrera cannot keep his AR-15 rifle in his home, he must commute over four hours round trip to complete shooting drills with his SWAT team. [Dkt. No. 1 at ¶¶ 31–34, 99; Dkt. No. 5-1 at ¶ 12]. Herrera contends that he must be prepared to handle or secure the AR-15 rifle of an injured officer in the event an officer hands that weapon to Herrera while the officer uses another tool. [Dkt. No. 5-1 at ¶ 8]. Herrera has not alleged that he has ever needed to handle the AR-15 of an injured officer or shoot such a weapon. [Dkt. No. 1, 5-1, 63-3]. But Herrera alleges that on one mission in 2021, a SWAT officer handed him an AR-15 rifle for him to secure. [Dkt. No. 63-3 at ¶ 13]. As a result, Herrera contends that he is effectively precluded from SWAT training shooting drills, given the long commute and his hours as an emergency doctor.[3] [Dkt. No. 1 at ¶ 99; Dkt. No. 5-1 at ¶ 12].

Herrera further alleges injury from the inability to purchase additional AR-15 rifles, rifle components, or large-capacity magazines for any of his weapons in

---

[3]    Herrera additionally alleges that "County and City ordinances deny Dr. Herrera easy access to his rifles for hunting and sport shooting in his off time. As a result, Dr. Herrera engages in these hobbies less than he otherwise would." [Dkt. No. 1 at ¶ 100]. Because this argument does not appear in the parties' briefs regarding a preliminary injunction, the Court need not address it further. *See generally* [Dkt. No. 5, 52, 54, 61, 63].

**SA35**

furtherance of his right to self-defense. [Dkt. No. 1 at ¶¶ 101–102]. Herrera argues that because certain large-capacity magazines come standard with his AR-15 rifle and Glock 45, his inability to purchase those items render the weapons inoperable and causes the weapons to wear out with disuse. [*Id.* at ¶¶ 98, 101].

Finally, Herrera contends that the Illinois Act "will soon prohibit [him] from possessing his AR-15 rifles anywhere in Illinois, even far away from [his] home, unless he complies with its intrusive and ahistorical registration requirement." [*Id.* at ¶ 103]. Herrera fears that the Illinois Act's requirement is but a "prelude to gun confiscation" and risks exposing his personal information in the event of a data breach. [*Id.* at ¶ 103].

## II.    Legal Standard

Because the standard for granting a temporary restraining order and a preliminary injunction is the same, the Court proceeds under the familiar *Winter v. National Resources Defense Council, Incorporated* framework. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). As such, one is "never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To be awarded such relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

**SA36**

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20).

## III.    Analysis

### A.    Likelihood of Success on the Merits

To meet the likelihood of success on the merits prong, Herrera must show that his challenge has "some likelihood of success on the merits, not merely a better than negligible chance." *Doe*, 43 F.4th at 791 (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (cleaned up) (noting that showing a "better than negligible chance" or "a mere possibility of success" are both insufficient to demonstrate a likelihood of success on the merits sufficient for a preliminary injunction). This prong serves as "an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

Having considered the preliminary record at this stage, the Court concludes that Herrera is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The challenged restrictions on semiautomatic weapons and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with "the Nation's historical tradition of firearm regulation," namely the history and tradition of regulating particularly "dangerous" weapons. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

**SA37**

The Court does not consider this case in isolation. There are two other matters within this district that challenge the Illinois Act as well as similar city restrictions on the possession, carry, and sale of semiautomatic weapons and large-capacity magazines. *See Goldman v. City of Highland Park, Ill.*, No. 22-cv-4774 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Highland Park ordinance that restricts possession and purchase of certain semiautomatic rifles and large-capacity magazines); *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Naperville City ordinance that restricts sale of certain semiautomatic rifles and large-capacity magazines). Most recently, the *Bevis* Court denied a motion for preliminary injunction of the Illinois Act and a Naperville City ordinance, both restricting the sale of certain semiautomatic rifles and large-capacity magazines.[4] *See Bevis*, 2023 WL 2077392, at *3. This Court agrees with the *Bevis* Court's analysis and incorporates it into this order as applicable.

## 1.    Second Amendment History and Jurisprudence

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme

---

[4] After the *Bevis* Court denied the request for a temporary restraining order and preliminary injunction, plaintiffs appealed. *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 64. On appeal, the *Bevis* plaintiffs requested a stay of the Illinois Act during the pendency of their appeal. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF. No. 8. On April 18, 2023, the Seventh Circuit denied the request for a stay. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF No. 51. As such, this Court can rule on the pending motion for a temporary restraining order and preliminary injunction in the present case. [Dkt. No. 4].

