No. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JAVIER HERRERA,

Plaintiff-Appellant,

v.

KWAME RAOUL, et al.

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 23-cv-00532
The Honorable Lindsay C. Jenkins, Judge Presiding

————

**OPENING BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLEES COOK COUNTY, TONI PRECKWINKLE, KIMBERLY M. FOXX, AND THOMAS J. DART**

————

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603.6934
Jessica.Scheller@cookcountyil.gov

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Division Chief, Civil Actions Bureau
JONATHON D. BYRER
PRATHIMA YEDDANAPUDI
MEGAN HONINGFORD
EDWARD M. BRENER
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF POINTS AND AUTHORITIES .................................................ii

JURISDICTIONAL STATEMENT ..............................................................1

ISSUES PRESENTED...................................................................................2

STATEMENT OF THE CASE.......................................................................2

    A. Common Use of Regulated Weapons .................................................4

    B. History of the Regulated Weapons .....................................................6

    C. The Comparative Performance Capacity of the Regulated Weapons.................6

    D. The Unreasonable Danger Posed by High-Performance Capacity Weapons .....8

    E. The Regulated Weapons are Not Common ......................................10

    F. The Regulated Weapons Present a Clear and Present Danger to Our Way of Life................................................................................11

    G. The Regulated Weapons Pose a Threat to Law Enforcement............12

SUMMARY OF ARGUMENT ....................................................................13

ARGUMENT ..............................................................................................14

I.    **Herrera is Not Likely to Succeed on the Merits of his Second Amendment Claim**................................................................15

    A. Assault Weapons and Large-Capacity Magazines are Not "Arms" For Purposes of the Second Amendment................................16

        1. Neither assault weapons nor large-capacity magazines are commonly used for lawful purposes .....................................18

        2. Assault weapons and large-capacity magazines are unusually "dangerous".........24

II.    **Bans on Assault Weapons and Large-Capacity Magazines Are Compatible With This Nation's History and Traditions**.................................29

A.  Gunpowder Regulations Demonstrate A Longstanding Tradition of Regulating Weapons Responsible for Mass Casualty Events ............................................31

B.  Regulations on Assault Weapons and Large-Capacity Magazines Are Constitutional Under *Bruen's* Nuanced Approach ........................................38

C.  Weapons in Common Use for Criminal Purposes May Be Regulated ...........................44

D.  Herrera's View of History is Wrong..................................................................45

III.     ***Bruen*** **Does Not Abrogate This Court's Decisions in** ***Friedman*** **and Wilson**................................................................48

CONCLUSION  ........................................................................................................49

CERTIFICATE OF COMPLIANCE ........................................................................ vii

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                    <u>Pages</u>

*Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592 (1982) ........................................41

*Andrews v. State*, 50 Tenn. 165 (1871).............................................................................44

*Anonymous*, 12 Mod. 342 (King's Bench)........................................................................33

*Aymette v. State*, 21 Tenn. 154 (1840).......................................................................42, 44

*Caetano v. Massachusetts*, 577 U.S. 411–412 (2016) ....................................................17

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) .....................................................14, 15

*Cheatham v. Shearon*, 31 Tenn. 213 (1851) ....................................................................34

*Davies Warehouse Co. v. Bowles*, 321 U.S. 144 (1944)..................................................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................... 16, passim

*Doe v. Univ. of S. Ind.,* 43 F.4th 784 (7th Cir. 2022).......................................................15

*Dominus Rex v. Taylor*, 2 Str. 1167 (King's Bench) ......................................................33

*English v. State*, 35 Tex. 473 (1872)................................................................................43

*Fife v. State*, 31 Ark. 455 (1876) .....................................................................................44

*Firestone Financial Corp. v. Meyer*, 796 F.3d 822 (7th Cir. 2015) ...............................37

*Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554 (N.D. Ill. Mar. 19, 1993) .......22

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ................................ 17, passim

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019)......................15

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ..................................................................................14, 15

*Harman v. Gordon*, 712 F.3d 1044 (7th Cir. 2013).........................................................37

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972).........................................................41

*Hill v. State*, 1874 Ga. LEXIS 509 (1874).......................................................................42

*In re Search*, 245 F.3d 978 (7th Cir. 2001) ................................................................15

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) .....................31

*Late Corp. of Church of Jesus Christ v. United States*, 136 U.S. 1 (1890) ..................41

*Lee v. Ne. Ill. Reg'l Commuter R.R.*, 912 F.3d 1049 (7th Cir. 2019) ............................37

*Lukaszczyk v. Cook County*, 47 F.4th 587 (7th Cir. 2022) .......................................14, 15

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).......... 15, passim

*O'Neill v. State*, 16 Ala. 65 (1849) ...............................................................................25

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910 (7th Cir. 2012)....................37

*People v. Morgan*, 719 N.E.2d 681 (Ill. 1999) ..............................................................22

*People v. Murillo*, 587 N.E. 2d 1199 (1st Dist. 1992) ...................................................23

*People v. Nunn*, 541 N.E.2d 182 (Ill. App. 1989)..........................................................23

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020) ....................................................................24

*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) ..........................................................21

*Simpson v. State*, 1833 Tenn. LEXIS 186 (1833) ..........................................................24

*South Carolina v. United States*, 199 U.S. 437 (1905)..................................................39

*Staples v. United States*, 511 U.S. 600 (1994) ..............................................................21

*State v. Duke*, 42 Tex. 455 (1874) .................................................................................40

*State v. Huntly*, 25 N.C. 418 (1843)            ............................................................41

*State v. Langford*, 10 N.C. 381 (1824)...........................................................................25

*State v. Lanier*, 71 N.C. 288 (1874) ..............................................................................24

*State v. Wells*, 1 N.J.L. 486 (N.J. 1790) ........................................................................22

*Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940 (2023) .............................37

*United States v. Miller*, 307 U.S. 174 (1939).................................................................17

*United States v. White*, 879 F.3d 1509 (7th Cir. 1989) .................................................37

*Wilson v. Cook Cty.*, 937 F.3d 1028 (7th Cir. 2019) ................................................48

*Wilson v. State*, 33 Ark. 557 (1878) ..........................................................................45, 47

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) .........................................................41

Statutes and Ordinances

18 U.S.C. § 921 .............................................................................................................3

18 U.S.C. § 922 .............................................................................................................3

720 ILCS 5/24-1-1.5 ...................................................................................................24

720 ILCS 5/24-1.2 .......................................................................................................24

720 ILCS 5/47-5(7) ......................................................................................................34

*An Act to Incorporate the City of Key West*, ch. 58, § 8, 1838 Fla. Laws 70 .............33

Cook County Ordinance No. 93-O-37 ...........................................................................3

Cook County Ordinance No. 06-O-50 ...........................................................................4

Cook County Ordinance No. 07-O-36 ...........................................................................4

Other Authorities

Blackstone, William, *Commentaries On The Laws Of England*, 148 (1769) .............17, 21, 22, 40

Cornell, Saul & DeDino, Nathaniel, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–12 (2004) ...................................................33-34

Chitty, J., PREROGATIVES OF THE CROWN 155 (1820) ....................................................41

Haynes, Alan, *The Gunpowder Plot* (History Press 1994) ...........................................32

Heyman, Steven J., *The First Duty of Government: Protection, Liberty, & the Fourteenth Amendment*, 41 DUKE L.J. 507, 512–24 (1992)...................................................41

Jones, J.W., *A Translation Of All The Greek, Latin, Italian & French Quotations Which Appear In Blackstone's Commentaries* 116 (T. & J.W. Johnson & Co. 1889) .................22

Keble, Joseph, *An Assistance to the Justices of the Peace, for the Easier Performance of their Duty* 147 (1689) ...................................................................................................41

Lambarde, William, *Eirenarcha* 134 (1579) ...............................................................41

Nourse, V.F., *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235 (2001).................................40

Novak, William J., *The People's Welfare:  Law & Regulation In Nineteenth-Century America* 63 (U.N.C. Press 2000) .......................................................33

Wood, H.G., *A Practical Treatise On The Law Of Nuisances* 142 § 142 (1875).........................33

WEBSTER'S II NEW COLLEGE DICTIONARY 226 (2001) ...............................................18

## JURISDICTIONAL STATEMENT

———————

On January 27, 2023, plaintiff-appellant Javier Herrera filed this suit in the district court, alleging violations of his Second Amendment rights pursuant to 42 U.S.C. § 1983. R. 1.[1] The district court had jurisdiction over that claim pursuant to 28 U.S.C. § 1331.

On April 25, 2023, the district court denied Herrera's motion for a preliminary injunction. R. 75. Herrera filed his notice of appeal from that decision on April 26, 2023. R. 77. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).

Plaintiffs-appellees Jeremy Langley; Timothy Jones; Matthew Wilson; Dane Harrel; C4 Gun Store, LLC; Marengo Guns, Inc.; Illinois State Rifle Association; Firearms Policy Coalition, Inc.; Second Amendment Foundation; Caleb Barnett; Brian Norman; Hood's Guns & More; Pro Gun & Indoor Range; National Shooting Sports Foundation, Inc.; Federal Firearms Licensees of Illinois; Guns Save Life; Gun Owners of America; Gun Owners Foundation; Piasa Armory; Debra Clark; Jasmine Young; and Chris Moore also filed suit under 42 U.S.C. § 1983, alleging violations of their Second Amendment and Fourteenth Amendment rights. Barnett R. 1; Harrel R. 1; Langley R. 1; and FFLI R. 1. The district court had jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

———————

[1] We cite the district court record as "R.___," the appendix to this brief as "A___" and the separate appendix as "SA___."

On April 28, 2023, the district court granted these plaintiffs' motions for preliminary injunction.  Barnett R. 104.  The State filed a notice of appeal from that order the same day.  Barnett R. 104; Harrel R. 47; Langley R. 38; FFLI R. 46.  This court has jurisdiction over these appeals pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.      Whether assault weapons and large-capacity magazines are "arms" within the text of the Second Amendment, where Herrera has failed to carry his burden to show that they are modern weapons that facilitate armed self-defense.

2.      Whether, assault weapons and large-capacity magazines are "arms" within the text of the Second Amendment where Herrera has failed to carry his burden to show that they are commonly used – rather than merely owned or possessed – for a lawful purpose and are not dangerous and unusual.

3.      Whether, even assuming that assault weapons and large-capacity magazines are "arms," the County's ordinance prohibiting their ownership is consistent with this nation's history and traditions, where it is undisputed that the government has traditionally banned or strictly limited possession of weapons regularly used by individuals to rapidly inflict mass casualties.

## STATEMENT OF THE CASE

The County adopts the recitation of procedural history offered by the State of Illinois and the City of Chicago in their respective briefs.

For three decades, Cook County has had various ordinances in place banning the possession of assault weapons. Beginning in 1993, the Cook County Board of Commissioners enacted the Cook County Firearms Dealer's License and Assault Weapons and Ammunition Ban Ordinance (Cook County Ordinance No. 93-O-37 (approved Jan. 1, 1994)). The law prohibited the sale, transfer, acquisition, ownership, or possession of "assault weapons," defined by a specific list of 60 rifles and pistols designated by model name or type. The commissioners specifically noted in the prefatory clause of the ordinance that: (1) easy access to firearms and ammunition had become a concern of public health, safety and welfare for the citizens of Cook County; (2) assault weapons were 20 times more likely to be used in the commission of a crime than other kinds of weapons; and (3) there was no legitimate sporting purpose for the military style assault weapons being used on the streets.

Shortly thereafter, in 1994, after a series of hearings on the subject of semiautomatic assault weapons over a five-year period, Congress enacted the Violent Crime Control and Law Enforcement Act, Pub. L. 103-322, 108 Stat. 1796 (codified at 18 U.S.C. §§ 921, 922 (1994)), including a ban on the possession of "semiautomatic assault weapons" and "large capacity ammunition feeding devices" not lawfully possessed as of the date of the enactment. 18 U.S.C. §§ 921(a)(30), (a)(31), 922(v), (w) (1994). The Act was written to expire 10 years after its enactment, and due to a lack of further congressional action, the law expired in 2004.

In 2006, the County sought to fill the void left by the expiration of the federal assault weapons ban by amending the 1993 ordinance. Currently, the ordinance expands the definition of assault weapon by imposing a characteristic-based test and by including a non-exhaustive list of various prohibited models and copies or duplicates thereof. Cook County Ordinance No. 06-O-50 (approved Nov. 14, 2006). The ordinance also prohibits the possession of large-capacity magazines with the capacity to accept more than 10 rounds of ammunition. *Id.* Under its provisions, a person who prior to the enactment lawfully possessed assault weapons or large-capacity magazines had 90 days from the effective date to surrender the weapons to the sheriff, to remove the weapons from the county, or to modify the weapons to render them inoperable or no longer defined as an assault weapon. *Id.* Violation of the ordinance is punishable by imprisonment for not more than six months and by a fine between $500 and $1,000. *Id.* In 2007, the ordinance was renamed the Blair Holt Assault Weapons Ban. Cook County Ordinance No. 07-O-36 (approved June 19, 2007).

*Common Use of the Regulated Weapons*

Mass shootings in America are occurring at an accelerating pace, R. 60-3, at 9-10, and are disproportionately being perpetrated by individuals armed with assault rifles, weapons equipped with large-capacity magazines, or both. *Id.* at ¶ 13. Assault weapons like the AR-15 design are the weapon of choice in 85 percent of the deadliest mass shootings in the United States. R. 60-9 at ¶ 37. Weapons equipped with large-capacity magazines are used disproportionately in mass shootings. R. 60-

4

4 at ¶ 122. Over the past eight years, 97% of high-fatality mass shootings involved large-capacity magazines. R. 60-3 at 8-9. Since 1991, when large-capacity magazines are used in a high-fatality mass shooting but not in conjunction with an assault rifle, the average death toll is 9.2 fatalities. R. 60-3 at 15. When used in conjunction with an assault rifle, the average death toll increases to 14 fatalities. *Id.* Large-capacity magazines are "force multipliers" and the increase in death toll from high-fatality mass shootings is in part due to the use of large-capacity magazines. *Id.* at 15, 20.

Assault weapons and large-capacity magazines are not often used in defense of self or home –other firearms like a pump action shotgun or eight-shot revolver are more suitable for such purposes because they have a low probability of overpenetration and greater ease of use. R. 60-5 at 28. Assault weapons and large-capacity magazines offer so much firepower that they become a danger themselves in home defense or retail robbery situations, which are rarely lengthy shootouts that would demand use of a large-capacity magazine and are events which are most likely to occur at close range, not from hundreds of yards away. R. 60-5 at 28-29; R. 60-9 at ¶ 59.

Assault rifles and large-capacity magazines figure so prominently in American mass shootings and not in lawful uses because the weapons regulated by the ordinance are weapons of war, R. 60-5 at 65, 69; R. 60-9 at ¶ 25, methodically designed to quickly maximize casualties on a battlefield. R. 60-9 at ¶25, 27. Assault rifles have been marketed and sold to private citizens with little meaningful

thought given to their shockingly overpowered nature amongst the civilian population., R. 60-4, at ⁋ 96, 101; R. 60-9, at ⁋ 35. Assault weapons equipped with large-capacity magazines are too overpowered to be useful for hunting or self-defense. R. 60-5, at 65, 76-77. They fire too fast, too far, and too frequently, and present too great a danger to third parties. Instead, these weapons are useful for the purpose for which they were designed: providing rapid and indiscriminate cover fire in the military. R. 60-5, at 69-70; R. 60-3, at ⁋ 13-14.

*History of the Regulated Weapons*

In 1957, the United States Army invited Armalite, a firearms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semiautomatic and fully automatic modes with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. R. 60-4, at ¶¶ 44, 103. Eugene Stoner of Armalite devised the AR-15 to meet these specifications. *Id.* ¶ 103. In December of 1963 the Army adopted the AR-15 and rebranded it the "M-16" *Id.* at ¶ 106; R. 60-5 at 61-62. The semiautomatic AR-15 rifle currently available to civilians retains the same performance characteristics in terms of muzzle velocity, range, and type of ammunition as does the M-16 and its variants. *Id.* at 61-64, 69; R. 60-12 at 6-7; R. 60-4 at ¶ 107.

*The Comparative Performance Capacity of the Regulated Weapons*

The weapons regulated under the ordinance carry the same destructive capacity as those developed for use in war-time offensives by the United States Military. R. 60-5 at 59-63, 67, 69, 77; R. 60-4 at ⁋ 106-107. As illustrated by the

table below, R. 60-5 at 46, there is not a meaningful difference between the military-grade M-16 and the civilian AR-15, but there is a significant difference between military weapons and handguns.

| Weapon | Ammunition | Kinetic Energy | Muzzle Velocity | Effective Range | Semiautomatic Cyclic Rate |
|---|---|---|---|---|---|
| M-16 / AR-15 Rifle | .223 / 5.56mm | 1220-1350 foot pounds | 2800-3100 feet per second | 602-875 yards | 300 rounds per minute |
| AK-47 / AK 74 Rifle | 7.62x39mm | 1450-1650 foot pounds | 2300-2600 feet per second | 550-800 yards | 300 rounds per minute |
| FN-FAL Rifle | 7.62x51mm | 2350-2550 foot pounds | 2800-3000 feet per second | 575-800 yards | 300 rounds per minute |
| Glock Model 17 Pistol | 9x19mm | 355-500 foot pounds | 1100-1300 feet per second | 50 yards maximum | 300-400 rounds per minute |
| Colt M1911 Pistol | .45 ACP | 350-375 foot pounds | 775-850 feet per second | 50 yards maximum | 300-400 rounds per minute |
| Walther PPK Pistol | .380/ 9mm Kurz | 300-500 foot pounds | 900-1100 feet per second | 50 yards maximum | 300-400 rounds per minute |

The performance characteristics illustrated above all contribute to their uncommon lethality as compared to handguns. R. 60-12 at 7. Assault rifle rounds travel two to nearly three times as fast. R. 60-5 at 46. The M-16/AR-15 is effective at striking targets nearly nine football fields away, a distance 17.5 times further than the Glock model 17. *Id.* Assault rifle rounds strike their targets with kinetic energy that is many multiples greater than the energy from a handgun round. *Id.* Large-capacity magazines are similarly military hardware, and their development was not intended for the civilian market. R. 60-5, at 74-75. Assault weapons present a high risk of overpenetration, meaning they can shoot far beyond the intended target. *Id.* at 77-79. They can shoot through concrete blocks at a distance of 20-40 yards, 3/8 inch steel plating at a distance of 300 yards, and Level III police body armor at a distance of 7 yards. *Id.* at 79. This concern contributed to the delay in neutralizing

the shooter and prevented the rescue of the victims of the Uvalde shooting on May 24, 2022. *FRONTLINE: AFTER UVALDE Guns, Grief & Texas Politics*, May 30, 2023 PBS,  https://tinyurl.com/UvaldeFrontline (last accessed June 5, 2023) (advance video to 15:43) ("[The responding police officers] are well aware that these types of rounds, because of their high velocity, will penetrate their normal body armor.").

*The Unreasonable Danger Posed by High-Performance Capacity Weapons*

The performance characteristics of assault weapons are not merely slight advantages or impressive features for gun afficionados – they translate into more gruesome injuries and more inevitable death. A weapon's killing capacity is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. R. 60-12 at 2–3. The ammunition often used in civilian AR-15s, the 5.56mm/.223 caliber cartridge, was adopted by the U.S. military for use in its assault weapons specifically because of its light weight and ability to deliver reliable lethality. R.60-5 at 15. The extra-lethal characteristics of this type of weapon and ammunition were immediately evident in Vietnam, where an Army report noted that the AR-15 left, for example, a back wound that "caused the thoracic cavity to explode;" and a "heel wound" where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip," both of which resulted in "instantaneous" death. SA15-18. This is partly due to the sheer velocity with which an assault weapon expels its ammunition and the yaw effect experienced by a bullet from a semiautomatic-rifle, in which the

bullet tumbles end over end when it hits human tissue, sending a wave of kinetic energy out radially from what will become the permanent wound cavity. R. 60-5 at 16-17.

Indeed, the temporary cavity created in the human body by the 5.56mm caliber cartridge is over three times the size of the temporary cavity created by the .45 caliber bullet from the Thompson Machine gun. R. 60-11 at ¶¶ 11,12. In the words of the trauma surgeon and Navy captain, Dr. Peter Rhee, who treated Representative Gabby Giffords after she was shot, "A handgun [wound] is simply stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can." R. 60-4 at ¶ 109.

This means the physical impact of ammunition shot from an assault weapon on human tissue is vastly different than the impact from a handgun and leads to greater fatality and injury. R. 60-5 at 64-65; R. 60-11 at ¶¶ 14–15; R. 60-12 at 6; R. 60-10 at 6. Bullets from semiautomatic AR-15 style rifles are more likely to fracture bones simply due to their higher energy release. R. 60-11 at ¶ 14. Assault rifle blasts to the extremities frequently result in amputations, even where an injury to the same body part caused by a handgun would be treatable. R. 60-10 at 6. Similarly, if a handgun injury requires surgery, typically only one surgery is needed, but patients with assault weapon injuries frequently require a series of operations and massive blood transfusions because often their major blood vessels and multiple organs are injured. R. 60-12 at 2. These injuries are even more deadly for children. R. 60-11 at 15. This fact is borne out in Dr. Roy Guerrero's, the

responding pediatrician in Uvalde, Texas, recollection of May 24, 2022: he arrived at the hospital to find "children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart, that the only clue as to their identities was blood-spattered cartoon clothes still clinging to them []." R. 60-1, at 7.

In combat, the ability to fire continuously without reloading contributes to a weapon's lethality and effectiveness. R. 60-5, at 75. In a civilian's hands, these features contribute to mass and indiscriminate shootings. *Id.* The continuous fire enabled by large-capacity magazines make it more difficult for victims or bystanders to defend themselves by reducing the opportunities they may have to disarm a gunman, escape, or call for help. R. 60-4 at ¶ 139-141. Assault rifles and weapons augmented with large-capacity magazines are not effective for and thus not "used" for self-defense or hunting. R. 60-5 at 75-76. By contrast, assault rifles and large-capacity magazines are extremely effective at -- and often used for -- mass murder. R. 60-3 at 9-10. These are the weapons that Herrera insists he must be allowed to own, carry, and use.

*The Regulated Weapons are Not Common*

Although their presence may loom large because of their use in mass shootings and their purposeful marketing as tools of battle-readiness, R. 60-4 at 90-102, assault weapons and large-capacity magazines are far from common among Americans. Assault weapons are not even common among American gun owners. Seventy percent of Americans do not own any firearm at all, let alone an assault weapon or a large-capacity magazine. R. 60-4 at 21. Of all the firearms in America,

10

only 5.3% are assault rifles, and that percentage includes the assault rifles held by law enforcement agencies. R. 60-3 at 11. An even smaller proportion are held by civilians, and those are concentrated among a smaller subgroup of firearms owners who typically own more than one assault weapon. R. 60-4 at 92.

*The Regulated Weapons Present a Clear and Present Danger to Our Way of Life*

Violence carried out with assault weapons has a far-reaching impact on the community that far outpaces the weapons' prevalence. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. R. 60-4 at ¶ 58. One study found that as many as 95% of mass shooting survivors develop PTSD in its aftermath. R. 60-13 at 14. The events lead to significant increases in rates of post-traumatic stress disorder not just for direct witnesses but also for the members of the broader community who do not witness the event first-hand. R. 60-4 at ¶¶ 60-62. Not surprisingly, many adults and young people identify the possibility of being involved in a mass shooting as a source of stress and fear. R. 60-13 at 15. Even mass shooters are affected by mass shooters. The use of assault weapons in these shootings has created an attractive template that is repeated by shooters over and again. They seek to establish their masculinity or avenge perceived wrongs and mimic one another by choosing the same assault weapons and tactics to carry out their massacres. R. 60-4 at 100-101; R. 60-9 at 30; R. 60-13 at 13.

The fear instilled by the mass shootings that are overwhelmingly committed with assault weapons leads to a chilling effect on the exercise of constitutional

rights. People are less likely to attend a protest or vocalize their views at a protest if they expect individuals carrying firearms to be present. R. 60-15 at 8-13. Campus instructors report a similar chilling effect of speech based on a perceived threat of aggression from the prospect of armed students. *Id* at 9. Regular citizens are asked to forego their free association as an effort to help police manage large scale events. SA14 at ¶26. As assault weapons and large-capacity magazines continue to be used in public mass shootings, their impact inevitably intrudes on more aspects of daily American life.

### *The Regulated Weapons Pose a Threat to Law Enforcement*

This concern is echoed by of law enforcement. The Chicago Police Department adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings. SA14 at ¶25. In anticipation of active shooter situations, the Chicago Police Department and other law enforcement agencies diverts scarce resources to the acquisition of specialized equipment and the planning and deployment of militarized tactics in order to overtake even a single shooter with an assault weapon. R. 60-16; SA14 at ¶25-27. These extreme tactics cause even further disruption and destruction to the community. *Id*. During the mass shooting at Pulse Nightclub in Orlando, for example, officers had to use an armed personnel carrier to breach the wall after learning the solitary shooter had an assault rifle. R. 60-16 at 13, 24. In Chicago, the police have asked residents of the buildings surrounding Lollapalooza to stay off their rooftops so the Chicago Police Department can more readily identify a potential shooter. SA14 at ¶26-27.

Officers themselves face an increased and unreasonable threat from assault weapons in civilian hands. Assault weapons are capable of discharging ammunition at such a velocity that it will pierce all standard issue body armor approved for use by officers in the Chicago Police Department. SA11 at ¶17. Even if an officer is wearing body armor capable of stopping a round fired by an assault weapon, the impact can cause significant bodily trauma due to the velocity of the ammunition. *Id*. ¶21. Larry Snelling, Chief of the Bureau of Counterterrorism of the Chicago Police Department, has witnessed a significant increase in the use of assault weapons, particularly by those involved in organized crime, over the past several years. SA9 at ¶11, SA11 at ¶17. They are the weapon of choice for mass shootings in public spaces, allowing a person to kill or injure as many people as possible in as short a time as possible. *Id*. ¶24.

## SUMMARY OF ARGUMENT

_____

The district court properly denied Herrera's request for injunctive relief here. Herrera has failed to carry his burden to show that the County's Ordinance regulates "arms" within the meaning of the Second Amendment, because he has failed to show that those arms facilitate armed self-defense and are commonly used for lawful purposes.  But even assuming that assault weapons or large-capacity magazines constitute Second Amendment "arms," the County has met its burden to show that its ordinance is compatible with this nation's history and traditions – specifically, it is analogous to the longstanding regulations on gunpowder enacted in England centuries ago.  The County's ordinance and gunpowder regulations were

13

enacted to address similar problems – the rapid infliction of mass casualties at the hands of lone individuals – and have only a minimal effect on an individual's ability to engage in armed self-defense.  And to the extent that Herrera denies that gunpowder regulations are analogous, that only demonstrates that the societal problem posed by assault weapons and large-capacity magazines is truly unprecedented, requiring application of a more nuanced approach to the constitutional analysis, which focuses on bedrock English common law principles rather than analogies to nonexistent problems.  The County's ordinance survives under that approach as well, as it is entirely compatible with English common law.

## ARGUMENT

_____

The County offers their arguments in this brief regarding the merits of the Plaintiffs' case to present an alternative basis for affirming the judgment in *Herrera* below. The County adopts the arguments of the State of Illinois and the City of Chicago offered in their briefs regarding the remaining preliminary injunction factors.

"A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Lukaszczyk v. Cook County*, 47 F.4th 587,598 (7th Cir. 2022)(quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021))( quotation marks omitted). A plaintiff is entitled to such relief only upon making a "threshold" showing that: (1) it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl*

*Scouts of the United States of America Inc.*, 549 F.3d 1079,1085 (7th Cir. 2008). If the plaintiffs fail to establish their likelihood of success on the merits, the court need not address the remaining preliminary injunction elements. *Doe v. Univ. of S. Ind.,* 43 F.4th 784, 791 (7th Cir. 2022). After a hearing, the district court denied Herrera's petition for a preliminary injunction in this case, concluding that Herrera was unlikely to succeed on the merits of his claim and not due the extraordinary equitable remedy of a preliminary injunction. A24. This court reviews that ruling for an abuse of discretion and will reverse only when the district court "commits a clear error of fact or an error of law." *Lukaszczyk*, 47 F.4th at 598 (quoting *Cassell*, 990 F.3d 539,545). This court reviews legal conclusions *de novo* when reviewing a district court's order denying a preliminary injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## I.     Herrera Is Not Likely To Succeed On The Merits Of His Second Amendment Claim.

It is well settled that legislative enactments are entitled to a presumption of constitutionality. *E.g., Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944); *In re Search*, 245 F.3d 978, 981 (7th Cir. 2001). In *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court adopted a two-step approach to Second Amendment challenges to firearm regulations, detailing how a plaintiff can go about rebutting this presumption. At the first step, the plaintiff must overcome the presumption of constitutionality by showing that the regulation falls within the plain text of the Second Amendment – specifically, that the regulated weapon is an "arm," defined as a weapon commonly used for lawful purposes such as self-defense.

15

*Id.* at 2134; *see District of Columbia v. Heller*, 554 U.S. 570, 620 (2008) (describing Second Amendment right as one to bear arms "for a lawful purpose"). If not, the regulation passes scrutiny. If so, the regulation is presumptively invalid unless the government demonstrates its consistency with this nation's historical traditions. *Bruen*, 142 S. Ct. at 2129–30.

Under these standards, Herrera is not likely to succeed on the merits for two reasons. First, he has failed to show that either assault weapons or large-capacity magazines are commonly used for a lawful purpose such as self-defense. To the contrary, the evidence in the record makes clear that they are both properly considered dangerous and unusual, taking them outside the Second Amendment's text. Second, even assuming for sake of argument that he could make such a showing, the regulation of assault weapons and large-capacity magazines is wholly consistent with this nation's historical tradition of strictly regulating arms that can be used by individuals to rapidly inflict mass casualties, as demonstrated by the longstanding regulations on gunpowder. We address these matters in turn.

### A.     Assault Weapons and Large-Capacity Magazines Are Not "Arms" For Purposes Of The Second Amendment.

This court need not go beyond the plain text of the Second Amendment to conclude that the ordinance passes constitutional muster because the regulated weapons are not "arms" within the plain text of the Amendment. It is well settled that the Second Amendment "is not unlimited," and does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. *Heller* states clearly that the Second Amendment

right "extends only to certain types of weapons." *Id*. at 627. *Bruen* further elaborated that the historical meaning of "arms" contains a self-defense component that continues today and clarified "that general definition covers *modern instruments that facilitate armed self-defense*." 142 S. Ct. at 2117 (emphasis added)(citing Cf. *Caetano v. Massachusetts*, 577 U.S. 411–412 (2016) (per curiam) (support for finding that a modern weapon that facilitates self-defense can be protected)). Thus, to "facilitate self-defense" is a necessary condition applied to modern weapons in order to constitute "arms." *See id*.

It has long been recognized that "dangerous or unusual" weapons are categorically unprotected. 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769). It is from Blackstone's "unusual" that *Heller* derived the rule that the sorts of weapons presumptively protected by the text of the Second Amendment at the first step of the constitutional analysis are "those 'in common use at the time,'" 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The Court has never elaborated further, however, on how frequently a weapon must be used to be considered in "common use," *see Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[W]hat line separates common from uncommon ownership is something [*Heller*] did not say."), nor has it ever elaborated on what makes a weapon — something that is *inherently* dangerous — qualify as "dangerous" in a constitutional sense. Notably, *Heller* and *Bruen,* the two leading cases interpreting the Second Amendment, involved regulation of ordinary handguns so commonly used for self-defense that the parties in *Bruen* even

17

stipulated to that fact, thus neither case ever defined "common use." 142 S. Ct. at 2134. Despite that uncertainty about the outer bounds of the constitutional analysis, it is clear that Herrera failed to show that assault weapons are commonly used for any lawful purpose, or that they are not too "dangerous and unusual" to constitute protected arms. We address those failings, in turn.

1. **Neither assault weapons nor large-capacity magazines are commonly used for lawful purposes.**

While neither the Supreme Court nor the Seventh Circuit have defined what makes a particular use of a weapon "common" in this context, there is no reason to believe that the Court had some unusual or idiosyncratic meaning in mind, rather than its common, ordinary meaning. Thus, whether a particular use of a desired weapon is "common" turns on whether the plaintiff can show that the use is "widespread" or "prevalent," "occur[s] frequently or habitually," or is "most widely known." WEBSTER'S II NEW COLLEGE DICTIONARY 226 (2001) (internal capitalization omitted). Meanwhile, *this* Circuit has acknowledged prevalence *alone* does not preclude regulation. *Friedman*, 784 F.3d at 409 (explaining that the Tommy gun "was all too common in Chicago" before it was federally prohibited).

To examine why assault weapons and large-capacity magazines can be regulated, this court must first understand what these weapons are, what they do, and how they are used. The language of the ordinance itself (Cook County Ordinance No. 060-O-50), written in the tidy and bloodless prose of legislation, does not capture the horror modern assault rifles inflict on their victims, such that they merited regulation in the first place. To properly understand assault rifles and their

place in the legal landscape, this court must understand their unique, and uniquely deadly, performance characteristics, it must understand the *way* in which these weapons are used when they are used, and it must understand the harms that these weapons inflict on society when they are used or even brandished.

America has a mass shooting problem. It is deadly. It is intractable. It is accelerating. R. 60-3 at 10-11. And it is disproportionately being perpetrated by individuals armed with assault rifles, weapons equipped with large-capacity magazines, or both. *Id.* at ¶ 13.

Here, the record shows beyond reasonable dispute that neither assault weapons nor large-capacity magazines are in "widespread" or "prevalent" use for lawful purposes.  The vast majority of Americans do not own a firearm at all, and assault weapons make up only an estimated 5.3% of all firearms in circulation. R. 60-4 ¶¶28, 131-132; R. 60-3 at 12. This percentage is even lower when subtracting the assault weapons owned by law enforcement. R. 60-3 at 12. Even that small number likely overrepresents the number of people who own assault weapons, because the average owner of an assault weapon owns more than one. R. 60-4 ¶92. And of those who do own a firearm, most do not possess weapons equipped with a large-capacity magazine. R.60-4 ¶28.  Reflecting their rarity, assault weapons and large-capacity magazines are also not commonly used for self-defense. Although there are over 300 million firearms in the United States, victims of violent crimes do not use any firearms to defend themselves 99.2% of the time, making the likelihood that the victim in any given attack used an assault weapon – which

account for only 5.3% of the firearms in America – to defend themselves vanishingly low. R. 60-4 ⁋150. The extended capacity provided by large-capacity magazines is also rarely, if ever, used in self-defense, which rarely involves lengthy shootouts that might necessitate the excess capacity provided by such a magazine. R. 60-5 at 8.

Herrera's arguments to the contrary are easily disposed of.  While he points to the number of AR-15 and similar rifles in circulation in the United States and the number of such weapons sold, R. 63 at 10, 24-26, none of this comes to grips with the central, governing inquiry here: whether the weapons Herrera desires are in common *use*. Neither *Heller* nor *Bruen* looked to whether weapons were frequently manufactured or commonly purchased in discussing "common use." *See Heller*, 554 U.S. at 624; *Bruen*, 142 S. Ct. at 2134. The express focus on "use" demonstrates that mere commonness of ownership of a particular weapon is not a relevant inquiry, only the regularity with which that weapon is commonly used for a lawful purpose. And it should go without saying that the mere ownership or sale of a weapon is not the same thing as that weapon being put to actual use — indeed, Herrera's metric of choice would sweep in countless weapons ultimately put to *unlawful* use, such as the lawfully sold assault weapon used by Adam Lanza to kill a room full of innocent schoolchildren at Sandy Hook Elementary School.  No rational person could possibly agree that the existence of that ill-fated sale is evidence that assault weapons are commonly used for a lawful purpose.

Herrera also relies on a smattering of random statements made by various out-of-circuit courts and the Supreme Court in *Staples v. United States*, 511 U.S. 600 (1994). R. 5 at 15. His reliance on *Staples* is particularly misplaced. The issue in *Staples* was whether the government had to prove Staples knew his rifle was modified to fire automatically in order to convict him of criminally possessing a machine gun under the National Firearms Act, not whether a weapon was common for purposes of Second Amendment protection. *Staples*, 511 U.S. at 602–604, 611–612. In its holding, the Court explained that "despite their potential for harm" many firearms can be owned legally and do not generally occupy a category of product that would put their owners on notice that they may be subject to regulation sufficient to satisfy criminal *mens rea*. *Id*. at 611–612. The Court did not evaluate whether assault weapons are in common use, nor did it comment on the meaning of "common use." Herrera cannot cobble together dicta from criminal cases to form a precedential opinion in a Second Amendment matter. *See Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (en banc). There is no precedential case law that requires this court to accept Herrera's definition of "common" and apply it to the regulated weapons; the court need only look to the record to make this determination.

In addition to posing a severe danger to innocent civilians, assault weapons are fundamentally incompatible with lawful self-defense. As Blackstone explains, the acts that constitute excusable homicide end at "the bounds of moderation, either in the manner, *the instrument*, or the quantity," so an act otherwise permissible by

the law becomes "manslaughter at least, and in some cases (according to the circumstances) murder" if a person uses a weapon or implement unsuited for an otherwise-lawful task. Blackstone, *supra*, at 183–84 (emphasis added).  As Blackstone summarized the controlling rule, "immoderate suo jure utatur, tunc reus homicidii sit," *id*. at 184, meaning if "he use his right beyond the bounds of moderation, then he is guilty of homicide," J.W. Jones, A TRANSLATION OF ALL THE GREEK, LATIN, ITALIAN & FRENCH QUOTATIONS WHICH APPEAR IN BLACKSTONE'S COMMENTARIES 116 (T. & J.W. Johnson & Co. 1889).  Indeed, as Blackstone later explains, such "excessive" actions "could not proceed but from a bad heart" and are thus "equivalent to a deliberate act of slaughter."  Blackstone, *supra*, at 200–201.  This understanding of the limits of self-defense carried over into American criminal law.  In fact, one of the earliest reported American decisions regarding self-defense rejected that defense specifically on the ground that it was not "necessary for the prisoner to avail himself of the instrument" — there, a club — "which occasioned the death. On his own confession, much less would have been sufficient," making his actions "clearly manslaughter."  *State v. Wells*, 1 N.J.L. 486, 493 (N.J. 1790).

Reflecting these longstanding principles, Illinois law does not readily accept a claim of self-defense when the defendant "uses force greater than necessary to ward off the imminent danger." *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.) (emphasis added); *accord People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (explaining Illinois law requires proof that "the kind and amount of force actually used was necessary"). If a person

responds with such excessive force that he or she is no longer acting in self-defense but in retaliation, that person may no longer claim self-defense; a non-aggressor has a duty not to become the aggressor. *People v. Nunn*, 541 N.E.2d 182,  (Ill. App. 1989).

Given the extraordinary lethality of assault weapons, such weapons are patently incompatible with basic principles of moderate self-defense. Such weapons are very powerful and effective at a long range, meaning they are more likely to travel easily through walls, vehicles, body armor, and the human body, regardless of whether the shooter intends to do so. SA9 at ¶9, SA11 at ¶17; R. 60-5 at 79; R. 60-11 ¶10; R. 60-4 at ¶83. Given the effective range of assault weapons when compared to the population density of Cook County, there are few, if any, places where one could safely discharge them without knowingly or unknowingly endangering the bodily safety of a third party.

Reduced to a fine point, firing a weapon that has the capacity to pierce body armor at 500 yards, R. 60-4 ¶¶44, 103, equipped with a large-capacity magazine or not, within densely populated Cook County, is excessive force, and not self-defense, and thus a crime. *See, e.g., People v. Murillo*, 587 N.E. 2d 1199, 1204 (1st Dist. 1992) (finding that self-defense was no longer a defense and became excessive force when shooting a person multiple times, including while the person no longer posed a threat). This is particularly true when there is an alternative kind of force available in the form of a handgun, R. 60-12 at 6, with one-tenth of the range of an assault weapon, R. 60-12 at 7. Such conduct that endangers a third party also gives

23

rise to a separate criminal charge under Illinois law. *See*, *e.g.*, 720 ILCS 5/24-1-1.5. Similarly, a person can be charged with aggravated discharge of a firearm when he or she "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2.

### 2.     Assault weapons and large-capacity magazines are unusually "dangerous."

The district court properly found that the ordinance "protect[s] public safety by removing particularly dangerous weapons from circulation." A31. Assault Weapons are not "common weapons" that can be used "without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Rogers v. Grewal*, 140 S. Ct. 1865, 1872 (2020) (Thomas, J. dissenting from denial of certiorari) (quoting *Simpson v. State*, 1833 Tenn. LEXIS 186, *4–5 (1833)).  This principle was clear to the framers. While "James Wilson, a prominent Framer and one of the six original Justices of the Supreme Court, understood founding era law to prohibit only the carrying of 'dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people'" *Rogers*, 140 S. Ct. at 1871 (Thomas, J., dissenting from denial of certiorari), legislatures imposed restrictions on categories of weapons when their proliferation resulted in escalated harm to the public. This view of the law was shared by a number of states, even well after the founding. *E.g., State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court

has declared the same to be the common law . . . ."); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("[I]f persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *State v. Langford*, 10 N.C. 381, 383–84 (1824) ("[I]t seems certain there may be an affray when there is no actual violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute.").

While there is no evidence that assault weapons or large-capacity magazines are commonly used for self-defense, there is ample evidence that they are dangerous in the sense contemplated by Blackstone. While all weapons are properly considered dangerous, in a strictly literal sense, history indicates that the Framers and their English ancestors would have understood dangerousness in this context as a function of the danger a weapon's normal uses pose to innocent civilians, weighed against that weapon's compatibility with ordinary principles of self-defense. The English ban on spring guns that has been adopted into American law, for example, is a prime example of these principles in action — while spring guns were incredibly popular in the late 18th century, they were ultimately banned (and remain banned to this day) because they tended to indiscriminately injure innocent bystanders and were not compatible with basic principles of self-defense. *National Assoc. for Gun Rights v. City of Naperville*, No. 23-1353, Doc. 56 at 39 (7th Cir.); *id.*, Doc. 59 at 48. Assault weapons and large capacity magazines fail on both metrics.

Regarding dangers to innocents, they are the weapons overwhelmingly chosen for mass shootings. *See* R. 60 at 12. Despite making up only 5.3% of the firearms in the United States, assault weapons were the weapon of choice in 85% of the deadliest mass shootings in the United States and were used in 53% of all mass public shootings since 2019. R. 60-9 ¶37; R. 60-3 at 10; R. 60-13 at 14-15. Over the past eight years, 97% of high-fatality mass shootings involved large-capacity magazines. R. 60-3 at 10. Looking at just the high-fatality mass shootings in the last four years, that number rises to 100%. R. 60-3 at ¶12;

Even when used with the intent to engage in lawful self-defense, assault weapons and large-capacity magazines remain an extreme danger to innocents. They are not "particularly suitable for[] home defense in short range close quarter situations." R. 60-5 at 77. They were designed and optimized for use in military offensives, and the characteristics and capabilities of the weapons make them identical to an M-16 in semi-automatic fire mode, R. 60 at 7-8; R. 60-4; R.60-5 at 46; R. 60-6, rendering them practically and legally unsuitable for self-defense under Illinois law. *See* R. 60 at 5-18.  Assault weapons present a high risk of overpenetration, and large-capacity magazines provide more ammunition than one would reasonably expect to need in a self-defense scenario. *See* R. 60-5 at 8, 76. In fact, large-capacity magazines make it more difficult for victims or bystanders to defend themselves by reducing the opportunities they may have to disarm a gunman, escape, or call for help while the shooter reloads, a tactic which survivors have used in many mass shootings. R. 60-4 at ¶¶139-140. Combined, these features

26

make the regulated weapons a poor choice for self-defense and actually deter the self-defense efforts of someone who is being attacked by a gunman. *Id*. If expert opinion is not sufficient to show that the regulated weapons are not designed for self-defense, the manufacturers themselves offer proof in the way they have marketed such weapons. R. 60-4 ¶¶90-91, 96-101, 153. The regulated weapons do not facilitate self-defense, but instead put bystanders or unintended targets at risk. *See* R. 60-5 at 8; R. 60-4 ¶¶154, 157, n.130; R. 60-9 ¶¶61. The danger to innocents is extraordinary, not just on a physical level, but also on emotional and societal levels. The large-capacity magazines often used with assault weapons cause victims of shootings to have more of these horrendous wounds, reducing the victims' capacity to defend themselves, and cause more victims being shot overall. R. 60-4 ¶67.

The significant difference in energy transfer and temporary cavity between gunshot wounds from assault weapons and from handguns has direct implications for injury and death. R. 60-11 ¶13. Handgun injuries produce less harm to the human body and are generally survivable unless the bullet penetrates a critical organ or major blood vessel. R. 60-12 at 6-7. Assault weapons lead to higher fatalities and more serious injuries than handguns, often requiring longer hospitalizations and treatment and greater disability and shortened lives. R. 60-10 at 4-5; R. 60-12 at 6.  Assault weapon injuries are particularly dangerous in children given their smaller torso and lower blood reserve when compared to teenagers or adults, leading to extremely high mortality rates for young patients. R. 60-11 ¶15.

Given the severity and number of injuries that can be inflicted by an assault weapon and large-capacity magazine, a mass shooting can easily inundate area hospitals diverting resources and personnel away from other patients in need. R. 60-10 at 5-6; *See* R. 60-12 at 7. As a result, semiautomatic rifles pose a greater danger to individual victims and the general public as the injuries caused are far more severe, require complex care, and are less likely to be successfully treated.

Further, assault weapons impose a psychological influence that, along with their physical properties, make them particularly attractive to mass shooters and even make an individual more violent. R. 60 at 27. In the context of mass shootings, researchers have documented a pattern of mimicry – many mass shooters conform to expectations of what mass shooters do – including attacking the unsuspecting while using semiautomatic rifles. R. 60-13 at 17.

Third, law enforcement faces an unusual crisis when dealing with assault weapons. R. 60 at 31-33. As Chief Larry Snelling of the Chicago Police Department testified, large scale events and mass gatherings require police to dedicate scarce manpower and resources to maximize security against the threat of assault weapons used for domestic terrorism. *See* R. 60-8. Because of the proliferation of these weapons, law enforcement face increasing safety and security complexities, and must use special tactics and equipment in the event of a mass shooting. R. 60-9 ¶54; *See* R. 60-16 at 17, 28. The use of specialized equipment and widespread action plans is simply not required to counter handgun violence.

In addition to the threats posed to the general public, assault weapons pose a significant threat to law enforcement officers themselves. R. 60 at 32-33. Standard police protective equipment, like that used by Chicago Police officers, has minimal effects on ammunition fired by an assault weapon and can be penetrated by an assault weapon. R. 60-8 ¶¶17-18. The increased prevalence of assault weapons only furthers the perception that being a police officer is less safe today than in earlier years which hurts the Chicago Police Department's recruiting ability. *Id.* ¶28.

Fourth, mass shootings involving assault weapons pose a unique risk of psychological damage to victims, bystanders, and society as a whole. R. 60-4 ¶¶44, 50, 58– 64; R. 60-13 at 18–19; R. 60-9 ¶¶22, 43-45; R. 60-13 at 18-20; R. 60-15 at 11-16; SA11 at ¶14, 27–28. The possibility of being involved in a mass shooting has become a source of stress and fear in many adults and young people. R. 60-13 at 19. This generalized fear is particular to assault weapons, and not handguns, as assault weapons are used in nearly all the highly publicized mass shootings in recent years. R. 60-4 ¶58.

Herrera has failed to show that assault weapons and large-capacity magazines are neither dangerous nor unusual.  To the contrary, the record shows that they are both.  Accordingly, they are not "arms" for purposes of the Second Amendment, and this court can affirm on that ground alone.

## II.    Bans On Assault Weapons And Large-Capacity Magazines Are Compatible With This Nation's History And Traditions.

The district court properly found that the "restrictions on semiautomatic weapons and large-capacity magazines … are consistent with 'the Nation's

historical tradition of firearm regulation,' namely the history and tradition of regulating particularly 'dangerous' weapons." A8, *citing Bruen,* 142 S. Ct. at 2130 and *Heller,* 554 U.S. at 627. Regardless, the bans on assault weapons and large-capacity magazines survive constitutional scrutiny because they are consistent with the nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2130. At this step of the analysis, a court asks whether the regulation at issue involves an "unprecedented societal concern or dramatic technological changes." *Id.* at 2132. If not, the government must offer up a historical regulation that can be considered analogous when considering why and how it affects the right to engage in lawful self-defense. *Id.* at 2133. If so, *Bruen* suggests "a more nuanced approach" to the analysis, but does not elaborate further because it did not confront such a problem. *Id.* at 2132. Here, an analogical regulation is readily apparent: historical regulations on gunpowder, which were implemented in response to the rapid, mass loss of life frequently inflicted by individuals misusing gunpowder, and which imposed a similarly minimal impediment on individuals' ability to engage in armed self-defense. While Herrera denies that gunpowder is sufficiently analogous, he waived that argument by burying it in a cursory, undeveloped footnote below, and it is too late now on appeal to ambush the County with a developed response. Regardless, were Herrera correct that gunpowder does not suffice, then the societal problem addressed by bans on assault weapons and large-capacity magazines — the rapid murder of large numbers of people by a single armed individual — is truly unprecedented, requiring application of *Bruen*'s nuanced approach. Under that

approach, the regulations survive because they are consistent with the regulation of dangerous and unusual weapons, as well as bedrock common-law principles the Framers would have applied had they confronted that problem in the first instance.

### A. Gunpowder Regulations Demonstrate A Longstanding Tradition Of Regulating Weapons Responsible For Mass Casualty Events.

At the time of this nation's founding, there were simply no firearms with which an ordinary individual could rapidly inflict casualties on large numbers of people — the only firearms capable of such destruction were cannons, which were owned by armies, not by ordinary individuals, who would have been hard pressed to commit mass murder while lugging a heavy cannon about the streets of London.[2] But the Second Amendment covers not only firearms themselves, but also the narrow category of items "necessary to use" those firearms, *e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), and if the analogical net is cast wide enough to include such materials, an analogy can easily be drawn to regulations regarding something with mass destructive power comparable to assault weapons: gunpowder. Unlike cannons or similar weapons of mass destruction that existed at the time of the founding, gunpowder could be acquired and stored by average citizens, who could theoretically stockpile large amounts of gunpowder in their homes or places of business. SA19-23. Gunpowder gave an

---

[2] To the extent that some have argued that repeating weapons technically *existed* at the time of the framing, that argument misses the point entirely. Such weapons were exceedingly rare – one was an elaborate mace-gun owned by King Henry VIII, who was hardly an ordinary citizen, https://collections.royalarmouries.org/object/rac-object-3295 – and thus could hardly have given rise to a "societal concern" about repeated mass killings.

average citizen the ability to kill many people quickly, as assault weapons do today. That lethal potential was often realized – in London alone, a gunpowder explosion at Tower Hill in 1552 killed seven, an explosion at Crooked Lane in 1560 killed eleven, another at Fetter Lane in 1583 killed three, another at Tower Street in 1650 killed 67 and destroyed fifteen houses, and in 1715 over a hundred houses on Thames Street were destroyed in a fire caused by a gunpowder explosion that leveled a house. *Id*.[3] Particularly following the famed Gunpowder Plot of 1605, in which Guy Fawkes and his coconspirators amassed 36 barrels of gunpowder to level the House of Lords, *see generally*, Alan Haynes, THE GUNPOWDER PLOT (History Press 1994), the Founders would have been well-aware of the destructive potential of excessive quantities of gunpowder, whether possessed by criminals or law-abiding citizens.

Reflecting this danger, states and localities have extensively regulated gunpowder since pre-colonial England and the earliest days of the American Republic. SA19-23. In England, the explosion at Crooked Lane led to an outright ban on gunpowder storage in houses, though that ban was later modified to allow storage of two pounds of powder. *Id*. In addition, the English law of nuisance also placed severe limits on individuals' ability to store gunpowder in their homes. By the 1700s, it was settled in the English courts that the storage of large amounts of gunpowder in one's home constituted an indictable offense against the crown, even

---

[3]  The problem was not limited to London – more than twenty major gunpowder explosions rocked European cities and towns between 1400 and 1850. *Id*.

if the activity was longstanding, and even "though gunpowder be a necessary thing, and for defence of the kingdom." *Anonymous*, 12 Mod. 342 (King's Bench); *accord*, *e.g.*, *Dominus Rex v. Taylor*, 2 Str. 1167 (King's Bench).  Notably, these restrictions were not limited to individuals with a history of unsafe practices or violations of the law – rather, they applied to all citizens equally, law-abiders and lawbreakers alike, *see* Porter, *supra*, without regard to the fact that the defendant's activities had never injured others, *see Anonymous*, *supra*.

This regulatory tradition carried over to the United States, where the use of gunpowder quickly proliferated due to its "obvious importance for public defense, frontier security, and hunting," and the "demand for a host of developmental projects in a labor-scarce economy, including mining, canal building, and road building."  William J. Novak, THE PEOPLE'S WELFARE:  LAW & REGULATION IN NINETEENTH-CENTURY AMERICA 63 (U.N.C. Press 2000).

Despite the extraordinary popularity and usefulness of gunpowder, it was "particularly susceptible" to the law of nuisance, *id.*, and the courts recognized that "the keeping of gunpowder . . . in large quantities in the vicinity of one's dwelling-house or place of business, is a nuisance *per se*, and may be abated as such by action at law, or by injunction," H.G. Wood, A PRACTICAL TREATISE ON THE LAW OF NUISANCES 142 § 142 (1875). Early American cities were incorporated with the express authority to regulate gunpowder, *e.g.*, *An Act to Incorporate the City of Key West*, ch. 58, § 8, 1838 Fla. Laws 70, and multiple states limited the amount of gunpowder a person could possess, Saul Cornell & Nathaniel DeDino, *A Well*

33

*Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–12 (2004) (describing numerous gunpowder storage laws). Such regulations persist to this day, despite the advent of cartridges making it generally unnecessary for the average person to possess freestanding gunpowder. *E.g.*, 720 ILCS 5/47-5(7) (forbidding powder magazines near incorporated towns in Illinois). [4]

The "why" behind the regulations was self-apparent – as the courts have explained, a "deposit of a large quantity of gunpowder in the midst of a populous city" could lead to an explosion, "and such would be the terrible and wide-spread destruction from it that the whole population would live in dread of some horrible catastrophe." *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1851). This fear supported legislation because "the dangers would be real, and all men of reflection and prudence would feel them to be so, and therefore their apprehensions would be well founded." *Id.* at 216–17. And, notably, regulations on gunpowder storage were not limited to individuals with a history of unsafe practices regarding the storage of gunpowder – rather, they applied to all citizens equally, law-abiders and lawbreakers alike. What's more, regulations often limited the quantity of gunpowder, reflecting the common wisdom that there is a line between a safe measure of powder for private use, and a stockpile of materiel that could cause mass casualties in an instant, before the government had a chance to react.

---

[4] These regulations conclusively refute the frivolous notion, advanced by Herrera below, that the Second Amendment categorically prohibits regulations of firearms in the home.  In making this argument, he forgets that nuisance applies to terrors stemming from actions within one's home, while affray applies to those stemming from without.

The "why" behind regulations on assault weapon and large-capacity magazines is virtually identical.  Like stockpiles of gunpowder, they give a single individual the extraordinary ability to kill great numbers of people quickly. And as with gunpowder in the 1500s through the 1700s, that fatal potential has been repeatedly realized, as mass shootings perpetrated with assault weapons and large-capacity magazines now occur with troubling regularity in this nation's schools and public places.  Just as was once the case with gunpowder, the innocent, law-abiding people of Illinois now live in dread of the next act of domestic terror to be committed using assault weapons. And those fears are even more well-founded than the fears that justified strict historical regulation of gunpowder – where gunpowder was strictly regulated in London after its misuse caused only two local explosions that resulted in a grand total of 18 deaths, the misuse of assault weapons has resulted in at least countless mass shootings and an incomprehensible number of American lives lost.

Gunpowder regulations and bans on assault weapons and large-capacity magazines are also relevantly similar in "how" they affect law-abiding citizens' right to armed self-defense. Certainly, laws imposing restrictions on the storage of gunpowder imposed some burden on the ability of an individual to engage in armed self-defense, because they "would at the very least have made it difficult to reload the gun to fire a second shot unless the homeowner happened to be in the [location] where the extra gunpowder was required to be kept." *Heller*, 554 U.S. at 685

(Breyer, J. dissenting). But as the *Heller* majority recognized, this burden was minimal, particularly in comparison to "an absolute ban on handguns." *Id*. at 632.

Bans on assault weapons and large-capacity magazines impose a comparably minimal burden on armed self-defense — like the historic English regulations of gunpowder, which allowed a small amount of gunpowder with significantly lesser destructive power to be stored in homes, they allow individuals seeking to engage in armed self-defense to retain possession of a host of weapons that are extremely well-suited for that purpose, and merely forbid possession of weapons with a proven, unusual potential for mass fatalities. The regulations of gunpowder only prohibited possession of amounts of gunpowder with no practical utility for self-defense – no individual defending himself from a home invader could possibly use thirty pounds of gunpowder in his defense without simply detonating it and risking great harm to innocent bystanders. Similarly, the regulations at issue here only prohibit the possession of weapons and the excessive capacity of magazines with no discernible additional self-defense utility beyond what is already provided by other, less destructive weapons. Just as the framers deemed it permissible to prevent individuals from possessing large quantities of gunpowder, they would be unconcerned with limiting an individual's ability to fire a large quantity of cartridges in rapid succession, at both close and long ranges, with uniquely lethal ammunition. R. 60-4 at ¶ 83; R. 60-5 at 78-79; SA10 at ¶12; R. 60-9 at ¶34.

Below, Herrera largely ignored the County's argument regarding gunpowder, offering only a cursory, undeveloped response, buried in a footnote. R. 63 at 31, fn

36

41.  By failing to engage with the County's argument below, Herrera waived any response to that argument on appeal.  *See Lee v. Ne. Ill. Reg'l Commuter R.R.*, 912 F.3d 1049, 1053-1054 (7th Cir. 2019) ("[Waiver] applies when a party fails to develop arguments related to a discrete issue or when a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss."); *See Harman v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote"); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (finding waiver when argument was in footnote, consisted of four sentences, and did not contain any citation to authority); *United States v. White*, 879 F.3d 1509, 1513 (7th Cir. 1989) (argument raised in passing in a footnote deemed waived).  And even were this court to overlook that waiver, Herrera's argument – that *Heller* already rejected gunpowder as an analogue – was frivolous.  Even setting aside that *Heller* predated the analogical analysis endorsed by *Bruen*, *Heller* could not possibly have rejected gunpowder as an analogue to assault weapons or large-capacity magazines, for the simple reason that neither was at issue in *Heller*. And as the Court has repeatedly reminded lower courts, its opinions must be read to address circumstances presently before the Court, not circumstances it was not considering at the time.  *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 950 (2023).

Because bans on assault weapons and large-capacity magazines are consistent with this nation's history and tradition of strictly regulating arms capable of causing rapid, mass casualties, they are permitted by the Second Amendment, requiring denial of injunctive relief here.

## B. Regulations On Assault Weapons And Large-Capacity Magazines Are Constitutional Under *Bruen*'s Nuanced Approach.

It is their shockingly overpowered performance characteristics, in conjunction with the extraneous firing capacity afforded by large-capacity magazines, which make the regulated weapons the choice for domestic terrorists. R. 60-3 at ¶12. These acts of domestic terror are only possible as a result of the dramatic technological differences between the defensive handgun and assault weapons designed to quickly maximize casualties in the theatre of war. R. 60-5 at 79-80; R. 60-9 at ¶27-32. Solo massacres in the nature of mass shootings were unknown to the Founders. R. 60-14 at 7.

Assault weapons and firearms equipped with extraneous capacity magazines are designed to be different, and those differences have made possible the succession of mass killings which would have shocked the conscience of our founding generation. R. 60-5 at 79-80.

When a court is faced with a firearm regulation that responds to a truly unprecedented societal problem, analogical reasoning necessarily breaks down – after all, the lack of an analogous situation necessarily precludes consideration of the legislative response to such a situation. As a result, in such circumstances, "when engaging in an analogical inquiry" the court must take into account those

unprecedented changes. *See Bruen*, 142 S. Ct. At 2133. The court must consult the bedrock legal principles established by statutes and the common law, as the framers would have understood them, to determine how the framers would have responded to the problem later confronted by their descendants, with the "central" focus continuing to be "how and why" the modern regulation burdens an individual's right to self-defense. *See Id*[5] Undertaking this kind of historical analysis, it is clear that the framers would have responded to the problem of mass murder perpetrated by individuals armed with assault weapons and large-capacity magazines by precluding the possession of those items by civilians.

Because it is long settled that the Constitution must be interpreted in the light of the common law, the principles and history of which were familiar to the framers, *South Carolina v. United States*, 199 U.S. 437, 450 (1905), that common law is the natural starting part for the analysis — specifically, the common law of self-defense, which is the central concern of the Second Amendment, *Heller*, 554 U.S. 610–16 . That starting point is particularly appropriate given that English weapons bans, such as the ban on spring guns, were driven specifically by concerns about those weapons' incompatibility with self-defense principles.  At English common law, self-defense was divided into two broad categories: (1) "justified" self-

---

[5] To be clear at the outset, this is *not* a freewheeling balancing of interests of the sort rejected by *Bruen*.  Rather, it is an application of Founding-era common-law principles to a problem that the founders could not personally have anticipated or seen the need to address.  That is wholly consistent with a proper understanding of the Second Amendment as preserving rights as they existed at the time of its adoption.

defense, in which "the defendant prevented a felony"; and (2) "excused" self-defense, in which "the defendant was in the midst of a fight." V.F. Nourse, *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235, 1244 (2001). Consistent with their understanding that the self-defense right was of only limited scope, and that the government had primary responsibility for the protection of its citizenry, the American courts also recognized that the right to bear arms extended only to the narrow category of weapons commonly used for lawful self-defense. *See, e.g., State v. Duke*, 42 Tex. 455, *6 (1874) (explaining that the "arms which every person is secured the right to keep and bear… must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense"); *see also*, 1 N.J.L. at 493. This is consistent, as we note above, with Blackstone's understanding that the law of self-defense did not justify killing with an "instrument" unsuited for the threat presented. Blackstone, *supra*, at 183–84. Because "the inherent right of self-defense has been central to the Second Amendment right," *Heller*, 554 U.S. at 628, the historical scope of that right provides important insight as to what weapons the founding generation might have considered too "unusual" or "dangerous" for use by a person exercising that right.

Also relevant is the English common-law principle of affray, derived from the Statute of Northampton, which made it a crime "to terrifie or bring feare," and the crime could be committed "without word, or blowe, given: as if a man shall shewe him selfe furnished with armour or weapon, which is not usually worne and borne, it will strike a feare into others that be not armed as he is." William Lambarde,

EIRENARCHA 134 (1579); *see* Joseph Keble, AN ASSISTANCE TO THE JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (1689) ("[I]f a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed"). The law of affray was adopted by the colonists and continued to control even after the American Revolution. *See State v. Huntly*, 25 N.C. 418, 420–421 (1843); *Young v. Hawaii*, 992 F.3d 765, 796 (9th Cir. 2021); *see id.* at 797–98 (noting that North Carolina adopted the Statute of Northampton verbatim, including "the references to the King").

The founding generation would have also understood that government derived its legitimacy from its ability to protect its citizenry, Steven J. Heyman, *The First Duty of Government: Protection, Liberty, & the Fourteenth Amendment*, 41 DUKE L.J. 507, 512–24 (1992), and that the government's authority to protect its citizenry was at its peak when the citizens were, for whatever reason, unable to adequately protect themselves from harm. In colonial-era England, the Crown had a "royal prerogative" that "included the right or responsibility to take care of persons who 'are legally unable . . . to take proper care of themselves and their property.'" *Alfred L. & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982) (quoting J. Chitty, PREROGATIVES OF THE CROWN 155 (1820)). After the revolution, that power to protect the people transferred to the States "in the form of a legislative prerogative," *id.*, that "is inherent in the supreme power of every State." *Late Corp. of Church of Jesus Christ v. United States*, 136 U.S. 1, 57 (1890); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972). While defense of self remained an individual right,

states nevertheless recognized the police-power interest as "a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves," *Id.*

This authority extended to the power to regulate weapons. The early American cases considering the right to bear arms recognized that the scope of that right was properly understood only in relation to the right of the government to take primary responsibility for defending its citizenry. *See Hill v. State*, 53 Ga. 472, 477 (1874) ("The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties."); *Aymette v. State*, 21 Tenn. 154, 159 (1840) (explaining that the right to bear arms "respects the citizens on the one hand and the rulers on the other"). Indeed, the Supreme Court of Georgia found it "absurd" to think the framers of the constitution "ever dreamed, that in their anxiety to secure to the state a well-regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies." *Hill*, 53 Ga. at 478.

Application of these principles here reveals that the framers would have believed the regulation of assault weapons and large-capacity magazines wholly consistent with the legal principles they hoped to enshrine in the constitution. This is consistent with their view of self-defense as a narrow doctrine permitting only

"moderate" responses to threats, and then only when no ready means of retreat is available. Indeed, the framers would likely have seriously questioned how a weapon that could put a Coke-can-size hole in a victim's body, R. 60-4 at ¶ 109, could ever be a moderate, proportionate response to a conceivable threat. The framers would have also been appalled at the notion that the government could not take action to protect its citizens from harm at the hands of an individual armed with an assault weapon or a large-capacity magazine, particularly when those individuals are – as is regularly the case – small children unable to protect themselves from harm and thus most needing of the government's protection. This was because, as observed by the Texas Supreme Court in upholding a regulation of certain "deadly" weapons, "in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress." *English v. State*, 35 Tex. 473, 477 (1872). To do otherwise, the court explained, risked a return to a "state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive." *Id.* Thus, even during this era, the right to self-defense was limited – the state was the citizen's primary protector, and an individual could not take the law into his own hands. Given this background, the founding generation would have understood that the government has primary responsibility for protecting its citizenry, most particularly those members of the citizenry unable to protect themselves and would not have expected the Second

Amendment to allow rule by those willing and able to arm themselves the most heavily. Such an understanding of the government as a protector of the citizenry would have informed any analysis of a regulation like the Ordinance.

### C. Weapons In Common Use For Criminal Purposes May Be Regulated.

Early American lawmakers often regulated weapons that, while theoretically useful in self-defense, were more likely than others to be used for unlawful purposes. *See Fife v. State*, 31 Ark. 455, 461 (1876) (explaining that right to bear arms did not extend to weapons such as "the dirk, butcher or Bowie knife, the sword or spear in a cane, brass or metal knucks, and the razor," which are normally "used in private quarrels and brawls"); *Andrews v. State*, 50 Tenn. 165, 186 (1871) (finding law constitutional "so far as it prohibits the citizen 'either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol'"). No constitutional right entitled citizens to "the use of weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Aymette*, 21 Tenn. at 158.

The record is replete with evidence that, when the regulated weapons are used, they are usually used for criminal actions like mass killings and may be banned. SA11 at ⁋ 14; R. 60-3 at ⁋ 12-13; R. 60-4 at ⁋ 114-115; R. 60-5 at 31-32; R. 60-9 at ⁋ 42. What's more, the current legality of semiautomatic rifles creates a loophole for would-be machine gun owners: they can buy a semiautomatic rifle and convert it to a fully automatic weapon. R. 60-4 at ⁋ 107; SA10 at ⁋ 12. This tactic is growing in popularity. A recently released ATF report reveals that the combined

44

total of "Machine-Gun Conversion Parts" recovered by ATF increased by 570%
between the 2012 to 2016 period and the 2017 to 2021 period. SA24. Today, it
appears that "law abiding citizens" – in other words, those to whom the Second
Amendment presumptively applies – are surreptitiously turning what Appellant
here strenuously contends is not a "dangerous and unusual" weapon, namely, the
semiautomatic rifle, into something that the United States Supreme Court in *Heller*
has essentially conceded *is* a "dangerous and unusual" weapon, namely, the fully
automatic rifle. *See Heller*, 554 U.S. at 627 ("weapons that are most useful in
military service – M-16 rifles and the like – may be banned.").

### D.    Herrera's View Of History Is Wrong.

Herrera has offered his own reading of history. In his telling, the right he
presumes to arm himself with any weapons he wishes, regardless of the danger it
presents to society, overrides any interest the government has in protecting its
citizenry. In his amicus brief before this Court, Herrera argues the government is
powerless to prevent massacres with assault rifles and large-capacity magazines,
and is left to utilize only the "penitentiary and gallows" to avenge the people who
are afflicted by gun violence. *National Assoc. for Gun Rights v. City of Naperville*,
No. 23-1353, Doc. 37 at 25 (7th Cir.) (citing *Wilson v. State*, 33 Ark. 557 (1878).

Herrera's view of history is problematic for multiple reasons. First, it is
utterly inconsistent with the extensive and representatively analogous history of
gunpowder regulation. *Bruen* does not instruct the parties to duel over the proper
historical analogue. Instead, it is the *government* who must justify its regulation by

showing an analogous history of regulation. *Bruen*, 142 S. Ct. at 2133 (emphasis added). *Bruen* does not then shift the burden to the challenging party to show a counter-regulation which supports his position, nor does it re-shift the burden back onto the government to come up with yet another analogue. *Id.* ("analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin")*. Under a plain language reading of *Bruen*, once the government has met its burden of identifying a representative historical analogue, the court may conclude that the regulation is constitutional. *Id.* ("So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.")

Next, while Herrera's view of history is not relevant to the test set forth in *Bruen*, it is revealing of his mindset. Under his view of history, the founders would have taken no interest in preventative measures to protect the American people from the potentially calamitous societal concerns of the day, ultimately enshrining that principle into the Second Amendment. That position is ahistorical and absurd. From the history of regulation of gunpowder, it is self-evident that the founders took their responsibility to prevent mass death seriously, and that they used the power of government regulation to preempt mass casualty events. It is equally clear that the founders regulated not only items necessary to use firearms, but dangerous firearms themselves. For instance, the District Court correctly considered the use of, and subsequent banning of "trap guns", A14, which were uniquely dangerous

because they could fire automatically based on a signal, such as a trip wire. *See also National Assoc. for Gun Rights v. City of Naperville*, No. 23-1353, Doc. 56 at 39 (7th Cir.); *id.*, Doc. 59 at 48.

Finally, Herrera's reliance on *Wilson* highlights his efforts to force the facts of this case upon those the Court considered in *Bruen* in order to compel a similar result. Like *Bruen*, *Wilson* was a case concerning the lawfulness of public carry of a firearm. *Wilson*, 33 Ark. at 557. Unlike *Bruen* and *Wilson*, the issue before this court is whether Herrera has satisfied his burden for injunctive relief, where he seeks to possess and use dangerous and unusual weapons such as assault rifles equipped with extraneous ammunition capacity. R. 60-2. The ordinance draws no distinction between home and public carry, and it does not in any way limit the possession or use of Second Amendment protected handguns equipped with ten round magazines. *Id.*

Herrera's comparison between the regulation of assault weapons and public carry laws is an ongoing error. At oral argument before the District Court, Herrera focused not on the unprecedented nature of lone wolf mass shooting attacks, or on the unique nature of modern assault rifles which facilitate these attacks, but instead on whether there is a history of banning weapons in the home. R. 73 at 68:11-49:3. And in his amicus brief before this court, Herrera argued that *Heller* guarantees the right to possess assault rifles in the home. *National Assoc. for Gun Rights v. City of Naperville*, No. 23-1353, Doc. 37 at 26 (7th Cir.) (citing *Heller*, 554 U.S. at 635). Here Herrera's analysis fails twice. First, because the distinction

47

between home and public carry is irrelevant to whether assault rifles equipped with extraneous capacity magazines may be regulated. Second, because Appellant presupposes that *Heller*'s assumption protecting the right to possess defensive handguns applies equally to weapons of mass murder. *Id.* No controlling court has ever announced such an extreme proposition. Herrera ignores the principle affirmed in *Heller* and continued in *Bruen*, that there is a historical tradition of banning dangerous and unusual weapons in the United States. *Heller*, 554 U.S. at 627. Given the documented risk to third parties in a stereotypical "defense of home and hearth" situation, Herrera is wrong to simply equate defensive handguns to assault weapons. R. 73 at 58:4-6:3. In sum, Herrera's focus on public carry is a red herring and this court should disregard it.

## III.  *Bruen* Does Not Abrogate This Court's Decisions in *Friedman* and *Wilson.*

As a final matter, this court has already concluded that "bans on assault weapons and large-capacity magazines do not contravene the Second Amendment." *Wilson v. Cook Cty.*, 937 F.3d 1028, 1035 (7th Cir. 2019); *see also Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). While Herrera believes this precedent no longer good law after *Bruen*, the fact of the matter is that *Bruen* casts no doubt on the results in *Wilson* and *Friedman*. To the contrary, a critical mass of the Justices in the *Bruen* majority wrote separately to make clear that *Bruen* (1) did not "decide anything about the kinds of weapons that people may possess," *id.* at 2157 (Alito, J., concurring); and (2) did not undermine the Court's previous statements that the Second Amendment allows the prohibition of "dangerous and

unusual weapons," *id.* at 2162 (Kavanaugh, J. & Roberts, C.J., concurring). And while *Bruen* rejected the two-tiered mode of Second Amendment scrutiny used by most courts when analyzing firearm regulations, *Friedman* specifically declined to adopt or rely on that mode of analysis, 784 F.3d at 410; *accord id.* at 420 (Manion, J., dissenting) (criticizing *Friedman* majority for "wholly disregard[ing]" that two-step inquiry). Instead, *Friedman* focused on the considerations identified by *Heller* and *Bruen*: (1) historical evidence; and (2) the impact of the regulation on individuals' meaningful opportunities for self-defense. 784 F.3d at 410. Given that *Friedman* is entirely compatible with the constitutional analysis endorsed by *Bruen*, it remains good law and should control the outcome of this case.

## CONCLUSION

This court should affirm the judgment of the district court.

Respectfully submitted,

KIMBERLY M. FOXX

State's Attorney of Cook County

BY:     *s/Jessica M. Scheller*
        Jessica M. Scheller
        Assistant State's Attorney
        Chief; Advice, Business & Complex
        Litigation Division
        Civil Actions Bureau
        500 Richard J. Daley Center
        Chicago, IL 60602
        (312)603-6934
        Jessica.Scheller@cookcountyil.gov

No. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JAVIER HERRERA,

Plaintiff-Appellant,

v.

KWAME RAOUL, et al.

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 23-cv-00532
The Honorable Lindsay C. Jenkins, Judge Presiding

_____

## SHORT APPENDIX

_____

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603.6934
Jessica.Scheller@cookcountyil.gov

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Division Chief, Civil Actions Bureau
JONATHON D. BYRER
PRATHIMA YEDDANAPUDI
MEGAN HONINGFORD
EDWARD M. BRENER
Assistant State's Attorneys
     *Of Counsel*

# TABLE OF CONTENTS

_____

Memorandum Opinion And Order, entered April 25, 2023 ................................ A1

Notice of Appeal, filed April 26, 2023 .................................................. A32

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| JAVIER HERRERA, | |
| *Plaintiff,* | No. 23 CV 532 |
| v. | Judge Lindsay C. Jenkins |
| KWAME RAOUL, *in his official capacity as Attorney General for the State of Illinois*, BRENDAN F. KELLY, *in his official capacity as Director of the Illinois State Police*, COOK COUNTY, *a body politic and corporate*, TONI PRECKWINKLE, *in her official capacity County Board of Commissioners President*, KIMBERLY M. FOXX, *in her official capacity as Cook County State's Attorney*, THOMAS J. DART, *in his official capacity as Sheriff of Cook County*, CITY OF CHICAGO, *a body politic and corporate*, DAVID O'NEAL BROWN, *in his official capacity as Superintendent of Police for the Chicago Police Department*, | |
| *Defendants.* | |

## MEMORANDUM OPINION AND ORDER

Laws enacted by the City of Chicago, Cook County, and, most recently, the State of Illinois restrict Illinois residents' ability to possess or purchase certain firearms and large-capacity magazines (defined as more than ten rounds for a semiautomatic rifle and more than fifteen rounds for a handgun). Javier Herrera, a Chicago resident, local emergency room doctor, and owner of several restricted firearms and large-capacity magazines, sued the City of Chicago, Cook County, and

the State of Illinois, alleging that these laws violate the Second and Fourteenth Amendments. [Dkt. No. 1]. He simultaneously moved for a temporary restraining order and preliminary injunction to enjoin the enforcement of these laws. [Dkt. No. 4]. The Court held a hearing on April 17, 2023. [Dkt. No. 72]. For the reasons detailed below, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

## I.    Background

### A.    Factual Background

In response to widespread mass shootings nationally, including the mass shooting in Highland Park, Illinois on July 4, 2022, the State of Illinois passed the "Protect Illinois Communities Act," HB 5471 ("the Illinois Act"). Ill. Pub. Act 102-1116, § 1; [Dkt. No. 1 at ¶ 40]. The Illinois Act made three changes to state law at issue in this case.

Under the Act, Illinois residents can no longer carry, possess, or purchase certain "assault weapon[s]." 720 ILCS 5/24-1(a)(15)–(16). The Act defines an "assault weapon" to include various models of firearms with various features, including a "semiautomatic rifle" with a "pistol grip." 720 ILCS 5/24-1.9(a)(1)(A)(i). This definition encompasses an AR-15 rifle. *See* 720 ILCS 5/24-1.9(a)(1)(J)(ii)(II). Additionally, Illinois residents can no longer purchase or possess any "large capacity ammunition feeding device" ("large-capacity magazine"). 720 ILCS 5/24-1.10(a). For rifles, the Illinois Act defines a "large capacity ammunition feeding device" as a "magazine . . . that can [be] readily restored or converted to accept, more than [ten]

rounds of ammunition." *See* 720 ILCS 5/24-1.10(a)(1). For handguns, it is defined as a magazine of more than fifteen rounds. *Id.* The restrictions on firearms and large-capacity magazines took effect on January 10, 2023. *See* 720 Ill. Comp. Stat. ("ILCS") 5/24-1.

The Illinois Act allows any owner of a restricted firearm who acquired the firearm prior to the Illinois Act's effective date to continue to lawfully possess that firearm if they provide an "endorsement affidavit" by October 1, 2023 ("registration requirement"). 720 ILCS 5/24-1.9(d). The affidavit must include the affiant's Illinois firearm owner's identification ("FOID") number, an affirmation that the affiant lawfully owned the restricted firearm before October 1, 2023, and the make, model, caliber, and serial number of the restricted firearm. *Id.* Owners of restricted large-capacity magazines may similarly retain all magazines acquired before the effective date. *See* 720 ILCS 5/24-1.10(d). The Illinois Act does not allow for the purchase of new restricted weapons or large-capacity magazines after its effective date. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d).

The Illinois Act mirrors county and city enactments already in place.[1] *See* Cook County, Ill., Code §§ 54-210–215 (2006); Chi., Ill., Mun. Code §§ 8-20-010, 8-20-075, 8-20-85 (2013); *see also Wilson v. Cook County*, 937 F.3d 1028, 1029 (7th Cir. 2019). Since 2006, the Cook County Code ("County Code") has prohibited county residents from purchasing, carrying, or possessing certain semiautomatic rifles, including an

---

[1]     Because the challenged laws all contain substantively the same restrictions, the Court often treats them together in its analysis below. The Court notes differences between the three enactments when necessary.

3

A3

AR-15 rifle, and large-capacity magazines, defined as any magazine that can accept more than ten rounds. Cook County, Ill., Code §§ 54-211(7)(A)(iii), 54-212(a). Owners of restricted firearms or large-capacity magazines who possessed either prior to the County Code's enactment are required to remove them from the county, render them "permanently inoperable," or surrender them to the Cook County Sheriff. *Id.* at § 54-212(c).

Since 2013, the City Code of Chicago ("City Code") similarly prohibited city residents from purchasing, carrying, or possessing certain semiautomatic rifles, which included the AR-15 rifle, and large-capacity magazines, defined as magazines of fifteen or more rounds for semiautomatic handguns and ten or more rounds for semiautomatic rifles. Chi., Ill., Mun. Code §§ 8-20-010(a)(10)(B)(ii), 8-20-075, 8-20-085. Much like the County Code, the City Code requires that all restricted firearms or large-capacity magazines possessed before the enactment date be disposed of or removed from city limits. *Id.* at §§ 8-20-075(c)(1), 8-20-085(b).

Plaintiff Javier Herrera is an emergency room doctor, Chicago resident, and owner of multiple firearms. [Dkt. No. 1 at ¶ 5]. Herrera owns a Glock 45, Glock 43x, and two AR-15 rifles. [*Id.* at ¶¶ 20, 23–24]. Herrera keeps his Glock 45 and Glock 43x at his Chicago home and his AR-15 rifle "beyond county lines." [*Id.* at ¶ 22–24]. Herrera alleges that he owns these firearms for self-defense, hunting, and sport shooting. [*Id.* at ¶¶ 19, 37]. Herrera has both a FOID card and a concealed carry license. [*Id.* at ¶¶ 5, 19, 23].

A4

In addition to his day job, as of 2018, Herrera has served as a volunteer medic on a local Special Weapons and Tactics ("SWAT") team, which carries out high-risk law-enforcement missions. [*Id.* at ¶ 25]. As a volunteer medic, Herrera renders medical aid to SWAT team officers, bystanders, or anyone else who may be injured on these missions. [*Id.* at ¶ 28]. Herrera is not a law enforcement officer on the SWAT team and does not carry a firearm on these missions. [*Id.*] During his volunteer shifts, Herrera is stationed inside the command vehicle until called upon to render medical aid. [*Id.*] Herrera also attends monthly SWAT trainings, which include shooting drills. [Dkt. No. 5-1 at ¶ 10]. He has participated in these trainings in the past with his personal AR-15 to maintain confidence and proficiency with the weapon. [*Id.* at ¶¶ 10, 12].

## B.    Procedural Background

On January 27, 2023, Herrera sued Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly (the "State Defendants"), County Board of Commissioners President Toni Preckwinkle, Cook County State's Attorney Kim Foxx, Sheriff of Cook County Thomas J. Dart, Cook County (the "County Defendants"), Chicago Police Department Superintendent David O'Neal Brown, and the City of Chicago (the "City Defendants"). [Dkt. No. 1]. Herrera moved for a temporary restraining order and preliminary injunction the same day.[2] [Dkt. No. 4]. In his complaint, Herrera alleges that the City Code, County Code, and Illinois Act

---

[2]    Herrera's complaint additionally seeks declaratory judgment that these statutes are unconstitutional and a permanent injunction. [Dkt. No. 1 at 30–31].

violate the Second and Fourteenth Amendments. [Dkt. No. 1 at ¶¶ 105–173]. Herrera charges that these laws infringe on his right to armed self-defense in several ways. [*Id.* at ¶¶ 97–103].

In particular, Herrera alleges that his right to self-defense is threatened by his inability to keep his AR-15 rifle, his Glock 45, or their accompanying standard magazine in his home due to the City and County Code. [*Id.* at ¶¶ 97–98]. As part and parcel of this harm, because Herrera cannot keep his AR-15 rifle in his home, he must commute over four hours round trip to complete shooting drills with his SWAT team. [Dkt. No. 1 at ¶¶ 31–34, 99; Dkt. No. 5-1 at ¶ 12]. Herrera contends that he must be prepared to handle or secure the AR-15 rifle of an injured officer in the event an officer hands that weapon to Herrera while the officer uses another tool. [Dkt. No. 5-1 at ¶ 8]. Herrera has not alleged that he has ever needed to handle the AR-15 of an injured officer or shoot such a weapon. [Dkt. No. 1, 5-1, 63-3]. But Herrera alleges that on one mission in 2021, a SWAT officer handed him an AR-15 rifle for him to secure. [Dkt. No. 63-3 at ¶ 13]. As a result, Herrera contends that he is effectively precluded from SWAT training shooting drills, given the long commute and his hours as an emergency doctor.[3] [Dkt. No. 1 at ¶ 99; Dkt. No. 5-1 at ¶ 12].

Herrera further alleges injury from the inability to purchase additional AR-15 rifles, rifle components, or large-capacity magazines for any of his weapons in

---

[3]     Herrera additionally alleges that "County and City ordinances deny Dr. Herrera easy access to his rifles for hunting and sport shooting in his off time. As a result, Dr. Herrera engages in these hobbies less than he otherwise would." [Dkt. No. 1 at ¶ 100]. Because this argument does not appear in the parties' briefs regarding a preliminary injunction, the Court need not address it further. *See generally* [Dkt. No. 5, 52, 54, 61, 63].

furtherance of his right to self-defense. [Dkt. No. 1 at ¶¶ 101–102]. Herrera argues that because certain large-capacity magazines come standard with his AR-15 rifle and Glock 45, his inability to purchase those items render the weapons inoperable and causes the weapons to wear out with disuse. [*Id.* at ¶¶ 98, 101].

Finally, Herrera contends that the Illinois Act "will soon prohibit [him] from possessing his AR-15 rifles anywhere in Illinois, even far away from [his] home, unless he complies with its intrusive and ahistorical registration requirement." [*Id.* at ¶ 103]. Herrera fears that the Illinois Act's requirement is but a "prelude to gun confiscation" and risks exposing his personal information in the event of a data breach. [*Id.* at ¶ 103].

## II.    Legal Standard

Because the standard for granting a temporary restraining order and a preliminary injunction is the same, the Court proceeds under the familiar *Winter v. National Resources Defense Council, Incorporated* framework. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). As such, one is "never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To be awarded such relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20).

## III.   Analysis

### A.   Likelihood of Success on the Merits

To meet the likelihood of success on the merits prong, Herrera must show that his challenge has "some likelihood of success on the merits, not merely a better than negligible chance." *Doe*, 43 F.4th at 791 (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (cleaned up) (noting that showing a "better than negligible chance" or "a mere possibility of success" are both insufficient to demonstrate a likelihood of success on the merits sufficient for a preliminary injunction). This prong serves as "an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

Having considered the preliminary record at this stage, the Court concludes that Herrera is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The challenged restrictions on semiautomatic weapons and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with "the Nation's historical tradition of firearm regulation," namely the history and tradition of regulating particularly "dangerous" weapons. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

The Court does not consider this case in isolation. There are two other matters within this district that challenge the Illinois Act as well as similar city restrictions on the possession, carry, and sale of semiautomatic weapons and large-capacity magazines. *See Goldman v. City of Highland Park, Ill.*, No. 22-cv-4774 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Highland Park ordinance that restricts possession and purchase of certain semiautomatic rifles and large-capacity magazines); *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 1 (challenging the Illinois Act and a Naperville City ordinance that restricts sale of certain semiautomatic rifles and large-capacity magazines). Most recently, the *Bevis* Court denied a motion for preliminary injunction of the Illinois Act and a Naperville City ordinance, both restricting the sale of certain semiautomatic rifles and large-capacity magazines.[4] *See Bevis*, 2023 WL 2077392, at *3. This Court agrees with the *Bevis* Court's analysis and incorporates it into this order as applicable.

### 1.    Second Amendment History and Jurisprudence

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme

---

[4]     After the *Bevis* Court denied the request for a temporary restraining order and preliminary injunction, plaintiffs appealed. *Bevis v. v. City of Naperville, Ill.*, No. 22-cv-4775 (N.D. Ill. filed Sept. 7, 2022), ECF No. 64. On appeal, the *Bevis* plaintiffs requested a stay of the Illinois Act during the pendency of their appeal. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF. No. 8. On April 18, 2023, the Seventh Circuit denied the request for a stay. *Bevis, et al. v. City of Naperville, et al.*, 23-1353 (7th Cir. filed Feb. 23, 2023), ECF No. 51. As such, this Court can rule on the pending motion for a temporary restraining order and preliminary injunction in the present case. [Dkt. No. 4].

Court first recognized the Second Amendment right to keep and bear arms for the purpose of self-defense. 554 U.S. 570, 628–29 (2008). In *Heller*, the Court confronted a challenge to a District of Columbia law that restricted handgun possession without a license and imposed a trigger-lock requirement, which rendered such firearms inoperable. *Id.* at 574–75. The Court ultimately struck down the law, finding that it violated the Second Amendment "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court emphasized that "self-defense" was a "central component" of the right. *Id.* at 599.

Notwithstanding the Court's central holding, the Court in *Heller* underscored that the Second Amendment right is not "unlimited." *Id.* at 626. Indeed, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court gave a few examples of limits on the Second Amendment right. First, as set out in *United States v. Miller*, 307 U.S. 174, 178 (1939), the right does not extend to "weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Furthermore, laws related to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms" are all presumptively lawful, *id.* at 626–27.

Two years later, in *McDonald v. City of Chicago*, the Court incorporated this right against the states through the Fourteenth Amendment. 561 U.S. 742, 767

A10

(2010). In that vein, the Court noted that "[f]rom the early days of the Republic, through the Reconstruction era, to the present day, States and municipalities . . . banned altogether the possession of especially dangerous weapons." *Id.* at 899–900. The Court remarked that "[t]his history of intrusive regulation is not surprising given that the very text of the Second Amendment calls out for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers." *Id.* at 900–01.

Thereafter, federal courts were left to formulate a test to determine whether a gun regulation was constitutional. *Bruen*, 142 S. Ct. at 2125. The Courts of Appeals generally adhered to a two-step test doing just that. *Id.*; *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). In 2022, however, the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen* rejected those efforts and set out a new framework for lower courts to evaluate gun laws. 142 S. Ct. at 2126–34; *see also United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023) (acknowledging that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rending our prior precedent obsolete" (cleaned up and internal citation omitted)). With that history in mind, as the *Bevis* Court succinctly explained, "*Bruen* is now the starting point" for this Court's analysis of a challenged gun regulation. *Bevis*, 2023 WL 2077392, at *9.

The *Bruen* Court outlined a two-step analysis to determine whether a challenged gun regulation is constitutional. *Bruen*, 142 S. Ct. at 2126–34. The Court must first determine whether "the Second Amendment's plain text covers an

individual's conduct." *Id.* at 2129–30. If the plain text does not cover the challenged regulation, then the regulation is outside of the Second Amendment's scope and is unprotected. *Id.* However, if the text does include such conduct, "the Constitution presumptively protects that conduct." *Id.* at 2130. As such, for the regulation to be upheld as constitutional, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To demonstrate that a regulation is "consistent with the Nation's historical tradition of firearm regulation," the government must engage in "analogical reasoning" by pointing to "a well-established and representative historical analogue." *Id.* at 2133 (emphasis removed). The government can utilize analogues from a range of historical periods, including English statutes from late 1600s, colonial-, Revolutionary- and Founding-era sources, and post-ratification practices, specifically from the late 18th and early 19th centuries. *Id.* at 2135–56; *Heller*, 554 U.S. at 605–626; *Rahimi*, 61 F.4th at 455–59. *Bruen* took special note that the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. The government's proposed analogue need not be "a historical twin" and the "modern-day regulation" need not be "a dead ringer for historical precursors" to "pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

Importantly, "*Bruen* does not displace the limiting examples provided in *Heller*." 2023 WL 2077392, at *9. As set out in *Heller*, states may still enact (1) "prohibitions on the possession of firearms by felons and the mentally ill"; (2) "laws

forbidding the carrying of firearms in sensitive places"; (3) "laws imposing conditions and qualifications on the commercial sale of arms"; and (4) bans on "dangerous" weapons that are not "in common use." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted). The list itself "does not purport to be exhaustive." *Id.* (quoting *Heller*, 554 U.S. at 626 n.26).

### 2. Restrictions on Semiautomatic Rifles and Large-Capacity Magazines under the Challenged Laws

The Court holds that the restrictions on possession of certain semiautomatic rifles and large-capacity magazines in the City Code, County Code, and Illinois Act are consistent with the Nation's "history and tradition" of treating particularly "dangerous" weapons as unprotected. *Bruen*, 142 S. Ct. at 2130.

Because the Court ultimately agrees with *Bevis* and its conclusion, only a brief discussion of that opinion is necessary.[5] In *Bevis*, a Naperville gun shop owner and the National Association for Gun Rights ("NAGR") challenged a Naperville City ordinance and the Illinois Act's restrictions on sale of certain semiautomatic weapons and large-capacity magazines as unconstitutional under the Second Amendment. *Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court denied the plaintiffs' request for

---

[5] While *Bevis* dealt principally with sale of restricted firearms, its analysis extends to gun possession, as is challenged in the present case. *See Bevis*, 2023 WL 2077392, at *1–2. The *Bevis* Court principally concluded that "Naperville and Illinois lawfully exercised their authority to control the[] *possession*, transfer, sale, and manufacture [of certain semiautomatic weapons] by enacting a ban on commercial sales." *Id.* at *16 (emphasis added). The *Bevis* Court explicitly noted that while the parties only challenged laws as they applied to sales, nonetheless, "the state[] [has] general authority to regulate assault weapons because logically if a state can prohibit the weapons altogether, it can also control their sales." *Id.* at *9 n.8. Otherwise, "a right to own a weapon that can never be purchased would be meaningless." *Id.* (citing *Drummond v. Robinson Township*, 9 F.4th 217, 229 (3d Cir. 2021)). This Court agrees and applies *Bevis*'s analysis to the question of possession presented here.

13

a preliminary injunction, concluding that "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected" and thus, the plaintiffs were unlikely to succeed on the merits sufficient for a preliminary injunction. *Id*. at *9.

To reach this conclusion, the *Bevis* Court detailed the regulatory history of "Bowie kni[ves]," clubs, trap guns, and gun silencers. *Id*. at *10–14. The Court utilized over fifty examples, ranging from the Colonial Era to the early 20th century, showing a clear trend that when weapons became "prevalent," so too would "the laws governing the most dangerous of them." *Id*. at *10. The Court noted that as firearms proved more reliable, states similarly regulated them, including "gun silencers" and "semiautomatic weapons." *Id*. at *12. As to the latter, the Court noted that "semiautomatic weapons themselves, which assault weapons fall under, were directly controlled in the early 20th century." *Id*. From this body of evidence, the Court concluded that "[t]he history of firearm regulation . . . establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)."[6] *Id*. at *14–16.

In response to the Defendants' citation to similar statutes in this case, Herrera argues that his suit does not concern public carry, but rather defense of the home. [Dkt. No. 63 at 1]. This argument is unavailing. The Supreme Court was clear in its instruction that "analogical reasoning" is not a "regulatory straightjacket" and "even

---

[6]    The State Defendants in this case similarly point to the history of regulations regarding "concealable [firearms], Bowie knives, clubs, and, later, machine guns and semi-automatic weapons" and conclude that "[b]ecause the Act regulates 'dangerous and unusual weapons' for a purpose and in a manner relevantly similar to comparable historical regulations, it does not violate the Second Amendment." [Dkt. No. 52 at 42–43]. The County and City Defendants do the same. [Dkt. 54 at 36, 45–50; Dkt. No. 61-1 at 15–17].

if a modern-day regulation is not a dead ringer for historical precursors," the government's chosen analogue "may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133. While the government's analogue may not be identical, it need not be. *Id. Bruen* also expressly observed that "dramatic technological changes" or "unprecedented societal concerns" may require a "more nuanced approach." *Id*. at 2132.

Such an approach is applicable here. As the State Defendants put forth at oral argument, laws regulating weapons, including various firearms, developed over time in response to the type of harm that those weapons presented, as in the present case. Transcript of Oral Argument at 82–84, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73; *see also* [Dkt. No. 52 at 58 ("Throughout American history, when lawmakers have confronted new or escalating forms of societal violence, they have frequently responded by regulating the instruments of that violence in an effort to reduce it.")]. Here, the City Code, County Code, and Illinois Act similarly responded to "dramatic technological changes" and "unprecedented societal concerns" of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them. *Bruen*, 142 S. Ct. at 2132. This is well in line with earlier laws regulating carry and progressing to restrictions on sale and possession, in and out the home. [See Dkt. No. 52 at 60–63].

Having concluded that Defendants demonstrated a tradition of regulating "particularly dangerous weapons," *id*. at *9, the *Bevis* Court next considered "whether assault weapons and large-capacity magazines fall under this category" of "highly

dangerous arms (and related dangerous accessories)," and answered with a resounding yes. *Id.* at *14. The Court considered ample record evidence of the vastly destructive injuries that semiautomatic weapons cause and their "disproportionate[]" use in "mass shootings, police killings, and gang activity. *Id.* at *14–15. The Court observed that large-capacity magazines "share similar dangers," with studies showing that the use of such magazines lead to an increased number of fatalities in mass-shooting scenarios. *Id.* at *15 ("[R]esearchers examining almost thirty years of mass-shooting data [have] determined that high-capacity magazines resulted in a 62 percent higher death toll."). The Court rejected any argument that regulations on semiautomatic weapons and large-capacity magazines are not "unusual," given the ten-year federal ban on assault weapons and eight bans on semiautomatic weapons and large-capacity magazines in jurisdictions such as Illinois. *Id.* at *16. As such, the Court concluded that "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." *Id.*

This Court concurs with the *Bevis* analysis, including its analysis and conclusions regarding large-capacity magazines, and adopts it here. *See Bevis*, 2023 WL 2077392, at *14–16. Herrera is unlikely to be successful in his challenge to the semiautomatic weapons and large-capacity magazine restrictions in the City Code, County Code, and Illinois Act. *Doe*, 43 F.4th at 791.

### 3.    Registration Requirement Under the Illinois Act

The Court next turns to Herrera's challenge to the Illinois Act's registration requirement to determine his likelihood of success on the merits.

#### a)    Ripeness

Before doing so, the Court first concludes that the question is ripe for adjudication and Herrera has alleged sufficient imminent injury in a pre-enforcement challenge context. To establish Article III standing, the plaintiff must allege injury-in-fact traceable to the defendant and capable of being redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury alleged must be "concrete and particularized," as well as "actual or imminent," rather than "conjectural or hypothetical." *Id.* at 560.

"Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up). In evaluating ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 560. In the context of a pre-enforcement challenge, like the present case, ripeness and standing often plumb the same concept: "timing." *Id.*

When a plaintiff faces a realistic threat that a law will be enforced against him, "a party may advance a preenforcement challenge before suffering an injury—so long as the threatened enforcement is sufficiently imminent." *Sweeney*, 990 F.3d at 559 (internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 159 (2014)). The plaintiff need not suffer "an actual arrest, prosecution, or other enforcement action," nor does the plaintiff need "to confess that he will in fact violate the law." *Driehaus*, 573 U.S. at 158, 163. Rather, a plaintiff may bring a pre-enforcement challenge where (1) he intends to perform conduct that is arguably constitutionally protected, (2) the conduct is prohibited by the rule or statute challenged, and (3) there is a credible threat of enforcement. *Id*. at 159.

These criteria are met in the present case. Herrera avers an intent to disobey any law that he perceives to be unconstitutional, like the Illinois Act's registration requirement. [Dkt. No. 63-3 at ¶ 18]. While the parties dispute whether the regulations are constitutional, failure to register in compliance with the Illinois Act at the very least implicates the Second Amendment and is "arguably constitutionally protected." See *Heller*, 554 U.S. at 635 (directing that the district court permit the plaintiff "to register his handgun" in compliance with District law). Finally, there seems to be a credible threat of enforcement, given that Herrera's "intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will not enforce the statute." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998); *see also* 720 ILCS 5/24-1(b) (stating that an individual who possesses a restricted firearm in violation of 720 ILCS 5/24-1(a)(15) commits a Class A misdemeanor, with second or subsequent violation classified as a Class 3 felony). As such, Herrera can advance his suit before suffering his alleged injury. To delay adjudication of these issues until the Illinois

A18

Act's registration requirement is in effect would cause undue "hardship" to Herrera and as such, the issue is similarly ripe. *Sweeney*, 990 F.3d at 560.

    **b)**    **Analysis**

While Herrera can challenge the Illinois Act's registration requirement before its effective date, he is unlikely to succeed on the merits of his claim. *Doe*, 43 F.4th at 791. The Court holds that the Illinois Act's registration requirement is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As discussed below, Defendants have put forth a "representative historical analogue" to demonstrate a tradition vindicating the Illinois Act's registration requirement. *Id.* at 1233; [Dkt. No. 52 at 40 n.24; Dkt. No. 52-14].

Pre-colonial evidence suggests that colonies required gun registration in a variety of ways. For instance, in 1631, Virginia implemented a "muster" requirement, necessitating inhabitants to annually account for their "arms and ammunition" to the "commanders" under which they served. [Dkt. No. 52-15 at 69]. As other district courts have similarly noted, American colonies in the 17th century had firearm owners register their guns through mandatory "muster" laws, taxes requiring identification of firearms, and as part of broader legislative programs regarding the sale, transfer, and taxation of firearms. See *United States v. Holton*, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (noting that multiple colonial governments required registration of arms through mandatory "muster" laws and taxes imposed from "as early as 1607 and well into the 1800s"); see also *United States v. Tita*, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (noting that "many of the colonies enacted

19

laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms," citing laws from 17th century New York, Virginia, and Connecticut). Indeed, the *Holton* Court relied on many of the same registration and taxation statutes as cited in this case to hold that 18 U.S.C. § 922(k), the statute prohibiting receipt of a firearm with the manufacturer's serial number obliterated or removed, "pass[ed] constitutional muster under *Bruen*." *Compare Holton*, 2022 WL 16701935, at *4–5 (cleaned up) *with* [Dkt. No. 52 at 40 n.24; Dkt. No. 52-15 at 69–71].

During the era of the Fourteenth Amendment's ratification, many state legislatures taxed firearms, which in essence required that firearms be identified and disclosed to the government. Mississippi required a "tax of two dollars on each dueling or pocket pistol" in 1848. [Dkt. No. 52-15 at 69]. In 1856, North Carolina similarly required that "every pistol, except such as are used exclusively for mustering" that was "used, worn or carried" be taxed. [*Id.*] This law was reenacted in a similar form the next congressional session. [*Id.*] Georgia, in 1866, enacted a similar tax, requiring "one dollar apiece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties," with the firearm owner required to render an "oath" of any such "gun, pistol, musket, or rifle." [*Id.* at 69–70]. Alabama did much the same a year later. [*Id.* at 70]. The state imposed a "tax of two dollars each" for "[a]ll pistols or revolvers in the possession of private persons," for which the taxpayer would receive "a special receipt" in order to prove payment. [*Id.*] The Court

finds that these historical regulations sufficiently analogous to the Illinois Act's registration requirement to satisfy *Bruen*. 142 S. Ct. at 2134.

Herrera complains that the statutes Defendants identify "mostly targeted certain kinds of pistols and arms like the Bowie knife," and "did not generally target rifles," such that they are not sufficiently analogous. [Dkt. No. 63 at 41]. Again, *Bruen* does not require a "historical twin." 142 S. Ct. at 2133. Rather, the inquiry is whether the modern statute and the historical regulations are sufficiently analogous. *Id*. ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

Late-19th and 20th century laws, while not themselves dispositive of a history or tradition of gun registration laws, can serve as "confirmation" of the same, as they do here. *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019); *see Heller*, 554 U.S. at 614, 621–25 (utilizing 19th and 20th century sources in its analysis); *see also Bruen*, 142 S. Ct. at 2154 n. 28 (noting that "late-19th-century evidence" and "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*" (emphasis added)). This sort of evidence confirms what the Court has already concluded: the registration requirement in the Illinois Act is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

A review of the legislation during this period shows a continuing tradition of state and national registration requirements. For example, starting in 1885, Illinois kept a "register of all such [deadly] weapons sold or given away" with various

identifying information, including the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the weapon, and the purpose for which it is purchased or obtained." [Dkt. No. 52-15 at 70–71]. Failure to comply with the register resulted in a fine. [*Id.*] In 1918, Montana required that any individual who possessed a "fire arm" to register it with the local sheriff. [*Id.* at 71]. Indeed, as the Supreme Court in *United States v. Miller* noted, the National Firearms Act of 1934 imposed registration requirements on owners of certain firearms, imposing a fine for failure to do so. *See Miller*, 307 U.S. at 175, 175 n.1 (noting that the National Firearms Act of 1934 required owners of grandfathered weapons to register their weapons within 60 days by providing "the number or other mark identifying such firearm, together with [the owner's] name, address, place where such firearm is usually kept, and place of business or employment").

*Bruen* itself suggests that the Illinois Act's registration requirement is permissible. In concluding that there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense," *Bruen*, 142 S. Ct. at 2138, the *Bruen* Court took special note that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of existing "shall-issue" licensing laws, *id.* at 2138 n.9. In so doing, the Court distinguished New York's problematic statute from other shall-issue licensing regimes because the latter did not require an "appraisal of facts, the exercise of judgment," or "the formation of an opinion" on the part of the licensing official. *Id.*; *see also id.* at 2162 (Kavanaugh, J., concurring) (noting that "shall-issue regimes" are "constitutionally permissible," even

if they require an individual to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements").

Of course, licensing regimes and registration requirements are not the same thing, as each serves a different purpose. But the Illinois Act's registration requirement remains far less invasive than the presumptively constitutional regulations described in *Bruen*. The shall-issue licensing schemes discussed in *Bruen* involved a "background check" or the passage of a "firearms safety course," *Bruen*, 142 S. Ct. at 2138 n.9, which are *more* onerous than the relatively mechanical registration process required by the Illinois Act, *see* 720 ILCS 5/24-1.9(d). Nor does the Act permit state officials to have "open-ended discretion" to deny or allow a firearm to be registered. *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Rather, owners of semiautomatic rifles before the Act's effective date must provide the affiant's FOID number, report the make, model, caliber, and serial number of the weapon, and thereafter affirm that he or she lawfully owned the weapon before January 10, 2023.[7] *See* 720 ILCS 5/24-1.9(d).

Citing *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011), Herrera argues that the "fundamental problem with [the] gun registration law

---

[7]     FOID cards and concealed carry licenses are arguably even more intrusive than the Illinois Act's registration requirement. *See* 430 ILCS 65/4(a) (requiring an applicant's name, birth date, home address, driver's license information, and a color photograph for the issuance of a FOID card); *see also* 430 ILCS 66/10(a), 430 ILCS 66/25, 430 ILCS 66/35 (requiring an applicant's FOID license, background check, and completion of a firearms training program). Herrera has already applied and received both a FOID card and a concealed carry license. [Dkt. No. 1 at ¶¶ 5, 19, 23].

23

A23

is that registration of lawfully possessed guns is not 'longstanding.'" [Dkt. No. 5 at 3, 27–28]. This argument is unpersuasive for at least two reasons. Herrera cites to then-Judge, now-Justice Kavanaugh's dissent in *Heller II* on remand. The opinion is not controlling, as both out-of-circuit caselaw and a dissenting opinion. *Heller II*, 670 F.3d at 1269–96 (Kavanaugh, J., dissenting). Second, the challenged registration requirement in *Heller II* is factually distinguishable from the present case. In *Heller II*, the District of Columbia required that an applicant provide his "name, address, and occupation," submit "for a ballistics identification procedure," appear in person to register (with a limit of one pistol allowed to be registered every thirty days), and renew each registration every three years with a renewed certificate of his compliance with the law. *Id.* at 1248. These are far afield from the requirements at issue here.

For these reasons, Defendants have put forth "representative historical analogue" to demonstrate a tradition of registration regulation in line with the registration requirement of the Illinois Act. *Bruen*, 142 S. Ct. at 2133. The registration requirement is "consistent with this Nation's historical tradition of firearm regulation" and therefore, likely constitutional. *Id.* at 2130. Accordingly, Herrera is unlikely to succeed on the merits of his claim and is not due the "extraordinary equitable remedy [of a preliminary injunction] that is available only when the movant shows clear need." *Turnell*, 796 F.3d at 661.

### B.    Irreparable Harm

While the Court need not address the remaining preliminary injunction factors, the Court additionally concludes that Herrera has not shown that he will suffer irreparable harm absent a preliminary injunction, *see Doe*, 43 F.4th at 791.

Harm is "irreparable" when "legal remedies are inadequate to cure it." *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate" does not denote that such remedies would be "wholly ineffectual," only that such a remedy would be "seriously deficient as compared to the harm suffered." *Id.* (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). In determining whether Herrera will suffer irreparable harm absent a preliminary injunction, the Court must weigh "how urgent the need for equitable relief really is." *U.S. Army Corps of Engineers*, 667 F.3d at 788.

Harm stemming from a constitutional violation can constitute irreparable harm. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). However, a presumption of irreparable harm is not applicable to all alleged constitutional violations. *Compare Int'l Ass'n of Fire Fighters, Loc. 365*, 56 F.4th at 450–51 ("Under Seventh Circuit law, irreparable harm is presumed in *First Amendment* cases.") (emphasis added); *and Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (describing that "[t]he loss of a *First Amendment right* is frequently presumed to cause irreparable harm") (emphasis added); *with Campbell v. Miller*, 373

F.3d 834, 835 (7th Cir. 2004) (rejecting plaintiff's argument that "money never is an adequate remedy for a constitutional wrong").

Herrera, much like the *Bevis* plaintiffs, cites *Ezell* for the proposition that there is a presumption of irreparable harm in all Second Amendment challenges. [Dkt No. 5 at 28; Dkt. No. 63 at 44]. The Court rejects this argument. *See Bevis*, 2023 WL 2077392, at *16. While the Seventh Circuit in *Ezell* likened the plaintiff's alleged Second Amendment harm to a First Amendment challenge, where harm can be presumed, the Seventh Circuit declined to create such a wide-ranging presumption for Second Amendment cases. *Ezell*, 651 F.3d at 699; *see also Bevis*, 2023 WL 2077392, at *16 (cleaned up) (observing that "the Seventh Circuit [in *Ezell*] stopped short of holding that injury in the Second Amendment context unquestionably constitutes irreparable harm," as stated in *Elrod*).

Apart from a presumption, Herrera alleges two sources of harm: (1) his inability to possess his AR-15 rifle, its corresponding standard large-capacity magazine, and additional large-capacity magazines for his Glock 45 impinges on his capacity to protect himself in his home, and (2) the commute time to retrieve his personal AR-15 rifle renders his monthly SWAT training a "practical impossibility." [Dkt. No. 1 at ¶¶ 31, 97–103; Dkt. No. 5-1 at ¶ 12]. The Court takes each argument in turn.[8]

---

[8] The Court has its doubts about the time-sensitive nature of Herrera's emergency request for preliminary injunction, given his delayed challenge to the City and County Codes. Since 2006, Herrera has been prohibited from keeping his AR-15 rifle, its assorted components, and any large-capacity magazine for his Glock 45 or AR-15 rifle in his Chicago home. *See* Cook County, Ill., Code §§ 54-211, 54-212(a), (c)(2); Chi., Ill., Mun. Code

Herrera's alleged inability to protect himself in his home is unsupported by the record. Herrera does not dispute that he currently has two firearms in his home—a Glock 43x and Glock 45—that he can use for self-defense. [Dkt. No. 1 at ¶¶ 20, 23–24.] While Herrera prefers to use his standard seventeen-round magazine for his Glock 45 due to fear of it malfunctioning or jamming [Dkt. No. 5 at ¶ 5], he does not dispute that his firearm can accept a magazine of less than fifteen rounds to operate, [Dkt. No. 63-3 at ¶ 17]. Indeed, Herrera utilizes a ten-round magazine for his Glock 43x, which is compliant with city, county, and state law. [Dkt. No. 1 at ¶ 23]. Additionally, none of the challenged laws seek to take from Herrera his two AR-15 rifles or existing large-capacity magazines. He need only register such accoutrements and he may continue to keep them in his out-of-county storage location. *See* 720 ILCS 5/24-1.9(d); 720 ILCS 5/24-1.10(d). Herrera's contention that without "standard" magazines for his firearms, his weapons will "wear out" is unsupported by the record. [Dkt. No. 52-7 at ¶ 25 ("Despite the recent proliferation of large capacity magazines, it is important to note that there is no known firearm that requires a large-capacity magazine to function as designed.")].

---

§§ 8-20-010, 8-20-075, 8-20-085. He has been subject to a lengthy round-trip commute to retrieve his personal AR-15 rifle since he became a volunteer medic in 2018. [Dkt. No. 5-1 at ¶¶ 8, 10, 12]. Yet, Herrera did not request a preliminary injunction seeking to enjoin either law until 2023. [Dkt. No. 4]. Herrera says that he held off on challenging these laws before now because he understood that he would likely be denied such relief given Seventh Circuit law. [Dkt. No. 63-3 at ¶ 19]. He cites to no caselaw showing that his reasoning constitutes sufficient grounds to delay filing a challenge or that he was reasonably diligent in doing so. As a result, Herrera's apparent delay weighs against his request. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (noting that "a party requesting a preliminary injunction must generally show reasonable diligence" and the "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request" for preliminary injunction).

Herrera's allegations regarding his training with the SWAT team are similarly undercut by record evidence. At the outset, Herrera expresses seemingly contradictory facts about his past and current efforts to bring his personal AR-15 rifle to SWAT team training. Herrera acknowledges that he has brought his personal AR-15 rifle to monthly trainings in the past but has now stopped. [*Compare* Dkt. No. 5-1 at ¶ 10 ("Similar to SWAT school, I have participated in those [SWAT] shooting drills in the past with my own AR-15.") *with* Dkt. No. 63-3 at ¶ 5 ("I can't feasibly bring my AR-15 to the training and participate in the weapons handling training or shooting drills with my other team members because I cannot keep that firearm and its standard magazines in my home.")].

Herrera's explanation for this change, in short, is that the drive is too long. But he alleges nothing in support of why the commute is *now* too long, as compared to his commute before. As the State Defendants noted at oral argument, for the past five years of training while only the City and County Codes were being enforced, Herrera faced no obstacle to bringing his personal AR-15 rifle with him, apart from the long commute. Transcript of Oral Argument at 53–54, 84–85, *Herrera et al. v. Kwame Raoul et al*, No. 23-cv-532 (N.D. Ill. Jan. 27, 2023), ECF No. 73. Even under the current state law, assuming that Herrera is completing SWAT training at a licensed firing range, he is expressly allowed to do so. *See* 720 ILCS 5/24-1.9(d) (allowing for "use of the assault weapon . . . at a properly licensed firing range"); 720 ILCS 5/24-1.10(d) (allowing for the "use of the large capacity ammunition feeding device at a properly licensed firing range").

That aside, Herrera's allegations are speculative. While the requirement of access to "[r]ange training" lies "close to the core of the individual right of armed defense," *Ezell*, 846 F.3d at 893, Herrera's allegations regarding SWAT training seem to place him outside of the scope of that right. Herrera does not carry a firearm during SWAT missions. [Dkt. No. 1 at ¶ 28]. As a volunteer medic, Herrera is tasked with "provid[ing] medical care to the operators on my team, any injured perpetrators, or injured bystanders," not shooting a weapon offensively or defensively. [Dkt. No. 5-1 at ¶ 8]. Herrera's harm is predicated on the contingency that he might need to "act if a SWAT officer is not immediately present to assist with an injured officer or armed suspect." [Dkt. No. 63-3 at ¶ 7]. In essence, Herrera's allegations amount to speculation about what he might need to do, not about harm he is "*likely* to suffer . . . in the absence of preliminary relief." *See Winter*, 555 U.S. at 20 (emphasis added).

Herrera argues that his inability to "adequately train for SWAT duties . . . flies in the face of textbook standards of tactical medicine." [Dkt. No. 63 at 46]. Yet, the authority Herrera cites in support requires that any training volunteer medics receive should be "mutually agree[d] upon" with "the involved agencies" and "local law enforcement." [Dkt. No. 63-3 at 13]. The local agencies in the present case, however, contend that as a medic, Herrera "should not have any reason to handle an injured operator's AR-15 while rendering medical aid." [Dkt. No. 52-15 at ¶ 10]. Volunteer SWAT medics, like Herrera, are affirmatively not trained in deadly force protocols, given weapons, or put in a position that requires the use of deadly force. [*Id.* at 2-3]. Indeed, "the training that is most valuable for a civilian medic is not . . .

shooting drills, but rather being trained and knowledgeable about tactical medicine, including how to quickly remove a SWAT team member's uniform and equipment to render medical aid." [*Id.* at ¶ 11 (internal quotation marks omitted)].

Given this record and the early stage of this case, the Court cannot conclude that the alleged harm is "anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022). For these reasons, Herrera has additionally failed to demonstrate a "clear need" for the "extraordinary equitable remedy [of preliminary injunction]." *Turnell*, 796 F.3d at 661.

### C.    Public Interest and Balance of the Equities

Finally, while not required given the Court's above conclusions, *see Turnell*, 796 F.3d at 662, the Court concludes that neither the public interest nor the equities favor Herrera's claim, *see Doe*, 43 F.4th at 791. *See also Nken v. Holder*, 556 U.S. 418, 435 (holding that the public interest and balance of the equities are considered together when the government is the party opposing injunctive relief). To balance the equities, the Court weighs "the degree of harm the nonmoving party would suffer if the injunction is granted against the degree of harm to the moving party if the injunction is denied." *Troogstad v. City of Chicago*, 576 F. Supp. 3d 578, 590 (citing *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021)). The analysis also gauges the public interest, or "the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971

F.2d 6, 11 (7th Cir. 1992)); *see id* (defining the public interest as the "interests of people and institutions that are not parties to the case").

This Court, like the *Bevis* Court, finds that the challenged laws "protect public safety by removing particularly dangerous weapons from circulation" which would be "injured by the grant of injunctive relief." *Bevis*, 2023 WL 2077392, at *17 (quoting *Metalcraft of Mayville, Inc. v. The Toro Comp.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017)). By contrast, Herrera seeks to prevent harm flowing from the enforcement of what he maintains is an unconstitutional law—an interest that is comparably weak given the conclusions above. [Dkt. No. 5 at 28–29]. None of the harms he identifies outweigh the overwhelming interest in public safety. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) (observing that it is the "primary concern of every government" to protect "the safety and indeed the lives of its citizens"). In sum, he has failed to show a "clear need" for the extraordinary remedy he seeks. *Turnell*, 796 F.3d at 661.

## XIV. Conclusion

For these reasons, Herrera's motion for a temporary restraining order and preliminary injunction is denied. [Dkt. No. 4].

Enter: 23-cv-532

Date:  April 25, 2023

_____
Lindsay C. Jenkins
United States District Judge

31

A31

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAVIER HERRERA, | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-00532 |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department, | Hon. Lindsay C. Jenkins |
| *Defendants.* | |

**<u>NOTICE OF APPEAL</u>**

Plaintiff Dr. Javier Herrera appeals this Court's order, entered on April 25, 2023, and which denied Plaintiff's motion for temporary restraining order and preliminary injunction, to the United States Court of Appeals for the Seventh Circuit. *See* Opinion and Order, ECF 75; Minute Entry, ECF 74; *see also* 28 U.S.C. §1292(a)(1).

A32

Dated: April 26, 2023

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

Gregory Abbott Bedell
KNABE & BEDELL
33 North Dearborn Street, 10th Floor
Chicago, IL 60602
(312) 977-9119
gbedell@kkbchicago.com

*   *Admitted pro hac vice*

Respectfully submitted,

 */s/ Taylor A.R. Meehan*
Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i)because it contains 13,327 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 49  In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

*s/ Jessica M. Scheller*
Jessica M. Scheller, Attorney

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

In accordance with Circuit Rule 30(d), I certify that the short appendix to this brief contains all of the materials required by Circuit Rule 30(a), and that all materials required by Circuit Rule 30(b) are contained in a separate appendix.

*s/Jessica M. Scheller*
Jessica M. Scheller, Attorney

## CERTIFICATE OF SERVICE

I certify that on June 5, 2023, I electronically filed the attached Opening Brief and Short Appendix of Defendant-Appellees Cook County, Toni Preckwinkle, Kimberly M. Foxx, Thomas J. Dart with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Jessica M. Scheller*
Jessica M. Scheller, Attorney