**Nos. 23-1825, 23-1826, 23-1827, 23-1828**

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

————————

CALEB BARNETT, et al.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL, Attorney General of Illinois,
and BRENDAN F. KELLY, Director of the Illinois State Police,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court for the
Southern District of Illinois,
No. 23-cv-00209

————————

## APPELLEES' RESPONSE BRIEF

————————

<table>
<tr>
<td valign="top">

GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 6025

</td>
<td valign="top">

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN*
MARIEL A. BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

\* Supervised by principals of the firm who are members
of the Virginia bar

</td>
</tr>
</table>

*Counsel for* Barnett *Appellees*
(additional counsel listed on inside cover)

June 19, 2023

DAVID G. SIGALE
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
(630) 452-4547
disgale@sigalelaw.com

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600

*Counsel for* Harrel *Appellees*

MARK L. SHAW
JENNIFER CRAIGMILE NEUBAUER
MICHAEL A. DANFORTH
SHAW LAW LTD.
33 North County Street, Suite 300
Waukegan, IL 60085
(847) 244-4696

C.D. MICHEL
ANNA M. BARVIR
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for* Federal Firearms Licensees of Illinois *Appellees*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

*Barnett* Appellees (3:23-cv-209-SPM)
        Caleb Barnett
        Brian Norman
        Hood's Guns & More
        Pro Gun & Indoor Range
        National Shooting Sports Foundation, Inc.

*Harrel* Appellees (3:23-cv-141-SPM)
        Dane Harrel
        C4 Gun Store, LLC
        Marengo Guns, Inc.
        Illinois State Rifle Association
        Firearms Policy Coalition, Inc.
        Second Amendment Foundation

*Federal Firearms Licensees of Illinois* Appellees (3:23-cv-215-SPM)
        Federal Firearms Licensees of Illinois
        Guns Save Life
        Gun Owners of America
        Gun Owners Foundation
        Piasa Armory
        Debra Clark
        Jasmine Young
        Chris Moore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

*Barnett* Appellees (3:23-cv-209-SPM)
   Swanson, Martin & Bell, LLP
   Clement & Murphy, PLLC

*Harrel* Appellees (3:23-cv-141-SPM)
   Law Firm of David G. Sigale, P.C.
   Cooper & Kirk, PLLC

*Federal Firearms Licensees of Illinois* Appellees (3:23-cv-215-SPM)
   Shaw Law Ltd.
   Michel & Associates, P.C.

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

*Barnett* Appellees (3:23-cv-209-SPM)
   Hood's Guns & More, Pro Gun & Indoor Range, and National Shooting Sports Foundation, Inc., have no parent corporations.

*Harrel* Appellees (3:23-cv-141-SPM)
   C4 Gun Store, LLC, Marengo Guns, Inc., Illinois State Rifle Association, Firearms Policy Coalition, Inc., and Second Amendment Foundation have no parent corporations.

*Federal Firearms Licensees of Illinois* Appellees (3:23-cv-215-SPM)
   Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, and Piasa Armory have no parent corporations.

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

*Barnett* Appellees (3:23-cv-209-SPM)

No company owns 10% or more of Hood's Guns & More, Pro Gun & Indoor Range, or National Shooting Sports Foundation, Inc.'s stock.

*Harrel* Appellees (3:23-cv-141-SPM)

No company owns 10% or more of C4 Gun Store, LLC, Marengo Guns, Inc., Illinois State Rifle Association, Firearms Policy Coalition, Inc., or Second Amendment Foundation's stock.

*Federal Firearms Licensees of Illinois* Appellees (3:23-cv-215-SPM)

No company owns 10% or more of Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, and Piasa Armory's stock.

s/Erin E. Murphy
Erin E. Murphy

Counsel for *Barnett* Appellees

s/ David G. Sigale
David G. Sigale

Counsel for *Harrel* Appellees

s/ C.D. Michel
C.D. Michel

Counsel for *Federal Firearms Licensees of Illinois* Appellees

June 19, 2023

**TABLE OF CONTENTS**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES....................................................................... vi

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE.................................................................. 3

    A.    Historical Background........................................................... 3

    B.    Illinois House Bill 5471 ......................................................11

    C.    Proceedings Below.............................................................. 16

SUMMARY OF ARGUMENT................................................................. 21

STANDARD OF REVIEW .................................................................... 26

ARGUMENT ..................................................................................... 26

I.    The District Court Correctly Concluded That Plaintiffs Are Likely To Succeed On The Merits ................................................................ 26

    A.    The Firearms and Feeding Devices HB5471 Bans Are "Arms"............................................................................... 27

    B.    The Arms HB5471 Bans Are in Common Use for Lawful Purposes, Including Self-Defense ....................................... 34

    C.    There Is No Historical Tradition in this Country of Banning Arms that Millions of Law-Abiding Citizens Own for Lawful Purposes................................................................. 43

    D.    Illinois Cannot Save HB5471's Sweeping Ban by Pointing to Some Dramatic Technological Change or Novel Societal Problem.............................................................................. 52

II.    The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors Favor Injunctive Relief ......................................... 56

CONCLUSION ................................................................................................... 57

CERTIFICATE    OF    COMPLIANCE    WITH    TYPE-VOLUME LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul*,
2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ...................................................45

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
910 F.3d 106 (3d Cir. 2018) .................................................................33

*Bevis v. City of Naperville*,
2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ......................................... 16, 43, 45

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .............................................................. 29, 40, 45

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................... *passim*

*Duncan v. Bonta*,
142 S.Ct. 2895 (2022) ............................................................4

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) ..................................................4

*Duncan v. Bonta*,
49 F.4th 1228 (9th Cir. 2022) ..................................................4

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020) ............................................. 4, 6, 39, 53

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................ 18, 26, 56

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .......................................... 26, 28, 29, 42

*Fyock v. City of Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ..................................................39

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ................................................39

*Herrera v. Raoul*,
   2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ......................................... 16, 43, 45

*Jackson v. City & Cnty. of S.F.*,
   746 F.3d 953 (9th Cir. 2014) ................................................................22

*Kolbe v. Hogan*,
   813 F.3d 160 (4th Cir. 2016) ................................................................20

*Koons v. Platkin*,
   2023 WL 3478604 (D.N.J. May 16, 2023) ........................................45

*Miller v. Bonta*,
   542 F.Supp.3d 1009 (S.D. Cal. 2021) ....................................... 10, 49

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S.Ct. 2111 (2022) ................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ................................................................39

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) ...........................................................55

*Nunn v. State*,
   1 Ga. 243 (1846) ..................................................................................49

*Promotions Ltd. v. Conrad*,
   420 U.S. 546 (1975) .............................................................................43

*Staples v. United States*,
   511 U.S. 600 (1994) .................................................................. *passim*

*Wilson v. Cook County*,
   937 F.3d 1028 (7th Cir. 2019) ............................................................26

*Worman v. Healey*,
   922 F.3d 26 (1st Cir. 2019) .................................................................39

**Constitutional Provision**

U.S. Const. amend. II ........................................................................ 27, 40

## Statutes

28 U.S.C. §1292 ................................................................................3

28 U.S.C. §1331 ................................................................................3

28 U.S.C. §1343 ................................................................................3

720 ILCS 5/24-1 ..............................................................................15

720 ILCS 5/24-1.10 .............................................................. 15, 16, 39

720 ILCS 5/24-1.9 ................................................................... *passim*

1797 Del. Laws 104 ........................................................................47

1798 Ky. Acts 106 ..........................................................................48

1837 Ala. Acts 7 .............................................................................48

1853 Comp. L. Cal. §127 ...............................................................49

1859 Ind. Acts 129 .........................................................................49

1927 Mich. Pub. Acts 887 ..............................................................51

1927 R.I. Acts & Resolves 256 .......................................................51

1933 Cal. Stat., ch. 450 ..................................................................51

1933 Minn. Laws ch. 190 ...............................................................51

1933 Ohio Laws 189 .......................................................................51

1933 S.D. Sess. Laws 245-47, ch. 206 ...........................................51

1959 Mich. Pub. Acts 249 ................................................................9

1959 R.I. Acts & Resolves 260 ........................................................9

1963 Minn. Sess. L. ch. 753 .............................................................9

1965 Cal. Stat., ch. 33 .....................................................................9

1972 Ohio Laws 1866 .......................................................................................9

1975 R.I Pub. Laws 738 ..................................................................................9

1975 Va. Acts, ch. 14 ......................................................................................9

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650 (1932)....................10

Pub. L. No. 103-322, 108 Stat. 1796 (1994)...............................................52

**Other Authorities**

7 *Journals of the Continental Congress 1774-1789* (1907)........................4

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S.
    Roads*, Ford Authority (Apr. 9, 2021), https://bit.ly/3GLUtaB .........................36

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault
    Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*,
    Rep. to the Nat'l Inst. of Justice (2004), https://bit.ly/3wUdGRE ..................52

David B. Kopel, *The History of Firearm Magazines and Magazine
    Prohibitions*, 78 Alb. L. Rev. 849 (2015) .................................................... 8, 9, 10

David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com
    (Nov. 20, 2022), bit.ly/3RNRpQD.......................................................49

E. Gregory Wallace, *"Assault Weapons" Myths*,
    43 S. Ill. L.J. 193 (2018) ............................................................ 50, 55

*Fourth-Quarter 2020 Sales*, Ford (Dec. 2020), https://ford.to/3H87Y5T..............37

*Gun Digest 2018* (Jerry Lee & Chris Berens eds., 2017) .......................................39

Joseph Belton, *Letter to the Continental Congress, Apr. 11, 1777*,
    in *Papers of the Continental Congress, Compiled 1774-1789* ............................4

Kate Robertson, *New York Times Reports a Gain of 180,000 Digital
    Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T .................37

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West
    1866-1894* (1984) .................................................................6

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT .................................................................. 44, 55

Maxine Bernstein, *From bowie knives to muskets and machine guns, historians testify in Measure 114 trial about America's gun history, regulations*, The Oregonian (June 8, 2023), bit.ly/3p4qvdi ..............................10

*Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021), https://pewrsr.ch/3CNXFS0 ..................................................................37

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1 (last visited June 19, 2023) ....................................................................12

NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), bit.ly/45Sj7lT ........................................36

NSSF, *Firearm Production in the United States* (2020), https://bit.ly/3LwJvKh ................................................................ 12, 38

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), bit.ly/3oXjavU .................................................... 36, 38

Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX.............................................14

*Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia*, 1606-25 (Lyon Gardiner Tyler ed., 1907)............................................47

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008)................................................................55

Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners* (Mar. 26, 2023), https://wapo.st/3KrUouy .......................36

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3HaqmKv ................................................................ 36, 40

## INTRODUCTION

Just last Term, the Supreme Court held that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022).  Rather than respect that loud-and-clear message, Illinois sprung into action to impose a sweeping new ban covering nearly 1,000 models of firearms, including models that are more common than the most popular vehicle in the United States, as well as ammunition feeding devices that are ten times more common than even that.  As their ubiquity indicates, these are not newfangled innovations that demand novel government intervention. Semiautomatic rifles, pistols, and shotguns of the sort Illinois now bans have been around for generations, as have feeding devices that hold more than 10 or 15 rounds, and they have been lawful both in Illinois and throughout the rest of the country for the better part of a century.  Indeed, it was common ground as recently as the 1990s that these common arms—now lawfully kept and borne by millions of law-abiding Americans—are "lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994).

As the district court correctly recognized, slapping the label "assault weapon" on firearms owned by millions of law-abiding Americans for self-defense does not take them outside the Second Amendment's protection.  Nor does dubbing standard magazines "large capacity ammunition feeding devices" change the fact that tens of millions of Americans own hundreds of millions of them as integral components of

firearms they keep and bear for self-defense.  Simply put, the firearms and feeding devices Illinois has banned are not just in common use; they are ubiquitous.  Under a straightforward application of *Bruen*, that puts HB5471 profoundly out of step with our Nation's history of regulating firearms.  The district court was thus eminently correct to recognize Illinois' grave overstep and enjoin HB5471.

Defendants' efforts to attack the district court's decision invite precisely the sort of departure from the clear teachings of *Bruen* that led the Supreme Court to abrogate the approach most courts of appeals adopted in the decade following *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Defendants ask this Court to ignore what the Supreme Court has repeatedly identified as "the Second Amendment's definition of 'arms,'" *Bruen*, 142 S.Ct. at 2132, in favor of a definition more to their liking.  They ask this Court to pretend that people do not "use" their firearms when they keep and carry them for self-defense, even though the Supreme Court has explicitly defined the Second Amendment right as a right to "be[] armed and ready for offensive or defensive action," *id.* at 2134, not just to fire firearms at would-be attackers.  They ask this Court to deem historical laws prohibiting the concealed carry of unusual arms as analogous to laws prohibiting the acquiring and keeping of common ones, even though *Bruen* rejected just such an effort—based on some of the very same laws, no less.  *Id.* at 2143.  And they ask this Court to indulge in the fiction that firearms and feeding devices that have been around for a century

and remain lawful and available in most of the country are "dramatic technological changes." *Id.* at 2132.  To accept those strained arguments would be to deny *Bruen*, not apply it.

In short, the district court correctly applied *Bruen*, and its preliminary injunction should be affirmed.

## JURISDICTIONAL STATEMENT

Defendants' jurisdictional statement is not complete and correct.  The district court had jurisdiction under 28 U.S.C. §1331 and §1343.  It granted Plaintiffs' preliminary injunction motions on April 28, 2023, after which Defendants timely appealed.  This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that Plaintiffs are likely to succeed on their claim that HB5471 violates the Second Amendment.

2. Whether the district court acted within its broad discretion in concluding that the remaining factors weigh in favor of injunctive relief.

## STATEMENT OF THE CASE

### A.    Historical Background

Firearms technology is constantly evolving.  But one thing has never changed: Law-abiding citizens who wish to keep and carry firearms for self-defense have consistently welcomed features that enhance the accuracy, efficiency, and speed with

which they can fire them.  Technological advancements thus unsurprisingly have focused on exactly that.

Firearms that can fire several rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such firearms "pre-date[d] the American Revolution," some by "nearly one hundred years." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020).[1]  For example, the Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was famously carried on the Lewis and Clark expedition." *Id.*  In 1777, the Continental Congress ordered 100 rifles that could "discharge sixteen, or twenty [rounds]" in as little as "five seconds," Joseph Belton, *Letter to the Continental Congress, Apr. 11, 1777*, in *Papers of the Continental Congress, Compiled 1774-1789, vol. 1 A-B*, at 139, though the deal ultimately fell through when the creator demanded an "extraordinary allowance," 7 *Journals of the Continental Congress 1774-1789*, at 324, 361 (1907).  Nevertheless, while "multi-shot firearms were not novel or unforeseen inventions to the Founders," most people

---

[1] The panel decision in *Duncan* was vacated when the Ninth Circuit went en banc; the en banc decision was vacated after *Bruen*. *See* 988 F.3d 1209 (9th Cir. 2021); 19 F.4th 1087 (9th Cir. 2021); 142 S.Ct. 2895 (2022); 49 F.4th 1228 (9th Cir. 2022).

could not access or afford them and were forced to make do with less advanced arms that were "slow and difficult to load."  Delay Decl. (Dist.Ct.Dkt.37-13) ¶56.

Like so many things, however, firearms evolved considerably once the Industrial Revolution kicked into gear.  "New innovations built on one another, such that the period from the 1820s through the 1860s became one of the most productive and dynamic in the history of firearms technology."  *Id.* ¶47.  Advances in "metallurgical techniques and … machine precision," as well as "the adoption of percussion-cap ignition in the 1830s and metallic cartridges in the 1850s," allowed "repeating firearms [to] become practical weapons of mass production, widespread military adoption, and commercial popularity."  *Id.* ¶18.  Hence "high-capacity firearms became reliable consumer items prior to the ratification of the Fourteenth Amendment."  *Id.* at 22 (capitalization altered).

That trend accelerated over the following decades.  "[I]n 1860," "Oliver Winchester's New Haven Arms Company" came out "with the world's first reliable firearm with a greater than ten-shot capacity."  *Id.* ¶58.  "The 'Henry,' named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular magazine)."  *Id.*; Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952).  "Refinements to the Henry resulted in an even better gun: the Winchester Model 1866," Delay

Decl. ¶58, which "could fire 18 rounds in half as many seconds," *Duncan*, 970 F.3d at 1148; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894* 128 (1984). Later models, including the famed Winchester 73 (also known as "the gun that won the West"), likewise had magazines that held more than 10 rounds and were huge commercial successes, selling "over 1.7 million total copies between 1873 and 1941." *Duncan*, 970 F.3d at 1148. Soon after the first Winchester came on the market, the Evans company began selling a repeating rifle that "incorporated a novel, rotating internal magazine that held twenty-eight or thirty-four rounds." Delay Decl. ¶62; *see id.* ("12,000" Evans rifles "produced between 1873-1879"). Colt was not far behind: It started selling its "popular Lightning Slide Action Rifle," which "had a twelve- or fifteen-round tube magazine and used a pump-action to cycle rounds into the chamber," in the 1880s. *Id.*; *see also id.* ("around 126,000" Colt Lightnings "produced between 1884-1904").

These rifles, as well as "[n]umerous [other] firearms" with "capacities exceeding ten" rounds, were quite common in "the late nineteenth century." *Id.* ¶¶63-64. Yet restrictions on keeping and bearing them were decidedly not. At most, only one state ever "singled [firearms] out for regulation on account of their … capacity" during the 1800s. *Id.* ¶63. And consistent with the almost-uniform tradition of treating such arms as lawful instruments of self-defense, many models

6

of high-capacity "lever-action rifles continue to be popular in the United States today." *Id.* ¶66.

They likely would be even more popular but for the advent of semiautomatic technology, which most view as the "great innovation" in firearms technology. *Id.* ¶69. Whereas "[l]ever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round," "semi-automatic firearms don't rely on human muscle. Instead, [they] enlist some of the energy released by the first round to eject the spent casing and chamber the next round." *Id.*

Notably, this "great innovation" happened well over a century ago. "By the early 1890s, then, gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semi-automatic firearms—self-loading mechanisms, smokeless powder ammunition, and detachable magazines." *Id.* ¶73; *see also id.* ¶70 ("[S]emi-automatic firearms first started coming on the market in the 1890s."); *id.* ¶72 ("Like self-loading mechanisms and smokeless powder, detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century."). What would "become characteristic of most modern automatic and semi-automatic firearms" thus came around before Henry Ford sold his first Model A, the Wright Brothers took their first flight at Kitty Hawk, or Albert Einstein realized that E=mc$^2$.

Yet for the better part of a century, no state sought to prohibit semiautomatic firearms, no matter what features they had, and only a handful ever restricted how many rounds they could fire without reloading. *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 864-67 (2015).

That history is particularly notable because it contrasts so starkly with the history of *fully* automatic firearms. Fully automatic technology developed at roughly the same time as semiautomatic technology. Delay Decl. ¶70. But it was initially confined to cumbersome devices that took multiple people to maneuver and operate. *Id.* (describing the "heavy Maxim gun"). It was not until the early 1920s that the "submachine" gun—i.e., an automatic firearm that could be carried and fired by one person—was developed. *Id.* ¶74. Yet while the submachine gun soon "became much sought-after by criminals," *id.*, it "was a failure from the start" among civilians looking for arms for individual self-defense, Spitzer Decl. (Dist.Ct.Dkt.37-12) ¶15, likely because it is difficult "to accurately shoot and hit [one's] intended target" with a firearm designed to fire indiscriminately, SA20. "By 1925," "only about 3,000" units "had sold" in the United States, Spitzer Decl. ¶15, and both states and Congress quickly began to severely restrict them. Indeed, 32 states enacted machine gun bans between 1925 and 1934. State.Br.37.

Even as states mobilized to address these uncommon weapons, however, the vast majority continued to impose no restrictions on by-then-common *semi*automatic

firearms, and *no* state banned the sale or possession of magazines "separately from the guns themselves." Delay Decl. ¶76. By Defendants' own (flawed) estimation, only seven states restricted semiautomatic firearms at all during the Prohibition Era. State.Br.37; *accord* Delay Decl. ¶77. No state completely banned semiautomatic firearms, and all laws that restricted them were either repealed entirely or replaced within a few decades with laws regulating only fully automatic weapons.[2]

Things did not change as semiautomatic technology was enhanced over the years. Auto Ordnance Company's semiautomatic rifle (1927, detachable 30-round magazine) and the Browning Hi-Power pistol (1935, detachable 13-round magazine) remained perfectly legal, as did the surplus M-1 carbines with 15- and 30-round magazines that the U.S. government sold to civilians in the hundreds of thousands at a steep discount starting in 1963 as part of the Civilian Marksmanship Program. Kopel, *supra*, 78 Alb. L. Rev. at 859, 861. The first AR-15 rifle, which comes standard with a detachable 30-round magazine and remains the most popular rifle in America today, was released that same year. *Id.* at 859-60. Yet while these and other new models of semiautomatic firearms consistently evolved in ways that made them easier to more accurately fire, states consistently reacted by welcoming, rather than

---

[2] *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263, *amended by* 1975 R.I Pub. Laws 738, 738-39, 742; 1963 Minn. Sess. L. ch. 753, at 1229; 1965 Cal. Stat., ch. 33, at 913; 1972 Ohio Laws 1866, 1963; 1975 Va. Acts, ch. 14, at 67.

banning, those advancements. Indeed, until "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021).

The earliest laws treating such features as sufficient to convert an otherwise-lawful firearm into a so-called unlawful "assault weapon" date back only to 1989, and the earliest state law restricting magazine capacity outside the machine gun context dates back only to 1990.[3] *See id.*; Maxine Bernstein, *From bowie knives to muskets and machine guns, historians testify in Measure 114 trial about America's gun history, regulations*, The Oregonian (June 8, 2023), bit.ly/3p4qvdi (one of the state's historians conceded that "he knew of no law" pre-1990 "that prohibited someone from acquiring an ammunition-feeding device"). There is thus no remotely longstanding historical tradition in this Nation of prohibiting firearms because they have features that enhance one's ability to fire them accurately and repeatedly.

---

[3] The lone outlier is a 1932 law that Congress passed prohibiting possession in the District of Columbia of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652 (1932), *repealed by* 48 Stat. 1236 (1934), *currently codified as amended at* 26 U.S.C. §§5801-72. That law was not originally understood to sweep up other ammunition feeding devices. But after the District achieved home rule in 1975, the new D.C. government interpreted it to "outlaw[] all detachable magazines and all semiautomatic handguns." Kopel, *supra*, 78 Alb. L. Rev. at 866.

### B.    Illinois House Bill 5471

Just this past year, the Supreme Court made clear that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *Bruen*, 142 S.Ct. at 2128.  It further made clear that laws restricting the right to keep and bear arms can survive only if they are "consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  One would have thought that would bring an end to efforts to ban firearms that are commonly chosen by law-abiding citizens for self-defense owing to features that make them easier to accurately fire repeatedly.  Yet in Illinois, it had the opposite effect.

Notwithstanding the lack of any historical tradition of prohibiting firearms with such features, on January 10, 2023, Illinois enacted a sweeping features-based ban that captures many of the most commonly owned semiautomatic firearms in America—arms that were perfectly lawful in Illinois before *Bruen* reaffirmed the Second Amendment's robust protection of arms in common use, and that remain perfectly lawful in most of the country.  Under HB5471, "it is unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon."  720 ILCS 5/24-1.9(b).  That blanket prohibition has already taken effect, and come "January 1, 2024," it will be unlawful even to "possess an assault weapon."  720 ILCS 5/24-1.9(c).

11

HB5471 defines "assault weapons" exceedingly broadly.  First, the definition includes any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "a pistol grip."  720 ILCS 5/24-1.9(a)(1)(A)(i).  That alone captures approximately 20% of all firearms sold in the United States in 2020 because it sweeps in all rifles on the AR platform, the most popular type of rifle.  SA24; *see* NSSF, *2021 Firearms Retailer Survey Report* 9, https://bit.ly/3CXJwC1  (last visited June 19, 2023); NSSF, *Firearm Production in the United States* 18 (2020), https://bit.ly/3LwJvKh.  HB5471 not only bans "all AR type[]" rifles ("including" 43 named variants, such as the AR-15) explicitly, but also prohibits all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." 720 ILCS 5/24-1.9(a)(1)(J)(ii).  And lest it leave anything on the table, HB5471 lists nearly 100 more rifles by name and deems all of them—as well as any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"— prohibited "assault weapons" too.  720 ILCS 5/24-1.9(a)(1)(J).

HB5471 also prohibits any semiautomatic rifle with a *fixed* (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition."  720 ILCS 5/24-1.9(a)(1)(B).  It prohibits any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "any feature capable of functioning as a protruding grip that can be held by the

non-trigger hand." 720 ILCS 5/24-1.9(a)(1)(A)(ii). And it bans any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "one or more of" a "thumbhole stock," "a folding, telescoping, thumbhole, or detachable stock," "a flash suppressor," or "a shroud attached to the barrel or that partially or completely encircles the barrel." 720 ILCS 5/24-1.9(a)(1)(A). That definition captures *nearly all modern semiautomatic rifles*, which typically come standard with a "feature capable of functioning as a protruding grip" and/or a "shroud attached to the barrel." All in all, HB5471 bans nearly 1,000 models of rifles, including all of the most popular ones.

And Illinois did not stop there. Not content with banning most modern rifles, HB5471 also bans all semiautomatic *pistols* with "the capacity to accept a detachable magazine" that have "one or more of" "a threaded barrel," "a second pistol grip," "another feature capable of functioning as a protruding grip that can be held by the non-trigger hand," a barrel shroud that "allow[s] the bearer to hold the firearm with the non-trigger hand," "a flash suppressor," "the capacity to accept a detachable magazine at some location outside of the pistol grip," or "a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder." 720 ILCS 5/24-1.9(a)(1)(C). HB5471 further bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-

1.9(a)(1)(D). And, as with its prohibitions on semiautomatic rifles, after banning these pistols once via their features, HB5471 goes on to ban them two more times: first by banning "[a]ll AR type[]" pistols ("including" 13 named variants) and approximately 40 more semiautomatic pistol models by name; and then once again by banning all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." 720 ILCS 5/24-1.9(a)(1)(K).

If that were not enough, the statute *also* bans all semiautomatic shotguns that hold more than five rounds, have a pistol grip, or can accept a detachable magazine (regardless of capacity). 720 ILCS 5/24-1.9(a)(1)(F). That includes numerous common models that Americans keep and carry for, *inter alia*, home defense, duck hunting, and shooting competitions. *See, e.g.*, Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX.

In a final catchall, "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," as well as any part that can convert any firearm into the above, is swept up in the new "assault weapons" ban. 720 ILCS 5/24-1.9(a)(1)(H)-(I). And the already-exceedingly-long list of banned firearms is not static: The State Police can add to it each year. 720 ILCS 5/24-1.9(d)(3).

Possession of an "assault weapon" (aside from grandfathered firearms) is a Class A misdemeanor, with subsequent violations a Class 3 felony. 720 ILCS 5/24-1(a)(15), (b). Sale is classified variously as a Class 3 or Class 2 felony. 720 ILCS

5/24-1(a)(11), (14), (16), (b).  And each firearm is a "single and separate violation."
720 ILCS 5/24-1(b).  The prohibition applies to "any person within this State,"
except peace officers, police, prison officials, active-duty members of the military,
and certain private security contractors.  720 ILCS 5/24-1.9(b), (e)(1)-(7).

While current owners may retain their firearms if they register them, they are
severely restricted in how and where they may keep and bear them.  Current owners
"shall possess such items only" "on private property owned or immediately
controlled by the person;" "on private property that is not open to the public with the
express permission of the person who owns or immediately controls such property";
"while on the premises of a licensed firearms dealer or gunsmith for the purpose of
lawful repair"; "at a properly licensed firing range or sport shooting competition
venue"; or "while traveling to or from these locations," provided that the firearm is
unloaded and placed in a container.  720 ILCS 5/24-1.9(d).  Current owners may not
publicly carry their grandfathered arms anywhere, despite six Justices having just
fully embraced the right to carry common arms in *Bruen*.

In addition to banning many of the most common firearms in America,
HB5471 bans any ammunition feeding device "that has a capacity of … more than
10 rounds of ammunition for long guns and more than 15 rounds of ammunition for
handguns," which the statute dubs a "[l]arge capacity ammunition feeding device."
720 ILCS 5/24-1.10(a)(1).  HB5471 bans the sale, manufacture, and purchase of

15

such feeding devices and imposes a $1,000 fine for each violation.  720 ILCS 5/24-1.10(b)-(c), (g).  Possession is also tightly controlled.  Current owners may continue to possess them (at least for now), but only subject to the same onerous restrictions on their use and disposal placed on the semiautomatic rifles, pistols, and shotguns that HB5471 deems verboten "assault weapons."  720 ILCS 5/24-1.10(d).

### C.     Proceedings Below

1. The State of Illinois was not the first governmental unit in the Land of Lincoln to respond to *Bruen* by defiantly imposing new restrictions on common firearms that are lawful in most of the country.  The City of Naperville enacted a so-called "assault weapon" ban (limited in the main to AR-style rifles) on August 17, 2022.  The litigation over Naperville's ordinance soon became litigation over HB5471 too, and it resulted in an opinion concluding that both enactments are constitutional "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories."  *Bevis v. City of Naperville*, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023).  Another district court judge in the Northern District reached the same conclusion shortly thereafter.  *See Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023).

2. The district court below saw things quite differently.  The parties who together comprise the consolidated *Barnett* Plaintiffs—four groups of individuals, industry members, and organizations consolidated before Judge McGlynn in the

16

Southern District and here on appeal—moved for preliminary injunctions against
HB5471 within weeks of its enactment.[4]  After extensive briefing and oral argument,
the court granted the motions and held that HB5471, which seems to have been
"written in spite of the clear directives in *Bruen* and *Heller*" rather than in
"conformity" with them, cannot be "harmonized with the Second Amendment."
SA3.  The court thus held that Plaintiffs are likely to succeed on the merits and
concluded that the remaining factors likewise favored injunctive relief.  SA8-11.

Consistent with the Supreme Court's instructions, the court started with the
text, as *Bruen* held that "[w]hen the Second Amendment's plain text covers an
individual's conduct, the Constitution presumptively protects that conduct."  SA15
(quoting *Bruen*, 142 S.Ct. at 2129); *see* SA17 ("Plain Text Analysis").  Because
HB5471 prohibits the general public from keeping and bearing a host of modern
instruments, the threshold textual question was whether those instruments satisfy the
Second Amendment's definition of "arms."  The court had no trouble concluding
that they do, as *Bruen* clarified that "the Second Amendment's definition of 'arms'"
presumptively protects all bearable "instruments that *facilitate* armed self-defense,"
even those not strictly *necessary* to self-defense and "even those that were not in

---

[4] This brief is filed on behalf of three of those sets of plaintiffs:  Plaintiffs in
*Barnett v. Raoul*, No. 3:23-cv-209-SPM, *Harrel v. Raoul*, No. 3:23-cv-141-SPM,
and *Federal Firearms Licensees of Illinois v. Pritzker*, No. 3:23-cv-215-SPM.

existence at the time of the founding." 142 S.Ct. at 2132 (emphasis added).[5] The court thus quickly dispatched Defendants' argument that the various semiautomatic firearms HB5471 bans are not "arms" because they might be "useful in military service." SA17. As the court explained, the mere fact that arms might be useful militarily does not eliminate their utility in *facilitating* armed self-defense; any other conclusion would mean that *no* firearm is an "arm," as *every* firearm is at the very least *useful* in a military context.

The court likewise rejected Defendants' theory that the various firearms HB5471 bans are not covered by the plain text of the Second Amendment because (Defendants claim) they are best suited for purposes other than self-defense. The various features HB5471 singles out as problematic indisputably (and undisputedly) "'facilitate … sustained accuracy,'" SA20 (quoting Dist.Ct.Dkt.88 at 80), and "'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target," SA20 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011))). The court therefore found "[t]he defensive application" of the firearms HB5471 bans "obvious," SA20, which sufficed to defeat any argument that they are not "arms" at all.

---

[5] Defendants puzzlingly assert that the court "declined to decide whether" the firearms HB5471 bans "f[a]ll within the Second Amendment's text." State.Br.24. That claim is impossible to square with the court's opinion.

The court reached the same conclusion as to the ammunition feeding devices HB5471 bans. Indeed, the court found the issue to be "not even a close call," as having more rounds at the ready plainly *facilitates* a citizen's ability to defend herself in case of confrontation, regardless of whether she ends up needing to expend every round. SA18-19.

The court next turned to common use. It explained that *Bruen* held that while "historical tradition supports 'prohibiting the carrying of "dangerous and unusual weapons,"'" "'the Second Amendment protects the possession and use of weapons that are "in common use at the time."'" SA21 (quoting *Bruen*, 142 S.Ct. at 2143). "Therefore," Defendants bore the "burden" to "(1) demonstrate that the 'arms' [HB5471] bans are not in 'common use'; and (2) 'identify a well-established and representative historical analogue' to [HB5471]." SA21. Defendants were unable to do either.

First, "Defendants made no argument and present[ed] no evidence regarding the commonality of" *any* of the myriad "arms" HB5471 bans. SA22. On the flip side, Plaintiffs cited "data show[ing] that more than 24 million AR-15 style rifles are currently owned nationwide," "accounting for nearly half of the rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020," SA23-24; additional government data showed that "'the number of [AR-style rifles] manufactured and imported into the United States was more than double the number of Ford F-150

trucks sold, the most commonly sold vehicle in the United States," SA23 (quoting *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016)); and the Supreme Court itself has long recognized that "AR-15 style rifles possess no 'quasi-suspect character' and 'traditionally have been widely accepted as lawful possessions,'" SA24 (quoting *Staples*, 511 U.S. at 612).  As for feeding devices, Plaintiffs supplied data showing that tens of millions of Americans collectively owned hundreds of millions of the magazines HB5471 bans, SA24, figures echoed by every court of appeals decision to address the commonality question.

The court likewise had no trouble concluding that these common arms are commonly used for lawful purposes.  Plaintiffs submitted evidence that "34.6% of owners utilize [AR-style] rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home," as well as similar evidence for the other firearms and feeding devices HB5471 bans.  SA22.  Defendants, by contrast, argued only that while people may frequently keep and carry the arms Illinois has banned, they do not frequently *need* to accurately fire multiple rounds continuously, since armed confrontations are thankfully rare and can usually be warded off by merely showing a firearm.  Because that argument was non-responsive to the common-use inquiry that *Bruen* requires, and was instead more reminiscent of the kind of interest-balancing that *Bruen* prohibits, the court concluded that "Defendants failed to meet their burden to demonstrate that the 'arms' banned by [HB5471] are 'dangerous *and*

*unusual*' and thus not protected by the Second Amendment." SA24-25 (emphasis altered) (quoting *Bruen*, 142 S.Ct. at 2128).

Although the court could have ended its merits analysis there, it went on to reject the state's purported historical analogies. Defendants relied predominantly on "conceal[ed] carry regulations," which do not prohibit the general public from keeping any type of arms and do not even outlaw all carrying. SA25. The court thus found such regulations "categorically different" in how and why they regulate from HB5471's ban on acquisition and possession. SA26.

Finally, the court concluded that the remaining preliminary injunction factors favored relief. SA26-28. This too was not a close call. HB5471 restricts ordinary citizens' ability to purchase or otherwise acquire a host of arms commonly owned for lawful purposes, including some of the most popular firearms in the country. And, come January 1, it will criminalize even their mere possession. The court was thus left unable to shake the impression that Illinois had not just violated the Constitution, but failed even to "consider[] [either] an individual's right under the Second Amendment []or Supreme Court precedent" in enacting HB5471. SA28.

## SUMMARY OF ARGUMENT

The district court correctly held that HB5471's sweeping ban on common arms violates the Second Amendment under a straightforward application of *Bruen*. Indeed, firearms and feeding devices that have been lawfully possessed by law-

abiding citizens for the better part of a century and remain lawful in most of the country today are the antithesis of the kind of "highly unusual" arms that the Supreme Court has said may be banned.

First, the firearms and feeding devices HB5471 prohibits are "presumptively protected" by the Second Amendment because they are plainly "arms" under the Supreme Court's definition of that term. Rifles, pistols, and shotguns "constitute bearable arms" that "facilitate armed self-defense," *Bruen*, 142 S.Ct. at 2132, regardless of what kind of grip, stock, or other features they may have. So do the ammunition feeding devices HB5471 bans. As the name suggests, feeding devices are not just "holders" of ammunition; they actively *feed* ammunition into the firing chamber and are integral to the design of semiautomatic firearms and the mechanism that makes them work. Citizens thus carry semiautomatic firearms equipped with magazines for the same constitutionally protected reason that they load those magazines with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless," and the central purpose of the Second Amendment—self-defense—eviscerated. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).

Because the firearms and feeding devices HB5471 bans are plainly "arms," Defendants bore the burden of proving that they are not commonly kept or carried for lawful purposes like self-defense. Defendants never even tried to make that showing as to *any* of the arms HB5471 bans, let alone *all* of them. Nor could they.

Among other things, HB5471 bans all AR-platform rifles, both by feature and by name, yet even Defendants admit that millions of Americans collectively own more than 24 million of these rifles.  A product owned by millions of law-abiding citizens is obviously not "highly unusual in society at large." *Bruen*, 142 S.Ct. at 2143.  As for the feeding devices HB5471 bans, they are not just common, but ubiquitous: Tens of millions of Americans own hundreds of millions of them.   Under a straightforward application of *Bruen*, that means that Illinois may not ban them.

Defendants resist that conclusion only by trying to rewrite *Bruen*.  They first insist that whether something is an "arm" presumptively protected by the Second Amendment depends not on whether it satisfies what the Supreme Court has identified as "the Second Amendment's definition of 'arms,'" *id.* at 2132, but on whether it is "in common use."  That confuses *Bruen*'s threshold textual inquiry with its historical-tradition inquiry.  To be sure, states may be able to ban arms that are not "in common use" consistent with the Second Amendment, but that is not because they are not "arms"; it is because our Nation's historical tradition permits restrictions on arms that are "dangerous and unusual."  Defendants' concern that the Supreme Court's definition of "arms" captures things like "machineguns," "grenade launchers," and "short-barreled shotguns," State.Br.26-27, is misplaced, as the *presumption* that "arms" are protected is just that, and it may be overcome by a showing that a particular type of arm is "dangerous and unusual."

Defendants next insist that whether people commonly keep and bear the arms HB5471 bans is irrelevant, and that all that matters is how frequently people *fire* them to ward off would-be attackers.  That argument defies constitutional text, Supreme Court precedent, and common sense.  As the Supreme Court has repeatedly held, the Second Amendment protects the right to *keep and bear* arms "at the ready for self-defense," not just the right to fire them in actual confrontations.  *Bruen*, 142 S.Ct. at 2134. That is why the common-use inquiry focuses on whether arms are "typically *possessed* by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25 (emphasis added), not on how frequently they are fired at assailants. Defendants do not and cannot deny that, every day, millions of Americans keep and bear the arms HB5471 bans.  They instead just insist that while people may routinely *choose* to keep and bear these arms for self-defense, they do not really *need* them. Indeed, Defendants repeat this mantra over and over again.  *See, e.g.*, State.Br.7, 19, 25, 29, 30.  But the point of the common-use test is to ensure that the people who exercise their Second Amendment rights, not the government (or those who would prefer a Constitution that did not protect those rights), get to decide what kinds of arms best suit their self-defense needs.  Defendants' how-much-do-you-really-*need* view of the fundamental right the Second Amendment protects is at fundamental odds with the historical tradition *Bruen* recognized.

The conclusion that the arms HB5471 bans are in common use today should suffice to end the analysis. But Defendants' attempt to conjure up some contrary historical tradition of banning common arms that the government deems "too dangerous" falls flat. Laws banning weapons that possess the kinds of features Illinois has singled out did not come around until the Bush Administration. No one could credibly claim that a regulatory effort initiated in 1989 to ban arms that had already been common for the better part of a century qualifies as an enduring American tradition—especially when those efforts pre-dated *Heller*, the federal ban was allowed to sunset as ineffective, and state bans remain uncommon even today. Nor can Defendants credibly claim that the absence of such a historical tradition is owing to some dramatic technological change or novel societal problem. The kinds of firearms and feeding devices HB5471 bans have been prevalent in this country for more than a century. Yet though the problem of criminals wreaking havoc with them is unfortunately not new, efforts to ban such arms have been rare and mostly late-breaking. In reality, Illinois' effort to revive and expand upon a recent, short-lived, and abandoned federal effort to regulate commonly owned firearms—and to do so in the immediate wake of *Bruen*, no less—is an act of defiance, not an effort to follow any national tradition worthy of the name.

In short, the district court was eminently correct to find that Plaintiffs are likely to succeed on the merits, and that Defendants should be enjoined from enforcing HB5471.  This Court should reinstate the injunction.

## STANDARD OF REVIEW

To secure a preliminary injunction, a movant must show "some likelihood of success on the merits," that it has "no adequate remedy at law," and that it "will suffer irreparable harm if a preliminary injunction is denied." *Ezell*, 651 F.3d at 694. When (as here) a district court has issued a preliminary injunction, this Court reviews the district court's legal conclusions de novo, findings of fact for clear error, and balancing of the equities for abuse of discretion.  *Id.*

## ARGUMENT

### I.    The District Court Correctly Concluded That Plaintiffs Are Likely To Succeed On The Merits.

The framework for addressing a ban on a class of arms may not have been pellucid when this Court decided *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), both of which applied intermediate scrutiny to uphold local bans on so-called "assault weapons."  But there is no longer any room for debate.  The Supreme Court made clear just last year that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.  And once that presumption arises, the state bears the burden of

affirmatively proving that its restriction is "consistent with this Nation's historical tradition of firearm regulation." *Id.* There is no longer any room for tiers of scrutiny or rights-diluting interest-balancing; under *Bruen*, "the traditions of the American people" carry the day. *Id.* at 2131. The district court correctly applied that framework to conclude that Plaintiffs are likely to succeed on their claims.

## A.     The Firearms and Feeding Devices HB5471 Bans Are "Arms."

1. Under *Bruen*, the first question when confronted with a law implicating the right to keep and bear arms is whether "the Second Amendment's plain text covers [the] conduct" the law restricts. *Id.* Here, the answer is easy. The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. HB5471 prohibits "the people" whose rights the Amendment protects from keeping wide swathes of rifles, pistols, shotguns, and feeding devices. All of those things are plainly "arms" as that term has been interpreted by the Supreme Court. Indeed, as the district court observed, that is "not even a close call." SA19.

*Bruen* and *Heller* leave no doubt about the meaning of "arms" in the Second Amendment: "'[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" thus covers all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding.'" *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*,

27

554 U.S. at 582). The rifles, pistols, and shotguns HB5471 bans obviously fit that bill, as firearms facilitate armed self-defense regardless of what kind of grip, stock, magazine, or other features they may have. Indeed, this Court has already recognized that the types of arms HB5471 bans "can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than larger-caliber pistols or revolvers." *Friedman*, 784 F.3d at 411.

The self-defense benefits of the ammunition feeding devices HB5471 bans are equally self-evident. Whether one views it through the lens of the feeding device or of the firearm equipped with it, there is no question that a firearm equipped with a device that enables it to be fired multiple times without reloading "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct. at 2132. And that unremarkable observation does not cease to hold true just because a feeding device holds 11 rounds rather than 10, or 16 rather than 15. A straightforward textual inquiry thus confirms that keeping and bearing the kinds of firearms and feeding devices Illinois has prohibited is conduct "presumptively protect[ed]" by the Second Amendment. *Id.* at 2126.

2. Defendants' efforts to resist that conclusion cannot be reconciled with *Bruen*. At the outset, while Defendants criticize the district court for not discussing *Friedman* and *Wilson*, they conspicuously do not argue (nor did they below) that the test those cases applied to decide which arms are covered by the Second Amendment

survives *Bruen*.[6] And rightly so, as *Bruen* explicitly rejected the notion that whether arms are protected by the Second Amendment turns on whether they "were common at the time of ratification," *Friedman*, 784 F.3d at 410. *See Bruen*, 142 S.Ct. at 2143. It nowhere identified a "reasonable relationship to the preservation or efficiency of a well regulated militia," 784 F.3d at 410, as having any bearing on the answer to that question, either—which is understandable, since the Court summarily reversed another court for employing similar logic one year after *Friedman*. *See Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam). Defendants thus argue not that *Freidman* and *Wilson* employed an analysis that survives *Bruen*, but only that "*Bruen* does not require the court to reach a different result." State.Br.49. But their arguments in support of that conclusion deny—indeed, defy—*Bruen*.

Defendants first contend that "Plaintiffs have not carried their burden of showing that the Act regulates conduct protected by the Second Amendment" *even as to the firearms* HB5471 bans because they purportedly are not "commonly used for self-defense." State.Br.16, 20. Defendants are wrong in their premise—the firearms HB5471 bans are clearly in common use today for lawful purposes, *see*

---

[6] Defendants likewise do not defend *Friedman*'s application of an interest-balancing test that *Wilson* subsequently described as "intermediate scrutiny." 937 F.3d at 1036. Nor could they, as *Bruen* explicitly rejected both interest-balancing and tiers of scrutiny in the Second Amendment context, and made clear beyond cavil that it was abrogating decisions from this Court and others applying them. *See Bruen*, 142 S.Ct. at 2127 & n.4.

*infra* Part I.B.—but they are also confused.  As they themselves repeatedly emphasize, there are two distinct questions under *Bruen*, not just one.  And whether a firearm is in common use has nothing to do with the threshold textual question of whether it constitutes an "arm."  Under *Bruen*, whether something is an "arm," and thus *presumptively* protected, depends simply and solely on whether it "facilitate[s] armed self-defense."  *Bruen*, 142 S.Ct. at 2132.  Whether a weapon is "in common use," and thus *conclusively* protected, is a separate question that a court reaches only if the weapon is an "arm."  *See id.* at 2143.  That is plain from the fact that *Bruen* described the "common use" test as one "[d]raw[n] from th[e] *historical tradition*" of restrictions on "dangerous and unusual" weapons, *id.* (emphasis added), not from the "historical understanding" of what is an "arm," *id.* at 2132.

Defendants do not argue that the various firearms HB5471 bans do not "facilitate armed self-defense."  *Id.*  Nor could they, as even they conceded below that the features HB5471 singles out for opprobrium "'facilitate … sustained accuracy,'" making "[t]he defensive application" of firearms equipped with them "obvious."  SA20 (alteration in original) (quoting Dist.Ct.Dkt.88 at 80).  Defendants instead make the head-scratching argument that the Supreme Court's definition of "arms" matters only at the historical-tradition stage, not the threshold textual inquiry, because the Court invoked that definition while explaining how historical tradition analysis works.  State.Br.26.  By Defendants' telling, then, this Court should ask

30

whether a weapon satisfies "the Second Amendment's definition of 'arms,'" *Bruen*, 142 S.Ct. at 2132, only *after* determining whether it "is common use."

Nonsense. *Bruen* nowhere made the illogical suggestion that the textual definition of "arms" has no role to play in the threshold textual inquiry or is somehow superseded entirely by the common-use inquiry. The Court simply invoked that definition in its historical-tradition discussion to supply an illustration of how "the Second Amendment's historically fixed meaning applies to new circumstances," which is of course just as true of its text as of the historical traditions it embodies. *Id.* Lest there be any doubt about that, the Court reiterated in the very same passage that whether something satisfies "the Second Amendment's *definition* of 'arms'" means only that it is "prima facia" protected by the Second Amendment, which would make no sense if that question could not even be asked until it came time for the state to try to *rebut* the presumption of protection that attaches to things covered by the plain text. *Id.* (emphasis added). It is thus not Plaintiffs who seek to "expand the definition of 'arms,'" State.Br.26, but Defendants who seek to eviscerate it.

Defendants insist that the Supreme Court cannot really have meant to embrace the definition it supplied because (they say) that would mean that states cannot ban things like "machineguns," "grenade launchers," and "short-barreled shotguns." State.Br.25-27. Once again, it is Defendants, not Plaintiffs, who mistakenly "reduc[e *Bruen*] to a one-step … test." State.Br.27. To be sure, such weapons may well be

31

"arms" *presumptively* protected by the Second Amendment. But a presumption is just that, and it can be overcome by showing that a particular type of arm is *not* "'in common use' today for self-defense" and other lawful purposes by "ordinary, law-abiding, adult citizens."[7] *Bruen*, 142 S.Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). That such instruments can "facilitate armed self-defense" thus in no way compels the conclusion that efforts to ban them are necessarily unconstitutional. Nor does it provide even the slightest basis for pretending that semiautomatic rifles, pistols, and shotguns somehow cease to be "arms" entirely simply because they are equipped with a particular type of grip, stock, or feeding device.

3. Defendants' effort to insulate HB5471's magazine ban from Second Amendment scrutiny fares no better. They claim that feeding devices are not "arms" because (1) "during the Founding and Reconstruction eras, cartridge cases and boxes were not viewed as 'arms,'" and (2) they "are not necessary to operate firearms." State.Br.17-19. The first argument fails out of the gate, as the difference between ammunition feeding devices and "cartridge cases and boxes" is self-evident. And the second argument fails as a matter of law.

The feeding devices HR5471 bans are not just "containers which hold ammunition." State.Br.18. As their name connotes, they are designed to actively

---

[7] That showing may well prove considerably easier when it comes to a law trained on the arms Defendants highlight. *See supra* p.8.

*feed* ammunition into the firing chamber.  When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the magazine to feed a new round into the chamber.  Founding-era cartridge cases, by contrast, were not attached to a firearm and played no role in its operation; they were literally just cardboard boxes for storing ammunition when it was not in use.  Saying that a cardboard box is analogous to a feeding device because both "hold" ammunition is thus like saying that a gas can is analogous to a carburetor because both "hold" fuel.  Without an ammunition feeding device, one cannot "effectively load" more than one round of ammunition into a semiautomatic firearm.  SA18; *see Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018).

Defendants' contrary argument makes particularly little sense given that HB5471 bans not just detachable magazines, but even feeding devices that are "fixed"—i.e., "permanently attached to a firearm, or contained in and not removable from a firearm."  720 ILCS 5/24-1.9(a)(8); *see* 720 ILCS 5/24-1.9(a)(1)(B).  Fixed magazines cannot be removed from a firearm without rendering the firearm inoperable.  These are no more "accessories" or "accoutrements" to a firearm than a steering wheel or engine is to a car.  And nothing in law or logic supports the notion that a component integral to the functioning of a mechanical object ceases to be integral just because engineers figure out how to make it detachable.

Defendants' second argument—that the ubiquitous feeding devices HB5471 bans are not covered by the plain text because they "are not necessary to operate firearms," State.Br.19—fares no better. The threshold textual inquiry the Supreme Court has articulated does not ask what is "necessary" for self-defense; it simply asks whether a bearable instrument "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct. at 2132. Devices that play an integral role in the firing mechanism of semiautomatic firearms by feeding ammunition to the firing chamber—which is ultimately what allows modern handguns (the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629) to work as intended—plainly fit that bill. It therefore makes no difference that "all firearms that can accept a detachable LCM can also accept magazines that hold fewer rounds."[8] State.Br.19. The feeding devices HB5471 bans, no less than the firearms it bans, facilitate armed self-defense, so they are covered by the plain text of the Second Amendment and presumptively protected.

**B.     The Arms HB5471 Bans Are in Common Use for Lawful Purposes, Including Self-Defense.**

Because the firearms and feeding devices HB5471 bans satisfy "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that they nonetheless can be banned "consistent with this Nation's historical tradition of

---

[8] Of course, even that is not true as to firearms that come with *fixed* magazines that exceed HB5471's arbitrary capacity thresholds.

firearm regulation."[9]  *Bruen*, 142 S.Ct. at 2126, 2132.  The state cannot meet that burden.  The Supreme Court has already decided what "arms" may be banned "consistent with this Nation's historical tradition of firearm regulation":  those that are (at a minimum) "highly unusual in society at large," rather than "in common use today."  *Id.* at 2143.  The critical question, then, is whether the arms HB5471 bans are in common use for lawful purposes.  And, once again, the answer is easy, as the arms HB5471 newly bans are the furthest thing from "highly unusual" in modern America.

1. HB5471 bans all AR-platform rifles by name and/or by feature.  720 ILCS 5/24-1.9(a)(1)(A), (B), (J).  The Supreme Court itself has long described "AR-15 rifle[s]" as "widely accepted as lawful possessions," *Staples*, 511 U.S. at 603, 612, which remains the case in the vast majority of the states and was true in Illinois until HB5471 came along.  And they have only become more popular over the past few decades.  Roughly one million Americans lawfully owned an AR-style rifle in 1994; since then, the number has *at least* sextupled.  This is not disputed, because it is not disputable.  Indeed, while Defendants quibble with various studies on the margins,

---

[9] As noted above, Defendants try to situate the common-use inquiry as part of the textual inquiry and thus part of Plaintiffs' burden.  That is wrong, for the reasons just explained.  But it makes no difference here, because the arms HB5471 bans are plainly in common use for lawful purposes.

they do not dispute the "[i]ndustry and government data show[ing] that 6.4 million

… Americans" lawfully possess an AR-style rifle.  State.Br.22.[10]

It should go without saying that a product lawfully owned by millions of

Americans (and more people than live in 32 of the 50 states of this country) is the

furthest thing from "highly unusual in society at large."  *Bruen*, 142 S.Ct. at 2143.

But a few examples prove the point.  There are approximately 16 million F-150s, the

most popular vehicle, on the road.  Brett Foote, *There Are Currently 16.1 Million*

*Ford F-Series Pickups on U.S. Roads*, Ford Authority (Apr. 9, 2021),

https://bit.ly/3GLUtaB.  That figure is eclipsed by the more than 24 million AR-15-

---

[10] In particular, Defendants point to testimony from another scholar criticizing Professor English's *2021 National Firearms Survey* as "vague about exactly how he developed his sample," so "you can't know that it applies in any way, shape, or form, to the US Population as a whole."  State.Br.21.  But that scholar overlooked that the first few pages of the survey disclose that it used an "extraordinarily large," "nationally representative sample" of firearms owners and explain the process used to develop the sample and English's findings.  *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 3-7 (May 13, 2022), https://bit.ly/3HaqmKv.  In all events, the English survey's findings are entirely consistent with ATF data, industry reports, and the Washington Post's recent findings—which likely explains why Defendants offer no contrary statistics or account of U.S. firearms (or magazine) ownership.  *See, e.g.*, Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners* (Mar. 26, 2023), https://wapo.st/3KrUouy (19% of sampled gun owners own an AR-style rifle); NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), bit.ly/45Sj7lT (government and industry data showing that Americans own 24 million AR-platform rifles); NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 12 (July 14, 2022), bit.ly/3oXjavU (average American who owns an AR-platform rifle owns 3 or 4 of them).

style rifles in circulation.  In 2020, Ford sold 787,442 F-Series pickup trucks, including, but not limited to, the F-150.  *Fourth-Quarter 2020 Sales* at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T.  That is less than a third of the number of AR-style rifles sold that year.  To take another example, the number of AR-platform rifles sold per year (over 2 million) is significantly more than the number of *New York Times* print subscribers (761,000).  *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T.  And the total number of these rifles in circulation is slightly more than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 … 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]." *Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021), https://pewrsr.ch/3CNXFS0.  Indeed, rifles built on the AR-15 platform are so common that courts, commentators, and industry members alike often refer to them simply as "modern rifles" (or "modern sporting rifles").

HB5471 does not stop with exceedingly common AR-platform rifles.  It also prohibits all semiautomatic rifles with a fixed (i.e., non-detachable) magazine that have "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition," 720 ILCS 5/24-1.9(a)(1)(B), as well as dozens of commonly owned semiautomatic pistols and shotguns, 720 ILCS 5/24-1.9(a)(1)(C), (D), (F), (K), (L).

*See supra* p.14.  The notion that these commonly owned firearms—which include, e.g., all of the 200,000-plus M-1 carbines that the federal government sold to civilians at a discount in the 1960s—are "highly unusual in society at large," *Bruen*, 142 S.Ct. at 2143, blinks reality, which likely explains why Defendants have never even tried to make that showing with respect to *any* of the arms HB5471 bans.

The feeding devices HB5471 bans are even more common.  Tens of millions of Americans own hundreds of millions of the feeding devices Illinois now prohibits. SA24; *see* NSSF, *Firearm Production in the United States*, *supra*, at 7 (finding, based on government and industry data, that Americans purchased more than 160 *million* 10-plus-round magazines from 1990-2018).  And the numbers are trending upward:  Recent data indicates that 75% of modern rifle magazines have a standard capacity of more than 10 rounds.  NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), https://bit.ly/3GLmErS.  As with the firearms HB5471 bans, this ubiquity reflects the fact that the magazines Illinois newly banned in the wake of *Bruen* were long lawful in Illinois and remain lawful in most of the states.  That makes them the antithesis of the kind of highly unusual weapons a state could ban consistent with historical tradition.

Defendants try to cast doubt on these numbers by disparaging one of the many sources to report them.  *See* State.Br.21.  *But see supra* n.10.  But it is not just a single professor in D.C. who has documented the ubiquity of what Illinois now dubs

38

"large capacity ammunition feeding devices."   Court after court after court has recognized this reality of modern American life.  *See, e.g.*, *Duncan*, 970 F.3d at 1142 ("One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation."); *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (noting same); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("about 25 million large-capacity magazines were available in 1995," and "nearly 50 million such magazines … were approved for import by 2000"); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("millions of … large-capacity magazines[] have been sold over the last two decades in the United States").   In short, what the D.C. Circuit said a decade ago rings even more true today:  While "[t]here may well be some capacity above which magazines are not in common use," "that capacity surely is not ten."  *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

Nor is it 15, the number Illinois arbitrarily selected for handguns.  *See* 720 ILCS 5/24-1.10(a)(1); 720 ILCS 5/24-1.9(a)(1)(D).  To be sure, the numbers are less staggering for magazines that hold more than 15 rounds—but only slightly.  Many (if not most) modern handguns come standard with magazines holding 15 or more rounds.  *See, e.g.*, *Gun Digest 2018* at 386-88, 408 (Jerry Lee & Chris Berens eds., 2017).  And the average American gun owner owns more ammunition feeding

devices that can hold *more than* 15 rounds than they do feeding devices that hold 10 rounds or less. English, *2021 National Firearms Survey*, *supra*, at 24-25. The commonality (indeed, ubiquity) of the feeding devices HB5471 is indisputable.

Unable to point to any evidence that any of the arms HB5471 ban are *not* common (because they have never supplied any), Defendants observe that the Supreme Court "has never … set a numerical threshold for commonality." State.Br.23. But whatever the threshold is, tens of millions of firearms owned by at least six million Americans, and magazines ten times as common as that, plainly surpass it. *Cf. Caetano*, 577 U.S. at 420 (Alito, J., concurring) (finding 200,000 sufficient). Defendants thus identify no basis to disturb the district court's eminently correct conclusion that the arms HB5471 are common.

2. Implicitly recognizing as much, Defendants insist that whether people commonly keep and bear arms "offer[s] no insight into whether [they] are commonly used for self-defense." State.Br.22. According to Defendants, the only "use" that matters is firing a firearm at an assailant during an armed confrontation. That argument defies constitutional text, Supreme Court precedent, and common sense. The Second Amendment protects the right "to keep and bear Arms," not just to fire them when the need for self-defense arises. U.S. Const. amend. II. That is precisely why the Supreme Court has held that "bear[ing] arms" includes not just firing them at would-be attackers, but "carry[ing]" them equipped with ammunition "for the

purpose … of *being armed and ready* for offensive or defensive action." *Bruen*, 142 S.Ct. at 2134 (ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584). Under a straightforward reading of both the text of the Constitution and *Bruen*, an individual "uses" her firearm for the Second Amendment's *ne plus ultra* purpose every time she *keeps* it inside her home or *carries* it outside her home "at the ready for self-defense." *Id.*

Defendants' contrary account makes nonsense of *Bruen* in more ways, too. *Bruen* juxtaposed the phrase "weapons that are those 'in common use at time'" with the phrase "those that 'are highly unusual in society at large.'" *Id.* at 2143. That juxtaposition makes sense only if the "uses" that matter include *keeping* and *bearing*, as the latter phrase is nonsensical vis-à-vis a frequency-of-*firing* inquiry. And lest there be any lingering doubt, *Bruen* concluded that people have a right to carry handguns outside the home for self-defense *without ever even asking how frequently they fire them in actual self-defense situations*. It was enough for the Court in *Bruen*, just as it was for the Court in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 142. S.Ct. at 2143. How frequently law-abiding citizens keep versus carry firearms, or fire them at ranges versus at attackers, is therefore legally irrelevant, as an individual lawfully "uses" her firearm every time she does *any* of those things.

41

Defendants are thus left criticizing the "in common use today" test as "'circular'" and "unworkable." State.Br.20, 27 (quoting *Friedman*, 784 F.3d at 409). But whatever they (or members of this Court) may think about that test, there is no denying that *Bruen* held that arms may not be banned consistent with our Nation's historical tradition if they are "in common use today" for lawful purposes. 142 S.Ct. at 2143. Indeed, the Court even went out of its way to make clear that arms that are common *today* are protected by the Second Amendment even if they were *not* common at the founding. *Id.* Moreover, to the extent the common-use test makes it particularly difficult to belatedly ban firearms already in wide circulation, there is every reason to think the *Bruen* majority would view that as a feature, not a bug. And in all events, Defendants' effort to convert common use into a frequency-of-firing test is not even responsive to *Friedman*'s circularity critique, as whether a particular type of firearm is lawful undoubtedly influences how frequently it is fired in self-defense situations, not just how frequently it is kept or carried.[11]

---

[11] The circularity critiques are also overstated. While *Bruen* focused on the need for a firearm to be "unusual," the historical test asks whether a firearm "is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Accordingly, states cannot freeze firearms technology in time by banning new models before they can enter the market and become common, as they would still need to show that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use. Far from being "circular," the common-use test appropriately trusts the American people's judgment in selecting the firearms they think are appropriate for lawful use.

Finally, Defendants emphasize the unquestionably terrible crimes that a small number of individuals have committed using types of arms Illinois now prohibits. The *Bevis* and *Herrera* courts did the same, concluding that the arms Illinois has banned are not protected because they can be and have been put to horrific ends. *Bevis*, 2023 WL 2077392, at *14-16; *Herrera*, 2023 WL 3074799, at *7. But the sad reality that a very small number of people—less than one one-hundredth of one percent of the millions who own them—have used the types of firearms and feeding devices HB5471 bans to perpetrate such devastating crimes has nothing to do with the relevant legal question, and instead harkens back to the kind of interest-balancing that *Bruen* rejected. What matters under binding Supreme Court precedent is who the *typical* owners of such arms are and how *they* typically use them. And the unassailable reality remains that the arms Illinois now bans are "typically possessed by law-abiding citizens for lawful purposes," including self-defense. *Heller*, 554 U.S. at 624-25. Just as in *Heller*, then, the state's flat ban is flatly unconstitutional, as it violates the foundational principle that "a free society prefers to punish the few who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

### C.     There Is No Historical Tradition in this Country of Banning Arms that Millions of Law-Abiding Citizens Own for Lawful Purposes.

The Court can and should end there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and that tradition

is that law-abiding citizens may possess arms that are commonly kept for lawful purposes.  In the context of a flat ban on the acquisition or even possession of classes of arms, that *is* the historical test.  *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT.  But even if further historical inquiry were necessary, Illinois has not come close to meeting its burden of demonstrating any historical tradition of prohibiting the arms it has banned.  To the contrary, the historical record reveals a long tradition of *welcoming* technological advancements aimed at enhancing law-abiding citizens' ability to accurately fire repeatedly.

For a historical law to serve as a "proper analogue" to a modern regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S.Ct. at 2132-33.  Indeed, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry."  *Id.* at 2133 (emphasis omitted).  Moreover, even a relevantly similar historical analogue must be "well-established and representative."  *Id.*  A court may not uphold a restriction just because a state manages to locate a few similar laws in the past, as doing so would "risk[] endorsing outliers that our ancestors would never have accepted."  *Id.*; *see, e.g.*, *Antonyuk v. Hochul*, 2022 WL 16744700, at *45 (N.D.N.Y.

44

Nov. 7, 2022) (purported analogues governing less than 6% of U.S. neither sufficiently representative nor sufficiently well-established); *Koons v. Platkin*, 2023 WL 3478604, at *62-68 (D.N.J. May 16, 2023) (purported analogues spanning only five states over 250 years insufficient to show historical tradition).

Applying those principles, Defendants' proposed analogues fall far short. At the outset, Defendants rely heavily on what they try to portray as a historical tradition of restricting "dangerous" arms without regard to whether they are "unusual." The *Bevis* and *Herrera* courts likewise posited that "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected," without ever even analyzing commonality. *Bevis*, 2023 WL 2077392, at *9, *10-16; *Herrera*, 2023 WL 3074799, at *7. But as Defendants now acknowledge, State.Br.34, the Supreme Court has recognized only a "historical tradition of prohibiting the carrying of 'dangerous *and unusual* weapons.'" *Bruen*, 142 S.Ct. at 2128 (emphasis added) (quoting *Heller*, 554 U.S. at 627). As Justice Alito has explained, "this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). That alone poses a considerable challenge for Defendants' effort to eliminate half the test.

Unsurprisingly, that effort fails. Their first examples—a 1686 East New Jersey law restricting concealed carry of various knives or "other unusual or unlawful weapons," State.Br.34, and "six laws enacted between 1750 and 1799

restricting the carrying of weapons like clubs," State.Br.35—not only involve what by their own admission were *unusual* weapons, but flunk the "relevantly similar" test for a simple reason:  Laws that restrict only the carrying of certain types of arms (and only *concealed* carrying at that) are not remotely similar in *how* they regulate to a law like HB5471 that bans possession.  After all, the question is "how … the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S.Ct. at 2133, and a law that restricts only one type of carrying but leaves the right to keep arms in the home untouched obviously imposes far lesser burdens than a law that bans both carrying *and keeping*.

As for the rest of Defendants' early historical narrative, the Supreme Court has already determined the import of the fact "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'":  "[E]ven if these colonial laws prohibited the carrying of [certain arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."  *Id.* at 2143.  That conclusion applies *a fortiori* when it comes to efforts to prohibit *both keeping and bearing* arms.  At any rate, whatever laws may have existed about "unusual or unlawful weapons," State.Br.34, no colony or state in the early Republic prohibited people from carrying *firearms*, either openly or concealed. To the contrary, some state and local laws affirmatively encouraged or even required

such carrying.  *See, e.g.*, *Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia*, 1606-25, at 273 (Lyon Gardiner Tyler ed., 1907).  Early regulations either prohibited concealed carry while allowing open carry and possession or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people."  *Bruen*, 142 S.Ct. at 2145.  And as *Bruen* explained in painstaking detail, those laws were never understood to cover commonly owned arms.  *Id.* at 2142-56.

Regulations on so-called "trap guns" and clubs, State.Br.34-35, are even less apposite.  Trap guns were not bearable arms; they fired a projectile automatically when a trap (i.e., a trip wire) was triggered.  Laws against setting traps do not impose *any* "burden [on] a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S.Ct. at 2133; they criminalize the rigging of a device to expel a projectile without a human pulling the trigger.  As for clubs, Defendants suggest that they were "regulated" or "restrict[ed]."  State.Br.35.  But neither they nor their historians say what sort of "restrictions" were placed on clubs—information that is crucial to determining whether modern and historical laws "impose a comparable burden" on Second Amendment rights.  *Bruen*, 142 S.Ct. at 2132.

The reason for that omission is not hard to discern.  Several of these laws targeted groups who were not, at the time, understood to have *any* constitutional rights—namely, enslaved people and other racial minorities.  *See, e.g.*, 1797 Del. Laws 104 (quoted at Spitzer Decl. Ex. E at 15) ("[I]f any Negro or Mulatto slave

47

shall presume to carry any guns … clubs, or other arms and weapons whatsoever, without his master's special license … he shall be whipped with twenty-one lashes, upon his bare back."); 1798 Ky. Acts 106 (quoted at Spitzer Decl. Ex. E at 32-33) (similar).  Laws that governed only those who were not at the time considered to be part of "the people" protected by the Second Amendment cannot tell courts anything about the rights of those who are.  At any rate, even laws prohibiting disfavored groups from carrying clubs did not restrict the right to *possess* them.  *See* Spitzer Decl. ¶73.[12]  Indeed, Defendants point to *zero* historical laws prohibiting the acquisition or possession of clubs or other analogous weapons like slungshots, and Plaintiffs are aware of none.

Defendants also invoke "regulation of Bowie knives" in the 1800s, State.Br.36, but they misstate what those laws did.  Plaintiffs are not aware of any antebellum statute that completely banned the sale or possession of Bowie knives.  Nearly all nineteenth-century Bowie-knife laws were limited to restricting concealed carry—which, again, cannot serve as a proper analogue to a ban on acquisition and possession.  And most of the restrictions Defendants cite merely escalated punishments for crimes committed with Bowie knives, *see* 1837 Ala. Acts 7; 1853

---

[12] Professor Spitzer claims that "some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime," Spitzer Decl. ¶73, but no law he cites actually prohibited club possession.

Comp. L. Cal. §127, or targeted concealed carry or open carry with intent to do harm, *see* 1859 Ind. Acts 129, while leaving intact citizens' right to possess and openly carry—i.e., keep and bear—such weapons. In all events, even the most sweeping Bowie knife laws were short-lived: By 1900, "no state prohibited possession of Bowie knives." David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD. And the most onerous laws were contemporaneously deemed *unconstitutional* unless they were construed more narrowly. *E.g.*, *Nunn v. State*, 1 Ga. 243 (1846); *see Bruen*, 142 S.Ct. at 2147 (singling out *Nunn* as "particularly instructive" regarding the Second Amendment's meaning).

There is, put simply, no evidence in the historical record that states in the eighteenth and nineteenth centuries broadly (or even narrowly) prohibited the general public from acquiring arms commonly kept and borne for lawful purposes just because they were considered too "dangerous," let alone of imposing such prohibitions on firearms with the kinds of features Illinois singles out. Nor do things change when one fast-forwards a century or even two. Before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024. The earliest laws treating such features as sufficient to convert an otherwise-lawful firearm into a so-called unlawful "assault weapon" date back to only 1989, and the earliest restriction on magazine capacity dates back only to 1990,

which is far too late to serve as an indicator of a "historical tradition." *See Bruen*, 142 S.Ct at 2126.

Defendants are thus forced to resort to trying to analogize *semi*automatic firearms to *fully* automatic firearms. But while they blithely suggest that "there is no principled distinction between" the two, State.Br.47, the Supreme Court begs to differ, *see Staples*, 511 U.S. at 603, 612.[13] So does the historical record, which confirms that they have never been treated as one and the same. To be sure, several states began restricting *automatic* firearms almost as soon as they came on the civilian market in the mid-1920s. *See supra* p.8. But most states notably did *not* impose such prohibitions on semiautomatic firearms—even though they had been marketed to civilians for decades before fully automatic submachine guns like the infamous Tommy gun came on the market. *See supra* pp.8-9.

Defendants claim that "at least seven of the anti-machinegun laws" enacted in during the Prohibition Era "extended … to both automatic and semiautomatic

---

[13] Defendants engage in similar conflation in positing that "the Army adopted the AR-15 as a combat rifle, rechristening it the M-16." State.Br.29. To be sure, the original design for the rifle that became the M-16 was a selective-fire weapon that allowed soldiers to fire automatically. But that rifle was never sold to civilians. The only "AR-15," "AR-platform," or "AR-style rifle" ever to be sold to civilians in this country is a semiautomatic-only rifle. And "[t]he United States military has never used the semiautomatic-only AR-15 for combat." E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. Ill. L.J. 193, 203-04 (2018). In fact, "[n]o military in the world uses a service rifle that is semiautomatic only." *Id.* at 205.

weapons." State.Br.37. Even assuming that were enough to demonstrate a "well-established" historical tradition, *but see Bruen*, 142 S.Ct. at 2155-56, that is misleading in the extreme. Of the seven laws to which they point, one applied only to fully automatic weapons from which multiple shots could be discharged "by a single function of the firing device," 1933 S.D. Sess. Laws 245-47, ch. 206, §§1-8; another applied to semiautomatics only to the extent they were "altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers," 1933 Minn. Laws ch. 190, §1(b); and two more merely required a special license, without prohibiting either sale or possession, *see* 1933 Cal. Stat., ch. 450; 1933 Ohio Laws 189. Even the remaining three—all extreme outliers—did not categorically prohibit the sale or possession of semiautomatics. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190. And *all* of those laws, including the few that banned acquisition of certain semiautomatics, were either repealed entirely or replaced with laws regulating only fully automatic weapons within a few decades. *See supra* n.2.

There is thus no historical evidence that states broadly prohibited the general public from acquiring semiautomatic firearms, regardless of what features or firing capacity they had. Indeed, such laws remain rare even today; the firearms Illinois

has banned are legal in (at least) 40 states.[14]  As for the federal government, it did not restrict semiautomatic arms in any way until 1994, *see* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)), and Congress allowed that law to expire after just ten years after a Department of Justice study showed that it had produced "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice 96 (2004), https://bit.ly/3wUdGRE.

The lack of a historical tradition supporting HB5471's magazine ban is even more palpable.  *No* state prohibited acquiring ammunition feeding devices of *any* capacity until the Bush Administration, as Defendants' own historian recently admitted in court.  *See supra* p.10.  That is so even though feeding devices capable of holding more than 10 or 15 rounds had by then been marketed to civilians for the better part of a century.  *See supra* pp.7-10.  Thus, even if this Court were to look beyond the indisputable commonality of the arms HB5471 bans, the result would remain unchanged, as there simply is no well-established tradition of banning

---

[14] Illinois' ban is so aggressive that it reaches many arms that even some of the states that do have "assault weapon" bans do not prohibit. *See, e.g.*, Haw. Rev. Stat. Ann. §134-1 (defining "assault pistol" as a semiautomatic firearm that "accepts a detachable magazine and has two or more" additional features).

semiautomatic firearms, the self-defense-enhancing features HB5471 singles out, or the feeding devices that enable ubiquitous firearms to work as intended.

**D.     Illinois Cannot Save HB5471's Sweeping Ban by Pointing to Some Dramatic Technological Change or Novel Societal Problem.**

The absence of any well-established tradition supporting the state's ban is not owing to any "dramatic technological changes." *Bruen*, 142 S.Ct. at 2132. Semiautomatic firearms with the features HB5471 singles out are not modern innovations, and neither are ammunition feeding devices that hold more than 10 or 15 rounds.  The first arm that could fire several rounds without reloading was invented in the 1500s, and several such arms pre-dated the Revolution. *Duncan*, 970 F.3d at 1147.  As for "cartridge-fed" "repeating" firearms—arguably the most direct forebears of the firearms Illinois now bans—they came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66." *Id.* at 1148.  These multi-shot firearms were not novelties; they were ubiquitous among civilians by the end of the Civil War. *See supra* pp.5-7.

Semiautomatic firearms capable of firing several rounds without reloading— i.e., exactly what HB5471 outlaws—were not far behind.  The modern semiautomatic action was invented in the 1880s; modern box magazines came onto the scene in the 1890s; and manufacturers first sold semiautomatic firearms with detachable magazine no later than 1896. *See supra* pp.7-8; *Duncan*, 970 F.3d at

53

1148.  None of this is disputed.  As one of Defendants' own historians explains in detail, "gunmakers had at their disposal" "[*b*]*y the early 1890s*" "a trio of potent new design features that would become characteristic of most modern … semi-automatic firearms"—namely, "self-loading mechanisms, smokeless powder ammunition, and detachable magazines."  Delay Decl. ¶73 (emphases added).  That explains why "[t]he most copied and influential of all modern handguns," which "is still in production today," was invented in 1911.  *Id.*

To be sure, modern firearms and magazines like the ones Illinois has banned can fire more rounds more accurately and more quickly than their founding-era predecessors (although they are not meaningfully better on those scores than a Colt Model 1911).  But that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified.  *Heller*, 554 U.S. at 624-25.  After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists.  Indeed, far from treating technological advancements aimed at improving accuracy, capacity, and functionality as nefarious developments that made firearms "too dangerous," history shows that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home.  Advancements welcomed by law-abiding citizens are simply not the sort of

"dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's emphatic focus on whether arms are "in common use *today*," *Bruen*, 142 S.Ct. at 2143 (emphasis added).  *See* Smith, *supra*, at 7-8.

To the extent Illinois seeks to justify its ban as owing to some "unprecedented societal concern[]," *Bruen*, 142 S.Ct. at 2132, that argument fails too.  Even accepting the dubious proposition that there is some causal link between the recent rise in mass shootings and arms that have been lawfully possessed by civilians for the better part of a century, State.Br.41-43, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time.  *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023).  Nevertheless, before the 1990s, no state banned semiautomatic weapons just because they had pistol grips, collapsible stocks, or barrel shrouds, and there were almost no efforts to restrict the firing capacity of semiautomatic arms, period.  *See supra*.  That is not because such firearms were adopted only by militaries:  "No military in the world uses a service rifle that is semiautomatic only."  Wallace, *supra*, at 205.

There has never been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them.  To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves

and others against those who seek to do them harm.  *See Bruen*, 142 S.Ct. at 2132;

*Heller*, 554 U.S. at 627.  Because HB5471 flies in the face of that historical tradition,

it violates the Second Amendment.

## II.    The District Court Did Not Abuse Its Discretion In Concluding That The Remaining Factors Favor Injunctive Relief.

As one would expect in a contest between law-abiding citizens' ability to

exercise constitutional rights and the state's interest in enforcing a novel restriction

on those recently reaffirmed rights, the remaining factors strongly favor the district

court's status-quo-preserving injunction.  The court was plainly correct to conclude

that HB5471 is causing Plaintiffs irreparable harm, as it is the square law of this

Circuit that "[i]nfringements of" "the right to possess firearms for protection" inflict

irreparable injury.  *Ezell*, 651 F.3d at 699.  Defendants argue that those constitutional

injuries do not matter because Plaintiffs could use other firearms for self-defense.

State.Br.54.  But *Heller* expressly rejected the argument "that it is permissible to ban

the possession of [one type of protected firearm] so long as the possession of other

firearms … is allowed."  554 U.S. at 629.  And while Defendants complain that the

district court "did not meaningfully explain why a damages award could not make

the businesses whole" from lost sales due to HB5471, State.Br.54, the explanation

is obvious:  Economic injuries are irreparable when, as here, the defendants have

Eleventh Amendment immunity.  The state tellingly nowhere suggests that it would

waive that immunity and compensate Plaintiffs who suffer such injuries on account

of a stay should HB5471 ultimately be held unconstitutional. Finally, HB5471 tramples on fundamental rights, and it is always in the public interest to prevent the violation of constitutional rights. Defendants have no answer for that black-letter law.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's preliminary injunction in the consolidated *Barnett* cases.

Respectfully submitted,

GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

\* Supervised by principals of the firm who are members of the Virginia bar

*Counsel for* Barnett *Appellees*

57

s/ David G. Sigale

DAVID G. SIGALE

LAW FIRM OF DAVID G. SIGALE, P.C.

430 West Roosevelt Road

Wheaton, IL 60187

(630) 452-4547

disgale@sigalelaw.com

DAVID H. THOMPSON

PETER A. PATTERSON

WILLIAM V. BERGSTROM

COOPER & KIRK, PLLC

1523 New Hampshire Avenue, NW

Washington, D.C. 20036

(202) 220-9600

*Counsel for* Harrel *Appellees*

MARK L. SHAW

JENNIFER CRAIGMILE NEUBAUER

MICHAEL A. DANFORTH

SHAW LAW LTD.

33 North County Street, Suite 300

Waukegan, IL 60085

(847) 244-4696

s/ C.D. Michel

C.D. MICHEL

ANNA M. BARVIR

MICHEL & ASSOCIATES, P.C.

180 East Ocean Blvd., Suite 200

Long Beach, CA 90802

(562) 216-4444

cmichel@michellawyers.com

*Counsel for* Federal Firearms Licensees of Illinois *Appellees*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the Brief contains 13,965 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

June 19, 2023

<u>s/Erin E. Murphy</u>
Erin E. Murphy

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the appendix.

June 19, 2023

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2023, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit

by using the CM/ECF system. I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy