Nos. 23-1793, 23-1825, 23-1826, 23-1827, 23-1828

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JAVIER HERRERA,

*Plaintiff-Appellant,*

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General, BRENDEN F. KELLY, in his official capacity as Illinois State Police Director, COOK COUNTY, TONI PRECKWINKLE, in her official capacity as Cook County Board of Commissioners President, KIMBERLY FOXX, in her official capacity as Cook County State's Attorney, THOMAS DART, in his official capacity as Cook County Sheriff, CITY OF CHICAGO, and ERIC CARTER, in his official capacity as Superintendent of Police for the Chicago Police Department,

*Defendants-Appellees.*

APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, No. 1:23-CV-00532
THE HONORABLE LINDSAY C. JENKINS

## BRIEF OF PLAINTIFF-APPELLANT

Gene Hamilton
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(202) 964-3721

Thomas R. McCarthy
Jeffrey M. Harris
Taylor A.R. Meehan
Gilbert C. Dickey
Matt Pociask
C'Zar D. Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423

*Counsel for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1793</u>

Short Caption: <u>Herrera v. Raoul</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Dr. Javier Herrera</u>

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell</u>

_____

(3)     If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

   <u>None</u>

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>None</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Thomas R. McCarthy</u>          Date: <u>April 27, 2023</u>

Attorney's Printed Name: <u>Thomas R. McCarthy</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>1600 Wilson Blvd., Suite 700</u>

<u>Arlington, Virginia 22209</u>

Phone Number: <u>(703) 243-9423</u>          Fax Number: _____

E-Mail Address: <u>tom@consovoymccarthy.com</u>

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-1793</u>

Short Caption: <u>Herrera v. Raoul, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Dr. Javier Herrera</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Taylor A.R. Meehan</u>    Date: <u>April 27, 2023</u>

Attorney's Printed Name: <u>Taylor A.R. Meehan</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address: <u>1600 Wilson Blvd., Suite 700</u>

        <u>Arlington, Virginia 22209</u>

Phone Number: <u>(703) 243-9423</u>    Fax Number: _____

E-Mail Address: <u>taylor@consovoymccarthy.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As       Clear Form

Appellate Court No: <u>23-1793</u>

Short Caption: <u>Herrera v. Raoul, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Dr. Javier Herrera</u>

_____

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell</u>

_____

(3)      If the party, amicus or intervenor is a corporation:

   i)        Identify all its parent corporations, if any; and

            <u>None</u>

   ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            <u>None</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Jeffrey M. Harris</u>          Date: <u>April 27, 2023</u>

Attorney's Printed Name:  <u>Jeffrey M. Harris</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address:  <u>1600 Wilson Blvd., Suite 700</u>

         <u>Arlington, Virginia 22209</u>

Phone Number: <u>(703) 243-9423</u>                    Fax Number: _____

E-Mail Address: <u>jeff@consovoymccarthy.com</u>

rev. 12/19 AK

**Save As**    **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1793

Short Caption: Herrera v. Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gilbert C. Dickey    Date: June 14, 2023

Attorney's Printed Name: Gilbert C. Dickey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 1600 Wilson Blvd., Suite 700

Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: gilbert@consovoymccarthy.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1793

Short Caption: Herrera v. Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Matt Pociask    Date: April 27, 2023

Attorney's Printed Name: Matt Pociask

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 1600 Wilson Blvd., Suite 700

Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: matt@consovoymccarthy.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1793</u>

Short Caption: <u>Herrera v. Raoul, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    <u>Dr. Javier Herrera</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    <u>Consovoy McCarthy PLLC; America First Legal Foundation; Knabe & Bedell</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/ C'Zar David Bernstein</u>    Date: <u>April 27, 2023</u>

Attorney's Printed Name: <u>C'Zar David Bernstein</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: <u>1600 Wilson Blvd., Suite 700</u>

    <u>Arlington, VA 22209</u>

Phone Number: <u>703-243-9423</u>    Fax Number: <u> </u>

E-Mail Address: <u>czar@consovoymccarthy.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As        Clear Form

Appellate Court No: <u>23-1793</u>

Short Caption: <u>Herrera v. Raoul, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Gene P. Hamilton</u>    Date: <u>April 27, 2023</u>

Attorney's Printed Name: <u>Gene P. Hamilton</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>300 Independence Avenue SE</u>

        <u>Washington, DC 20003</u>

Phone Number: <u>(202) 964-3721</u>    Fax Number: _____

E-Mail Address: <u>gene.hamilton@aflegal.org</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT .................................... ix

JURISDICTIONAL STATEMENT ........................................................ 1

INTRODUCTION ............................................................................. 2

COUNTERSTATEMENT OF THE ISSUES .......................................... 4

STATEMENT OF THE CASE ............................................................. 5

SUMMARY OF ARGUMENT ............................................................ 11

ARGUMENT ................................................................................. 14

    I.  Dr. Herrera is likely to succeed on the merits of his claims............. 15

        A.  *Bruen* abrogates *Friedman* and *Wilson* .................................... 15

        B.  Dr. Herrera is likely to succeed on his claim that it is unconstitutional to ban the purchase and possession of commonly owned firearms at home ...................................................................... 17

            1.  The Second Amendment's plain text covers purchasing semiautomatic rifles, keeping them at home, and training with them.......................................................................... 17

            2.  Whether banned "Arms" are uncommon goes to the government's burden of likening the bans to historical regulations. ............... 23

            3.  The government parties have shown no historical tradition of banning commonly owned firearms from homes ......................... 27

        C.  Dr. Herrera is likely to succeed on his claim that it is unconstitutional to ban standard magazines .............................................................. 38

            1.  The Second Amendment's plain text covers purchasing and keeping magazines ...................................................................... 38

            2.  The government parties have shown no historical tradition of banning commonly owned magazines ........................................ 40

        D.  Dr. Herrera is likely to succeed on his claim that the State cannot constitutionally require additional registration of his lawfully acquired firearms ................................................................... 42

    II. The remaining factors entitle Dr. Herrera to a preliminary injunction ........... 45

        A.  Dr. Herrera is suffering ongoing irreparable harm, no different than the *Ezell* plaintiffs ........................................................... 45

        B.  The remaining factors favor a preliminary injunction ........................... 51

CONCLUSION......................................................................................................52

CERTIFICATE OF COMPLIANCE........................................................................53

CERTIFICATE OF SERVICE...................................................................................54

# TABLE OF AUTHORITIES

## Cases

*520 Mich. Ave. Assocs. v. Devine,*
433 F.3d 961 (7th Cir. 2006) ...................................................51

*Am. C.L. Union of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ...........................................16, 61

*Andrews v. State,*
50 Tenn. 165 (1871) ................................................... passim

*ANJRPC v. Attorney General N.J.,*
910 F.3d 106 (3d Cir. 2022) .................................................48

*Aymette v. State*, 21 Tenn.
154 (1840) ...............................................................25, 34, 38

*Barnett v. Raoul,*
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ................13, 28, 29

*Bevis v. City of Naperville,*
2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ...............11, 19, 48

*Bliss v. Commonwealth,*
12 Ky. 90 (1822) .................................................................38

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ................................................... passim

*Cheatham v. Shearon,*
31 Tenn. 213 (1851) ............................................................41

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ...............................................61

*Citizens United v. FEC,*
558 U.S. 310 (2010) ............................................................41

*Cockrum v. State,*
24 Tex. 394 (1859).............................................................38

*Connection Distrib. Co. v. Reno,*
154 F.3d 281 (6th Cir. 1998) ...............................................61

*Dean Foods Co. v. Brancel,*
187 F.3d 609 (7th Cir. 1999) .........................................16, 17

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................... passim

*Duncan v. Becerra,*
970 F.3d 113 (9th 2020)................................................48, 49

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) (en banc)...........................................21, 48

*English v. State,*
    35 Tex. 473 (1871)...........................................................26, 34, 38

*Ezell v. City of Chicago,*
    651 F.3d 684 (2011) ..............................................................passim

*Federated Dep't Stores, Inc. v. Moitie,*
    452 U.S. 394 (1981) ....................................................................60

*Friedman v. Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ...................................................passim

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) .......................................................55

*Grace v. District of Columbia,*
    187 F. Supp. 3d 124 (D.D.C. 2016) ...............................................56

*Heller v. District of Columbia (Heller II),*
    670 F.3d 1244 (D.C. Cir. 2011) .........................................11, 15, 52, 54

*Hill v. State,*
    53 Ga. 472 (1874)..................................................................43, 44

*Jackson v. San Francisco,*
    746 F.3d 953 (9th Cir. 2014) .........................................................45

*Katko v. Briney,*
    183 N.W.2d 657 (Iowa 1971) ........................................................39

*Kemp v. United States,*
    142 S. Ct. 1856 (2022) ...............................................................60

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ...............................................................passim

*McDonald v. State,*
    102 S.W. 703 (Ark. 1907)........................................................14, 40

*Michigan v. U.S. Army Corps of Engineers,*
    667 F.3d 765 (7th Cir. 2011) ........................................................58

*Miller v. Bonta,*
    542 F. Supp. 3d 1009 (S.D. Cal. 2021)..........................................30

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ....................................................56

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ........................................................17

iv

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ............................................................................ passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ................................................................ 28, 29

*Nken v. Holder*,
556 U.S. 418 (2009) ..................................................................................... 61

*Nunn v. State*,
1 Ga. 243 (1846) ........................................................................................... 38

*O'Neil v. State*,
16 Ala. 65 (1849) .......................................................................................... 37

*Planned Parenthood Ariz., Inc. v. Humble*,
753 F.3d 905 (9th Cir. 2014) ..................................................................... 56

*Presser v. Illinois*,
116 U.S. 252 (1886) ................................................................................ passim

*Preston v. Thompson*,
589 F.2d 300 (7th Cir. 1978) ...................................................................... 61

*Quilici v. Vill. of Morton Grove*,
532 F.Supp. 1169 (N.D. Ill. 1981) ............................................................ 42

*Range v. Att'y Gen.*,
– F.4th –, 2023 WL 3833404 (3d Cir. 2023) (en banc) ........................... 42

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ..................................................................................... 55

*Staples v. United States*,
511 U.S. 600 (1994) ............................................................................... 26, 41

*State v. Huntly*,
25 N.C. 418 (1843) ................................................................................. 31, 37

*State v. Kerner*,
107 S.E. 222 (N.C. 1921) ...................................................................... 25, 34

*State v. Reid*,
1 Ala. 612 (1840) ............................................................................ 14, 45, 46

*State v. Workman*,
14 S.E. 9 (W. Va. 1891) ............................................................................... 26

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ...................................................................... 21

*United States v. Miller*,
307 U.S. 174 (1939) ................................................................................ passim

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ...................................................17

*Whitaker v. Kenosha Unified School Dist.*,
    858 F.3d 1034 (7th Cir. 2017) ..........................................54, 60

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ...........................12, 18, 19, 60

*Wilson v. State*,
    33 Ark. 557 (1878) ...........................................................4, 25

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) .....................................................................58

*Woodring v. Jackson County*,
    986 F.3d 979 (7th Cir. 2021) ...............................................20

**Statutes**

1819 Ind. Acts 39, §1 (Jan. 14, 1820) .......................................33

1859 Ind. Acts 129 (Feb. 23, 1859) ...........................................33

1869 N.M. Laws 72 (Jan. 29, 1869) ...........................................33

1871 Tex. Laws 25, §1 (Apr. 12, 1871) ......................................33

1879 N.C. Sess. Laws 231, ch. 127 (Mar. 5, 1879) ...................33

1880 S.C. Acts 448 (Dec. 24, 1880) ...........................................33

1881 Ark. Acts 191, no. 96, §1 ...................................................33

1882 Acts of West Virginia 421-22, §7 ......................................33

1889 Ariz. Terr. Sess. Laws 30-31, §2 .......................................33

1890 Wy. Laws 140 (Mar. 14, 1890) ..........................................33

1905 N.J. Laws 324-25 (Apr. 18, 1905) .....................................33

1923 Cal. Stat. 696-97 (June 13, 1923) ......................................33

1923 Conn. Pub. Acts 3709 (June 2, 1923) ................................33

1923 N.D. Laws 380 (Mar. 7, 1923) ...........................................33

1923 N.H. Laws 138, §4 (May 4, 1923) ......................................33

1925 Ind. Acts 496 (Mar. 12, 1925) ...........................................33

1925 Mich. Pub. Acts 473, §5 (May 26, 1925) ...........................33

1925 Or. Laws 479, §5 (Feb. 26, 1925) ......................................33

1927 Haw. Sess. Laws 209-17 (Apr. 27, 1927) ..........................33

26 U.S.C. §5841 ..........................................................................34

26 U.S.C. §5845 ...................................................................................................33

26 U.S.C. §5861 ...................................................................................................33

720 Ill. Comp. Stat. 5/24-1 ..................................................................................9

720 Ill. Comp. Stat. 5/24-1.10 .........................................................................8, 9

720 Ill. Comp. Stat. 5/24-1.9 .............................................................8, 9, 42, 48

A. Hutchinson, *Code of Mississippi* 182 (1848) ...........................................44

*Acts of the General Assembly of the State of Georgia* (1867) ......................44

*Acts of the Session of 1866-7 of the General Assembly of Alabama* (1867).................45

Chi. Muni. Ord. 8-20-010 ....................................................................................8

Chi. Muni. Ord. 8-20-075 ....................................................................................8

Chi. Muni. Ord. 8-20-085 ....................................................................................8

Chi. Muni. Ord. 8-20-300 ....................................................................................8

Cook Cty. Ord. 54-211 .........................................................................................8

Cook Cty. Ord. 54-212 .........................................................................................8

Cook Cty. Ord. 54-214 .........................................................................................8

Josiah A. Patterson, The Revised Code of the Statute Laws of the State of Mississippi (1880) ...............................................................................33

*Public Laws of the State of North Carolina, Session of 1856-'57* (1857) ...................44

*Public Laws of the State of North Carolina, Session of 1858-'59* (1859) ...................44

## Other Authorities

1 T. Cunningham, *A New and Complete Law Dictionary* (1764) .........................36, 37

American Bar Association, *ABA Profile of the Legal Profession* (2022) ....................30

David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ...................................................................47

*House-Passed Assault Weapons Ban of 2022* (H.R. 1808) (Aug. 4, 2022)..................30

National Center for Education Statistics, *Teacher Characteristics and Trends* .......30

Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195 (2022) .................................................................34

Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989, 1008-09 (2020) ...................................................22

Stark, *Surgical Care of the Confederate States Army*, 10 U.S. Armed Forces Med. J. 50 (1959)...................................................................43

**Treatises**

1 Blackstone, *Commentaries on the Laws of England* (1768)....................................39

1 Hawkins, *A Treatise of the Pleas of the Crown* 266 (1777) ....................................30

1 Richard Burn, *Justice of Peace and Parish Officer* (1762).....................................31

1 William Waller Hening, *The Statutes at Large* (1823)...........................................44

3 Wood, *An Institute of the Laws of England* (1754)................................................30

4 Blackstone, *Commentaries on the Laws of England* (1769)............................30, 35

Thomas M. Cooley, *General Principles of Constitutional Law* (Rothman ed. 1981) ...........................................................................................................................passim

Thomas M. Cooley, *Treatise on the Constitutional Limitations* (5 ed. 1883)............20

**Regulations**

87 Fed. Reg. 24,652 (Apr. 26, 2022) ..........................................................................25

**Constitutional Provisions**

U.S. Const. art. I, §10 ................................................................................................21

U.S. Const. art. I, §8 ..................................................................................................21

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is scheduled for June 29, 2023.

## JURISDICTIONAL STATEMENT

The government parties' jurisdictional statements are not complete and correct. Dr. Herrera's complaint alleges that state and local firearms laws violate the Second and Fourteenth Amendments, and he sought a preliminary injunction. *See* 42 U.S.C. §1983. The district court had jurisdiction under 28 U.S.C. §1331 and §1343. The district court denied the motion for preliminary injunction on April 25, 2023, and Dr. Herrera filed a timely notice of appeal on April 26, 2023. This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

**INTRODUCTION**

This case is about whether an emergency room physician and SWAT team medic has a Second Amendment right to purchase and keep commonly owned firearms and magazines in his home. Illinois, Cook County, and the City of Chicago now ban semiautomatic rifles and the magazines sold with them—rifles more common than American lawyers, teachers, and Ford F-150s. Dr. Herrera cannot keep these popular arms at home or purchase replacement magazines. And as a result, he cannot participate in regular SWAT training with his rifle—training that, consistent with the American College of Emergency Physicians (ACEP) best practices for tactical medicine, ensures he could safely disarm downed officers' firearms or otherwise prepare for the team's dangerous and unpredictable missions.

The government parties must justify their bans with historical evidence that banning a whole category of popular firearms from Americans' homes "is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022). But as the country's early militia acts illustrate, governments have long expected citizens to keep common arms in their homes and learn how to use them, for both their own defense and the collective defense. Although 19th-century legislatures and courts quibbled over public-carry rights, they were unanimous that keeping common arms useful for "contribut[ing] to the common defense" was at the very core of the Second Amendment and state analogues. *United States v. Miller*, 307 U.S. 174, 178 (1939). But here, the government parties wish to ban purchasing or keeping modern rifles at home

2

precisely because they would be useful for the common defense, as well as individual defense. State.Br.28; County.Br.5; City.Br.7. Handguns for self-defense are enough, they contend. *E.g.*, State.Br.23. But just as government bans on political speech cannot be saved by arguments that other speech is left unaffected, the government parties here cannot constitutionally ban purchasing, training with, and keeping commonly owned semiautomatic rifles from homes—conduct in the Second Amendment's heartland.

The district court rejected any distinction between historical public-carry regulations and today's ban on firearms at home. The government parties repeat that error on appeal. County.Br.47-48 (deeming distinction "irrelevant"); State.Br.48 ("same justifications" of "protecting the public"); City.Br.6-7 (similar). If 19th- and 20th-century governments could ban Bowie knives and other concealable weapons from the streets, they argue, then today's governments can ban dangerous arms at home too. And based on those public-carry regulations, the district court declared a historical tradition of banning "particularly 'dangerous'" arms anywhere, including at home. A.14-16.[1] But that is what the *McDonald* dissent said, not any majority opinion of the Supreme Court. *Compare* A.10-11 (citing dissent as opinion of "the Court"), *with District of Columbia v. Heller*, 554 U.S. 570, 629-33 (2008) (rejecting handgun ban over dissent's dangerousness arguments), *Bruen*, 142 S. Ct. at 2131-32

---

[1] A.__ citations refer to the Cook County brief's Short Appendix. R.__ citations refer to entries in the *Herrera* district court record. Supp.A.__ citations refer to Dr. Herrera's supplemental appendix containing declarations in support of the preliminary injunction motion.

(finding "no such tradition" that urban "'handgun violence'" could justify New York's proper-cause requirement), *and Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring) ("relative dangerousness of a weapon is irrelevant when … commonly used"). If public-carry laws and these other historical arguments justify the bans here, then *Bruen*'s historical inquiry is a blank check.

Dr. Herrera's case is about what he can do in his home. And where, as here, no one denies that there are millions of lawful users of the banned firearms and magazines, the Constitution precludes governments from removing them from law-abiding citizens' homes because of the law-breaking acts of "cowardly and dishonorable men." *Wilson v. State*, 33 Ark. 557, 560 (1878). Their "evil[s] must be prevented by the penitentiary and gallows" as they have always been, *id.*, not by disarming whole cities, counties, or States.

## COUNTERSTATEMENT OF THE ISSUES

I.  Whether Dr. Herrera is likely to succeed on the merits of his claim that it is unconstitutional to ban the purchase and at-home possession of commonly owned firearms.

II.  Whether Dr. Herrera is likely to succeed on the merits of his claim that it is unconstitutional to ban the purchase and at-home possession of commonly owned magazines.

III.  Whether Dr. Herrera is likely to succeed on the merits of his claim that it is unconstitutional to impose an after-the-fact registration requirement on gun owners to register firearms they already lawfully purchased.

IV.  Whether Dr. Herrera is suffering irreparable harm and whether the balance of the equities and the public interest entitle him to a preliminary injunction.

## STATEMENT OF THE CASE

**I.** Dr. Herrera is a board-certified emergency medicine physician, an assistant professor of tactical medicine, and a medic on a SWAT team. Supp.A.1-3. He lives in Chicago, the largest city in Cook County. Chicago is simultaneously one of the country's most dangerous cities and home to some of the most restrictive gun laws. Last year, Chicago reported nearly 31,000 violent crimes, including nearly 700 homicides. R.1 at 7. Dr. Herrera is no stranger to Chicago's violence. During his medical residency, an armed attacker entered the hospital and killed an attending physician and two others, and Dr. Herrera rendered aid at the scene. Supp.A.3-4.

Dr. Herrera owns two semiautomatic handguns and two semiautomatic AR-15 rifles for hunting, sport-shooting, and self-defense—all lawful purposes. Supp.A.2; R.1 at 7. These semiautomatic firearms can fire only one round when the trigger is pulled. Supp.A.168. An automatic firearm, by comparison, fires continually so long as the trigger is depressed, or in multiple-round bursts. Supp.A.168-67. No automatic firearms are at issue here.

Dr. Herrera's rifles are lawful in most American jurisdictions, and many millions of law-abiding Americans keep those same arms in their homes (by the government parties' own numbers). State.Br.22 ("6.4 million gun owners"); County.Br.19 (estimating 5.3% of 300 million firearms, or more than 15 million semiautomatic rifles); City.Br.12 (similar). But not Dr. Herrera's. Explained below, local laws forbid Dr. Herrera from keeping in his Chicago home his rifles and standard magazines that came with them. They also forbid him from keeping at home

the 17-round magazine that came standard with his semiautomatic Glock 45 handgun. And all laws forbid Dr. Herrera from purchasing replacement magazines or AR-15 components that he would otherwise purchase. Supp.A.2; Supp.A.171 (firearms are engineered for standard magazines, which wear over time and must be replaced). For now, he keeps his Glock 45 inoperable and the banned rifles and magazines beyond county lines. Supp.A.2, 4-5. Come January, he will have to move them beyond state lines unless he registers serial numbers and personal information with the state police. Supp.A.4-5, 11-12.

With his AR-15 rifles at least an hour away, it is a practical impossibility for Dr. Herrera to participate in firearms training with his Chicago-area SWAT team. Supp.A.4, 8. In 2018, Dr. Herrera was recruited to serve as a medic for that SWAT team. Supp.A.2-3. Once or twice a month, the team responds to hostage and active-shooter situations or high-risk search-and-arrest warrants on subjects that are known or suspected to carry firearms. Supp.A.2-3, 11. The team is primarily police officers, who carry AR-15 rifles on missions, and medics. Supp.A.2-3. The team trains two to three days each month on tactics, medical procedure, and weapons handling with AR-15 rifles. Supp.A.3. Every team member, including Dr. Herrera, may participate in firearms training, but they must bring their own rifles. Supp.A.3-4, 11.

A medic's familiarity with the team's tactics and weapons improves his safety and others' safety on missions. Supp.A.3. The ACEP textbook on tactical medicine explains that firearms training is "especially" important for civilian medics like Dr. Herrera who are not sworn police officers, because they often have less experience

6

handling firearms. Supp.A.9-10. SWAT medics should have at least "a baseline understanding of law enforcement and the operational aspects of the SWAT unit" and "must be competent with firearms." *Id*. "At a minimum," the ACEP textbook explains, medics "should be familiar with how to make these weapons 'safe' by manipulating the safety and magazine release, and ideally know how to fire these weapons under duress should the need arise." *Id*. Dr. Herrera, who uses the ACEP textbook in his own tactical medicine course, explained that for his "safety and everyone else's safety, it is important to [him] to cross-train to ensure that [he is] confident and proficient with the AR-15 rifle that the operators on [his] team carry." Supp.A.3. For example, training "ensures that [he] could immediately secure, unload, and make safe an operator's AR-15 if an operator were to be injured." *Id.*; *see* Supp.A.9-10. On past missions, he has been asked to secure an officer's AR-15 so the officer could switch to a different firearm, and there is not always separation between the "hot zone" and the safety perimeter where a SWAT team's command vehicle might be located. Supp.A.10-11.

But because team members bring their own rifles to training, Dr. Herrera cannot participate with his rifle far from home beyond county lines. Supp.A.3-4, 11. Dr. Herrera would have to drive more than four hours—retrieving his rifle outside Cook County, commuting to training, returning his rifle, and finally coming home. Supp.A.4. Dr. Herrera cannot make that hours-long trip given his current hospital shifts and teaching obligations. Supp.A.4.

**II.** Local and state laws preclude Dr. Herrera from purchasing certain firearms and magazines and possessing them at home in the following ways. Chicago bans AR-15 rifles and "high capacity" magazines in homes. It is unlawful to "import, sell, manufacture, transfer, or possess" any "assault weapon"—defined to include AR-15s. Chi. Muni. Ord. 8-20-075(a); *see id.* §8-20-010(a)(10)(B)(ii). It is unlawful to possess a "high capacity magazine," defined as holding more than 15 rounds. *Id.* §§8-20-085(a), 8-20-010. Keeping an AR-15 rifle or prohibited magazine at home is punishable by incarceration and fines. *See id.* §8-20-300(a).

Cook County's ordinance makes it unlawful to (among other things) "acquire, carry or possess" any "assault weapon," including an "AR-15." Cook Cty. Ord. 54-212(a); *see id.* §54-211(7)(A)(iii). It is unlawful to possess a "large capacity magazine," defined as holding more than 10 rounds. *Id.* §§54-211, 54-212(a). Violations are punishable by fines and up to six months in prison. *Id.* §54-214(a).

Most recently, Illinois banned semiautomatic rifles and certain magazines. Governor Pritzker lauded the bill as "one of the strongest assault weapons bans in the nation." R.1 at 14. It is unlawful to "knowingly possess an assault weapon," defined to include a "semiautomatic rifle" with certain common features, and expressly including AR-15s. 720 Ill. Comp. Stat. 5/24-1.9(c); *id.* §24-1.9(a)(1)(A)-(B), (J)(ii)(II). It is unlawful to "knowingly possess a large capacity" magazine, defined as holding more than 10 rounds for rifles and 15 rounds for handguns. *Id.* §24-1.10(c); *id.* §24-1.10(a)(1). A person commits a misdemeanor by possessing a single prohibited firearm and a Class 3 felony for possessing multiple such firearms. *See id.* §24-

1(a)(15), (b). Possessing or purchasing a prohibited magazine is a petty offense and carries a $1,000 fine. *Id.* §24-1.10(g).

A narrow grandfathering provision allows rifles or magazines owned before January 2023 to remain in the State, but rifles must be registered with state police between October 2023 and January 2024. *Id.* §§24-1.9(d), 24-1.10(d). Registrants must provide the make, model, serial number, and other information. *Id.* §24-1.9(d). Registrants cannot purchase replacement magazines for rifles (or handguns) that exceed the 10-round and 15-round capacity limits. *Id.* §24-1.10(g). And it is not clear that registrants may use grandfathered rifles for self-defense or other lawful purposes at home. The grandfathering provision contains no exception for rifles used in self-defense. And its text distinguishes between *possessing* and *using* grandfathered rifles. A person may "possess" grandfathered rifles and magazines at home or another's private property with express permission. *Id.* §24-1.9(d)(1)-(2); *id.* §24-1.10(d)(1)-(2). As for "use," the text states only that grandfathered rifles and magazines may be "use[d]" while "at a properly licensed firing range or sport shooting competition venue." *Id.* §24-1.9(d)(4); *id.* §24-1.10(d)(4); *compare Ezell v. City of Chicago*, 651 F.3d 684, 691 n.4 (2011) (discussing self-defense exception in enjoined Chicago law).

**III.** Dr. Herrera filed his lawsuit the same month that Illinois enacted its AR-15 ban and moved for a preliminary injunction of state and local laws the same day. Preliminary relief would allow him to keep an AR-15, its magazine, and the 17-round

magazine that came with his Glock 45 at home, which in turn would enable him to participate in ongoing SWAT training. R.5 at 9.

The district court denied the preliminary injunction on April 25. A.1-31. Adopting the reasoning of *Bevis v. City of Naperville*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023), the court concluded that Dr. Herrera is unlikely to succeed on the merits of his claims because the challenged laws are consistent with a historical tradition of "regulating 'particularly dangerous weapons.'" A.15-16. The court reasoned that "the Court" in *McDonald* said that states and municipalities "'[f]rom the early days of the Republic … banned altogether the possession of especially dangerous weapons.'" A.11 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 899-900 (2010)). But the quoted language is from Justice Stevens's dissent. As for the State's new registration requirement, the district court rejected the historical analysis in then-Judge Kavanaugh's dissent in *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011), and deemed the registration requirements "factually distinguishable." A.23-24.

With respect to irreparable harm, the district court rejected Dr. Herrera's reliance on *Ezell*, 651 F.3d at 699. A.25-26. And the court concluded that if he had been able to bring his AR-15 rifle to SWAT team training in the past, then he could do so now. A.28. The court did not address Dr. Herrera's declaration that current "demands of [his] job as an emergency medicine doctor and [his] teaching commitments" do not allow him to spend hours retrieving and returning his AR-15. Supp.A.4, 12. Dr. Herrera appealed the day after the district court denied his motion.

## SUMMARY OF ARGUMENT

**I.A.** Dr. Herrera is likely to succeed on the merits. The government parties cannot "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep … arms." *Bruen*, 142 S. Ct. at 2127, 2129-30. And they cannot overcome that failure of proof by instead relying on proffered public-safety benefits. *Id.* In this way, *Bruen* abrogated *Friedman v. Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) (per curiam). This Court must review the challenged laws under *Bruen*'s historical framework, distinct from any interest-balancing approach.

**B.1.** Applying *Bruen*, the rifles at issue are "Arms," and arguments to the contrary defy ordinary English. The Second Amendment's plain text covers acquiring modern semiautomatic rifles, training with them, and keeping them at home. *See Heller*, 554 U.S. at 581-82; *see also Caetano*, 577 U.S. at 412; *Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use," and the "right wouldn't mean much without the training and practice that make it effective.").

**2.** The government parties cannot show that there is a historical tradition of banning commonly owned rifles from homes. *See Bruen*, 142 S. Ct. at 2135-56. They concede that there are millions of lawful users of the now-banned firearms and thus cannot argue that they are "'highly unusual in society at large.'" *Id.* at 2143; *see also Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023) (explaining that the government bears the burden to "demonstrate that the 'arms' [the Act] bans are

11

not in 'common use'"). Nor can they be constitutionally banned from law-abiding citizens' homes based on arguments about the dangers of such arms in criminal hands. *Compare Heller*, 554 U.S. at 635-36, *with id.* at 682, 694-95 (Breyer, J., dissenting).

Militia acts confirm that, historically, families were expected to have in their homes commonly owned arms useful for both self-defense and collective defense, consistent with the Second Amendment's animating principle to have ordinary civilians capable of military service rather than rely exclusively on an armed military class living under military law. *See Miller*, 307 U.S. at 178-79; *see also* R.63-1 at 75-185 (compilation of historical statutes). But the district court ignored that history and instead declared a tradition of prohibiting "'especially dangerous weapons'" or "particularly dangerous weapons," even at home. A.10-11 (quoting *McDonald*, 561 U.S. at 899-90 (Stevens, J., dissenting)); A.15. That elevates Justice Stevens's dissenting view in *McDonald* above *Heller* and *Bruen*. Properly understood, the historical tradition is less sweeping. At common law, dangerous and unusual weapons could not be *publicly carried* to terrorize. At varying times, weapons small enough to be concealed could not be carried concealed *in public*. But many of those same public-carry laws expressly did *not* prohibit keeping arms "upon [one's] own premises." *McDonald v. State*, 102 S.W. 703, 703 (Ark. 1907). No history justifies a ban on commonly owned rifles at home.

**C.** Likewise, the Second Amendment's protection of "Arms" covers magazines necessary to operate semiautomatic firearms. *Heller*, 554 U.S. at 584, 630; *see also,*

*e.g.*, *State v. Reid*, 1 Ala. 612, 616-18 (1840) ("A statute … which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right … to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."). Just as there is no historical tradition of banning firearms in common use for lawful purposes, there is no historical tradition that supports banning the magazines that came with them. Standard magazines with capacities above 10 rounds are necessary to effectuate the Second Amendment right, are owned in the tens of millions today, and have long been commercially available. The only conceivably analogous regulations are a handful of 20th-century capacity regulations that, standing alone, are too late under *Bruen*, 142 S. Ct. at 2154-55 & n.28.

**D.** The State's registration requirement also fails under *Bruen*. There is no historical tradition of mandatory gun registration like that at issue here. Contrary to the district court's analysis, the question is not whether registration of *any* sort is impermissible; the question is whether the State may constitutionally impose an after-the-fact registration requirement for gun owners who already lawfully own common firearms that the State now seeks to ban. That registration requirement is "not longstanding." *Heller II*, 670 F.3d at 1255 (majority); *accord id.* at 1291-94 (Kavanaugh, J., dissenting) (discussing history).

**II.A.** Dr. Herrera's harm is irreparable. The constitutional violation alleged here is materially indistinguishable from that in *Ezell*, so "irreparable harm is

13

presumed." 651 F.3d at 699. What the district court and the government parties saw as the "occasional expense and inconvenience" of driving hours to retrieve and return his rifle for SWAT training is "not the relevant constitutional harm." *Id.* at 698. It is the ongoing infringement of Dr. Herrera's right to keep common arms for protection and to train with them, consistent with best practices prescribed by the ACEP. Those ongoing constitutional violations "cannot be compensated by damages," no different from other "similarly intangible and unquantifiable interests" like ongoing First Amendment violations. *Id.* at 699.

**II.B.** Finally, the district court erred in ruling that the public interest and the balance of the equities did not favor an injunction. The public has no interest in "the enforcement of a statute that is probably unconstitutional." *Am. C.L. Union. of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012).

## ARGUMENT

The district court denied the preliminary injunction motion based on a nonexistent historical tradition and an erroneous view of irreparable harm that this Court rejected in *Ezell*. In this appeal, the historical determinations that *Bruen* requires are ultimately questions of law to be reviewed *de novo* and entail subsidiary determinations about the "application of constitutional principles to historical fact." *Dean Foods Co. v. Brancel*, 187 F.3d 609, 616-17 (7th Cir. 1999); *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Contrary to the State's plea for clear-error review, State.Br.15, these "mixed questions" also require "more searching" *de*

*novo* review. *Dean Foods*, 187 F.3d at 616-17 (collecting cases). The Court should reverse and remand with instructions to enter a preliminary injunction.

## I.    Dr. Herrera is likely to succeed on the merits of his claims.

### A.    *Bruen* abrogates *Friedman* and *Wilson*.

*Bruen* rejected the prevailing view that the government's interest in gun regulation could override the Second Amendment's text so long as "the regulation [wa]s 'substantially related to the achievement of [that] important governmental interest.'" *Bruen*, 142 S. Ct. at 2126-27. *Bruen* "'fundamentally changes the focus of the relevant analysis.'" *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023). After *Bruen*, if the "Second Amendment's plain text covers" keeping semiautomatic rifles and magazines at home, "the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. The government overcomes that presumption only if it can prove its law is "consistent with this Nation's historical tradition of firearm regulation"—for example, the historical tradition of regulating the "carrying of 'dangerous and unusual weapons,'" meaning those not "in common use *today*." *Id.* at 2128, 2143 (emphasis added). The government cannot "simply posit that" a law "promotes an important interest." *Id.* at 2126. There must be a pattern of historical regulations that are "relevantly similar." *Id.* at 2132-33.

*Bruen*'s framework is not the framework applied in *Wilson*, 937 F.3d 1028, or *Friedman*, 784 F.3d 406, which upheld Cook County's and Highland Park's rifle bans. *Friedman* reasoned that features of AR-15s "were not common in 1791," 784 F.3d at 410, and rejected arguments about how they were "in common use today," *contra Bruen*, 142 S. Ct. at 2143. And while *Friedman* acknowledged that semiautomatic

rifles "bear a relation to the preservation and effectiveness of state militias," 784 F.3d at 410, *Friedman* misunderstood the "Militia" as a military force that the States could disarm, *contra Presser v. Illinois*, 116 U.S. 252, 265 (1886). *See infra* 20-21. Finally, *Friedman* acknowledged that AR-15s "can be beneficial for self-defense," but went on to conclude that they could be banned because (1) AR-15s were "the weapons of choice in mass shootings," (2) bans would "reduce the share of gun crimes," (3) bans had the "substantial benefit" of "mak[ing] the public feel safer," and (4) bans still left "residents with many self-defense options." 784 F.3d at 411-12. "[W]hen there is no definitive constitutional rule," *Friedman* concluded, "matters are left to the legislative process." *Id.* at 412; *accord Wilson*, 937 F.3d at 1035 (citing other pre-*Bruen* court of appeals decisions and concluding "plaintiffs have not come forward with *any* authority or developments that postdate [*Friedman*] that require us to reconsider that decision").

*Bruen* abrogates that approach in the following three ways. *See Bevis*, 2023 WL 2077392 at *8 ("*Friedman* cannot be reconciled with *Bruen*"). **First**, *Friedman* relied on the potential benefits of the firearms ban, concluded that such "matters are left to the legislative process," and doubted the relevance of a lack of "'historical tradition' of regulation." 784 F.3d at 408, 411-12. But *Bruen* rejects that matters are left to the legislative process and makes historical tradition the central inquiry. 142 S. Ct. at 2127.

**Second**, *Wilson* described *Friedman* as "evaluat[ing] the importance of the reasons for the [ban] to determine whether they *justified* the ban's intrusion on

16

Second Amendment rights," such as the "'substantial' interest[]" in "making the public feel safer" and "overall dangerousness." *Wilson*, 937 F.3d at 1036. But *Bruen* rejects that interest-balancing approach as "inconsistent with *Heller*'s historical approach." 142 S. Ct. at 2129. Governments may no longer "simply posit that the regulation promotes an important interest," *id.* at 2126, or advances a "substantial benefit," *Friedman*, 784 F.3d at 412.

**Third**, *Friedman* rejected as "circular" arguments about present-day commonality of firearms. 784 F.3d at 409. But *Bruen* confirms that the relevant question is whether weapons are "in common use today." 142 S. Ct. at 2143.

For these reasons, *Wilson* and *Friedman* did not apply the historical test *Bruen* requires, and it is not enough that *Wilson* and *Friedman* "came out the right way," *Woodring v. Jackson County*, 986 F.3d 979, 992-93 (7th Cir. 2021). *But see* County.Br.48 (discussing consistent "results"); State.Br.49. *Bruen*'s text-and-history framework is the starting point, not *Friedman* or *Wilson. See, e.g., Woodring*, 986 F.3d at 992-95 (concluding prior circuit precedent abrogated by intervening Supreme Court precedent making *Lemon* "no longer a viable framework").

**B.    Dr. Herrera is likely to succeed on his claim that it is unconstitutional to ban the purchase and possession of commonly owned firearms at home.**

**1. The Second Amendment's plain text covers purchasing semiautomatic rifles, keeping them at home, and training with them.**

The rifle bans implicate the Second Amendment's plain text. Dr. Herrera has an individual right to "keep" modern firearms and use them "in defense of hearth and home," *Heller*, 554 U.S. at 582-83 & n.7, 635, as well as the "corresponding right to

acquire and maintain proficiency in their use," *Ezell*, 651 F.3d at 704, and "to purchase and use them in such a way as is usual," *Andrews*, 50 Tenn. at 178; *accord Teixeira v. Cnty. of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."). Accordingly, "the Constitution presumptively protects" Dr. Herrera's conduct so long as the country's most popular semiautomatic rifles are "Arms." *Bruen*, 142 S. Ct. at 2126.

The semiautomatic rifles at issue here are plainly "Arms." The Second Amendment "'extends … to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Bruen*, 142 S. Ct. at 2132; *see also Heller*, 554 U.S. at 581-82. That includes "rifle[s] of all descriptions," *Andrews*, 50 Tenn. at 179, be it "commercially successful" Winchester repeating rifles of the 1860s or today's semiautomatic rifles. *See Duncan v. Bonta*, 19 F.4th 1087, 1154-55 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting) (discussing history of Winchester repeating rifles), *vac'd* 142 S. Ct. 2895 (2022). Technological advancements do not put modern semiautomatic rifles outside the scope of the Second Amendment's text. *See, e.g.*, *Caetano*, 577 U.S. at 412.

The government parties' voluminous arguments to the contrary "border[] on the frivolous." *Heller*, 554 U.S. at 581-82. They contend that semiautomatic rifles are not "Arms" because they are too modern and too "militaristic." State.Br.28-29; *see*

County.Br.5; City.Br.7.[2] The district court did not adopt those arguments. *See* A.13 (analyzing whether historical tradition justified ban). For good reason: Semiautomatic rifles doubtless count as "Arms" under that term's ordinary meaning, and their utility for both individual defense and collective defense confirms it. It turns the Second Amendment's text and structural guarantee on its head to argue that a weapon's usefulness for collective defense *disqualifies* it as an "Arm." *Contra* City.Br.25; State.Br.28-29.

The Second Amendment begins with this prefatory clause: "A well regulated Militia, being necessary to the security of a free State…." The Second Amendment's "Militia" is distinct from the military. It refers to "all citizens capable of bearing arms" for our collective defense, not a standing army. *Presser*, 116 U.S. at 265; *see* Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989, 1008-09 (2020) ("the militia" referred "to the entire national able-bodied population subject to military service"). By vesting civilians with a general right to bear arms, the amendment ensures that the country can protect itself by drawing from the general citizenry in wartime. Without civilians capable and ready for military service, the country's alternative would be to rely on an armed military class of professional soldiers. The English experience with unrepresentative armed factions living under

---

[2] They also stretch the facts. Semiautomatic AR-15s are civilian-owned arms, capable of firing a theoretical maximum of around 45 rounds per minute at a stationary target, but real-world constraints will often slow the firing rate substantially. Supp.A.179. They are *not* military-issued fully automatic firearms, which can fire 800 or 970 rounds per minute for suppressive fire. Supp.A.182-83. Conflating the two is counterfactual and misleading. *But see* County.Br.6; State.Br.29.

military law triggered concerns that standing armies could subvert the new U.S. Constitution. *See* Thomas M. Cooley, *Treatise on the Constitutional Limitations* 428-29 (5 ed. 1883) ("A standing army is peculiarly obnoxious in any free government … more dreaded by the people [in England] as an instrument of oppression than a tyrannical monarch or any foreign power"); Thomas M. Cooley, *General Principles of Constitutional Law* 271 (Rothman ed. 1981) (describing standing army as "condemned by the traditions and sentiments of the people, as being … dangerous to the liberties of the people" and that "general preparation of the people for the defence of their institutions with arms is preservative of them"). Civilians' ownership of and proficiency with common rifles is fully consistent with the amendment's animating principle. The Second Amendment embodies "a view that the citizens making up the yeomanry of the land, the body of the militia, shall become familiar with their use in times of peace, that they may the more efficiently use them in times of war." *Andrews*, 50 Tenn. at 178. And today, the millions of rifles in gun safes across the country are just as much "Arms" as the minuteman's musket. Supp.A.182-83.

As the history shows, the "Militia" as used in the Second Amendment is not a state-regulated entity. It refers to able-bodied civilians, vested with the right to become proficient with firearms, and upon whom the government can rely to expand the military forces in wartime or in times of insurrection. *See Presser*, 116 U.S. at 265. There is no authority for the notion that the "Militia" must have the State's "permission" before they can acquire and become proficient with firearms. *See* Cooley, *General Principles*, *supra*, at 271. Nor is that "Militia" equivalent to a state army that

20

the State may freely regulate. *See* U.S. Const. art. I, §10, cl. 3 (prohibiting States from keeping "Troops" or "Ships of War in time of Peace" without "Consent of Congress" or otherwise "engage in War, unless actually invaded"); *Miller*, 307 U.S. at 178-79 ("The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress."). States *cannot* "prohibit the people from keeping and bearing arms so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government." *Presser*, 116 U.S. at 265; *see* U.S. Const. art. I, §8, cls. 15-16 (describing *Congress's* power to call and organize militias).

The prefatory clause thus confirms that "Arms" must *at least* include civilians' weapons commonly owned for lawful purposes that are also useful as "'ordinary military equipment.'" *See Heller*, 554 U.S. at 577-78, 624-25 (quoting *Miller*, 307 U.S. at 179); *Aymette v. State*, 21 Tenn. 154, 158, 160 (1840) ("arms" include individuals' "ordinary military equipment" and the "right to keep" arms of such character is "unqualified"). The Second Amendment's protection of "Arms" confers a self-enforcing right for civilians to possess and become proficient with arms suitable for both individual and collective defense, so long as the arms are not "highly unusual in society at large." *Heller*, 554 U.S. at 627; *see, e.g.*, *Wilson*, 33 Ark. at 560 (cannot "prohibit the citizen from wearing or carrying a war arm"); *Aymette*, 21 Tenn. at 158 ("arms … usually employed in civilized warfare"); *State v. Kerner*, 107 S.E. 222 (N.C. 1921) ("arms" are those "whose use was necessary for their protection against the

21

usurpation of illegal power—such as rifles, muskets, shotguns, swords, and pistols"); *English v. State*, 35 Tex. 473, 474 (1871) ("Arms of what kind? Certainly such as are useful and proper to an armed militia."); *State v. Workman*, 14 S.E. 9, 10 (W. Va. 1891) ("in regard to the kind of arms … it must be held to refer to the weapons of warfare to be used by the militia"); Cooley, *General Principles*, *supra*, at 271 ("arms … suitable for the general defence of the community against invasion or oppression").

The government parties do not engage with this history. They instead contend that Dr. Herrera's reading of the Second Amendment "calls into question the federal law prohibiting machineguns" and similar strawmen. State.Br.48; County.Br.44; City.Br.23-24 (discussing bump stocks or unlawful machinegun conversion). These arguments ignore what *Heller* and *Bruen* already said about the State's power to regulate firearms consistent with historical tradition. No one contests that the government may lawfully regulate fully automatic functionality of firearms. *See Staples v. United States*, 511 U.S. 600, 603, 611-12 (1994) (distinguishing between fully-automatic functionality and commonly owned semiautomatic rifles). The Second Amendment does not greenlight possession of any and all technology, even that "most useful in military service" today, such as fully automatic cover fire or arms that *Heller* described as "highly unusual in society at large," 554 U.S. at 627. But the Second Amendment also does not permit what the governments have done here: ban widely popular civilian arms as if they were not "Arms" at all. *See Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2129-30; *see also Presser*, 116 U.S. at 265 ("states cannot …

prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security").

Applied here, just as the Second Amendment encompassed firearms used by civilians to defend the colonies or increasingly modern firearms to defend the frontier, the Second Amendment encompasses modern rifles today. *See Friedman*, 784 F.3d at 410-11 (semiautomatic rifles "bear a relation to the preservation and effectiveness" of the militia, as well as self-defense); *see also* Supp.A.183. Acquiring semiautomatic rifles, training with them, and keeping them at home is thus presumptively protected, and the government parties must show there is a historical tradition of banning them in homes. *See Bruen*, 142 S. Ct. at 2129-30.

### 2. Whether banned "Arms" are uncommon goes to the government's burden to liken their bans to historical regulations.

The government parties' remaining arguments about the Second Amendment's meaning of "Arms" rest on a legal error made worse by a factual one: that "Arms" include only arms commonly used for individual self-defense, and that semiautomatic rifles are uncommon despite the millions possessed by law-abiding citizens. *See, e.g.*, State.Br.20, 22, 24-25, 28; County.Br.13, 19-20; City.Br.12-14. They are wrong on both counts.

***First***, the Second Amendment does not require a plaintiff to proffer statistics about the obvious—that rifles owned by millions are "Arms"—any more than the First Amendment requires a plaintiff to put on a statistical case about the nature of her political speech to be sure it's "speech." Rather, "common use" is a concept relevant to the *government's* burden. *See Barnett*, 2023 WL 3160284, at *9. Neither *Heller* nor

23

*Bruen* said that dangerous and unusual arms are unprotected because they aren't "Arms," *i.e.*, "'[w]eapons of offence.'" *Heller*, 554 U.S. at 581, 627. Rather, the government can regulate those arms consistent with the "*historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (emphasis added); *accord Bruen*, 142 S. Ct. at 2143. Conversely, there is not a tradition of banning common weapons. *Id.* And if there were, that would be the *government's* burden to show. *Bruen*, 142 S. Ct. at 2139; *see also, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) (government's burden to show bearable arms are "unusual").

**Second,** the government parties cannot seriously contend as a factual matter that the firearms and magazines at issue are not "in common use today" and are instead "'highly unusual in society at large.'" *Bruen*, 142 S. Ct. at 2143. Tellingly, the district court did *not* adopt arguments that semiautomatic rifles are not common enough. Nor could it have based on the government parties' own numbers.

Rifles account for at least one-third of the civilian stock of firearms. R.52-4 at 26; *see also Heller*, 554 U.S. 628-29 (assessing the commonality of handguns generally, not semiautomatic handguns specifically). With respect to semiautomatic rifles, the State and County concede that there are between 15 and 24.4 million such rifles in circulation, and the State pegs the number of semiautomatic rifle owners at 6.4 million. State.Br.22; County.Br.19; *see also Cuomo*, 804 F.3d at 255-56 ("Americans own millions of the firearms that the challenged legislation prohibits" and "[t]he same is true of large-capacity magazines."); *Barnett*, 2023 WL 3160284, at

*9-10 (factual finding that "'24 million AR-15 style rifles are currently owned nationwide,'" that "AR-15 style rifles are among the most popular arms produced," and that "34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home."). By the State's own estimate, Americans who own semiautomatic rifles are more common than lawyers (1.3 million),[3] teachers (4 million),[4] and Ford F-150 owners.[5] These persons are not "'highly unusual in society at large.'" *Bruen*, 142 S. Ct. at 2143. Neither are semiautomatic rifles. The Congressional Research Service reports that in 2020 alone, 2.8 million such rifles "were introduced into the U.S. civilian gun stock." *See House-Passed Assault Weapons Ban of 2022 (H.R. 1808)*, at 2 (Aug. 4, 2022), perma.cc/MB73-PSC3. In 2022, the ATF acknowledged that "the AR-15-type rifle" is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022).

The government parties respond that's not enough because there is no evidence that semiautomatic rifles are *used* for self-defense. *See, e.g.*, City.Br.18; County.Br.19-20. Under that logic, *no* firearms would be in common use. *See* County.Br.19 ("victims of violent crimes do not use *any* firearms to defend themselves 99.2% of the time." (emphasis added)). The argument also misstates *Heller* and

---

[3] American Bar Association, *ABA Profile of the Legal Profession*, at 22 (2022), perma.cc/WFN4-6RKF.
[4] National Center for Education Statistics, *Teacher Characteristics and Trends*, perma.cc/L8HX-NW25.
[5] *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022-23 & n.32 (S.D. Cal. 2021), *vac'd and remanded*, 2022 WL 3095986 (9th Cir. Aug. 2, 2022).

*Bruen*, which ask whether arms are "typically *possessed* by law-abiding citizens *for lawful purposes*," *Heller*, 554 U.S. at 625 (emphases added), as compared to a "'wicked purpose … to terrify and alarm,'" *Bruen*, 142 S. Ct. at 2146 n.15 (quoting *State v. Huntly*, 25 N.C. 418, 422-23 (1843)). Those lawful purposes are "*like* self-defense," in *Heller*'s words, but aren't limited to self-defense. 554 U.S. at 624 (emphasis added); *Miller*, 307 U.S. at 179.

In any event, uncontroverted record evidence shows that law-abiding citizens keep these popular rifles and magazines for self-defense. *See* R.63-7 at 2; Supp.A.3-4, 78-79, 170-71, 175, 177-78. They are lightweight and easier to control than other firearms, especially in high-stress situations, and their detachable magazines can be safer to keep in homes than fixed magazines or the loaded shotguns or revolvers that the government parties' experts suggest as alternatives. Supp.A.171, 175-78. The government parties' experts opined on what they think citizens *should* prefer for self-defense—including their incredible claims that weapons *without* a safety switch are better suited for self-defense at home or that pistol rounds cannot penetrate drywall. *See* Supp.A.176-77. But the question is what citizens prefer, not government experts. *See Helle*r, 554 U.S. at 629. As the dissenters acknowledged, *Heller* "struck down the … handgun ban not because of the utility of handguns for lawful self-defense, but rather because of their popularity for that purpose." *McDonald*, 561 U.S. at 890 n.33 (Stevens, J., dissenting); *accord Heller*, 554 U.S. at 720-21 (Breyer, J., dissenting) (complaining that the test concerns popular possession). And on that score, the government parties have not contested that millions including Dr. Herrera do in fact

26

prefer semiautomatic rifles for self-defense or other lawful purposes, as do first-time buyers who purchase semiautomatic rifles for personal protection (67.2%), target shooting (24.3%), and hunting (8.5%). Supp.A.3-4; R.63-6 at 3-20; R.63-7 at 2. The government parties cannot show that the banned arms are not commonly owned for lawful purposes.

### 3. The government parties have shown no historical tradition of banning commonly owned firearms from homes.

The government parties have not shown a history of banning commonly owned firearms from law-abiding Americans' homes. The history points in the opposite direction—colonists were expected to have common arms and sufficient ammunition at home for their common defense. The district court ignored that history. The court instead quoted from Justice Stevens's dissent regarding "'especially dangerous weapons,'" A.10-11 (quoting *McDonald*, 561 U.S. at 899-90 (Stevens, J., dissenting)), and analogized to public-carry regulations, A.14 & n.6, to approve the government parties' sweeping bans. That reasoning creates the "regulatory blank check" that *Bruen* rejected. 142 S. Ct. at 2133.

*a. Commonly owned for lawful purposes.* The district court did not grapple with *Heller*'s basic rule, confirmed by *Bruen*'s historical framework: So long as arms are not "highly unusual in society at large" and are "*chosen* by American society" for a "lawful purpose," then there is no historical tradition that could justify banning them from homes. *Heller*, 554 U.S. at 627-29; *accord McDonald*, 561 U.S. at 767-68; *Bruen*, 142 S. Ct. at 2156. Put another way, the government parties here would have to show that semiautomatic rifles are not "typically possessed by law-abiding citizens

for lawful purposes." *Heller*, 554 U.S. at 625. For the reasons stated, *supra* I.B.2, they have not made that showing here.

***b. Militia acts.*** Colonial-era militia acts refute the notion that history supports banning commonly owned rifles from homes. But the district court said nothing about them, despite Dr. Herrera's compilation of militia acts and arguments about the same. *See* R.63-1 at 2-13, 75-185.

Described above, the country has depended upon a civilian militia for the common defense from before its inception. *Supra* 19-22. To enable a "well-regulated Militia," civilians had to have their own arms and learn how to use them. Cooley, *General Principles*, *supra*, at 271; *Miller*, 307 U.S. at 179-80. Militia laws expected citizens to furnish themselves with muskets, carbines, or rifles, as well as the required ammunition, and train with them, or face fines. *See id.* at 178-82 (collecting examples); R.63-1 at 83-156 (statutes). That is why, historically, public-carry regulations of "dangerous and unusual arms" would target not rifles but instead Bowie knives and the like—weapons that "belong[ed] to no military vocabulary." *English*, 35 Tex. at 477. Those same laws had exceptions for weapons useful for self-defense, the collective defense, and weapons on one's own premises, *infra* 31-33. And the constitutionality of those laws depended on the presence of such exceptions. *See, e.g.*, *Kerner*, 107 S.E. at 225; *Aymette*, 21 Tenn. at 159.

But today, the government parties have done an about-face: enacting firearms bans that extend to homes and forbid the very conduct that these historical laws expected of citizens. There is no dispute that proficiency with the widely popular

28

semiautomatic rifles that the government parties seek to ban would be useful for the common defense of the country. Supp.A.183. Civilians' ownership and use of such arms in peacetime enables them to come to the country's defense in wartime. *See* Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195, 1279 (2022). And the State's, County's, and City's aim to extinguish such arms is antithetical to historical practice. *See Miller*, 307 U.S. at 178-82.

That is not to say all such arms are beyond regulation. *Heller* did not doubt that the government can regulate machineguns like M16s and other "sophisticated arms that are highly unusual in society at large," even if necessary "against modern-day bombers and tanks," 554 U.S. at 627. But the firearms at issue here are not that, and the Court should reject the government parties' conflating commonly owned semiautomatic weapons with military-issued weapons. *E.g.*, State.Br.31; County.Br.7; City.Br.20.[6] Today's AR-15s are highly popular civilian-owned semiautomatic rifles that fire only 45 rounds per minute (and ordinarily far fewer), compared to 750 to 900 rounds per minute for military-issued M16s. *See* Supp.A.182-83. For those popular civilian-owned arms, the militia acts establish a historical tradition of *expecting* them at home.

---

[6] In discussing firing rates, for example, the County omits that common pistols of the type *Heller* protects can fire up to one-hundred rounds *more* per minute than an AR-15. County.Br.7 (table). And while the government parties point to similarities in muzzle velocities and effective range, they ignore that virtually all traditional hunting rifles—which are permitted under their laws—fire at even *greater* speeds and distances. Supp.A.178-79. If those sorts of comparisons sufficed, then the government parties could presumably ban semiautomatic handguns and deer hunting rifles without Second Amendment scrutiny.

***c. The illusory historical tradition of banning "particularly dangerous arms."*** There is no historical tradition of banning "particularly 'dangerous'" arms altogether, including in law-abiding Americans' homes. *See* A.8; State.Br.28; County.Br.24; City.Br.25.

**i.** The "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" discussed in *Heller* and *Bruen* pertains to *public carry* regulations that are inapposite here. *See Heller*, 554 U.S. at 627 (emphasis added); *Bruen*, 142 S. Ct. at 2143; *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). *Heller* cited treatises describing the common-law "offence of *riding* or *going armed*, with dangerous or unusual weapons" or "dangerous and unusual weapons,"[7] which "is a crime against the *public* peace, by terrifying the good people of the land." 4 Blackstone, *Commentaries on the Laws of England* 148 (1769) (second emphasis added).

That historical tradition does not empower the government to do as it has done here, banning commonly owned arms *in homes*. The common-law offense of "going armed" to the terror of the people, *id.*, occurred *outside* the home and involved unlawful weapons handling. And it did not proscribe "*common weapons*." 1 Richard Burn, *Justice of Peace and Parish Officer* 15-16 (1762) (emphasis added); *Bruen*, 142

---

[7] Both "dangerous *and* unusual weapons" and "dangerous *or* unusual weapons" appear in other 18th-century legal treatises. *See*, *e.g.*, 1 Hawkins, *A Treatise of the Pleas of the Crown* 266 (1777); 4 Blackstone, *Commentaries on the Laws of England* 148-149 (1769); 3 Wood, *An Institute of the Laws of England* 453 (1754). The phrase is a unified concept describing a class of unusual weapons that would implicate the common-law offense. *See* "Affray," 1 T. Cunningham, *A New and Complete Law Dictionary* (1764).

S. Ct. at 2143; *see also* "Affray," 1 T. Cunningham, *A New and Complete Law Dictionary* (1764). Nor did it reach *all* manners of carrying dangerous and unusual arms. Even if it was "unusual" to carry a dangerous arm, "the citizen [was] at perfect liberty to carry" it *unless* he had a "wicked purpose." *Huntly*, 25 N.C. at 422-23; *see O'Neil v. State*, 16 Ala. 65, 67 (1849) (similar). For any of these reasons, the historical tradition regarding dangerous and unusual weapons in *public* is no analogy for the governments' bans in the *home* of rifles "unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

**ii.** Likewise, 19th- and 20th-century laws regulating how small arms could be carried in public cannot justify the bans here. *See* A.14-16 & n.6, 20-22. Analogizing to these public-carry laws, the district court reasoned that *Bruen*'s "'analogical reasoning' is not a 'regulatory straightjacket.'" A.14-15 (quoting *Bruen*, 142 S. Ct. at 2133). But it is also not a "blank check." *Bruen*, 142 S. Ct. at 2133.

The failed analogy to public-carry laws ignores that courts upholding those laws did so because the particular weapons at issue—Bowie knives or clubs—were *unlike* the "ordinary military equipment" that would be commonly kept at home by civilians: "Were a soldier on duty found with any of these things [such as dirks, daggers, or brass-knuckles], he would be punished for an offense against discipline." *English*, 35 Tex. as 477. Such laws ordinarily targeted dangerous and unusual concealed weapons and did *not* broadly prohibit keeping common weapons useful for individual and collective defense. *Aymette*, 21 Tenn. at 159-60; *see, e.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846) (explaining that prohibitions "against bearing arms *openly*" are

unconstitutional and "*void*," even if concealed carry could be banned); *Cockrum v. State*, 24 Tex. 394, 402 (1859) (affirming that the "right to carry a bowie-knife for lawful defense is secured," despite being "an exceeding[ly] destructive weapon"); *Bliss v. Commonwealth*, 12 Ky. 90, 90, 93-94 (1822) (invalidating statute proscribing concealed carry of "a pocket pistol, dirk, large knife, or sword in a cane").

By their own terms, those narrower public-carry restrictions cannot be likened to the bans here. *See Bruen*, 142 S. Ct. at 2143 (emphasizing that same set of laws "restricted only concealed carry, not all public carry, and [the] restrictions applied only to certain 'unusual or unlawful weapons'"); *Heller*, 554 U.S. at 629; *see also* R.63-1 at 20-55, 227-468 (compiling public-carry statutes). They did not "impose a comparable burden on the right of armed self-defense" as the government parties' at-home bans. *Bruen*, 142 S. Ct. at 2133.[8] Indeed, between 1819 and 1927, at least 20 statutes expressly *protected* possession and use of weapons at home or while traveling.[9] An 1881 Arkansas law, for example, expressly permitted carrying Bowie

---

[8] Similarly, prohibitions of spring guns are too far afield. County.Br.25; State.Br.14, 34-35. Spring guns were used to defend *property* by rigging a firearm to discharge automatically when a trespasser tripped a rope. There is a long tradition of states prohibiting such contraptions, *see, e.g.*, *Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971) (recounting history), but the firearms themselves—shotguns and the like—were not banned.

[9] *See, e.g.*, 1819 Ind. Acts 39, §1 (Jan. 14, 1820) ("act shall not be so construed as to affect travellers"); 1859 Ind. Acts 129 (Feb. 23, 1859) (same); 1869 N.M. Laws 72 (Jan. 29, 1869) ("except … on their own landed property"); Josiah A. Patterson, The Revised Code of the Statute Laws of the State of Mississippi 776 (1880) (except those "travelling … or setting out on a journey"); 1871 Tex. Laws 25, §1 (Apr. 12, 1871) (exempting premises or place of business); 1879 N.C. Sess. Laws 231, ch. 127 (Mar. 5, 1879) ("except when upon his own premises"); 1880 S.C. Acts 448 (Dec. 24, 1880) (same); 1881 Ark. Acts 191, no. 96, §1 (exempting those "upon a journey or upon his own premises"); 1882 Acts of West Virginia 421-22, §7 ("about his dwelling house");

knives and other weapons while "on a journey, and on his premises." *McDonald*, 102 S.W. at 703. If anything, these laws confirm a longstanding tradition of *not* extending weapons bans into American homes.

    **iii.** 20th-century machinegun statutes are also disanalogous, *contra* State.Br.45; City.Br.35. *See* R.63-1 at 469-559 (statutes). Those laws restrict fully automatic functionality not at issue here. The Uniform Machine Gun Act, for example, exempted semiautomatic rifles of certain calibers and would *not* have reached AR-15s. *See, e.g.*, R.63-1 at 519-38. Similarly, federal law treats a pistol or rifle as a restricted "machinegun" only if capable of firing automatically, 26 U.S.C. §5845(b), §5861, and imposes strict registration requirements on the machinegun's "manufacture, importer, and maker," *id.* §5841. Dr. Herrera does not challenge the constitutionality of these or any other laws regulating automatic machineguns, and contrary to the State's claim (at 47-48), his arguments cast no doubt on those restrictions. As these laws show, governments can regulate the uncommon fully automatic functionality of firearms without banning a whole class of popular semiautomatic rifles. *See Staples*, 511 U.S. at 603, 611-12. The "lack of a distinctly similar historical regulation" for the common rifles here "is relevant evidence that

---

1889 Ariz. Terr. Sess. Laws 30-31, §2 (exempting "premises or place of business" or "traveling"); 1890 Wy. Laws 140 (Mar. 14, 1890) (except "a traveler"); 1905 N.J. Laws 324-25 (Apr. 18, 1905) (exempting "keeping or carrying about his or her place of business, dwelling house or premises"); 1923 Cal. Stat. 696-97 (June 13, 1923) (similar); 1923 Conn. Pub. Acts 3709 (June 2, 1923) (similar); 1923 N.D. Laws 380 (Mar. 7, 1923) (similar); 1923 N.H. Laws 138, §4 (May 4, 1923) (similar); 1925 Ind. Acts 496 (Mar. 12, 1925) ("except in his dwelling house or place of business"); 1925 Mich. Pub. Acts 473, §5 (May 26, 1925) (similar); 1925 Or. Laws 479, §5 (Feb. 26, 1925) (similar); 1927 Haw. Sess. Laws 209-17 (Apr. 27, 1927) (similar).

the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

**iv.** The County's analogy to gunpowder quantity regulations fails too. County.Br.31-38.[10] *Heller* already dismissed "gunpowder-storage laws" as disanalogous "fire-safety laws" that could not support an "absolute ban" on handguns in the home. *Heller*, 554 U.S. at 632. To the extent they are relevant, they may support "laws regulating the *storage* of firearms to prevent accidents." *Id.* (emphasis added). Such laws aren't at issue here. Just the opposite—the record's uncontroverted evidence is that the detachable magazines now banned are *safer* than other ways of storing firearms. *See* Supp.A.170-71, 177. Then, as now, regulations of unusually large quantities of gunpowder like "500 kegs" stored outside the home, *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1851), at best support regulations for large quantities of ammunition, such as magazines with non-standard capacities for highly unusual fully automatic functionality. *See* Supp.A.171.

**v.** The County's arguments (at 22-24, 39-41) about self-defense law also do not justify its ban. The County suggests that rifles "are patently incompatible with basic

---

[10] The County's contention (at 37) that "Herrera waived any response" is wrong. He responded below, as now, that *Heller* foreclosed the County's broad argument. At best, that the analogy might justify narrower regulations of "non-standard" arms, like "50- or 100-round magazines," R.63 at 31 n.41, or machineguns that typically use them, *see* Dep't of the Army, *FM 3-22.68 - Crew Served Machine Guns 5.56-mm and 7.62-mm,* at 1-2 (July 21, 2006). The County also misunderstands waiver (or more accurately, forfeiture). Because Dr. Herrera's "federal claim is properly presented," he "can make any argument in support of that claim" without being "limited to the precise arguments [he] made below." *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010) (cleaned up).

34

principles of moderate self-defense." County.Br.23. Even assuming the County's recitation of state and local self-defense law were correct, the Second Amendment is supreme over those laws. Nor are they all that probative of the Second Amendment's scope because Illinois's constitution did not protect the right to keep and bear arms until 1970. *See Range v. Att'y Gen.*, – F.4th –, 2023 WL 3833404, at \*10 (3d Cir. 2023) (en banc) (Porter, J., concurring); *see Quilici v. Vill. of Morton Grove*, 532 F. Supp. 1169, 1171 (N.D. Ill. 1981). In any event, the County's discussion of the common law of self-defense is erroneous. The cited pages from Blackstone pertain to the limits of excusable homicide in circumstances not relevant here. *See* County.Br.21-22, 40. Blackstone was discussing when homicide would (and would not) be excused when a person is engaged in lawful activity—*e.g.*, chopping wood—with the wrong type of instrument—*e.g.*, dynamite—and kills someone. The pages that follow, omitted in the County's discussion of self-defense, contain the relevant discussion of self-defense, and those pages make no mention of any restrictions on the instrument that a self-defender may use. *See* 4 Blackstone, *supra,* at 183-86.

Relatedly, the County's contention (at 43) that the Framers would have questioned the Second Amendment protection of a weapon capable of inflicting "Coke-can-size" wounds is counterfactual. Firearms capable of causing devastating wounds have long existed. Minie ball ammunition, for example, used in Civil War muskets caused a "bursting type of wound" due to its "low velocity" that was "much more severe that those caused by bullets of higher velocity." Stark, *Surgical Care of the Confederate States Army*, 10 U.S. Armed Forces Med. J. 50, 60 (1959).

Finally, the County broadly argues (at 41-42) that the government derives "its legitimacy from its ability to protect its citizenry," empowering it to ban common firearms for public safety. For this, the County cites irrelevant cases about the nature of *parens patriae* standing. County.Br.41. The only relevant cited authority contradicts the argument. Citing *Hill v. State*, 53 Ga. 472, 477 (1874), the County says the government's right to regulate weapons must be "properly understood only in relation to the right of the government to take primary responsibility for defending its citizenry." County.Br.42. That notion is at odds with the Second Amendment's actual historical tradition, *supra*, and it is at odds with *Hill* itself. In *Hill*, the defendant unlawfully brought a pistol to court. 53 Ga. at 473. The case confirms that there is not a "right to bear or carry arms about the persons at all times and places and under all circumstances." *Id.* at 476. But *Hill*'s next point controls here: the "great purpose" of the right is "that the people shall be familiar with the use of arms and capable from their habits of life, of becoming efficient militiamen," and arms "may at pleasure be borne and used in the fields, and in the woods, on the highways and bye-ways, at home and abroad." *Id.*

**vi.** All that's left to support the district court's "particularly dangerous weapons" rule is Justice Stevens's dissenting opinion in *McDonald*, in which he discussed "bann[ing] altogether the possession of especially dangerous weapons." 561 U.S. at 899-900. The district court described that discussion as the decision of "the Court." A.10-11 (quoting dissent). But the Supreme Court has never concluded that there is a "history and tradition of regulating particularly 'dangerous' weapons"

36

everywhere. A.8. The notion that commonly owned arms could be "banned altogether" contravenes *Heller*, which held that handguns could not be banned in homes even if they were particularly dangerous among criminals. 554 U.S. at 635; *accord Caetano*, 577 U.S. at 418 (Alito, J., concurring). Neither *Bruen* nor *Heller* discusses "dangerousness" in isolation; they discuss the "historical tradition of prohibiting the *carrying of 'dangerous and unusual* weapons'" in public. *Heller*, 554 U.S. at 627 (emphasis added). That tradition cannot justify what the governments have done here.

Nor can AR-15s fit the description of "dangerous arms" even if such a tradition banning such weapons in the home did exist. The County's contentions include the stunning statement that when AR-15s "are used, they are *usually used* for criminal actions like mass killings." County.Br.44; *see also* State.Br.33; City.Br.26. Yet all parties' experts' tabulations lead to the conclusion that as a statistical matter mass shootings are "freakishly rare," even though horrific, while AR-15 ownership is in the millions. Supp.A.29-30. The State and County's expert confirmed that tens of millions of semiautomatic rifles are in circulation, yet he documented only "53 'gun massacres' ... from 2002 through 2017"—a near-zero fraction of lawful AR-15 owners. *See* Supp.A.29-30. And in any event, the legal issue here is not the right to "carry," *contra* County.Br.10. It is about what Dr. Herrera may do at home, and there is no tradition supporting the State and local laws' application there.

**C.    Dr. Herrera is likely to succeed on his claim that it is unconstitutional to ban standard magazines.**

   **1. The Second Amendment's plain text covers purchasing and keeping magazines.**

The Second Amendment necessarily encompasses the right to acquire and keep what is necessary for protected arms to function. *See Reid*, 1 Ala. at 616-17; *Andrews*, 50 Tenn. at 178; *see also, e.g.*, *Jackson v. San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (bullets). Applied here, "semiautomatic firearms require a magazine to function," Supp.A.169, and magazines are thus part and parcel of "modern instruments that facilitate armed self-defense," *Bruen*, 142 S. Ct. at 2132.

The government parties' argument that the Second Amendment does not cover magazines because they are "accessories" and not "Arms" is faux textualism. State.Br.17; City.Br.6. The district court did not endorse that argument. By the government parties' logic, they could ban triggers without implicating the Second Amendment's presumptive protections, or ink and paper without implicating the First Amendment. A semiautomatic firearm without a magazine would be a mere paperweight. *See* Supp.A.169 (magazines "are integral to the operating cycle of a semiautomatic firearm"). The government cannot constitutionally "make[] it impossible for citizens to use" firearms "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. Blackstone said that the right to keep arms included "the right of … *using* arms for self-preservation and defence." *See* 1 Blackstone, *Commentaries on the Laws of England* 143-44 (1768) (emphasis added). Arming oneself thus encompasses not only "'[t]he possession of arms,'" but also necessary and proper incidents of the right, including "'the possession of ammunition, and the

38

authorities paid quite as much attention to the latter as to the former.'" *Miller*, 307 U.S. at 180; *see also, e.g.*, *Reid*, 1 Ala. at 616-17; *Andrews*, 50 Tenn. at 178.

As a fallback, the State now argues that the Second Amendment does not protect the standard-capacity magazines that came with Dr. Herrera's Glock 45 and rifles because smaller-capacity magazines are available for aftermarket purchase. State.Br.19. According to Illinois, magazines that came with Dr. Herrera's firearms "are not necessary" for them to operate, and are thus unprotected, because he could use government-approved smaller magazines that would work "just as well." *Id*. But that is not an argument that goes to the meaning of "Arms"; it is an argument about what is within the government's power to ban. And as to that latter question, the government bears the burden of showing that the disfavored magazines are not commonly owned by law-abiding citizens—not that there are alternatives that the government parties would prefer. *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S. Ct. at 2129-30.

The argument is also wrong as a factual matter. "A semiautomatic firearm is designed to be used with the magazine that comes with it" or replacements by the original equipment manufacturer, and "[a]ftermarket magazines … may cause the firearm to malfunction." Supp.A.171 (explaining the importance of magazines' "spring length and tension"). Dr. Herrera's own experience has been that "using Glock handguns with non-standard magazines causes them to malfunction," and he won't use them as a result. Supp.A.2, 11; *see also* Supp.A.176 ("a malfunction during a life-or-death situation can mean that the user, or anyone the user is defending, is killed.").

39

## 2. The government parties have shown no historical tradition of banning commonly owned magazines.

The district court erroneously concluded that the government parties established that a ban on common magazines that came standard with Dr. Herrera's Glock 45 handgun and semiautomatic rifles is consistent with history. A.15-16. Adopting the *Bevis* district court's decision, that conclusion also relied on the government's illusory power to ban "particularly dangerous" magazines, even at home. *See Bevis*, 2023 WL 2077392, at *14-16. There is no such history. *Supra* I.B.3.c.

As the Third Circuit acknowledged even before *Bruen*, "there is no longstanding history of [large-capacity magazine] regulation." *ANJRPC v. Attorney General N.J.*, 910 F.3d 106, 116-17 & n.18 (3d Cir. 2022), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Firearms capable of holding more than 10 rounds of ammunition have been available for two centuries. *Duncan v. Becerra*, 970 F.3d 113, 1149 (9th 2020), *on reh'g en banc*, 19 F.4th 1087 (*Duncan II*), *vac'd* 142 S. Ct. 2895. By the 1860s, popular Winchester rifles could hold more than 10 rounds and fired within seconds. *Duncan II*, 19 F.4th at 1154-55 (Bumatay, J., dissenting); *see* David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851, 854-57 (2015). The first capacity regulations were enacted well into the 20th century, virtually all of which were soon repealed. *See Duncan*, 970 F.3d at 1150-51 (summarizing history). Such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155. They are inconsistent with the central purpose of the Second Amendment, confirmed by minimum ammunition requirements in the militia acts, that citizens

40

have a right to arm themselves both for their own defense and the collective defense "and they need no permission or regulation of law for the purpose." Cooley, *General Principles*, *supra*, at 271.

The district court did not grapple with this history, or the fact that there are tens of millions of so-called "large"-capacity magazines in circulation today—a function of those magazines coming standard with widely popular rifles and handguns including Dr. Herrera's. *See* R.63-6 at 9; Supp.A.2; *Duncan*, 970 F.3d at 1149 n.8. They are therefore "typically possessed" "for lawful purposes." *Heller*, 554 U.S. at 625. That is not to say that the government's power to regulate magazines is unlimited, but the government has not met its burden here that its severe capacity restrictions are consistent with history.

Instead of *Bruen*'s historical analysis, the government parties offer policy reasons to justify their magazine bans. They point to a small number of cases where deranged criminals used rifle magazines to commit mass murders, and the ensuing "economic effects" and trauma. State.Br.43; County.Br.26; City.Br.7. But criminality cannot justify banning firearm components owned by millions of law-abiding citizens. That's because the Second Amendment is "the very *product* of an interest balancing by the people," which "elevates above all other interests" the right of law-abiding citizens to keep commonly owned firearms at home. *Bruen*, 142 S. Ct. 2131. So although courts may take a "more nuanced approach" to the historical analysis when assessing regulations that address "unprecedented societal concerns" and "dramatic

41

technological changes," *id.* at 2132, that is not an invitation to return to the interest-balancing approach that prevailed before *Bruen*.

> **D.    Dr. Herrera is likely to succeed on his claim that the State cannot constitutionally require additional registration of his lawfully acquired firearms.**

Dr. Herrera already lawfully purchased his rifles, but he will have to move them out of the State unless he submits to new requirements to register the make, model, caliber, and serial number, along with his personal information, with the state police. *See* 720 Ill. Comp. Stat. 5/24-1.9(d). That registration requirement is not for new firearms at the point-of-purchase; it applies to firearms already lawfully acquired that the State now wishes to extinguish from circulation. R.1 at 14 (Governor Pritzker stating the Act "will stop the spread of assault weapons" and threatening "consequences" for non-compliance). Given those particular aspects of the registration requirement, Dr. Herrera has no present intent to register, fearing that the State's after-the-fact registration requirement is a tool for later confiscation and otherwise "leaves [him] vulnerable to information breaches, where third parties could get access to [his] information." Supp.A.4-5; *see also* A.17-19. Dr. Herrera thus faces a certain and immediate irreparable injury because he must either take steps *now* to move his lawfully acquired firearms out of Illinois to a yet-to-be determined custodian, or else face severe criminal sanctions. Supp.A.11-12; *see 520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006).

Contrary to the State's assertion (at 50) that "Herrera offered no explanation" about how a registration requirement implicates the Second Amendment, Dr. Herrera argued below that the registration requirement burdens the right to keep

arms because he cannot *keep* his rifles in the State unless he registers them, and that *Bruen* itself is an example of how such conditions of ownership or use plainly implicate the Second amendment. R.5 at 27; R.63 at 18-19. Contrary to the State's arguments (at 51), the registration requirement here implicates Dr. Herrera's right to "keep" arms at home, just as New York's may-issue licensing requirement implicated the *Bruen* plaintiffs' right to "bear" arms in public. 142 S. Ct. at 2134. So the question becomes whether the particular regulation here comports with historical tradition.

The State has offered no analogous historical tradition that could justify requiring gun owners to either move lawfully acquired firearms out of state or register them. Even recent registration laws impose requirements for gun *sellers* at the point-of-purchase, not after-the-fact requirements for gun *owners*, as then-Judge Kavanaugh explained in his dissenting opinion in *Heller II*, 670 F.3d at 1291-92; *see also* R.63-2 at 27-114 (examples of gun-seller registration requirements). And the district court's conclusion that Illinois' new registration requirement was likely constitutional is contrary to history in the following three ways.

***First,*** as to historical *registration* laws, the district court cited a single 1631 Virginia statute. A.19; State.Br.52. The purpose of that statute was ensuring there was an adequate number of armed civilians—requiring "commanders" to "take a muster of their men" and "also of armes and munition." 1 William Waller Hening, *The Statutes at Large* 174-75 (1823). Such a registration requirement would have been in furtherance of the militia act's requirement that civilians keep arms. It bears

no resemblance to the State's collection of serial numbers here, in furtherance its aim to extinguish semiautomatic rifles. In any event, this Court "cannot put meaningful weight on this solitary statute" enacted well before the English Bill of Rights. *Bruen*, 142 S. Ct. at 2144; *id.* at 2136 (admonishing courts not to "'go too far back'" in history); *Heller*, 554 U.S. at 593.

**Second,** the district court relied on a handful of "taxation statutes." A.19-20; State.Br.52. Those statutes, enacted between 1848 and 1867, mostly targeted weapons including "dueling or pocket pistol[s]" or Bowie knives, not entire categories of firearms; Alabama, for example, excluded rifles.[11] As with other laws, those statutes draw a line between weapons of purely private conflict and weapons such as rifles, useful for the collective defense. Such laws are also too few. If "*three* colonial regulations" did not "suffice to show a tradition of public-carry regulation" in *Bruen*, 142 S. Ct. at 2142, then the four regulations more than half a century after ratification likewise cannot establish the requisite tradition. Similarly, outlier 1885

---

[11] The court identified four tax statutes from 1848, 1856, 1866, and 1867. A.19-20. The 1848 Mississippi statute applied only to "dueling or pocket pistol[s]," and excepted those "kept for use by military companies." A. Hutchinson, *Code of Mississippi* 182 (1848). North Carolina's 1856 statute taxed arms like the "bowie-knife," "sword canes," and "pistol[s], except such as are used exclusively for mustering." *Public Laws of the State of North Carolina, Session of 1856-'57*, at 34 (1857). The tax applied only if they were "used, worn or carried." *Id.* North Carolina's 1858 statute taxed the carriage of similarly unusual arms and stated "[a]rms used for mustering shall be exempt from taxation." *Public Laws of the State of North Carolina, Session of 1858-'59*, at 35-36 (1859). Georgia's 1866 statute taxed all firearms "over the number of three kept or owned on any plantation in [certain] counties." *Acts of the General Assembly of the State of Georgia* 27-28 (1867). And Alabama's 1867 statute targeted pistols, revolvers, and arms like the Bowie knife, but not rifles. *Acts of the Session of 1866-7 of the General Assembly of Alabama* 263 (1867).

Illinois and 1918 Montana statutes, State.Br.52-53, come too late. *Compare* A.21-22, *with Bruen*, 142 S. Ct. at 2138, 2154 n.28 (rejecting sufficiency of "a handful of late-19th-century jurisdictions" and disregarding 20th-century statutes).

**Finally,** the district court likened the State's after-the-fact registration requirement to shall-issue *licensing* regimes for public-carry. A.22-23. The district court reasoned "*Bruen* itself suggests that" the State's "registration requirement is permissible" because of a *Bruen* footnote about the constitutionality of "shall-issue" licensing laws permitting concealed carry outside the home. A.22 (citing *Bruen*, 142 S. Ct. at 2138 n.9). The State's after-the-fact registration requirement and the licensing at issue in *Bruen* cannot be equated for this purpose. Here, the State is making a list of serial numbers and other information to identify who already possesses semiautomatic rifles in the State as a condition for keeping them at home. Licensing, on the other hand, can entail "ensuring that owners know how to operate guns safely" for use outside the home, *Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting), not creating a gun registry of rifles it disfavors. That justification is not "comparable" to "why" *any* relevant historical regulation was enacted. *Bruen*, 142 S. Ct. at 2132-33.

## II.    The remaining factors entitle Dr. Herrera to a preliminary injunction.

### A.    Dr. Herrera is suffering ongoing irreparable harm, no different from the *Ezell* plaintiffs.

The ongoing denial of Dr. Herrera's Second Amendment right to keep common firearms and their necessary components at home and to continue training with those firearms is irreparable harm. *Ezell*, 651 F.3d at 700; *see also Whitaker v. Kenosha*

*Unified School Dist.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017). Dr. Herrera alleged the challenged laws harm his ability to defend himself from a home invasion and makes it a practical impossibility to participate in firearms training with his SWAT team— thereby diminishing his ability to keep himself and others safe in the unpredictable, high-risk environment that he encounters every month. These harms are little different from those in *Ezell*, where the plaintiffs alleged that a Chicago ordinance precluded them from "maintain[ing] proficiency in firearm use" with ranges beyond city limits and from obtaining licenses to "possess firearms at home for protection." 651 F.3d at 690, 698. The district court's conclusion that the harms here are distinct from *Ezell* is reversible error. *See Ezell*, 651 F.3d at 699-70 (reversing district court's finding of no irreparable harm and issuing preliminary injunction); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (same); *see also, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

    **1.** *Ezell* explained that when the government violates these Second Amendment rights, including missed training, a plaintiff's "irreparable harm is presumed." 651 F.3d at 699.[12] *Ezell* specifically *rejected* the district court's "zero[ing] in on the occasional expense and inconvenience of having to travel to a firing range

---

[12] *See also Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149-50 (D.D.C. 2016) (citing *Ezell* and presuming irreparable harm to Second Amendment rights); *see also, e.g.*, *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (Fourth Amendment rights); *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) (abortion rights).

46

in the suburbs" and instead refocused the analysis on "the relevant constitutional harm," including the inability "to maintain proficiency in firearm use." *Id.* at 698-99.

But that is the very error here—the district court surmised that Dr. Herrera could make the hours-long drive to return and retrieve his rifle if he really needed to and that his allegations about SWAT missions were "speculative." A.28-29; *but see* Supp.A.2-3 (explaining that he has been asked to handle a firearm on mission, that he could be asked to render aid in the "hot zone" on missions, and that missions can be unpredictable and dangerous); Supp.A.9-10 (explaining weapons training is "especially" important for medics who do not have a law enforcement background). Contrary to the district court's conclusion, what matters under *Ezell* is that Dr. Herrera also alleges violations of his right "to maintain proficiency in firearm use" and "to possess firearms for self-defense." 651 F.3d at 698, 708. As in *Ezell*, Dr. Herrera cannot train with his AR-15 as part of his SWAT team's regular training without driving hours to retrieve and return his rifle beyond county lines, nor can he even keep his Glock 45 operable at home. And even if he could, state law does not indicate that he may *use* his rifle for self-defense. *See* 720 Ill. Comp. Stat. 5/24-1.9(d), 24-1.10 (d); *supra* 9. The ongoing violation of any one of these rights interests is irreparable harm, and no legal remedy can adequately redress it. *Ezell*, 651 F.3d at 700.

But the district court focused on whether Dr. Herrera's commute imposed a big enough "obstacle" to his right to firearms training and faulted him for not explaining how he managed to bring his AR-15 to training in the past. A.28 (noting these

47

"seemingly contradictory facts"); *see* City.Br.7 (adopting that argument). That quibbling with Dr. Herrera's circumstances is "*not* the relevant constitutional harm" when deciding if preliminary relief is warranted. 651 F.3d at 698 (emphasis added).[13] *Ezell* already rejected the district court's reliance on testimony showing the plaintiffs were "'capable of [traveling outside the city to train]" and that they had "done so in the past.'" *Id.* at 697. So too here. There is also nothing "contradictory" in the record. A.28; State.Br.55. As explained in his declarations, Dr. Herrera's hospital shifts and teaching commitments now prevent him from making the hours-long trip to attend training with his rifle. *See* Supp.A.4, 8. And because weapons handling "is a perishable skill," Supp.A.183-84, Dr. Herrera's attending SWAT school in 2021 does not erase the ongoing harm from his inability to train today. *See* Supp.A.3. The harm compounds each month he cannot participate in the team's weapons training.

If the district court's irreparable harm analysis were right, then allegations of irreparable harm in *Ezell* should have been rejected as "speculative." But there, the plaintiffs did not have to show they were likely to *use* their firearms training against an attacker to establish irreparable harm. *See* 651 F.3d at 697-99. Similarly, in *Winter v. Natural Resources Defense Council*, the Navy was not required to demonstrate that the threat of enemy submarines would materialize to show that

---

[13] Likewise, the district court's suggestion that Dr. Herrera must defer to the government parties makes no sense. A.29-30. Dr. Herrera does not work for the government parties' departments, and his particular SWAT team has "encouraged" Dr. Herrera to participate in the full spectrum of training for his benefit and his team's benefit. Supp.A.8; *see also* Supp.A.184 (discussing the benefits of cross-training).

stopping its training exercises would pose "a serious threat to national security." 555 U.S. 7, 32-33 (2008). And in *Michigan v. U.S. Army Corps of Engineers*, allegations of irreparable harm to the environment were sufficient despite "no one know[ing] whether this irreparable harm will come to pass." 667 F.3d 765, 789 (7th Cir. 2011). Just like training for potential submarine warfare or taking steps to avoid the chance of environmental catastrophe, a SWAT team trains for worst-case scenarios even if it cannot predict when the worst-case will occur. Supp.A.8-9. For Dr. Herrera, that means he must be facile and familiar with firearms if he's asked to handle one on a mission. Supp.A.9-10. His inability to participate in training decreases his readiness as SWAT team member, and that harm is irreparable.

**2.** The Court should reject attempts to distinguish *Ezell*. The State contends that everyone can still keep government-approved "handguns, … shotguns, and rifles" at home for self-defense. State.Br.54-55; City.Br.48-49. But that was not enough in *Ezell*, whose named plaintiff had a firearm at home because she'd already completed the City's permitting process. *Ezell*, 651 F.3d at 695. *Ezell* concluded that her inability to train within city limits was harm enough. *Id.* at 698. Here too, Dr. Herrera cannot participate in weapons training, contrary to the ACEP best practices, Supp.A.9-10; he cannot replace standard magazines with the same types of magazines as they wear out; and he cannot keep his "preferr[ed]" firearms operable at home for self-defense. *Heller*, 554 U.S. at 628. That Dr. Herrera may possess one of a *government*-preferred firearm at home does not erase the State's intrusion into his "core Second Amendment right" to train with and keep constitutionally protected

firearms, along with their standard magazines. *Ezell*, 651 F.3d at 698; *see also Heller*, 554 U.S. at 629 ("no answer" that other firearms allowed even though handguns were not). Courts are in no position to referee debates between expert witnesses below about which commonly owned firearms are best for self-defense. *E.g.*, Supp.A.175 (reasons for preferring AR-15s); R.52-9 at 30-31 (recommending shotguns). If firearms are commonly owned for lawful purposes, that is enough.

**3.** Finally, the district court was wrong to "doubt[]" the time-sensitive nature of Dr. Herrera's claims. A.26 n.8. The court erred by weighing his "apparent delay" against his claim for preliminary relief. *Id.*; *see* Supp.A.12. Dr. Herrera filed his lawsuit the same month that the State passed its rifle ban.[14] And with respect to the local laws, the district court's "delay" reasoning puts Dr. Herrera in a catch-22: *Friedman* would have doomed such a challenge, *see Wilson*, 937 F.3d at 1029, and Dr. Herrera knew it, Supp.A.12. The resulting judgment would have likely precluded this suit after *Bruen*. *See, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) (*res judicata* applies even where the earlier judgment "rested on a legal principle subsequently overruled in another case"); *Kemp v. United States*, 142 S. Ct. 1856, 1865 (2022) (timely Rule 60(b) motions generally filed within one year of judgment). But file after *Bruen*, and the district court deemed that too late. That catch-22 is at odds with the practical considerations that guide equitable relief. *See,*

---

[14] The State's law immediately prohibited Dr. Herrera from purchasing semiautomatic rifles and magazines *anywhere*, §24-1.9(b), where previously he could purchase them outside Cook County. Because Dr. Herrera intended to purchase an AR-15 and magazines this year, Supp.A.2, he timely filed suit the same month the law was enacted.

*e.g.*, *Whitaker*, 858 F.3d at 1046 (finding no delay in seeking injunction where the plaintiff's circumstances weighed against an earlier filing).

    **B.**    **The remaining factors favor a preliminary injunction.**

When the government is the opposing party, balance of harms and public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public interest favors enjoining a law "that is probably unconstitutional." *Alvarez*, 679 F.3d at 589-90; *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("enforcement of an unconstitutional law is always contrary to the public interest"); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (similar).

Here, because Dr. Herrera is likely to succeed on the merits, the remaining preliminary injunction factors go in his favor. *See Alvarez*, 679 F.3d at 589-90. The district court "necessarily" abused its discretion by weighing the equities and public interest against the injunction. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). Its reliance on freestanding public-safety concerns cannot trump the public's interest in "'prevent[ing] the violation of a party's constitutional rights.'" *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). And the relief Dr. Herrera seeks—allowing him to keep common firearms in his home—still leaves room for the governments to quickly re-tool firearm safety within their jurisdictions, as *Ezell* emphasized. The City faced a "similar dilemma" after *McDonald*, and it issued new safety regulations "just four days later." *Ezell*, 651 F.3d at 711. Here too, the governments can and must regulate firearms consistent with the Second Amendment.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order

and remand with instructions to enter a preliminary injunction.

Dated: June 19, 2023                      Respectfully submitted,

  */s/ Taylor A.R. Meehan*

Gene P. Hamilton                          Thomas R. McCarthy
AMERICA FIRST LEGAL FOUNDATION            Jeffrey M. Harris
611 PENNSYLVANIA AVE. SE, SUITE 231       Taylor A.R. Meehan
Washington, DC 20003                      Gilbert C. Dickey
Tel: (202) 964-3721                       Matt Pociask
gene.hamilton@aflegal.org                 C'Zar D. Bernstein
                                          CONSOVOY MCCARTHY PLLC
                                          1600 Wilson Blvd., Ste. 700
                                          Arlington, VA 22209
                                          Tel: (703) 243-9423
                                          tom@consovoymccarthy.com
                                          jeff@consovoymccarthy.com
                                          taylor@consovoymccarthy.com
                                          gilbert@consovoymccarthy.com
                                          matt@consovoymccarthy.com
                                          czar@consovoymccarthy.com


*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) and Cir. R. 32(c) because it contains 13,915 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) and Cir. R. 32 because it has been prepared in 12-point Century Schoolbook font. This brief has been scanned for viruses and is virus-free.

Dated: June 19, 2023                    */s/ Taylor A.R. Meehan*

                                                *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the

CM/ECF system, which will notify all counsel.


Dated: June 19, 2023                      */s/ Taylor A.R. Meehan*

                                          *Counsel for Plaintiff-Appellant*