Nos. 23-1825, 23-1826, 23-1827, 23-1828

---

## UNITED STATES COURT OF APPEALS

## FOR THE SEVENTH CIRCUIT

JEREMY W. LANGLEY, et al,

Plaintiffs-Appellees,

v.

BRENDAN KELLY, in his official
capacity as Director of the Illinois
State Police,

Defendant-Appellant

---

On Appeal from the United States District Court for the
Southern District of Illinois
No. 23-CV-192-SPM

---

### APPELLEES' RESPONSE BRIEF

---

Thomas G. Maag
Peter J. Maag
*Counsel of Record*
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL  62095

(618)-216-5291

tmaag@maaglaw.com

Counsel for Langley *Appellees*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellants furnishes the following statement in compliance with Circuit Rule 26.1.

**(1) The full name of every party that the attorney represents in the case:**

Jeremy W. Langley

Timothy B Jones

Matthew Wilson

**(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:**

Maag Law Firm, LLC

**(3) If the party or amicus is a corporation:**

**i)     Identify all its parent corporations, if any:**

N/A

**ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:**

N/A

*s/Thomas G. Maag*

Counsel for Langley Appellees

i

## TABLE OF CONTENTS

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**  …………………  **i**

**TABLE OF AUTHORITIES**  ……………………………………………  **ii**

**INTRODUCTION**  …………………………………………………  **1**

**JURISDICTIONAL STATEMENT**  …………………………………  **2**

**STATEMENT OF THE ISSUES**  ……………………………………  **3**

**STATEMENT OF THE CASE**  ………………………………………  **4**

**SUMMARY OF THE ARGUMENT** ……………………………………  **7**

**STANDARD OF REVIEW**  ……………………………………………..  **11**

**ARGUMENT**  …………………………………………………………..  **11**

# TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*, 577 U.S. (2016) ……………………………… 13, 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ……………… 8, 12, 14

*Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011)…………….. 18

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)………. 13

*Haynes v. U.S.*, 390 U.S. 85 (1968) ……………………………….. 18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ……………… 12

*New York Rifle and Pistol A;ssn v. Bruen*, 142 S.Ct. 2111 (2022)……….1, 7, 13

*Quilici v. Village of Morton Grove*, 695 F.2d 261 (7th Cir. 1982) ………. 11, 12

*Wilson v. Cook County,* 937 F.3d 1028 (7th Cir. 2019) ……………… 13

**Statutes**

Illinois Public Act 102-1116 ……………………………………… 1

18 U.S.C. 922(g)(1) ……………………………………… 1

720 ILCS 5/24-1.9 ……………………………………… 4, 5

**Constitutional Amendments**

U.S. Const., Amendment 2 ……………………………… 2, 3, 7

U.S. Const., Amendment 14 ……………………………… 2

**INTRODUCTION**

This case asks whether a citizen convicted of no crime, suffering of no mental illness, addicted to no narcotic or illegal drugs, and who are simply ordinary Americans, can be deprived of access to common modern firearms and ammunition feeding devices for said firearms, simply because the State, in this case, Illinois, says so.

About a year ago, the Supreme Court issued its opinion in *New York Rifle and Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2128 (2022), and held that "the Second Amendment protects the possession and use of weapons that are in common use."

Just a few months later, in January, 2023, the State of Illinois enacted, with great fanfare, Illinois Public Act 102-1116, which, by any other name, is simply a firearm and magazine ban for firearms largely of mid to late 20th Century design and/or manufacture. Penalties for violation range from minor misdemeanors to major felonies, depending on the particulars. Of course a felony conviction, per 18 U.S.C. § 922(g)(1), and several other statutes, bars possession of firearms and ammunition, meaning a violation of the statute has the potential to deprive Plaintiffs of all of their Second Amendment rights.

After signature by the Governor, and the statute being in effect for several days, Plaintiffs, all residents of Crawford County, Illinois, filed suit in the Circuit Court of Crawford County, Illinois, challenging the ban. Defendants promptly

removed the case to the Southern District of Illinois, which in turn consolidated it with three other similar cases there pending.

The firearms and ammunition feeding devices in question are largely not new inventions, with many of the exact items being designed literally five or six decades ago, and all of them based on century or older technology.  Langley Doc. 6-1, paras 24, 25, 30.  In fact, many of the actual ammunition feeding devices banned are themselves, literally of 50 to 60 year old actual manufacture, with, for instance, 15 round 1940s manufacture M1 carbine magazines well outnumbering reproduction magazines on the commercial market.

In any events, there are literally tens of millions of such firearms, and likely hundreds of millions of such magazines owned in the United States today, making those firearms and ammunition feeding devices some of the most common consumer products owned in the United States today.  Langley Doc. 6-4.

In this case, the trial court, in the Southern District of Illinois, Judge McGlynn, found that the ban likely violated the Second and 14th Amendments, along with related findings, following full briefing and argument, an entered a preliminary injunction, based on the dictates of *Bruen,* against the ban.  This Court summarily stayed the preliminary injunctions without giving the trial court a chance to rule on said motion, and set a truncated briefing schedule, consolidating this matter with others pending.

In sum, it is the position of Plaintiffs that the challenged ban prohibits ordinary Americans from possessing common and popular bearable arms, in common use at this time, and that there is no relevant historical precedent to allow same under the Second Amendments.  Thus, it is unconstitutional under the Second Amendment and Fourteenth Amendment to the U.S. Constitution to ban said firearms and ammunition feeding devices.

This Court should affirm Judge McGlynn's Preliminary Injunction, and vacate the order of this Court staying same.

## JURISDICTIONAL STATEMENT

The "State Defendants" comprised of Defendants-Appellants Attorney General Kwame Raoul, State Police Director Brendan Kelly, and Governor JB has filed a jurisdiction statement which is complete and correct.  Plaintiff-Appellee does not dispute this Court's subject matter jurisdiction.

## STATEMENT OF THE ISSUE

1. The first issue presented is, whether Plaintiffs are likely to succeed on the merits, that under the Second and Fourteenth Amendments to the U.S. Constitution, that that the Constitution *prima facia* protects the right of ordinary Americans, like Plaintiffs, to keep and bear modern firearms and modern ammunition feeding devices, such as those banned by the Act,

and that no relevant historical analogue from near or prior to the time of the Revolution provides any justification for any such restriction or ban.

2. The second issue presented is whether the trial court acted within its broad discretion is concluding the remaining factors weigh in favor of granting a preliminary injunction, and that Plaintiff is likely to succeed on the merits in this case.

## STATEMENT OF THE CASE

On January 10, 2023, Illinois enacted the Act, which imposes restrictions on the sale, purchase, manufacture, delivery, importation, and possession of the firearms and necessary components of said firearms most commonly used for self defense, and other lawful purposes, in the United States today.  720 ILCS 5/24-1.9, 1.10.  These firearms are not some new invention, or some radically advanced departure from what came before them, or from what has been on the market for over 100 years.  Langley Doc. 6-1  They are, quite simply, modern incarnations of the lineal descendants of Brown Bess and Charleville muskets of the Revolutionary War era.

Consistent with the purpose of the Act, to ban as many modern firearms as possible, the Act defines the prohibited firearms, mostly, but not exclusively, semi-automatic, in terms of the features that, individually or in combination, render them ideal for civilian self-defense.  After all, the core while hunting may of may not be

a legitimate lawful activity under the Second Amendment, the core purpose is that of armed confrontation, not deer hunting.  In fact, these firearms are the modern lineal descendants of the Brown Bess and Charleville military arms used in our Revolution, that evolved into the Henry/Winchester rifles and Spencer carbines of the late Civil War / Reconstruction / Old West Era were common, complete with magazine capacities prohibited under this legislation.  These, in turn evolved into the Mauser / Springfield type bolt action rifles of the late 19th and early 20th Centuries, with their turnbolt actions and quick loading "clips" of which were used to maintain high rates of fire, to grisly effect in two world wars, and countless small wars, and which provided the basis of design for the bolt action rifles commonly used for deer hunting today, which this Act exempts, but by the early 1940s was certainly feeling their age.

The Act broadly includes semiautomatic rifles with the capacity to accept "detachable magazine[s]" including the ability to be converted to accept detachable magazines, and at least one of the following features: a pistol grip or thumbhole stock, a protruding grip held by the non-trigger hand, a flash suppressor, a flare launcher, a barrel shroud, or a folding telescoping, or detachable stock. 720 ILCS 5/24-1.9(a)(1)(A).  Similar prohibitions apply to pistols.  Most semi-automatic shotguns on the market are prohibited under the Act.

In their Brief, Defendants acknowledge that pistol grips are useful for stabilizing firearms for accurate shooting, as though accurate aimed fire is only useful in military situations, and self defense is sufficient with inaccurate fire.

Defendants also acknowledge that "flash suppressors" help reduce "night blindness", as through being able to see in a self defense situation and thus better defend oneself is somehow a purely military feature.

Barrel shrouds are attacked, as lights and aiming devices can be attached to them, again, as through being able to see and hit the target is somehow a purely military feature, as though this was somehow undesirable.

Defendants, relying on their "expert" goes to great pains to justify how one firearm or item or another is not "needed" for self defense.

Much of the history of firearms use and the passage of the Act itself is contained in the brief of co-appellee, and thus will not be restated here, keeping with this Court's instruction to avoid restating the same information in multiple briefs.

The exceptions are irrelevant as well, as there is no exception for ordinary Americans, no matter how well or highly trained they may be.  Likewise, that existing items are "grandfathered" with all the historical baggage that term carries, is likewise irrelevant.

## SUMMARY OF ARGUMENT

With absolute certainty, it can be said that *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) largely overruled every Second Amendment case that this Court has considered in which it upheld a statute or restriction, simply by virtue of the fact that this Court, like many others, was applying a standard that *Bruen* rejects.

Applying *Bruen*, correctly, as stated by the Supreme Court itself,

> "We reiterate that the standard for applying the Second Amendment is as follows:
>
> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.
>
> Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."
>
> Just as the First Amendment
>
> protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in exist   ence at the time of the founding."

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court undertook its first-ever "in-depth examination" of the Second Amendment's meaning Id. at 635. After a lengthy historical discussion, the Court ultimately concluded that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (id. at 592); that "central to" this right is "the inherent right of self-defense"(id. at 628); that "the home" is "where the need for defense of self, family, and property is most acute" (id. at 628); and that, "above all other interests," the second amendment elevates "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (id. at 635). *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) reaffirmed that modern devices and arms not common at the time of the Revolution are indeed protected by the Second Amendment.

Applying *Bruen,* the plain text of the Second Amendment covers this issue. The firearms in question are bearable arms, there is not one firearm in the list of what is prohibited filed by the State than cannot be carried and used by one person. They are, in fact, the lineal descendants of the Brown Bess and Charleville muskets common during the Revolution, perhaps of shorter length, longer range, made of

different materials, and firing metallic cartridges, but fulfilling the exact same function as those firearms of the Revolutionary Era.

The firearms are not only "commonly" owned, they are, perhaps, the most commonly owned firearms in the United States today, bar none. Their numbers are measured in the multiple tens of millions. The M1 Garand and M1 carbines of World War II vintage, that armed the largest professional army this nation has ever known, only produced about 10 million total for both models during the greatest war in history. To say that the semi-automatic firearms based only on the AR15 model, made in numbers exceeding multiple tens of millions, is more ubiquitous than all of the small arms of this nation during World War II combined, is a fair statement. The other banned models, while not as common, are, as a whole, tens of millions more of the same general type of firearms. To say that the AR15, or the class of firearms banned by the Act are anything other than common as dirt, is simply wishful thinking on the part of those who wish to ban them.

Likewise, the banned magazines, or for that matter any of the banned ammunition feeding devices are, as a group, even more common than the firearms. Defendants play word games, claiming that magazines are not "arms", rather they are "accouterments" but, under the Second Amendment, this is a distinction without a difference. The argument is the equivalent of stating that the Second

Amendment might protect a Charleville Musket, but not the flint that will make it fire or the powder that will propel its projectile.

Also, Defendants miss the entire target range, not just the bullseye, when they claim that Plaintiffs presented to evidence of actual use in self defense of these arms. Actual use in self defense of these arms is not the test. If it were, then a nation with literally no crime might have no right to bear arms. In actuality, the, per *Heller*, the right extends to all arms held "for traditionally lawful purposes, such as self-defense within the home.". The record is replete with these firearms being used for "traditionally lawful purposes."

The time has come for the Defendants to justify their regulation on historical grounds, not judicially weighed public policy grounds. Unfortunately, Defendant actually offers no comparable historical analogy, likely because there is none. Instead, Defendants make reference to some vague to "unprecedented societal concerns" that emerged as a result of "dramatic technological changes" in weapons technology." But the arms in question are not the result of "dramatic technological changes", the semi automatic AR15 rifle has been on the market since 1964. Langley Doc. 58, p. 9. Folding stock M1 carbines have been made since 1944. Semi-automatic shotguns have been on the market since at least 1905. Semi automatic pistols with detachable magazines have been available commercially for

well over 100 years.  The same is true of ammunition feeding devices of over 10 or 15 rounds.

Nor do Defendants offer some kind of "nuanced" approach.  They bring a sledge hammer and ban away with it.  A "nuanced" approach might be to impose a background check or to require registration of  the actual most dangerous firearms.  Nuance is not a broad and outright ban.

## STANDARD OF REVIEW

When a district court has issued a preliminary injunction, as is the case here, this Court is to review the district court's legal conclusions *de novo*, its findings of fact for clear error and its balancing of the equities for abuse of discretion.  *Ezell*, 651 F.3d at 694.

## ARGUMENT

In accordance with this Court's instruction, these Appellees have endeavored to avoid repeating that addressed in other briefs.

In this Court's now *overruled* Second Amendment case of *Quilici v. Village of Morton Grove*, 695 F. 2d 261 (7th Circuit 1982),

 While we recognize that this case raises controversial issues which

engender strong emotions, our task is to apply the law as it has been

interpreted by the Supreme Court, regardless of whether that Court's

interpretation comports with various personal views of what the law should be.

If the *Morton Grove* case ever had one once of correct legal analysis in it, that was it. It remains this Court's obligation to apply the law as it has been interpreted by the Supreme, regardless of whether that Court's interpretation comports with *anyone's* various personal views of what the law *should* be.

Like many of the major issues in dispute today, there are strong feelings among many, including many in the court system itself, as to what the law *ought* to be. While Plaintiffs in this case vehemently disagree with this Court's prior holding in *Morton Grove*, this Court's practical admonition of the role of the court remains as true today as it was over 40 years ago.

Our Supreme Court has, since 2008, effectively overruled most of this Court's Second Amendment jurisprudence in due course, starting with *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized a private right to keep and bear arms, unconnected to any militia service, for historically lawful activities, such as self defense in the home.

*Heller* also made crystal clear that one cannot ban one kind of protected arm as long as some other kind is available. *District of Columbia v. Heller*, 554 US 570, 575 (Supreme Court 2008)("It is no answer to say, as petitioners do, that it is

12

permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

Shortly thereafter, the Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) overruled this Court in finding that the Second Amendment is not incorporated against the states.

Despite the forgoing, this Court, in *Friedman v. City of Highland Park*, No. 784 f.3D 406 (7th Cir. 2015), upheld, over a very well reasoned dissent, a semi-automatic firearm ban, finding that, the features banned were not common at the time of the Revolution, a point rebuked in *Caetano v. Massachusetts*, 577 U.S. ___ (2016), and by applying a very weak balancing test.  Thereafter, in *Wilson v. Cook County*, 937 F. 3d 1028 (7th Circuit 2019) this Court just following *Friedman* finding no reason to change its prior decision.

Today we have *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022), which very clearly shows that the balancing tests used by this Court thus far are, one step to far, and which provides compelling reason to throw *Friedman* and *Wilson* to the dustbin of history.

Applying *Bruen*, correctly, as stated by the Supreme Court itself, "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

The government must then justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation.

Only then may a court conclude that the individual's conduct falls outside the

Second Amendment's "unqualified command."

Just as the First Amendment

protects modern forms of communications, and the Fourth

Amendment applies to modern forms of search, the Second

Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in exist ence at the time of the

founding."

**Presumptively Protected Conduct**

When the Second Amendment's plain text covers an individual's conduct,

the Constitution presumptively protects that conduct. The Second Amendment's

plain text presumptively protects the rights to "keep" and "bear" "arms".

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court

undertook its first-ever "in-depth examination" of the Second Amendment's

meaning Id. at 635. After a lengthy historical discussion, the Court ultimately

concluded that the Second Amendment "guarantee[s] the individual right to

possess and carry weapons in case of confrontation" (id. at 592); that "central to"

this right is "the inherent right of self-defense"(id. at 628); that "the home" is

"where the need for defense of self, family, and property is most acute" (id. at 628); and that, "above all other interests," the second amendment elevates "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (id. at 635).

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) reaffirmed that modern devices and arms not common at the time of the Revolution are indeed protected by the Second Amendment.

At the risk of stating the obvious, the firearms and ammunition feeding devices at issue are weapons and weapon components, and common ones at that, with several tens of millions of just AR15 model rifles owned, and perhaps 100 million such magazines owned today.  Langley Doc. 6-4.

Applying *Bruen*, the plain text of the Second Amendment covers this issue. The firearms in question are bearable arms, there is not one firearm in the list of what is prohibited filed by the State than cannot be carried and used by one person in self defense.  They are, in fact, the lineal descendants of the Brown Bess and Charleville muskets common during the Revolution, perhaps of shorter length, longer range, made of different materials, and firing metallic cartridges, but fulfilling the exact same function as those firearms of the Revolutionary Era.

These firearms are not only "commonly" owned, they are, perhaps, the most commonly owned firearms in the United States today, bar none.  Their numbers are

measured in the multiple tens of millions.  The M1 Garand and M1 carbines of World War II vintage, that armed the largest professional army this nation has ever fielded, only produced about 10 million total for both models during the greatest war in human history.  To say that the semi-automatic firearms based only on the AR15 model, made in numbers exceeding multiple tens of millions, is more ubiquitous than all of the small arms of this nation during World War II combined, is a fair statement.  The other banned models, while not as common, are, as a whole, tens of millions more of the same general type of firearms.  To say that the AR15, or the class of firearms banned by the Act are anything other than common as dirt, is simply wishful thinking on the part of those who wish to ban them.

Likewise, the banned magazines, or for that matter any of the banned ammunition feeding devices are, as a group, even more common than the firearms. Defendants play word games, claiming that magazines are not "arms", rather they are "accouterments" but, under the Second Amendment, this is a distinction without a difference.  The argument is the equivalent of stating that the Second Amendment might protect the right to a knife, but the stone to sharpen that knife into a useful tool with is not protected.

**Common Use For Lawful Purposes**

Defendants miss the entire target range, not just the bullseye, when they claim that Plaintiffs presented to evidence of actual use in self defense of these

arms.  Actual use in self defense of these arms is not the test.  If it were, then a

nation with literally no violent crime might have no right to bear arms, which is

somewhat circuitous, as perhaps it is the presence of the arms that deters the

violent crime..  In actuality, per *Heller*, the right extends to all arms held not just

used for actual self defense, but "for traditionally lawful purposes, such as self-

defense within the home.".  The record is replete with these firearms being used for

"traditionally lawful purposes."

**Historical Analogies**

The time has come for the Defendants to justify their regulation on historical

grounds, not judicially weighed public policy grounds.  Unfortunately, Defendant

actually offers no comparable historical analogy, likely because there is none.

Instead, Defendants make reference to some vague to "unprecedented societal

concerns" that emerged as a result of "dramatic technological changes" in weapons

technology."  But the arms in question are not the result of "dramatic technological

changes", the semi automatic AR15 rifle has been on the market since 1964.

Langley Doc. 58, p. 9.  Folding stock M1 carbines have been made since 1944.

Semi-automatic shotguns have been on the market since at least 1905.  Semi

automatic pistols with detachable magazines have been available commercially for

well over 100 years.  The same is true of ammunition feeding devices of over 10 or

15 rounds.  Langley Doc. 58, pp. 8-9.

Nor do Defendants offer some kind of "nuanced" approach.  They bring a sledge hammer and ban away with it.  A "nuanced" approach might be to impose a background check or to require registration of the actual most dangerous firearms.  Nuance is not a broad and outright ban.  That *might* justify some sort of registration requirement, assuming the registration requirement did not violate other constitutional rights (See *Haynes v. United States,* 390 U.S. 85 (1968), or if it might actually accomplish some legitimate law enforcement function.  But this ban goes well beyond mere registration, what it required to be registered is essentially what is grandfathered, with no new purchases allowed.  In other words it is a means to enforce the otherwise total ban.

**Irreparable Harm**

As noted in *Ezell v. City of Chicago*, 651 F. 3d 684, 700 (7th Circuit 2011), for constitutional violations, irreparable harm is presumed.  If the subject statute is unconstitutional, it is enough to say that money damages are inadequate.  That alone is enough to show the district court did not abuse its discretion in granting the preliminary injunction.

## CONCLUSION

For the foregoing reasons, as well as those reasons articulated by the other challengers to the ban, that are not inconsistent with the arguments made of record, this Court should vacate its stay of the district court's preliminary injunction, and

affirm the district court of the Southern District of Illinois preliminary injunction, and remand this matter back to the district court.

6-20-23                                    Respectfully Submitted,

Thomas G. Maag
Peter J. Maag
*Counsel of Record*
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL  62095

(618)-216-5291

tmaag@maaglaw.com

Counsel for Langley *Appellees*

## CERTIFICATE OF COMPLIANCE

## WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2306, the Brief contains 4,236 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

June 20, 2023

s/Thomas G. Maag

Thomas G. Maag

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the appendix.

June 20, 2023

s/Thomas G. Maag

Thomas G. Maag

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Thomas G. Maag

Thomas G. Maag
