**No. 23-1825, 23-1826, 23-1827, 23-1828**

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————————

CALEB BARNETT, et al.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL, Attorney General of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police,

*Defendants-Appellants*.

————————————

On Appeal from the United States District Court for the Southern District of Illinois, No. 23-cv-00209

————————————

## BRIEF *AMICUS CURIAE* ON BEHALF OF THE AMERICAN FIREARMS ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

————————————

Trevor Burrus
2301 S. June St.
Arlington, VA 22202
P: 720.231.4899
Trevorburrus@gmail.com

*Counsel for Amicus*

June 22, 2023

### CORPORATE & FINANCIAL DISCLOSURE STATEMENT

Pursuant to Seventh Circuit Local Rule 26.1, *amicus* makes the following declarations:

The American Firearms Association is a 501(c)(4) nonprofit advocacy organization dedicated to defending the Second Amendment rights of all Americans. *Amicus* does not have a parent corporation or issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

<u>/s/ *Trevor Burrus*</u>
June 23, 2023

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ........................................................................... 2

ARGUMENT ................................................................................................... 6

   I.     The *Bruen* Decision Presumptively Protects "Arms," Which Includes the Type of Arms Singled-Out by Illinois's Ban ........................................... 6

   II.    The Guns Targeted by Illinois's Law Are Standard Semiautomatic Arms that Are Commonly Used for Self Defense and Other Lawful Purposes and Are Thus Protected by the Second Amendment ................................................. 8

      A.    The Semiautomatic Rifles Banned by Illinois Are Used by Millions of Americans for Lawful Purposes .............................................................. 9

      B.    The Arms Singled Out by Illinois's Ban Are Standard Semiautomatic Rifles with Characteristics that Make Them More Effective for Lawful Uses .. 12

   III.   The Military's Use of Analogs to "Assault Weapons" Is Constitutionally Irrelevant ................................................................................................... 15

   IV.   "Assault Weapons" Are Not "Dangerous and Unusual" Compared to Other Common Firearms ...................................................................................... 19

CONCLUSION .............................................................................................. 24

CERTIFICATE OF COMPLIANCE ............................................................. 25

CERTIFICATE OF SERVICE ...................................................................... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .................................................. 4, 7, 9

*District of Columbia v. Heller*, 554 U.S. 570  (2008) .......................................... passim

*Friedman v. City of Highland Park*, 136 S. Ct. 447 (2015) ......................................... 9

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) rev'd, 849 F.3d 114
(4th Cir. 2017) ................................................................................................ 3, 20

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .............. passim

*State v. Kessler*, 614 P.2d 94 (Or. 1980) ...................................................................... 15

**Statutes**

720 ILCS 5/24-1 .......................................................................................................... 23

720 ILCS 5/24-1.10 ....................................................................................................... 2

720 ILCS 5/24-1.9 .................................................................................................. 2, 14

720 ILCS 5/24-2 .......................................................................................................... 23

**Other Authorities**

Aaron Blake, "Is it fair to call them 'assault weapons'?,"
Wash. Post (Jan. 17, 2013) ................................................................................ 4, 13

Amanda Vinicky, "Which Guns are Covered by Illinois' Assault Weapons Ban?,"
WTTW.com (Feb. 16, 2023) ..................................................................................... 10

Ames Grawert & Noah Kim, "Understanding the FBI's 2021 Crime Data," Brennan
Ctr. for Justice (Oct. 4, 2022) ................................................................................. 22

Avalon Zoppo, "Oklahoma Man Uses AR-15 to Kill Three Teen Home Intruders,"
NBCNews.com (Mar. 28, 2017) ............................................................................... 10

Chase Gardner, "The Most Popular Cars in America (2022),"
Insurify (Apr. 5, 2022) ............................................................................................ 10

Christopher Ingram, "There are more guns than people in the United States,
according to a new study of global firearm ownership,"
Wash. Post (June 19, 2018) ..................................................................................... 21

David K. Li, "Pregnant woman uses AR-15 to fatally shoot armed intruder,"
NBCNews.com (Nov. 4, 2019) ................................................................................. 11

Dennis Chapman, *Firearms Chimera: The Counter Productive Campaign to Ban the
AR-15 Rifle*, 8 Belmont L. Rev. 191 (2020) ...................................................... 18, 19

E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev 1 (2020) ..... passim

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193 (2018)..............18

Everyday Marksman, "Deal With Compromise: AR-15 Weight, Capability, and Balance," (Feb. 8, 2022) ........................................................................8

FBI, "2019 Crime in the United States: Expanded Homicide Data Table 8—Murder Victims by Weapon 2015–2019" .......................................................22

Garrett Pelican, "Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion," New4Jax.com (Apr. 17, 2018) ...........................................11

Glenn Kessler, "Biden bungled talking point on the muzzle velocity of AR-15s," Wash. Post (Sept. 2, 2022) ..........................................................20

Joseph P. Avery, *An Army Outgunned: Physics Demands a New Basic Combat Weapon*, Mil. Rev., July–Aug. 2012..............................................17

Mark Bowden, *Black Hawk Down: A Story of Modern War* 208 (1999) ...................17

Massachusetts Municipal Police Training Committee, *Basic Firearms Instructor Course: Patrol Rifle* 3 (Sept. 2007) ..........................................11, 12

National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, (July 20, 2022) ................................9, 21

Police Executive Research Forum, *Police Department Service Weapon Survey* 2 (2013) .....................................................................................11

Press Release, "Gov. Pritzker Signs Legislation Banning Assault Weapons and High-Capacity Magazines," Illinois.gov (Jan. 10, 2023) ...................10

Robert H. Scales, "Gun Trouble," Atlantic (Jan./Feb. 2015) ............................21

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*......................7, 10, 14

William J. Krouse, "How Many Guns Are in the United States?—Number," U.S. Cong. Res. Serv. (2012) .............................................................21

## INTEREST OF *AMICUS CURIAE*[1]

The American Firearms Association (AFA) is a nonprofit organized under section 501(c)(4) of the Internal Revenue Code. The AFA is a nationwide grassroots mobilization organization that fights to for the rights guaranteed by the Second Amendment. AFA fights on behalf of its members to defend the Second Amendment and natural right to self-defense in both the legislatures and in courts.

This case concerns AFA because laws like Illinois's "assault weapons" ban infringe on the Second Amendment rights of the state's residents. Other states have recently passed similar gun laws, and more are likely to do so in the future. Constitutional guidance from federal courts is needed.

---

[1] Fed. R. App. P. 29 Statement: Most Plaintiffs-Appellees in this consolidated case consented to this filing, including counsel for Barnett (23-1825), Harrel (23-1826), Federal Firearms Licensees of Illinois (23-1828), and Herrera (23-1793). Counsel for Langley (23-1827) did not respond to the consent request. Defendant-Appellees Cook County denied consent, and Defendant-Appellees the City of Chicago and the State of Illinois agreed to consent only if this brief were filed on the same day as Plaintiffs-Appellees' brief. A motion for leave to file is therefore attached. No counsel for either party authored this brief in whole or in part. No person or entity other than amicus and its members made a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

This group of consolidated cases all address the crucial question of how so-called "assault weapons" should be treated under the Second Amendment. But this case isn't about "assault weapons," it's about normal semiautomatic guns and accompanying magazines that are among the most commonly owned types of guns in the country. While parties in this case, courts, scholars, and commentators have been debating the term "assault weapons" for decades, the rhetorical gamesmanship here matters. The First Amendment would be completely toothless if legislatures were freely allowed to pass "bad speech" bills—or even "assault speech" bills—and courts took the legislature's characterization as facially valid. Similarly, the Second Amendment and the decisions in *Heller* and *Bruen* require more than trusting the legislature that such weapons are "assault weapons."

Illinois's HB5471 is one of the broadest gun prohibitions recently passed in the United States. The law bans almost 1,000 models of rifles, including the AR-15, the most popular rifle in the country. It also bans many semiautomatic pistols and shotguns, as well as ammunition feeding devices that can hold more than 10 rounds for rifles and 15 rounds for handguns. 720 ILCS 5/24-1.10(a)(1). All in all, the ban encompasses a huge amount of commonly owned weapons. In fact, the number of arms and accessories affected by the ban is so large that it would be impossible to estimate how many are in the country, much less the state of Illinois. And more guns can be added in the future since the law allows the State Police to add to the list. 720 ILCS 5/24-1.9(d)(3). Illinois's ban includes so many commonly owned firearms and

accessories that it's possible a majority of gun owners in the state could run afoul of the law. In other words, the banned arms and accessories meet any reasonable definition of "common use."

In *New York State Rifle and Pistol Association v. Bruen*, the Supreme Court clarified that the "Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). While some disagree with policies that allow law-abiding citizens to own common firearms, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131. Until the Constitution is duly amended, courts are obliged to give constitutional text, history, and tradition proper weight.

*Amicus* is a nationwide gun-rights groups that is concerned with how brazenly Illinois's law violates the Second Amendment and the Court's decision in *Bruen*. The banned weapons are clearly "arms" and thus presumptively protected by the text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126.  Around the country, and in Illinois, the semiautomatic firearms at issue have been overwhelmingly purchased by law-abiding citizens for self-defense, target shooting, hunting, and defense against oppressive government. In fact, nationwide, there are more modern sporting rifles (MSRs) (a much better term than "assault weapon") in private hands than there are Ford F-Series pickups on the streets, one of the most popular cars in the country. *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) rev'd, 849 F.3d 114 (4th Cir. 2017)

(*en banc*) ("in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States."). And almost none of those MSRs are being used for crime.

MSRs were (and are) normal, everyday rifles until they were re-christened "assault weapons" to sound more menacing. The term is often linked to a 1988 paper by gun-control activist Josh Sugarmann of the Violence Policy Center. Sugarmann felt the incendiary term, coupled with public ignorance, could increase support for banning the weapons: "The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons." Aaron Blake, "Is it fair to call them 'assault weapons'?," Wash. Post (Jan. 17, 2013), https://perma.cc/8HCC-FZGK. Inventing a term like "assault weapon" and then applying it to an ad hoc group of weapons does not change the Second Amendment's scope.

Like many other states that ban MSRs and other semiautomatic weapons, the Illinois law bans some weapons by name and others by characteristics. The characteristics singled out, however, do not make the banned guns any less commonly used for lawful purposes, nor do they make the weapons "dangerous and unusual." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment)

(explaining that the test is conjunctive and "[a] weapon may not be banned unless it is *both* dangerous *and* unusual."). That millions of Americans use the banned weapons for lawful purposes sufficiently demonstrates that Illinois's ban cannot be sustained under the Second Amendment and the Supreme Court's precedents.

Yet the government insists on arguing that the guns are uniquely dangerous and highlights the military's use of similar weapons to demonstrate they are "weapons of war" that are "methodically designed to quickly maximize casualties on a battlefield." Cook County Br. at 5. Even if the military's choice of weapons determined—or even affected—the scope of the Second Amendment, these claims do not stand up to scrutiny. The military's analog to the AR-15—the M-16—is significantly and importantly different, and why the military chooses a particular small arm depends on numerous factors that, nevertheless, do not affect whether a type of firearm is in common use for lawful purposes.

Because Illinois's law flouts current doctrine and is one of the broadest gun prohibitions in the country, this Court should affirm the preliminary injunction that was correctly granted by the district court in the consolidated *Barnett* cases.

**ARGUMENT**

**I.    The *Bruen* Decision Presumptively Protects "Arms," Which Includes the Type of Arms Singled-Out by Illinois's Ban**

Illinois has tried to ban commonly owned firearms that are presumptively protected by the Second Amendment and overwhelmingly used for lawful purposes. That ban is unconstitutional under the standards articulated by the Supreme Court. *See*, *Heller*, 554 U.S. at 625 (holding that the Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes.").

*Bruen* adopted a text-first approach that is informed by history and tradition. *Bruen*, 142 S. Ct. at 2134–35. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129; *id.* at 2132 ("the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding") (quoting *Heller*, 554 U.S. at 582). Thus, under *Bruen*, a court should first look to whether something is an "arm," and subsequent analysis looks to history and tradition to determine which type of regulations "are consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Unlike some difficult-to-interpret constitutional terms, the definition of bearable "arms" is straightforward. For example, the term does not include F-16 fighter jets because no one can "bear" a fighter jet. And the amendment's definition of "arms" is no more restricted to 18th-century weapons than the First Amendment's definition of "speech" is restricted to parchment, town criers, and movable-type printing. "[E]ven though the Second Amendment's definition of 'arms' is fixed

according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (citing *Caetano*, 577 U.S. at 411–12 (per curiam) (stun guns)). The relevant question is whether a given "arm" is a bearable "modern instrument[] that facilitate[s] armed self-defense." *Id.* If the answer to that question is "yes," then a court should presume that the arm is protected and look to history and tradition to determine whether the arm can nevertheless be banned.

Some bearable arms can be prohibited because the Second Amendment doesn't guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; see also *Bruen*, 142 S. Ct. at 2132, 2143. When such "arms" can be prohibited depends on history and tradition to overcome the textual threshold: "bearable arms" are "presumptively protect[ed]." *Id.*

It is beyond reasonable argument that MSRs and the other weapons subject to Illinois's law are bearable arms presumptively protected by the Second Amendment. Millions of Americans, and an untold number of Illinoisans, keep and bear these arms for lawful purposes. *See*, *infra*, Part II. The weapons' "bearability" is a significant reason why so many people prefer to use them for lawful purposes rather than other, more cumbersome guns. Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, 8 (2022) ("They are particularly attractive for women and older individuals because of their light weight and ease of use, particularly in comparison to shotguns."). The average "starting weight" for an unloaded AR-15 is around 6.4 lbs—

7 lbs with a loaded 30-round magazine. Everyday Marksman, "Deal With Compromise: AR-15 Weight, Capability, and Balance," (Feb. 8, 2022), https://perma.cc/B8Y4-JHFC. By contrast, an M1 Garand, the semiautomatic rifle that was the standard-issue weapon for American troops in World War II—a literal "weapon of war"—weighs 9.5 lbs unloaded and around 11 lbs loaded. *Id.*

Because the firearms banned by Illinois are "presumptively protect[ed]" by the Second Amendment, the Court should next look to whether such weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

## II. The Guns Targeted by Illinois's Law Are Standard Semiautomatic Arms that Are Commonly Used for Self Defense and Other Lawful Purposes and Are Thus Protected by the Second Amendment

Given that the guns banned by Illinois's law are clearly "arms" that are presumptively protected by the Second Amendment's text, the next question is whether banning such arms is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2132. The "Second Amendment protects only the carrying of weapons that are those 'in common use at the time'" and doesn't protect arms that are "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627). By any metric, the guns targeted by Illinois's ban are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

**A. The Semiautomatic Rifles Banned by Illinois Are Used by Millions of Americans for Lawful Purposes**

Illinoisans have long used the banned guns for lawful purposes. It is irrelevant that such guns are arguably "new" or that the arms are different than those that were commonly used at the time of the ratification of the Second Amendment. *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) ("[T]he pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*."). The common nature of these weapons was pointed out by Justice Thomas in 2015: "The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari).

*Amicus* has been unable to find specific data for how many modern sporting rifles are owned by Illinoisans. It is unlikely such granular data exists because there is no gun registry and Americans (and Illinoisans) often don't want the government to know what arms they own, which only underscores the difficulty of enforcing a ban like Illinois's. But nationwide surveys estimate that there are more than 24.4 million MSRs in the country. National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, (July 20, 2022) ("the firearm industry trade association, updated the industry estimate of Modern Sporting Rifles (MSRs) in circulation in the United States to 24,446,000 since 1990. That is an increase of over 4.5 million rifles since the last estimate was released in 2020."),

https://perma.cc/2LX6-UN3B. As mentioned, that's more than the number of Ford F-Series pickup trucks on the road, which is the second most popular car in the country. *Id*; Chase Gardner, "The Most Popular Cars in America (2022)," Insurify (Apr. 5, 2022), https://perma.cc/D4A3-934L.

According to one survey, "[i]n 2021, 75 percent of those who shot a center-fire rifle shot an MSR[,]" and of "the 66 percent who hunted with a center-fire rifle, 60 percent used an MSR." Halbrook, *America's Rifle*, *supra* at 1. In general, semiautomatic rifles that accept detachable magazines have been commonplace in America for at least a century. *Id.* at 2. It wasn't until the rhetorical category of "assault weapons" was invented in the late 1980s that there was any concerted effort to ban these commonly owned firearms. *Id.*

Illinois's Governor J.B. Pritzker claimed that the banned guns are "weapons of war," and "mass-killing machines." Amanda Vinicky, "Which Guns are Covered by Illinois' Assault Weapons Ban?," WTTW.com (Feb. 16, 2023), https://tinyurl.com/2kmfyhcs. Illinois Senate President Don Harmon said the law is "against weapons whose only intent is to eviscerate other human beings." Press Release, "Gov. Pritzker Signs Legislation Banning Assault Weapons and High-Capacity Magazines," Illinois.gov (Jan. 10, 2023), https://tinyurl.com/5n8yxme6. That would come as a surprise to people like Zack Peters, an Oklahoma man who used an AR-15 to defend his home against three home invaders. Avalon Zoppo, "Oklahoma Man Uses AR-15 to Kill Three Teen Home Intruders," NBCNews.com (Mar. 28, 2017), https://perma.cc/RX8B-6A7S. Or a pregnant woman in Florida who

defended her home and her husband with an AR-15. David K. Li, "Pregnant woman uses AR-15 to fatally shoot armed intruder," NBCNews.com (Nov. 4, 2019), https://perma.cc/TW7N-QN44. Or a man in Glen St. Mary, Florida, who defended himself and his home with an AR-15 against seven armed intruders, discharging 30 rounds in the process. Garrett Pelican, "Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion," New4Jax.com (Apr. 17, 2018), https://perma.cc/RE7J-8XDS.

Governor Pritzker's comments would also come as a surprise to the significant number of police departments that equip their officers with AR-15s and other "assault weapons." Police Executive Research Forum, *Police Department Service Weapon Survey* 2 (2013), ("Ninety-three percent of responding agencies equip some of their officers with rifles or assault weapons."), https://perma.cc/5AMT-WNGN. Presumably, departments don't equip their officers with a weapon that are "mass-killing machines."

A Massachusetts police training manual describes the utility of such weapons for the lawful defense of self and others. The weapons are used "due to the increased accuracy that the rifle afforded over the pistol and the shotgun." Massachusetts Municipal Police Training Committee, *Basic Firearms Instructor Course: Patrol Rifle* 3 (Sept. 2007), https://perma.cc/6HMQ-QS7W. The weapons are useful because the department "found most officers have difficulty hitting the MPTC Q target with regularity using their service pistol at distances further than the 10-yard line," and when you "factor in the stress level of a life and death encounter with rapidly evolving

circumstances—the actual hit ratio drops even further." *Id.* Ordinary citizens who aren't as extensively trained would of course suffer from similar difficulties. Moreover, rather than being a distinctly powerful rifle, "the most popular patrol rifle round, the 5.56mm NATO (.223 Remington) will penetrate fewer walls than service pistol rounds or 12-gauge slugs," thus lowering the possibility of accidents. *Id.* In short, "[t]he rifle is a superior tool" for law enforcement officers in many situations. *Id.* Law-abiding citizens use the rifles for the same purposes.

Under the Supreme Court's test articulated in *Heller* and expanded on in *Bruen*, MSRs are in common use for lawful purposes. While the government points to crimes being committed with MSRs and other guns singled out by Illinois's law, that criminals misuse weapons for horrible crimes does not negate the millions of people who use the guns responsibly and legally. Any gun can be misused for horrible crimes. The misuse of a constitutional right by some does not negate the constitutional rights of others. The question the Supreme Court has directed courts to ask is whether the weapons are "*typically* possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

**B. The Arms Singled Out by Illinois's Ban Are Standard Semiautomatic Rifles with Characteristics that Make Them More Effective for Lawful Uses**

As discussed above and in Appellees response brief, a type of weapon that outnumbers one of the most popular cars in the country should be considered in "common use." Yet while the raw numbers show that Illinois's ban targets commonly used arms, the banned guns should be considered part of an even bigger category of weapons—semiautomatic rifles—that are even more commonly used. The proper

category for constitutional analysis is not simply so-called "assault weapons" or "modern sporting rifles"—or whatever rhetoric is used to define the category—but whether the prohibited weapons have characteristics that make them uniquely suitable for unlawful purposes and unsuitable for lawful purposes.

While the term "assault weapon" is a gun-control advocate's rhetorical invention, *see*, Blake, *supra*, *amicus* acknowledges that the term "modern sporting rifle" is also a rhetorical invention used to counter the erroneous term "assault weapon." The important question for Second Amendment analysis is whether such terms articulate a constitutionally relevant category of firearms that is not in "common use" for lawful purposes. Mere rhetoric can't trump constitutional text or the Supreme Court's interpretation of that text. To determine whether a certain firearm is commonly used for lawful purposes, the firearm should be properly defined with relevant characteristics.

For example, a semiautomatic rifle that is painted hot pink would not be considered "in common use" if the color is regarded as a salient feature (based on the presumably safe assumption that relatively few people own hot pink semiautomatic rifles). Yet a ban on a certain color of weapon should not survive even rational basis review—a standard of review much lower than the Supreme Court has dictated for the Second Amendment. *Bruen*, 142 S. Ct. 2127–28. This only underscores the obvious fact that the function of any feature singled out for prohibition is relevant to analyzing a law. In other words, the Second Amendment prohibits the government from inventing a category of weapons—e.g. "hot pink semiautomatic rifles"—and then

declaring such weapons are not in "common use." More is required to clear the Second Amendment's hurdle.

Illinois's ban is not so transparently cosmetic as to ban certain colors of weapons, yet the ban focuses on characteristics that are either mostly cosmetic or characteristics that make the gun more effective for lawful uses. For example, 720 ILCS 5/24-1.9(a)(1)(A)(i)-(ii) bans semiautomatic rifles that accept detachable magazines that have a "pistol grip" and those with a "protruding grip that can be held by the non-trigger hand." Such grips help the shooter pull the weapon comfortably against his/her shoulder for better control. Halbrook, *America's Rifle*, *supra*, at 14. Any law-abiding gun owner cares about accuracy because shooting an inaccurate gun is both dangerous to others and relatively ineffective for law-abiding uses. The odd implication here is that law-abiding citizens should apparently have guns that are less easy to control, while criminals evidently prefer more accurate guns. Similarly, 720 ILCS 5/24-1.9(a)(1)(A)(iii) bans semiautomatic rifles with folding or telescoping stocks that allow users to better adjust the weapon to their height. It's common sense that a short person shooting an exceptionally long gun will not be able to control the gun as well as a gun more tailored to her size. And 720 ILCS 5/24-1.9(a)(1)(A)(vi) bans semiautomatic rifles that accept detachable magazines that have barrel shrouds, which allow "the bearer to hold the firearm with the non-trigger hand without being burned." This is a particularly strange acknowledgement that a law-abiding gun owner who does not want to get burned is apparently preferring a characteristic that only criminals would want.

14

It's an interesting world Illinois wants to bring about: a world where criminals who acquire and use the banned guns are better equipped with more accurate guns (that don't burn them) than law-abiding citizens. If a law-abiding citizen diligently obeys the Illinois ban, they will be deprived of more accurate and effective weapons for authorized purposes like self-defense, hunting, target shooting, and defense against oppressive government. A criminal who chooses to disobey the ban—as a criminal is more likely to do—will have a more effective weapon for criminal activities.

Rather than identifying uniquely dangerous characteristics for prohibition, Illinois's ban singles out aspects that help make standard semiautomatic rifles more reliable, accurate, and comfortable for law-abiding users.

## III.   The Military's Use of Analogs to "Assault Weapons" Is Constitutionally Irrelevant

The government highlights the fact that so-called "assault weapons" are "weapons of war." In the consolidated case of *Herrera v. Raoul*, Defendant-appellees Cook County describe "assault weapons" as "weapons of war" that are "methodically designed to quickly maximize casualties on a battlefield." Cook County Br. at 5. They also claim that "there is not a meaningful difference between the military-grade M-16 and the civilian AR-15[.]" *Id.* at 7. These claims are false. Yet, even if true, the Second Amendment protects a civilian's right to own small arms that are also used by the military. *Heller*, 554 U.S. at 624–25 (2008) (internal quotation marks omitted) (quoting *State v. Kessler*, 614 P.2d 94, 98 (Or. 1980)) ("[i]n the colonial and

revolutionary era, [small arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.").

First, it would be odd if the military's adoption of a particular small arm changed the constitutional protection of that arm for civilians. Such a theory would move small arms in and out of constitutional protection based on the complexities of military procurement and strategy. Moreover, the military adopts small arms for a variety of reasons that are not entirely related to lethality or to "quickly maximize casualties on a battlefield."

The government highlights the military's use of analogs to civilian-available "assault weapons" as a reason to believe that such weapons have no valid lawful purpose in civilian hands. See, e.g., State.Br.29 ("their features render them uniquely effective as weapons of war"). The implicit assumption is that the military primarily chooses a small arm based on its ability to kill as many people as quickly as possible. This is wrong. The military considers numerous factors in choosing a weapon, such as "mission adaptability, weight, reliability, maintenance, and cost." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev 1, 7–8 (2020). In fact, those considerations are not dissimilar to why a civilian may prefer an "assault weapon" for self-defense and sporting reasons.

What makes a particular gun more or less lethal depends on a variety of factors. The U.S. military did not choose the M-16 because it is the most effective known weapon for killing enemy troops. *Id.* at 8–10. Some ammunition, such as the 5.56mm NATO rounds used by the M-16 and M4—which is nearly identical to the

.223 Remington round used by many modern sporting rifles—is preferred because it less lethal per shot but lighter, thus allowing troops to carry more rounds. *Id.* at 8. Yet a bigger round, such as the .30-06 round used by the M1 Garand in World War II—could be more lethal but also much heavier for soldiers to carry around, and how much weight a soldier carries is an important factor. *Id.* Which gun is more "lethal"?

In fact, many have criticized the U.S. military's use of the M-16 and M4 rifles because the rifles are not lethal enough. *See, e.g.*, Joseph P. Avery, *An Army Outgunned: Physics Demands a New Basic Combat Weapon*, Mil. Rev., July–Aug. 2012 ("Despite an increasing portfolio of enemies that are flexible, well-armed, and robust, our Army, Marine Corps, and special operations forces have been stuck for decades hauling assault rifles firing NATO 5.56x45 millimeter (mm) (.223 caliber) varmint rounds over a half-century old."), https://tinyurl.com/54ehupba. During the Battle of Mogadishu in 1993, famously recounted in the book and movie *Black Hawk Down*, soldiers complained that the 5.56mm rounds used—which are, again, nearly identical to the .223 Remington civilian round—lacked stopping power. Shooting someone "was like sticking somebody with an ice pick. The bullet made a small, clean hole, and unless it happened to hit the heart or spine, it wasn't enough to stop a man in his tracks. [The soldier] felt like he had to hit a guy five or six times just to get his attention." Mark Bowden, *Black Hawk Down: A Story of Modern War* 208 (1999).

Recent studies and surveys have shown that many servicemen and women request ammunition with more stopping power and lethality. Wallace, *"Assault Weapon" Lethality*, *supra* at 11. A 2006 test by the U.S. Joint Service Wound Ballistics

Integrated Product Team concluded that a 6.8mm round is more effective than the 5.56mm round, and "[t]he next generation of combat rifles likely will use a more effective intermediate caliber round between 6.5mm and 7.0mm rather than the smaller 5.56mm round." *Id.* at 11. Yet even if the military moves away from variants of civilian modern sporting rifles, that shouldn't affect the constitutional status of so-called "assault weapons."

This is not to say that modern sporting rifles such as the AR-15 are not lethal, as all guns are. The relevant question is whether they are particularly or uniquely lethal compared to other semiautomatic civilian rifles that are not banned. The military's choice to use a variant of these guns shouldn't be regarded as demonstrating a level of danger such that the guns can be constitutionally banned from civilians.

Moreover, the difference between the military's M-16 and the civilian AR-15 is not merely incidental to the rifle's use in military contexts. E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193, 205–06 (2018). That civilian-available semiautomatic rifles share functionality with military rifles—namely semiautomatic fire—does not make them "weapons of war." "[S]emi-automatic fire is useful in law enforcement and military situations because it is useful in *all* legitimate shooting applications." Dennis Chapman, *Firearms Chimera: The Counter Productive Campaign to Ban the AR-15 Rifle*, 8 Belmont L. Rev. 191, 205 (2020). The crucial difference is selective-fire capability (the ability to choose fully automatic or burst fire), and that capability "is the only significant uniquely military firearms feature."

18

*Id.* The ability to choose automatic fire creates unique functionality for military applications. *Id.* at 206 ("automatic fire enables an attacker to direct such a high volume of fire at that enemy that he is suppressed—that is to say, the intensity of the attacker's fire materially degrades the defender's ability to return effective fire or to maneuver to counter the attack."). There is a better argument that such guns are uniquely suited for military applications and therefore can be more heavily regulated in civilian hands, as they are under the National Firearms Act.[2] Such an argument would at least identify a unique capability of the military's rifles that is not a trait—semiautomatic fire—shared by hundreds of millions of guns in private hands.

### IV.  "Assault Weapons" Are Not "Dangerous and Unusual" Compared to Other Common Firearms

As described above, the Supreme Court has been clear that weapons that are commonly owned by law-abiding citizens for lawful purposes cannot be banned under the Second Amendment. Weapons that can be banned are those that are "dangerous *and* unusual," which also means they are not in common use for law abiding purposes. *Bruen*, 142 S. Ct. at 2143; *Heller*, 554 U.S. at 627 (emphasis added). MSRs are normal, commonly owned semiautomatic rifles that are neither dangerous nor unusual.

MSRs are semiautomatic—or "self-loading"—meaning they discharge a single shot per trigger pull and the next round loads into the chamber without any intervening action—such as cocking—by the user, at least until the gun jams or the ammunition is depleted. Some activists and judges have claimed that a

---

[2] Amicus does not concede the constitutionality of the National Firearms Act. However, identifying a unique difference between the military's firearms and civilian-owned analogs is a better argument than what the government offers here.

semiautomatic rifle like the AR-15 can fire at essentially the same rate as a fully automatic machine gun. Cook County Br. at 7 (claiming that the AR-15 can fire 300 rounds per minute); *see also Kolbe*, 849 F.3d at 136 (claiming that the firing rate of the AR-15 is "nearly identical" to a fully automatic M-16). This is false and doesn't stand up to cursory scrutiny. To fire 300 to 500 rounds in a minute, as a fully automatic M-16 can do, a shooter would have to pull the trigger *five to eight times a second for 60 seconds*, something beyond the capabilities of the human body. Wallace, *"Assault Weapon" Lethality*, *supra* at 20. Rather than being uniquely dangerous, "[t]here is little if any difference between the rates of fire for the semiautomatic AR-15 and a semiautomatic handgun." *Id.* at 25.

While it is difficult to estimate how many semiautomatic weapons there are in the country, they are extremely common and equally—rather than uniquely—dangerous. Most pistols are semiautomatic, as is any rifle that is not single shot, bolt action, lever action, slide action, or pump action, which are the most common forms of non-semiautomatic rifle. The total number of semiautomatics is likely more than 200 million, and all can fire as quickly as the user can pull the trigger.

Nor are the rounds fired from an MSR uniquely dangerous compared to other commonly owned weapons, despite numerous claims to the contrary. *See, e.g.*, Glenn Kessler, "Biden bungled talking point on the muzzle velocity of AR-15s," Wash. Post (Sept. 2, 2022), (noting that President Biden was "clearly wrong" in his claim that AR-15s fire five times faster than any other gun), https://tinyurl.com/jjxx3s6t. In fact, the round that most MSRs fire, the .223 Remington, is considered by many states to

be too weak to hunt deer because the round will only cruelly injure rather than kill the animal. Wallace, *"Assault Weapon" Lethality*, *supra* at 54. And, as discussed *supra*, many military analysts complain that the M-16 is underpowered because it fires a variant of "a commercial Remington rifle cartridge that had been designed to kill small varmints." Robert H. Scales, "Gun Trouble," Atlantic (Jan./Feb. 2015), https://tinyurl.com/bddah2n2.

When looking at crime rates, MSRs are also not uniquely dangerous. As mentioned *supra*, according to the National Shooting Sports Foundation (NSSF), there are approximately 24.4 million MSRs in the country, which is about 6 percent of all weapons, including both rifles and handguns. *Commonly Owned*, *supra*; Christopher Ingram, "There are more guns than people in the United States, according to a new study of global firearm ownership," Wash. Post (June 19, 2018), https://tinyurl.com/3k9vunum. MSRs are a subset of rifles, and it is difficult to estimate how many rifles there are in the country because there are few updated statistics and gun owners don't like to tell the government what they have. Nevertheless, a 2012 estimate found 110 million rifles out of the approximately 310 million total guns at the time, or 35 percent. William J. Krouse, "How Many Guns Are in the United States?—Number," U.S. Cong. Res. Serv. (2012), https://tinyurl.com/bdf5dhkr. Although there is a paucity of recent numbers, it is reasonable to assume that the ratio of 35 percent would hold true just over a decade later. Currently, it's estimated that there are approximately 400 million guns in the country, meaning approximately 140 million rifles (35 percent of 400 million).

Ingram, *supra*. The NSSF estimate of 24.4 million MSRs would equate to about 17 percent of all rifles.

Rifles, in general, are used in very few crimes. In 2019, according to FBI crime statistics, rifles of any kind—of which MSRs are a subset—were used to kill 364 people.[3] Handguns killed 6,368. FBI, "2019 Crime in the United States: Expanded Homicide Data Table 8—Murder Victims by Weapon 2015–2019," https://tinyurl.com/33vcyyfd. In the four previous years, starting in 2015, rifles killed 215, 300, 389, and 305 people, respectively, and handguns in those years killed a similar number, between 6,000–7,000. *Id.* Each of those years, about 1,500 people were killed with "knives and cutting instruments," and around 600–700 were killed with "personal weapons" such as fists and feet. *Id.*

While the data are not deep enough to determine how many murders with rifles were committed with MSRs, it's reasonable to assume something around 17 percent, the same ratio of MSRs to total rifles. That would be 62 murders. If we double that percentage and round up—assuming 40 percent of all murders with rifles were perpetrated with MSRs—then we get 146 murders.

One hundred and forty-six murders is a lot, but it has to be looked at comparatively and with the question of whether the data show the guns are uniquely dangerous.

---

[3] 2019 is the most recent year there is a reliable breakdown of weapons used in crime. The FBI changed how it tracks crime data starting in 2020, and "[l]aw enforcement agencies covering just over half of the population reported a full year's worth of data to the FBI in 2021." Ames Grawert & Noah Kim, "Understanding the FBI's 2021 Crime Data," Brennan Ctr. for Justice (Oct. 4, 2022), https://tinyurl.com/bdezhk29.

In 2019, there were 10,258 total homicides with firearms. Assuming the higher estimate of how many murders were caused by MSRs—146—means that 1.4 percent of murders in 2019 were perpetrated with MSRs. With 24.4 million MSRs and approximately 146 murders, and assuming one gun per homicide, means that around 0.000006 percent of MSRs are used to kill.

Of course, raw numbers of crimes committed don't entirely explain whether a type of firearm can be considered uniquely dangerous. Some firearms may have particularly lethal capabilities and are essentially never used for crime. A grenade launcher, for example, is a bearable arm that is distinct in how it operates—a wide explosion rather than a targeted bullet—and *amicus* were unable to find one instance of a crime being committed with the weapon.[4] That is one reason the Supreme Court's test is conjunctive—"*both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment)—and why the "common use" test makes conceptual sense.

MSRs are both extremely commonly used for lawful purposes and neither dangerous nor unusual, thus meriting the full protection of the Second Amendment.

---

[4] It is worth noting that Illinois does not prohibit the possession of large bore "destructive devices" (like grenade launchers) as long as the device is registered in accordance with federal law. Illinois's new law requires non-transferable registration of MSRs, yet, under federal law, grenade launchers can be registered with a transferable license. In other words, defendants seek to regulate common rifles more strictly than grenade launchers. *See* 720 ILCS 5/24-1, 2.

## CONCLUSION

For the forgoing reasons, HB5471 unconstitutionally bans firearms that are commonly used by law-abiding persons for lawful reasons. The Court should affirm the preliminary injunction in the consolidated *Barnett* cases.

Respectfully submitted,


DATED: June 22, 2023

/s/ *Trevor Burrus*

Trevor Burrus
2301 S. June St.
Arlington, VA 22202
P: 720.231.4899
Trevorburrus@gmail.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 7th Cir. R. 29 because it contains 6,118 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Century Schoolbook, 12-point font.

/s/ *Trevor Burrus*
June 22, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Trevor Burrus*
June 22, 2023