Nos. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

JAVIER HERRERA,

Plaintiff-Appellant,

v.

KWAME RAOUL, et al.

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 23-cv-00532
The Honorable Lindsay C. Jenkins, Judge Presiding
————

**REPLY BRIEF OF DEFENDANTS-APPELLEES COOK COUNTY,**
**TONI PRECKWINKLE, KIMBERLY M. FOXX, AND THOMAS J. DART**
————

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6934
Jessica.Scheller@cookcountyil.gov

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Division Chief, Civil Actions Bureau
JONATHON D. BYRER
PRATHIMA YEDDANAPUDI
MEGAN HONINGFORD
EDWARD BRENER
Assistant State's Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

_____

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES................................................................ ii

ARGUMENT IN REPLY................................................................... 1

I.   **Evidence Of Common Possession Does Not Satisfy Herrera's Burden To Show Common Use**............................................ 2

II.  **Assault Weapons Are Fundamentally Incompatible With The Limited Doctrine Of Self-defense Recognized At English Common Law And Are Thus Outside The Scope Of The Amendment's Protection**............................................ 8

III. **Gunpowder Regulations Demonstrate A Longstanding Tradition Of Regulating Arms Responsible For Mass Casualty Events**.................................................................. 14

IV.  **Spring Gun Regulations Demonstrate A Longstanding Tradition Of Regulating Firearms Incompatible With Lawful Self-Defense**.................................................................. 18

V.   **Herrera Has Waived Any Argument Regarding The Application Of The Nuanced Approach To Unprecedented Social Problems**.................................................... 23

VI.  **Herrera's Remaining Arguments Are Frivolous**.............................. 24

CONCLUSION............................................................................... 26

CERTIFICATE OF COMPLIANCE.................................................. 27

# TABLE OF AUTHORITIES

————————

<u>Cases</u>                                                                                    <u>Pages</u>

*Aguilar v. Atlantic Ritchfield Co.*, 25 Cal. 4th 826 (2001)................................. 20

*Andrews v. State*, 50 Tenn. 165 (1871)......................................................... 3, n.2

*Atkinson v. Garland*, No. 22-1557, 2023 U.S. App. LEXIS 15357
(7th Cir. June 20, 2023)................................................................................ 14

*Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71 (1988)........................... 15

*Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714 (1998).................................... 20

*Citizens United v. FEC*, 558 U.S. 310 (2010).................................................. 15

*Cockcroft v. Smith*, 11 Mod. 43 (King's Bench 1705)........................................ 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................. 4, passim

*Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971)........................................ 19, 20, 21

*Markadonatos v. Village Of Woodridge*, 760 F.3d 545 (7th Cir. 2014)................... 16

*Nailor's Case*, Fost. 278 (1704)................................................................... 10

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ...........3, passim

*Presser v. Illinois*, 116 U.S. 252 (1886)..................................................... 24, 25

*State v. Wells*, 1 N.J.L. 486 (N.J. 1790).................................................. 8, 10, 11

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)............................................ 16

*United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991)................................. 15

*United States v. Collins*, 604 F.3d 481 (7th Cir. 2010)............................. 15, passim

*Yee v. City of Escondido*, 503 U.S. 519 (1992)................................................ 15

Statutes

720 ILCS 5/24-1......................................................................... 19

Mich. Comp. Laws § 750.236......................................................... 19

Spring Gun Act 1827, 7 & 8 Geo. 4, ch. 18....................................... 19

Offenses Against the Person Act 1861, 24 & 25 Vict., ch. 100, § 31...................... 19

Other Authorities

Blackstone, William, COMMENTARIES ON THE LAWS OF ENGLAND 182 (1769)..........10

Christy, Miller, *Man Traps & Spring-Guns*, OUTING
vol. XLI, issue 6 (1903)................................................................. 19, 20, 22, 23

Leonard, Pat, *The Bullet That Changed History*, THE NEW YORK TIMES
(August 31,2012)........................................................................ 12

Shoop, Isaac, *Small But Deadly: The Minié Ball*, THE GETTYSBURG COMPILER
(April 30, 2019)........................................................................ 11

Smith, Rev. Sydney, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW
Vol. 35, Issue 70 (1821)................................................................ 21, 22, 23

Tangen, Ed, *Spring Guns*, 1 AM. J. POLICE SCI. 307 (1930)................................ 19

*Failing Our Troops*, 42 YALE J. INT'L L. 215, 249 (2017)..................................... 13

House of Commons Debates, March 23, 1827, vol. 17, cc19-34...................... 20, 21

## ARGUMENT IN REPLY[1]
_____

Herrera's deeply troubling response brief demonstrates that this case is now about more than just the Second Amendment, but about competing visions for this country, and the hundreds of millions who love it and call it their home. The County and its fellow defendants offer up one vision, of a country where the government has the modest, limited power to protect its citizens by prohibiting access to an extraordinarily narrow category of weapons – specifically, weapons expressly designed for war and which are the implements of choice for those who would wreak devastation in our schools, our public places, our places of worship, and our homes – while leaving available a panoply of options for lawful self-defense, including the handgun overwhelmingly favored by Americans for that purpose. As explained in our opening brief, that vision was shared by this nation's founders, who understood that the right to self-defense was a narrow right that must be exercised in moderation, not by immediate resort to the most lethal weapon available. This is consistent with the longstanding tradition of strictly regulating access to items such as gunpowder that have caused repeated mass-casualty events, as well as with the first principles underlying the right to self-defense at English common law.

---

[1] As in our opening brief, the County offers their arguments in this brief regarding the merits of Herrera's case to present an alternative basis for affirming the judgment in _Herrera_ below. The County adopts pursuant to Fed. R. App. P. 28(i) the arguments presented by the State of Illinois and the City of Chicago in their respective briefs regarding the remaining preliminary injunction factors.

Herrera and his ilk offer a far darker vision.  They envision a country where assault weapons are absolutely immune from regulation, regardless of the regularity with which they are used to terrorize law-abiding citizens and helpless children.  They would leave the government to jail (or execute) mass murderers and bury their victims, Herrera Br. 4, but otherwise impotently stand by while "maniacs use semi-automatic rifles to kill." Bevis Br. 29.  They see not a nation of individuals and families, but a militia armed with weapons of war.  They see a nation where the countless bloody horrors of Civil War battlefields and field hospitals are offered up not as a cautionary tale, but as something to be aspired to in our homes and our schools and the hospitals where doctors wait in vain for survivors from the latest in a series of massacres perpetrated with assault weapons. Theirs is a nation where a desire to possess weapons designed for war is somehow a "moderate" exercise of the limited common-law right of self-defense.

Unsurprisingly, this is not a vision that this nation's founders shared.  It is not a vision supported by this nation's history and traditions.  And it is not a vision finding even an iota of support in the law, for the reasons we now explain.  This court should affirm, with haste.

## I.     Evidence Of Common Possession Does Not Satisfy Herrera's Burden To Show Common Use.

As explained in our opening brief, Herrera bears the initial burden of demonstrating that the weapons he seeks to possess are "arms" – not in a literal sense, which would expand a presumption of constitutional protection to literally every conceivable weapon – but in the sense contemplated by the Second

Amendment's text. To satisfy this burden, he specifically must make an initial showing that the assault weapons he seeks to possess are in common use for lawful purposes – namely, for the purpose of self-defense. And as explained in our opening brief, Herrera has made no such showing, having erroneously focused on *ownership* of assault weapons, rather than their actual use.

Herrera's response only doubles down on this error, focusing squarely on the number of assault weapons in circulation in the United States. Herrera Br. 24-25, 26-27.[2] First, that number does not demonstrate commonness because it offers no context, obfuscating the fact that assault weapons are owned by a small percentage of gun owners, which translates into an even smaller percentage of the general U.S. population. Moreover, it is beyond dispute by now that the relevant question is how commonly a particular weapon is actually used, not how commonly that weapon is owned. This is plain from the language of *Bruen* itself, which repeatedly focuses on the commonness of a weapon's use. *E.g.*, 142 S. Ct. at 2128 ("the Second Amendment protects the possession and use of weapons that are 'in common use at the time'"); *id.* at 2138 ("the historical record compiled by respondents does not

---

[2] Herrera lumps assault weapons in the generic category of "rifles," in order to make it appear that they constitute "one-third of the stock of civilian firearms." Herrera Br. 24. None of the laws at issue here reach all "rifles," and no reasonable person could possibly think that ordinary rifles and assault weapons are so indistinguishable as to be considered as part of an undifferentiated whole. The fact that a Tennessee court once said that "rifle[s] of all descriptions" constitute protected arms, *Andrews v. State*, 50 Tenn. 165, 179 (1871), is not contradictory. *Andrews* predated the first assault weapon, the German *Sturmgewehr*, by approximately 70 years and thus cannot possibly be read to express any opinion on their protected status.

demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms…"); *id.* at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms…"); *id.* ("American governments simply have not broadly prohibited the public carry of commonly used firearms…"); *accord, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) ("the sorts of weapons protected [a]re those 'in common use at the time'").

    *Bruen* and *Heller* derived the "common use" principle directly from the historical prohibition on "unusual" weapons identified in Blackstone's writings. *Bruen*, 142 S. Ct. at 2128, citing *Heller*, 554 U.S. at 627.  And Blackstone would have understood the term "usual" to refer specifically to use, since that term originally meant "accordant with *usage*." https://www.merriam-webster.com/dictionary/usual (emphasis added).[3]  That original definition persists to this day. *Id.*

     Herrera's arguments to the contrary are easily disposed of. Herrera notes that the Second Amendment protects all "bearable arms," Herrera Br. 18, but that only begs the operative question here – namely, whether assault weapons are arms in a constitutional, rather than literal, sense.  Herrera also seizes upon a stray statement in *Heller* regarding possession, *id.* (citing *Heller*, 554 U.S. at 625); *id.* at 27-28, but takes that statement completely out of context to distort its meaning.  In

---

[3]  This is reflected in the etymology of the word "usual" as a direct lineal descendant of the Latin term *usus*, which was derived from the Latin term *uti*, meaning "make use of, profit by, take advantage of." Given the frequent use of Latin in his writings, Blackstone would have been well aware of this lineage.

the pertinent passage, *Heller* said merely that its previous decision in *Miller* stood only for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. That statement is wholly consistent with the Court's numerous other statements in *Heller* and *Bruen*. *See Bruen,* 142 S. Ct. at 2128 ("the Second Amendment protects the *possession* and *use* of weapons that are "in common *use* at the time.") (emphasis added); *Id.* at 2160 ("Although *Heller* concerned the *possession* of a handgun in the home, the key point that we decided was that 'the people,' … have the right to *use* a firearm to defend themselves.") (emphasis added). This is further borne out in the governing legal principle identified in Blackstone's writings, establishing that the Second Amendment protects only commonly-used weapons – after all, if a weapon is not even commonly *possessed*, it naturally follows that it is not commonly *used*, either. But that statement is a far cry from a statement that mere common possession is enough; if the Court meant to protect mere possession, then its repeated statements regarding common use would be little but inexplicably misleading surplusage.

Finally, Herrera complains that "use" cannot be the relevant inquiry when determining if a weapon is an "arm" because that would leave no firearms protected, given that crime victims exceedingly rarely use firearms in self-defense. Herrera Br. 25. But if Herrera thinks that "use" provides too little constitutional protection, that is a matter for him to take up with the Supreme Court, which has made clear that "use" is the textual touchstone – this court is not free to depart from

the Supreme Court's commands merely because of practical concerns with those commands.[4]

While Herrera callously writes off the deaths of hundreds in mass shootings with assault weapons as "freakishly rare," Herrera Br. 37, the evidence in the record shows that the true rarity is the use of assault weapons in self-defense – at time of writing, we are aware of exactly *one* such instance, during the 2020 riots in Kenosha, Wisconsin. And Herrera fails to present any evidence showing that assault weapons are commonly used for any lawful purpose – whether that be self-defense or otherwise.

Likely recognizing the impossibility of equating "possession" and "use," and his lack of evidence of use, Herrera insists that he should be forgiven this failing because the burden of showing an *absence* of common use is the "*government's* burden" at *Bruen*'s second, historical step. Herrera Br. 23. Herrera offers this statement without reasoning and cites to no precedential authority. *Bruen* itself disposed of this notion. After setting out the applicable two-step standard

---

[4] This also invites three obvious responses. First, it is possible that the Court considered 0.8% use enough, across a nation of hundreds of millions of people, to show common use. Second, it is possible that the Court was considering uses beyond self-defense as "common uses." Or, third, it is possible that the issue of common use was not adequately briefed to the Court in *Heller* or *Bruen* – in the latter, common use was undisputed, 142 S. Ct. at 2134 – and thus it was not posited that guns are *not* commonly used in self-defense. This court need not choose among these possibilities because none helps Herrera, who does not offer in his response *any* instances of an assault weapon used for self-defense or any other lawful purposes, and obviously does not benefit from an interpretation of *Heller* and *Bruen* that calls their ultimate conclusions into question.

governing Second Amendment challenges, *Bruen* turned to the first step – the constitutional text:

> It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

142 S. Ct. at 2134 (cleaned up). After finding that such conduct fell within the Second Amendment's text, the Court concluded that the Second Amendment "presumptively" protected the petitioners and their desired conduct, *id.* at 2134-35, and only *then* turned to the question whether the government could overcome that presumption by "show[ing] that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2135.

These passages from *Bruen* conclusively establish that proof of "common use" is part of a plaintiff's initial textual burden in every Second Amendment case. The Court addressed that issue squarely in the middle of a paragraph expressly discussing the Amendment's text, and only after addressing that and other textual issues did the Court conclude that the presumption of constitutionality – a presumption it had just made clear only attaches when an activity falls within the Amendment's plain text, 142 S. Ct. at 2126 – was applicable and turn to the question of historical traditions.

This reading of *Bruen*, aside from being true to its text, also follows a natural, coherent logical progression, with the entirety of the first, textual step of the

analysis conducted in a single place, at the conclusion of which the Court proceeded to the second, historical step of the analysis.  Because Herrera has failed to show that assault weapons are commonly used, he has failed to carry his burden to show that they are "arms" within the meaning of the Second Amendment.  This court can thus affirm on that ground alone.

## II.    Assault Weapons Are Fundamentally Incompatible With The Limited Doctrine Of Self-defense Recognized At English Common Law And Are Thus Outside The Scope Of The Amendment's Protection.

Herrera's arguments face another insurmountable problem: the fundamental incompatibility of assault weapons with the form of moderate self-defense recognized in English law at the time of this nation's founding, expressly endorsed by early American courts, and operative in Illinois to this very day. County Br. 22-23. This incompatibility leaves assault weapons outside the scope of the Second Amendment's protection.

Herrera's halfhearted attempts to address this problem, Herrera Br. 34-35, fare even worse than his arguments regarding gunpowder.  Herrera begins with a truism that the Second Amendment trumps contrary Illinois law, *id.* at 34, but that does not come to grips with the County's actual argument.  The armed self-defense that the Second Amendment was designed to protect was inherently limited to moderate responses to perceived threats, and this historic limitation not only traveled across the Atlantic with the founding generation, but was expressly adopted by early American courts, *State v. Wells*, 1 N.J.L. 486, 493 (N.J. 1790), and persists to this very day in Illinois law.  Illinois law of self-defense does not

*supersede* the Second Amendment, but *informs* that Amendment's meaning, by reflecting the limited, traditional doctrine of self-defense that the Second Amendment was designed to protect. Herrera's argument that Illinois law of self-defense is not "all that probative of the Second Amendment's scope" because Illinois did not have a state constitutional right to bear arms until its 1970 constitution, Herrera Br. 35, misses the point. Current Illinois law continues to reflect the traditional, limited form of moderate self-defense that would have been familiar to the Founders, and thus protected by the Second Amendment. And because assault weapons are so unusually destructive and lethal both to intended targets and innocent bystanders as to make them fundamentally incompatible with that limited doctrine of self-defense, those arms fall outside the scope of that Amendment, just as do the military weapons they were derived from and so closely resemble.

Herrera next offers the frivolous claim that English law did not actually recognize a moderation principle of self-defense at all. While Herrera agrees that a homicide would not be excused under English common law when committed with "the wrong type of instrument," he claims that this principle did not apply to self-defense because Blackstone did not discuss it in the section of his writings discussing principles of self-defense. Herrera Br. 35. This argument elevates form over substance and demonstrates only that Herrera is as unfamiliar with basic principles of criminal law as he is with history.

As Blackstone recognized (and as continues to be the case today), killing in self-defense is but one form of excused homicide, another being homicide by

misadventure. 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 182 (1769). The principle of moderation Blackstone discusses is a limiting principle applicable to *all* forms of excused homicide, not merely forms of excused homicide *other than* self-defense. This is why Blackstone states that moderation principle in such general terms: if "he use his right beyond the bounds of moderation, then he is guilty of homicide." *Id.* at 183 (translated). That is, if an individual exercises his natural right to self-defense in a manner beyond the bounds of moderation, he has committed murder, or homicide *without justification or excuse. See id.* at 177.

In fact, Chief Justice Holt explained as early as 1705 that the moderation principle was a central component of English self-defense, holding that self-defense is inapplicable to "*excessive*" force because the law only protected the use of weapons that are actually "necessary for a man's defense." *Cockcroft v. Smith*, 11 Mod. 43 (King's Bench 1705). As Chief Justice Holt further explained, the law of self-defense did not give a man the right "in case of a small assault, [to] give a violent or unsuitable return." *Id.* This was because "hitting a man with a little stick on the shoulder, is not reason for him to draw a sword and cut and hew the other." *Id.*

The applicability of the moderation principle to self-defense is confirmed by early American caselaw – caselaw Herrera simply ignores – which rejected a claim of self-defense when the defendant used an instrument that was clearly unnecessary considering the threat he faced. *Wells*, 1 N.J.L. at 493. In reaching that conclusion, *Wells* relied on a decades-old English case, *Nailor's Case*, Fost. 278 (1704), in which the court rejected a plea of self-defense – despite the fact that the

10

defendant was pinned on the ground such that "he could not escape nor avoid the blows" of his attacker – because his use of a penknife to wound and ultimately kill an unarmed attacker was not necessary given the threat he faced. *Wells*, 1 N.J.L. at 492.

Perhaps recognizing that he cannot possibly deny the existence of a centuries-old limitation on the right to self-defense, Herrera tries to claim that the Framers would not have considered excessive or immoderate the use of weapons that create Coke-can-sized holes in their victims, because the Minié ball used in muskets during the American Civil War also "caus[ed] devastating wounds." Herrera Br. 35. This profoundly heartless argument is flawed on every imaginable level. Most obviously, it is anachronistic – Minié balls were not invented until the mid-1800s, and represented a revolutionary leap in firearms technology when compared to the round musket balls that preceded them. Isaac Shoop, *Small But Deadly: The Minié Ball*, THE GETTYSBURG COMPILER (April 30, 2019) https://gettysburgcompiler.org/2019/04/30/small-but-deadly-the-minie-ball/ (last visited June 25, 2023). The Framers thus could not possibly have anticipated their existence, let alone accepted them.

The Minié ball inflicted such devastating wounds because it functioned effectively as an expanding round – the ball was designed to flatten upon firing, to press it tightly into the rifling of the gun barrel, and as a result,

> [u]nlike a solid ball, which could pass through the human body nearly intact, leaving an exit wound not much larger than the entrance wound, the soft, hollow-based Minié ball flattened and deformed upon impact, while creating a shock wave that emanated outward.

11

The Minié ball didn't just break bones, it shattered them. It didn't just pierce tissue and internal organs, it shredded them. And if the ragged, tumbling bullet had enough force to cleave completely through the body, which it often did, it tore out an exit wound several times the size of the entrance wound. Civil War surgeons were quickly overwhelmed by the gaping wounds, mangled bodies and mutilated limbs they were asked to repair as the scope of the war broadened and casualties mounted.

Pat Leonard, *The Bullet That Changed History*, THE NEW YORK TIMES

(August 31, 2012). Compare this passage to the effects of the .223/5.56mm

ammunition commonly used in the AR-15:

5.56mm bullets, upon contacting tissue, will "yaw[.]" The yaw movement of a 5.56/.22 bullet can also cause it to fragment upon striking bone which contributes to additional tissue damage not immediately adjacent to the cavity itself. R 60-5 at 29, R60 at 38.

When a projectile fired from an AR-15 penetrates the human body, it creates a temporary cavity with devastating effects to surrounding organs.… Patients with assault rifle injuries frequently have multiple organs injured as well as major blood vessels.…  R. 60-12 at 2.

Bullets from AR-15 style rifles will have greater injury likelihood to fracture bones due to their higher energy release. Organs such as the liver and spleen, which are relatively inelastic organs due to their cellular structures, … are more severely lacerated due to the greater temporary cavity formation by these bullets that result in significant stretching and tearing, resulting in veins and arteries torn, resulting in immediate bleeding. R. 60-11 ¶14.

 The notion that the Framers, had they the opportunity to stand in the ashes

of a nation ravaged by a civil war that claimed more American lives than every

other American war *combined*, would have looked upon the grave injuries inflicted

by the Minié ball and thought that the weapons capable of inflicting those wounds

were compatible with moderate, non-excessive acts of self-defense, is patently

absurd. Indeed, we need not speculate as to the Framer's response to the Minié ball, because we have conclusive evidence of the national – truly, global – response to it and its ilk.  Use of ammunition akin to the Minié ball has been declared a war crime.

A nation reeling from the heartbreak of burying 1 in every 4 military-age Southern male did not respond to the horrors of the Minié ball with cold-hearted admiration for its lethality, but actively sought to condemn the horrors of that weapon for all generations to come.  In the debates leading to the signing of the Hague Convention of 1899, the United States unsuccessfully advocated for a ban on all ammunition that caused injuries as horrific as those inflicted by expanding ammunition like the Minié ball, because it would allow other weapons that inflicted such injuries to be used with impunity.  *Failing Our Troops*, 42 YALE J. INT'L L. 215, 249 (2017).  And the resulting narrower ban based solely on bullet design rather than effect, the Hague Declaration on Expanding Bullets, "has subsequently received virtually universal recognition" as customary international law.  *Id.*  The use of expanding ammunition was later explicitly declared a war crime under the Rome Statute of the International Criminal Court signed by the United States in 1998.  In a bit of sad irony, if Herrera is correct that the injuries inflicted by the Minié ball are comparable to those now inflicted by assault weapons, then the broader ban unsuccessfully proposed by the United States in 1899 would have encompassed assault weapons as well.

No rational person could possibly believe that the use of a historic weapon with effects on the human body *so horrific as to constitute a literal war crime* is an exemplar of a "moderate" use of force in ordinary civilian self-defense. The Second Amendment's scope cannot be contorted to mean that governments are powerless to stop atrocities from being inflicted on their denizens and innocent children that they thought too horrific even for the battlefield.

III.  **Gunpowder Regulations Demonstrate A Longstanding Tradition Of Regulating Arms Responsible For Mass Casualty Events.**

Even assuming the weapons in question here are protected by the plain text of the Second Amendment, there is a historical tradition of regulating weapons of such destructive force. As we explained in our opening brief, the historical prohibition on storage of gunpowder in the home, enacted after multiple mass-casualty events caused by gunpowder, is analogous to present-day regulations of assault weapons and large-capacity magazines. The aptness of this historical analogy is clear when considering, as required by *Bruen*, "why" those bans were enacted and "how" they affected individuals' ability to engage in armed self-defense. County Br. 30; *accord Atkinson v. Garland*, No. 22-1557, 2023 U.S. App. LEXIS 15357, at *5 (7th Cir. June 20, 2023) ("The proper inquiry, in short, turns on whether the 'modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'"). Herrera waived any argument on this point by addressing gunpowder in only a cursory, undeveloped footnote.  County Br. 37.

In his response, Herrera claims that he waived nothing below, Herrera Br. 34 n.10, but his arguments on that score are without merit.  According to Herrera, he could not have waived anything on appeal because he is supposedly permitted to make any argument he wants, without regard to the arguments he raised below. *Id.* (citing *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010)).  That is demonstrably wrong – the doctrine Herrera invokes from *Citizens United* is known as the "mere enlargement doctrine," *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 78 n.2 (1988), and is particular to the Supreme Court, which allows a petitioner for certiorari "to frame the question to be decided in any way he chooses, without being limited to the manner in which the question was framed below," *Yee v. City of Escondido*, 503 U.S. 519, 535 (1992).  But a doctrine derived from the Supreme Court's certiorari process has no possible application in *this* court, which has reminded attorneys "numerous times" that "undeveloped arguments are deemed waived on appeal," *United States v. Collins*, 604 F.3d 481, 487 n.2 (7th Cir. 2010), even where those arguments implicate constitutional issues, *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). And "undeveloped" is a particularly apt description of Herrera's discussion of gunpowder below – two cursory sentences buried in one of nearly seventy footnotes, and one of those sentences was not even an argument, but a conclusory statement that Herrera found it "difficult to see" how gunpowder bans were analogous to the laws at issue here.  R. 63 at 31 n.41.

As might be expected given Herrera's belief that he is categorically exempt from the rules of waiver, the waiver problems continue to plague him on appeal.

Notably, Herrera does not dispute *any* of the County's historical evidence.  He does not dispute that misuse of gunpowder led to repeated mass-casualty events in London and around Europe between the 16th and 18th centuries. County Br. 32.  He does not dispute that the legislative response to these tragedies was to completely ban the possession of gunpowder in the home, before relaxing that ban to allow storage of exceedingly small amounts. *Id.*  And he does not dispute that this country carefully regulated gunpowder at the founding and continues to do so to this very day.  *Id.* at 32-34.  More importantly, and despite *Bruen*'s specific instruction that the primary questions when weighing a proffered analogy for a challenged regulation are (1) "why" the regulations were enacted; and (2) "how" they affect individuals' ability to engage in lawful self-defense, 142 S. Ct. at 2133, Herrera does not even acknowledge this inquiry, let alone dispute that bans on assault weapons and high-capacity magazines align with historical regulations on gunpowder in both respects, County Br. 34-36.

Having failed to develop any meaningful response to the County's proffered gunpowder analogy, Herrera has waived any argument on that subject, *see Collins*, 604 F.3d at 487 n.2, and this court should affirm on that ground alone.  Indeed, affirmance on waiver grounds here is particularly appropriate in light of the canon of constitutional avoidance, *see Trump v. Thompson*, 20 F.4th 10, 45 (D.C. Cir. 2021), which most strongly counsels in favor of affirmance when, as here, a plaintiff seeks to enjoin duly enacted legislation on constitutional grounds, *see Markadonatos*

*v. Village Of Woodridge*, 760 F.3d 545, 566 (7th Cir. 2014) (en banc) (Hamilton, J., dissenting) (collecting authority).

Waiver aside, the arguments Herrera does make are meritless. Herrera begins by claiming that the Supreme Court already rejected historical gunpowder regulations as an analogy in *Heller*. Herrera Br. 34. *Heller* did no such thing – it merely rejected laws dictating where exactly gunpowder must be stored in the home as an analogy because "they do not remotely burden the right of self-defense *as much as an absolute ban on handguns*." 554 U.S. at 632 (emphasis added). Herrera also wrongly attributes to *Heller* the notion that gunpowder regulations only "support 'laws regulating the storage of firearms to prevent accidents.'" Herrera Br. 34. Rather, *Heller* merely clarified that its rejection of gunpowder storage laws as an analogy for handgun bans did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." 554 U.S. at 632.

Herrera's remaining cursory arguments regarding gunpowder, Herrera Br. 34, are not only waived because they were not presented below, but are meritless as well. Herrera declares that "the detachable magazines now banned are *safer* than other ways of storing firearms," *id.*, but this statement is incoherent as a magazine is not a "way[ ] of storing firearms" to begin with. Presuming that Herrera meant to say that it is safer to store a firearm with a detachable magazine than one without, that is simply irrelevant after *Bruen*, which definitively disposed of the sort of interest-balancing under which the effectiveness of a law relative to possible alternatives might be taken into account. *Bruen* established that the Second

Amendment inquiry focuses on the "why" and "how" of historical practices, 142 S.

Ct. at 2133, and Herrera conspicuously offers no argument on either subject.

Finally, Herrera argues that "regulations of unusually large quantities of

gunpowder," support only "regulations for large quantities of ammunition," Herrera

Br. 35, but this argument fails for two reasons.  First, historical regulations did not

prohibit only "unusually large quantities" of gunpowder – the London gunpowder

law categorically forbade possession of *any* gunpowder in the home, before relaxing

that prohibition to a modest two pounds.  SA19-23.  It should go without saying that

two pounds of gunpowder is not an unusually large quantity, by any stretch of the

imagination.  Second, to the extent that Herrera claims that gunpowder storage

laws support only a restriction on "large quantities" of ammo, he offers no actual

argument on that subject – no discussion of the "why" and "how" of gunpowder

regulations, as mandated by *Bruen* – only his *ipse dixit*, shorn of any reasoning or

justification.  That is far from enough.  *Collins*, 604 F.3d at 487 n.2.

Absent any serious dispute from Herrera whether gunpowder regulations are

analogous to the laws challenged here, he cannot possibly carry his burden of

showing likely success on the merits of his Second Amendment claim.  Accordingly,

this court should affirm on that ground alone.

**IV.    Spring Gun Regulations Demonstrate A Longstanding
        Tradition Of Regulating Firearms Incompatible With Lawful
        Self-Defense.**

Herrera also summarily declares, in a footnote, that historic regulations on

spring guns are "too far afield" to be considered analogous to the regulations at

issue here, Herrera Br. 32 n.8, but this cursory argument once again fails to engage with the "why" and "how" inquiries required by *Bruen*, 142 S. Ct. 2133. Again, such cursory arguments are waived. *Collins*, 604 F.3d at 487 n.2. Had Herrera engaged with the inquiry required by *Bruen*, he would have realized that the longstanding tradition of banning spring guns strongly supports the regulations at issue here because they demonstrate a longstanding tradition of regulating guns – even guns used in the home – that endanger innocent bystanders when used as designed.

The use of spring guns dates back to England in the latter half of the eighteenth century, when the practical impossibility of personally guarding large tracts of land against poachers made the use of spring guns "especially in vogue" from 1770 to 1825. Miller Christy, *Man Traps & Spring-Guns*, OUTING, vol. XLI, issue 6, at 729 (1903); *accord* Ed Tangen, *Spring Guns*, 1 AM. J. POLICE SCI. 307, 307 (1930) (noting that spring guns "were much used in England against poachers and trespassers"). Despite the popularity of spring guns, Parliament in 1827 banned the use of spring guns, with a limited exception for defense of one's home between sunset and sunrise. Spring Gun Act 1827, 7 & 8 Geo. 4, ch. 18 (now recodified as Offenses Against the Person Act 1861, 24 & 25 Vict., ch. 100, § 31). American law followed suit – to this day, states criminalize spring guns, *e.g.*, 720 ILCS 5/24-1(a)(5); Mich. Comp. Laws § 750.236, and the rule against their use is so well-settled in American law that first-year tort students study the famed spring gun case, *Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971).

This history of spring gun regulation is analogous to assault weapons bans in both "why" and "how" they burden the right to armed self-defense. Starting with the "why," spring guns were banned for two primary reasons. First, they risked injuring innocents; among the unintended victims of spring guns were children playing outdoors, a maid killed by a spring gun her employer set to guard his house, and a gardener killed by his employer's spring gun. Christy, *supra*, at 729-30. The problem, it was realized, was that spring guns – while effective deterrents against criminals – "did not possess the power to discriminate between a depredator and the owner of the property they were intended to protect" and "maimed or killed him just as promptly and impartially as it would have killed a trespasser and a thief." *Id.* at 730. Indeed, the debates over the 1827 English statute banning spring guns confirmed that Parliament was deeply concerned with unintended injury to innocents, with one member comparing the use of a spring gun to firing "a cannon" in the middle of a street to rid it of criminals. House of Commons Debates, March 23, 1827, vol. 17, cc19-34 (comments of William Smith). The concerns about unintended harm to innocent victims remains a driving force behind the rule against spring guns that persists in American law. *See Katko*, 183 N.W.2d at 661 (noting instances in which innocent policeman and small boy were killed by spring guns); *see also Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 733 (1998) (overruled in part in other grounds by *Aguilar v. Atlantic Ritchfield Co.*, 25 Cal. 4th 826, 853 n. 19 (2001) (noting "indiscriminate violence" spring guns inflict).

Second, spring guns were incompatible with English principles of self-defense, under which a landowner was guilty of murder if he "uses more force than is absolutely necessary" in his defense, due to "the sacred regard which our law every where exhibits for the life and safety of man—its tardiness and reluctance to proceed to extreme violence." Rev. Sydney Smith, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW, Vol. 35, Issue 70, at 417 (1821); *accord id.* at 414 ("You cannot shoot a man that comes on your land, because you may turn him off by means less hurtful of him . . ."); *id.* at 412-13 (also noting limits of English law). As Smith memorably summarized it: "If the Legislature enacts fine and imprisonment as the punishment for stealing turnips, it is not to be endured that the proprietor should award to this crime the punishment of death." *Id.* at 418. This fear was echoed by Parliament when banning spring guns, with one proponent noting the "anxious caution the law surrounds the life of man, even where the person slain has been the original aggressor; how minutely it exacts, that the object of attack shall not have exceeded the limits of a just and necessary defence." House of Commons Debates, *supra* (comments of Sir Edmund Carrington). This concern, too, underlies American laws against spring guns, which are outlawed specifically because their use is inconsistent with background principles of lawful self-defense. *See Katko*, 183 N.W.2d at 660.

The "why" behind assault weapons bans stems directly from these same concerns. Like spring guns, assault weapons pose significant danger to innocent

victims when used in self-defense – including when used in one's home, particularly in densely populated areas like Cook County.

Bans on assault weapons and bans on spring guns are also similar in "how" they burden the right to armed self-defense. As the English recognized when banning spring guns, those bans necessarily contemplated that guns could be seized by the government, depriving their owners of their use in self-defense. *See* Smith, *supra*, at 410-11 (noting that banning spring guns necessarily required "entering into enclosed lands to take away guns"). But those burdens were minimal because banning spring guns only required property owners to rely on the ordinary, commonplace weapons that were already available for lawful use in self-defense, like rifles and pistols. Bans on assault weapons have the exact same effect on individuals' right to armed self-defense, because they leave the individuals a host of lawful options for self-defense, whether they be handguns, rifles, or shotguns.

Herrera's arguments to the contrary, aside from being waived, are unavailing. Herrera begins by declaring, without citation, that spring guns were used only "to defend *property*," Herrera Br. 32 n.8, but that is demonstrably false. Defense of property was one common historic use of spring guns, but not the only one –they were also used for personal defense of the home, especially at night when a homeowner would not be awake to protect himself from an intruder. *See* Christy, *supra*, at 729 (noting accidental death of maid caused by spring gun placed in individual's home).

Next, Herrera makes the strange claim that bans on spring guns are not comparable because they did not constitute bans on "the firearms themselves," Herrera Br. 32 n.8, apparently envisioning spring guns as ordinary guns rigged to trees and doorways with strings. While that may be how some primitive spring guns operated, the more standard spring gun was a particular kind of gun with an integrated mounting device specially designed to serve that purpose. *See* Christy, *supra*, at 730-31 (providing three images of historic spring guns).[5] Thus, a ban on spring guns was properly understood as a ban on particular kinds of guns, not just particular uses of existing guns. Reflecting this fact, one of the most vocal English opponents of spring guns before their prohibition expressly acknowledged that a ban on spring guns necessarily contemplated that guns could be seized by the government. *See* Smith, *supra*, at 410-11 (noting that banning spring guns necessarily required "entering into enclosed lands to take away guns").

## V.    Herrera Has Waived Any Argument Regarding The Application Of The Nuanced Approach To Unprecedented Social Problems.

Even assuming arguendo that neither gunpowder nor spring guns, nor the analogies offered by the State, are sufficiently analogous to the present laws, that merely pushes this case into the farthest reaches of *Bruen*'s "nuanced approach" – applicable to truly unprecedented societal concerns for which analogies cannot realistically be demanded – which requires consideration not of analogies, but first principles of English common law. County Br. 39. Herrera does not meaningfully

---

[5] While Barnett claims spring guns are not bearable, Barnett Br. 47, that historical evidence shows otherwise.

engage with this argument, other than to cursorily declare those first principles "irrelevant" and cherry-pick language from a single case he deems "relevant." Herrera Br. 36. Such an undeveloped, cursory argument simply does not suffice, *Collins*, 604 F.3d at 487 n.2, and this court should affirm on that ground alone.

## VI.    Herrera's Remaining Arguments Are Frivolous.

Herrera's remaining arguments can be disposed of in short order. First, he argues that the Second Amendment categorically prohibits regulation of "commonly owned arms" in the home. Herrera Br. 30. His confusion regarding the permissibility of firearm regulations in the home likely stems from his failure to recognize that the law of affray (on which he focuses his entire attention) applied to terrors outside the home, while the law of nuisance (which he ignores) focused on terrors emanating from inside the home. Second, he argues from the Second Amendment's prefatory clause and the Supreme Court's decision in *Presser v. Illinois*, 116 U.S. 252 (1886), that the Second Amendment prohibits laws of the sort at issue here, because they interfere with the federal government's authority to regulate the militia. Herrera Br. 19-23. These arguments are so frivolous that they appear designed to *challenge Heller* and *Bruen*, rather than faithfully apply them. This court being without power to depart from rulings of the Supreme Court, it should reject Herrera's arguments as well.

Contrary to Herrera's notion that the "home" receives special constitutional immunity, Herrera Br. 30, *Bruen* made clear that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep

and bear arms." 142 S. Ct. at 2134.[6]  Herrera's arguments also fail as a historic

matter for the simple reason that there is a historic tradition of regulating weapons

in the home, as demonstrated by longstanding regulations of gunpowder and spring

guns, *both* of which expressly applied in the home.  *See, supra*, Sections II & III;

County Br. 34 n.4. Those laws definitively dispose of Herrera's attempt to

categorically exempt the home from regulation, regardless of whether they are

analogous to the regulations at issue here.

    Herrera's arguments regarding militias fares no better.  To the extent that

Herrera cites *Presser* as evidence of the Second Amendment's meaning, *Heller*

already rejected that notion, explaining in no uncertain terms that "*Presser* said

nothing about the Second Amendment's meaning or scope, beyond the fact that it

does not prevent the prohibition of private paramilitary organizations."  554 U.S. at

621.  Properly understood, then, *Presser*'s language prohibiting the States from

taking action to "deprive the United States of their rightful resource for

maintaining the public security, and disable the people from performing their duty

to the general government," 116 U.S. at 265-66, is merely an application of basic

Supremacy Clause principles.  Further, *Heller* made clear that the prefatory clause

may at most be employed to "resolve an ambiguity in the operative clause," but has

no other function, and "does not limit or expand the scope of the operative clause."

---

[6]  Herrera is well aware that an exemption barring any regulations from affecting
the home would effectively nullify virtually *every* existing restriction on firearm
possession.  The federal ban on possession of firearms by violent felons, for example,
could not possibly function if it was inapplicable in the home.

*Heller,* 554 U.S. at 577-78.  But that is precisely how Herrera tries to use the prefatory clause here when he argues that it expands the term "arms" to include "military equipment."  Herrera Br. 21 (quotation marks omitted), *Contra Heller*, 554 U.S. at 581 ("The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity.").  Such use of the prefatory clause is directly foreclosed by *Heller*, and that is the end of the matter.

## CONCLUSION

———

This court should affirm the judgment of the district court.

Respectfully submitted,

KIMBERLY M. FOXX
State's Attorney of Cook County

BY: s/Jessica M. Scheller
Jessica M. Scheller
Assistant State's Attorney
Chief; Advice, Business & Complex
Litigation Division
500 Richard J. Daley Center
Chicago, IL 60602
(312)603-6934
Jessica.Scheller@cookcountyil.gov

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

_____

    In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,999 words, beginning with the words "ARGUMENT IN REPLY" on page 1 and ending with the words "Respectfully submitted" on page 26. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

s/ Jessica M. Scheller
Jessica M. Scheller, Attorney

**CERTIFICATE OF SERVICE**

_____

    I certify that on June 25, 2023, I electronically filed the attached Reply Brief of Defendant-Appellees Cook County, Toni Preckwinkle, Kimberly M. Foxx, Thomas J. Dart with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jessica M. Scheller
Jessica M. Scheller, Attorney
