Nos. 23-1793, 23-1825, 23-1826, 23-1827, 23-1828 (consol.)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JAVIER HERRERA, et al.,

                                            Plaintiffs-Appellants,

   v.

KWAME RAOUL, et al.,

                                            Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division &
the Southern District of Illinois
Nos. 23-cv-00532, 23-cv-00209-SPM, 23-cv-00141-SPM,
23-cv-00192-SPM, 23-cv-00215-SPM
The Honorable Lindsay C. Jenkins & Stephen P. McGlynn, Judges Presiding
————

## REPLY BRIEF OF THE CITY OF CHICAGO
## AND SUPERINTENDENT OF POLICE
————

                          MARY B. RICHARDSON-LOWRY
                          Acting Corporation Counsel
                           of the City of Chicago
                          2 N. LaSalle Street, Suite 580
                          Chicago, Illinois 60602
                          (312) 744-3173

MYRIAM ZRECZNY KASPER
 Deputy Corporation Counsel
SUZANNE M. LOOSE
 Chief Assistant Corporation Counsel
ELIZABETH MARY TISHER
 Assistant Corporation Counsel
     Of Counsel

# TABLE OF CONTENTS

———

**Page**

**ARGUMENT** ........................................................................................... 1

**I.     HERRERA IS NOT LIKELY TO SUCCEED ON THE MERITS.** .............. 2

     **A.     Assault Weapons And High-Capacity Magazines Are Not In Common Use For Self-Defense.** ........................................... 3

     **B.     Assault Weapons And High-Capacity Magazines Are Dangerous And Unusual.** ..................................................... 8

     **C.     The City's Ordinance Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.** .......................... 13

**II.    HERRERA WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.** .................................................... 17

**III.   THE BALANCE OF EQUITIES FAVORS DEFENDANTS AND THE PUBLIC INTEREST.** ....................................................................... 19

**CONCLUSION** ..................................................................................... 21

# TABLE OF AUTHORITIES

———

**CASES**                                                    **Page(s)**

Atkinson v. Garland,
      No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023)................................ 14

Connection Distribution Co. v. Reno,
      154 F.3d 281 (6th Cir. 1998)......................................................................... 19-20

District of Columbia v. Heller,
      554 U.S. 570 (2008) ....................................................................................*passim*

Ezell v. City of Chicago,
      651 F.3d 684 (7th Cir. 2011) .................................................................. 18, 19, 20

Friedman v. City of Highland Park,
      784 F.3d 406 (7th Cir. 2015) ............................................................................ 6-7

Joelner v. Village of Washington Park,
      378 F.3d 613 (7th Cir. 2004) ....................................................................... 18, 20

New York State Rifle & Pistol Association v. Bruen,
      142 S. Ct. 2111 (2022) .................................................................................*passim*

Winter v. Natural Resources Defense Council, Inc.,
      555 U.S. 7 (2008) ............................................................................................... 18

**OTHER AUTHORITIES**

Chicago City Council Journal of Proceedings, July 7, 1992........................................ 15

Mark A. Frassetto, To the Terror of the People: Public Disorder Crimes & the
Original Public Understanding of the Second Amendment, 43 S. Ill. U. L.J. 61
(2018)....................................................................................................................... 15-16

# ARGUMENT

———

Assault weapons and high-capacity magazines are instruments of war.  In the hands of civilians, they enable perpetrators of mass shootings to unleash horrific carnage, pose a grave threat to law enforcement officers, instill terror in citizens, disrupt public life, undermine democracy, and impose significant economic and social costs on communities and municipal governments.  The City's ordinance banning these military-grade weapons passes constitutional muster, and for that reason alone, Herrera is not entitled to a preliminary injunction.

Herrera fails to show any likelihood that he will succeed on the merits.  He merely dusts off the same arguments he made in the district court, which we already refuted in our opening brief, and does not even respond to our most critical points.  He continues to press for a Second Amendment test that would afford constitutional protection to any bearable weapon – no matter how militaristic and destructive.  Neither <u>Heller</u> nor <u>Bruen</u> ties the government's hands in that way.

Herrera's arguments about irreparable harm and the balance of equities fare no better.  Herrera continues to have ample options for self-defense without an injunction.  And with the rise in violence perpetrated with assault weapons and high-capacity magazines, the risk to the public of enjoining the Chicago ban that has been in place since 1992 clearly outweighs the minor cost or inconvenience to Herrera.  For these reasons, the district court's judgment denying Herrera's request for a preliminary injunction should be affirmed.

## I.     HERRERA IS NOT LIKELY TO SUCCEED ON THE MERITS.

The evidence overwhelmingly demonstrates that the weapons Herrera seeks to use – AR-15 rifles and high-capacity magazines – are not protected by the Second Amendment because they are not in common use for self-defense, they are dangerous and unusual weapons of the sort that <u>Heller</u> said may be banned, and the City's ordinance is wholly consistent with a longstanding historical tradition of regulating dangerous and unusual weapons to quell terror and protect public safety and citizens' freedom to participate in public life.  For all these reasons, Herrera is not likely to succeed on the merits.

Herrera continues to flout all the tests that <u>Heller</u> and <u>Bruen</u> established. He rattles off bare numbers about ownership of "semi-automatic rifles," but does not show that those weapons are kept for the purpose of, or actually used for, self-defense, as required under <u>Bruen</u>.  And while Herrera insists that AR-15 rifles are vastly different from the militaristic M-16 rifles that <u>Heller</u> said may be banned, he then turns around and argues that AR-15s are entitled to Second Amendment protections precisely *because* they are useful in military service.  Along those same lines, he touts the effectiveness of AR-15s for purposes of "collective defense," despite that <u>Heller</u> held, and <u>Bruen</u> reaffirmed, that the Second Amendment guarantees an *individual* right to self-defense unconnected to the militia.  And, finally, he ignores <u>Bruen</u>'s explicit direction to consider whether the early laws and their modern counterparts impose comparable burdens and whether those burdens are comparably justified.  His arguments are meritless and should be rejected.

## A.  Assault Weapons And High-Capacity Magazines Are Not In Common Use For Self-Defense.

Assault rifles are owned by a small percentage of gun owners (8%) and an even smaller percentage of Americans overall (2%).  R. 52-4 ¶ 27.  An even more miniscule number of Americans purport to own assault rifles for self-defense – well below 1%.  Brief and Short Appendix of City of Chicago and Superintendent of Police ("City Br.") 12.  Nor are high-capacity magazines commonly owned for self-defense – many of the firearms owned for self-defense do not even accommodate high-capacity magazines.  R. 60-4 ¶ 133.

Herrera nevertheless continues to insist that these instruments are "popular."  Brief of Plaintiff-Appellant Javier Herrera ("Herrera Br.") 2, 18, 22, 25, 26, 28, 29, 33, 41.  But even if popularity were decisive, Herrera's statistics do not hold water.  They provide no context for determining how common assault weapons and high-capacity magazines actually are, relative to handguns and other firearms, among gun owners in the civilian population.  And his numbers are misleading in other ways.  For example, he contends that "[r]ifles account for at least one-third of the civilian stock of firearms," id. at 24 (citing R. 52-4 at 26), but that number includes *all* rifles, R. 52-4 ¶ 28 (Figure 14).  Only 5.3% of all firearms in circulation are *assault* rifles – and that estimate includes those possessed by law enforcement agencies.  R. 52-4 ¶ 27.[1]

---

[1]  Herrera contends the district court "did *not* adopt arguments that semiautomatic rifles are not common."  Herrera Br. 24.  That is misleading, too.  The court did not address common use at all because it concluded the laws here fit comfortably within the historical tradition of regulating particularly dangerous weapons.  A13.  The

But more important, the determination of what weapons are protected under the Second Amendment is not a mere popularity contest. Indeed, <u>Heller</u> did not resort to ownership headcounts when it determined that handguns are the preferred weapon for self-defense; it relied on rigorous studies showing that, in the vast majority of circumstances, the weapons that people *actually use* to defend themselves are handguns. <u>District of Columbia v. Heller</u>, 554 U.S. 570, 628-29 (2008); City Br. 13-14. And, as <u>Heller</u> recognized, the reason is simple: handguns offer myriad advantages that make them suitable for both personal and home defense. 554 U.S. at 629; City Br. 14, 24. Put simply, <u>Heller</u> shows that counting the number of firearms alone is not enough to answer the question whether a category of firearms is commonly used and suitable for purposes of self-defense. <u>See</u> City Br. 13-14.

Despite this analysis, Herrera insists that <u>Heller</u>'s common-use test asks nothing more than whether the weapons at issue are "'typically *possessed* by law-abiding citizens *for lawful purposes*.'" Herrera Br. 26 (quoting <u>Heller</u>, 554 U.S. at 625). But, in reaching that conclusion, he simply ignores the studies on defensive gun use undergirding <u>Heller</u>'s central premise and the Court's repeated statements in <u>Heller</u> and <u>Bruen</u> that the Second Amendment protects an individual right to self-defense, which we discuss at length in our opening brief. City Br. 10-18. Instead of addressing these points, he constructs a straw man out of our argument

court, therefore, did not need to consider whether these weapons are in common use to conclude that banning them passes constitutional muster.

that, to obtain Second Amendment protections, a weapon must be, not just commonly *owned*, but commonly *used* for purposes of self-defense.  Herrera Br. 25.  "Under that logic," Herrera argues, "*no* firearms would be in common use," because "victims of violent crimes do not use *any* firearms to defend themselves 99.2% of the time."  Id. (quotation omitted).  But we do not argue that common use among all victims of violent crimes is the test, or that a firearm must be discharged in a defensive situation to be considered "used" for purposes of self-defense.  It is nevertheless telling that, as Heller made clear, the vast majority of people who defend themselves or their homes reach for a handgun, not an assault rifle.  It is similarly telling that, according to analyses of the NRA's own data on defensive use of weapons, the average number of shots fired in self-defense is 2.2.  R. 54-5 at 8, 22.  So, it would be an extremely *uncommon* – indeed almost non-existent – situation to need for self-defense a magazine that holds more than 15 rounds.

Moreover, while Herrera identifies reasons some people might prefer assault weapons, and even makes the astonishing assertion that assault weapons are "safer to keep in homes" than loaded shotguns or revolvers, Herrera Br. 26, he does nothing to dispute the overwhelming evidence we present in our opening brief about how unsuitable assault weapons and high-capacity magazines are for self-defense, see City Br. 12-18.  He ignores the potential for harm to innocent people, even when assault weapons are used in defensive situations.  And while Herrera touts how lightweight and easy to control assault weapons are, he ignores that those features exist precisely because these weapons were specifically designed for war – so that

5

soldiers could carry them into the battlefield and use them to shoot as many enemy combatants as possible in a short period of time. R. 52-6 ¶¶ 30-34; R. 52-7 ¶ 32; City Br. 21-22. They are no more suitable for self-defense, even in the home, than other extraordinarily lethal weapons of war, such as machine guns, bazookas, grenade launchers, or hand grenades. Moreover, it is their light weight and ease of control that makes assault weapons the weapons of choice for perpetrators of mass shootings and allows them to strike multiple victims in a matter of minutes from a rooftop, hotel room, or other concealed location. R. 52-10 ¶¶ 26, 27, 29; City Br. 26, 44. In short, assault rifles are most compatible with *offensive*, not *defensive* uses.

On Herrera's view, if a weapon can be used to kill or incapacitate a home intruder, it is suitable for self-defense, no matter the risks to friends, family, neighbors, and other innocent bystanders. But that cannot be what <u>Bruen</u> meant by "facilitate armed self-defense." <u>New York State Rifle & Pistol Association v. Bruen</u>, 142 S. Ct. 2111, 2132 (2022). By Herrera's logic, even a machine gun – which <u>Heller</u> said "may be banned," 554 U.S. at 627 – would "facilitate" self-defense because even an unskilled homeowner armed with a machine gun could spray 750 to 900 bullets per minute in the close confines of a hallway and strike an intruder with ease.

Beyond all that, Herrera's position that the Second Amendment protects any weapon that is widely owned by American citizens falls into the very trap that this court warned of in <u>Friedman v. City of Highland Park</u>, 784 F.3d 406 (7th Cir. 2015). As this court explained, "relying on how common a weapon is at the time of

litigation would be circular" because "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." Id. at 409.  In other words, "[a] law's existence can't be the source of its own constitutional validity." Id.  It would be just as absurd to say that the reason why particular weapons *cannot* be banned is because manufacturers and retailers aggressively market and sell large numbers of those weapons before the societal problems associated with them become large enough for legislative bodies to react.  Yet that is precisely what Herrera advocates here.  AR-15 rifles owe their popularity today largely to the "rapid increase in the number of companies that manufacture" AR-15s and similar assault rifles, R. 52-7 ¶ 41, coupled with the aggressive marketing campaigns manufacturers mounted to rebrand these previously marginalized firearms as "modern sporting rifles" and push them on young American men, all in the wake of the 2004 expiration of the federal assault weapons ban, R. 52-7 ¶¶ 38-50.  In essence, Herrera's "popularity" test would leave gun manufacturers in control of the scope of Second Amendment rights.  That would be a perverse and unprecedented means of determining the scope of a constitutional right of any kind and should not be sanctioned.

Finally, Herrera argues that it is not his burden to show his AR-15 rifles and high-capacity magazines are in common use, but rather it is the government's burden to show they "are uncommon" in order to "liken their bans to historical regulations." Herrera Br. 23.  But he cites only the district court's decision in Barnett to support the point.  Id.  And since neither Heller nor Bruen supports that

7

ruling, it should not be followed here – indeed, <u>Barnett</u> should be reversed for the same reasons the district court's decision in this case should be affirmed.  In any event, for purposes of this appeal from the denial of a preliminary injunction, it does not matter where the burden ultimately lies on the common-use question.  Either way, Herrera must show a likelihood of success on the merits, and the evidence adduced in this case overwhelmingly shows that assault weapons and high-capacity magazines are not commonly used for self-defense.  That is clear even accepting the 24 million assault weapons Herrera claims are in circulation.  Herrera Br. 24.  As we explain above, that remains a small percentage of firearms, and only a subset of those are claimed to be kept for self-defense.  It defies all credibility to characterize these numbers – or anything else in the record – as showing assault weapons or high-capacity magazines to be commonly used for purposes of self-defense.

### B.    Assault Weapons And High-Capacity Magazines Are Dangerous And Unusual.

Consistent with the longstanding "historical tradition of prohibiting the carrying of dangerous and unusual weapons," <u>Heller</u> pronounced that those "weapons that are most useful in military service – M-16 rifles and the like – may be banned."  554 U.S. at 627.  As we explain in our opening brief, AR-15 rifles are, in all relevant respects, "like" M-16s – they share the same military heritage and possess nearly all the same features that make them effective killing machines on the battlefield.  City Br. 21-25.

Herrera admits that the Second Amendment does not protect M-16s.  <u>See</u> Herrera Br. 22 ("No one contests that the government may lawfully regulate fully

8

automatic functionality of firearms."); id. at 29 ("Heller did not doubt that the
government can regulate machineguns like M16s[.]"); id. at 33 ("Herrera does not
challenge the constitutionality of . . . laws regulating automatic machineguns[.]").
And there is no principled basis to treat AR-15 rifles any differently than M-16s.
The only functional difference Herrera identifies is that AR-15s are semiautomatic
and capable of firing 45 rounds per minute, while M-16s can switch to fully
automatic mode and fire roughly 750 to 900 rounds per minute.  Id. at 29; see also
id. at 19 n.2 (fully automatic firearms "can fire 800 or 970 rounds per minute").
Herrera's attempt to use this comparison to minimize the destructive capabilities of
AR-15s is shocking.  There can be no serious doubt that a firearm that can
discharge 45 rounds per minute has an extremely deadly amount of fire power.  The
perpetrator of the Las Vegas shooting used an AR-15 to shoot hundreds of rounds in
a matter of minutes, killing 58 concertgoers and injuring several hundred more.
R. 52-10 ¶ 29.  Likewise, the perpetrator of the Highland Park shooting fired 83
rounds in under 60 seconds, striking 55 parade attendees and killing seven, also
with an AR-15.  R. 52-2 ¶ 19.  These are staggering death rates for such short
periods of time.  And that is no less true just because there are other weapons
capable of killing even more people in such a short time span.

Moreover, while Herrera accuses the City of "stretch[ing] the facts," Herrera
Br. 19 n.2, and "conflating" AR-15s with fully automatic firearms, id. at 29, we
pointed out the differences in our opening brief, City Br. 22 ("AR-15 lacks the fully
automatic mode"); id. at 22-23 ("M-16 is capable of firing 750 to 900 rounds per

minute when set to fully automatic mode, compared to 45 rounds per minute in semiautomatic mode"). And we also provided extensive expert testimony explaining why those differences do not make AR-15s any less dangerous. Id. at 22-23. In particular, we explained that the U.S. Army's preferred combat mode is semiautomatic, R. 52-7 ¶ 34; R. 52-11 ¶ 49, because that mode "allows targeting of specific human targets with repeated accurate shots rather than inaccurate, indiscriminate spray," R. 52-7 ¶ 34 (quotation omitted), and thus "more accurately, effectively, and sustainably" inflicts "mass casualties," R. 52-11 ¶ 49. See City Br. 23. Herrera does not even acknowledge this evidence, much less identify any to the contrary.

In the same vein, Herrera contends that there are pistols not banned under the City's ordinance that fire up to 100 rounds *more* per minute than AR-15s and that "virtually all traditional hunting rifles" "fire at even *greater* speeds and distances" than AR-15s. Herrera Br. 29 n.6. But Herrera ignores that it is a combination of features that makes the AR-15 such an effective killing machine. R. 52-10 ¶¶ 26-27. And for that reason, AR-15s are overwhelmingly the weapon of choice for perpetrators of mass shootings.

Next, in a baffling about-face, Herrera pivots from protesting that AR-15s are not like military-grade M-16s to urging that they must be protected by the Second Amendment *because* they are useful for military purposes. Not only does this argument completely undermine Herrera's attempt to distinguish AR-15s from M-16s, but it flips upside down what Heller has to say about military-grade weapons.

Herrera latches onto the Second Amendment's prefatory clause, and its reference to a "well-regulated militia," to argue that the Second Amendment guarantees the right to possess weapons for "collective defense," Herrera Br. 19, 21, 28, 31, 41, 44; for "defence [sic] of community against invasion or oppression," id. at 22 (quotation omitted); for "common defense of the country," id. at 29; "for maintaining the public security," id. at 21; to enable citizens "to come to the country's defenses in wartime," id. at 29; and to protect "against the usurpation of illegal power," id. at 21-22 (quotation omitted). Herrera also relies on the prefatory clause to argue that the type of weapons the Second Amendment protects are "war arm[s]," id. at 21 (quotation omitted); "weapons of warfare," id. at 22 (quotation omitted); and weapons that are "useful as ordinary military equipment," id. at 21 (quotation omitted). That is flatly wrong. As we explain in our opening brief, relying on the prefatory clause as a source of a constitutional right to military-grade weapons is a non-starter, as Heller firmly put to rest any notion that military-grade weapons are covered by the Second Amendment. City Br. 25-26. Heller explained that modern developments in weapons technology "have limited the degree of fit between the prefatory clause and the protected right," and that arms that are "most useful in military service," like M-16 rifles and similar "sophisticated" firearms, "may be banned." 554 U.S. at 627. The Court even found it "startling" to suggest that "weapons useful in warfare are protected." Id. at 624.

Herrera seems to believe that, so long as a military-grade weapon is "widely popular," Herrera Br. 22, 28, 41, it is beyond the reach of lawmakers. On Herrera's

view, then, if machine guns had never been banned in the first place and enough gun enthusiasts purchased them before legislative bodies tried to regulate them, they could not be banned – regardless of the potential carnage that could result from spraying up to 900 rounds per minute.  Or for that matter, governments theoretically could never ban bazookas, grenade launchers, or any other weapons of war that are horrifically destructive and incompatible with self-defense, so long as gun manufacturers have already managed to flood the market with them.  Heller plainly did not share that view, since it disapproved of Second Amendment protection for M-16 rifles without any discussion of their popularity among law-abiding citizens.

Herrera's focus on the usefulness of military weapons for the "collective defense" suffers another glaring flaw – as Heller explained, the right of "the people" described in the operative clause of the Second Amendment is, like the right of "the people" described in the First, Fourth, and Ninth Amendments, an *individual*, not "collective," right.  554 U.S. at 579; see also id. at 592 (Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation."); id. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."); id. at 616 ("It was plainly the understanding in the post-Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense."); id. at 622 (Miller "is not only consistent with, but positively suggests, that the Second Amendment confers an individual right to keep and bear arms[.]").

And <u>Heller</u> repeatedly held that this individual right is "unconnected with militia service." <u>Id.</u> at 605; <u>see also</u> <u>id.</u> at 610 ("The 19th-century cases that interpreted the Second Amendment universally support an individual right unconnected to militia service."); <u>id.</u> at 616 ("Every late-19th-century legal scholar that we have read interpreted the Second Amendment to secure an individual right unconnected with militia service."). <u>Bruen</u> reaffirmed: "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." 142 S. Ct. at 2125. Thus, any utility that an AR-15 may have in defending one's community or country places it *outside* the scope of the Second Amendment, rather than within it.

## C.     The City's Ordinance Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.

As we explain in our opening brief, and which Herrera ignores, from the founding era to the present day, lawmakers have sought to protect public safety and preserve citizens' freedom to participate in public life by enacting restrictions on dangerous and unusual weapons responsible for causing terror and instigating violent crime. The City's ordinance seeks to address these same concerns. <u>See</u> City Br. 31-32. And the City's ordinance – banning assault weapons and high-capacity magazines – places no more of a burden on the right to self-defense than its historical predecessors. It leaves on the table myriad handguns and other firearms that are widely used and suitable for purposes of self-defense.

Herrera asserts that the public carry laws we rely on "are inapposite here" because they prohibited the carrying of weapons "*outside* the home," unlike the City's ordinance, which prohibits the possession of "commonly owned arms *in*

*homes*." Herrera Br. 30.  But that is just an identification of an obvious difference between the earlier public carry restrictions and the City's ordinance – it does nothing to address, let alone diminish, the comparable burdens and justifications between those laws.  In our opening brief, we identify several justifications for the City's ban, including that assault weapons and high-capacity magazines wreak an unprecedented level of destruction on society, cause collective trauma, and undermine the public's sense of security in public spaces.  City Br. 36-45.  We also point out that perpetrators of mass shootings can easily acquire assault rifles kept lawfully in the home, id. at 43, and when used in self-defense, these weapons can cause devastating injuries, including to unintended targets, even in the privacy of one's own home, id. at 43-44.  The only way to quell public terror and prevent devastating injuries and fatalities is to ban assault weapons and high-capacity magazines outright in both public and private spaces.  Id. at 45.

Herrera engages with none of this discussion.  Instead, he shrugs off the entire historical analysis as mere interest-balancing.  Herrera Br. 41-42.  That facile approach cannot be squared with Bruen, which requires a comparison of the burdens and justifications of the historical laws with the modern challenged laws.  See 142 S. Ct. at 2133; see also Atkinson v. Garland, No. 22-1557, 2023 WL 4071542, at *2 (7th Cir. June 20, 2023).  And, as we explain in our opening brief, to determine whether the historical laws address a comparable societal problem in a comparable way, it is important to understand why both the founders and today's lawmakers adopted a particular restriction.  City Br. 40.  Public carry laws were

enacted to quell public fear and prevent violent crime, id. at 40-42; so, too, was the City's ordinance, id. at 2-3; Chicago City Council Journal of Proceedings, July 7, 1992, 19197. In a similar vein, gunpowder regulations were enacted to prevent mass death and did not prevent individuals from exercising the right of self-defense, see Opening Brief and Short Appendix of Cook County 31-38; so, too, does the City's ordinance. Again, that is not interest-balancing; it is the analogizing that Bruen requires.

Herrera attempts to minimize mass shootings as "freakishly rare" events, Herrera Br. 37, that are perpetrated by "deranged criminals," id. at 41. And he points out how there were "only" 53 such shootings between 2002 and 2017. Id. at 37. But, as we explain in our opening brief, City Br. 37, the phenomenon of mass shootings is growing by leaps and bounds – there have been more than five times the number of mass shootings resulting in ten or more fatalities since the federal ban was lifted than there were before it was enacted, R. 52-4 ¶ 21; R. 52-14 ¶ 19 (Table 7). It is not clear how many more mass shootings there must be, or how many school children, concert attendees, or parade observers must actually die at the hands of mass shooters, before Herrera thinks the problem is significant enough for the government to take action. But whatever Herrera's opinion, there is no historical support for the notion that the number of injuries or deaths must reach a certain critical mass before a legislative body can take action to address the budding societal concern. It was enough that the regulated weapons, by their very nature, struck terror in the people and threatened their use and enjoyment of public spaces.

Mark A. Frassetto, <u>To the Terror of the People: Public Disorder Crimes & the Original Public Understanding of the Second Amendment</u>, 43 S. Ill. U. L.J. 61, 62, 68 (2018); City Br. 40-42.  Assault weapons and high-capacity magazines also strike terror because of their extraordinarily lethal features and their outsize use in high-visibility mass shootings.  City Br. 36-38.

Herrera next quarrels with the notion that assault weapons and high-capacity magazines represent dramatic technological changes, arguing that "[f]irearms capable of causing devastating wounds have long existed."  Herrera Br. 35.  He cites only one example, though – Minié ball ammunition, which was "used in Civil War muskets" and caused a "bursting type wound," comparable to the "Coke-can-size" wounds left behind by AR-15s.  <u>Id.</u>  That one particularly deadly form of ammunition was used in the Civil War does not undermine the conclusion that the instruments at issue here are unprecedented in the threat they pose to civilians and the level of destruction they wreak on society.

Finally, Herrera trundles out the prefatory clause again to argue that colonial-era militia laws actually *required* citizens to "have their own arms and learn how to use them."  Herrera Br. 28.  But his arguments about the importance of a "well-regulated militia" gain no further traction in this context.  As we explain above, <u>Heller</u> effectively eliminated the relevance of the militia in evaluating the scope of Second Amendment rights to modern weapons, so militia laws of the colonial-era provide no relevant analog today.  That only makes sense.  The laws of yesteryear requiring civilians to own and train with muskets, carbines, and rifles,

see id., tell us nothing about the extent to which the founders believed they could regulate dangerous and unusual weapons. On the contrary, the historical laws we cite strongly suggest that, if the founders had been confronted with a weapon that had the killing power and disproportionate use in mass murder that assault weapons and high-capacity magazines do today, they no doubt would have believed they could ban it outright.

## II.  HERRERA WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

Herrera will not suffer irreparable harm absent an injunction. He will still be able to exercise the right to self-defense by using one of his two Glock handguns equipped with lower-capacity magazines, or by using any of the other myriad firearms that remain lawful under the City's ordinance. He identifies no authority suggesting his inability to use the firearm of his choosing constitutes irreparable harm. City Br. 46.

Herrera also fails to show that irreparable harm would result from his alleged inability to bring his AR-15 to SWAT trainings. Herrera is a volunteer medic, R. 1 ¶ 25, and according to the Special Operations Commander for the Illinois State Police, he should never need to handle an AR-15 during missions, nor train with one, R. 52-16 ¶¶ 9-11; City Br. 47. Herrera responds that he need not "defer to the government parties" regarding whether he should be handling and training with his AR-15, because he does not "work for" their "departments." Herrera Br. 48 n.13. But whether a person participating in SWAT training is a government employee or not, the protocols for medics remain the same. And, under

those protocols, a medic "should not have any reason to handle" an AR-15 during missions.  R. 52-16 ¶ 10.

And even if Herrera were required to bring an AR-15 to SWAT trainings, he does not explain how the City's law makes it impossible for him to do so.  He complains that his work obligations keep him too busy to make the four-hour roundtrip to retrieve his rifle from, and return it to, storage, Herrera Br. 48, but he does not claim there are no storage facilities closer to the training location, nor explain why he could not ask another SWAT team member to hold onto his rifle for him or retrieve it from storage, or use another member's spare rifle.  Herrera has the burden to show he will suffer irreparable harm, <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 20 (2008), and he has not carried that burden.

Herrera continues to rely on <u>Ezell v. City of Chicago</u>, 651 F.3d 684 (7th Cir. 2011), to argue that irreparable harm is presumed.  Herrera Br. 45-50.  But <u>Ezell</u> explained that irreparable harm is presumed only for "some kinds of constitutional violations," not all, and certainly not every Second Amendment one.  651 F.3d at 699.  And while the court analogized to presumed irreparable harm in First Amendment cases, <u>id.</u>, there are circumstances when that presumption does not apply, such as where the challenged regulation seeks to "minimize the deleterious secondary effects" of the allegedly protected conduct, <u>Joelner v. Village of Washington Park</u>, 378 F.3d 613, 620 (7th Cir. 2004).  That is certainly the case here, where the City's ordinance seeks to protect the public from the deleterious effects of assault weapons and high-capacity magazines.

18

Moreover, Herrera's alleged harm, Herrera Br. 46, is a far cry from the harm in <u>Ezell</u>. As we explain in our opening brief, City Br. 48-49, the ordinance in <u>Ezell</u> mandated range training as a prerequisite to lawful gun ownership, while also prohibiting all firing ranges in the city, <u>id.</u> at 689-90. The court held that these provisions stood "as a fixed harm to every Chicagoan's Second Amendment right to maintain proficiency in firearm use by training at a range." <u>Id.</u> at 699. There is no similar fixed harm here. Moreover, unlike the shooting range ban in <u>Ezell</u>, the ordinance here does not require that Herrera's Second Amendment rights "be exercised in another jurisdiction." <u>Id.</u> at 697. As we explain above, Herrera is still free to keep firearms for purposes of self-defense in his Chicago home.

## III.  THE BALANCE OF EQUITIES FAVORS DEFENDANTS AND THE PUBLIC INTEREST.

The district court properly weighed the equities and concluded that they favor defendants and the public interest. A30-A31. As we explain in our opening brief, assault weapons and high-capacity magazines are increasingly used in violent crime, including high-fatality mass shootings, and the City's ordinance has already aided in removing thousands of such weapons from the streets. City Br. 49-50. Thus, enjoining enforcement of any of the bans that apply in Chicago would risk a serious increase in violent crime. <u>Id.</u> at 50. On the other hand, as we explain above, Herrera will suffer little, if any, harm absent a preliminary injunction.

Herrera argues that "freestanding public-safety concerns cannot trump the public's interest in 'preventing the violation of a party's constitutional rights.'" Herrera Br. 51 (alteration omitted) (quoting <u>Connection Distribution Co. v. Reno</u>,

154 F.3d 281, 288 (6th Cir. 1998)).  But the case he cites involves the First

Amendment, Reno, 154 F.3d at 284, which protects freedom of speech, and is thus

quite different from the alleged Second Amendment right asserted here – the right

to use a military-grade weapon for self-defense.  The relative public safety concerns

are far more significant than Herrera's claimed injury, especially since Herrera can

still keep firearms, other than his AR-15 rifles, in his home.  And even in the First

Amendment context, where a regulation seeks to prevent public safety threats, the

court looks beyond the merits to the balance of harms.  Joelner, 378 F.3d at 620.

Finally, Herrera again relies on Ezell to argue that defendants could avoid

harm by easily "re-tool[ing] firearm safety within their jurisdictions."  Herrera Br.

51.  But Ezell did not involve a ban on extraordinarily lethal weapons that are used

in mass shootings and other violent crime across the City.  It involved a ban on

shooting ranges, which despite the preliminary injunction, the City could continue

to regulate under its zoning and safety regulations without opening the door "to a

parade of firing-range horribles."  651 F.3d at 711.  Here, by contrast, enjoining the

ban on assault weapons and high-capacity magazines would open the door to a

parade of violent-crime "horribles."  As we explain above, there are no comparable

safety regulations that would protect the public in the same way.  And the evidence

before the district court demonstrated that bans on these instruments actually

work; when those bans are lifted, violent crime increases.  City Br. 50.  The district

court did not abuse its discretion in concluding that the significant public-safety

interests outweigh Herrera's purported interest in using his preferred firearm.

## CONCLUSION

———

For the foregoing reasons, this court should affirm the district court's

judgment denying Herrera's request for a preliminary injunction.

Respectfully submitted,

MARY B. RICHARDSON-LOWRY
Acting Corporation Counsel
  for City of Chicago

s/ Elizabeth Mary Tisher

BY:    ELIZABETH MARY TISHER
       Assistant Corporation Counsel
       2 N. LaSalle Street, Suite 580
       Chicago, Illinois 60602
       (312) 744-3173
       elizabeth.tisher@cityofchicago.org
       appeals@cityofchicago.org

## CERTIFICATE OF COMPLIANCE

_____

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(ii) and Cir. R. 32(c).  This brief contains 5,543 words, beginning with the word "Argument" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word processing system used to prepare the brief.

s/ Elizabeth Mary Tisher
ELIZABETH MARY TISHER, Attorney

## CERTIFICATE OF SERVICE

_____

I certify that on June 26, 2023, I electronically filed the attached Reply Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Elizabeth Mary Tisher
ELIZABETH MARY TISHER, Attorney