Nos. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, et al., | ) | Appeal from the United States |
| | ) | District Court for the Southern |
| Plaintiffs-Appellees, | ) | District of Illinois |
| | ) | |
| v. | ) | No. 3:23-cv-00209-SPM |
| | ) | |
| KWAME RAOUL, et al., | ) | The Honorable |
| | ) | STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) | Judge Presiding. |

(Full Caption on Next Page)

## REPLY BRIEF OF THE STATE PARTIES

**SARAH A. HUNGER**
Deputy Solicitor General
**IVAN PARFENOFF**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

Attorneys for the State Parties

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Nos. 23-1793, 23-1825, 23-1826, 23-1827 & 23-1828 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 3:23-cv-00209-SPM |
| KWAME RAOUL, Attorney General of the State of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, | ) ) ) ) ) | The Honorable STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) | Judge Presiding. |
| DANE HARREL; C4 GUN STORE, LLC; MARENGO GUNS, INC.; ILLINOIS STATE RIFLE ASSOCIATION; FIREARMS POLICY COALITION, INC.; and SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, | ) ) ) ) ) ) | |
| Defendants-Appellants, | ) ) | No. 3:23-cv-00141-SPM |
| and | ) ) | |

| | | |
|---|---|---|
| JAMES GOMRIC, in his official capacity as State's Attorney of St. Clair County, Illinois; JEREMY WALKER, in his official capacity as State's Attorney of Randolph County, Illinois; PATRICK D. KENNEALLY, in his official capacity as State's Attorney of McHenry County, Illinois; RICHARD WATSON, in his official capacity as Sheriff of St. Clair County, Illinois; JARROD PETERS, in his official capacity as Sheriff of Randolph County, Illinois; ROBB TADELMAN, in his official capacity as Sheriff of McHenry County, Illinois, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | The Honorable |
| | ) | STEPHEN P. McGLYNN, |
| Defendants. | ) | Judge Presiding. |

| | | |
|---|---|---|
| JEREMY W. LANGLEY, TIMOTHY B. JONES, and MATTHEW WILSON, | ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRENDAN KELLY, in his official capacity as Director of the Illinois State Police, | ) ) ) | No. 3:23-cv-00192-SPM |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLE PRICE SHANER, in his official capacity as State's Attorney of Crawford County, Illinois, | ) ) ) | |
| | ) | The Honorable |
| | ) | STEPHEN P. McGLYNN, |
| Defendant. | ) | Judge Presiding. |

| | | |
|---|---|---|
| FEDERAL FIREARMS LICENSEES OF ILLINOIS, an Illinois not-for-profit corporation; GUNS SAVE LIFE, an Illinois not-for-profit corporation; GUN OWNERS OF AMERICA, a California non-stock corporation and a not-for-profit membership organization; GUN OWNERS FOUNDATION, a Virginia non-stock corporation and a not-for-profit legal defense and educational foundation; PIASA ARMORY, a Missouri corporation; DEBRA CLARK; JASMINE YOUNG; and CHRIS MOORE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois<br><br><br><br><br><br><br><br><br><br>No. 3:23-cv-00215-SPM |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| JAY ROBERT "J.B." PRITZKER, in his official capacity as Governor of the State of Illinois; KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellants. | ) ) ) | The Honorable STEPHEN P. McGLYNN, Judge Presiding. |
| JAVIER HERRERA, | ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant, | ) ) | |
| v. | ) | |

KWAME RAOUL, in his official
capacity as Attorney General for the
State of Illinois; BRENDAN F. KELLY,
in his official capacity as Director of the
Illinois State Police; COOK COUNTY,
ILLINOIS, a body politic and corporate;
TONI PRECKWINKLE, in her official
capacity as County Board of
Commissioners President; CITY OF
CHICAGO, a body politic and
corporate; KIMBERLY M. FOXX, in her
official capacity as Cook County State's
Attorney; THOMAS J. DART, in his
official capacity as Sheriff of Cook
County; and DAVID O'NEAL BROWN,
in his official capacity as
Superintendent of Police for the
Chicago Police Department,

        Defendants-Appellees.

No. 1:23-cv-00532

The Honorable
LINDSAY C. JENKINS,
Judge Presiding.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................i

ARGUMENT ....................................................................................................... 1

I.    Plaintiffs are unlikely to succeed on the merits of their claim that the Act's restrictions on assault weapons and LCMs violate the Second Amendment. ................................................................................................ 2

      A.    Plaintiffs failed to show that assault weapons and LCMs are protected under the plain text of the Second Amendment. ................... 2

            1.    LCMs are not "arms." ........................................................ 2

            2.    Plaintiffs bear the burden to show that assault weapons and LCMs are in common use for self-defense today. .................... 5

            3.    Assault weapons and LCMs are not in common use for self-defense. ........................................................................... 9

      B.    In any event, the Act's restrictions on assault weapons and LCMs are consistent with this country's tradition of firearms regulation. ................................................................................... 12

            1.    The "more nuanced approach" applies. .......................... 13

            2.    The Act is "relevantly similar" to historical analogues ................ 18

      C.    *Bruen* does not dictate a different result than in *Friedman* and *Wilson*. ................................................................................... 24

II.    Herrera has not shown a likelihood of success on the merits of his claim challenging the endorsement affidavit requirement. ........................... 25

CONCLUSION .................................................................................................. 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State,*
    50 Tenn. 165 (1871) ........................................................................ 3

*Atkinson v. Garland,*
    No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) .................................. 6

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. *passim*

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ....................................................... *passim*

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ......................................................... 23

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ....................................................... 2-3, 4

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ...................................................................... 8

*McHenry v. Raoul,*
    No. 21-3334, 2022 WL 636643 (7th Cir. Jan. 12, 2022) .................................... 1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .............................................................. *passim*

*Staples v. United States,*
    511 U.S. 600 (1994) ...................................................................... 9

*State v. Huntly,*
    25 N.C. 418 (1843) ..................................................................... 19

*State v. Reid,*
    1 Ala. 612 (1840) ....................................................................... 3

*United States v. Alaniz,*
    No. 22-30141, 2023 WL 3961124 (9th Cir. June 13, 2023) ............................... 6, 20

*United States v. Miller*,
    307 U.S. 174 (1939) ................................................................. 7, 8, 26

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ............................................................ 24

**Statutes, Regulations, and Rules**

Cal. Penal Code
    § 30510 ................................................................................. 11
    § 30515 ................................................................................. 11

Conn. Gen. Stat. Ann. § 53-202a ......................................................... 11

D.C. Code § 7-2501.01 ...................................................................... 11

Del. Code Ann. tit. 11, § 1465 ............................................................ 11

720 ILCS 5/24-1.9 .......................................................................... 11

720 ILCS 5/24-1.10 .......................................................................... 4

Md. Code, Crim. Law § 4-301 ............................................................. 11

N.J. Stat. § 2C:39-1 ......................................................................... 11

N.Y. Penal Law § 265.00 ................................................................... 11

Wash. Rev. Code Ann. § 9.41.010 ....................................................... 11

**Other Authorities**

*4-H Shooting Sports: Muzzle Loader Project*, Michigan State University ................ 14

*Connect with U.S. Stamps*, Smithsonian National Postal Museum ..................... 10

*Dungeons and Dragons and COVID-19: A Critical Success*, Temple University
    (Feb. 16, 2021) .......................................................................... 10

*Girardoni Air Rifle as Used by Lewis and Clark*, NRA Museums ....................... 15

Koper, Christopher S., et al., *Updated Assessment of the Federal Assault Weapons
    Ban: Impacts on Gun Markets & Gun Violence, 1994-2003* (2004) ................ 23

Magill's Glock Store ............................................................................... 3

Peterson, Harold Leslie, *Arms and Armor in Colonial America, 1526-1783*
    (1956) ............................................................................................. 15

*Six-Barreled Pepperbox Disk Primer Pistol with Case and Accessories,*
    The Met ......................................................................................... 14

*Veganism and Vegetarianism in the United States – Statistics & Facts,*
    Statista ......................................................................................... 10

Wier, S. K., *The Firearms of the Lewis and Clark Expedition* ................... 15

Winant, Lewis, *Firearm Curiosa* (1955). ................................................. 14

## ARGUMENT

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court clarified that the framework for Second Amendment claims "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. As explained in State Defendants' opening brief, no plaintiff has shown that they are likely to succeed under either inquiry on their claim that the restrictions on assault weapons and large capacity ammunition feeding devices ("LCMs") in the Protect Illinois Communities Act ("Act") are unconstitutional.[1] Plaintiffs' primary rejoinder is to reimagine the applicable standard as one that hinges on whether the restricted "arm" is in common use at the time of litigation. And if it is, plaintiffs assert, then the government cannot restrict it. But there is no basis for this extreme approach, which would effectively eliminate *Bruen*'s historical inquiry and allow the marketplace to dictate the constitutionality of laws restricting firearms. This court should reject plaintiffs' arguments on this and other fronts and conclude that they are not entitled to preliminary injunctive relief.

---

[1] For the same reasons discussed, State Br. Section IV, plaintiffs are not likely to succeed on the remaining preliminary injunction factors. Furthermore, there is no merit to the claim that economic injuries suffice "when, as here, the defendants have Eleventh Amendment immunity." *Barnett* Br. 56. If that were the case, then preliminary injunctive relief would always be warranted against a State when a plaintiff alleges a constitutional violation and economic harm. *Cf. McHenry v. Raoul*, No. 21-3334, 2022 WL 636643, *1 (7th Cir. Jan. 12, 2022).

I.    **Plaintiffs are unlikely to succeed on the merits of their claim that the Act's restrictions on assault weapons and LCMs violate the Second Amendment.**

A.    **Plaintiffs failed to show that assault weapons and LCMs are protected under the plain text of the Second Amendment.**

Plaintiffs are unlikely to succeed for the threshold reason that they failed to demonstrate that assault weapons and LCMs fall within the Second Amendment's text. Specifically, plaintiffs have failed to show that LCMs—which are accessories unnecessary to operate firearms—are "arms" or that LCMs and assault weapons, which are offensive, militaristic weapons, are "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (internal quotations omitted).

1.    **LCMs are not "arms."**

As an initial matter, LCMs are accessories, not "arms" under the Second Amendment's text. As explained, State Br. 17-18, there is ample evidence that during the Founding and Reconstruction eras, "arms" referred to weapons, whereas related accessories like ammunition containers and cartridge boxes were considered "accoutrements," Doc. 37-8 ¶¶12, 30-35, 40. Because LCMs are also "containers which hold ammunition," they are not "arms" within the meaning of the Second Amendment. Doc. 37-7 ¶¶22, 29; Doc. 37-8 ¶26 (earliest use of "magazine" associated with firearms and ammunition was as "a bullet storage container").

Plaintiffs contend that this is wrong but offer conflicting reasons why. Herrera asserts that LCMs are "arms" because magazines are "necessary" to operate firearms that are themselves protected by the Second Amendment. *Herrera* Br. 38 (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir.

2

2014); *Andrews v. State*, 50 Tenn. 165 (1871); *State v. Reid*, 1 Ala. 612 (1840)). But Herrera conflates the items regulated by the Act (LCMs) with those that are not (magazines generally). And as the *Barnett* plaintiffs rightly appear to recognize, LCMs—as opposed to magazines generally—are not "necessary" to operate firearms. *Barnett* Br. 34 (court need not "ask what is necessary for self-defense; it simply asks whether a bearable instrument facilitates armed self-defense") (cleaned up). Indeed, as explained, State Br. 19, all firearms that can accept a detachable LCM can also accept magazines that hold fewer rounds (which are not restricted by the Act) and work just as well, Doc. 37-7 ¶25. And firearms with "fixed magazines" may be "plugged" or shortened" to reduce round capacity. *Id.* ¶22.

Herrera also asserts that State Defendants' evidence is "wrong as a factual matter" because a "semiautomatic firearm is designed to be used with the magazine that comes with it or replacements by the original equipment manufacturer," and using "non-standard magazines" raises a risk of malfunctioning. *Herrera* Br. 39 (cleaned up). But this testimony ignores that manufacturers offer a number of different magazines for their rifles and handguns, including the Glock 45 that Herrera owns.[2] Indeed, "[f]or AR-15s and handguns, even where magazines with capacities of more than 10 rounds are prevalent, the industry always offers 10-round or 'compliant' magazines as an option." Doc. 37-7 ¶26; *id.* ¶25 ("manufacturers all offer the optional purchase of 10 round or even lower capacity

---

[2] *E.g.*, Magill's Glock Store, https://www.glockstore.com/Glock-45-9mm (selling Glock 45 with 10-round or 17-round magazine).

magazines" for rifles "sold with a 30 round magazine"). In short, there is no merit to the claim that the Act regulates accessories that are necessary to the operation of firearms.

Nor is there any merit to the argument that the Second Amendment extends to any accessories that "facilitate" the operation of firearms for self-defense. *Barnett* Br. 34. The reason that the Second Amendment applies to restrictions on accessories or components that are necessary to operate a firearm is because such restrictions are, in effect, a restriction on the use of the firearm itself. *E.g.*, *Jackson*, 746 F.3d at 967. The same is not true for accessories that facilitate, but are not necessary to, the operation of a firearm. And here, individuals in Illinois remain able to purchase and possess magazines and ammunition necessary to operate their firearms. 720 ILCS 5/24-1.10; State Br. 19-20.

Finally, the *Barnett* plaintiffs incorrectly assert that there is a substantial difference between LCMs, which "feed ammunition into the firing chamber," and "cartridge cases and boxes," which are "boxes for storing ammunition when it was not in use." *Barnett* Br. 32-33 (cleaned up). For starters, the firearm itself performs the "feeding" action that places a round into an empty chamber. *E.g.*, Doc. 37-9 ¶29 (for semiautomatic weapons, "[t]he energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot"). And like cartridge boxes, LCMs hold the excess ammunition. *E.g.*, Doc. 37-7 ¶24. To be sure, technology has advanced such that the rounds in LCMs are now held in "spring-loaded preparation for feeding into the receiver of a firearm" (as opposed to separate

4

boxes), but the function and purpose is the same. *Id.* ¶22. Thus, plaintiffs cannot show that LCMs, which are recognized by the industry as accessories, Doc. 37-7 ¶29, are "arms" within the Second Amendment's text.

> ## 2. Plaintiffs bear the burden to show that assault weapons and LCMs are in common use for self-defense today.

As State Defendants explained, State Br. 20-24, even if LCMs were "arms," plaintiffs did not satisfy their step-one burden for the additional reason that they failed to provide evidence that assault weapons or LCMs are "in common use today for self-defense." *Bruen*, 132 S. Ct. at 2134 (internal quotations omitted). Plaintiffs contend, however, that they do not have the burden to show that assault weapons and LCMs are in "common use" because that inquiry properly belongs in *Bruen*'s second step, where the burden shifts to the government. *Barnett* Br. 29-30; *Herrera* Br. 23. According to plaintiffs, the plain-text step turns on a different inquiry, though they do not agree what that is: Herrera asserts that firearms are presumptively protected by the plain text so long as they are "bearable," *Herrera* Br. 18 (internal quotations omitted), whereas the *Barnett* plaintiffs believe that the plain text covers "all modern instruments that facilitate armed self-defense," *Barnett* Br. 27 (internal quotations omitted). All plaintiffs are incorrect.

To start, plaintiffs' collective view that the plain-text step does not include a "common use" inquiry cannot be squared with *Bruen*, which concluded that the "arms" at issue there (handguns) were presumptively protected by the plain text because they are "in common use today for self-defense." 142 S. Ct. at 2134 (internal quotations omitted). Indeed, the Ninth Circuit recently determined that

*Bruen*'s threshold inquiry "requires a textual analysis," that includes "determining . . . whether the weapon at issue is 'in common use' today for self-defense." *United States v. Alaniz*, No. 22-30141, 2023 WL 3961124, *3 (9th Cir. June 13, 2023) (quoting *Bruen*, 142 S. Ct. at 2134). And to the extent that *Bruen* discussed "common use" in its historical analysis, that was in assessing whether a proffered historical regulation was an appropriate analogue, which is a different exercise. 142 S. Ct. at 2143 (discussing the tradition of regulating firearms "in common use at the time") (cleaned up).

In reality, plaintiffs' attempt to place the "common use" inquiry into the historical analysis is part of their broader strategy to replace the *Bruen* text-and-history standard with an inquiry based on the popularity of the regulated weapons at the time of litigation. According to plaintiffs, the "common use" inquiry is part of assessing whether the challenged regulation is consistent with the historical tradition of regulating firearms, *see Barnett* Br. 29-30; *Herrera* Br. 23, which in turn hinges solely on whether the "arm" is in common use *today*, *see Barnett* Br. 35. In other words, plaintiffs' view is that if an instrument is commonly owned by Americans at the time of litigation, then the government cannot restrict it. *Barnett* Br. 22; *Herrera* Br. 27. This proposed standard runs counter to the text and spirit of *Bruen* because, if accepted, it would effectively eliminate the historical inquiry. *E.g.*, *Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542, *1 (7th Cir. June 20, 2023) (*Bruen*'s "approach anchors itself exclusively in the Second Amendment's text and the pertinent history of firearms regulation").

6

In any event, the alternative plain-text standards proposed by plaintiffs are flawed for additional reasons. For his part, Herrera takes the view, which even the *Barnett* plaintiffs do not endorse, that the Second Amendment protects all arms that someone can bear. *Herrera* Br. 18. But as explained, State Br. 26-27, by using the phrase "bearable arms," the Court did not mean that the Second Amendment presumptively protects any weapons that a single person can bear, like shoulder-fired rocket launchers. On the contrary, the Court made clear that the Amendment protects an individual right to armed self-defense, which necessarily excludes firearms that do not further that right, such as "weapons that are most useful in military service" or those typically used for criminal purposes. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *United States v. Miller*, 307 U.S. 174, 178 (1939) (short-barreled shotguns). But under Herrera's proposed standard, courts would undertake no inquiry at the first step into whether the restricted arm is used for a lawful, civilian purpose (let alone for self-defense), and, combined with plaintiffs' proposed "common use" test at the second step, would render the government powerless to ban any commonly owned weapons that a single person could carry, no matter how dangerous or harmful. *Bruen* does not require that extreme result.

The *Barnett* plaintiffs alternately contend that all modern instruments that "facilitate" self-defense are covered by the Second Amendment, irrespective of whether those instruments are suitable, or actually used, for self-defense. *Barnett* Br. 27 (internal quotations omitted). But as explained, State Br. 25-26, the passage from *Bruen* that plaintiffs cite for that argument is part of the Court's discussion of

7

the historical methodology required under the second step.  It does not establish the standard for the plain- text inquiry.  *Id.*  Furthermore, plaintiffs provide no support for eliminating the inquiry into how the weapon is "used."  *See Barnett* Br. 24, 40-41; *Herrera* Br. 25.  On the contrary, *Heller* described the "'common use'" inquiry as an "important limitation on the right to keep and carry arms."  554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179).  Without this limitation, weapons that could in theory facilitate self-defense, but that are actually predominantly used for criminal or other unlawful purposes—for example, short-barreled shotguns or Bowie knives—would satisfy plaintiffs' standard.  In all events, however, plaintiffs would not prevail under their version of the standard because, as explained, State Br. Section II.A.3, assault weapons and LCMs are not suitable for, and are often counterproductive to, typical self-defense scenarios.  Accordingly, Americans select other weapons, like handguns and shotguns, to possess and use for self-defense purposes.  *Id.*

Finally, there is no merit to plaintiffs' alternative suggestion that they need only show that a weapon is in common use for lawful purposes, as opposed to self-defense.  *E.g.*, *Barnett* Br. 24; *Herrera* Br. 26.  As explained, State Br. 24, this argument is inconsistent with the plain-text standard outlined in *Bruen*, as well as the fact that the touchstone of the Second Amendment is individual self-defense.  *See, e.g.*, *Bruen* 142 S. Ct at 2132, 2134 ("in common use today for self-defense") (internal quotations omitted); *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) ("Second Amendment protects the right to keep and bear arms for the

purpose of self-defense"); *Heller*, 554 U.S. at 628 ("inherent right of self-defense" is "central to the Second Amendment"); *id.* at 630 ("core lawful purpose of self-defense"). Furthermore, as also explained, State Br. 27, plaintiffs derive this standard—that the firearm need only be "typically possessed by law-abiding citizens for lawful purposes"—from a statement taken out of context from *Heller*.

In short, this court should reject plaintiffs' various attempts to craft a standard that would eliminate the historical inquiry from, and is otherwise inconsistent with, *Bruen*'s text-and-history framework.

### 3. Assault weapons and LCMs are not in common use for self-defense.

Plaintiffs assert, however, that even if they were required to show that assault weapons and LCMs are in common use for self-defense, they have done so. *Barnett* Br. 29, 35-39; *Herrera* Br. 24-25. This is incorrect. At the threshold, there is no merit to the argument that the Supreme Court resolved this question in *Staples v. United States*, 511 U.S. 600 (1994). *E.g.*, *Barnett* Br. 1, 20. As explained, State Br. 22, *Staples* was not a Second Amendment case, did not assess what kinds of weapons are "arms" covered by that Amendment, and was decided in 1994, when federal law did not prohibit assault weapons.

Furthermore, the evidence in the record does not show common use. On the contrary, it shows that approximately 6.4 million Americans possess an AR-style rifle, which is less than 2% of Americans and 8% of gun owners. Doc. 37-4 ¶27. And the 24 million AR-style rifles in circulation are only 5% of the 461.9 million firearms in circulation. *Id.* These numbers are a far cry from the 50% to 60% of Americans

that owned the weapons deemed common at the Founding (muskets and fowling pieces), Doc. 37-11 ¶15, or the 50% of modern gun owners who possess handguns, Doc. 37-4 ¶28.

But more fundamentally, plaintiffs' method of demonstrating commonality does not withstand scrutiny. According to plaintiffs, AR-15-style rifles are "common" because there are more in circulation than Ford "F-150s, the most popular vehicle, on the road" and the "total U.S. daily newspaper circulation." *Barnett* Br. 36-37 (internal quotations omitted); *see also Herrera* Br. 25 (fewer lawyers and teachers than "Americans who own semiautomatic rifles"). But these metrics are cherry-picked, and there are plenty that point in the other direction. For instance, nearly four times as many Americans collect stamps (22 million) as own AR-15-style rifles, and there are more Americans who play Dungeons and Dragons (9.5 million) or are vegan (13 million) than own these rifles.[3] In other words, plaintiffs' approach is as unprincipled as it is "circular." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). And under it, the validity of a law could turn on any number of factors unrelated to the purpose and use of the regulated weapons, such as the regulatory landscape or the sales and marketing priorities of manufacturers and dealers. *Id.* at 409 (discussing role of firearm bans

---

[3] *Connect with U.S. Stamps*, Smithsonian National Postal Museum, https://s.si.edu/3r3YsuV; *Dungeons and Dragons and COVID-19: A Critical Success*, Temple University (Feb. 16, 2021), https://bit.ly/3NK3hT3; *Veganism and Vegetarianism in the United States – Statistics & Facts*, Statista, https://bit.ly/3NmVitS.

in commonality); Doc. 37-7 ¶¶39-40 (discussing production and marketing trends before, during, and after federal assault weapons ban).

When plaintiffs' arbitrary approach to commonality is put to one side, they have no meaningful answer to State Defendants' substantial evidence that, while the defining features of assault weapons and LCMs make them effective in offensive scenarios (such as on the battlefield), they are not suitable or in common use for self-defense. State Br. 28-32. The *Barnett* plaintiffs engage with none of this evidence, except to suggest in their Statement of the Case that the features regulated by the Act facilitate self-defense by "enhanc[ing] one's ability to fire . . . accurately and repeatedly," *Barnett* Br. 10, and that the Act is broader than necessary and out of step with the many States and localities that have enacted similar restrictions, *id.* at 11-15. On the contrary, as explained, State Br. 28-32, the features regulated by the Act are not necessary for self-defense and were designed to facilitate shooting in offensive scenarios. And it is common for States, like Illinois, to adopt a two-fold definition of assault weapons, in which they identify specific models by name and list features that, individually or in combination, make specific firearms qualify as assault weapons.[4]

---

[4] *Compare* 720 ILCS 5/24-1.9(a)(1)(A) *with, e.g.*, Cal. Penal Code § 30510(a), 30515(a)(1)-(2); Conn. Gen. Stat. Ann. § 53-202a(1)(A)(i), (E); Del. Code Ann. tit. 11, § 1465(6)(a)(2); D.C. Code § 7-2501.01(IV); Md. Code, Crim. Law § 4-301(h)(1)(i); N.J. Stat. § 2C:39-1(4); N.Y. Penal Law § 265.00(a); Wash. Rev. Code Ann. § 9.41.010(2)(a)(i), (iv).

Herrera likewise does not engage with State Defendants' evidence that assault weapons and LCMs are offensive, militaristic weapons unsuitable for self-defense. Instead, he argues that the militaristic nature of these weapons supports *his* theory because the Second Amendment recognizes both an individual and collective right, *Herrera* Br. 19, and thus protects "civilians' weapons commonly owned for lawful purposes that are also useful as ordinary military equipment," *id.* at 21 (internal quotations omitted). In addition to being premised on the incorrect assumption that the "common use" inquiry extends beyond self-defense to any "lawful purposes," as well as that assault weapons and LCMs meet the standard under either formulation, this argument cannot be squared with *Heller* and *Bruen*, which held that the Amendment guaranteed an individual rather than a collective right, *Heller*, 554 U.S. at 580-92, and recognized that the individual right is "unconnected to militia service," *id.* at 610; *see also Bruen*, 142 S. Ct. at 2127 (right "does not depend on service in the militia"). Nor can it be reconciled with the Court's recognition that "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Heller*, 554 U.S. at 627.

**B.    In any event, the Act's restrictions on assault weapons and LCMs are consistent with this country's tradition of firearms regulation.**

Even if plaintiffs had shown that the Second Amendment's text protects assault weapons or LCMs, they did not clearly show that the government will be unable to satisfy its burden of demonstrating that the Act is "consistent with this Nation's historical tradition." *Bruen*, 142 S. Ct. at 2126. The two "central

considerations" for determining whether the historical inquiry is satisfied are "whether [the] modern and historical regulations impose a comparable burden on the right of armed self-defense and . . . whether that regulatory burden is comparably justified." *Id.* at 2133 (cleaned up). And where, as here, the modern regulation implicates "unprecedented societal concerns or dramatic technological changes," courts should apply a "more nuanced approach" to the inquiry. *Id.* at 2132; State Br. 39. Because the Act is analogous to the historical tradition of regulating dangerous and unusual weapons under that approach, State Br. 44-49, plaintiffs cannot succeed on their Second Amendment claim.

### 1. The "more nuanced approach" applies.

As an initial matter, and contrary to plaintiffs' arguments, the "more nuanced approach" applies because the Act implicates both dramatic technological changes and unprecedented societal concerns. As to technological changes, the Act regulates items that were not in existence during the Founding or Reconstruction eras and that were made possible only by advancements in weapons technology in the mid-20th century. State Br. 39-41; *Friedman*, 784 F.3d at 410. And the phenomenal lethality associated with these technological advancements has allowed lone shooters armed with assault weapons and LCMs to murder many people at once. As explained, State Br. 41-43, the increasing frequency and severity of these mass shootings confirms this is an unprecedented societal concern.

Plaintiffs assert that there have been no "dramatic technological change[s]" in the relevant weapons technology because firearms "that could fire several rounds

without reloading" have existed since the 16th century and "[s]emiautomatic firearms" were invented in the late 19th century. *Barnett* Br. 53. This mischaracterizes both the prevalence and the capabilities of multi-shot weapons in the past.

As explained, single-shot firearms like muskets and fowling pieces remained the standard firearm through the Civil War. State Br. 40-41; Doc. 37-12 ¶¶44-45. Indeed, although there were a handful of "experimental multi-shot guns" that existed in and before the Founding era, Doc. 37-12 ¶36, they were highly unusual and flawed curiosities that were dangerous to the shooter, State Br. 40. For instance, plaintiffs refer to a 1580 multi-shot firearm, *Barnett* Br. 4, citing a book from the 1950s entitled *Firearm Curiosa* that described these weapons as "strange and freakish fabrications."[5] And though plaintiffs discuss "[p]epperbox-style pistol[s]," *Barnett* Br. 4, those small, six- or seven-shot pistols relied on flintlock technology and, later, muzzle-loading, percussion lock ignition systems—neither of which allowed for rapid fire of large quantities of ammunition like assault weapons and LCMs.[6]

Similarly, the Girardoni air rifle, which was invented in 1779 for the Austrian army, utilized compressed gas from a hand air pump that took around 1,500 pumps to fully load and then fire a full 22 rounds—nothing like modern

---

[5] Lewis Winant, *Firearm Curiosa* (jacket cover) (1955), https://bit.ly/44h4E1i.

[6] *Six-Barreled Pepperbox Disk Primer Pistol with Case and Accessories*, The Met, https://bit.ly/3NJLwDr; *4-H Shooting Sports: Muzzle Loader Project*, Michigan State University, https://bit.ly/3CJRoGB.

assault weapons that can be loaded and fire dozens of rounds in seconds.[7]  And despite plaintiffs' observation that the rifle "was famously carried on the Lewis and Clark expedition," *Barnett* Br. 4 (internal quotations omitted), it was essentially unknown to the American public and described as "a curious piece of workmanship" by one visitor to the expedition.[8]  Similarly, there is little evidence of the 16-shot repeating rifle that Joseph Belton demonstrated before the Continental Congress in 1777, *see Barnett* Br. 4, and no record of how it operated.[9]

Ultimately, the first practical firearm that could shoot more than one bullet without reloading was not invented until 1830s (the Colt revolver) and did not proliferate until after the Civil War.  State Br. 40-41.  And even then, the multi-shot weapons in circulation during Reconstruction were not "ubiquitous," as plaintiffs claim.  *Barnett* Br. 53.  On the contrary, "reliable hand-held arms with capacities greater than ten rounds remained exceedingly rare in the United States when the Fourteenth Amendment was ratified."  Doc. 37-13 ¶47.  As one example, Winchester produced only 74,000 of its "Henry" and "Winchester" models between 1861 and 1871, about 64,000 of which were sold to foreign governments.  *Id.* ¶59.  Furthermore, as plaintiffs admit, these weapons were not semiautomatic.  *Barnett*

---

[7] *Girardoni Air Rifle as Used by Lewis and Clark*, NRA Museums, https://bit.ly/3NKd8bF.

[8] S. K. Wier, *The Firearms of the Lewis and Clark Expedition* at 7-8, https://bit.ly/3pcmvrn.

[9] Harold Leslie Peterson, *Arms and Armor in Colonial America, 1526-1783* at 217-18 (1956), https://bit.ly/3NpC46U.

Br. 6-7.  Indeed, the "famed Winchester 73," *id.* at 6, "was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot," Doc. 37-12 ¶46.

Finally, while firearms with semiautomatic capabilities came into existence during the late 19th and early 20th centuries, the enormous technological advancements during the second half of the 20th century render modern assault weapons materially different from the seven-round semiautomatic pistols produced at the turn of the century.  State Br. 41; Doc. 37-13 ¶73 (semiautomatic pistols sold in early 20th century came with seven-round magazine).  This omission is critical, because it is the Cold War-era developments—which enabled rifles to fire rounds at a "high velocity," "high rate of delivery," and "high degree of accuracy at long range," Doc. 37-14 ¶14 n.5—that distinguish assault weapons from earlier semiautomatic firearms.  *E.g.*, Doc. 37-9 ¶¶40-64 (describing new combination of features of 1950s-era assault rifles, such as detachable magazines, pistol grips, threaded barrels, gas-powered semiautomatic fire, steel stamping, barrel shrouds, and flash hiders); Doc. 37-6, Ex. B (1962 field report describing AR-15 as "superior in virtually all respects" to the M-1 rifle, Thompson machine gun, and the Browning automatic rifle, among others); Doc. 37-14 ¶29 (AR-15-style rifles "more destructive" than Thompson machine guns).  The assault weapons and LCMs regulated by the Act thus are different in almost every respect from the single-shot, muzzle loading muskets of 1791, the revolvers and repeating rifles of the 19th century, and the seven-round semiautomatic pistols of early 20th century, including in their rate of

fire, ease of reloading, power, range, sustained accuracy, and ultimately, lethality. State Br. 40-41.

Plaintiffs also claim that the "more nuanced approach" does not apply because mass shootings are not an unprecedented societal concern as "mass murder has been a fact of life in the United States for a very long time." *Barnett* Br. 55. But the Act is not responding to the threat of mass murder generally. As explained, State Br. 41-42, the Act responds the modern and unprecedented public-safety threat of lone shooters increasingly using assault weapons and LCMs to commit multiple murders within minutes or even seconds.

Indeed, State Defendants' evidence showed that, before the advent of modern weapons technology, mass murder was "a group activity" where "like-minded neighbors" rallied "to kill a large number of people." Doc. 37-11 ¶41. These mass killings "were almost always spontaneous and loosely organized," like "lynchings by white supremacist terrorists." *Id.* ¶¶41-43. In the late 19th and early 20th centuries, the nature of the threat changed with the advent of dynamite and submachine guns, which smaller groups deployed to kill large numbers of people until Congress responded by restricting access to those weapons. *Id.* ¶¶44, 47. And in recent years, that threat has transformed once again, as lone gunmen are able to use assault weapons and LCMs "to commit mass murder." *Id.* ¶49; *see also* State Br. 42-43. In other words, this threat differs in material respects from those in prior eras and thus constitutes an "unprecedented societal concern." *See*, *e.g.*, *Alaniz*, 2023 WL 3961124, *4 (rejecting argument that "felony drug trafficking

presents the same 'perceived societal problem,' as did smuggling crimes in the founding era").

### 2.    The Act is "relevantly similar" to historical analogues.

As the Court recognized in *Heller* and *Bruen*, our country has a longstanding tradition of regulating "dangerous and unusual" weapons. *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627.  Relevant here, there is a tradition—which predates the Founding—whereby a weapon is introduced into society, proliferates to the point where its use causes escalating or novel forms of violence, and is then regulated by the government to protect the public.  State Br. Section II.B.1.  And as State Defendants explained, State Br. Section II.B.2.b, the Act is consistent with this historical tradition.

Plaintiffs assert, however, that there is no need for this court to engage with the historical record because in "the context of a flat ban on the acquisition or even possession of classes of arms," the relevant "tradition is that law-abiding citizens may possess arms that are commonly kept for lawful purposes." *Barnett* Br. 43-44; *Herrera* Br. 27.  But as discussed, *supra* pp. 5-6, plaintiffs' theory that the historical inquiry may be satisfied with evidence that an instrument is commonly owned by Americans at the time of litigation is in direct conflict with *Bruen*.  But even if there were support for this novel standard, plaintiffs cannot succeed under it because the Act does not impose a categorical ban on classes of commonly possessed firearms.  Assault weapons and LCMs are not commonly owned, *supra* pp. 9-11, and the Act does not impose a categorical ban on an entire class of firearms.  Instead, it restricts

instruments with features that are particularly dangerous to the public while leaving individuals free to possess many types of handguns, rifles, and shotguns, including ones with semiautomatic technology, so long as they lack the restricted features.  State Br. 46-47.

Next, plaintiffs contend that assault weapons and LCMs do not fit within the historical tradition of restricting "dangerous and unusual" weapons because commonly possessed weapons cannot be "highly unusual."  *Barnett* Br. 23, 45 (internal quotations omitted); *Herrera* Br. 27.  As explained, however, *supra* pp. 9-10, plaintiffs have not made the threshold showing that these instruments are owned by more than a small percentage of Americans.  In any event, the historical record refutes plaintiffs' premise that popular weapons cannot be considered unusual.  *E.g.*, *State v. Huntly*, 25 N.C. 418, 422 (1843) (rejecting argument that a "double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons'" just because many "in the community . . . own[ed] and occasionally use[d] a gun"); Doc. 37-12 ¶¶ 64-70 (discussing popularity of Bowie knifes and laws restricting them); *id.* ¶¶ 73-81 (discussing restrictions on popular clubs and other blunt weapons).

In fact, the historical evidence shows that weapons only came to be considered dangerous and unusual—thus requiring a regulatory response—after their widespread use created new societal problems.  During the 19th century, Bowie knives were dangerous and increasingly prevalent—in fact, this era was dubbed "the craze for the knives," *id.* ¶63—leading to their strict regulation by the

19

vast majority of States by the start of the 20th century.  *See id.* ¶¶64-70.  In other words, it is precisely because of the "ubiquity" of the weapon that laws restricting Bowie knives were enacted.  *Id.* ¶¶63, 70.  The same is true for other weapons that became viewed as especially dangerous because of their popularity.  During the 19th century, clubs, slung shots, and other blunt weapons were regulated after their "spreading use by criminals and as fighting implements."  *Id.* ¶79.  The Act, which was enacted in response to the modern problem of assault weapons and LCMs being increasingly used in mass shootings, adheres to that historical tradition.

Plaintiffs alternatively argue that the historical evidence marshaled by State Defendants is insufficient because there are no laws restricting the possession of commonly owned firearms in the home.  *Barnett* Br. 46-49; *Herrera* Br. 30-32.  This is incorrect.  To start, plaintiffs' argument mischaracterizes State Defendants' historical evidence in several respects.  The historical record is not limited to laws restricting concealed carriage, which, in any event, are relevant to the analysis because they share the same justifications (protecting the public from new forms of violence) and impose the same minimal burden on self-defense (by restricting only the conduct causing the violence while leaving other means of armed self-defense available) as the Act.  State Br. 46-47.  Indeed, a number of States regulated the ownership and use of trap guns in the home in the 18th and 19th centuries, Doc. 37-12, Ex. B, and many others regulated the sale or possession of Bowie knives in the 19th century, *id.* Ex. C; Doc. 37-15 (including 1837 Tennessee law prohibiting sale of Bowie knives and 1884 New York and 1888 Minnesota laws prohibiting

20

possession with intent to use against another). Then, in the early 20th century, the federal government and more than half of the States enacted anti-machine gun laws, State Br. 37, at least 16 of which restricted the possession of these weapons in the home, Doc. 37-12, Exs. B, D. Around this same time, States also enacted restrictions on semiautomatic weapons, including restrictions on possession. *E.g.*, Doc. 37-12, Ex. B; Doc. 37-15 (including 1927 Rhode Island and 1932 District of Columbia laws banning possession of semiautomatic weapons subject to limited exceptions).

Plaintiffs assert, however, that the laws prohibiting automatic weapons are not appropriate analogues because they "restrict fully automatic functionality not at issue here." *Herrera* Br. 33; *Barnett* Br. 50. This argument flows from the mistaken premise that the government is under an obligation to identify identical historical regulations; on the contrary, no "historical twin" is required, especially under the "more nuanced approach." *Bruen*, 142 S. Ct. at 2132-33 (emphasis omitted). In any event, plaintiffs still fail to explain *why* the distinction between automatic and semiautomatic fire is determinative as a constitutional matter. Nor could they: when the Supreme Court explained in *Heller* that M-16 rifles may be banned, it did so because those rifles are "weapons that are most useful in military service," and not because they have the ability to engage in automatic fire. 554 U.S. at 627. And the evidence here shows that, like automatic weapons, assault weapons and LCMs were designed for, and are most useful on, the battlefield. State Br. 28-32. Accordingly, they should be treated the same.

Plaintiffs further assert that laws restricting automatic weapons differ from the Act because restrictions on automatic weapons were enacted "almost as soon as they came on the civilian market." *Barnett* Br. 50. But plaintiffs ignore that the timing of these laws coincided with the increased use of automatic weapons in violent crime—just like laws regulating assault weapons coincided with the increased use of these weapons in mass shootings. The Tommy gun was introduced into the civilian market in the early 1920s, but news reports of its criminal misuse did not begin to appear until 1926. Doc. 37-12 ¶¶15-22. In the late 1920s and early 1930s, States and the federal government responded with restrictions on automatic firearms. *See id.* ¶¶22-24; State Br. 37. Similarly, when assault weapons were introduced into the civilian market in the second half of the 20th century, commercial sales started slowly (only 787,000 AR-15s were sold between 1964 and 1994, when the federal assault weapons ban became effective, *see* Doc. 37-7 ¶38), and they were not regularly used to perpetrate criminal violence, *e.g.*, Doc. 37-4 ¶19 & Table 7. But after the expiration of the federal assault weapons ban in 2004, gun manufacturers and sellers engaged in a "direct and purposeful industry marketing effort" with respect to assault weapons, Doc. 37-7 ¶40, sales of these weapons increased, and mass shootings involving them became prevalent, Doc. 37-4 ¶21 (between 2004 and 2022, mass shootings involving assault weapons "increased . . . six-fold").[10] The Act and laws like it followed.

---

[10] The *Barnett* plaintiffs assert that the federal government allowed the ban to expire "after a Department of Justice study showed that it had produced no discernable reduction in violence committed with firearms." *Barnett* Br. 52 (internal quotations

As a final matter, there is no merit to Herrera's argument that the historical record marshaled by State Defendants should be disregarded in favor of colonial-era militia statutes. *Herrera* Br. 28-29. These laws are improper analogues because government's authority to organize the militia and require possession of firearms in furtherance of that goal is categorically different from statutes like the Act that restrict dangerous and unusual weapons to protect public safety. *Cf. Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1292 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (purpose of the "early militia requirements" was "simply to ensure that the militia was well-equipped"). And as explained, *supra* p. 12, the right to armed self-defense is "unconnected to militia service." *Heller*, 554 U.S. at 610; *see also Bruen*, 142 S. Ct. at 2127 (right "does not depend on service in the militia").

### C.   *Bruen* does not dictate a different result than *Friedman* and *Wilson*.

Plaintiffs argue that *Bruen* abrogated this court's decisions in *Friedman* and *Wilson*. *Barnett* Br. 26-27; *Herrera* Br. 15-17. But none of plaintiffs' arguments are persuasive. To start, plaintiffs are wrong that *Friedman* and *Wilson* relied on the interest-balancing analysis that *Bruen* disclaimed. *Barnett* Br. 26; *Herrera* Br. 16-

---

omitted). This ignores the study's finding that "criminal use" of assault weapons "declined after 1994, independently of trends in gun crime." Christopher S. Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003* at 51 (2004), https://bit.ly/3NJWkBF; *see also Friedman*, 784 F.3d at 411 (Koper study shows that laws similar to the Act "reduce the share of gun crimes involving assault weapons"); Doc. 37-4, ¶46 & Table 8 (States with laws like the Act "experienced a 62% decrease in the rate of high-fatality mass shootings involving . . . assault weapons or LCMs" and "a 72% decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs.").

17. In fact, *Friedman* expressly declined to "decide what 'level' of scrutiny applies, and how it works." 784 F.3d at 410. And although this court in *Friedman* (and later in *Wilson*) did not have the benefit of *Bruen*, its analysis is consistent with the text-and-history approach articulated by the Court. *E.g.*, *id.* (assessing whether challenged law interferes with individual right to self-defense and historical underpinnings of law); *Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (same). Furthermore, the fact that *Friedman* considered the justifications for the challenged regulation does not put it in conflict with *Bruen*, which instructs courts to conduct that very inquiry when reasoning by analogy, 142 S. Ct. at 2133.

Plaintiffs also claim that *Friedman* improperly assessed whether the regulated items were common at the time of ratification, as opposed to in common use today. *Barnett* Br. 29; *Herrera* Br. 17. But this, too, is untrue. *Friedman* recognized that under *Heller*, modern weapons could be protected by the Second Amendment, explaining that the Amendment protected "weapons that were in common use at the time," which it noted "have changed over the years." 784 F.3d at 408. In any event, whether a firearm was common during the Founding or Reconstruction eras can be relevant to the historical analysis, *supra* p. 18, as well as to determining whether there has been a dramatic technological change and, in turn, whether a "more nuanced approach" is warranted, *id.* at 2132.

Finally, the *Barnett* plaintiffs take *Friedman*'s reference to the militia out of context. *Barnett* Br. 29; *see also Herrera* Br. 16. As the court explained, *Heller* distinguished between weapons "in common use at the time" that were likely to be

used by private citizens in their militia duties, on the one hand, and "military-grade weapons" of the "sort that would be in a militia's armory," like "machine guns" or "weapons especially attractive to criminals," on the other. 784 F.3d at 408. And while those in common use were protected by the Second Amendment, those in the latter category (military-grade weapons and weapons used by criminals) were not. *Id.* Though *Bruen* clarified the framework for assessing challenges to laws restricting firearms, it is still the case that military-grade firearms and those used by criminals are unprotected by the Second Amendment. 142 S. Ct. at 2143 (citing *Heller*, 554 U.S. at 627).

## II. Herrera has not shown a likelihood of success on the merits of his claim challenging the endorsement affidavit requirement.

Additionally, Herrera has not shown that he is likely to succeed on the merits of his claim that the endorsement affidavit requirement violates the Second Amendment. For starters, he still has no explanation as to how this requirement burdens conduct within the Second Amendment's plain text. *Herrera* Br. 42-45. Instead, he asserts that he "fear[s] that the [requirement] is a tool for later confiscation and otherwise leaves him vulnerable to information breaches." *Id.* at 42 (cleaned up). But as explained, State Br. 50, this is both speculative and contrary to the purpose of the requirement, which enables individuals like Herrera—who lawfully obtained assault weapons prior to the Act—to continue to possess their weapons.

Herrera further asserts that he is likely to succeed because State Defendants have not shown that the requirement is supported by appropriate historical

analogues. *Herrera* Br. 43-44. This is untrue. There is a well-established tradition—which predated the Founding and continued into the 18th and 19th centuries—of laws requiring an annual accounting of firearms. State Br. 51-53. In fact, the requirement tracks a similar provision in the 1934 National Firearms Act. *Miller*, 307 U.S. at 175-76 & n.1. And contrary to Herrera's suggestion, *Herrera* Br. 44, these laws were not "too few"; there were more than a "handful" of them, State Br. 52-53, and, in any event, *Bruen*, made clear that "relatively few" regulations will suffice where, as here, there are "no disputes regarding the lawfulness of [the] prohibitions," 142 S. Ct. at 2132.

Finally, Herrera disputes the district court's reasoning that *Bruen* suggested that the requirement is permissible because it endorsed "shall-issue" regimes for licensing firearms. *Herrera* Br. 45. According to Herrera, the endorsement affidavit requirement is different from licensing requirements because it does not "ensur[e] that owners know how to operate guns safely." *Id.* (internal quotations omitted). On the contrary, one of the reasons for the endorsement affidavit requirement is to ensure that the affiant is a law-abiding citizen. State Br. 51.

All told, Herrera is unlikely to succeed on his claim that the endorsement affidavit requirement violates the Second Amendment.

## CONCLUSION

State Defendants request that this court affirm the district court's denial of preliminary injunctive relief in *Herrera* and reverse the district court's decision granting a preliminary injunction in *Barnett*.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for the State Parties

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
**IVAN PARFENOFF**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

June 26, 2023

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(A) in that the brief is 6,937 words.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing Reply Brief of State Parties with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Sarah A. Hunger</u>
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov