Nos. 23-1793, 23-1825, 23-1826, 23-1827, & 23-1828

# In The United States Court of Appeals
## for the Seventh Circuit

CALEB BARNETT, et al.,

Plaintiffs-Appellees,

*v.*

KWAME RAOUL, et al.,

Defendants-Appellants.

On Interlocutory Appeal from the United States District Court
for the Southern District of Illinois

No. 3:23-cv-00209-SPM
The Honorable Stephen P. McGlynn

## BRIEF FOR AMICI CURIAE IDAHO, ALABAMA, ALASKA, ARKANSAS, FLORIDA, GEORGIA, INDIANA, IOWA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE, NORTH DAKOTA, SOUTH CAROLINA, SOUTH DAKOTA, UTAH, VIRGINIA, WEST VIRGINIA, AND WYOMING SUPPORTING PLAINTIFFS

RAÚL R. LABRADOR
*Attorney General*

Idaho Office of the Attorney
General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov

THEODORE J. WOLD
*Solicitor General*

JOSHUA N. TURNER
*Deputy Solicitor General*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1825

Short Caption: Barnett, et al. v. Raoul, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

States of Idaho, Ala., Alaska, Ark., Fla., Ga., Ind., Iowa, Kan., Ky., La., Miss., Mo., Mont., Neb., N.H., N.D., S.C., S.D.,

Utah, Va., W. Va., Wyo.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

N/A

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Joshua N. Turner    Date: 06/26/2023

Attorney's Printed Name:  Joshua N. Turner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔]    **No** [ ]

Address:  700 W. Jefferson St., Suite 210, Boise, ID 83720

Phone Number: (208) 334-2400    Fax Number:

E-Mail Address: josh.turner@ag.idaho.gov

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST OF AMICI STATES ........................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................ 2

ARGUMENT .................................................................................................................. 4

I.    The Plain Text of the Second Amendment Bars States from Banning Arms
Owned by Millions of Law-Abiding Americans ....................................................... 4

    A.   Illinois is Wrong that the Plain Text of the Second Amendment Only
Covers Firearms that are Proven to be Commonly Used for Self-Defense.... 5

    B.   Illinois is Wrong that the Plain Text of the Second Amendment
Necessarily Excludes "Offensive" and "Militaristic" Arms ............................ 9

    C.   Illinois's Claim that the Firearms It Bans Are Not Commonly Used for
Self-Defense is Wrong ...................................................................................... 12

II.   Concealed Carry Laws do not Justify Illinois's Total Ban on Commonly
Used Arms ........................................................................................................... 15

CONCLUSION .............................................................................................................. 16

## TABLE OF AUTHORITIES

### CASES

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)................................................................................ 9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................ *passim*

*District of Columbia v. Heller*,
  No. 07-290, 2007 WL 2962910 (U.S. Oct. 5, 2007)..................................... 11

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) .............................................................. 12

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)......................................................................... 2, 10

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023) .............................................................. 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ................................................................. 12

*Nunn v. State*, 1 Ga. 243 (1846)................................................................ 7

### STATUTES

Morton Grove, Ill., Ordinance 81-11 (June 8, 1981) ........................................ 2

### OTHER AUTHORITIES

2 Collected Works of James Wilson............................................................ 3, 7

3 J. Story,
  *Commentaries on the Constitution of the United States* ............................... 10

*Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*,
    Dep't of the Treasury: Bureau of Alcohol, Tobacco and Firearms ........................... 12

St. George Tucker, *View of the Constitution of the United States* ...................................... 5, 10

*Transcription Debate*, 102nd General Assembly .................................................................. 13

U.S. CONST. amend. II ................................................................................................. *passim*

**INTEREST OF AMICI STATES**

The States of Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, South Carolina, South Dakota, Utah, Virginia, West Virginia, and Wyoming respect the people's right to keep and bear Arms. They and the Constitution agree that the right protected by the Second Amendment is "necessary to the security of a free State." U.S. CONST. amend. II. Particularly today, when crime too often goes unchecked and with criminal brazenness increasing, law-abiding citizens need the ability to Arm and defend themselves with effective weapons. For this reason, Amici States unapologetically defend the Second Amendment.

Illinois's "Protect Illinois Communities Act" reflects a very different view of the Second Amendment. Instead of maximally protecting the right, the Act attacks the core of the right. It disregards a fundamental liberty that belongs to all Americans, and it encourages other governments to experiment with the people's rights. In many regards, States are important laboratories of democracy. But when it comes to the Bill of Rights, States are not free to experiment. All States must respect and defend the rights of Americans. Unless enjoined, the PICA's eroding impact will not be confined to Illinois.

Amici States are also home to lawful firearm businesses that can no longer sell

the hundreds of types of firearms banned by the PICA in Illinois.[1] Illinois's unconstitutional law should not limit the lawful activity of its own residents or the lawful activity of residents in Amici States.

Accordingly, Amici States file this brief in support of Plaintiffs-Appellees under Federal Rule of Appellate Procedure 29(a)(2).

## SUMMARY OF ARGUMENT

Firearm bans in Illinois are not new. In 1981, Morton Grove, Illinois passed America's first handgun ban. *See* Morton Grove, Ill., Ordinance 81-11 (June 8, 1981). In 1982, Chicago and Evanston followed suit. In 1984, Oak Park banned handguns too. And in 1992, Chicago banned "assault weapons."

In 2010, the Supreme Court stepped in and struck down handgun bans, vindicating Illinoisians' Second Amendment rights at last. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010). Undeterred, Illinois recently passed the Protect Illinois Communities Act to ban even the mere ownership of hundreds of types of firearms that were lawful prior to its enactment and remain lawful in the great majority of the country. The Act is just another instance of Illinois's fixation with firearm bans. And although Illinois has become the standard-bearer for gun bans, the PICA is just as unlawful as the ones struck down in *McDonald*.

---

[1] *See* https://tinyurl.com/4rat5ew7 (noting a 2018 "survey ranked Idaho as the state most dependent on the firearms industry" and that other states with strong gun industries include Montana, Alaska, South Dakota, and Wyoming).

Illinois's sweeping gun ban is at odds with just about every jot and tittle of the Second Amendment. Illinois has no right to limit firearm rights to whatever it deems "necessary" for self-defense. That is not how the Second Amendment works. The Amendment, rather, stands as a reminder to governments—state and federal alike—that "the people" have a "*pre-existing*" right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The right guarantees the people the very "Arms" Illinois has banned. Illinois's job is to recognize and defend that right, not empty it. *See id.* at 585; *see also* James Wilson, Of Crimes Against the Right of Individuals to Personal Safety, *in* 2 Collected Works of James Wilson 1137, 1142, n.x (K. Hall & M. Hall eds., 2007), https://tinyurl.com/2p8244t4 (The right to bear arms "cannot be repealed, or superseded, or suspended by any human institution.").

Applying *Bruen* in this case is straightforward. At step one, the Court should have "little difficulty" concluding that the "plain text of the Second Amendment" protects the right to keep and bear the semiautomatic weapons Illinois has banned. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022). These weapons are "bearable arms," and the PICA bans people from keeping and bearing them. Nothing more at step one is required—especially not Illinois's concocted "commonly used for self-defense" test. *Bruen*, 142 S. Ct. at 2132; *Heller*, 554 U.S. at 582.

At step two, Illinois has not come close to meeting its burden to identify a "well-established and representative historical analogue" justifying the PICA's severe restrictions. *See Bruen*, 142 S. Ct. at 2133. Its reliance on recycled regulations already

rejected in *Bruen* Court will not cut it. The Supreme Court held that those historical examples do not justify regulating the public carry of handguns. They certainly cannot justify the far more restrictive bans at issue here.

Amici States recognize the heartbreaking gravity of gun violence. But at ratification, the people acted to ensure that they would always remain able to arm themselves with effective and useful weapons. In the face of gun violence, Illinois can act too, and it should: by investigating crime and holding criminals fully responsible for their unlawful conduct. Illinois, however, cannot act by stripping law-abiding citizens of proven ways to defend themselves. The Court should strike down the PICA and vindicate the people's rights under the Second Amendment.

ARGUMENT

## I. The Plain Text of the Second Amendment Bars States from Banning Arms Owned by Millions of Law-Abiding Americans.

Illinois considers some firearms unnecessary for self-defense and bans them. The list of these "unnecessary" firearms is lengthy—an unsurprising feature given the narrowness of Illinois's concept of self-defense. The list includes hundreds of semiautomatic handguns and rifles that are commonly used by law-abiding Americans for self-defense. Never mind that these firearms are popular or effective. By Illinois's lights, since people don't need elephant guns to shoot rabbits, they also don't need handguns or rifles that hold too much ammunition to defend themselves. But the Second Amendment does not codify Illinois's minimalist principle.

Just the opposite. The Second Amendment protects the people's right to keep and bear "Arms," which is a broad term that "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. It "extends, prima facie, to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (emphasis added). At least facially, the Second Amendment will not "permit any prohibition of arms to the people." St. George Tucker, *View of the Constitution of the United States, with Selected Writings* 91, 253 (Liberty Fund ed. 1999), https://tinyurl.com/bdmzrdzz. It demands that "the right of the people to keep and bear arms, shall not be infringed," period. U.S. CONST. amend. II.

Despite the breadth of this "unqualified command," *Bruen*, 142 S. Ct. at 2132, Illinois contends its firearms ban should bypass Second Amendment scrutiny. The argument is consistent with the strategy employed by anti-gun regulators post-*Bruen*. They try at all costs to avoid *Bruen*'s full analysis, even if it means advancing arguments "bordering on the frivolous." *Heller*, 554 U.S. at 582. And so too here, where Illinois claims that its ban of some of the most commonly used firearms today does not even implicate the Second Amendment. Illinois could hardly be more wrong.

A. **Illinois is Wrong that the Plain Text of the Second Amendment Only Covers Firearms that are Proven to be Commonly Used for Self-Defense.**

Illinois's principal argument on appeal is grounded in a made-up test. It repeatedly argues that *Bruen*'s first step requires a plaintiff to prove that the "Arms" at issue are commonly used for self-defense. *See* Dkt #47 at 13, 15-28. But that is not at all what

*Bruen*'s first step requires. The question is simply whether the Illinois ban regulates conduct covered by the "plain text" of the Second Amendment. *See Bruen*, 142 S. Ct. at 2126. It does, so it is presumptively unlawful, and Illinois bears the burden of justifying its facial infringement. *Id.*

But Illinois tries to duck its burden with its made-up test and mischaracterized language from *Heller* and *Bruen*. For example, the Court in *Heller* noted "that the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627. And the Court in *Bruen* said that "[t]he Second Amendment guaranteed to all Americans the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156. Neither of these statements supports Illinois's necessary-condition test that "Arms" must be "commonly used for self-defense"—particularly at *Bruen*'s first step. *See* Dkt. #47 at 17. If anything, the Supreme Court's "common use" language supports a sufficient condition for finding arms protected at step two.

Not only is Illinois's reading unsupported by *Heller* and *Bruen*, both cases unambiguously reject it. *Heller* says the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms," and explains that "bearable arms" include all weapons possessed or carried "for offensive or defensive action in a case of conflict." *Heller*, 554 U.S. at 582, 584; *see also id.* at 581 (relying on founding-era "source [that] stated that all firearms constituted 'arms'"). Likewise, *Bruen* reaffirms that understanding and adds that the term "Arms" broadly "covers modern instruments that facilitate

armed self-defense." *Bruen*, 142 S. Ct. at 2132. And *Nunn v. State*, 1 Ga. 243, 251 (1846)—which the *Bruen* Court found "particularly instructive" in this area, *Bruen*, 142 S. Ct. at 2147—understood the right to include "*arms* of every description, and not *such* merely as are used by the *militia*." The "assault weapons" that Illinois bans are "bearable arms"; they are possessed or carried for "offensive or defensive action"; and they are "modern instruments that facilitate armed self-defense." *Heller*, 554 U.S. at 582, 584; *Bruen*, 142 S. Ct. at 2132. The criminal and tragic use of these weapons by some does not change their nature.

Illinois ignores this analysis entirely. It instead monotonously claims that "assault weapons" are not "commonly used for self-defense." *See, e.g.,* Dkt. #47 at 17, 20, 22, 28, & 47. That is irrelevant at step one—it's also incorrect (more on that later). Arms covered by the Second Amendment need only be "bearable." *Heller*, 554 U.S. at 582. There is no threshold requirement that a firearm achieve "common use" status before it falls within the Amendment's scope. That standard would produce an even more "absurd" result than the "view of commonality" about which Illinois complains. *See* Dkt. #47 at 21. Under Illinois's view, a government could ban any firearm if it acts quickly enough. But of course, that understanding renders the arms-bearing right contingent on the State, rather than a natural and pre-political right that serves as a moral check on the State. *See Heller*, 554 U.S. at 585; *see also* Wilson, *supra,* at 1142 (The right to bear arms "cannot be repealed, or superseded, or suspended by any human institution.").

*Bruen*'s analysis on this score confirms that the "plain text" of the Second Amendment covers "assault weapons" as defined by PICA. The Court had "little difficulty concluding" that the Second Amendment protected the right to carry all types of handguns publicly for self-defense. *Bruen*, 142 S. Ct. at 2134. The Court did not even question whether the firearms at issue were "Arms." *Id.* It did not pause and count round capacity. Nor did it consider how criminals used them. It simply noted that the "textual elements" of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* Beyond being "bearable," the class, type, capacity, and "common use" of a weapon plays no part in the step-one analysis.

Illinois's test is just a disguised attempt to transfer its step-two burden to plaintiffs. A plaintiff challenging a firearms regulation need only show that "the Second Amendment's plain text covers [his] conduct." *Bruen*, 142 S. Ct. at 2126. That's it. The analysis then proceeds with the government bearing the burden at step two to justify its regulation, which it may do by showing that the regulated firearms are "dangerous and unusual." *Id.* at 2143 ("At most, [the State] can show that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons.'"). In other words, whether a firearm is "commonly used for self-defense" or "dangerous and unusual" is a step-two consideration. *See id.*

All that matters at *Bruen*'s first step is that Illinois bans ownership of "bearable arms," which makes the PICA presumptively unconstitutional.

8

**B. Illinois is Wrong that the Plain Text of the Second Amendment Neces-sarily Excludes "Offensive" and "Militaristic" Arms.**

Illinois's next pass at evading its burden under *Bruen* goes something like this. The Second Amendment applies only to "civilian self-defense." Dkt. #47 at 29. And because "assault weapons" are "offensive" and "militaristic" arms, they fall outside the Second Amendment's "prima facie" sweep. *See id.* at 28-32. That argument is meritless.

First, Illinois's "offensive" and "militaristic" test makes no sense. Arms cannot be classified as strictly "offensive" or "defensive" weapons. Any weapon useful for self-defense purposes is capable of "offensive" uses. The Second Amendment does not turn on how a weapon is used. Illinois's "militaristic" descriptor is just as problematic. Con-sider the 1911. It is arguably the most popular handgun in the world—protected by the Second Amendment per the express holdings of *Bruen* and *Heller*—and yet Colt de-signed it at the request of, and for, the U.S. military. The 1911 is far more "militaristic" than, say, the AR-15, which the U.S. military has not adopted. Adopting Illinois's ra-tionale justifies banning firearms the Supreme Court has already said cannot be banned. Those tests are defunct for the same reason a "dangerous" test "cannot be used to identify arms that fall outside the Second Amendment." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).

After all, the Second Amendment protects "offensive" and "militaristic" arms. Both *Heller* and *Bruen* confirm that the right to "bear arms" includes the right "of being armed and ready for offensive or defensive action in a case of conflict with another

person." *Heller*, 554 U.S. at 584 (citation omitted); *Bruen*, 142 S. Ct. at 2134; *see also Heller*, 554 U.S. at 581 (noting that definition of "arms" included "instruments of offence *generally* made use of in war" (citation omitted)). And the Framers included the right as "a strong moral check against the usurpation and arbitrary power of rulers" that would "enable the people to resist and triumph over them." 3 J. Story, *Commentaries on the Constitution of the United States: Amendments to the Constitution* § 1890, at 746 (1833), https://ti-nyurl.com/4j2rdcbt. That is why they referred to the right as "the true palladium of liberty" and warned that government narrowing the right would place liberty "on the brink of destruction." Tucker, *supra*, at 238-39; *see also McDonald v. City of Chicago*, 561 U.S. 742, 769 (2010). And the militia—a citizen military force armed with personal weapons—was seen as necessary to secure liberty and repel tyranny. Illinois is thus wrong to argue that "offensive" and "militaristic" firearms are unprotected by the Second Amendment.

Moreover, the Supreme Court has emphasized that the right to keep and bear arms goes beyond the militia to include an individual right to self-defense. *See Bruen*, 142 S. Ct. at 2127; *Heller*, 554 U.S. at 599. But it has never limited the right to individual self-defense. "[P]reserving the militia" and "hunting" are additional legitimate reasons "Americans valued the ancient right." *Heller*, 554 U.S. at 599. The Court has simply corrected the narrow and incorrect view that the Second Amendment protects firearm possession only in connection with militia service. *Id.* at 577. Today, Illinois adopts an

10

equally narrow and incorrect view, this time carving out militia service and hunting. Its cabined view of the Second Amendment lacks textual or precedential support.

But constitutional precision has not been a feature of Illinois's Second Amendment analysis. When it was in the business of banning all handguns, Illinois said the Second Amendment only protects military weapons. *District of Columbia v. Heller*, No. 07-290, 2007 WL 2962910, at *6 (U.S. Oct. 5, 2007) (arguing as an amicus party that the Second Amendment only protected firearms that are "ordinary military equipment"). Now it has done an about-face, arguing that the Second Amendment only protects firearms used for "civilian self-defense" but that "militaristic weapons . . . are not covered by the Second Amendment's text." Dkt. #47 at 28-29. Apparently, Illinois is willing to say just about anything—no matter how contradictory with previous positions it has taken—to justify its unconstitutional laws.

Nor is it not enough for Illinois to hang its argument on the passing observation in *Heller* that "M–16 rifles and the like" may be banned. *See Heller*, 554 U.S. at 627. That stray comment is dicta, but in any event, such a ban would still need to pass through *Bruen*'s second step. A firearm ban is not exempt from *Bruen*'s full analysis just because it happens to be analogous to a different unchallenged regulation. Besides, the ban at issue involves semiautomatic firearms, not fully automatic firearms like the M–16. The firearms banned here are in common civilian use like the handguns banned in *Heller*. That contrasts with the distinctly military M–16.

11

Illinois's swing from one extreme interpretation to the other is untethered to the Second Amendment's plain text. Militia service is not the only reason for the Second Amendment right, but neither is it irrelevant to the right. Weapons useful for self-defense and militia service fit neatly within the scope of "Arms" protected by the Second Amendment. And Illinois's use of "scary" adjectives like "offensive" and "militaristic" to describe firearms it bans does not automatically render those firearms unprotected.

## C. Illinois's Claim that the Firearms It Bans Are Not Commonly Used for Self-Defense is Wrong.

Even if Illinois's made-up test were the standard, the banned "assault weapons" are "commonly used for self-defense." First, the banned arms are in "common use." Millions of them are owned by millions of Americans. They are even more common than America's most common pickup truck. SA23. The undeniable ubiquity of these firearms has led courts to find that they are in common use. *See, e.g., Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use.'"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[T]he assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."). Even the ATF has recognized that the firearms Illinois targets are both suitable for "home and self-defense" and "popular" for "self-defense." *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, Dep't of the Treasury: Bureau of Alcohol, Tobacco and Firearms

(July 6, 1989), https://www.atf.gov/file/61761/download. Not even the legislators who passed the PICA pretended that the firearms lacked common use. *See Transcription Debate*, 102nd General Assembly 57-58 (Jan. 5, 2023), https://ilga.gov/house/transcripts/htrans102/10200109.pdf (Leader Durkin acknowledging that the AR-15 is "a commonly used weapon"). Illinois may quibble with the exact number, but it does not (and cannot) dispute that assault weapons are in common use.

The firearms are also commonly used for self-defense. A few harrowing reports make the point. In 2019, two masked and armed burglars invaded a family's home just outside of Tampa, Florida. *See* Amelia Wynne, *Heavily pregnant mother uses an AR-15 to kill a home intruder after two men burst into her Florida home, pistol whipped her husband and grabbed their 11-year-old daughter,* Daily Mail (Nov. 4, 2019, 4:08 PM), https://tinyurl.com/3m6yzs6c. They pointed their guns at the father and his 11-year-old daughter and pistol-whipped and kicked the father while demanding money. *Id.* The mother, who was pregnant at the time, was in another part of the house, got ahold of the family's AR-15, and opened fire on the armed invaders. *Id.* The father would later say, "the AR did its thing" and saved his family's life. *Id.*

In 2014, a Detroit mother protected her children from men who had kicked her door down. *See Detroit Mom Fires Assault Rifle To Protect Family From Home Invaders,* NewsOne (Feb. 20, 2014), https://tinyurl.com/yc659xtt. With an assault rifle in hand, she warned the intruders that she had a gun. *Id.* They scoffed and she fired a warning shot, which sent them scrambling back out the door. *Id.* Detroit Police Chief James Craig

said the mother "did the right thing," and her husband expressed relief that he had armed his wife and prepared her for that kind of situation. *Id.* Had he not, he recognized that he "could have came home to a family that was gone." *Id.*

In 2017, a civilian in Sutherland Springs, Texas used an AR-15 to stop an active shooter at a church. *See* Michael J. Mooney, *The Hero of the Sutherland Springs Shooting Is Still Reckoning With What Happened That Day,* Texas Monthly (Nov. 2018), https://tinyurl.com/yact97dt. When Stephen Willeford heroically went to the aid of his community, he had many types of guns he could have taken with him. *Id.* But he deliberately chose his AR-15. *Id.* And it's a good thing. The shooter had an AR-15, "but," as Willeford says, "so did I." *Sutherland Springs Hero Honored At NRA Convention: 'He Had An AR-15 And So Did I',* CBS Texas (May 4, 2018, 4:45 PM), https://tinyurl.com/5n899j8z.

Numerous similar accounts could be retold. But these ones are response enough to Illinois's paternalistic claim that there is "no need in self-defense scenarios" for the weapons it has banned. *See* Dkt. #47 at 30. There was just such a need for the pregnant mother in Tampa, for the mom home alone with her kids in Detroit, and for the Sutherland Springs hero. Each repelled force with force, and an assault rifle was their lawful and effective weapon of choice.

II.     **Concealed Carry Laws do not Justify Illinois's Total Ban on Common Arms.**

Once reaching Illinois's historical analysis, it becomes clear why Illinois worked so hard to avoid *Bruen*'s second step. It *really* does not want the Court to compare the PICA to traditional firearms regulations. One reason is that the *Bruen* Court already considered the same types of regulations—and even some of the very same laws, like the 1686 East New Jersey Law—that Illinois says justify its gun ban. The Court found that those laws were either too "solitary" to warrant any "meaningful weight" or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *See Bruen*, 142 S. Ct. at 2143-45. They did not justify regulations on the public carry of firearms more broadly. And if the laws that Illinois cites were unfit for New York's far narrower firearm regulation, they are unfit to justify Illinois's blanket ban on a whole class of weapons.

That leads to another reason Illinois has gone to great lengths to sidestep *Bruen*. It has no answer to the central question at *Bruen*'s second step: whether the PICA is "relevantly similar" to historical regulations based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *See Bruen*, 142 S. Ct. at 2132-33. Zilch. That's because even raising those "how" and "why" questions spells defeat for the PICA. The PICA does not just prohibit "bearing arms in a way that spreads 'fear' or 'terror' among the people." *See Bruen*, 142 S. Ct. at 2145. No, it outright bans the simple possession of hundreds of bearable arms—a far greater effect on the

people's right to bear arms. And the reason for the ban is not to prevent public fear at the sight of such weapons but to limit mass shootings and other crime. The PICA thus does not share a relevantly similar impact or reason compared with the proffered historical analogues.

Illinois ignores another important point. The *Bruen* Court explained that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Tragically, wicked men have long used guns to murder fellow human beings. In 1876, a man shot and killed his "lover" out of jealousy. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). In 1884, an 18-year-old in Philadelphia shot a 14-year-old girl and then turned the gun on himself "because she would not love him." *Id.* And in 1949, Henry Unruh embarked upon his "walk of death" murdering 13 people. *See* Patrick Sauer, *The Story of the First Mass Shooting in U.S. History,* Smithsonian Magazine (Oct. 14, 2015), https://tinyurl.com/578szh6v. But governments did not respond to the depraved and criminal actions of these—and sadly, several other—individuals by banning law-abiding citizens from owning firearms in the way that Illinois has here. Illinois has pointed to no "distinctly similar historical regulation" addressing the problem of gun violence. That alone makes the PICA unconstitutional.

## Conclusion

For the foregoing reasons, this Court should affirm.

Respectfully Submitted,

**RAÚL R. LABRADOR**
Attorney General
*State of Idaho*

**THEODORE J. WOLD**
Solicitor General

Date: June 26, 2023

*/s/ Joshua N. Turner*
Joshua N. Turner
*Deputy Solicitor General*
Idaho Attorney General's Office
Statehouse, Room 210
Boise, ID  83720

*Additional State Signatories*

| | |
|---|---|
| STEVE MARSHALL<br>Attorney General<br>*State of Alabama* | ANDREW BAILEY<br>Attorney General<br>*State of Missouri* |
| TREG TAYLOR<br>Attorney General<br>*State of Alaska* | AUSTIN KNUDSEN<br>Attorney General<br>*State of Montana* |
| TIM GRIFFIN<br>Attorney General<br>*State of Arkansas* | MICHAEL T. HILGERS<br>Attorney General<br>*State of Nebraska* |
| ASHLEY MOODY<br>Attorney General<br>*State of Florida* | JOHN M. FORMELLA<br>Attorney General<br>*State of New Hampshire* |
| CHRISTOPHER M. CARR<br>Attorney General<br>*State of Georgia* | DREW H. WRIGLEY<br>Attorney General<br>*State of North Dakota* |
| THEODORE E. ROKITA<br>Attorney General<br>*State of Indiana* | ALAN WILSON<br>Attorney General<br>*State of South Carolina* |
| BRENNA BIRD<br>Attorney General<br>*State of Iowa* | MARTY J. JACKLEY<br>Attorney General<br>*State of South Dakota* |
| KRIS W. KOBACH<br>Attorney General<br>*State of Kansas* | SEAN REYES<br>Attorney General<br>*State of Utah* |
| DANIEL CAMERON<br>Attorney General<br>*Commonwealth of Kentucky* | JASON S. MIYARES<br>Attorney General<br>*Commonwealth of Virginia* |
| JEFF LANDRY<br>Attorney General<br>*State of Louisiana* | PATRICK MORRISEY<br>Attorney General<br>*State of West Virginia* |

Lynn Fitch
Attorney General
*State of Mississippi*

Bridget Hill
Attorney General
*State of Wyoming*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a), and Seventh Circuit Rule 32, I certify that the attached response brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,173 words.


Date: June 26, 2023                    */s/ Joshua N. Turner*
                                       Joshua N. Turner

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joshua N. Turner
Joshua N. Turner