**SA38**

Court first recognized the Second Amendment right to keep and bear arms for the purpose of self-defense. 554 U.S. 570, 628–29 (2008). In *Heller*, the Court confronted a challenge to a District of Columbia law that restricted handgun possession without a license and imposed a trigger-lock requirement, which rendered such firearms inoperable. *Id.* at 574–75. The Court ultimately struck down the law, finding that it violated the Second Amendment "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court emphasized that "self-defense" was a "central component" of the right. *Id.* at 599.

Notwithstanding the Court's central holding, the Court in *Heller* underscored that the Second Amendment right is not "unlimited." *Id.* at 626. Indeed, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court gave a few examples of limits on the Second Amendment right.  First, as set out in *United States v. Miller*, 307 U.S. 174, 178 (1939), the right does not extend to "weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Furthermore, laws related to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms" are all presumptively lawful, *id.* at 626–27.

Two years later, in *McDonald v. City of Chicago*, the Court incorporated this right against the states through the Fourteenth Amendment. 561 U.S. 742, 767

**SA39**

(2010). In that vein, the Court noted that "[f]rom the early days of the Republic, through the Reconstruction era, to the present day, States and municipalities . . . banned altogether the possession of especially dangerous weapons." *Id.* at 899–900. The Court remarked that "[t]his history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers." *Id.* at 900–01.

Thereafter, federal courts were left to formulate a test to determine whether a gun regulation was constitutional. *Bruen*, 142 S. Ct. at 2125. The Courts of Appeals generally adhered to a two-step test doing just that. *Id.*; *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). In 2022, however, the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen* rejected those efforts and set out a new framework for lower courts to evaluate gun laws. 142 S. Ct. at 2126–34; *see also United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023) (acknowledging that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rending our prior precedent obsolete" (cleaned up and internal citation omitted)). With that history in mind, as the *Bevis* Court succinctly explained, "*Bruen* is now the starting point" for this Court's analysis of a challenged gun regulation. *Bevis*, 2023 WL 2077392, at *9.

The *Bruen* Court outlined a two-step analysis to determine whether a challenged gun regulation is constitutional. *Bruen*, 142 S. Ct. at 2126–34. The Court must first determine whether "the Second Amendment's plain text covers an

**SA40**

individual's conduct." *Id.* at 2129–30. If the plain text does not cover the challenged regulation, then the regulation is outside of the Second Amendment's scope and is unprotected. *Id.* However, if the text does include such conduct, "the Constitution presumptively protects that conduct." *Id.* at 2130. As such, for the regulation to be upheld as constitutional, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To demonstrate that a regulation is "consistent with the Nation's historical tradition of firearm regulation," the government must engage in "analogical reasoning" by pointing to "a well-established and representative historical analogue." *Id.* at 2133 (emphasis removed). The government can utilize analogues from a range of historical periods, including English statutes from late 1600s, colonial-, Revolutionary- and Founding-era sources, and post-ratification practices, specifically from the late 18th and early 19th centuries. *Id.* at 2135–56; *Heller*, 554 U.S. at 605–626; *Rahimi*, 61 F.4th at 455–59. *Bruen* took special note that the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. The government's proposed analogue need not be "a historical twin" and the "modern-day regulation" need not be "a dead ringer for historical precursors" to "pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

Importantly, "*Bruen* does not displace the limiting examples provided in *Heller*." 2023 WL 2077392, at *9. As set out in *Heller*, states may still enact (1) "prohibitions on the possession of firearms by felons and the mentally ill"; (2) "laws

12

**SA41**

forbidding the carrying of firearms in sensitive places"; (3) "laws imposing conditions and qualifications on the commercial sale of arms"; and (4) bans on "dangerous" weapons that are not "in common use." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted). The list itself "does not purport to be exhaustive." *Id.* (quoting *Heller*, 554 U.S. at 626 n.26).

### 2.    Restrictions on Semiautomatic Rifles and Large-Capacity Magazines under the Challenged Laws

The Court holds that the restrictions on possession of certain semiautomatic rifles and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with the Nation's "history and tradition" of treating particularly "dangerous" weapons as unprotected. *Bruen*, 142 S. Ct. at 2130.

Because the Court ultimately agrees with *Bevis* and its conclusion, only a brief discussion of that opinion is necessary.[5] In *Bevis*, a Naperville gun shop owner and the National Association for Gun Rights ("NAGR") challenged a Naperville City ordinance and the Illinois Act's restrictions on sale of certain semiautomatic weapons and large-capacity magazines as unconstitutional under the Second Amendment. *Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court denied the plaintiffs' request for

---

[5]    While *Bevis* dealt principally with sale of restricted firearms, its analysis extends to gun possession, as is challenged in the present case. *See Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court principally concluded that "Naperville and Illinois lawfully exercised their authority to control the[] *possession*, transfer, sale, and manufacture [of certain semiautomatic weapons] by enacting a ban on commercial sales." *Id.* at *16 (emphasis added). The *Bevis* Court explicitly noted that while the parties only challenged laws as they applied to sales, nonetheless, "the state[] [has] general authority to regulate assault weapons because logically if a state can prohibit the weapons altogether, it can also control their sales." *Id.* at *9 n.8. Otherwise, "a right to own a weapon that can never be purchased would be meaningless." *Id.* (citing *Drummond v. Robinson Township*, 9 F.4th 217, 229 (3d Cir. 2021)). This Court agrees and applies *Bevis*'s analysis to the question of possession presented here.

**SA42**

a preliminary injunction, concluding that "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected" and thus, the plaintiffs were unlikely to succeed on the merits sufficient for a preliminary injunction. *Id.* at *9.

To reach this conclusion, the *Bevis* Court detailed the regulatory history of "Bowie kni[ves]," clubs, trap guns, and gun silencers. *Id.* at *10–14. The Court utilized over fifty examples, ranging from the Colonial Era to the early 20th century, showing a clear trend that when weapons became "prevalent," so too would "the laws governing the most dangerous of them." *Id.* at *10. The Court noted that as firearms proved more reliable, states similarly regulated them, including "gun silencers" and "semiautomatic weapons." *Id.* at *12. As to the latter, the Court noted that "semiautomatic weapons themselves, which assault weapons fall under, were directly controlled in the early 20th century." *Id.* From this body of evidence, the Court concluded that "[t]he history of firearm regulation . . . establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)."[6] *Id.* at *14–16.

In response to the Defendants' citation to similar statutes in this case, Herrera argues that his suit does not concern public carry, but rather defense of the home. [Dkt. No. 63 at 1]. This argument is unavailing. The Supreme Court was clear in its instruction that "analogical reasoning" is not a "regulatory straightjacket" and "even

---

[6]    The State Defendants in this case similarly point to the history of regulations regarding "concealable [firearms], Bowie knives, clubs, and, later, machine guns and semi-automatic weapons" and conclude that "[b]ecause the Act regulates 'dangerous and unusual weapons' for a purpose and in a manner relevantly similar to comparable historical regulations, it does not violate the Second Amendment." [Dkt. No. 52 at 42–43]. The County and City Defendants do the same. [Dkt. 54 at 36, 45–50; Dkt. No. 61-1 at 15–17].

if a modern-day regulation is not a dead ringer for historical precursors," the government's chosen analogue "may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133. While the government's analogue may not be identical, it need not be. *Id. Bruen* also expressly observed that "dramatic technological changes" or "unprecedented societal concerns" may require a "more nuanced approach." *Id.* at 2132.

Such an approach is applicable here. As the State Defendants put forth at oral argument, laws regulating weapons, including various firearms, developed over time in response to the type of harm that those weapons presented, as in the present case. Transcript of Oral Argument at 82–84, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73; *see also* [Dkt. No. 52 at 58 ("Throughout American history, when lawmakers have confronted new or escalating forms of societal violence, they have frequently responded by regulating the instruments of that violence in an effort to reduce it.")]. Here, the City Code, County Code, and Illinois Act similarly responded to "dramatic technological changes" and "unprecedented societal concerns" of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them. *Bruen*, 142 S. Ct. at 2132. This is well in line with earlier laws regulating carry and progressing to restrictions on sale and possession, in and out the home. [See Dkt. No. 52 at 60–63].

Having concluded that Defendants demonstrated a tradition of regulating "particularly dangerous weapons," *id.* at *9, the *Bevis* Court next considered "whether assault weapons and large-capacity magazines fall under this category" of "highly

15

**SA44**

dangerous arms (and related dangerous accessories)," and answered with a resounding yes. *Id.* at *14. The Court considered ample record evidence of the vastly destructive injuries that semiautomatic weapons cause and their "disproportionate[]" use in "mass shootings, police killings, and gang activity. *Id.* at *14–15. The Court observed that large-capacity magazines "share similar dangers," with studies showing that the use of such magazines lead to an increased number of fatalities in mass-shooting scenarios. *Id.* at *15 ("[R]esearchers examining almost thirty years of mass-shooting data [have] determined that high-capacity magazines resulted in a 62 percent higher death toll."). The Court rejected any argument that regulations on semiautomatic weapons and large-capacity magazines are not "unusual," given the ten-year federal ban on assault weapons and eight bans on semiautomatic weapons and large-capacity magazines in jurisdictions such as Illinois. *Id.* at *16. As such, the Court concluded that "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." *Id.*

This Court concurs with the *Bevis* analysis, including its analysis and conclusions regarding large-capacity magazines, and adopts it here. *See Bevis*, 2023 WL 2077392, at *14–16. Herrera is unlikely to be successful in his challenge to the semiautomatic weapons and large-capacity magazine restrictions in the City Code, County Code, and Illinois Act. *Doe*, 43 F.4th at 791.

**SA45**

### 3.    Registration Requirement Under the Illinois Act

The Court next turns to Herrera's challenge to the Illinois Act's registration requirement to determine his likelihood of success on the merits.

#### a)    Ripeness

Before doing so, the Court first concludes that the question is ripe for adjudication and Herrera has alleged sufficient imminent injury in a pre-enforcement challenge context. To establish Article III standing, the plaintiff must allege injury-in-fact traceable to the defendant and capable of being redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury alleged must be "concrete and particularized," as well as "actual or imminent," rather than "conjectural or hypothetical." *Id*. at 560.

"Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up). In evaluating ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id*. at 560. In the context of a pre-enforcement challenge, like the present case, ripeness and standing often plumb the same concept: "timing." *Id*.

When a plaintiff faces a realistic threat that a law will be enforced against him, "a party may advance a preenforcement challenge before suffering an injury—so long as the threatened enforcement is sufficiently imminent." *Sweeney*, 990 F.3d at 559 (internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573

**SA46**

U.S. 149, 159 (2014)). The plaintiff need not suffer "an actual arrest, prosecution, or other enforcement action," nor does the plaintiff need "to confess that he will in fact violate the law." *Driehaus*, 573 U.S. at 158, 163. Rather, a plaintiff may bring a pre-enforcement challenge where (1) he intends to perform conduct that is arguably constitutionally protected, (2) the conduct is prohibited by the rule or statute challenged, and (3) there is a credible threat of enforcement. *Id*. at 159.

These criteria are met in the present case. Herrera avers an intent to disobey any law that he perceives to be unconstitutional, like the Illinois Act's registration requirement. [Dkt. No. 63-3 at ¶ 18]. While the parties dispute whether the regulations are constitutional, failure to register in compliance with the Illinois Act at the very least implicates the Second Amendment and is "arguably constitutionally protected." See *Heller*, 554 U.S. at 635 (directing that the district court permit the plaintiff "to register his handgun" in compliance with District law). Finally, there seems to be a credible threat of enforcement, given that Herrera's "intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will not enforce the statute." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998); *see also* 720 ILCS 5/24-1(b) (stating that an individual who possesses a restricted firearm in violation of 720 ILCS 5/24-1(a)(15) commits a Class A misdemeanor, with second or subsequent violation classified as a Class 3 felony). As such, Herrera can advance his suit before suffering his alleged injury. To delay adjudication of these issues until the Illinois

**SA47**

Act's registration requirement is in effect would cause undue "hardship" to Herrera and as such, the issue is similarly ripe. *Sweeney*, 990 F.3d at 560.

> **b)    Analysis**

While Herrera can challenge the Illinois Act's registration requirement before its effective date, he is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The Court holds that the Illinois Act's registration requirement is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As discussed below, Defendants have put forth a "representative historical analogue" to demonstrate a tradition vindicating the Illinois Act's registration requirement. *Id.* at 1233; [Dkt. No. 52 at 40 n.24; Dkt. No. 52-14].

Pre-colonial evidence suggests that colonies required gun registration in a variety of ways. For instance, in 1631, Virginia implemented a "muster" requirement, necessitating inhabitants to annually account for their "arms and ammunition" to the "commanders" under which they served. [Dkt. No. 52-15 at 69]. As other district courts have similarly noted, American colonies in the 17th century had firearm owners register their guns through mandatory "muster" laws, taxes requiring identification of firearms, and as part of broader legislative programs regarding the sale, transfer, and taxation of firearms. See *United States v. Holton*, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (noting that multiple colonial governments required registration of arms through mandatory "muster" laws and taxes imposed from "as early as 1607 and well into the 1800s"); see also *United States v. Tita*, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (noting that "many of the colonies enacted

19

**SA48**

laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms," citing laws from 17th century New York, Virginia, and Connecticut). Indeed, the *Holton* Court relied on many of the same registration and taxation statutes as cited in this case to hold that 18 U.S.C. § 922(k), the statute prohibiting receipt of a firearm with the manufacturer's serial number obliterated or removed, "pass[ed] constitutional muster under *Bruen*." *Compare Holton*, 2022 WL 16701935, at *4–5 (cleaned up) *with* [Dkt. No. 52 at 40 n.24; Dkt. No. 52-15 at 69–71].

During the era of the Fourteenth Amendment's ratification, many state legislatures taxed firearms, which in essence required that firearms be identified and disclosed to the government. Mississippi required a "tax of two dollars on each dueling or pocket pistol" in 1848. [Dkt. No. 52-15 at 69]. In 1856, North Carolina similarly required that "every pistol, except such as are used exclusively for mustering" that was "used, worn or carried" be taxed. [*Id.*] This law was reenacted in a similar form the next congressional session. [*Id.*] Georgia, in 1866, enacted a similar tax, requiring "one dollar apiece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties," with the firearm owner required to render an "oath" of any such "gun, pistol, musket, or rifle." [*Id.* at 69–70]. Alabama did much the same a year later. [*Id.* at 70]. The state imposed a "tax of two dollars each" for "[a]ll pistols or revolvers in the possession of private persons," for which the taxpayer would receive "a special receipt" in order to prove payment. [*Id.*] The Court

20

finds that these historical regulations sufficiently analogous to the Illinois Act's registration requirement to satisfy *Bruen*. 142 S. Ct. at 2134.

Herrera complains that the statutes Defendants identify "mostly targeted certain kinds of pistols and arms like the Bowie knife," and "did not generally target rifles," such that they are not sufficiently analogous. [Dkt. No. 63 at 41]. Again, *Bruen* does not require a "historical twin." 142 S. Ct. at 2133. Rather, the inquiry is whether the modern statute and the historical regulations are sufficiently analogous. *Id*. ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

Late-19th and 20th century laws, while not themselves dispositive of a history or tradition of gun registration laws, can serve as "confirmation" of the same, as they do here. *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019); *see Heller*, 554 U.S. at 614, 621–25 (utilizing 19th and 20th century sources in its analysis); *see also Bruen*, 142 S. Ct. at 2154 n. 28 (noting that "late-19th-century evidence" and "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*" (emphasis added)). This sort of evidence confirms what the Court has already concluded: the registration requirement in the Illinois Act is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

A review of the legislation during this period shows a continuing tradition of state and national registration requirements. For example, starting in 1885, Illinois kept a "register of all such [deadly] weapons sold or given away" with various

**SA50**

identifying information, including the date of the sale or gift, the name and age of the

person to whom the weapon is sold or given, the price of the weapon, and the purpose

for which it is purchased or obtained." [Dkt. No. 52-15 at 70–71]. Failure to comply

with the register resulted in a fine. [*Id.*] In 1918, Montana required that any

individual who possessed a "fire arm" to register it with the local sheriff. [*Id.* at 71].

Indeed, as the Supreme Court in *United States v. Miller* noted, the National Firearms

Act of 1934 imposed registration requirements on owners of certain firearms,

imposing a fine for failure to do so. *See Miller*, 307 U.S. at 175, 175 n.1 (noting that

the National Firearms Act of 1934 required owners of grandfathered weapons to

register their weapons within 60 days by providing "the number or other mark

identifying such firearm, together with [the owner's] name, address, place where such

firearm is usually kept, and place of business or employment").

    *Bruen* itself suggests that the Illinois Act's registration requirement is

permissible. In concluding that there is no "historical tradition limiting public carry

only to those law-abiding citizens who demonstrate a special need for self-defense,"

*Bruen*, 142 S. Ct. at 2138, the *Bruen* Court took special note that "nothing in our

analysis should be interpreted to suggest the unconstitutionality" of existing "shall-

issue" licensing laws, *id.* at 2138 n.9. In so doing, the Court distinguished New York's

problematic statute from other shall-issue licensing regimes because the latter did

not require an "appraisal of facts, the exercise of judgment," or "the formation of an

opinion" on the part of the licensing official. *Id.*; *see also id.* at 2162 (Kavanaugh, J.,

concurring) (noting that "shall-issue regimes" are "constitutionally permissible," even

**SA51**

if they require an individual to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements").

Of course, licensing regimes and registration requirements are not the same thing, as each serves a different purpose. But the Illinois Act's registration requirement remains far less invasive than the presumptively constitutional regulations described in *Bruen*. The shall-issue licensing schemes discussed in *Bruen* involved a "background check" or the passage of a "firearms safety course," *Bruen*, 142 S. Ct. at 2138 n.9, which are *more* onerous than the relatively mechanical registration process required by the Illinois Act, *see* 720 ILCS 5/24-1.9(d). Nor does the Act permit state officials to have "open-ended discretion" to deny or allow a firearm to be registered. *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Rather, owners of semiautomatic rifles before the Act's effective date must provide the affiant's FOID number, report the make, model, caliber, and serial number of the weapon, and thereafter affirm that he or she lawfully owned the weapon before January 10, 2023.[7] *See* 720 ILCS 5/24-1.9(d).

Citing *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011), Herrera argues that the "fundamental problem with [the] gun registration law

---

[7]     FOID cards and concealed carry licenses are arguably even more intrusive than the Illinois Act's registration requirement. *See* 430 ILCS 65/4(a) (requiring an applicant's name, birth date, home address, driver's license information, and a color photograph for the issuance of a FOID card); *see also* 430 ILCS 66/10(a), 430 ILCS 66/25, 430 ILCS 66/35 (requiring an applicant's FOID license, background check, and completion of a firearms training program). Herrera has already applied and received both a FOID card and a concealed carry license. [Dkt. No. 1 at ¶¶ 5, 19, 23].

**SA52**

is that registration of lawfully possessed guns is not 'longstanding.'" [Dkt. No. 5 at 3, 27–28]. This argument is unpersuasive for at least two reasons. Herrera cites to then-Judge, now-Justice Kavanaugh's dissent in *Heller II* on remand. The opinion is not controlling, as both out-of-circuit caselaw and a dissenting opinion. *Heller II*, 670 F.3d at 1269–96 (Kavanaugh, J., dissenting). Second, the challenged registration requirement in *Heller II* is factually distinguishable from the present case. In *Heller II*, the District of Columbia required that an applicant provide his "name, address, and occupation," submit "for a ballistics identification procedure," appear in person to register (with a limit of one pistol allowed to be registered every thirty days), and renew each registration every three years with a renewed certificate of his compliance with the law. *Id.* at 1248. These are far afield from the requirements at issue here.

For these reasons, Defendants have put forth "representative historical analogue" to demonstrate a tradition of registration regulation in line with the registration requirement of the Illinois Act. *Bruen*, 142 S. Ct. at 2133. The registration requirement is "consistent with this Nation's historical tradition of firearm regulation" and therefore, likely constitutional. *Id.* at 2130. Accordingly, Herrera is unlikely to succeed on the merits of his claim and is not due the "extraordinary equitable remedy [of a preliminary injunction] that is available only when the movant shows clear need." *Turnell*, 796 F.3d at 661.

24

### B.    Irreparable Harm

While the Court need not address the remaining preliminary injunction factors, the Court additionally concludes that Herrera has not shown that he will suffer irreparable harm absent a preliminary injunction, *see Doe*, 43 F.4th at 791.

Harm is "irreparable" when "legal remedies are inadequate to cure it." *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate" does not denote that such remedies would be "wholly ineffectual," only that such a remedy would be "seriously deficient as compared to the harm suffered." *Id.* (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). In determining whether Herrera will suffer irreparable harm absent a preliminary injunction, the Court must weigh "how urgent the need for equitable relief really is." *U.S. Army Corps of Engineers*, 667 F.3d at 788.

Harm stemming from a constitutional violation can constitute irreparable harm. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). However, a presumption of irreparable harm is not applicable to all alleged constitutional violations. *Compare Int'l Ass'n of Fire Fighters, Loc. 365*, 56 F.4th at 450–51 ("Under Seventh Circuit law, irreparable harm is presumed in *First Amendment* cases.") (emphasis added); *and Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (describing that "[t]he loss of a *First Amendment right* is frequently presumed to cause irreparable harm") (emphasis added); *with Campbell v. Miller*, 373

25

**SA54**

F.3d 834, 835 (7th Cir. 2004) (rejecting plaintiff's argument that "money never is an adequate remedy for a constitutional wrong").

Herrera, much like the *Bevis* plaintiffs, cites *Ezell* for the proposition that there is a presumption of irreparable harm in all Second Amendment challenges. [Dkt No. 5 at 28; Dkt. No. 63 at 44]. The Court rejects this argument. *See Bevis*, 2023 WL 2077392, at *16. While the Seventh Circuit in *Ezell* likened the plaintiff's alleged Second Amendment harm to a First Amendment challenge, where harm can be presumed, the Seventh Circuit declined to create such a wide-ranging presumption for Second Amendment cases. *Ezell*, 651 F.3d at 699; *see also Bevis*, 2023 WL 2077392, at *16 (cleaned up) (observing that "the Seventh Circuit [in *Ezell*] stopped short of holding that injury in the Second Amendment context unquestionably constitutes irreparable harm," as stated in *Elrod*).

Apart from a presumption, Herrera alleges two sources of harm: (1) his inability to possess his AR-15 rifle, its corresponding standard large-capacity magazine, and additional large-capacity magazines for his Glock 45 impinges on his capacity to protect himself in his home, and (2) the commute time to retrieve his personal AR-15 rifle renders his monthly SWAT training a "practical impossibility." [Dkt. No. 1 at ¶¶ 31, 97–103; Dkt. No. 5-1 at ¶ 12]. The Court takes each argument in turn.[8]

---

[8]    The Court has its doubts about the time-sensitive nature of Herrera's emergency request for preliminary injunction, given his delayed challenge to the City and County Codes. Since 2006, Herrera has been prohibited from keeping his AR-15 rifle, its assorted components, and any large-capacity magazine for his Glock 45 or AR-15 rifle in his Chicago home. *See* Cook County, Ill., Code §§ 54-211, 54-212(a), (c)(2); Chi., Ill., Mun. Code

**SA55**

Herrera's alleged inability to protect himself in his home is unsupported by the record. Herrera does not dispute that he currently has two firearms in his home—a Glock 43x and Glock 45—that he can use for self-defense. [Dkt. No. 1 at ¶¶ 20, 23–24.] While Herrera prefers to use his standard seventeen-round magazine for his Glock 45 due to fear of it malfunctioning or jamming [Dkt. No. 5 at ¶ 5], he does not dispute that his firearm can accept a magazine of less than fifteen rounds to operate, [Dkt. No. 63-3 at ¶ 17]. Indeed, Herrera utilizes a ten-round magazine for his Glock 43x, which is compliant with city, county, and state law. [Dkt. No. 1 at ¶ 23]. Additionally, none of the challenged laws seek to take from Herrera his two AR-15 rifles or existing large-capacity magazines. He need only register such accoutrements and he may continue to keep them in his out-of-county storage location. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d). Herrera's contention that without "standard" magazines for his firearms, his weapons will "wear out" is unsupported by the record. [Dkt. No. 52-7 at ¶ 25 ("Despite the recent proliferation of large capacity magazines, it is important to note that there is no known firearm that requires a large-capacity magazine to function as designed.")].

---

§§ 8-20-010, 8-20-075, 8-20-085. He has been subject to a lengthy round-trip commute to retrieve his personal AR-15 rifle since he became a volunteer medic in 2018. [Dkt. No. 5-1 at ¶¶ 8, 10, 12]. Yet, Herrera did not request a preliminary injunction seeking to enjoin either law until 2023. [Dkt. No. 4]. Herrera says that he held off on challenging these laws before now because he understood that he would likely be denied such relief given Seventh Circuit law. [Dkt. No. 63-3 at ¶ 19]. He cites to no caselaw showing that his reasoning constitutes sufficient grounds to delay filing a challenge or that he was reasonably diligent in doing so. As a result, Herrera's apparent delay weighs against his request. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (noting that "a party requesting a preliminary injunction must generally show reasonable diligence" and the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request" for preliminary injunction).

**SA56**

Herrera's allegations regarding his training with the SWAT team are similarly undercut by record evidence. At the outset, Herrera expresses seemingly contradictory facts about his past and current efforts to bring his personal AR-15 rifle to SWAT team training. Herrera acknowledges that he has brought his personal AR-15 rifle to monthly trainings in the past but has now stopped. [*Compare* Dkt. No. 5-1 at ¶ 10 ("Similar to SWAT school, I have participated in those [SWAT] shooting drills in the past with my own AR-15.") *with* Dkt. No. 63-3 at ¶ 5 ("I can't feasibly bring my AR-15 to the training and participate in the weapons handling training or shooting drills with my other team members because I cannot keep that firearm and its standard magazines in my home.")].

Herrera's explanation for this change, in short, is that the drive is too long. But he alleges nothing in support of why the commute is *now* too long, as compared to his commute before. As the State Defendants noted at oral argument, for the past five years of training while only the City and County Codes were being enforced, Herrera faced no obstacle to bringing his personal AR-15 rifle with him, apart from the long commute. Transcript of Oral Argument at 53–54, 84–85, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73. Even under the current state law, assuming that Herrera is completing SWAT training at a licensed firing range, he is expressly allowed to do so. *See* 720 ILCS 5/24-1.9(d) (allowing for "use of the assault weapon . . . at a properly licensed firing range"); 720 ILCS 5/24-1.10(d) (allowing for the "use of the large capacity ammunition feeding device at a properly licensed firing range").

**SA57**

That aside, Herrera's allegations are speculative. While the requirement of access to "[r]ange training" lies "close to the core of the individual right of armed defense," *Ezell*, 846 F.3d at 893, Herrera's allegations regarding SWAT training seem to place him outside of the scope of that right. Herrera does not carry a firearm during SWAT missions. [Dkt. No. 1 at ¶ 28]. As a volunteer medic, Herrera is tasked with "provid[ing] medical care to the operators on my team, any injured perpetrators, or injured bystanders," not shooting a weapon offensively or defensively. [Dkt. No. 5-1 at ¶ 8]. Herrera's harm is predicated on the contingency that he might need to "act if a SWAT officer is not immediately present to assist with an injured officer or armed suspect." [Dkt. No. 63-3 at ¶ 7]. In essence, Herrera's allegations amount to speculation about what he might need to do, not about harm he is "*likely* to suffer . . . in the absence of preliminary relief." *See Winter*, 555 U.S. at 20 (emphasis added).

Herrera argues that his inability to "adequately train for SWAT duties . . . flies in the face of textbook standards of tactical medicine." [Dkt. No. 63 at 46]. Yet, the authority Herrera cites in support requires that any training volunteer medics receive should be "mutually agree[d] upon" with "the involved agencies" and "local law enforcement." [Dkt. No. 63-3 at 13]. The local agencies in the present case, however, contend that as a medic, Herrera "should not have any reason to handle an injured operator's AR-15 while rendering medical aid." [Dkt. No. 52-15 at ¶ 10]. Volunteer SWAT medics, like Herrera, are affirmatively not trained in deadly force protocols, given weapons, or put in a position that requires the use of deadly force. [*Id.* at 2-3]. Indeed, "the training that is most valuable for a civilian medic is not . . .

29

**SA58**

shooting drills, but rather being trained and knowledgeable about tactical medicine, including how to quickly remove a SWAT team member's uniform and equipment to render medical aid." [*Id.* at ¶ 11 (internal quotation marks omitted)].

Given this record and the early stage of this case, the Court cannot conclude that the alleged harm is "anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022). For these reasons, Herrera has additionally failed to demonstrate a "clear need" for the "extraordinary equitable remedy [of preliminary injunction]." *Turnell*, 796 F.3d at 661.

### C.    Public Interest and Balance of the Equities

Finally, while not required given the Court's above conclusions, *see Turnell*, 796 F.3d at 662, the Court concludes that neither the public interest nor the equities favor Herrera's claim, *see Doe*, 43 F.4th at 791. *See also Nken v. Holder*, 556 U.S. 418, 435 (holding that the public interest and balance of the equities are considered together when the government is the party opposing injunctive relief). To balance the equities, the Court weighs "the degree of harm the nonmoving party would suffer if the injunction is granted against the degree of harm to the moving party if the injunction is denied." *Troogstad v. City of Chicago*, 576 F. Supp. 3d 578, 590 (citing *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021)). The analysis also gauges the public interest, or "the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971

**SA59**

F.2d 6, 11 (7th Cir. 1992)); *see id* (defining the public interest as the "interests of people and institutions that are not parties to the case").

This Court, like the *Bevis* Court, finds that the challenged laws "protect public safety by removing particularly dangerous weapons from circulation" which would be "injured by the grant of injunctive relief." *Bevis*, 2023 WL 2077392, at *17 (quoting *Metalcraft of Mayville, Inc. v. The Toro Comp.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017)). By contrast, Herrera seeks to prevent harm flowing from the enforcement of what he maintains is an unconstitutional law—an interest that is comparably weak given the conclusions above. [Dkt. No. 5 at 28–29]. None of the harms he identifies outweigh the overwhelming interest in public safety. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) (observing that it is the "primary concern of every government" to protect "the safety and indeed the lives of its citizens"). In sum, he has failed to show a "clear need" for the extraordinary remedy he seeks. *Turnell*, 796 F.3d at 661.

## XIV.  Conclusion

For these reasons, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

Enter: 23-cv-532

Date:  April 25, 2023

_____
Lindsay C. Jenkins
United States District Judge

31

**SA60**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 5, 2023, I electronically filed the foregoing Opening Brief of the State Parties and Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov